UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

| | |
|---|---|
| LEAGUE OF WOMEN VOTERS OF FLORIDA, INC., LEAGUE OF WOMEN VOTERS OF FLORIDA EDUCATION FUND, INC., BLACK VOTERS MATTER FUND, INC., FLORIDA ALLIANCE FOR RETIRED AMERICANS, INC., CECILE SCOON, DR. ROBERT BRIGHAM, and ALAN MADISON, | Case No. 4:21-cv-_____ |
| Plaintiffs, | **COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF** |
| v. | |
| LAUREL M. LEE, in her official capacity as Florida Secretary of State, ASHLEY MOODY, in her official capacity as Florida Attorney General, KIM BARTON, in her official capacity as Supervisor of Elections for ALACHUA County, CHRIS MILTON, in his official capacity as Supervisor of Elections for BAKER County, MARK ANDERSEN, in his official capacity as Supervisor of Elections for BAY County, AMANDA SEYFANG, in her official capacity as Supervisor of Elections for BRADFORD County, LORI SCOTT, in her official capacity as Supervisor of Elections for BREVARD County, JOE SCOTT, in his official capacity as Supervisor of Elections for BROWARD County, SHARON CHASON, in her official capacity as Supervisor of Elections for | |

CALHOUN County, PAUL A.
STAMOULIS, in his official capacity
as Supervisor of Elections for
CHARLOTTE County, MAUREEN
"MO" BAIRD, in her official capacity
as Supervisor of Elections for CITRUS
County, CHRIS H. CHAMBLESS, in
his official capacity as Supervisor of
Elections for CLAY County,
JENNIFER J. EDWARDS, in her
official capacity as Supervisor of
Elections for COLLIER County, TOMI
S. BROWN, in her official capacity as
Supervisor of Elections for
COLUMBIA County, MARK
NEGLEY, in his official capacity as
Supervisor of Elections for DESOTO
County, STARLET CANNON, in her
official capacity as Supervisor of
Elections for DIXIE County, MIKE
HOGAN, in his official capacity as
Supervisor of Elections for DUVAL
County, DAVID H. STAFFORD, in his
official capacity as Supervisor of
Elections for ESCAMBIA County,
KAITI LENHART, in her official
capacity as Supervisor of Elections for
FLAGLER County, HEATHER
RILEY, in her official capacity as
Supervisor of Elections for
FRANKLIN County, SHIRLEY
KNIGHT, in her official capacity as
Supervisor of Elections for GADSDEN
County, CONNIE SANCHEZ, in her
official capacity as Supervisor of
Elections for GILCHRIST County,
ALETRIS FARNAM, in her official

capacity as Supervisor of Elections for
GLADES County, JOHN HANLON, in
his official capacity as Supervisor of
Elections for GULF County, LAURA
HUTTO, in her official capacity as
Supervisor of Elections for
HAMILTON County, DIANE SMITH,
in her official capacity as Supervisor of
Elections for HARDEE County,
BRENDA HOOTS, in her official
capacity as Supervisor of Elections for
HENDRY County, SHIRLEY
ANDERSON, in her official capacity
as Supervisor of Elections for
HERNANDO County, PENNY OGG,
in her official capacity as Supervisor of
Elections for HIGHLANDS County,
CRAIG LATIMER, in his official
capacity as Supervisor of Elections for
HILLSBOROUGH County, THERISA
MEADOWS, in her official capacity as
Supervisor of Elections for HOLMES
County, LESLIE R. SWAN, in her
official capacity as Supervisor of
Elections for INDIAN RIVER County,
CAROL A. DUNAWAY, in her
official capacity as Supervisor of
Elections for JACKSON County,
MARTY BISHOP, in his official
capacity as Supervisor of Elections for
JEFFERSON County, TRAVIS HART,
in his official capacity as Supervisor of
Elections for LAFAYETTE County,
ALAN HAYS, in his official capacity
as Supervisor of Elections for LAKE
County, TOMMY DOYLE, in his
official capacity as Supervisor of

Elections for LEE County, MARK EARLEY, in his official capacity as Supervisor of Elections for LEON County, TAMMY JONES, in her official capacity as Supervisor of Elections for LEVY County, GRANT CONYERS, in his official capacity as Supervisor of Elections for LIBERTY County, HEATH DRIGGERS, in his official capacity as Supervisor of Elections for MADISON County, MICHAEL BENNETT, in his official capacity as Supervisor of Elections for MANATEE County, WESLEY WILCOX, in his official capacity as Supervisor of Elections for MARION County, VICKI DAVIS, in her official capacity as Supervisor of Elections for MARTIN County, CHRISTINA WHITE, in her official capacity as Supervisor of Elections for MIAMI-DADE County, JOYCE GRIFFIN, in her official capacity as Supervisor of Elections for MONROE County, JANET H. ADKINS, in her official capacity as Supervisor of Elections for NASSAU County, PAUL A. LUX, in his official capacity as Supervisor of Elections for OKALOOSA County, MELISSA ARNOLD, in her official capacity as Supervisor of Elections for OKEECHOBEE County, BILL COWLES, in his official capacity as Supervisor of Elections for ORANGE County, MARY JANE ARRINGTON, in her official capacity as Supervisor of Elections for OSCEOLA County,

WENDY LINK, in her official capacity
as Supervisor of Elections for PALM
BEACH County, BRIAN CORLEY, in
his official capacity as Supervisor of
Elections for PASCO County, JULIE
MARCUS, in her official capacity as
Supervisor of Elections for PINELLAS
County, LORI EDWARDS, in her
official capacity as Supervisor of
Elections for POLK County,
CHARLES OVERTURF, in his official
capacity as Supervisor of Elections for
PUTNAM County, TAPPIE A.
VILLANE, in her official capacity as
Supervisor of Elections for SANTA
ROSA County, RON TURNER, in his
official capacity as Supervisor of
Elections for SARASOTA County,
CHRISTOPHER ANDERSON, in his
official capacity as Supervisor of
Elections for SEMINOLE County,
VICKY OAKES, in her official
capacity as Supervisor of Elections for
ST. JOHNS County, GERTRUDE
WALKER, in her official capacity as
Supervisor of Elections for ST. LUCIE
County, WILLIAM KEEN, in his
official capacity as Supervisor of
Elections for SUMTER County,
JENNIFER M. KINSEY, in her official
capacity as Supervisor of Elections for
SUWANNEE County, DANA
SOUTHERLAND, in her official
capacity as Supervisor of Elections for
TAYLOR County, DEBORAH
OSBORNE, in her official capacity as
Supervisor of Elections for UNION

County, LISA LEWIS, in her official capacity as Supervisor of Elections for VOLUSIA County, JOSEPH R. MORGAN, in his official capacity as Supervisor of Elections for WAKULLA County, BOBBY BEASLEY, in his official capacity as Supervisor of Elections for WALTON County, CAROL FINCH RUDD, in her official capacity as Supervisor of Elections for WASHINGTON County,

Defendants.

_____/

Plaintiffs LEAGUE OF WOMEN VOTERS OF FLORIDA, INC., LEAGUE OF WOMEN VOTERS OF FLORIDA EDUCATION FUND, INC., BLACK VOTERS MATTER FUND, INC., FLORIDA ALLIANCE FOR RETIRED AMERICANS, INC., CECILE SCOON, DR. ROBERT BRIGHAM, and ALAN MADISON (collectively, "Plaintiffs"), by and through the undersigned attorneys, file this Complaint for Injunctive and Declaratory Relief against Defendants LAUREL M. LEE, in her official capacity as Florida Secretary of State (the "Secretary"), ASHLEY MOODY, in her official capacity as Florida Attorney General, and Florida's 67 Supervisors of Elections, each in their official capacities as Supervisors for their respective counties (collectively, "Supervisors").

## **NATURE OF THE CASE**

1.     Last year, Florida voters turned out to vote in record-shattering numbers. In the 2020 general election, more than 77% of Florida voters cast a ballot, the highest turnout Florida had seen in nearly 30 years. This included a surge of participation by a young and diverse electorate.

2.     Of the 11 million Florida voters who voted in the 2020 general election, nearly five million did so using a vote-by-mail ballot—a record number for the state. In a notable reversal of past trends, Democratic voters made up a majority of the voters who participated in the election this way, submitting 680,000 *more* vote-by-mail ballots than Republican voters. Voters who consider themselves to be members of the Democratic Party in Florida are far more likely to be non-white and younger than voters who associate with the Republican Party. Non-white voters and young voters were also more likely to vote with a vote-by-mail ballot in the 2020 election than they had been in prior elections.

3.     Notably, the 2020 election was lauded not only for its record voter turnout, but overall smooth administration. The Governor, state legislators, local election officials, and the Secretary of State all publicly praised the state's voting process for its safety and security, repeatedly calling it a model for the country. Nevertheless, just a few months later, the Legislature moved to enact sweeping omnibus legislation ("SB 90" or the "Voter Suppression Bill") that will make it

7

harder for lawful Florida voters to participate in the State's elections. Republican legislators passed the bill over strong objection from not only voters and civil rights groups, but also the Supervisors themselves.

4.      Those objections were well-founded: SB 90 is a bill that purports to solve problems that do not exist, caters to a dangerous lie about the 2020 election that threatens our most basic democratic values, and, in the end, makes it harder to vote without adequate justification for doing so.

5.      SB 90 does not impede all of Florida's voters equally. It is crafted to and will operate to make it more difficult for certain types of voters to participate in the state's elections, including those voters who generally wish to vote with a vote-by-mail ballot and voters who have historically had to overcome substantial hurdles to reach the ballot box, such as Florida's senior voters, youngest voters, and minority voters.

6.      Among its provisions, the Voter Suppression Bill:

- Severely reduces access to vote-by-mail drop boxes ("Drop-Box Restrictions");

- Effectively bans organizations and volunteers from helping voters return their vote-by-mail ballots ("Volunteer Assistance Ban");

- Unnecessarily requires voters to more frequently re-request vote-by-mail ballots ("Vote-by-Mail Repeat Request Requirement");

- Appears to ban anyone except election workers from giving food or drink, including water, to voters waiting in line to vote ("Line Warming Ban");

- Requires voter registration organizations to recite a misleading, government-mandated "warning" that has the intent to and will have the effect of discouraging Floridians from registering to vote with such organizations ("Deceptive Registration Warning").

