UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

| | |
|---|---|
| LEAGUE OF WOMEN VOTERS OF FLORIDA, INC., et al.,<br><br>    Plaintiffs,<br><br>    v.<br><br>LAUREL M. LEE, in her official capacity as Florida Secretary of State, et al.,<br><br>    Defendants,<br><br>    and<br><br>REPUBLICAN NATIONAL COMMITTEE, and NATIONAL REPUBLICAN SENATORIAL COMMITTEE,<br><br>    Intervenor-Defendants. | Case No.:   4:21-cv-186-MW/MAF<br><br>Consolidated for discovery purposes only with case nos.:<br>        4:21-cv-187-MW/MAF<br>        4:21-cv-201-MW/MAF<br>        4:21-cv-242-MW/MAF |

## *LEAGUE* PLAINTIFFS' MEMORANDUM IN OPPOSITION TO SECRETARY OF STATE LEE'S MOTION TO DISMISS

# **TABLE OF CONTENTS**

**Page**

INTRODUCTION ................................................................................1

BACKGROUND ................................................................................3

LEGAL STANDARD.........................................................................8

ARGUMENT ....................................................................................9

  I.  The *League* Plaintiffs have stated a right-to-vote claim. ..................9

    A.   The *Anderson-Burdick* balancing test cannot be adjudicated on a motion to dismiss. ..................................................10

    B.   There is no vote-by-mail exception to the *Anderson-Burdick* balancing test...........................................................13

    C.   The *League* Plaintiffs need not show that "voters generally" are burdened..................................................................18

  II.  The *League* Plaintiffs have stated vagueness and overbreadth claims against the Line Warming Ban. ..........................................20

    A.   The *League* Plaintiffs have adequately pled that the Line Warming Ban restricts a substantial amount of constitutionally protected conduct, rendering it unconstitutionally overbroad. ....................................................21

    B.   Plaintiffs have adequately pled that the Line Warming Ban fails to provide sufficient guidance regarding prohibited conduct making it unconstitutionally vague. ..........................................25

CONCLUSION ....................................................................................32

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### CASES

*Anderson v. Celebrezze*,
  460 U.S. 780 (1983)..................................................................passim

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)..................................................................9, 12

*Badaracco v. Comm'r*,
  464 U.S. 386 (1984)..................................................................28

*Baggett v. Bullitt*,
  377 U.S. 360 (1964)..................................................................26

*Beecham v. United States*,
  511 U.S. 368 (1994)..................................................................31

*Bergland v. Harris*,
  767 F.2d 1551 (11th Cir. 1985) ............................................12, 14, 16

*Brnovich v. Democratic Nat'l Comm.*,
  141 S. Ct. 2321 (2021)............................................................11, 12

*Burdick v. Takushi*,
  504 U.S. 428 (1992)........................................................10, 15, 16, 17

*Burson v. Freeman*,
  504 U.S. 191 (1992)..................................................................3, 25

*Chaparro v. Carnival Corp.*,
  693 F.3d 1333 (11th Cir. 2012) .................................................9, 24

*City of Chi. v. Morales*,
  527 U.S. 41 (1999)....................................................................21, 26

*Coates v. City of Cincinnati*,
  402 U.S. 611 (1971)..................................................................29

*Common Cause/Ga. v. Billups*,
554 F.3d 1340 (11th Cir. 2009) .......................................................................10

*Cooper Indus., Inc. v. Aviall Servs., Inc.*,
543 U.S. 157 (2004)..........................................................................................32

*Crawford v. Marion Cnty. Election Bd.*,
553 U.S. 181 (2008)....................................................................................passim

*Democratic Exec. Comm. of Fla. v. Detzner*,
347 F. Supp. 3d 1017 (N.D. Fla. 2018) .....................................................14, 18

*Democratic Exec. Comm. of Fla. v. Lee*,
915 F.3d 1312 (11th Cir. 2019) .................................................................passim

*Duke v. Cleland*,
5 F.3d 1399 (11th Cir. 1993) ..........................................................2, 12, 16, 18

*FF Cosms. FL, Inc. v. City of Miami Beach*,
866 F.3d 1290 (11th Cir. 2017) ......................................................................24

*Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*,
901 F.3d 1235 (11th Cir. 2018) ......................................................................22

*Gooding v. Wilson*,
405 U.S. 518 (1972)..........................................................................................21

*Graham Cnty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*,
559 U.S. 280 (2010)....................................................................................30, 31

*Grayned v. City of Rockford*,
408 U.S. 104 (1972)..........................................................................................26

*Griffin v. Roupas*,
385 F.3d 1128 (7th Cir. 2004) .............................................................16, 17, 18

*Harris v. Garner*,
216 F.3d 970 (11th Cir. 2000) ...................................................................27, 28

*Hibbs v. Winn*,
542 U.S. 88 (2004)............................................................................................31

*Jacobson v. Fla. Sec'y of State*,
  974 F.3d 1236 (11th Cir. 2020) ...................................................16, 17

*Kolender v. Lawson*,
  461 U.S. 352 (1983) ...................................................................30

*Konikov v. Orange Cnty.*,
  410 F.3d 1317 (11th Cir. 2005) ........................................................27

*League of Women Voters of Fla., Inc. v. Detzner*,
  314 F. Supp. 3d 1205 (N.D. Fla. 2018) ......................................passim

*League of Women Voters v. Hargett*,
  400 F. Supp. 3d 706 (M.D. Tenn. 2019) ........................................22

*Luft v. Evers*,
  963 F.3d 665 (7th Cir. 2020) ...............................................18

*McDonald v. Bd. of Educ. Comm'rs of Chi.*,
  394 U.S. 802 (1969) ...................................................................15, 16

*Meyer v. Grant*,
  486 U.S. 414 (1988) ...................................................................22, 23

*Minn. Voters All. v. Mansky*,
  138 S. Ct. 1876 (2018) ...............................................................24, 25

*New Ga. Project v. Raffensperger*,
  976 F.3d 1278 (11th Cir. 2020) ...................................................16, 17

*O'Brien v. Skinner*,
  414 U.S. 524 (1974) ...................................................................15

*Rodriguez de Quijas v. Shearson/Am. Express, Inc.*,
  490 U.S. 477 (1989) ...................................................................15

*Soltysik v. Padilla*,
  910 F.3d 438 (9th Cir. 2018) ...............................................13

*United States v. Stevens*,
  559 U.S. 460 (2010) ...................................................................22, 24

iv

STATUTES

Fla. Stat. § 97.012 ................................................................24

Fla. Stat. § 102.031(4)(b) ................................................................20, 21

**INTRODUCTION**

From the Governor to state legislators to state and local election officials, Florida officials were nearly unanimous: the 2020 election in Florida was safe and secure, a model for the country. Yet just months later, the Legislature enacted Senate Bill 90, a set of sweeping changes to Florida's election laws that will make it harder for many Florida voters to vote and to assist or encourage others to vote. Republican legislators passed SB90 along party lines over strong objections from voters, civil rights groups, and the county Supervisors of Elections themselves. If the law is allowed to stand, countless lawful voters will find it unjustifiably harder to participate in Florida's elections, and civic organizations and their members will be unable to exercise their free speech and associational rights in pursuit of greater levels of political participation, including among vulnerable communities.

Plaintiffs in this case (the "*League* Plaintiffs") are four individual voters and five organizations working to empower and encourage civic participation in Florida. The *League* Plaintiffs bring six counts challenging five provisions of SB90 which— separately and cumulatively—unconstitutionally burden the right to vote and infringe on the *League* Plaintiffs' First Amendment rights. The Secretary's motion challenges just two of those counts.

