IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

LEAGUE OF WOMEN VOTERS
OF FLORIDA, INC., et al.,

      *Plaintiffs,*

v.                                **Case No.:  4:21cv186-MW/MAF**

LAUREL M. LEE, in her official
capacity as Florida Secretary of
State, et al.,

      *Defendants,*

and

NATIONAL REPUBLICAN
SENATORIAL COMMITTEE and
REPUBLICAN NATIONAL
COMMITTEE,

      *Intervenor-Defendants.*

_____/

## ORDER ON MOTIONS TO DISMISS

This is a voting rights case. Plaintiffs are nonprofit groups and individual

voters who challenge Florida's newly enacted law, Senate Bill 90 ("SB 90"), which

they allege "burdens all Floridians," and "is crafted to and will operate to make it

more difficult for certain types of voters to participate in the state's elections[.]" ECF

No. 160 ¶ 5. Plaintiffs have sued Florida's Secretary of State, Laurel Lee, Florida's

Attorney General, Ashley Moody, and Florida's 67 Supervisors of Elections.

Defendant Lee and Defendant Moody have both moved to dismiss Plaintiffs' amended complaint. ECF Nos. 175 & 176. This Court has considered, without hearing, the motions to dismiss, *id*., memoranda in support, all other attachments, and the Plaintiffs' responses in opposition to the motions, ECF Nos. 197 & 198.[1]

This Court has also reviewed the parties' supplemental briefing related to Plaintiffs' Article III standing to proceed against Defendant Lee. ECF Nos. 128 & 163. For the reasons set out below, the motions to dismiss are **GRANTED in part** and **DENIED in part**.

I

Plaintiffs League of Women Voters of Florida, Inc. ("LWV"), League of Women Voters of Florida Education Fund ("LWVEF"), Black Voters Matter Fund, Inc. ("Black Voters Matter"), Florida Alliance for Retired Americans, Inc. ("Florida Alliance"), Cecile Scoon, Susan Rogers, Dr. Robert Brigham, and Alan Madison filed their second amended complaint on July 22, 2021, alleging six counts against

---

[1] On June 16, 2021, Defendant Lee moved to consolidate this case with other election cases before this Court. ECF No. 87. This Court granted the motion in part and consolidated this case with others for *discovery purposes only*. ECF No. 92. This Court specifically noted that "[a]ny motions to dismiss, for summary judgment, or other motions not related to discovery must be filed in its corresponding case, *not* in the parent case." *Id*. at 2 (emphasis in original). However, Defendant Lee ignored this Court's order and filed an "omnibus" memorandum with each motion to dismiss in each of the consolidated election cases before this Court. Accordingly, this Court will clarify its prior directive. Even if you file a separate motion for each case, you must also file a separate memorandum addressing *only* that case. Otherwise, going forward, this Court will deny without prejudice any substantive motions raising "omnibus" arguments in the same manner as Defendant Lee's "omnibus" memorandum in support of her motions to dismiss.

Defendants Lee, Moody, and the 67 Supervisors of Elections.[2] ECF No. 160.[3] Before discussing Plaintiffs' claims in more detail, some background information regarding Plaintiffs is necessary.

## A

Starting with the LWV and LWVEF, collectively the "League," Plaintiffs allege that they are "nonpartisan voter-focused nonprofit organizations," with 29 chapters across the state of Florida." ECF No. 160 ¶ 15. "The League's mission is to encourage informed and active participation of its citizens in government." *Id*. "Among other activities, the League educates citizens about their voting rights and facilitates voting including through get-out-the-vote efforts and registration drives." *Id*. "The League devotes substantial time, effort, and resources to encourage voting by engaging in voter registration at various community events and in public places, such as parks and college and university campuses." *Id*. ¶ 16. They also devote substantial resources toward "helping eligible Floridians cast their votes," by "helping Floridians return their vote-by-mail ballots on a volunteer basis." *Id*. ¶ 17.

---

[2] Plaintiff League of United Latin American Citizens moved to voluntarily dismiss its claims on October 1, 2021. ECF No. 261. This Court granted the motion. ECF No. 269. Accordingly, this Order addresses only the remaining Plaintiffs.

[3] Plaintiffs filed an amended complaint, ECF No. 124, and several days later, a "corrected" amended complaint, ECF No. 160. The "corrected" amended complaint is the operative complaint. *See* ECF No. 158 (granting leave to file "corrected" first amended complaint). Defendant Moody has moved to dismiss counts in ECF No. 160, but Defendant Lee, in filing an omnibus memorandum and motion to dismiss in direct contradiction to this Court's directions, appears to have directed her motion at ECF No. 124.

Finally, the League devotes substantial resources to assisting and encouraging "voters at their polling locations to achieve its mission of ensuring that lawful voters are able to successfully access the franchise and make their voices heard through the ballot box." *Id*. ¶ 18. For instance, "the League has previously hosted 'Party at the Polls' events across Florida at polling locations to answer questions voters have about the voting process and to encourage voters to vote and stay in line by providing food and water at those events." *Id*.

The League also has "members across Florida, including its Black and Latino members, . . . many of whom assist the organization through their voter registration efforts, polling place efforts, and ballot collection efforts." *Id*. ¶ 20. "The vast majority of the League's members are also registered Florida voters themselves, and many of them use vote-by-mail ballots to cast their votes[.]" *Id*.

As to Black Voters Matter, Plaintiffs allege it "is a nonprofit civic organization," whose "goal is to increase power in communities of color." *Id*. ¶ 28. The organization focuses on removing barriers to voting "by engaging in get-out-the-vote activities, educating voters on how to vote, and advocating for policies to expand voting rights and access." *Id*. During the 2020 general election, "Black Voters Matter was on the ground working to turn out the vote in Florida . . . [and] was active at polling locations, encouraging voters to vote and handing out water, food, and other resources at polling locations, including to voters in line to vote." *Id*.

4

Plaintiff Florida Alliance is also a nonprofit corporation, whose "membership includes almost 200,000 retirees from public and private sector unions, community organizations, and individual activists in every county in Florida." *Id.* ¶ 29. Most of Florida Alliance's members are seniors between the ages of 65 and 85, and many with disabilities. *Id*. ¶ 31. Florida Alliance itself does not conduct organized voter registration or ballot collection efforts. *Id*. at 19 n.1. Instead, "[i]ts mission is to ensure social and economic justice and full civil rights that retirees have earned after a lifetime of work." *Id*. ¶ 29. To do this, Florida Alliance "actively pursu[es] and promot[es] legislation and public policies that are in the best interest of current and future retired Floridians." *Id*. Florida Alliance also seeks to ensure "that its members are able to meaningfully and actively participate in and vote in Florida's elections." *Id*.

With respect to the individual Plaintiffs, Ms. Cecile Scoon is a U.S. citizen and registered voter in Bay County, Florida. *Id.* ¶ 32. She is a former prosecutor for the U.S. Air Force and the first Black woman in private law practice in Bay County. *Id*. Now she serves as the First Vice President of the LWV and is nominated to serve as its President beginning in June 2021. *Id*. She has previously helped register voters and assisted voters near polling places by providing food, water, and non-partisan encouragement and plans to do so in the future. *Id*.