7.     Together, these foregoing provisions ("Challenged Provisions") target almost every aspect of the voting process, and they do so without a legitimate purpose, much less a compelling state interest that can justify their restrictions on the franchise. State Senator Perry Thurston was correct when he described the bill as just one more chapter in Florida's "sordid history" of "trying to make it harder for people to vote." As Representative Omari Hardy aptly observed, the bill is "about making sure that ballots cast by eligible voters don't count because they didn't jump through the myriad hoops that this bill creates," and amounts to nothing more than "legislative engineering of the electorate to shave off in particular people of color."

8.     The proponents of the bill had no meaningful rebuttal. The legislator who led the efforts to pass SB 90 in the Florida Senate, Senator Dennis Baxley, effectively acknowledged as much, offering instead this glib rationale for the bill:

"Some people say 'why?' and I say 'why not?' Let's try it. We can always do it differently next week or next month or next year, but why not try this?"

9.    The answer is because it will deprive lawful Floridians of their most fundamental rights, undermining the integrity of the state's elections, and once ballots are cast, there will be no meaningful redress for injured voters. The states may be "laboratories of democracy," but those "experiments" must stay within the confines of the federal constitution. This one does not. It should be declared invalid and enjoined.

## JURISDICTION AND VENUE

10.    Plaintiffs bring this action under 42 U.S.C. §§ 1983 and 1988 to redress the deprivation under color of state law of rights secured by the United States Constitution.

11.    This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1343 because the matters in controversy arise under the Constitution and laws of the United States.

12.    Venue is proper in this Court under 28 U.S.C. § 1391(b) because (1) all Defendants are residents of Florida, in which this judicial district is located, and numerous Defendants reside in this judicial district; and (2) a substantial part of the events that gave rise to Plaintiffs' claim occurred in this judicial district.

13.     This Court has the authority to enter a declaratory judgment and to provide preliminary and permanent injunctive relief pursuant to Rules 57 and 65 of the Federal Rules of Civil Procedure and 28 U.S.C. §§ 2201–2202.

14.     All conditions precedent to the maintenance of this case and Plaintiffs' claims have occurred, been performed, or otherwise been waived.

## PARTIES

15.     Plaintiffs LEAGUE OF WOMEN VOTERS OF FLORIDA, INC. and LEAGUE OF WOMEN VOTERS OF FLORIDA EDUCATION FUND, INC., (collectively, the "League"), are nonpartisan voter-focused nonprofit organizations formed under section 501(c)(4) and section 501(c)(3) of the Internal Revenue Code, respectively. The League has 29 chapters across the State of Florida, from Pensacola to the Keys. The League's mission is to encourage informed and active participation of citizens in government. Among other activities, the League educates citizens about their voting rights and facilitates voting including through get-out-the-vote efforts and registration drives. While the League aims to assist all voters with the voting process, the League is particularly dedicated to enabling and protecting the right to vote of Florida's youngest voters, many of whom may be voting for the first time and will need to register to vote.

16.     To achieve its mission, the League devotes substantial time, effort, and resources to encouraging voting by engaging in voter registration at various

community events and in public places, such as parks and college and university campuses. When the League and its members engage in voter registration, they assure individuals registering to vote that the organization will properly deliver the voter's registration application to the appropriate election officials. The Voter Suppression Bill, however, now requires the League and its members to notify a voter registrant applicant at the time they register to vote that the League "might not deliver" that voter's application to the appropriate authorities in a timely manner, and advise the voter of their other options for registering to vote in Florida that do not involve the assistance of a third-party organization such as the League. Such a "warning" will undermine the League's important voter registration efforts by expressly (and falsely) conveying to voters that the League cannot be trusted to deliver their application. In reality, the League takes great care to ensure that voter registration applications are promptly delivered to election officials in compliance with Florida law, and it opposes the law's mandate that the League and its members engage in deceptive speech to personally warn voters that their forms "might not" be delivered appropriately.

17.    To achieve its mission of helping eligible Floridians cast their votes, the League also devotes substantial time, effort, and resources to helping Floridians return their vote-by-mail ballots on a volunteer basis. Because the Voter Suppression Bill prohibits even *volunteers* from helping Floridians return their ballots to their

county, the League and its members will no longer be able to assist voters in these vital ballot collection efforts. But for the new law, the League would help collect and deliver vote-by-mail ballots on behalf of its members and members of its voting constituencies who asked for their assistance.

18.     The League also devotes substantial time, effort, and resources to assist and encourage voters at their polling locations to achieve its mission of ensuring that lawful voters are able to successfully access the franchise and make their voices heard through the ballot box. In furtherance of this mission, the League has previously hosted "Party at the Polls" events across Florida at polling locations to hand out food and water to voters. These types of events increase voter participation, which is part of the League's core mission. The Voter Suppression Bill, however, appears to effectively prohibit such civic engagement and assistance to voters— assistance the League would otherwise provide.

19.     Collectively, the Challenged Provisions will require the League to expend and divert additional funds, staff resources, and volunteer resources to its voter education and voter registration efforts, at the expense of its other initiatives and programs, including its work on important priorities such as ensuring fair redistricting in the State of Florida and providing its long-standing candidate forums.

20.     The League also brings this suit on behalf of its members across Florida, many of whom will find it more difficult to cast their ballots and to assist

voters if the Challenged Provisions stand. The League has thousands of members across Florida, many of whom assist the organization through their voter registration efforts, polling place efforts, and ballot collection efforts. The vast majority of the League's members are also registered Florida voters themselves, and many of them use vote-by-mail ballots to cast their votes and will be burdened by the Challenged Provisions.

21.    Plaintiff BLACK VOTERS MATTER FUND, INC. ("Black Voters Matter") is a nonpartisan civic organization organized under 501(c)(4) of the Internal Revenue Code. Its goal is to increase power in communities of color. Black Voters Matter knows that effective voting allows a community to determine its own destiny, but communities of color often face barriers to voting that other communities do not. Black Voters Matter focuses on removing those barriers. It does so by engaging in get-out-the-vote activities, educating voters on how to vote, and advocating for policies to expand voting rights and access. In the 2020 general election, Black Voters Matter was on the ground working to turn out the vote in Florida, particularly in communities that tend to have less access to national, state, and local resources and that have low-income and working-class populations. In particular, Black Voters Matter was active at polling locations, encouraging voters to vote and handing out water, food, and other resources to voters in line. As a result of the Voter Suppression Bill, which threatens to undermine the organization's mission, Black Voters Matter

14

must divert scarce resources away from its other policy priorities toward efforts to ensure that voters, and communities of color in particular, can navigate the restrictions to their voting options imposed by the Voter Suppression Bill. The Voter Suppression Bill also appears to effectively prohibit the type of civic engagement and assistance that Black Voters Matter has previously provided to Florida voters and intends to provide again in upcoming elections.

22.     Plaintiff FLORIDA ALLIANCE FOR RETIRED AMERICANS, INC. (the "Florida Alliance") is a nonprofit corporation organized as a social welfare organization under section 501(c)(4) of the Internal Revenue Code. The Florida Alliance's membership includes almost 200,000 retirees from public and private sector unions, community organizations, and individual activists in every county in Florida. The Florida Alliance is a chartered state affiliate of the Alliance for Retired Americans. Its mission is to ensure social and economic justice and full civil rights that retirees have earned after a lifetime of work. The Florida Alliance accomplishes this mission by actively pursuing and promoting legislation and public policies that are in the best interest of current and future retired Floridians. The Florida Alliance also accomplishes its mission by ensuring that its members are able to meaningfully and actively participate in and vote in Florida's elections. Because a significant percentage of Florida's elections are decided by close margins, it is essential that the Florida Alliance's members can effectively exercise their right to vote.

23.    The Challenged Provisions frustrate the Florida Alliance's mission because they make it more difficult for its members to cast their ballots, thus threatening the electoral prospects of Alliance-endorsed candidates and making it more difficult for the Florida Alliance and its members to associate to effectively further their shared political purposes. The Challenged Provisions' barriers to voting will require the Alliance to devote time and resources to educating its members about these new requirements and assisting them in complying so that their members can successfully cast their ballots. These efforts will reduce the time and resources the Florida Alliance has to educate its members, legislators, and the public on legislation that threatens Florida's seniors. In light of these injuries, the Florida Alliance joins in the First and Fourteenth Amendment claims to the Challenged Provisions.[1]

24.    The Florida Alliance also brings this action on behalf of its members who face burdens on their right to vote because of the Challenged Provisions. Most of the Florida Alliance's members are between 65 and 85 years of age and many have disabilities. Given these realities, the Florida Alliance's members are especially likely to be burdened by the Challenged Provisions, which impose obstacles on access to vote-by-mail ballots and may restrict the assistance they can receive at their polling location.

---

[1] The Florida Alliance does not join in the remaining First Amendment claims because the Florida Alliance itself does not conduct organized voter registration or ballot collection efforts.

25.     Plaintiff CECILE SCOON is a U.S. citizen and registered voter in Bay County, Florida. Ms. Scoon formerly practiced law as a prosecutor in the United States Air Force as an Assistant Staff Judge Advocate. She later became the first black woman in private law practice in Bay County, Florida. Ms. Scoon currently serves as the First Vice President of the League of Women Voters of Florida and is nominated to serve as its President beginning in June 2021. Ms. Scoon is passionate about assisting voters with the voting process. As a member of the League, Ms. Scoon helps register eligible Floridians to vote. Ms. Scoon has previously registered voters at her local library, shopping centers, and community events, and she intends to do so in the future. Once a voter fills out a voter registration application, Ms. Scoon ensures the application is delivered promptly to election officials, usually within 48 hours after the person registers to vote. The Deceptive Registration Warning will require Ms. Scoon to deliver a message she otherwise would not deliver while she registers voters, impairing her ability to effectively register voters. As a member of the League, Ms. Scoon has also previously assisted voters near polling places by providing food, water, and non-partisan encouragement, and she intends to continue to provide such assistance and encouragement in the future. The Voter Suppression Bill, however, appears to effectively prohibit providing such encouragement and assistance to individuals at or near polling places.