First, the Secretary asks the Court to dismiss Count I, the *League* Plaintiffs' claim that the challenged provisions of SB90 impose an unconstitutional undue

burden on voting rights under the well-established *Anderson-Burdick* analysis. Precedent plainly holds that *Anderson-Burdick* cannot be adjudicated on a motion to dismiss. *Duke v. Cleland*, 5 F.3d 1399, 1405 & n.6 (11th Cir. 1993). The Secretary urges the Court to adopt a novel, vote-by-mail exception to the *Anderson-Burdick* analysis. But the Supreme Court has repeatedly rejected "litmus tests" of that sort in the voting rights context, and this Court and the Eleventh Circuit have previously applied the full *Anderson-Burdick* analysis to claims involving vote-by-mail procedures. The Secretary also urges the Court to hold that voting rights claims must allege burdens on "voters generally," rather than on particular groups. But her argument relies entirely on Justice Scalia's non-controlling concurring opinion in *Crawford v. Marion County Election Board*, 553 U.S. 181 (2008), and ignores the six justices who disagreed with him. As this Court has previously held, the law is to the contrary. *League of Women Voters of Fla., Inc. v. Detzner* ("*LOWV I*"), 314 F. Supp. 3d 1205, 1216 (N.D. Fla. 2018).

Second, the Secretary asks the Court to dismiss Count IV, the *League* Plaintiffs' vagueness and overbreadth challenges to SB90's prohibitions on in-person, non-partisan activities at polling places (the "Line Warming Ban"). Ignoring the plain language of the statute, which prohibits "engaging in any activity with the intent to influence or effect of influencing a voter," the Secretary argues that the Line Warming Ban's expansive, undefined text is both "unambiguous" and narrowly

2

targeted only at undue partisan influence on voters waiting to cast their ballots. The *League* Plaintiffs wish that the Secretary's description were accurate. But the text of the Ban is virtually limitless and thus unconstitutionally overbroad because it appears to prohibit a substantial amount of constitutionally protected speech, going well beyond the limited speech restrictions on partisan campaigning at polling places that the Supreme Court has upheld. *See Burson v. Freeman*, 504 U.S. 191, 211 (1992). The Ban is also unconstitutionally vague because it fails to provide individuals or law enforcement with sufficient guidance on what conduct is criminalized, chilling constitutionally protected activities by leaving the *League* Plaintiffs and others to guess at what conduct could result in their criminal prosecution.

The Court should therefore deny the Secretary's motion.

## **BACKGROUND**

This lawsuit challenges five provisions of SB90, a sweeping reform of Florida's election laws that will make it harder for lawful Florida voters—especially senior, young, and minority voters—to participate in future elections. Corrected First Am. Compl. ¶ 3, ECF No. 160 ("Compl."). The Florida Legislature enacted SB90 after a 2020 election that the Governor, state legislators, election officials, and the Secretary of State all lauded as a model for its smooth administration and safety, and in which Floridians turned out in record numbers to vote.

Among other provisions, SB90 (1) severely reduces access to vote-by-mail drop boxes, (2) effectively prohibits organizations and volunteers from helping voters return vote-by-mail ballots, (3) unnecessarily requires voters to request vote-by-mail ballots more often, (4) seems to ban organizations from distributing food or drink at polling places, and (5) requires voter registration organizations to recite a misleading, government-mandated "warning" that will dissuade Floridians from registering to vote with them. *Id.* ¶ 6. Voters, civil rights groups, and many Supervisors of Elections objected to these provisions as harmful and unnecessary, but the Legislature paid them no heed. *Id.* ¶ 3.

Those who touted the bill offered little to justify it. Its principal sponsor deflected the legitimate outrage over this significant revision to the state's elections regime, flippantly responding: "Some people say 'why?' and I say 'why not?' Let's try it. We can always do it differently next week or next month or next year, but why not try this?" *Id.* ¶ 8. The obvious answer is that an election, once it occurs under an unduly burdensome and oppressive regime, cannot be undone. And each of the Bill's revisions makes it harder for eligible Floridians to exercise their most fundamental right, undermining the legitimacy of the state's elections.

It was thus not surprising that shortly after SB90 was enacted, four separate lawsuits were filed challenging the constitutionality of several of its provisions. This particular case was brought by five organizations—the League of Women Voters of

Florida, Inc., the League of Women Voters of Florida Education Fund, Inc. (collectively, the "League"), the League of United Latin American Citizens ("LULAC"), Black Voters Matter Fund, Inc., and Florida Alliance for Retired Americans, Inc.—and four Florida voters. Compl. ¶¶ 15-35. They sue the Florida Secretary of State, the Florida Attorney General, and the Supervisors of Elections for each of Florida's 67 counties. *Id.* ¶¶ 36-38. The *League* Plaintiffs bring six claims for declaratory and injunctive relief.

First, the *League* Plaintiffs challenge SB90's voting restrictions—the limits on drop boxes, non-partisan activities at polling places, and vote-by-mail ballot collection, and the need to request vote-by-mail ballots more often—as an unconstitutional undue burden on Floridians' right to vote in violation of the First and Fourteenth Amendments. Compl. ¶¶ 148-160. The *League* Plaintiffs allege that individually and cumulatively, these provisions inflict severe burdens on Florida's voters. *Id.* ¶ 152. Voters will be forced to re-request vote-by-mail ballots for each general election, even though such requests have been valid for two general elections for the past 14 years. *Id.* ¶ 153. Voters will be virtually prohibited from relying on assistance to submit their vote-by-mail ballots, other than from immediate family members—including the *League* Plaintiffs' volunteers. *Id.* There will also be fewer drop boxes, because SB90 limits where they may be placed and requires that they be under constant physical, in-person supervision. *Id.* ¶ 154. And in-person voters

5

will no longer be able to depend on assistance from volunteers, who previously provided water, food, and other assistance to voters in line. *Id.* ¶ 155. There is no state interest justifying any of these provisions, because Florida's 2020 election— which proceeded without any of the new limitations—was excellent and recognized as secure by everyone involved. *Id.* ¶¶ 156-158.

Second, the *League* Plaintiffs challenge SB90's limits on vote-by-mail ballot collection as an infringement of First Amendment free speech and associational rights. *Id.* ¶¶ 161-172. Voter turnout efforts, which include vote-by-mail ballot collection, are a means by which the *League* Plaintiffs communicate their belief in the power and importance of democratic participation, and associate with others to further their expressive goals. *Id.* ¶¶ 165, 167. SB90 sharply inhibits that speech and association by providing that no volunteer may collect more than two vote-by-mail ballots per election from voters other than immediate family members. *Id.* ¶ 102. This limitation does not serve any adequate state interest. *Id.* ¶ 171.

Third, the *League* Plaintiffs challenge the Line Warming Ban—SB90's limits on in-person, non-partisan activities at polling places—as an infringement of First Amendment free speech and associational rights. *Id.* ¶¶ 173-177. Many of the *League* Plaintiffs have historically distributed or coordinated the distribution of food and drink at polling places, hoping to make it easier for voters to endure long lines and exercise their fundamental right to vote. *Id.* ¶ 175. This, too, is core political

speech and association. *Id.* But SB90 appears to prohibit it, by making it a crime to "engag[e] in any activity with the intent to influence or effect of influencing a voter" within 150 feet of a polling location. *Id.* ¶ 176. Again, no adequate state interest justifies this prohibition. *Id.* ¶ 177.

Fourth, the *League* Plaintiffs separately challenge the Line Warming Ban as unconstitutionally vague and overbroad under the First Amendment. *Id.* ¶¶ 178-186. SB90's prohibition on "engaging in any activity with the intent to influence or effect of influencing a voter" is unconstitutionally vague, because it provides no guidance on what constitutes a prohibited "influenc[e]" on a voter or what "any activity" means, and because it appears to impose strict liability for all activities that have the "effect of influencing a voter," without limitation or definition, and regardless of the defendant's intent. *Id.* ¶¶ 179, 182-183. It is also unconstitutionally overbroad, because it prohibits a substantial amount of constitutionally protected expression, going well beyond the prohibitions on partisan campaign activity that courts have upheld at polling places. *Id.* ¶ 182.