Plaintiff Susan Rogers is also a U.S. citizen and registered voter in Pinellas

County, Florida. *Id.* ¶ 33. She is legally blind and has difficulty travelling to vote in person. *Id*. Accordingly, Ms. Rogers "depends on a vote-by-mail ballot to cast her vote . . . [and she] often needs assistance to request her ballot, fill out her ballot, and return her ballot." *Id*. In addition, "Ms. Rogers cannot easily travel to return a vote-by-mail ballot on her own and no longer trusts the USPS to deliver her ballot." *Id*. "For that reason, Ms. Rogers would like to entrust a neighbor or friend to ensure her ballot is delivered timely." *Id*.

Plaintiff Robert Brigham is also a U.S. citizen and registered voter in Orange County, Florida. *Id.* ¶ 34. There, Dr. Brigham taught as a Professor of Mathematics for more than 40 years at the University of Central Florida. *Id*. "Voting is extremely important to Dr. Brigham, who tries to vote in every election." *Id*. He has previously often voted early in person, but now he has difficulty waiting in line to vote given his health conditions. Specifically, Dr. Brigham was diagnosed with colorectal cancer and "often avoids activities that may prevent him having ready access to clean restroom facilities." *Id*. Dr. Brigham voted by mail, which he returned to a drop box, in the 2020 general election. *Id*. He wants to have this option available in future elections as a reliable way of returning his vote-by-mail ballot. *Id.* ¶ 34.

Finally, Plaintiff Alan Madison is a U.S. citizen and registered voter in Indian River County, Florida. *Id*. ¶ 35. He is a Navy veteran for whom "[v]oting is extremely important," and he tries to vote in every election. *Id*. Mr. Madison also

6

"assists with third-party voter registration efforts to help register voters in his community." *Id*. Like Dr. Brigham, Mr. Madison voted by mail in the 2020 general election and returned his ballot along with his wife's ballot to a drop box. *Id*. He intends to use this voting method in the future.

B

Plaintiffs allege that SB 90's challenged provisions "impede every step of the voting process in Florida" ECF No. 160 at 37. These provisions include the following statutes, as amended by SB 90:

(1) Section 101.69, Florida Statutes (2021), pertaining to the return of vote-by-mail ballots to drop boxes and requiring an employee of the Supervisor of Elections' office to continuously monitor any secure drop box at an office of the Supervisor when the drop box is accessible for deposit of ballots, among other changes, and imposing a $25,000 civil penalty if any drop box is left accessible for ballot receipt other than as authorized;

(2) Section 104.0616(2), Florida Statutes (2021), which provides that any person who distributes, orders, requests, collects, delivers or otherwise physically possesses more than two vote-by-mail ballots per election in addition to their own ballot or a ballot belonging to an immediate family member commits a first-degree misdemeanor;

(3) Section 101.62(1)(a), Florida Statutes (2021), which reduces the number of

election cycles for which a request to vote-by-mail is good from two election cycles to every general election cycle;

(4) Section 102.031(4)(a)-(b), Florida Statutes (2021), which prohibits anyone from "engaging in any activity with the intent to influence or effect of influencing a voter" inside a polling place or within 150 feet of a drop box or the entrance to any polling place; and

(5) Section 97.0575(3)(a), Florida Statutes (2021), which requires third-party voter registration organizations to

    a. notify the applicant at the time the application is collected that the organization might not deliver the application to the division or the supervisor of elections in the county in which the applicant resides in less than 14 days or before registration closes for the next ensuing election;

    b. to advise the applicant that he or she may deliver the application in person or by mail; and

    c. to inform the applicant how to register online with the division and how to determine whether the application has been delivered.

## II

Defendants Lee and Moody move to dismiss Plaintiffs' complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). A Rule 12(b)(1) motion to

dismiss for lack of subject matter jurisdiction "can be asserted on either facial or factual grounds." *Carmichael v. Kellogg, Brown & Root Servs., Inc.*, 572 F.3d 1271, 1279 (11th Cir. 2009) (citation omitted). A facial challenge occurs when, as here, defendants base their challenge to subject matter jurisdiction solely on the allegations in the complaint. *Id.* In considering Defendants' facial challenge, this Court must take Plaintiffs' allegations as true. *Id.* Here the only threshold issue is standing.

Though Defendant Lee does not argue in her motion to dismiss that Plaintiffs lack standing to bring any of their claims, in response to this Court's order to show cause, she argues that Plaintiffs lack standing to challenge the vote by mail repeat request requirement, and the third-party vote by mail return and voting line relief restrictions. ECF No. 163 at 2. Either way, regardless of what Defendant Lee says, this Court has an independent responsibility to ensure Plaintiffs have standing to bring all of their claims. *E.g.*, *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009). So this Court considers whether Plaintiffs have standing to bring each claim they assert.

To establish standing, Plaintiffs must show (1) that they have suffered an injury-in-fact that is (2) traceable to Defendants and that (3) can likely be redressed by a favorable ruling. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). And they must do so for each statutory provision they challenge. *CAMP Legal Def.*

*Fund, Inc. v. City of Atlanta*, 451 F.3d 1257, 1273 (11th Cir. 2006) (emphasizing that courts have an "independent obligation . . . to ensure a case or controversy exists as to each challenged provision even in a case where the plaintiffs established harm under one provision of the statute"). Plaintiffs proceed under two theories of standing, organizational standing and associational standing. This Court discusses each in turn.

An organization may have standing to assert claims based on injuries to itself if that organization is affected in a tangible way. *See Fla. Democratic Party v. Hood*, 342 F. Supp. 2d 1073, 1079 (N.D. Fla. 2004) ("An organization has standing to challenge conduct that impedes its ability to attract members, to raise revenues, or to fulfill its purposes." (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982))). Here, Plaintiffs proceed under a diversion-of-resources theory. "Under the diversion-of-resources theory, an organization has standing to sue when a defendant's illegal acts impair the organization's ability to engage in its own projects by forcing the organization to divert resources in response." *Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1341 (11th Cir. 2014).[4]

---

[4] "The party invoking federal jurisdiction bears the burden of proving standing." *Bischoff v. Osceola Cnty., Fla.*, 222 F.3d 874, 878 (11th Cir. 2000). Critically, "each element of standing 'must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation.' " *Id.* (quoting *Lujan*, 504 U.S. at 561). "Therefore, when standing becomes an issue on a motion to dismiss, general factual allegations of injury resulting from the defendant's conduct may be sufficient to show standing." *Id.* "However, when standing is raised at the summary judgment stage, the plaintiff must 'set forth by affidavit or other evidence specific facts, which for

In addition to organizational standing, an organization may sue "on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Greater Birmingham Ministries v. Sec'y of State of Ala.*, 992 F.3d 1299, 1316 (11th Cir. 2021) ("*GBM*"). As discussed below, Plaintiffs' members have standing as to the challenged provisions of SB 90. Additionally, this lawsuit is germane to Plaintiffs, whose core purposes involve registering voters, voter education, encouraging electoral participation, and advocating for accessibility for Florida voters. Finally, neither the claims asserted, nor the relief requested requires the participation of the individual members in this lawsuit. *See Nat'l Parks Conservation Ass'n v. Norton*, 324 F.3d 1229, 1244 (11th