26.     Plaintiff DR. ROBERT BRIGHAM is a U.S. citizen and registered voter, who lives in Orange County, Florida, where he taught as a Professor of Mathematics for over forty years at the University of Central Florida. Voting is extremely important to Dr. Brigham, who tries to vote in every election. While Dr. Brigham has previously often voted early in person, he now can have difficulty waiting in line to vote given his health conditions. Since he was diagnosed with colorectal cancer and underwent associated treatment, Dr. Brigham often avoids activities that may prevent him having ready access to clean restroom facilities, as is common when having to wait in line for events or in line at the polls. In the 2020 general election, Dr. Brigham voted with a vote-by-mail ballot which he returned to a drop box. Dr. Brigham found the drop-box process to be convenient, safe, secure, and reliable means of returning his vote-by-mail ballot without the uncertainty of whether the U.S. Postal Service will or will not timely deliver his ballot. In the future, Dr. Brigham wants to have the option to use a drop box as a reliable means to return his vote-by-mail ballot. In upcoming elections, the Drop-Box Restrictions will burden Dr. Brigham's right to vote and adversely impact him because he will have reduced opportunities to access a drop box.

27.     Plaintiff ALAN MADISON is a U.S. citizen, registered voter, and Navy veteran who lives in Indian River County, Florida. Voting is extremely important to Mr. Madison, who tries to vote in every election. In the 2020 general election, Mr.

Madison voted with a vote-by-mail ballot which he returned to a drop box along with his spouse's ballot. Mr. Madison found the drop-box process to be convenient, safe, and secure. In the future, Mr. Madison intends to use a drop box to return his vote-by-mail ballot. In upcoming elections, both the Drop-Box Restrictions and Vote-by-Mail Repeat Request Requirement will make it more difficult for Mr. Madison to cast a vote-by-mail ballot, as Mr. Madison will now have to submit additional requests for vote-by-mail ballots to receive them and will also have reduced opportunities to access a drop box. Separately, Mr. Madison assists with third-party voter registration efforts to help register voters in his community. The Deceptive Registration Warning will require Mr. Madison to deliver a message he otherwise would not deliver while he registers voters, impairing his ability to effectively register voters.

28.    Defendant LAUREL M. LEE is sued in her official capacity as Florida's Secretary of State. The Secretary is a person within the meaning of 42 U.S.C. § 1983 and acts under color of state law. Pursuant to Fla. Stat. § 97.012, the Secretary of State is the chief elections officer of the State and responsible for the administration of state laws affecting voting. The Secretary's duties consist, among other things, of "[o]btain[ing] and maintaining uniformity in the interpretation and implementation of the election laws." *Id*. § 97.012(1). The Secretary is also tasked with ensuring that county Supervisors perform their statutory duties, *see id.* §

97.012(14); she is responsible for providing technical assistance to County Supervisors on voter education, election personnel training services, and voting systems, *see id.* §§ 97.012(4)-(5); and she is responsible for "[p]rovid[ing] written direction and opinions to the supervisors of elections on the performance of their official duties with respect to the Florida Election Code or rules adopted by the Department of State." *Id*. § 97.012(16).

29.    Defendant ASHLEY MOODY is sued in her official capacity as the Attorney General of Florida. The Attorney General is a person within the meaning of 42 U.S.C. § 1983 and acts under color of state law. The Attorney General's authority includes overseeing the Office of the Florida Statewide Prosecutor, which has the responsibility to "[i]nvestigate and prosecute . . . [a]ny crime involving voter registration, voting, or candidate or issue petition activities." Fla. Stat. § 16.56(1)(a)(12). This responsibility includes, based on information and belief, enforcing the criminal misdemeanor provisions of the Volunteer Assistance Ban, *see* Fla. Stat. § 104.0616(2), and criminal penalties against election officials and individuals violating Florida's election code, *see* Fla. Stat. §§ 104.051, 104.091, 104.41. The Attorney General also has oversight authority over Florida's state attorneys, who may also prosecute violations of the Florida Election Code. *See* Fla. Stat. § 16.08. ("The Attorney General shall exercise a general superintendence and

direction over the several state attorneys of the several circuits as to the manner of discharging their respective duties . . . .").

30.    Defendants FLORIDA ELECTION SUPERVISORS, sued in their official capacities only, are elected officials in each of Florida's 67 counties who are responsible for administering elections in their respective counties. Their responsibilities include, but are not limited to, administering voting by mail, arranging polling locations, determining when to start early voting, and organizing drop off locations for vote-by-mail ballots. The Supervisor Defendants are: KIM BARTON, in her official capacity as Supervisor of Elections for ALACHUA County, CHRIS MILTON, in his official capacity as Supervisor of Elections for BAKER County, MARK ANDERSEN, in his official capacity as Supervisor of Elections for BAY County, AMANDA SEYFANG, in her official capacity as Supervisor of Elections for BRADFORD County, LORI SCOTT, in her official capacity as Supervisor of Elections for BREVARD County, JOE SCOTT, in his official capacity as Supervisor of Elections for BROWARD County, SHARON CHASON, in her official capacity as Supervisor of Elections for CALHOUN County, PAUL A. STAMOULIS, in his official capacity as Supervisor of Elections for CHARLOTTE County, MAUREEN "MO" BAIRD, in her official capacity as Supervisor of Elections for CITRUS County, CHRIS H. CHAMBLESS, in his official capacity as Supervisor of Elections for CLAY County, JENNIFER J.

EDWARDS, in her official capacity as Supervisor of Elections for COLLIER County, TOMI S. BROWN, in her official capacity as Supervisor of Elections for COLUMBIA County, MARK NEGLEY, in his official capacity as Supervisor of Elections for DESOTO County, STARLET CANNON, in her official capacity as Supervisor of Elections for DIXIE County, MIKE HOGAN, in his official capacity as Supervisor of Elections for DUVAL County, DAVID H. STAFFORD, in his official capacity as Supervisor of Elections for ESCAMBIA County, KAITI LENHART, in her official capacity as Supervisor of Elections for FLAGLER County, HEATHER RILEY, in her official capacity as Supervisor of Elections for FRANKLIN County, SHIRLEY KNIGHT, in her official capacity as Supervisor of Elections for GADSDEN County, CONNIE SANCHEZ, in her official capacity as Supervisor of Elections for GILCHRIST County, ALETRIS FARNAM, in her official capacity as Supervisor of Elections for GLADES County, JOHN HANLON, in his official capacity as Supervisor of Elections for GULF County, LAURA HUTTO, in her official capacity as Supervisor of Elections for HAMILTON County, DIANE SMITH, in her official capacity as Supervisor of Elections for HARDEE County, BRENDA HOOTS, in her official capacity as Supervisor of Elections for HENDRY County, SHIRLEY ANDERSON, in her official capacity as Supervisor of Elections for HERNANDO County, PENNY OGG, in her official capacity as Supervisor of Elections for HIGHLANDS County, CRAIG LATIMER, in his

official capacity as Supervisor of Elections for HILLSBOROUGH County, THERISA MEADOWS, in her official capacity as Supervisor of Elections for HOLMES County, LESLIE R. SWAN, in her official capacity as Supervisor of Elections for INDIAN RIVER County, CAROL A. DUNAWAY, in her official capacity as Supervisor of Elections for JACKSON County, MARTY BISHOP, in his official capacity as Supervisor of Elections for JEFFERSON County, TRAVIS HART, in his official capacity as Supervisor of Elections for LAFAYETTE County, ALAN HAYS, in his official capacity as Supervisor of Elections for LAKE County, TOMMY DOYLE, in his official capacity as Supervisor of Elections for LEE County, MARK EARLEY, in his official capacity as Supervisor of Elections for LEON County, TAMMY JONES, in her official capacity as Supervisor of Elections for LEVY County, GRANT CONYERS, in his official capacity as Supervisor of Elections for LIBERTY County, HEATH DRIGGERS, in his official capacity as Supervisor of Elections for MADISON County, MICHAEL BENNETT, in his official capacity as Supervisor of Elections for MANATEE County, WESLEY WILCOX, in his official capacity as Supervisor of Elections for MARION County, VICKI DAVIS, in her official capacity as Supervisor of Elections for MARTIN County, CHRISTINA WHITE, in her official capacity as Supervisor of Elections for MIAMI-DADE County, JOYCE GRIFFIN, in her official capacity as Supervisor of Elections for MONROE County, JANET H. ADKINS, in her official capacity as

Supervisor of Elections for NASSAU County, PAUL A. LUX, in his official

capacity as Supervisor of Elections for OKALOOSA County, MELISSA ARNOLD,

in her official capacity as Supervisor of Elections for OKEECHOBEE County, BILL

COWLES, in his official capacity as Supervisor of Elections for ORANGE County,

MARY JANE ARRINGTON, in her official capacity as Supervisor of Elections for

OSCEOLA County, WENDY LINK, in her official capacity as Supervisor of

Elections for PALM BEACH County, BRIAN CORLEY, in his official capacity as

Supervisor of Elections for PASCO County, JULIE MARCUS, in her official

capacity as Supervisor of Elections for PINELLAS County, LORI EDWARDS, in

her official capacity as Supervisor of Elections for POLK County, CHARLES

OVERTURF, in his official capacity as Supervisor of Elections for PUTNAM

County, TAPPIE VILLANE, in her official capacity as Supervisor of Elections for

SANTA ROSA County, RON TURNER, in his official capacity as Supervisor of

Elections for SARASOTA County, CHRISTOPHER ANDERSON, in his official

capacity as Supervisor of Elections for SEMINOLE County, VICKY OAKES, in

her official capacity as Supervisor of Elections for ST. JOHNS County,

GERTRUDE WALKER, in her official capacity as Supervisor of Elections for ST.

LUCIE County, WILLIAM KEEN, in his official capacity as Supervisor of

Elections for SUMTER County, JENNIFER M. KINSEY, in her official capacity as

Supervisor of Elections for SUWANNEE County, DANA SOUTHERLAND, in her

official capacity as Supervisor of Elections for TAYLOR County, DEBORAH OSBORNE, in her official capacity as Supervisor of Elections for UNION County, LISA LEWIS, in her official capacity as Supervisor of Elections for VOLUSIA County, JOSEPH R. MORGAN, in his official capacity as Supervisor of Elections for WAKULLA County, BOBBY BEASLEY, in his official capacity as Supervisor of Elections for WALTON County, and CAROL FINCH RUDD, in her official capacity as Supervisor of Elections for WASHINGTON County.