Fifth, the *League* Plaintiffs challenge, as unconstitutional compelled speech under the First Amendment, SB90's requirement that they warn prospective voters who give them voter registration forms that the *League* Plaintiffs "might not deliver" their voter registration forms in time for the voters to be registered. *Id.* ¶¶ 187-193. By requiring recitation of this disclaimer to prospective voters, SB90 compels the

*League* Plaintiffs to engage in government-mandated political expression that undermines the *League* Plaintiffs' own message that they can be trusted with voter registration forms. *Id.* ¶ 189-190. Moreover, the government-mandated message is false because the *League* Plaintiffs who engage in voter registration in fact take pains to ensure that all registration forms are properly and timely submitted. *Id.* ¶ 191. And the compelled expression is not narrowly tailored to serve any compelling state interest, because the government could speak for itself if it thinks such a warning is needed. *Id.* ¶ 193.

Sixth, and finally, the *League* Plaintiffs challenge that same deceptive registration warning as an infringement of the *League* Plaintiffs' free-speech rights, because the mandated warning will interfere with the *League* Plaintiffs' ability to engage with potential voters and encourage them to register and vote. *Id.* ¶¶ 194-202. Prospective voters who are falsely told that the *League* Plaintiffs "might not deliver" their registration forms in a timely manner will be dissuaded from registering to vote with the *League* Plaintiffs. *Id.* ¶ 200. And the government has no legitimate interest in dissuading voters from registering to vote with the *League* Plaintiffs or other third-party voter registration organizations. *Id.* ¶ 201.

## LEGAL STANDARD

On a Rule 12(b)(6) motion to dismiss, the allegations in the complaint are accepted as true and construed in the light most favorable to the plaintiff. *Chaparro*

*v. Carnival Corp.*, 693 F.3d 1333, 1335 (11th Cir. 2012). The standard is not rigorous: a motion to dismiss must be denied so long as the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Co. v. Twombly*, 550 U.S. 544, 570 (2007)).

## ARGUMENT

The Secretary's motion seeks dismissal of just two of the *League* Plaintiffs' six claims for relief: Count I, a constitutional right-to-vote claim challenging SB90's limits on drop boxes, non-partisan activities at polling places, and vote-by-mail ballot collection, and the need to request vote-by-mail ballots more often, Mot. at 5-12; and Count IV, a vagueness and overbreadth challenge to SB90's restrictions on non-partisan activities at polling places, Mot. at 29-34, 36-39. The rest of the Secretary's Motion is directed to claims of racial discrimination and violations of the Voting Rights Act that the *League* Plaintiffs do not bring. And the Secretary does not seek dismissal of Counts II, III, V, and VI of the *League* Plaintiffs' Complaint, which allege that multiple provisions of SB90 violate the *League* Plaintiffs' First Amendment rights.

## I.    The *League* Plaintiffs have stated a right-to-vote claim.

Count I of the *League* Plaintiffs' First Amended Complaint alleges that SB90 imposes an undue burden on the right to vote in violation of the First and Fourteenth

Amendments. Compl. ¶¶ 148-160. The legal standard for such claims is clear and well-established: courts must "apply the flexible standard from *Anderson* and *Burdick*." *Common Cause/Ga. v. Billups*, 554 F.3d 1340, 1352 (11th Cir. 2009) (citing *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983) and *Burdick v. Takushi*, 504 U.S. 428, 434 (1992)); *see also Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1318 (11th Cir. 2019) (holding that courts must "evaluate the constitutionality of a challenged election law by applying the *Anderson-Burdick* test").

### A. The *Anderson-Burdick* balancing test cannot be adjudicated on a motion to dismiss.

*Anderson-Burdick* is a balancing test that requires a fully developed factual record and cannot be adjudicated on a motion to dismiss. Under *Anderson-Burdick*, courts must weigh "the burden imposed on voters" by the challenged laws "against the interests of the state" in enforcing them. *Common Cause/Ga.*, 554 F.3d at 1352. This analysis proceeds in three steps. Courts "must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate." *Anderson*, 460 U.S. at 789. Courts "then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule." *Id.* Finally, courts must "determine the legitimacy and strength of each of those interests," and "the extent to which those interests make it necessary to burden the plaintiff's rights." *Id.* "Only after weighing

all these factors is the reviewing court in a position to decide whether the challenged provision is unconstitutional." *Id.*

The full *Anderson-Burdick* balancing analysis is required no matter what level of burden is alleged. Here, the *League* Plaintiffs have alleged severe burdens. Compl. ¶¶ 152-155. But even if they had not done so, a full balancing analysis would still be needed, because "however slight [the] burden may appear, . . . it must be justified by relevant and legitimate state interests 'sufficiently weighty to justify the limitation.'" *Crawford*, 553 U.S. at 191 (plurality op.) (quoting *Norman v. Reed*, 502 U.S. 279, 288-89 (1992)); *see also id.* at 211 (Souter, J., dissenting) (expressly agreeing with this standard). Thus, "even when a law imposes only a slight burden on the right to vote, relevant and legitimate interests of sufficient weight still must justify that burden." *Democratic Exec. Comm. of Fla.*, 915 F.3d at 1318-19; *see also LOWV I*, 314 F. Supp. 3d at 1215-16. There is, however, a sliding-scale standard of review: "[t]he more a challenged law burdens the right to vote, the stricter the scrutiny to which" the law is subjected. *Democratic Exec. Comm. of Fla.*, 915 F.3d at 1319; *LOWV I*, 314 F. Supp. 3d at 1215.[1]

---

[1] The Secretary cites the Supreme Court's recent discussion of "the usual burdens of voting" in *Brnovich v. Democratic National Committee*, 141 S. Ct. 2321, 2338 (2021). But *Brnovich* addressed a claim under Section 2 of the Voting Rights Act, not a constitutional challenge under *Anderson-Burdick*. It did not and could not alter the longstanding rule that in a *constitutional* challenge to voting procedures, "[h]owever slight th[e] burden may appear, . . . it must be justified by relevant and

This fact-bound analysis requires a fully developed record and cannot be adjudicated on a motion to dismiss. As a result, courts of appeals have repeatedly reversed district courts when they have dismissed *Anderson-Burdick* claims at this preliminary stage. As the Eleventh Circuit has expressly recognized, it is "impossible for [a court] to undertake the proper review required by the Supreme Court" under the *Anderson-Burdick* test on a motion to dismiss. *Duke*, 5 F.3d at 1405 & n.6; *see also Bergland v. Harris*, 767 F.2d 1551, 1555 (11th Cir. 1985) (remanding to allow district court "to develop the factual record necessary to follow the weighing process dictated by *Anderson*"). On a motion to dismiss, the Court must accept as true the *League* Plaintiffs' allegations of severe burdens on the right to vote, and must draw all reasonable inferences in the *League* Plaintiffs' favor. *Iqbal*, 556 U.S. at 678. And the Court cannot simply accept the state's assertion of its own interests. Rather, "[t]he existence of a state interest . . . is a matter of proof," and a court addressing a motion to dismiss necessarily lacks "*evidence* as to the state's interests in promulgating" the challenged law. *Duke*, 5 F.3d at 1405 & n.6 (emphasis added). Without evidence of state interests, a court cannot balance the alleged burdens against state interests, as *Anderson-Burdick* requires. Courts that attempt to decide

legitimate state interests 'sufficiently weighty to justify the limitation.'" *Crawford*, 554 U.S. at 191 (plurality op.). And even in the Section 2 context, *Brnovich* expressly *declined* "to announce a test to govern all VRA § 2 claims involving rules, like those at issue here, that specify the time, place, or manner for casting ballots." *Brnovich*, 141 S. Ct. at 2336.

*Anderson-Burdick* claims without a factual record are therefore "in the position of Lady Justice: blindfolded and stuck holding empty scales." *Soltysik v. Padilla*, 910 F.3d 438, 450 (9th Cir. 2018).