---

purposes of the summary judgment motion will be taken as true.' " *Id.* (quoting *Lujan*, 504 U.S. 561). This Court reiterates this well-worn standard to make plain that Plaintiffs must present evidence moving forward. Moreover, Plaintiffs must be mindful that generalized testimony about a diversion of resources may not be enough at the summary judgment stage or later to prove that the organizational plaintiffs have been injured due to a diversion-of-resources theory. *See, e.g.*, *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1250 (11th Cir. 2020) ("Although resource diversion is a concrete injury, neither Kazin nor Cecil explained what activities the Committee or Priorities USA would divert resources away from in order to spend additional resources on combatting the primacy effect, as precedent requires." (emphasis in original)). Here, although Plaintiffs' detailed factual allegations may survive a motion to dismiss, Plaintiffs must substitute their allegations with sufficient, detailed, and relevant evidence at summary judgment and later.

Cir. 2003); *GBM*, 992 F.3d at 1316 n.29 ("[P]rospective relief weigh[s] in favor of finding that associational standing exists.").

In addressing both forms of standing, this Court starts with the injury requirement as to each of the challenged provisions.

## 1. *Injury*

### i.   Section 101.69, Florida Statutes (2021)

Plaintiffs allege that the new drop box restrictions in this section "will effectively severely limit the number of drop boxes that are available to voters, as well as the days and hours those drop boxes are available." ECF No. 160 ¶ 75. This section now requires drop boxes to be monitored in person by an employee of the Supervisor of Elections and imposes a $25,000 civil penalty against any Supervisor who does not comply with the monitoring requirements. §§ 101.69(2)(a), (3), Fla. Stat. (2021). In addition, drop boxes that are not located at the Supervisor of Elections main office or branch office are only available during early voting hours. §§ 101.69(2)(a), (2)(c)1., Fla. Stat. (2021). The Division of Elections, within Defendant Lee's Department of State, is responsible for enforcing the $25,000 penalty provision. § 101.69(3), Fla. Stat. (2021).

Plaintiffs allege that voters have come to rely on drop boxes as a safe option for casting a ballot. ECF No. 160 ¶ 80. Plaintiffs claim the new restrictions limiting when, where, and how Supervisors of Elections can offer drop boxes as a voting

option, combined with the threat of a $25,000 fine from Defendant Lee's Division of Elections, "severely burdens the right to vote in Florida[,]" especially for "voters in highly diverse counties [who] relied on drop boxes to vote[.] *Id.* ¶¶ 89, 94.

Plaintiffs have also alleged that SB 90 requires them to divert time, money, and resources away from other specified activities to assist and educate their members and other Florida voters about the new law. *Id.* ¶¶ 19, 28. In addition, Plaintiffs have alleged that their Florida members' and constituents' right to vote is severely burdened by this new restriction based on the limited hours and days during which many drop boxes will be available to their members. *See id.* ¶ 35. Because section 101.69, as amended by SB 90, arguably burdens the individual Plaintiffs' right to vote and organizational Plaintiffs' Florida members' right to vote by limiting available options to return their ballots, and because Plaintiffs have been forced to divert resources to respond to this new law, Plaintiffs sufficiently allege organizational and associational injuries as to section 101.69.[5]

---

[5] Several courts have reached the same conclusion in similar assessments. *See Common Cause Ind. v. Lawson*, 937 F. 3d 944, 952–53 (7th Cir. 2019) ("Our sister circuits have upheld the standing of voter-advocacy organizations that challenged election laws based on similar drains on their resources. Like us, they have found that the organizations demonstrated the necessary injury in fact in the form of unwanted demands on their resources.") (citing cases from the Fifth, Sixth, Ninth, and Eleventh Circuits). *See also OCA-Greater Houston v. Texas*, 867 F. 3d 604, 612 (5th Cir. 2017) (upholding organizational standing for non-profit based on injury—albeit "not large" one—resulting from extra time spent educating voters about a new voting law instead of organization's normal "get out the vote" activities with membership); *Nat'l Council of La Raza v. Cegavske*, 800 F. 3d 1032, 1040–41 (9th Cir. 2015) ("Resources Plaintiffs put toward registering someone who would likely have been registered by the State had it complied with the NVRA, are resources they would have spent on some other aspect of their organizational purpose—such as registering voters the NVRA's provisions do not reach, increasing their voter education efforts, or

ii.   Section 104.0616, Florida Statutes (2021)

Plaintiffs allege that section 104.0616, as amended by SB 90, "virtually ends the practice of individuals helping Florida voters return their vote-by-mail ballots to their county to be counted." ECF No. 160 ¶ 99. Plaintiffs contend this new law criminalizes "all Floridians (even unpaid volunteers) from returning more than two ballots, unless the ballot belongs to an 'immediate family member,' " which "uniquely burdens minority voters because they more frequently reside in households with non-'immediate' family members . . . who would face severe restrictions on returning family members' ballots." *Id*. ¶¶ 102, 108.

Because this new law makes it a crime to collect more than two ballots from others outside of one's immediate family, Plaintiffs' members are now unable to continue their volunteer assistance efforts to help Florida voters vote. For instance, "the League, other civic-minded organizations, and everyday good Samaritans will no longer be able to aid Florida voters as they have done in the past." *Id.* ¶ 103. Similarly, Plaintiffs allege this new law will make it more difficult for Ms. Rogers to return her vote-by-mail ballot, as she requires assistance from a neighbor or friend to ensure her ballot is delivered on time. *Id*. ¶ 33. Moreover, electoral engagement and access is core to the organizational Plaintiffs' purposes, and as Plaintiffs allege,

---

any other activity that advances their goals. Contrary to the district judge's view, Plaintiffs have not alleged that they are simply going about their 'business as usual,' unaffected by the State's conduct.").

this new law forces them to divert resources to respond to the new restriction and educate their members and other Florida voters about its impact and what to do to make their votes count. *See id*. ¶ 17. Because section 104.0616(2), as amended by SB 90, arguably burdens Ms. Rogers's right to vote and Plaintiffs' Florida members' right to vote by limiting available options to return their ballots and because Plaintiffs have been forced to divert resources to respond to this new law, Plaintiffs sufficiently allege organizational and associational injuries as to section 104.0616(2).

### iii.    Section 101.62(1)(a), Florida Statutes (2021)

Plaintiffs allege that section 101.62(1)(a), as amended by SB 90, "purg[es] Floridians' standing vote-by-mail requests[,]" because it "now requires all voters to make new requests for vote-by-mail ballots every general election cycle, with the voter's request expiring at the end of each calendar year after a general election." ECF No. 160 ¶¶ 113, 116. This new law now requires voters like Ms. Rogers and Dr. Brigham to request vote-by-mail ballots more frequently, which makes voting more difficult for Ms. Rogers who needs assistance in making her request due to her blindness. *See id*. ¶¶ 33, 35. Plaintiffs also assert this new law requires organizations like the League "to divert resources to reach [Florida's minority and young voters]," to educate them about the new "repeat request" requirement," to tell voters what to do to apply to vote by mail. *Id*. ¶ 118.