## STATEMENT OF FACTS AND LAW

**I.     Florida's 2020 General Election was widely regarded as a resounding success.**

31.     Voter enthusiasm was extremely high in 2020, and Florida saw the highest percentage of voter participation that it had seen in nearly three decades, with a full 77% of registered voters casting ballots to make their voices heard.

32.     The 2020 general election electorate was also particularly young and diverse. Approximately 1.1 million more new Florida voters between the ages of 18 and 34 participated in the election, as compared to 2016.

33.     Florida's electorate is rapidly changing, as the 2020 election demonstrated. While 76% of the state's voters 65 years or older are non-Hispanic whites, the same is true of only 50% of voters under 30. Among the total population, the majority of Floridians under 70 are now non-white, with Hispanic and Black Floridians making up the state's largest ethnic and racial minority groups.

34.     Florida's election administration success in 2020 was due in large part to widespread use of vote-by-mail. Even former President Trump—the chief national opponent of mail voting in 2020—cast his vote-by-mail ballot in Florida.

35.     The growing accessibility of vote-by-mail also had a measurable effect on access to the polls for senior voters. According to a national poll conducted by the U.S. Census Bureau, 34 percent of seniors who didn't vote in 2016 said that a health problem or disability preventing them from getting to the polls, compared to only four percent in 2020. Florida, of course, is home to a significant senior population, for whom ease of access to the polls and assistance with voting are often essential.

36.     After the election, Florida officials, from the counties all the way up to the Governor and Secretary of State, repeatedly publicly praised Florida's elections as secure, transparent, and a model for the country.

37.     For example, in his March 2, 2021 State of the State address, Governor Ron DeSantis stated: "[W]e should take a moment to enjoy the fact that Florida ran perhaps the most transparent and efficient election in the nation in 2020." He further noted that, "People actually asked, why cannot these other states be like Florida?"

38.     That Florida elections should be the prototype for other states is a theme the Governor has emphasized since the November election. On the day after the

election, in fact, he tweeted exactly that: "Florida is a model for the rest of the nation to follow."

39.     Governor DeSantis was far from the only elected official who praised Florida's election administration in 2020. Secretary of State Laurel M. Lee said in December, when Florida certified its electoral votes: "All Florida voters, no matter how they chose to cast a ballot, or who they voted for, could be confident in the integrity of our elections system and the security of their vote."

40.     Even Senator Baxley, who led the efforts to pass SB 90, has repeatedly commended Florida's election administration in 2020 in the course of various hearings on the legislation. For example, on February 14, 2021, Senator Baxley admitted that "vote by mail was a success" in 2020. On March 10, he detailed how "we had an excellent, excellent conducted election and very high credibility." And on April 14, he lauded how "Florida was a model for the nation in November."

41.     Local election officials also celebrated Florida's administration of the 2020 election. In Pinellas County, the populous county home of St. Petersburg, Supervisor of Elections Julie Marcus described the 2020 election as a "resounding undisputed success."

II.   **Without justification, the Legislature moved to enact sweeping restrictions that will impede access to the franchise.**

42.   Nevertheless, as soon as the 2021 legislative session convened, certain members of the Legislature moved quickly to introduce bills to severely restrict access to the franchise in a myriad of ways.

43.   The justifications for these sudden and significant revisions to an elections administration scheme that had just resulted in historic modern-day records for voter participation in an election that was lauded as secure were either glib and non-sensical (i.e., the "Why not?" explanation) or based on vague references to concerns about elections "integrity" or "fraud," that were themselves contrary to reality.

44.   Given the undisputed success of Florida's 2020 election, it is understandable that the Supervisors of Elections across the state quickly and broadly questioned the need for such legislation. Among them were:

- Leon County Supervisor of Elections Mark Earley, who stated in April that "I think frankly all of [the Supervisors of Elections] don't think that either SB 90 or HB 7041 are really needed."

- Manatee County Supervisor of Elections Mike Bennett, who said about an earlier version of SB 90: "In reality, I didn't think that [the entire election legislation] was necessary at all."

- Pasco County Supervisor of Elections Brian Corley, who said he was "literally befuddled as to why we would tweak a system that performed exceedingly well."

- Hillsborough County Supervisor Craig Latimer—who also is the President of the FSE—characterized the legislation after it passed as an "unnecessary call for election reform [that] will not detract from the confidence that was well-earned in 2020."

45.     On April 23, 2021, as the Voter Suppression Bill neared final passage, the Florida Supervisors of Elections issued a clear and unequivocal statement: "Florida Supervisors of Elections (FSE) does not support SB90 or HB7041 in their current form."

46.     And while the Legislature debated the Voter Suppression Bill, Florida's elections professionals also explained that voter fraud—the bill's purported *raison d'etre*—was not a legitimate concern in Florida under its preexisting Election Code.

47.     In fact, during a presentation to the Legislature at the start of the most recent legislative session that saw the Voter Suppression Bill as one of the Legislature's top priorities, Secretary Lee confirmed that she was unaware of *any* instances of fraud that occurred last year, noting that Florida has a "well-crafted and effective elections code" that provides safeguards to ensure the proper voters are receiving and returning their vote-by-mail ballots.

29

48.     Similarly, Pasco County Supervisor Corley issued a statement shortly after the November 2020 election stating, among other things, that "true voter fraud is isolated and infrequent" and that "anomalies or irregularities are the result of clerical errors by elections' staff who are taxed by extremely long hours in high stress environments, and the fact that elections' administration is highly dependent on temporary staff with steep learning curves in short timeframes."

49.     The bill's own sponsors were routinely unable to identify what fraud or insecurity in Florida's elections necessitated such changes to Florida's elections. In fact, the bill's sponsors made clear time and time again that the legislation was not responsive to any fraud that had actually occurred in Florida's elections.

50.     In addition to admitting the lack of voter fraud, elected officials also acknowledged that public confidence in Florida's election administration was high.

51.     Senator Baxley himself noted, "we have a very high customer satisfaction rate on how the election was run."

52.     And, just the *day before* the House passed the Voter Suppression Bill, House Speaker Chris Sprowls stated that he had "great confidence" in Florida's early voting and mail-in voting laws.

53.     The record-breaking turnout among voters and testimonials from Florida's elected officials and election officials make clear that Florida's elections are already secure and inspire confidence in the Sunshine State.

54.     Yet, the Legislature seized the opportunity at the start of its most recent session to craft new, suppressive voting restrictions under the guise of election integrity and improving voter confidence.

55.     Notably, at the very start of the legislative session, the Supervisors collectively submitted a list of legislative priorities to the Legislature. These priorities included making voting *more* accessible to voters, including by allowing "super voting sites" and additional early voting locations.

56.     But the Legislature took the precise opposite track, enacting suppressive voting laws that have no clear purpose, laying bare its intent to make it more difficult for voters to register to vote, obtain their vote-by-mail ballots, return their vote-by-mail ballots, and stand in line to vote in person.

57.     As Senator Baxley himself admitted during a committee hearing on SB 90 this month: "Voting by mail has proven to be a safe method to cast a ballot in Florida for many years." When asked by fellow legislators at one of the last hearings on SB 90 why changes were needed to secure Florida's elections, Senator Baxley admitted, "I'm not trying to present a case that there is a problem [with Florida's elections]." He was instead simply "infatuated about security," hoping to resolve any lingering "doubts" one might have about Florida's elections.

58.     If Florida voters had "doubts" about the security of Florida's elections, they did not show it at the hearings on SB 90. Of the dozens of individuals who

spoke during public testimony in the Florida Senate, only a single individual spoke in support of the bill. But even the lone supporter tipped her hand to the Legislature's true motivation in passing the bill, remarking that she hoped vote-by-mail would not be available to most Florida voters who currently use it.

59.     Faith leaders and civic nonprofit organizations joined voters and Supervisors of Elections in the chorus opposing the bill, explaining to the Legislature how the Challenged Provisions would harm their communities—particularly for those voters who are senior, disabled, or generally require assistance with the voting process.

60.     At one of the last Senate Committee hearings on SB90, Republican State Senator Jeff Brandes voted no on the bill, explaining: "Not one Republican Supervisor of Elections in the State of Florida supports this bill in its current form. Even [Lake County Supervisor] Alan Hays, a staunch conservative, has said that it will hurt the voting process. The Republicans that have run for office to represent a fair election process to my knowledge [have] not stood up and supported this bill."

61.     The Voter Suppression Bill's final passage was a rushed affair on the second-to-last day of the legislative session. After a little more than an hour debate, the Senate passed the final version of the legislation with bipartisan opposition. Mere hours later, late at night, the House hurried through cursory debate and passed it along party lines. Throughout the debate, opponents to the law highlighted the total

lack of need for the legislation from any Supervisors of Elections and the bill's restrictions on voting rights. Representative Omari Hardy voted against the bill because it is "legislative engineering of the electorate to shave off in particular people of color."

62.     The day after the Florida Legislature passed the bill, Craig Latimer, the Hillsborough County Supervisor and President of the FSE, released a statement condemning the bill, explaining how the bill would make "requesting Vote By Mail ballots and returning those ballots harder," among other issues.

63.     Indeed, as described below, at every step of the voting process, the Voter Suppression Bill imposes unjustified burdens on lawful Florida voters and on other Floridians who wish to help them vote.

## III.    The Challenged Laws impede every step of the voting process in Florida.

### A.    Drop Box Restrictions

64.     The Voter Suppression Bill severely restricts the availability of drop boxes.

65.     During the 2020 election, Florida voters could vote by dropping off their vote-by-mail ballots at secure government-provided drop boxes stationed at county early voting locations and the Supervisor's main or branch offices, among other locations. Most of the state's 67 counties offered 24-hour drop boxes. Counties

also offered *many* drop boxes, with some providing upwards of ten, twenty, or even thirty drop boxes per county.

66.     As the Supervisors themselves have described, drop boxes were incredibly popular with Florida voters and essential to expanding access to the franchise. Supervisor Latimer, for example, recently explained that voters in the 2020 general election "overwhelmingly appreciated the peace of mind that came from dropping their mail ballot off in a secure drop box, because they knew that by using the drop box instead of a mailbox, their ballot would be received on time."

67.     The Voter Suppression Bill, however, will effectively severely limit the number of drop boxes that are available to voters, as well as the days and hours those drop boxes are available.

68.     These unjustified changes came on the heels of the highly successful 2020 election, when young, senior, and minority voters used vote-by-mail at unprecedented rates and relied heavily on drop boxes to submit such ballots.