> **B.    There is no vote-by-mail exception to the *Anderson-Burdick* balancing test.**

Unable to challenge the well-established law requiring a fact-based balancing analysis of the *League* Plaintiffs' right-to-vote claim, the Secretary invents an exception, arguing that vote-by-mail procedures categorically do not burden the right to vote and are therefore not subject to *Anderson-Burdick*. This argument fails at the threshold, because the *League* Plaintiffs' right-to-vote challenge is not limited to vote-by-mail—it also challenges the Line Warming Ban, which affects in-person voting. Compl. ¶ 155. And because the *League* Plaintiffs allege that the challenged provisions of SB90 unconstitutionally burden the right to vote through both "each individual restriction and the cumulative effect of each of the Challenged Provisions," *id.* ¶ 152, the burdens that the Line Warming Ban imposes must be considered along with the other restrictions and cannot be separated. The Secretary simply ignores this aspect of the *League* Plaintiffs' claims.

Even as to the *League* Plaintiffs' challenges to vote-by-mail procedures, controlling precedent rejects the Secretary's argument that they are categorically exempt from the *Anderson-Burdick* balancing test. The Supreme Court has repeatedly held that there can be no "litmus test for measuring the severity of a

burden that a state law imposes" as an alternative to conducting the fact-intensive *Anderson-Burdick* balancing. *Crawford*, 553 U.S. at 191 (plurality op.). "Constitutional challenges to specific provisions of a State's election laws . . . cannot be resolved by any 'litmus-paper test' that will separate valid from invalid restrictions." *Anderson*, 460 U.S. at 789. Instead, courts always "must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments," and then "must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule." *Id.*; *see also Bergland*, 767 F.2d at 1553 (same). Then, "[i]n passing judgment, the Court must not only determine the legitimacy and strength of each of those interests; it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights." *Anderson*, 460 U.S. at 789.

The Supreme Court has therefore emphasized that "there is 'no substitute for the hard judgments that must be made'" in adjudicating voting rights claims. *Id.* at 789-90 (quoting *Storer v. Brown*, 415 U.S. 724, 730 (1974)). And the Eleventh Circuit has held *in the specific context of a challenge to vote-by-mail procedures* that such procedures are subject to balancing under the *Anderson-Burdick* test because they "burden . . . vote-by-mail and provisional voters' fundamental right to vote." *Democratic Exec. Comm. of Fla.*, 915 F.3d at 1318-19; *see also Democratic Exec. Comm. of Fla. v. Detzner*, 347 F. Supp. 3d 1017, 1022, 1029 (N.D. Fla. 2018)

(applying *Anderson-Burdick* to "a case about vote-by-mail and provisional ballots").

The Secretary's argument depends principally on the Supreme Court's decision in *McDonald v. Board of Education Commissioners of Chicago*, 394 U.S. 802 (1969). *McDonald*, however, predates *Anderson*, *Burdick*, *Crawford*, and each of the Eleventh Circuit cases just described, which reject the litmus-test approach that the Secretary says *McDonald* requires. And even *McDonald* does not impose the failure-as-a-matter-of-law litmus test that the Secretary favors. Rather, as the Supreme Court has since clarified, "the Court's disposition of the claims in McDonald rested on failure of proof." *O'Brien v. Skinner*, 414 U.S. 524, 529 (1974). *McDonald* was an appeal from a summary judgment decision, and there was "nothing in the record to indicate that the Illinois statutory scheme has an impact on appellants' ability to exercise the fundamental right to vote." *McDonald*, 394 U.S. at 807. When plaintiffs presented such evidence in a later absentee voting case, the Court reached the opposite conclusion. *See O'Brien*, 414 U.S. at 530. Thus, the Secretary is wrong to argue that *McDonald* "has direct application" here. Mot. at 8 (quoting *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989)). Instead, as the opinion and later precedent make clear, *McDonald* "rested on failure of proof," after discovery and at summary judgment, that was unique to that case. *O'Brien*, 414 U.S. at 529.

The three other cases the Secretary cites do even less to support her argument.

15

*See New Ga. Project v. Raffensperger*, 976 F.3d 1278, 1281 (11th Cir. 2020); *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1261 (11th Cir. 2020); *Griffin v. Roupas*, 385 F.3d 1128 (7th Cir. 2004). None even cites *McDonald*, much less holds that it exempts vote-by-mail restrictions from *Anderson-Burdick*, as the Secretary argues here.

Far from supporting the Secretary's position, *New Georgia Project* does exactly what the Secretary argues is *not* required: it conducts an *Anderson-Burdick* balancing analysis of an absentee voting restriction. *New Ga. Project*, 976 F.3d at 1282. After expressly holding that "*Anderson* and *Burdick*" provide "the appropriate framework" for evaluating a challenge to an absentee voting deadline, the court explains that "the alleged burdens" from the deadline "are not severe" and that they are outweighed by "several interests that justify the deadline." *Id.* at 1280, 1282. The analysis is abbreviated because *New Georgia Project* involved a motion to stay a preliminary injunction. *Id.* at 1280-82. But it is precisely the balancing analysis that *Anderson-Burdick* requires, and that Eleventh Circuit precedent makes clear cannot properly be conducted on a motion to dismiss. *See Duke*, 5 F.3d at 1405 & n.6; *Bergland*, 767 F.2d at 1553. The Secretary's quoted sentence asserting that the absentee voting deadline "does not implicate the right to vote at all" comes as part of that balancing analysis—it does not establish an exception to it. *New Ga. Project*, 976 F.3d at 1281. And regardless, *New Georgia Project* is a stay panel decision that

was written "only for the parties' benefit" and has no precedential "effect outside that case." *Id.* at 1280 n.1.

*Jacobson* is even further afield, because it does not involve absentee voting or vote by mail at all. Instead, it was a challenge to a Florida law governing "the order in which candidates appear on the ballot." *Jacobson*, 974 F.3d at 1241. It holds that a challenge to the order of candidates' names on a ballot "is not based on the right to vote *at all*" and therefore is not subject to "the legal standards that apply to laws that burden the right to vote." *Id.* at 1261. But even in doing so, *Jacobson* reaffirms that courts "must evaluate laws that burden voting rights using the approach of *Anderson* and *Burdick*, which requires [courts] to weigh the burden imposed by the law against the state interests justifying the law." *Id.* That includes laws that "make it more difficult for individuals to vote," *id.*, as the *League* Plaintiffs allege SB90 does here. Thus, *Jacobson* only confirms that cases like this one, which do allege that a statute "make[s] it more difficult for individuals to vote," must be decided under *Anderson-Burdick*. *Id.*

Finally, *Griffin* is an out-of-circuit decision that applies the *Anderson-Burdick* framework to an absentee ballot restriction—it, too, does not create an exception to that framework. 385 F.3d at 1130-31. Citing *Burdick* among other cases, *Griffin* explains "the constitutional question is whether the restriction and resulting exclusion are reasonable given the interest the restriction serves." *Id.* at 1130. *Griffin*

does then go on to conduct the balancing analysis on a motion to dismiss, after taking judicial notice of press reports about voter fraud concerns that had not been subjected to adversarial testing. *Id.* at 1131. But controlling Eleventh Circuit precedent prevents courts here from doing the same. *See Duke*, 5 F.3d at 1405 n.6.[2]

### C.    The *League* Plaintiffs need not show that "voters generally" are burdened.

The Secretary also runs head into binding precedent in arguing that the *Anderson-Burdick* analysis must consider only SB90's effect on "voters generally," Mot. at 10-12, and not its effect on any subset of the electorate. In any event, this argument is irrelevant, because the *League* Plaintiffs do allege burdens on all voters—both those who vote by mail and those who vote in person. Compl. ¶¶ 152-155. And a six-justice majority specifically rejected the Secretary's approach in *Crawford*, concluding that *Anderson-Burdick* requires consideration of whether a