The Eleventh Circuit has previously held that "[t]he slightness of [the voters'] burden . . . is not dispositive." *Common Cause/Ga. v. Billups*, 554 F.3d 1340, 1351 (11th Cir. 2009). Instead, "a small injury, 'an identifiable trifle,' is sufficient to confer standing." *Id.* (quoting *United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 689 n.14 (1973)). In this case, Plaintiffs allege that the new vote-by-mail request requirement is more than a mere "trifle," especially for voters with disabilities like Ms. Rogers, and they have also sufficiently alleged that they have organizational standing under a diversion-of-resources theory. *See Billups*, 554 F.3d at 1351–52 (holding that even when a voter possesses an acceptable identification, they may still challenge a voter ID law because they are required to produce that photo identification to vote in person).

iv.   Section 102.031, Florida Statutes (2021)

With respect to section 102.031, as amended by SB 90, Plaintiffs allege the new provision "appears to prevent voters waiting in line to vote from interacting with or receiving food and water from individuals and members of third-party organizations[.]" ECF No. 160 ¶ 119. Plaintiffs further allege that the law "does not make clear whether others may distribute food or water at polling places and to voters in line to vote, an activity that was explicitly prohibited in prior versions of SB 90." *Id.* ¶ 120. Plaintiffs allege that they "do not know what activities are permitted or prohibited under the law, leaving them to guess, and consequently

16

afraid to engage in line warming activities for fear of violating the law." *Id.* Moreover, to the extent the law does prohibit providing such assistance to voters, Plaintiffs allege it directly burdens voters, "including senior voters, voters with disabilities, or any voter who is forced to wait in long lines at polling places (which, in Florida, has disproportionately been minority voters)." *Id.* ¶ 122.

Plaintiffs claim that "[p]rohibiting people and groups such as the League and Black Voters Matter from offering food or drink at polling places, including to those who are waiting in line to cast their ballots . . . exacerbates the burden of waiting in long lines," and it "disproportionately impacts minority voters." *Id.* ¶ 132. In addition, Plaintiff Cecile Scoon is prohibited from providing such assistance at the polls as she has done in the past. *Id.* ¶ 32. And Plaintiffs have alleged that this new provision requires the diversion of resources to respond and educate voters going forward. *See id.* ¶¶ 19, 28. Here, based on these allegations, Plaintiffs have adequately alleged organizational and associational injuries under this challenged statute.

v.    Section 97.0575, Florida Statutes (2021)

Finally, Plaintiffs allege that section 97.0575 "now requires third-party registration organizations and its volunteers to 'warn' the applicant at the time the application is collected that the organization 'might not deliver' the voter's application 'before registration closes for the next ensuing election.' " ECF No. 160

17

¶ 142. They must also "inform the voter of various other means to register to vote that do not depend on a third-party organization and educate them on how to use those other options." *Id*. Plaintiffs allege that this is a "Deceptive Registration Warning" that is "calculated to and will have the effect of discouraging Floridians from registering and associating with third-party organizations." *Id*. ¶ 143. The Plaintiffs assert this "government-compelled message" is "contrary to the message that the League and other third-party registration organizations currently convey to voter registration applicants." *Id*. ¶ 145. Further, the content of this message allegedly "damage[es] the League's credibility and impair[s] its ability to effectively register voters." *Id*. ¶ 144. In addition, this requirement compels individuals, like Ms. Scoon, to convey a message they would not otherwise convey, and which impairs their ability to effectively register voters. *Id*. ¶ 32.

Here, the League's and Ms. Scoon's First Amendment injuries are cognizable injuries-in-fact that satisfy the first prong of this Court's standing analysis. *See, Janus v. Am. Fed. of State, Cnty., and Mun. Emps., Council 31*, 138 S. Ct. 2448, 2464 (2018) ("Whenever the Federal Government or a State prevents individuals from saying what they think on important matters or compels them to voice ideas with which they disagree, it undermines [the] ends [that free speech serves].").
Indeed, no Defendant has argued that Plaintiffs have not properly alleged an injury-in-fact with respect to this statute. *See, e.g.*, ECF No. 166 at 10 (supplemental brief

concluding that Plaintiffs have standing to proceed against Defendant Lee with respect to this statute). Accordingly, I conclude that Plaintiffs are suffering injuries-in-fact with respect to section 97.0575, as amended by SB 90.

Having decided that Plaintiffs allege an injury-in-fact as to each of the five challenged provisions, this Court turns to the second element of standing, causation.

### 2. *Causation*

As described above, this Court is satisfied that Plaintiffs have suffered an injury-in-fact as to each of the challenged provisions. But an injury-in-fact is not enough, Plaintiffs must also show causation and redressability. *Lujan*, 504 U.S. at 560.

First, causation. Plaintiffs must establish causation by showing that "their injuries are connected with" Defendants' conduct. *Wilding v. DNC Servs. Corp.*, 941 F.3d 1116, 1125 (11th Cir. 2019) (cleaned up) (quoting *Trump v. Hawaii*, 138 S. Ct. 2392, 2416 (2018)). In other words, Plaintiffs must show that their injury is "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Lujan*, 504 U.S. at 560.

To do so, Plaintiffs need only show "that there is a substantial likelihood of causation." *Duke Power Co. v. Env't Study Grp.*, 438 U.S. 59, 75 n.20 (1978). This is not an exacting standard; "[p]roximate causation is not a requirement of Article III standing." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118,

134 (2014). And thus "[a] plaintiff . . . need not show (or, as here, allege) that 'the defendant's actions are the very last step in the chain of causation.' " *Wilding*, 941 F.3d at 1126 (quoting *Bennett v. Spear*, 520 U.S. 154, 168–69 (1997)). "[E]ven harms that flow indirectly from the action in question can be said to be 'fairly traceable' to that action for standing purposes." *Focus on the Fam. v. Pinellas Suncoast Transit Auth.*, 344 F.3d 1263, 1273 (11th Cir. 2003).

Plaintiffs' claims against Defendant Lee, Moody, and the Supervisors challenge each of the five provisions. This Court will address each provision in turn as it relates to Defendant Lee, Defendant Moody, and the Defendant Supervisors, starting with the new drop box restrictions under section 101.69.[6]

First, Plaintiffs' asserted injuries, including the diversion of resources to respond to the new restrictions and the burdens such restrictions will place on voters who will have fewer drop box options, are traceable to Defendant Lee's enforcement authority created by this new law. Specifically, Defendant Lee's Division of Elections is granted specific authority to impose a $25,000 civil penalty against any Supervisor of Elections who leaves a drop box "accessible for ballot receipt other than as authorized by this section." § 101.69(3), Fla. Stat. (2021). In turn, this serves as a specific deterrent to Supervisors of Elections who would otherwise offer more

---

[6] The Supervisors of Elections have not moved to dismiss. However, this Court has an independent responsibility to determine whether it has jurisdiction to hear Plaintiffs' claims, which includes whether Plaintiffs have standing to challenge each of the provisions at issue in this case.

drop box options beyond the statutorily required drop boxes at the Supervisors' main office, permanent branch office, and early voting sites. *See* § 101.69(2)(a), Fla. Stat. (2021) ("Secure drop boxes *shall* be placed at the main office of the supervisor, at each permanent branch office of the supervisor, and at each early voting site. Secure drop boxes *may* also be placed at any other site that would otherwise qualify as an early voting site under s. 101.657(1)." (emphasis added)). Defendant Supervisors are likewise responsible for enforcing the challenged provisions, because they are directly responsible for offering drop boxes and complying with the statute limiting the locations, operating hours, and monitoring of such drop boxes. § 101.69, Fla. Stat. Accordingly, Plaintiffs' injuries flowing from the drop box restrictions are traceable to Defendant Lee and Defendant Supervisors.