69.     Since 2001, Florida has permitted any registered voter to cast a vote-by-mail ballot without an excuse. Fla. Stat. § 101.62. As a result, mail voting has steadily grown in Florida.

70.     In 2016, 28.7% of Florida voters voted by mail; and in 2018, 31.8% of all ballots cast in Florida's 2018 general election were cast by mail. In 2020, that number increased to 44%, amounting to nearly 5 million votes.

34

71.     As shown in the table below, in past elections, Republican use of vote-by-mail ballots far outpaced Democratic and unaffiliated voter use. But the gap has been narrowing over the last few elections, and in 2020—the first year drop boxes were available—Democrats cast almost 700,000 more vote-by-mail ballots than did Republicans. In Florida, younger voters and minority voters tend to identify as Democrats, while older voters and white voters tend to identify as Republicans.

*Source:* Fla. Division of Elections, Early Voting and Vote-by-Mail Ballot Request Reports, *available at*
https://dos.myflorida.com/elections/data-statistics/elections-data/absentee-and-early-voting/

| | 2014 | | 2016 | | 2018 | | 2020 | |
|---|---|---|---|---|---|---|---|---|
| | Number of VBM Ballots | Percent of All VBM Ballots | Number of VBM Ballots | Percent of All VBM Ballots | Number of VBM Ballots | Percent of All VBM Ballots | Number of VBM Ballots | Percent of All VBM Ballots |
| **Republican** | 833,420 | 44% | 1,108,053 | 41% | 1,080,808 | 41% | 1,506,223 | 31% |
| **Democrat** | 705,752 | 38% | 1,049,809 | 38% | 1,026,600 | 39% | 2,189,710 | 45% |
| **Unaffiliated** | 284,887 | 15% | 504,895 | 18% | 500,564 | 19% | 1,093,399 | 23% |
| **Other** | 53,761 | 3% | 69,318 | 3% | 15,826 | 1% | 66,345 | 1% |
| **Total** | 1,877,820 | 100% | 2,732,075 | 100% | 2,623,798 | 100% | 4,855,677 | 100% |

72.     In 2020, almost 1.5 million Floridians returned vote-by-mail ballots using drop boxes, comprising approximately 30% of all vote-by-mail ballots cast. Drop boxes were critical for Floridians who work multiple jobs, work in jobs with non-traditional working hours, attend school, have family care responsibilities, are disabled, or have other constraints limiting their ability to reach the polls on election day or during early voting hours.

73.     Despite the widespread reliance on drop boxes, the Legislature singled out this highly successful, convenient, and secure voting method.

74.     Under the Voter Suppression Bill, instead of 24-hour availability, most drop boxes will now be permitted only during early voting hours which—at the discretion of local election officials—range between only eight and 12 hours per day. And because early voting is required to end the Sunday before election day, under the Voter Suppression Bill, most drop boxes are also now banned the day before election day—a day the Supervisors testified is exceedingly popular for voters to drop off their ballots.

75.     While counties may offer a drop box outside of early voting hours, they may do so only at a Supervisor's main office or permanent branch office. Most counties have only one such office and as a result, most can offer only one drop box outside of early voting hours. Even Miami-Dade, the most populous county in Florida with over 2.7 million residents, has only two such offices and, at most, can offer only two drop boxes outside of early voting hours. As a result, voters who live in Florida's largest counties, who tend to be younger and more diverse, will have far less access to drop boxes than voters in smaller counties.

76.     Compounding these limitations, under the Voter Suppression Bill, drop boxes may now only be used while continuously and physically monitored by an employee of the Supervisor's Office, significantly increasing counties' costs to maintain each drop box and unnecessarily straining election administrators' limited resources. This will likely reduce drop box availability for voters who live in

underserved and under-resourced counties in particular and increase the average distance all voters must travel to reach a drop box. And Counties may be unable to offer drop boxes outside of early voting hours at all, eliminating an essential voting method for many Floridians. The bill also imposes a $25,000 penalty on any Supervisor who fails to comply (even inadvertently) with these new restrictions, further disincentivizing the Supervisors from offering drop boxes.

77.     In practice, S.B. 90 is already decreasing drop box availability. On May 5, before Governor DeSantis even signed the bill into law, Bay County announced it would be removing its long-standing drop box outside the Supervisor of Elections' Office, citing S.B. 90 as the reason for doing so.

78.     To demonstrate the paralyzing effect the Voter Suppression Bill will have on drop-box access, take Miami-Dade County as an example. In the 2020 general election, Miami-Dade offered 33 drop boxes across the county. Under the Voter Suppression Bill, each of those 33 drop boxes would have to be continuously monitored by an employee of the Supervisor's Office. In all likelihood, no county, even one with the resources of Miami Dade, has the manpower or resources to staff 33 locations with a Supervisor's employee simply to monitor a drop box that is already locked and secured.

79.     Supervisors of Elections have condemned these restrictions. For instance, Supervisor Latimer explained "[w]e should be looking for cost-effective

ways to expand their use, including the use of secure 24-hour drop boxes with camera surveillance. Instead, the new legislation prohibits that."

80.    The result is that Florida has effectively cut hundreds of hours during which drop boxes would otherwise be available to voters, including in the final seven days before election day, when the state acknowledges it could be *too late* to mail a vote-by-mail ballot to ensure it is delivered in time to be counted.

81.    The significant reduction in drop box availability severely burdens the right to vote in Florida. Indeed, it frustrates the purpose of drop boxes in the first place.

82.    Before, Floridians who struggled to vote on election day or during early voting hours due to personal circumstances, including restrictive work or class schedules, family care responsibilities, disabilities, health conditions, or other personal circumstances, were able to successfully cast their ballots and ensure their delivery in time to be counted by using drop boxes. The bill significantly reduces this important means of voting, without adequate justification.

83.    As Orange County Supervisor Bill Cowles explained, his county, where Orlando is located, is a service industry community, where most people do not have a typical 8-to-5 work schedule. As such, voters who work alternative schedules and could drop off their ballots on their way to work at night or on the way home after working overnight used drop boxes.

84.     Approximately 80,000 voters in Orange County utilized drop boxes in 2020, meaning almost 30% of vote-by-mail ballots were returned using drop boxes. And 41% of Black voters in the county voted by mail. Orange County is also extremely diverse, with nearly 60% of residents identifying as minorities.

85.     Voters in other large, diverse counties, including Miami-Dade, Hillsborough, and Pinellas Counties, also used drop boxes at high rates.

86.     That voters in highly diverse counties relied on drop boxes to vote is likely reflective of the fact that they are more necessary in those jurisdictions because of the different characteristics of the voting populations they serve. For example, minority voters are more likely to work multiple jobs as compared to whites, and more likely to work in the service industry. Thus, eliminating before- and after-hours voting opportunities will disproportionately burden their electoral participation.

87.     Additionally, elections administrators will now be forced to devote significant personnel resources in order to provide drop boxes, eliminating the administrative convenience of drop boxes and likely limiting the number of drop boxes counties can provide, especially outside of normal voting hours and in resource-constrained counties.

88.     Supervisors of Elections broadly credited the use of drop boxes in gathering and processing the unprecedented surge in ballots last year. The new,

unnecessary and strict restrictions on the use of drop boxes will make their jobs harder.

89.     If voters are now diverted to voting in person, lines will get longer and some number of lawful voters will be deterred from voting entirely. Inevitably, these voters are more likely to be voters from communities without the flexibility to rearrange their day to stand in lines to vote. Studies have repeatedly shown these voters tend to be less white and younger than the rest of the voting population.

90.     No government interest justifies severely limiting drop box availability. In fact, Sen. Baxley admitted during a legislative hearing that he was not aware of any problems with drop boxes during the 2020 election.

**B.     Volunteer Assistance Ban**

91.     In one fell swoop, the Voter Suppression Bill also virtually ends the practice of individuals helping Florida voters return their vote-by-mail ballots to their county to be counted.

92.     Prior to the enactment of the Voter Suppression Bill, organizations like the League and other civic-minded individuals, friends, colleagues, neighbors, and family members like nieces, nephews, or cousins were permitted to assist Floridians in returning their vote-by-mail ballots, provided that they were not paid for their assistance returning ballots. *See* Fla. Stat. § 104.0616(2).

93.    Just last year, when the previous version of Florida's ballot collection prohibition was challenged in court, the State of Florida argued that prohibiting paid collectors was not restrictive or burdensome on voters precisely because individuals acting on an unpaid basis (such as volunteers associated with the League), were fully *permitted* to assist Florida voters return their ballots. *See* Trial Brief of Secretary of State, Attorney General, Individual Canvassing Commissioners, and Fifty-Three County Supervisors of Elections, *Nielsen v. DeSantis*, No. 4:20-cv-00236, ECF No. 391 at 30 (N.D. Fla. July 3, 2020) (arguing ballot collection prohibition on paid organizers was reasonable because "it regulates only compensation for the specific act of collecting [ballots] . . . . Unpaid ballot collection does not violate Section 104.0616(2) of the Florida Statutes, no matter how many ballots a person collects.").

94.    The Voter Suppression Bill drastically alters this landscape, criminalizing all Floridians (even unpaid volunteers) from returning more than two ballots, unless the ballot belongs to an "immediate family member." Even then, however, an immediate family member includes only "a person's spouse or the parent, child, grandparent, grandchild, or sibling of the person or the person's spouse," and excludes other relatives or household members.

95.    In practice, this means that the League, other civic-minded organizations, and everyday good Samaritans will no longer be able to aid Florida voters as they have done in the past. The penalties for a potential violation are

steep—a misdemeanor in the first degree, Fla. Stat. § 104.0616(2), which can result in fines of up to $1,000 and imprisonment, Fla. Stat. §§ 775.082(4)(a), 775.083(1)(d).

96.     These volunteer efforts are critical to Florida voters who need to return a vote-by-mail ballot but cannot return that ballot via mail, whether because there is not enough time for the ballot to arrive in the mail to the Supervisor by Election Day, or because the voter reasonably no longer trusts the USPS to deliver their ballot at all.

97.     Returning a vote-by-mail ballot in person can be an onerous task for Florida's senior voters, voters with disabilities, and voters whose work or family circumstances make it difficult to return a ballot during business hours. Indeed, the very purpose of a vote-by-mail ballot is to allow the voter a means to return a ballot without making an in-person trip to the polls.