---

[2] Citing out-of-circuit precedent, the Secretary also argues in passing that *Anderson-Burdick* requires the Court to "look[] at the whole electoral system," not just at the effects of SB90. Mot. at 6 (citing *Luft v. Evers*, 963 F.3d 665, 671-72 (7th Cir. 2020)). The Court need not address this issue now, because the Secretary does not argue that she is entitled to dismissal on this basis. But the Secretary is wrong: courts often address *Anderson-Burdick* claims by focusing specifically on the effect of the challenged statute. *See, e.g.*, *Democratic Exec. Comm. of Fla.*, 347 F. Supp. 3d at 1030-31 (analyzing a vote-by-mail signature matching requirement under *Anderson-Burdick* by focusing on the effects of the challenged requirement, specifically); *Democratic Exec. Comm. of Fla.*, 915 F.3d at 1320-21 (same). Even when a voting procedure is offered "as a convenience to the voter," in addition to other options, "[c]onstitutional problems emerge . . . when conveniences are available for some people but affirmatively blocked for others." *LOWV I*, 314 F. Supp. 3d at 1217.

statute "imposes 'excessively burdensome requirements' on *any class of voters*." 553 U.S. at 202 (plurality op.) (quoting *Storer v. Brown*, 415 U.S. 724, 738 (1974) (emphasis added); *see also id.* at 199 (assessing the "somewhat heavier burden [that] may be placed on a limited number of persons" by the challenged law); *id.* at 212-14 (Souter, J., dissenting) (describing the burdens faced by "[p]oor, old, and disabled voters" and those who do not own cars); *id.* at 239 (Breyer, J., dissenting) (similar). The Supreme Court in *Anderson* similarly focused on the challenged law's "burden on an identifiable segment of Ohio's independent-minded voters"—not on voters generally. *Anderson*, 460 U.S. at 792. As this Court has recognized, "[d]isparate impact matters under *Anderson-Burdick*." *LOWV I*, 314 F. Supp. 3d at 1216.

The Secretary's argument that only burdens on "voters generally" matter depends entirely on Justice Scalia's non-controlling concurrence in *Crawford*—the Secretary cites nothing else. Justice Scalia did argue in *Crawford* that *Anderson-Burdick* should "consider[] the laws and their reasonably foreseeable effect on *voters generally*," rather than on a subset of voters. *Crawford*, 553 U.S. at 206 (Scalia, J., concurring). But he was joined by only two other justices, and the rest of the Court rejected his approach. *See id.* at 199, 202 (plurality op.); *id.* at 212-14 (Souter, J., dissenting); *id.* at 239 (Breyer, J., dissenting).

It is no surprise that a majority of the *Crawford* Court rejected the approach that the Secretary now urges. Focusing the analysis exclusively on "voters generally"

would give states free reign to disenfranchise groups of voters without any legal recourse, as long as other voters were unaffected. As this Court has explained, a law that "has the effect of creating a secondary class of voters . . . is constitutionally untenable." *LOWV I*, 314 F. Supp. 3d at 1217. For that reason, courts applying *Anderson-Burdick* routinely consider the effects of the challenged law on the most-burdened groups. *See, e.g.*, *Crawford*, 553 U.S. at 199 (plurality op.) (addressing "a somewhat heavier burden [that] may be placed on a limited number of persons"); *Democratic Exec. Comm. of Fla.*, 915 F.3d at 1322 (addressing a burden that affected "only about 4,000 ballots" out of "9 million total ballots cast"). The Court should do the same here.

## II. The *League* Plaintiffs have stated vagueness and overbreadth claims against the Line Warming Ban.

The Line Warming Ban, which prohibits "engaging in any activity with the intent to influence or effect of influencing a voter" is unconstitutionally overbroad and vague under the First Amendment and the Due Process Clause of the Fourteenth Amendment. Fla. Stat. § 102.031(4)(b) ("Section 29"). The Ban is unconstitutionally overbroad because its text seems to proscribe a substantial amount of constitutionally protected activities, going well beyond the limited restrictions on partisan campaigning at polling places that the Supreme Court has upheld. The Ban is also unconstitutionally vague because it provides no guidance to individuals or law enforcement on what constitutes prohibited conduct, and because it appears to

impose liability for any activity that has the "effect of influencing a voter," regardless of intent or how a voter is influenced. *Id.*

### A.    The *League* Plaintiffs have adequately pled that the Line Warming Ban restricts a substantial amount of constitutionally protected conduct, rendering it unconstitutionally overbroad.

The Line Warming Ban is unconstitutional because its expansive breadth restricts an unacceptably large amount of constitutionally protected speech. The overbreadth doctrine is premised on the notion that free-speech "freedoms need breathing space to survive," because "persons whose expression is constitutionally protected may well refrain from exercising their rights for fear of criminal sanctions provided by a statute susceptible of application to protected expression." *Gooding v. Wilson*, 405 U.S. 518, 521-22 (1972) (quoting *NAACP v. Button*, 371 U.S. 415, 433 (1963)). As a result, the "government may regulate in the area only with narrow specificity," and speech regulations must "be carefully drawn or be authoritatively construed to punish unprotected speech and not be susceptible of application to protected expression." *Id.* at 522. "[T]he overbreadth doctrine permits the facial invalidation of laws that inhibit the exercise of First Amendment rights if the impermissible applications of the law are substantial when judged in relation to the statute's plainly legitimate sweep." *City of Chi. v. Morales*, 527 U.S. 41, 52 (1999) (citing *Broadrick v. Oklahoma*, 413 U.S. 601, 612-615 (1973)). The Ban is unconstitutional under this doctrine because it "create[s] a criminal prohibition of

alarming breadth," pulling within its prohibitions a significant amount of protected speech. *United States v. Stevens*, 559 U.S. 460, 474 (2010).

Plaintiffs' volunteer efforts at polling places, including providing food, water, and other assistance, as well as their conversations and interactions with voters surrounding voting, are core political speech. Compl. ¶¶ 18, 25-26. The First Amendment protects the rights of free speech and expression—including "the type of interactive communication concerning political change that is appropriately described as 'core political speech.'" *Meyer v. Grant*, 486 U.S. 414, 421-22 (1988). Encouraging voters to cast a ballot and assisting voters to do so "necess[arily] involves . . . the expression of a desire for political change." *Id.* at 421. Discussions about voting "implicate[] political thought and expression." *League of Women Voters v. Hargett*, 400 F. Supp. 3d 706, 724 (M.D. Tenn. 2019) (citing *Buckley v. Am. Const. Law Found. Inc.*, 525 U.S. 182, 195 (1999)). And the Eleventh Circuit has specifically held that providing food in a public forum is constitutionally protected expressive conduct. *See Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*, 901 F.3d 1235, 1243 (11th Cir. 2018). Organizations and individuals, like the *League* Plaintiffs, who distribute or coordinate the distribution of food and drink at polling places therefore engage in First Amendment protected core political speech and expression by encouraging those voters to stay in line, cast their ballots,

and participate in democracy. Compl. ¶¶ 18, 25-26, 173, 179.[3]

The Line Warming Ban appears to criminalize this expression. It restricts any conduct that has the intent or effect of "influencing a voter," without limitation or explanation of what kind of influence is prohibited. *Id.* ¶ 179. Under the plain language of the statute, a non-partisan individual handing food or water to a voter in line would risk violating the Ban because she would have the intent, and possibly the effect, of "influencing a voter" to stay in line and vote. *Id.*

The *League* Plaintiffs have engaged in such conduct in the past. For example, the League has previously hosted "Party at the Polls" events across Florida outside polling locations to answer questions voters have about the voting process, encourage voters to vote and stay in line, and distribute food and water. *Id.* ¶ 18. Both LULAC and Black Voters Matter have engaged in similar activities. *Id.* ¶¶ 25, 26. All of these constitutionally protected activities, which may have the effect of influencing voters—to stay in line, to cast their ballots, to make their voices heard, to participate in democracy—appear prohibited under the Ban. *Id.*[4]

---

[3] The Secretary wrongly assumes that Plaintiffs' overbreadth claim depends on voters having a constitutional right to receive food, water, and chairs while waiting in line. Mot. at 38, n.24. As explained here, this claim relates to Plaintiffs' exercise of their own First Amendment rights to engage in core political speech, which is entirely separate from the burden the Line Warming Ban places on voters. *See Meyer*, 486 U.S. 422-23.