However, the same is not true with respect to Defendant Moody. Plaintiffs cite no comparable enforcement authority for the drop box restrictions. Accordingly, Plaintiffs' claims against Defendant Moody with respect to section 101.69 are due to be **DISMISSED for lack of standing**.

Second, Plaintiffs' asserted injuries with respect to the volunteer assistance restriction under section 104.0616 are not traceable to any of the Defendants. This provision is a criminal statute which makes it a first degree misdemeanor to, among other things, possess more than two vote-by-mail ballots except in very limited circumstances. Plaintiffs have not alleged, nor has this Court identified, any statutory

provision that connects the Defendant Supervisors or Defendant Lee to Plaintiffs' alleged injuries under section 104.0616(2).

Moreover, this Court has not identified any statute that requires Defendant Supervisors or Defendant Lee to record or confirm the identities of volunteers who assist voters in returning vote-by-mail ballots or to report any suspected violation of section 104.0616(2) to the appropriate authorities. Nor have Plaintiffs alleged any facts from which this Court could reasonably infer that Defendant Lee or Defendant Supervisors have collected or will collect or confirm such information to aid in the prosecution of individuals suspected of violating section 104.0616(2). In short, Plaintiffs have not identified any authority or alleged any facts from which this Court could reasonably infer that Defendant Lee or Defendant Supervisors have any enforcement authority under this criminal statute. I therefore conclude that Plaintiffs' alleged injuries with respect to section 104.0616(2) are not traceable to the Defendant Supervisors or Defendant Lee.

This leaves Defendant Moody. As Defendant Moody points out, in most cases, Florida's State Attorneys are responsible for enforcing criminal statutes like section 104.0616(2). ECF No. 176 at 10–11. And absent a showing that Defendant Moody is part of the causal chain resulting in Plaintiffs' alleged injuries, Plaintiffs have not satisfied the causation element of standing. This Court agrees that State

Attorneys are arguably proper defendants when challenging a criminal statute like section 104.0616(2). However, Plaintiffs have not sued any State Attorneys.

Alternatively, Plaintiffs assert that their injuries are traceable to Defendant Moody through the enforcement authority of the Office of Statewide Prosecution, which has the power to investigate and enforce violations of the challenged criminal statute if it occurs in two or more judicial circuits. *See* § 16.56(1)(a)13., Fla. Stat. (authorizing office to investigate and prosecute any crime involving voter registration, voting, or candidate or issue petition activities). But, aside from arguing that the League and Black Voters Matter have members throughout the state who ordinarily engage in vote-by-mail ballot collection, *see* ECF No. 198 at 11, Plaintiffs allege no facts permitting this Court to reasonably infer that those members have or intend to assist more than two voters in two or more judicial circuits, and thus would become subject to investigation or prosecution by the Statewide Prosecutor. In other words, this Court cannot reasonably infer that any one of those members plans to collect two or more ballots from multiple judicial circuits just because the organizations have members throughout the state.[7] Instead, this Court must fill in the blanks left in the amended complaint and stack inferences to reach the conclusion that these organizations' members are subject to prosecution by the Statewide

---

[7] The fact that this pleading deficiency might be easily remedied with amended allegations does not mean this Court should do the Plaintiffs' work for them and infer something that cannot reasonably be inferred from the allegations before it.

Prosecutor. Accordingly, Plaintiffs have not alleged that their injuries related to section 104.0616 are traceable to Defendant Moody. I conclude that Plaintiffs' claims with respect to section 104.0616 are due to be **DISMISSED for lack of standing** as to all Defendants.

Third, as to the repeat request requirement under section 101.62, Plaintiffs have not shown how their injuries are traceable to Defendant Lee. Plaintiffs' only argument as to traceability here is limited to Defendant Lee's authority to adopt rules that the Supervisors "shall" follow. *See* ECF No. 128 at 13–14. But this argument runs counter to binding authority on this Court. *See Jacobson*, 974 F.3d 1236. Indeed, Defendant Supervisors are solely responsible for processing vote-by-mail requests. Accordingly, I conclude that Plaintiffs' injuries are traceable to the Defendant Supervisors under section 101.62, but not Defendant Lee. Plaintiffs' claims against Defendant Lee with respect to this provision are **DISMISSED for lack of standing**. Likewise, Plaintiffs identity no enforcement authority held by Defendant Moody as it relates to section 101.62. Thus, Plaintiffs' claims against Defendant Moody with respect to this provision are **DISMISSED for lack of standing**.

Fourth, Plaintiffs' injuries under the "line warming ban" in section 102.031 are not traceable to Defendant Lee. Instead, Defendant Supervisors are responsible for designating "no-solicitation zones" at voting locations and marking their

boundaries. § 102.031(4)(a), Fla. Stat. (2021). Defendant Supervisors are also statutorily authorized to "take any reasonable action necessary to ensure order at the polling places, including, but not limited to, having disruptive and unruly persons removed by law enforcement officers from the polling room or place or from the 150-foot zone surrounding the polling place." § 102.031(4)(c), Fla. Stat. (2021).

Plaintiffs' assertion that their injuries are traceable to Defendant Lee because she can adopt uniform standards to interpret and implement Florida's election laws does not change the outcome and, again, runs contrary to binding Eleventh Circuit authority. *Compare* ECF No. 128 at 17–18 *with Jacobson*, 974 F.3d at 1253. And though the Eleventh Circuit did not hold in *Jacobson* that injuries flowing from Florida's election laws are *never* traceable to the Secretary of State, it did require that Plaintiffs show some "control" over the challenged provision beyond the Secretary's general election authority. Here, like in *Jacobson*, "Florida law expressly gives a different, independent official control over" the way in which the "line warming ban" is enforced—namely, the Defendant Supervisors of Elections. Accordingly, Plaintiffs' claims against Defendant Lee, challenging section 102.031, are **DISMISSED for lack of standing**. The same is true for Defendant Moody. Accordingly, Plaintiffs' claims against Defendant Moody, challenging section 102.031, are also **DISMISSED for lack of standing**.