98.     For these reasons, assistance with ballot return is essential. As one Supervisor of Elections and former State Senator and State Representative, Alan Hays, testified before the Senate, many of Florida's senior voters, including Supervisor Hays's own mother, do not live near immediate family. The Voter Suppression Bill makes it significantly harder for these voters to successfully access the franchise.

99.    Assistance with ballot delivery is also critical in communities of color in Florida, which have historically depended on community and volunteer-based ballot collection efforts in order to ensure that their ballots are delivered in time to be counted.

100.    The Volunteer Assistance Ban also uniquely burdens minority voters because they more frequently reside in households with non-"immediate" family members, such as uncles, aunts, nieces, nephews, and cousins, who are just some of the family members who would face severe restrictions on returning family members' ballots.

101.    No government interest justifies severely restricting volunteers from helping Floridians to return their vote-by-mail ballots.

### C.    Vote-by-Mail Repeat Request Requirements

102.    Prior to passage of the Voter Suppression Bill, a voter's request for a vote-by-mail ballot was valid for two general election cycles (or four years) unless the voter indicated that he or she would only like to receive a vote-by-mail ballot for certain elections. *See* Fla. Stat. § 101.62.

103.    Thus, for example, unless the voter requested otherwise, a Floridian requesting a vote-by-mail ballot to vote in the 2018 general election did not need to request another one for the 2020 general election; they received one automatically.

104.   The provision allowing a voter's vote-by-mail request to be valid for two general election cycles has been in place since 2007, when the Legislature sought to make it easier for voters to receive a vote-by-mail ballot and to reduce administrative burdens on the Supervisors. Florida voters were informed by the state that their requests for vote-by-mail ballots lasted four years and are now highly accustomed to making a single request for two general election cycles.

105.   The Voter Suppression Bill, however, now requires all voters to make new requests for vote-by-mail ballots every general election cycle, with the voter's request expiring at the end of each calendar year after a general election.[2]

106.   The Legislature made this change despite the fact that (a) voters are now accustomed to a two-cycle request; (b) Supervisors and other organizations like the League will incur significant costs to educate voters about the need to re-request a vote-by-mail ballot for each general election cycle; and (c) processing the additional registrations will impose additional time and expense burdens on the Supervisors.

107.   As opponents of the bill testified during legislative hearings, so many Florida voters believe that their request is valid for two general election cycles that

---

[2] The Vote-By-Mail Request Requirement applies to voters applying for vote-by-mail ballots after the Voter Suppression Bill becomes law.

it is likely that some voters will not realize their request has expired until it is too late to receive a ballot for a coming election.

108.   No government interest sufficiently justifies purging Floridians' standing vote-by-mail requests. As the Supervisors testified, this change will only increase administrative costs, forcing the Supervisors to effectively enter twice as many requests for vote-by-mail ballots and to educate their voters about the change.

109.   The voters most likely to be difficult to reach and to lack information about the change include Florida's minority and young voters.

110.   The League, among many other organizations, will have to divert resources to reach these communities, but even with extraordinary effort, there are likely to be many voters who are disenfranchised, waiting for ballots that they have come to expect but which never arrive.

**D**.   **Line Warming Ban**

111.   Next, the Voter Suppression Bill prohibits any person from "engaging in any activity with the intent to influence or effect of influencing a voter" within 150 feet of a polling location, which appears to prevent voters waiting in line to vote from interacting with or receiving food and water from individuals and members of third-party organizations, often referred to as "line warming."

112.   The bill specifically states that individuals affiliated with a Supervisor's office may give items to voters, but does not make clear whether others may give

food or water to voters in line to vote, an activity that was explicitly prohibited in prior versions of SB 90. Representative Blaise Ingoglia, the primary sponsor of the House's version of the Voter Suppression Bill, made clear in debate that SB 90 as passed does prohibit handing out water to voters in line, especially if the water came from a candidate's campaign.

113.   To the extent that the Voter Suppression Bill does, in fact, prohibit providing such assistance to voters, this prohibition will directly burden senior voters, voters with disabilities, or any voter who is forced to wait in long lines at polling places (which, in Florida, has disproportionately been minority voters).

114.   Florida, of course, has a long history of long lines at polling places. In the November 2012 race, some voters waited in line for as long as seven hours to cast a ballot during early voting.

115.   This led the Secretary of State to characterize the problems with long lines as "excessive and unreasonable." In a report published in 2013, the Secretary acknowledged the serious problems with long lines that Floridians had encountered, with "many voters . . . waiting in line for hours to cast a ballot both during the early voting period and on Election Day."

116.   While the state made some improvements to the electoral process after the 2012 elections (such as permitting Supervisors of Elections to offer early voting in more facilities), long lines have persisted in Florida's subsequent elections.

117.   In 2018, for instance, voters in South Florida waited for more than one-and-a-half hours to cast their ballots.

118.   During that same election, voters in Miami reported waiting in line for more than three hours.

119.   Even during the 2020 general election, when record-breaking numbers of voters opted to vote-by-mail to avoid exposure to the COVID-19 virus, in-person voting generated long wait times.

120.   Polling locations in predominantly minority neighborhoods are more likely to experience congestion and lengthy wait times.

121.   It is a crime for anyone to aid, abet, or advise a violation of Florida's election code. *See* Fla. Stat. § 104.091; *see also id*. § 104.41 ("Any violation of [the Florida election] code not otherwise provided for is a misdemeanor of the first degree."). Any election official who "willfully refuses or willfully neglects to perform his or her duties" (including duties to prohibit the new vague definition of solicitation at polling places) commits a misdemeanor. *Id*. § 104.051.

122.   The Line Warming Ban will mean that election officials must actively monitor the inevitable long lines at polling places and bar anyone not affiliated with a Supervisor's office from handing out anything to voters within 150 feet of the polling place.

123.   Prohibiting people and groups such as the League and Black Voters Matter from offering food or drink to voters who are waiting in line to cast their ballots advances no plausible election administration goal, exacerbates the burden of waiting in long lines, and disproportionately impacts minority voters.

### E.   The Deceptive Registration Warning

124.   Civic organizations have historically played a critical role in assisting eligible Floridians who wish to register to vote.

125.   Over the past several decades, third-party organizations like the League have registered hundreds of thousands, if not millions, of Florida voters.

126.   In just the past three years alone, third party organizations in Florida have registered nearly 220,000 new Florida voters.

127.   While all Floridians can benefit from third-party voter registration organizations, such organizations are crucial to reaching underserved communities.

128.   Under current Florida law, third-party organizations that wish to register voters are subject to laws and regulations that ensure voter registration forms are handled appropriately and delivered promptly to Florida's Supervisors.

129.   These third-party organizations must, for example, register directly with the Division of Elections, receive their registration forms directly from the Division (which are marked with the organization's unique identifier number), and timely submit completed applications by book closing or 10 days after the

application is completed, whichever is earlier. *See* Fla. Admin. Code Ann. r. 1S-2.042; Fla. Stat. § 97.0575.

130.    Well before the enactment of the Voter Suppression Bill, organizations that failed to timely return applications were already subject to fines and referral to the Attorney General. *Id*.

131.    Because voter registration is a constitutionally protected activity, Florida's federal courts have carefully monitored the Legislature's restrictions on third party voter registration to ensure they do not violate the First Amendment.

132.    In just the past fifteen years, federal courts have twice struck down onerous requirements imposed by Florida on third-party registration organizations, *see League of Women Voters of Fla. v. Browning*, 863 F. Supp. 2d 1155 (N.D. Fla. 2012); *League of Women Voters of Fla. v. Cobb*, 447 F. Supp. 2d 1314 (S.D. Fla. 2006).

133.    The Voter Suppression Bill, however, now requires third-party registration organizations and its volunteers to "warn" the applicant at the time the application is collected that the organization "might not deliver" the voter's application "before registration closes for the next ensuing election." The organization must also inform the voter of various other means to register to vote

that do not depend on a third-party organization and educate them on how to use those other options.[3]

134.   The Deceptive Registration Warning is clearly calculated to and will have the effect of discouraging Floridians from registering and associating with third-party organizations.

135.   When a would-be voter hears that the League "might not deliver" their form on time and the League advises the voter they have other options to register, that voter is not likely to trust the League with their application, damaging the League's credibility and impairing its ability to effectively register voters.

136.   This government-compelled message is also contrary to the message that the League and other third-party registration organizations currently convey to voter registration applicants.

137.   When the League currently assists Florida voters in registering and collects their registration forms, League volunteers and organizers take time to

---

[3] In full, the Deceptive Registration Warning mandates that third-party voter registration organizations "must notify the applicant at the time the application is collected that the organization might not deliver the application to the division or the Supervisor of Elections in the county in which the elector resides in less than 14 days or before registration closes for the next ensuing lection and must advise the applicant that he or she may deliver the application in person or by mail. The third-party voter registration organization must also inform the applicant how to register online with the division and how to determine whether the application has been delivered."

specifically assure those voters that they will promptly return their voter registration form.

138.   The likely purpose, and ultimate effect, of the Deceptive Registration Warning will be to discourage Floridians to register to vote with organizations like the League, making it more difficult for the League to register voters.

## CLAIMS FOR RELIEF

## COUNT I

**U.S. Const. Amend. I & XIV, 42 U.S.C. § 1983**
**Undue Burden on the Right to Vote**
**(Drop Box Restrictions, Line Warming Ban, Vote-By-Mail Repeat Request**
**Requirement, Volunteer Assistance Ban)**

139.   Plaintiffs reallege and reincorporate by reference paragraphs 1-138 of this Complaint as though fully set forth therein.

140.  Under the *Anderson-Burdick* balancing test, a court considering a challenge to a state election law must carefully balance the character and magnitude of injury to the First and Fourteenth Amendment rights that the plaintiff seeks to vindicate against the justifications put forward by the State for the burdens imposed by the rule. *See Burdick v. Takushi*, 504 U.S. 428, 434 (1992); *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983).

141.  This balancing test uses a flexible sliding scale, where the rigorousness of scrutiny depends upon the extent to which the challenged law burdens voting

rights. *See Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1318–19 (11th Cir. 2019).