[4] The Secretary's claim that Plaintiffs "never offer[] factual allegations" in support of their overbreadth claim, Mot. 39, is demonstrably false. *See, e.g.,* Compl. ¶¶ 6,

The Ban's expansive prohibition thus appears to proscribe Plaintiffs' constitutionally protected conduct. And its very existence will cause Plaintiffs to "refrain from constitutionally protected speech," *FF Cosms. FL, Inc. v. City of Miami Beach*, 866 F.3d 1290, 1303-04 (11th Cir. 2017)—a striking example of what the overbreadth doctrine protects against, Compl. ¶ 183.

The Secretary argues for a narrower construction of the Ban, to restrict only "partisan efforts to influence the decisions of voters." Mot. at 31. But the *League* Plaintiffs can have no confidence that prosecutors and courts will agree with that narrower construction, because—as discussed further below—it has no basis in the text of the statute or its legislative history, and it is not binding on anyone else, absent a court order.[5] In any event, as the Supreme Court has explained, it "would not uphold an unconstitutional statute merely because the Government promised to use it responsibly." *Stevens*, 559 U.S. at 480. And for good reason: it would be a small comfort to Plaintiffs or their staff, members, and volunteers to simply roll the dice, submitting themselves to highly discretionary charges and prosecution.

Finally, the Secretary's reliance on *Minnesota Voters All. v. Mansky*, 138 S.

---

117-20, 128, 130. On a Rule 12(b)(6) motion to dismiss, the allegations in the complaint are accepted as true and construed in the light most favorable to the plaintiff. *Chaparro*, 693 F.3d at 1335.

[5] If the Secretary is confident in her interpretation, pursuant to Fla. Stat. § 97.012, she has the authority to issue a directive to supervisors of election making clear that non-partisan line warming activities are permitted.

Ct. 1876 (2018), and the nonpublic forum standard for speech regulations is misplaced. Mot. at 37. *Mansky* is inapplicable because it held only that the *inside* of a polling place is a nonpublic forum, *id.* at 1886; *id.* at 1885 (noting "parks, streets, sidewalks, and the like" are "traditional public forums"). *Mansky* did not consider whether the area outside of a polling place is a public forum. The Line Warming Ban challenged here regulates conduct *outside* of a polling place, and importantly, a plurality of the Supreme Court has held that the area immediately surrounding a polling place, including "parks, streets, and sidewalks," are "quintessential public forums." *Burson*, 504 U.S. at 196. Equally problematic, the Ban is not limited to the partisan speech the Court has allowed governments to restrict in the immediate vicinity of polling places. *See id.* at 211. *Burson*'s concerns about *partisan* speech in the immediate vicinity of a polling place are wholly insufficient to justify the Ban's prohibitions of non-partisan speech and voter assistance. *Id.*

Because a significant portion of the Ban's prohibition impacts protected speech, Plaintiffs have adequately pled that the Ban is overbroad.

### B. Plaintiffs have adequately pled that the Line Warming Ban fails to provide sufficient guidance regarding prohibited conduct making it unconstitutionally vague.

The Line Warming Ban is unconstitutionally vague under the Fourteenth Amendment because it does not provide sufficient notice of what conduct is prohibited. Indeed, it leaves Plaintiffs and others to guess at what activities could

land them in jail. By doing so, the Ban burdens Plaintiffs' free speech and associational activities and chills their constitutionally-protected activities. The Secretary attempts to address this problem in her motion by redefining the Ban's scope, but her arguments ignore the plain language of the statute and are not binding on the relevant officials.

"It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). The Supreme Court has long recognized that laws must give "the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly" and "must provide explicit standards for those who apply them." *Id*. Thus, "[v]agueness may invalidate a criminal law for either of two independent reasons. First, it may fail to provide the kind of notice that will enable ordinary people to understand what conduct it prohibits; second, it may authorize and even encourage arbitrary and discriminatory enforcement." *Morales*, 527 U.S. at 56. The Ban fails both tests. Further, in this case, the Court must scrutinize the statute with a particularly skeptical eye because it "abut[s] upon sensitive areas of basic First Amendment freedoms." *Baggett v. Bullitt*, 377 U.S. 360, 372 (1964). The "Constitution demands a high level of clarity from a law if it threatens to inhibit the exercise of a constitutionally protected right, such as the right of free speech."

*Konikov v. Orange Cnty.*, 410 F.3d 1317, 1329 (11th Cir. 2005) (citing *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 499 (1982)).

As explained above, the Line Warming Ban offers no guidance on what conduct is prohibited, rendering it unconstitutionally vague. It prohibits "any activity with the intent to influence or effect of influencing a voter," and "influencing a voter" could have countless interpretations. Is it prohibited to "influenc[e] a voter" to stay in line? Is it prohibited to "influenc[e] a voter" to cast their ballot? Is it prohibited to "influenc[e] a voter" to participate in democracy? The statute offers no delineation of what types of activities and influence are prohibited and Plaintiffs are left to speculate about what they may and may not do.

Remarkably, the Secretary's Motion illustrates the Ban's vagueness by arguing that the Ban is significantly narrower than the statute's plain text would suggest. The Secretary claims that "any activity with the intent to influence or effect of influencing a voter" "unambiguous[ly]" means only "partisan efforts of individuals or campaigns to pressure or influence voters' decisions" about who to vote for. Mot. at 31-32. But the Secretary's limiting interpretation is not at all clear from the text of the statute, and Plaintiffs cannot be confident that prosecutors and courts will adopt the same construction.

Statutory interpretation must begin (and "often should end") "with the words of the statutory provision." *Harris v. Garner*, 216 F.3d 970, 972 (11th Cir. 2000).

Nowhere in the statute is the restricted activity limited to "swaying a voter's decision on how to vote," as the Secretary claims. Mot. at 32. The Secretary asks this Court to assume that courts will rewrite the statute—which they may not do—rather than apply its plain text. *Harris*, 216 F.3d at 976 ("the role of the judicial branch is to apply statutory language, not to rewrite it"); *Badaracco v. Comm'r*, 464 U.S. 386, 398 (1984) ("Courts are not authorized to rewrite a statute because they might deem its effects susceptible of improvement."). What is more, the Secretary's interpretation conflicts with the primary legislative sponsor's interpretation of the Ban. Representative Ingoglia explained that he construes the Ban to restrict handing out water in some circumstances, Compl. ¶ 118, illustrating how reasonable individuals could differ in their understanding of the Ban. The statute therefore fails to give reasonable notice of what is prohibited and chills speech by leading reasonable individuals to guess at what is prohibited and self-censor to comply with the law. Contrary to the Secretary's claims, Plaintiffs do not argue that the Legislature must "draw an absolute line separating proscribed from permitted speech and conduct." Mot. at 30. But the Legislature is required to provide a person of ordinary intelligence sufficient guidance to understand what they may and may not do—and it has failed to do so.

The Ban is additionally problematic because it criminalizes conduct based on third parties' subjective reactions to it, making it impossible for Plaintiffs to know

when they might be violating the law. The Secretary wrongly argues that the Ban's scienter requirement remedies any vagueness concerns. Mot. at 32, n.21. But the Ban prohibits not only activities carried out with an intent to influence voters, but also activities that "*have the effect of* influencing a voter," regardless of the actor's intent. Section 29. The Ban's focus on others' reactions to conduct resembles the law invalidated by the Supreme Court in *Coates v. City of Cincinnati*, 402 U.S. 611 (1971). There, the Court held that a law making it unlawful for individuals to assemble on public property and engage in conduct that was "annoying to persons passing by" was unconstitutionally vague, explaining that because "[c]onduct that annoys some people does not annoy others," it was impossible for someone to determine whether they were violating the law. *Id.* at 614. Likewise here, when Plaintiffs operate their constitutionally protected programs, whether and how someone is "influenced" is out of Plaintiffs' control. Aside from completely halting their engagement in their protected activities, Plaintiffs have no way of determining whether their activities will violate the Ban.