Lastly, with respect to traceability, Plaintiffs' injuries flowing from the registration warning requirement under section 97.0575 are traceable to both Defendant Lee and Defendant Moody, but not to Defendant Supervisors. Indeed, both Defendants Lee and Moody acknowledge that the law contemplates their roles in directly enforcing its terms. *See, e.g.*, ECF No. 163 at 4, 10; *see also* ECF No. 176 at 4 n.1. But the law leaves no role for Defendant Supervisors to act to enforce its terms. Accordingly, Plaintiffs' claims with respect to this provision against Defendant Supervisors are **DISMISSED for lack of standing**.

To sum up, this Court concludes (1) that Plaintiffs' injuries with respect to the drop box restrictions are traceable to Defendant Supervisors and Defendant Lee, (2) that their injuries with respect to the "line warming" ban and the "repeat request" requirement to vote by mail are traceable only to Defendant Supervisors, (3) that their injuries with respect to the required "registration warning" are traceable to Defendants Lee and Moody but not to the Supervisors, and (4) that their injuries with respect to the "volunteer assistance" ban to return vote-by-mail ballots are traceable to no Defendants before this Court. Having so concluded, this Court turns to the third element of standing, redressability, as it relates to Plaintiffs' claims that survive this Court's traceability analysis.

26

### 3. *Redressability*

The redressability prong "focuses . . . on whether the injury that a plaintiff alleges is likely to be redressed through the litigation." *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 287 (2008) (emphasis removed). A "substantial likelihood" of redressability will satisfy this prong. *Duke Power*, 438 U.S. at 79.

Here, enjoining Defendant Lee from using her powers to impose a $25,000 civil penalty on any Supervisor who offers drop boxes in violation of section 101.69 will go a long way towards redressing Plaintiffs' and their members' injuries. To understand why, one need only ask what practical effect such an order would have. *See Utah v. Evans*, 536 U.S. 452, 464 (2002) (finding redressability where a favorable ruling's "practical consequence" was to make it more likely "that the plaintiff would obtain relief that directly redresses the injury suffered"). Enjoining Defendant Lee would remove the threat of punishment for Supervisors who offer drop boxes in violation of Florida law, even if such Supervisors are acting in compliance with a court order. Indeed, if this Court were to order the Supervisors not to comply with the challenged drop box restrictions, they would have to choose between complying with this Court's order and facing a $25,000 penalty from the Department of State's Division of Elections. Moreover, enjoining Defendant Lee and her agents or employees from enforcing the civil penalty provision also removes a major deterrent for Supervisors who would otherwise offer drop boxes but do not

want to run the risk of violating the strict terms of the statute's monitoring requirements. And it makes no difference that, were Defendant Lee enjoined, some Defendant Supervisors might still comply with the drop box restrictions absent an order from this or any other court. "Article III . . . does not demand that the redress sought by a plaintiff be complete." *Moody v. Holman*, 887 F.3d 1281, 1287 (11th Cir. 2018); *see also I. L. v. Alabama*, 739 F.3d 1273, 1282 (11th Cir. 2014).

As for the Defendant Supervisors, the practical effect of enjoining them from complying with the challenged drop box restrictions is that Defendant Supervisors will no longer be limited to providing voters with drop boxes that must be always monitored in person and open only during early voting hours. Similarly, enjoining Defendant Supervisors from enforcing the "repeat request" requirement for voters requesting vote-by-mail ballots and from prohibiting "any activity with the intent to influence or effect of influencing a voter" within the non-solicitation zone at polling places, will have a similar practical effect with respect to Plaintiffs' alleged injuries. An injunction against enforcing the "repeat request" requirement would redress Plaintiffs' injuries involving having to request a vote-by-mail ballot twice as often as before and a court order prohibiting enforcement of the new solicitation restriction would prohibit the Defendant Supervisors from reporting Plaintiffs' members and volunteers who wish to engage with voters at drop boxes and polling places as they have done in the past without fear of running afoul of the law.

Lastly, as to the registration warning requirement under section 97.0575, enjoining Defendant Lee and Defendant Moody from using their powers to investigate and prosecute civil enforcement proceedings for suspected violations of this section will go a long way towards redressing Plaintiffs' constitutional injuries. For example, an order enjoining these Defendants from enforcing section 97.0575(3)(a) and section 97.0575(4) would have the practical effect of removing the threat of punishment for Plaintiffs, including potential financial penalties, restraining orders, and injunctions against them, in the event their members or volunteers violate the new warning requirement. Defendants Lee and Moody do not dispute this.

Accordingly, I conclude that Plaintiffs have demonstrated, at the pleading stage, that they have standing to pursue their claims challenging the drop box restrictions against Defendant Lee and the Defendant Supervisors. In addition, I conclude Plaintiffs have standing to pursue their claims challenging the "repeat request" requirement and the "line warming" ban against the Defendant Supervisors. I also conclude that Plaintiffs have standing to challenge the registration warning requirement against Defendants Lee and Moody. Lastly, as noted above, I conclude that Plaintiffs lack standing to challenge the vote-by-mail ballot return provision against any of the Defendants.

In sum with respect to the threshold issue of standing, Defendant Moody's motion to dismiss, ECF No. 176, is **GRANTED in part** and **DENIED in part**. Plaintiffs' claims against Defendant Moody in Counts I, II, III, and IV are **DISMISSED for lack of standing**. This Court need not address the balance of Defendant Moody's arguments to dismiss Counts I and IV.

Similarly, Defendant Lee's motion to dismiss Counts I and IV, ECF No. 175, is **GRANTED in part** and **DENIED in part**. Plaintiffs' claim against Defendant Lee in Count II is **DISMISSED for lack of standing**. Plaintiffs' challenges against Defendant Lee with respect to the ballot return provision, the repeat request requirement, and the line warming ban in Counts I and IV are also **DISMISSED for lack of standing**. This Court will now turn to the balance of Defendant Lee's arguments to dismiss Count I as it relates to Plaintiffs' undue burden claim challenging the new drop box restrictions.[8]

---

[8] As the parties well know, in evaluating Defendant Lee's motion, this Court accepts the allegations in the amended complaint as true and construes them in the light most favorable to Plaintiffs. *See Hunt v. Amico Props., L.P.*, 814 F.3d 1213, 1221 (11th Cir. 2016). "To withstand a motion to dismiss under Rule 12(b)(6), a complaint must include 'enough facts to state a claim to relief that is plausible on its face.' " *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A 'claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.' " *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "Plaintiff's allegations must amount to 'more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.' " *Id.* (quoting *Twombly*, 550 U.S. at 555).

III

In her omnibus motion to dismiss, Defendant Lee first moves to dismiss all claims alleging that SB 90 places an undue burden on the right to vote. ECF No. 175-1 at 5–12. Here, Count I of Plaintiffs' second amended complaint alleges that the drop box, vote-by-mail ballot return, the vote-by-mail repeat request, and voting line relief restrictions place an undue burden on the right to vote in violation of the First and Fourteenth Amendments. ECF No. 160 ¶¶ 148–60. Because, as discussed above, this Court dismissed Plaintiffs' claims against Defendant Lee as to all of these provisions except the drop box restrictions, Defendant Lee only has standing to defend the drop box restrictions. *See Yellow Pages Photos, Inc. v. Ziplocal, LP*, 795 F.3d 1255, 1265 (11th Cir. 2015) (explaining that "the requirement that a party establish its standing to litigate applies not only to plaintiffs but also defendants"); *Fleetwood Servs., LLC v. Ram Cap. Funding LLC*, No. 20-cv-5120 (LJL), 2021 WL 1987320, at *2 (S.D.N.Y. May 18, 2021) ("[I]t is axiomatic that for a defendant to move to dismiss a cause of action for failure to state a claim for relief, the complaint must actually assert that cause of action against the defendant."). Plus, this Court dismissed Count I to the extent Plaintiffs bring it against Defendant Moody, and no other Defendants adopt the arguments Defendant Lee raises. Thus, this Court focuses solely on the drop box provision.