142.   Courts need not accept a state's justifications at face value, particularly where those justifications are "speculative," otherwise it "would convert *Anderson-Burdick*'s means-end fit framework into ordinary rational-basis review wherever the burden a challenged regulation imposes is less than severe." *Soltysik v. Padilla*, 910 F.3d 438, 448–49 (9th Cir. 2018) (citing *Pub. Integrity Alliance v. City of Tucson*, 836 F.3d 1019, 1024–25 (9th Cir. 2016)); *see also Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 191 (2008) (Stevens, J., controlling op.) ("However slight th[e] burden may appear, . . . it must be justified by relevant and legitimate state interests *sufficiently weighty to justify the limitation*.") (emphasis added) (citation and quotation marks omitted) (emphasis added); *Democratic Exec. Comm. of Fla.*, 915 F.3d at 1318-19 ("[E]ven when a law imposes only a slight burden on the right to vote, relevant and legitimate interests of sufficient weight still must justify that burden. The more a challenged law burdens the right to vote, the stricter the scrutiny to which we subject that law.").

143.   The Voter Suppression Bill inflicts severe burdens on Florida's voters through each individual restriction and the cumulative effect of each of the Challenged Provisions.

144.  Voters who cast vote-by-mail ballots will now be forced to re-request their ballots for each general election, even though such requests have been valid for two general election cycles for the past 14 years. A voter who does remember to re-request a vote-by-mail ballot will now be virtually prohibited from handing their ballot to a non-immediate family member to drop off at a Supervisor of Elections' office or drop box. Before the Voter Suppression Bill's passage, volunteers could deliver vote-by-mail ballots for voters who wished such assistance, helping enable that their ballots reached the Supervisors' offices in time to be counted.

145.  To make matters worse, a voter seeking to drop off their vote-by-mail ballot will have significantly reduced access to drop boxes. Most drop boxes will be available only during early voting hours. While one to two drop boxes in a voter's county may be available outside of early voting hours, they could be located at prohibitive distances from large numbers of voters—which will almost certainly be the case in larger, more diverse counties. Drop boxes must also be continuously monitored in person *only* by employees of the Supervisor, which will dramatically increase the Supervisors' costs to maintain each individual drop box and almost certainly reduce the number of drop boxes offered. Because Supervisors will now also face a stiff $25,000 civil penalty if they violate any drop-box rule (even inadvertently or momentarily), Supervisors will be incentivized to offer fewer drop boxes overall, likely increasing the average distance for voters to travel to each one

and potentially eliminating access during non-traditional hours, burdening voters'
access to them.

146. Meanwhile, voters who cast their ballots in-person—whether on
election day or at an early voting location—will likely no longer be able to depend
on the assistance of third parties such as the League and other groups that previously
handed out water, food, or other assistance to voters in line. The Voter Suppression
Bill will deter anyone who is not an employee or volunteer of the Supervisors of
Elections' office from offering voter assistance at polling places—including handing
out food or water—and impose burdens on voters who are already waiting in long
lines. Even worse, it is a crime for anyone to aid, abet, or advise a violation of
Florida's election code. *See* Fla. Stat. § 104.091. And any election official who
"willfully refuses or willfully neglects to perform his or her duties" (including duties
to prohibit the new vague definition of solicitation at polling places) commits a
misdemeanor. *Id.* § 104.051. In the face of the Ban's vagueness and the threat of
criminal penalties, election workers will almost certainly bar anyone from handing
out food or water or else risk prosecution.

147. No state interest justifies any of these restrictions, which individually
and cumulatively burden the right to vote. Even as the Legislature was passing the
bill, multiple legislators and Supervisors of Elections praised Florida's election
administration in 2020. *Supra* at ¶¶ 36–41. Others, such as Pasco County Supervisor

Corley, have been "befuddled as to why we would tweak a system that performed exceedingly well" in 2020. Governor DeSantis has flaunted Florida as a state for others to emulate. All these statements followed an election in which Floridians voted in record-breaking numbers amidst a deadly global pandemic.

148. The potential prospect for fraud in Florida's voting system—the justification for these restrictive measures—is virtually non-existent. Florida law already protects voters against fraud, including by generally prohibiting fraud in connection with casting a vote, Fla. Stat. § 104.041, disallowing marking or designating a choice on a ballot for another person, *id*. § 104.047, and banning voting a fraudulent ballot, *id*. § 104.16.

149. Voters do not lack faith or confidence in Florida elections. The staggering turnout in 2020 and absence of any significant election-administration issues makes that apparent. Even Senator Baxley, the Voter Suppression Bill's primary backer in the Senate, praised how "we have a very high customer satisfaction rate on how the election was run."

150. Rather than promote public confidence in Florida's elections and ensure election integrity, the Voter Suppression Bill will make voting more difficult, result in disenfranchisement, and diminish voter confidence in Florida's elections. It will also make it more difficult for elections administrators to successfully administer the state's elections.

151. The Challenged Provisions of the Voter Suppression Bill are not supported by any state interest sufficient to justify the resulting restrictions on the voting process, and unduly burden the right to vote of Plaintiffs, their members, and their constituencies, in violation of the First and Fourteenth Amendments.

**WHEREFORE**, Plaintiffs respectfully request that this Court enter judgment:

A.   Declaring that the Drop-Box Restrictions, Vote-by-Mail Repeat Request Requirement, Volunteer Assistance Ban, and Line Warming Ban violate the right to vote protected by the First and Fourteenth Amendments to the U.S. Constitution;

B.   Enjoining Defendants, their respective agents, officers, employees, and successors, and all persons acting in concert with each or any of them, from enforcing the Drop-Box Restrictions, Vote-by-Mail Repeat Request Requirement, Volunteer Assistance Ban, and Line Warming Ban;

C.   Awarding Plaintiffs their costs, expenses, and reasonable attorneys' fees pursuant to, *inter alia*, 42 U.S.C. § 1988 and other applicable laws; and

D.   Granting such other and further relief as the Court deems just and proper.

## COUNT II

**Free Speech and Association**
**U.S. Const. Amend. I, 42 U.S.C. § 1983**
**Infringement of Free Speech and Associational Rights**
**(Volunteer Assistance Ban)**

152. Plaintiffs reallege and reincorporate by reference paragraphs 1-138 of this Complaint as though fully set forth herein.

153.   The First Amendment protects against the promulgation of laws "prohibiting the free exercise [of] or abridg[ment] [of] freedom of speech." U.S. Const. amend. I.

154.   Courts apply "exacting scrutiny" to review laws governing election-related speech. *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 345–46 (1995); *see also League of Women Voters v. Hargett*, 400 F. Supp. 3d 706, 722 (M.D. Tenn. 2019) ("[L]aws that govern the political process surrounding elections—and, in particular, election-related speech and association—go beyond merely the intersection between voting rights and election administration, veering instead into the area where 'the First Amendment has its fullest and most urgent application.'") (quoting *Eu v. S.F. Cnty. Democratic Cent. Comm.*, 489 U.S. 214, 223 (1989)).

155.   Restrictions on such speech are unconstitutional when they "significantly inhibit" election-related speech and association and are "not warranted by the state interests . . . alleged to justify [the] restrictions." *Buckley v. Am. Const. L. Found.*, *Inc.*, 525 U.S. 182, 192 (1999).

156.   Voter turnout efforts, including assisting voters with the submission of vote-by-mail ballots, are a means by which the League communicates their belief in the power and importance of participating in democratic elections. Such activity is "the type of interactive communication concerning political change that is

appropriately described as 'core political speech.'" *Meyer v. Grant*, 486 U.S. 414, 421–22 (1988).

157. The act of assisting voters to submit ballots by any individuals is inherently expressive and an individual or organization that conducts such activities engages in speech by encouraging voting. *Cf. Bernbeck v. Moore*, 126 F.3d 1114, 1115 (8th Cir. 1997) (rejecting the argument that regulating an election "process" raises no First Amendment concerns).

158. Furthermore, under the United States Constitution, First Amendment rights "include the right to band together for the advancement of political beliefs." *Hadnott v. Amos*, 394 U.S. 358, 364 (1969). "An organization's attempt to broaden the base of public participation in and support for its activities is conduct 'undeniably central to the exercise of the right of association.'" *Am. Ass'n of People with Disabilities v. Herrera*, 690 F. Supp. 2d 1183, 1202 (D.N.M. 2010) (citing *Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 214–15 (1986)).

159. The conversations and interactions between the League and their respective organizers and voters surrounding the submission of ballots are forms of protected political speech and association. *See Williams v. Rhodes*, 393 U.S. 23, 30 (1968) (describing the "overlapping" rights "of individuals to associate for the advancement of political beliefs" and "of qualified voters . . . to cast their votes effectively").

160.   Florida's Volunteer Assistance Ban inhibits that speech by "limit[ing] the number of voices who will convey [Plaintiffs'] message," and "the size of the audience they can reach." *Meyer*, 486 U.S. at 422–23.

161.   Moreover, the threat of criminal penalties for violating the Volunteer Assistance Ban deters individuals from participating in the League's get-out-the-vote efforts and thus has a chilling effect on Plaintiffs' get-out-the-vote efforts—the means by which Plaintiffs associate with each other and voters, and communicate with voters about the importance of voting. *See Hargett*, 400 F. Supp. 3d at 720 (noting that even the threat of civil penalties "is likely to have a chilling effect on the entirety of [a voter registration] drive, including its communicative aspects.").

162.   Given its significant inhibition of Plaintiffs' speech and associational rights, the Volunteer Assistance Ban is not warranted by any sufficiently weighty state interest.

163.   The Volunteer Assistance Ban thus represents an overbroad restriction on political speech and political organizing that infringes the constitutional rights of the League, and other Floridians.

**WHEREFORE**, Plaintiffs respectfully request that this Court enter judgment:

> A. Declaring that the Volunteer Assistance Ban violates the First Amendment to the U.S. Constitution as an unconstitutional infringement on speech and association;

59

B. Enjoining Defendants, their respective agents, officers, employees, and successors, and all persons acting in concert with each or any of them, from enforcing the Volunteer Assistance Ban;

C. Awarding Plaintiffs their costs, expenses, and reasonable attorneys' fees pursuant to, *inter alia*, 42 U.S.C. § 1988 and other applicable laws; and

D. Granting such other and further relief as the Court deems just and proper.

## COUNT III

**Free Speech and Association**
**U.S. Const. Amend. I and XIV, 42 U.S.C. § 1983**
**(The Line Warming Ban is Unconstitutionally Vague and Overbroad)**

164.   Plaintiffs reallege and reincorporate by reference paragraphs 1-138 of this Complaint as though fully set forth herein.