For the same reasons, the Ban fails the void-for-vagueness doctrine's second requirement that it not invite arbitrary or discriminatory enforcement. Because Plaintiffs' activities always run a risk of having the effect of influencing a voter in some way, the Ban gives those enforcing it free reign to pick and choose who might be prosecuted under its provisions. In other words, the Ban presents "a standardless

sweep [that] allows policemen, prosecutors and juries to pursue their personal predilections." *Kolender v. Lawson*, 461 U.S. 352, 358 (1983) (quoting *Smith v. Goguen*, 415 U.S. 566, 575 (1974)).

Finally, the Secretary's statutory interpretation arguments for why the Ban is not unconstitutionally vague only confirm the Ban's vagueness. First, the Secretary's claim that surrounding portions of the statute make clear that the Ban prohibits only "partisan solicitation," Mot. at 31, 33, is unavailing. To the contrary, the other activities prohibited by the statute—which include among other activities selling any item, including non-partisan items, conducting polls, and seeking signatures for petition—mean that the statute appears to target both partisan and non-partisan conduct. *See* Section 29. Thus, Plaintiffs cannot be confident that the Ban applies only to partisan conduct.

The Secretary's reliance on the doctrine of *nonscitur a sociis* is also misplaced. *Nonscitur a sociis* literally translates to "it is known by its associates," and indicates that in some cases the meaning of an ambiguous word can be discerned by surrounding words when part of a "list" or "string of statutory terms." *Graham Cnty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*, 559 U.S. 280, 287, 289 (2010) (quoting Black's Law Dictionary) (citing cases). But here there is no such list or string of terms such that it would be appropriate to apply this statutory cannon. Even if applicable, "the substantive connection, or fit, between the terms" in

question, which restrict a variety of partisan and non-partisan activities, "is not so tight or so self-evident as to demand that we 'rob' any one of them 'of its independent and ordinary significance.'" *Graham Cnty.*, 559 U.S. at 288 (quoting *Reiter v. Sonotone Corp.*, 442 U.S. 330, 338-39 (1979)). Instead, the statute regulates a wide range of conduct that is both partisan and non-partisan in nature. *Cf. Beecham v. United States*, 511 U.S. 368, 371 (1994) ("That several items in a list share an attribute counsels in favor of interpreting the other items as possessing that attribute as well."). Thus, the Ban has "a character of its own not to be submerged by its association," with the other prohibited conduct. *Graham Cnty.*, 559 U.S. at 288 (quoting *Russell Motor Car Co. v. United States*, 261 U.S. 514, 519 (1923)).

Relatedly, the Secretary's proposed limiting construction would seem to render the Ban superfluous and duplicative of the statute's preexisting prohibition on "seeking or attempting to seek any vote," as well as other parts of the statute. But "the rule against superfluities instructs courts to interpret a statute to effectuate all its provisions, so that no part is rendered superfluous." *Hibbs v. Winn*, 542 U.S. 88, 89 (2004). Indeed, the Secretary's example of what would qualify as prohibited activity under the Ban is already explicitly prohibited by the preceding parts of the statute. She says that the Ban would prohibit handing out water bottles that have campaign logos pasted on the front or are supplemented with campaign literature. Mot. at 32-33. But the statute already separately prohibits "distribut[ing] any

political or campaign material." Section 29. The Secretary's limiting construction of the Ban would thus render it entirely superfluous of other preexisting portions of the statute—an outcome the Supreme Court has said it is "loath" to reach. *Cooper Indus., Inc. v. Aviall Servs., Inc.*, 543 U.S. 157, 166 (2004).

The Secretary's final argument that the carveout for non-partisan assistance from election officials saves the statute also misses the mark. Mot. 34-35. The statute allows *only* election supervisors' employees or volunteers to provide assistance to voters—implying, but not making clear, that others, like the *League* Plaintiffs, may not render the same assistance. In fact, in prior litigation before this Court, the Secretary made a near opposite argument to the one she makes here. In interpreting a Florida statute, she argued "that the Florida Legislature's failure to specifically include" something in the statutory text indicated that the unlisted item was "prohibit[ed]." *See LOWV I*, Case No. 4:18-cv-00251-MW-CAS, ECF No. 20 at 14 (June 15, 2018).

Because the statute provides no guidance on what activities are prohibited it is unconstitutionally vague.

## **CONCLUSION**

For these reasons, the Court should deny the Secretary's motion to dismiss.

## LOCAL RULES CERTIFICATION

Undersigned counsel certifies that this response contains 7,970 words, excluding the case style, table of contents, table of authorities, and certificate of service.

Respectfully submitted this 13th day of August, 2021.

/s/ Frederick S. Wermuth
Frederick S. Wermuth
Florida Bar No. 0184111
Thomas A. Zehnder
Florida Bar No. 0063274
King, Blackwell, Zehnder & Wermuth, P.A.
P.O. Box 1631
Orlando, FL 32802-1631
Telephone: (407) 422-2472
Facsimile: (407) 648-0161
fwermuth@kbzwlaw.com
tzehnder@kbzwlaw.com

Marc E. Elias
Aria C. Branch*
David R. Fox*
Lalitha D. Madduri*
Christina A. Ford
Francesca Gibson*
Perkins Coie, LLP
700 Thirteenth Street, N.W., Suite 800
Washington, D.C. 20005-3960
Telephone: (202) 654-6200
Facsimile: (202) 654-9959
melias@perkinscoie.com
abranch@perkinscoie.com
davidfox@perkinscoie.com
lmadduri@perkinscoie.com
christinaford@perkinscoie.com
fgibson@perkinscoie.com

Danielle Sivalingam*
Perkins Coie LLP
1888 Century Park East, Suite 1700
Century City, California 90067
Telephone: (310) 788-3344
Facsimile: (310) 843-2844
dsivalingam@perkinscoie.com

*Admitted *Pro Hac Vice*

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on August 13, 2021, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel in the Service List below.

/s/ Frederick S. Wermuth
Frederick S. Wermuth
Florida Bar No. 0184111

*Counsel for Plaintiffs*

## SERVICE LIST

Bradley R. McVay                William H. Stafford, III
Florida Bar No. 79034           Florida Bar No. 70394
Ashley E. Davis                 Bilal A. Faruqui
Florida Bar No. 48032           Florida Bar No. 15212
Colleen E. O'Brien              Karen A. Brodeen
Florida Bar No. 76578           Florida Bar No. 512772
Florida Department of State     Office of the Attorney General
RA Gray Building                PL-01 The Capitol

500 South Bronough Street, Ste. 100
Tallahassee, FL 32399
Telephone: 850-245-6531
brad.mcvay@dos.myflorida.com
ashley.davis@dos.myflorida.com
colleen.obrien@dos.myflorida.com

Mohammad O. Jazil
Florida Bar No. 72556
Gary V. Perko
Florida Bar No. 855898
Holzman Vogel Baran Torchinsky &
Josefiak PLLC
1532 Cristobal Dr.
Tallahassee, FL 32303
Telephone: 850-567-5762
mJazil@holtzmanvogel.com
gperko@holtzmanvogel.com

Phillip M. Gordon
Holzman Vogel Baran Torchinsky &
Josefiak PLLC
15405 John Marshall Hwy.
Haymarket, VA 20169
Telephone: 540-341-8808
pgordon@holtzmanvogel.law

*Counsel for Defendant Laurel M. Lee*

Robert C. Swain
Florida Bar No. 366961
Diana M. Johnson
Florida Bar No. 366961
Alachua County Attorney's Office
12 SE First St.
Gainesville, FL 32602
Telephone: 352-374-5218
bswain@alachuacounty.us
dmjohnson@alachuacounty.us

Tallahassee, Florida 32399
Telephone: 850-414-3785
william.stafford@myfloridalegal.com
bilal.faruqui@myfloridalegal.com
karen.brodeen@myfloridalegal.com

*Counsel for Defendant Ashley Moody*

Edward P. Cuffe
Florida Bar No. 1018521
Susan Erdelyi
Florida Bar No. 0648965
Marks Gray, P.A.
1200 Riverplace Blvd, Ste. 800
Jacksonville, FL 32207
Telephone: 904-807-2110
sse@marksgray.com
pcuffe@marksgray.com