Challenges to election laws are evaluated using the sliding scale standard set out in *Anderson v. Celebrezze*, 460 U.S. 780 (1983) and *Burdick v. Takushi*, 504 U.S. 428 (1992). The *Anderson-Burdick* test is designed to balance the fundamental right to vote against the reality that "there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." *Storer v. Brown*, 415 U.S. 724, 730 (1974). The test requires this Court to "weigh the character and magnitude of the asserted First and Fourteenth Amendment injury against the state's proffered justifications for the burdens imposed by the rule" while "taking into consideration the extent to which those justifications require the burden to plaintiffs' rights." *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1318 (11th Cir. 2019). The greater burden the law imposes on the right to vote, the greater the scrutiny this Court must apply. Laws that impose " 'severe' restrictions . . . must be 'narrowly drawn to advance a state interest of compelling importance.' " *Burdick*, 504 U.S. at 434 (quoting *Norman v. Reed*, 502 U.S. 279, 289 (1992)). Laws that impose "reasonable, nondiscriminatory restrictions," on the other hand, are subject to a more-forgiving review, under which the "state's important regulatory interests" will generally justify the restrictions. *Anderson*, 460 U.S. at 788. But no matter how slight the burden, "it must be justified by relevant and legitimate state interests 'sufficiently weighty to

justify the limitation.' " *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 191 (2008) (controlling op.) (quoting *Norman*, 502 U.S. at 288–89).

Because the *Anderson-Burdick* test "emphasizes the relevance of context and specific circumstances," it is particularly difficult to apply at the motion to dismiss stage. *Cowen v. Ga. Sec'y of State*, 960 F.3d 1339, 1346 (11th Cir. 2020); *see also Duke v. Cleland*, 5 F.3d 1399, 1405 (11th Cir. 1993); *Bergland v. Harris*, 767 F.2d 1551, 1555 (11th Cir. 1985). And any court foolhardy enough to attempt such a stunt is liable to find itself "in the position of Lady Justice: blindfolded and stuck holding empty scales." *Ariz. Libertarian Party v. Reagan*, 798 F.3d 723, 736 (9th Cir. 2015) (McKeown, J., concurring).

Against this backdrop, Defendant Lee nonetheless urges this Court to dismiss Plaintiffs' undue burden claim. This case is different, she argues, for two reasons. *First*, she argues that regulations on vote-by-mail ballots do not implicate the right to vote at all. ECF No. 175-1 at 7. *Second*, she argues that Plaintiffs' claims fail because they focus on the burdens placed on "vulnerable" voters instead of the electorate as a whole. *Id.* at 6, 10–11. She is wrong on both points.

This Court begins with Defendant Lee's first argument. Relying entirely on *McDonald v. Board of Election Commissioners of Chicago*, 394 U.S. 802 (1969), the Secretary argues that "unless a restriction on vote-by-mail 'absolutely prohibit[s]' someone from voting, the right to vote is not at stake." ECF No. 175-1

at 7 (quoting *McDonald*, 394 U.S. at 809). Though the Secretary argues at length that the Supreme Court has not abrogated *McDonald*, *see id.* at 8–10, her argument has a more fundamental problem; namely, that she grossly overreads *McDonald*.

In *McDonald*, pretrial detainees in the Cook County jail sued Chicago's election board, arguing—in part—that an Illinois law that allowed inmates from outside Cook County to receive absentee ballots while denying them to those from Cook County violated the Equal Protection Clause. *McDonald*, 394 U.S. at 806. A three-judge district court panel granted the board's motion for summary judgment, and the plaintiffs appealed directly to the Supreme Court. *Id.*

Writing for the unanimous Court, Chief Justice Warren explained that the first step was to "determine . . . how stringent a standard to use" in evaluating the challenged law. *Id.* Rational basis review applied, the *McDonald* Court determined, because the challenged classification was not based on wealth or race and because there was "nothing in the record to indicate that the Illinois statutory scheme has an impact on [the plaintiffs'] ability to exercise the fundamental right to vote." *Id.* at 807. In a footnote, the Court emphasized that, because the plaintiffs had offered no evidence, for all the Court knew, Illinois might "furnish the jails with special polling booths or facilities on election day, or provide guarded transportation to the polls themselves for certain inmates, or entertain motions for temporary reductions in bail to allow some inmates to get to the polls on their own." *Id.* at 809 n.6. Because the

34

state might offer pretrial detainees an equally convenient method of voting, the only thing before the Court was "a claimed right to receive absentee ballots." *Id.* The Court explained that it would not assume that the state in fact denied the plaintiffs the right to vote "with nothing in the record to support such an assumption." *Id.* at 808. And so, the Court concluded that the challenged statute did not implicate the right to vote. *Id.*

Four years later, in *Goosby v. Osser*, the Court addressed a nearly identical claim. 409 U.S. 512, 514 (1973). This time around, pretrial detainees in the Philadelphia County jail brought suit against Pennsylvania's Attorney General and Secretary of State. The plaintiffs argued that Pennsylvania's election laws denied them the right to vote because Pennsylvania "neither permit[ed] [plaintiffs] to leave prison to register and vote, nor provide[d] facilities for the purpose at the prisons," and Pennsylvania law "expressly prohibit[ed] persons 'confined in penal institutions' from voting by absentee ballot." *Id.* at 514. *Goosby* rejected the argument that *McDonald* foreclosed the plaintiffs' claims. In so doing, *Goosby* emphasized that *McDonald* turned on the lack of record evidence that Illinois refused to "make the franchise available by other means." *Id.* at 520. By contrast, in *Goosby*, the record was clear that the state provided no alternatives. *Id.* at 522. Satisfied that *McDonald* did not control, the *Goosby* Court remanded the plaintiffs' claims to a three-judge district court panel for consideration. *Id.*

The very next year, the Court addressed the issue yet again. This time, the plaintiffs were pretrial detainees in Monroe County, New York. *O'Brien v. Skinner*, 414 U.S. 524, 525 (1974). The facts in *Skinner* were nearly identical to *McDonald*. *See id.* at 525–27. Distinguishing *McDonald*, the Court explained that its decision in *McDonald* "rested on failure of proof." *Id.* at 529. But, presented with evidence that New York did not allow the plaintiffs "to use the absentee ballot," and that it denied them "any alternative means of casting their vote," the *Skinner* Court held the statute unconstitutional. *Id.* at 530.