165.   The Line Warming Ban is unconstitutionally vague under the First Amendment and the Due Process Clause of the Fourteenth Amendment. It defines impermissible solicitation at a polling place to include "engaging in any activity with the intent to influence or effect of influencing a voter." Fla. Stat. § 102.031(4)(b).

166.   The Line Warming Ban does not provide any guidance on what "any activity" means. The possibilities of prohibited activities are virtually limitless, ranging from speaking words to a voter to handing them water bottles or food. Nor does the Ban provide any guidance on what activities may have the "effect of influencing a voter." It is unclear, for example, whether an organizer for a non-profit organization handing out food or water at a polling place would be deemed to have

an "effect on influencing" a voter under the statutory language. But during an April 19 House of Representatives debate, the House's primary sponsor of the Voter Suppression Bill, Representative Ingoglia, admitted he construes this language to encompass handing out water, especially if the water came from a candidate's campaign.

167.   "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). The Supreme Court has long recognized that laws must give "the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly" and "must provide explicit standards for those who apply them." *Id*. Vague statutes are especially egregious when they "abut upon sensitive areas of basic First Amendment freedoms." *Baggett v. Bullitt*, 377 U.S. 360, 372 (1964).

168.   The "Constitution demands a high level of clarity from a law if it threatens to inhibit the exercise of a constitutionally protected right, such as the right of free speech." *Konikov v. Orange County*, 410 F.3d 1317, 1329 (11th Cir. 2005) (citing *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 499 (1982))). The Line Warming Ban lacks any clarity and will work to "trap the innocent by failing to give fair notice of what is prohibited." *Id*.

169.   The Line Warming Ban is therefore unconstitutionally vague under the Due Process Clause and vague and overbroad under the First Amendment to the U.S. Constitution.

**WHEREFORE**, Plaintiffs respectfully request that this Court enter judgment:

> A. Declaring that the Line Warming Ban violates the First and Fourteenth Amendments to the U.S. Constitution as impermissibly vague and overbroad;
>
> B. Enjoining Defendants, their respective agents, officers, employees, and successors, and all persons acting in concert with each or any of them, from enforcing the Line Warming Ban;
>
> C. Awarding Plaintiffs their costs, expenses, and reasonable attorneys' fees pursuant to, *inter alia*, 42 U.S.C. § 1988 and other applicable laws; and
>
> D. Granting such other and further relief as the Court deems just and proper.

## COUNT IV

**Free Speech and Association**
**U.S. Const. Amend. I, 42 U.S.C. § 1983**
**Compelled Speech**
**(Deceptive Registration Warning)**

170.   Plaintiffs reallege and reincorporate by reference paragraphs 1-138 of this Complaint as though fully set forth herein.

171.   The First Amendment to the Constitution prohibits abridgment of Plaintiffs' freedom of speech through government-compelled speech.

172.   The Deceptive Registration Warning severely undermines Plaintiffs' core political speech. It unconstitutionally forces Plaintiffs and other individuals or organizations that conduct voter registration drives to speak for the government by making a disclaimer or warning that Plaintiffs would not otherwise recite. The disclaimer constitutes speech (specifically, confusing, misleading, and dissuading speech), Plaintiffs object to the government imposing such speech upon them, and the speech will be readily associated with Plaintiffs and tied to their name when Plaintiffs are required to personally warn voters that they "might not deliver" their voter registration forms on time for the voter to be registered.

173.   Concerningly, the Deceptive Registration Warning will undermine voters' confidence that Plaintiffs can be trusted with voter registration forms. In particular, this disclaimer will undermine the League's credibility.

174.   Moreover, the Deceptive Registration Warning is not accurate. Plaintiffs take great care to deliver voter registration forms promptly and consistently with Florida law. In the absence of the Deceptive Registration Warning, Plaintiffs inform voter registration applicants that they will promptly deliver their form in time for the voter to be registered for the next election.

175.   A law that "compel[s] individuals to speak a particular message" by following a "government-drafted script" that "alte[rs] the content of [their] speech" is a "content-based regulation of speech" and, therefore, "presumptively

unconstitutional." *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2371 (2018). Such laws are subject to strict scrutiny. *See id*.

176.   But the Deceptive Registration Warning is not narrowly tailored to serve any compelling state interest. To the extent the government thinks that the Deceptive Registration Warning is needed, the government must speak for itself. The State must not co-opt Plaintiffs and other civic organizations to speak in furtherance of Florida's own message, which attempts to discourage voters from utilizing voter registration drives to register to vote.

**WHEREFORE**, Plaintiffs respectfully request that this Court enter judgment:

A. Declaring that the Deceptive Registration Warning violates the First Amendment as impermissible compelled speech;

B. Enjoining Defendants, their respective agents, officers, employees, and successors, and all persons acting in concert with each or any of them, from enforcing the Deceptive Registration Warning Requirement.

C. Awarding Plaintiffs their costs, expenses, and reasonable attorneys' fees pursuant to, *inter alia*, 42 U.S.C. § 1988 and other applicable laws; and

D. Granting such other and further relief as the Court deems just and proper.

## COUNT V

**Free Speech and Association**
**U.S. Const. Amend. I, 42 U.S.C. § 1983**
**Infringement on Political Speech**
**(Deceptive Registration Warning)**

177.   Plaintiffs reallege and reincorporate by reference paragraphs 1-138 of this Complaint as though fully set forth herein.

178.   Voter registration drives implicate the expressive and associational rights of the parties who engage in voter registration.

179.   The First Amendment requires vigilance "to guard against undue hindrances to political conversations and the exchange of ideas." *Buckley*, 525 U.S. at 192. For that reason, courts apply "exacting scrutiny" to review laws governing election-related speech. *McIntyre*, 514 U.S. at 345–46 (1995); *see also Hargett*, 400 F. Supp. 3d at 722 ("[L]aws that govern the political process surrounding elections— and, in particular, election-related speech and association—go beyond merely the intersection between voting rights and election administration, veering instead into the area where 'the First Amendment has its fullest and most urgent application.'") (quoting *Eu*, 489 U.S. at 223).

180.   At its most fundamental level, a voter registration drive involves "encourag[ing] . . . citizens to register to vote." *Project Vote v. Blackwell*, 455 F. Supp. 2d 694, 698 (N.D. Ohio 2006). "Voter registration implicates a number of both expressive and associational rights which . . . belong to—and may be invoked

by—not just the voters seeking to register, but by third parties who encourage participation in the political process." *Id.* at 700.

181.   "[E]ncouraging others to register to vote" is "pure speech." *Browning*, 863 F. Supp. 2d at 1158. And because that speech is "political in nature," "it is a core First Amendment activity." *Hargett*, 400 F. Supp. 3d. at 720 (quotation marks omitted). Like circulating an initiative petition for signatures, registering voters is "the type of interactive communication concerning political change that is appropriately described as 'core political speech.'" *Meyer*, 486 U.S. at 421–22.

182. Restrictions on such speech are unconstitutional when they "significantly inhibit" election-related speech and association and are "not warranted by the state interests . . . alleged to justify [the] restrictions." *Buckley*, 525 U.S. at 192.

183. The Deceptive Registration Warning violates Plaintiffs' First Amendment rights by chilling the protected expressive speech that occurs during voter registration and effectively impairing Plaintiffs' ability to register voters. Overall, the Deceptive Registration Warning will make it significantly more difficult for Plaintiffs, when conducting voter registration drives in Florida, to fulfill their purpose of engaging with potential voters and encouraging them to register and vote. Because the Deceptive Registration Warning requires Plaintiffs to warn voters that Plaintiffs "might not deliver" their forms in a timely manner, including by the time

that registration closes, and requires Plaintiffs at the same time to inform applicants of other ways to register to vote, the Deceptive Registration Warning will effectively dissuade potential applicants from registering to vote with Plaintiffs. The Deceptive Registration Warning will convey to applicants that Plaintiffs should not be trusted to deliver their voter registration forms, when in fact Plaintiffs take great care to ensure that voter applications forms are delivered promptly and consistently with Florida law.

184.   Given its significant inhibition of Plaintiffs' political speech rights, the Deceptive Registration Warning is not warranted by any sufficiently weighty state interest. The State simply does not have a legitimate interest in discouraging eligible Floridians from registering to vote with third-party voter registration organizations. While the State may have an interest in ensuring that third-party voter registration organizations submit applications promptly, it can and does accomplish that goal by other means.

185.   The Deceptive Registration Warning thus represents an overbroad restriction on political speech that infringes the constitutional rights of the League, and other Floridians.

**WHEREFORE**, Plaintiffs respectfully request that this Court enter judgment:

A. Declaring that the Deceptive Registration Warning violates the First Amendment to the U.S. Constitution as an unconstitutional infringement on core political speech;

B. Enjoining Defendants, their respective agents, officers, employees, and successors, and all persons acting in concert with each or any of them, from enforcing the Deceptive Registration Warning Requirement;

C. Awarding Plaintiffs their costs, expenses, and reasonable attorneys' fees pursuant to, *inter alia*, 42 U.S.C. § 1988 and other applicable laws; and

D. Granting such other and further relief as the Court deems just and proper.

Respectfully submitted this 6th day of May, 2021.

/s/ Frederick S. Wermuth
Frederick S. Wermuth
Florida Bar No. 0184111
Thomas A. Zehnder
Florida Bar No. 0063274
King, Blackwell, Zehnder & Wermuth, P.A.
P.O. Box 1631
Orlando, FL 32802-1631
Telephone: (407) 422-2472
Facsimile: (407) 648-0161
fwermuth@kbzwlaw.com
tzehnder@kbzwlaw.com

Marc E. Elias
Aria C. Branch*
Lalitha D. Madduri*
Christina A. Ford

Perkins Coie, LLP
700 Thirteenth Street, N.W., Suite 800
Washington, D.C. 20005-3960
Telephone: (202) 654-6200
Facsimile: (202) 654-9959
melias@perkinscoie.com
abranch@perkinscoie.com
lmadduri@perkinscoie.com
christinaford@perkinscoie.com

*Pro Hac Vice Motions forthcoming*

*Counsel for Plaintiffs*