*Counsel for Defendant Kim A. Barton*

*Counsel for Defendants Christopher Milton, Mark Anderson, Amanda Seyfang, Sharon Chason, Tomi S. Brown, Starlet Cannon, Heather Riley, Shirley Knight, Laura Hutto, Carol Dunaway, Travis Hart, Grant Conyers, Janet Adkins, Charles Overturf, Tappie Villane, Vicky Oakes, William Keen, Jennifer Musgrove, Dana Southerland, Deborah Osborne, Joseph Morgan, Bobby Beasley and Carol Rudd*

Frank M. Mari
Florida Bar No. 93243
Bell & Roper PA
2707 E. Jefferson St.
Orlando, FL 32803
Telephone: 407-897-5150
fmari@bellroperlaw.com

Ronald A. Labasky
Florida Bar No. 206326
Brewton Plante PA
215 S. Monroe Street, Ste. 825
Tallahassee, FL 32301
Telephone: 850-222-7718
rlabasky@bplawfirm.net

*Counsel for Defendants Mark Negley, Connie Sanchez, John Hanlon, Marty Bishop, Heath Driggers, Lori Scott, Kaiti Lenhart, and Penny Ogg*

John T. LaVia
Florida Bar No. 853666
Gardner, Bist, Bowden, Bush, Dee, Lavia & Wright, P.A.
1300 Thomaswood Drive
Tallahassee, FL 32308
Telephone: 850-385-0070
jlavia@gbwlegal.com

*Counsel for Defendants Chris H. Chambless, Vicki Davis, Mary Jane Arrington, Gertrude Walker and Lori Edwards*

Andy V. Bardos
Florida Bar No. 822671
GrayRobinson PA
301 S. Bronough St, Ste. 600
Tallahassee, FL 32301
Telephone: 850-577-9090

Stephen M. Todd
Florida Bar No. 0886203
Office of The County Attorney
601 E. Kennedy Blvd., 27th Floor
Tampa, FL 33602
Telephone: 813-272-5670

andy.bardos@gray-robinson.com

*Counsel for Defendant Jennifer J. Edwards, Leslie Swan, Alan Hays, Tommy Doyle, Michael Bennett, Wesley Wilcox, Joyce Griffin, Brian Corley, Christopher Anderson and Paul Stamoulis*

Jon A. Jouben
Florida Bar No. 149561
Hernando County
20 N. Main Street, Ste. 462
Brookesville, FL 34601-2850
Telephone: 351-754-4122
jjouben@co.hernando.fl.us

*Counsel for Defendant Shirley Anderson*

Kia M. Johnson
Florida Bar No. 124746
Escambia County Attorneys Office
221 Palafox Place, Ste. 430
Pensacola, FL 32502
Telephone: 850-595-4970
kmjohnson@myescambia.com

*Counsel for Defendant David H. Stafford*

Dale Scott
Florida Bar No. 568821
Bell & Roper, P.A.
2707 E. Jefferson St.
Orlando, Florida 32803
Telephone: 407-897-5150
dscott@bellroperlaw.com

todds@hillsboroughcounty.org

*Counsel for Defendant Craig Latimer*

Kelly L. Vicari
Florida Bar No. 88704
Pinellas County Attorney's Office
315 Court Street, 6th Floor
Clearwater, FL 33756
Telephone: 727-464-3354
kvicari@pinellascounty.org

*Counsel for Defendant Julie Marcus*

Benjamin Salzillo
Florida Bar No. 582751
Nathaniel A. Klitsberg
Florida Bar No. 307520
115 South Andrews Ave., Ste. 423
Ft. Lauderdale, FL 33301
Telephone: 954-357-7600
bsalizzo@broward.org
nklitsberg@broward.org

*Counsel for Defendant Joe Scott*

Craig D. Feiser
Florida Bar No. 164593
Jason Teal
Florida Bar No. 157198
Mary Margaret Giannini
Florida Bar No. 105572
117 W. Duval Street, Suite 480
Jacksonville, Florida 32202

*Counsel for Defendant Maureen Baird*

Telephone: 904-255-5052
cfeiser@coj.net
mgiannini@coj.net

*Counsel for Defendant Mike Hogan*

Robert Shearman
Florida Bar No. 105572
Geraldo F. Olivo
Florida Bar No. 60905
Henderson, Franklin, Starnes
& Holt, P.A.
1715 Monroe Street
Ft. Myers, Florida 33901
Telephone: 239-334-1346
robert.shearman@henlaw.com
jerry.olivo@henlaw.com

*Counsel for Defendants Aletris
Farnam, Diane Smith, Brenda Hoots,
Therisa Meadows, Tammy Jones and
Melissa Arnold*

Mark Herron
Florida Bar No. 199737
S. Denay Brown
Florida Bar No. 88571
Patrick O'Bryant
Florida Bar No. 1011566
Messer Caparello & Self, P.A.
2618 Centennial Place
Tallahassee, Florida 32308
Telephone: 850-222-0720
mherron@lawfla.com
dbrown@lawfla.com
pobryant@lawfla.com

*Counsel for Defendant Mark Earley*

Gregory T. Stewart
Florida Bar No. 203718
Elizabeth D. Ellis
Florida Bar No. 97873
Kirsten H. Mood
Florida Bar No. 115595
Nabors, Giblin & Nickerson, P.A.
1500 Mahan Drive, Suite 200
Tallahassee, FL 32308
Telephone: 850-224-4070
gstewart@ngnlaw.com
eellis@ngnlaw.com
kmood@ngnlaw.com

Nicholas Shannin
Florida Bar No. 9570
Shannin Law Firm
214 S. Lucerne Circle East
Orlando, Florida 32801
Telephone: 407-985-2222
nshannin@shanninlaw.com

*Counsel for Defendant Bill Cowles*

*Counsel for Defendant Paul Lux*

W. Kevin Bledsoe
Florida Bar No. 029769
London L. Ott
Florida Bar No. 95058
123 W. Indiana Avenue, Room 301
Deland, Florida 32720
Telephone: 386-736-5950
kbledsoe@volusia.org
lott@volusia.org

*Counsel for Defendant Lisa Lewis*

Michael B. Valdes
Florida Bar No. 93129
Oren Rosenthal
Florida Bar No. 86320
Miami-Dade Attorney's Office
Stephen P. Clark Center
111 N.W. 1st Street, Suite 2810
Miami, Florida 33128
Telephone: 305-375-5620
michael.valdes@miamidade.gov
oren.rosenthal@miamidade.gov

*Counsel for Defendant Christine White*

Benjamin J. Gibson
Daniel E. Nordby
George N. Meros, Jr.
Amber S. Nunnally
Shutts & Bowen LLP
215 S. Monroe St., Ste. 804
Tallahassee, FL 32301
Telephone: 850-241-1720
bgibson@shutts.com
dnordby@shutts.com
gmeros@shutts.com
anunnally@shutts.com

Morgan Bentley
Florida Bar No. 962287
Bentley Law Firm, P.A.
783 South Orange Ave., Third Floor
Sarasota, Florida 34236
Telephone: 941-556-9030
mbentley@thebentleylawfirm.com

*Counsel for Defendant Ron Turner*

Ashley D. Houlihan
Florida Bar No. 125852
Palm Beach County Supervisor of Elections
240 S Military Trail
West Palm Beach, FL 33416
Telephone: 561-656-6200
ashleyhoulihan@votepalmbeach.gov

*Counsel for Defendant Wendy Link*

Daniel J. Shapiro
Cameron T. Norris
Tyler R. Green
Steven C. Begakis
Consovoy McCarthy, PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
Telephone: 703-243-9423
daniel@consovoymccarthy.com
cam@consovoymccarthy.com
tyler@consovoymccarthy.com
steven@consovoymccarthy.com

*Counsel for Intervenor Defendants
Republican National Committee and
National Republican Senatorial
Committee*