As other circuits have explained, this line of cases does not "require proof that there was no possibility that the plaintiffs would find a way to adjust and vote through the remaining options." *Ohio State Conf. of NAACP v. Husted*, 768 F.3d 524, 541 (6th Cir. 2014). Instead, it stands for the unremarkable proposition that, when plaintiffs proffer no evidence that the challenged law burdens their right to vote, rational basis review applies. *See Obama for Am. v. Husted*, 697 F.3d 423, 431 (6th Cir. 2012).

Although *McDonald* came long before *Anderson-Burdick*, when put in context, it fits neatly within that test. Under *Anderson-Burdick*, when plaintiffs fail to show that the law creates more than a de minimis burden, rational basis review applies. And if a plaintiff offers *no* evidence that the challenged law burdens the right to vote, the court cannot assume that such a burden exists. *See Namphy v.*

36

*DeSantis*, 493 F. Supp. 3d 1130, 1145 (N.D. Fla. 2020) (noting that, in applying *Anderson-Burdick*, "this Court . . . is limited to the evidence before it"). It is for that proposition that *McDonald* stands and nothing more.

Given that *McDonald* did not—in one sentence—create a sweeping vote-by-mail exception to the Constitution, it should come as no surprise that the Eleventh Circuit has repeatedly applied *Anderson-Burdick* to restrictions on mail-in voting. *See, e.g., Lee*, 915 F.3d at 1318 (using *Anderson-Burdick* to evaluate "the constitutionality of the signature-match scheme as it relates to vote-by-mail and provisional voters"). Just last year, when addressing the constitutionality of Georgia's absentee ballot deadline, the Eleventh Circuit remarked, "[t]he standard is clear: '[W]e must evaluate laws that burden voting rights using the approach of *Anderson* and *Burdick*.' " *New Ga. Project v. Raffensperger*, 976 F.3d 1278, 1282 (11th Cir. 2020) (quoting *Jacobson*, 974 F.3d at 1261).[9]

In sum, Defendant Lee's argument that restrictions on voting by mail does not implicate the right to vote is unsound. Having so concluded, this Court turns to her

---

[9] In support of her position, Defendant Lee cites Judge Lagoa's concurrence from *New Georgia Project*. In so doing, Defendant Lee puts words in Judge Lagoa's mouth. In her concurrence, Judge Lagoa *agreed* that *Anderson-Burdick* applied to the challenge before the court. *New Ga. Project*, 976 F.3d at 1288 (Lagoa, J., concurring). She took a different tack and cited *McDonald* to argue that there is no liberty interest in voting absentee, and thus, in her view, the district court had erred in applying the factors set out in *Mathews v. Eldridge*, 424 U.S. 319 (1976). *Id.* at 1289.

second argument; namely, that Plaintiffs' claims fail because they focus on the burdens placed on "vulnerable" voters instead of the electorate as a whole.

If Defendant Lee's second argument looks familiar, it is because this Court has already rejected it. *See League of Women Voters of Fla., Inc. v. Detzner*, 314 F. Supp. 3d 1205, 1216 (N.D. Fla. 2018) ("Disparate impact matters under *Anderson-Burdick*."). Still, this Court will briefly address it here.

Defendant Lee's argument relies entirely on Justice Scalia's concurrence in *Crawford*. Joined by Justices Thomas and Alito, Justice Scalia concurred in the judgment, but took issue with Justice Steven's opinion because it "assume[d] [the] premise that the voter-identification law 'may have imposed a special burden on' some voters, . . . but [held] that [the] petitioners ha[d] not assembled evidence to show that the special burden is severe enough to warrant strict scrutiny" instead of considering the law's "reasonably foreseeable effect on *voters generally*." *Crawford*, 553 U.S. at 204, 208 (Scalia, J., concurring) (emphasis in original). But Justice Scalia's concurrence is not the law. Instead, "Justice Stevens's plurality opinion controls . . . because it is the narrowest majority position."[10] *ACLU of N.M. v.*

---

[10] *See Marks v. United States*, 430 U.S. 188, 193 (1977) ("When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds.") (internal quotation marks omitted).

*Santillanes*, 546 F.3d 1313, 1321 (10th Cir. 2008); *see also GBM*, 992 F.3d at 1320 (applying Justice Stevens's opinion).

If anything, *Crawford* supports, not forecloses, the conclusion that disparate impact matters. "[A] majority of the justices in *Crawford* either did not expressly reject or in fact endorsed the idea that a burden on only a subgroup of voters could trigger balancing review under *Anderson-Burdick*." *Ohio State Conf. of NAACP*, 768 F.3d at 544. The Eleventh Circuit has applied *Anderson-Burdick* this way as well. *See Lee*, 915 F.3d at 1319 (evaluating the "burden . . . on vote-by-mail and provisional voters' fundamental right to vote"). And if there was any lingering doubt, *Anderson* itself "assessed the burden imposed by the challenged law by looking to its impact on a subgroup of voters." *Ohio State Conf. of NAACP*, 768 F.3d at 544 (citing *Anderson*, 460 U.S. at 792).

Beyond citing Justice Scalia's concurrence as if it were law, Defendant Lee offers zero authority supporting her position. Thus, given the above and in the absence of any authority to the contrary, this Court reiterates what it said before, "[d]isparate impact matters under *Anderson-Burdick*." *League of Women Voters*, 314 F. Supp. 3d at 1216.

Defendant Lee often finds herself on the receiving end of lawsuits challenging Florida's election laws. So this Court can hardly blame her for finding the "New" *Anderson-Burdick* test she has concocted more refreshing. But, unless and until the

Supreme Court changes the formula, this Court will vend exclusively *Anderson-Burdick* "Classic." Defendant Lee's motion to dismiss is **DENIED** as to Plaintiffs' undue burden claim challenging the drop box restrictions.

For the foregoing reasons,

**IT IS ORDERED**:

1. Defendant Lee's and Defendant Moody's motions to dismiss, ECF Nos. 175 & 176, are **GRANTED in part** and **DENIED in part**.

2. Count II is **DISMISSED for lack of standing**.

3. Plaintiffs' claims against Defendant Moody with respect to sections 101.69, 102.031, and 101.62, Florida Statutes, are **DISMISSED for lack of standing**.

4. Plaintiffs' claims against Defendant Lee with respect to sections 102.031 and 101.62, Florida Statutes, are **DISMISSED for lack of standing**.

5. Plaintiffs' claims against the Defendant Supervisors with respect to section 97.0575, Florida Statutes, are **DISMISSED for lack of standing**.

6. Plaintiffs may proceed against Defendant Lee in Count I with respect to section 101.69, Florida Statutes.

7. Plaintiffs may proceed against Defendant Supervisors in Count I with respect to sections 101.69, 101.62, and 102.031, Florida Statutes.

8.  Plaintiffs may proceed against Defendant Supervisors in Counts III and IV.

9.  Plaintiffs may proceed against Defendants Lee and Moody in Counts V and VI.

10. If any party files a substantive "omnibus" memorandum or "omnibus" order again, that party's motion will be denied without prejudice for failure to follow this Court's orders.

**SO ORDERED on October 8, 2021.**

> **s/Mark E. Walker**
> **Chief United States District Judge**