## DARIO MORENO, PH.D.

## Report on SB90

### Introduction

The purpose of this report is to assess the impact of SB90 and determine whether it was adopted with intent to suppress voter participation or, rather, to address widespread, well-documented abuses in Florida elections.  In summary, my 30 years of real-life, professional, and academic experience show that SB90 is a modest, appropriate response to Florida's history *and present abuse* of absentee ballot fraud, and thus the bill was not intended to, nor will it result, in racially discriminatory effects.  Dr. Kousser fails to appreciate the core differences between African Americans, whites, and Hispanics in South Florida.

### Qualifications

My testimony is based on over 30 years of professional and academic experience in Florida elections and politics. Over that time, I have conducted intensive factfinding and research in preparation of my books and publications.  I have been a political consultant based in Miami over the last twenty-five years and know many of the political players in Miami Dade and South Florida politics. I have conducted over 150 political surveys and focus groups on South Florida. Among my clients were Miami-Dade Mayor Alex Penelas, Miami-Dade Mayor Carlos Gimenez, State Attorney Katherine Fernandez-Rundle, Congressman David Rivera, Congressman Mario Diaz-Balart, Congressman Lincoln Diaz-Balart, Congresswoman Ileana Ros-Lehtinen, City of Miami Mayor Joe Carollo, City of Miami Mayor Manny Diaz, and Mayor Francis Suarez.  I was director of the FIU Metropolitan Center (2002-10) and still direct research projects for the center on elections, redistricting and public opinion. I have used newspapers only to the extent necessary for historical context and dates.

During this time I have published twenty-five scholarly articles and book chapters dealing with elections and politics in Florida, as well as two books: *A Divided Union: Structural Challenges to Bipartisanship in America*, co-edited with Eduardo Gamarra, Representative Patrick Murphy, and Representative David Jolly (New York Routledge, 2021), and *Florida Politics: Ten Media Markets, One Powerful State*, co-edited with Kevin Hill and Susan McManus (Tallahassee: Florida Institute of Government, 2004).

I have served as the Principal Investigator for various research projects at the Florida International University Metropolitan Center dealing with elections. Currently, I am the Principal Investigator of three redistricting projects for the Broward County Commission, Broward School Board, and Miami-Dade School Board. Other projects include:

- Co-Principal Investigator, Survey of Citizens, Miami Beach, $15,500;

- Principal Investigator, Earned Income Credit Outreach Program, City of Miami, $793,000, 2003-2006;

- Co-Principal Investigator, Miami-Dade Voter Confidence Poll, Miami-Dade County, $35,000, 2006;

- Co-Principal Investigator, Broward Exit Poll, Broward Election Department, $30,000, 2006;

- Principal Investigator, Broward Voter Confidence Poll, Broward Election Department, $25,000, 2005;

- Principal Investigator, Annexation Feasibility Study, City of Opa-Locka, $25,000, 2006;

- Co-Principal Investigator, Miami-Redistricting, City of Miami, $40,000, 2003;

- Principal Investigator, EITC Poll, Human Service Coalition, $10,000, 2002;

- Research Team member, Miami Annexation, City of Miami, $49,500, 2002;

- Co-Principal Investigator, Miami Annexation II, City of Miami, $25,000 2003;

- Principal Investigator, Key Biscayne Visioning Project, Village of Key Biscayne, $15,000;

- Principal Investigator, Earned Income Credit Outreach Program, City of Miami, $205,000, 2004.

- ❖ Principal of Dario Moreno Inc., a public opinion and survey firm in South Florida since 2002.

  - This firm has conducted over 150 public opinion surveys and polls. It has worked with candidates at the state and local level such as Mario Diaz Balart, Carlos Curbelo, Manny Diaz, David Rivera for Congress, the Codina Group and Carlos Gimenez for Miami-Dade County Mayor, Inc, including:
    - o Consultant Carlos Gimenez campaign for Miami-Dade, 2011, 2012, 2016. Duties included designing and helping direct the absentee ballot campaign of the Carlos Gimenez campaign for Miami-Dade County in 2016.
    - o Consultant for Norman Braman on the efforts to recall Miami-Dade Mayor Carlos Alvarez.
    - o Consultant for Michael Bileca for State Representative 2010, 2012, 2014, and 2016. Duties included designing and helping direct the absentee ballot campaign for the Michael Bileca campaign for State House 2010.
    - o Consultant for Yes for a Greater Miami Dade on County Question No 3 January 2008.

- ❖ Expert witness on various Federal and State cases involving elections or redistricting:

  - *DeGrandy vs. Wetherall;*
  - *Suarez vs. Miami-Dade School Board*;
  - *Diaz vs. City of Miami Beach*;
  - *Martinez vs. Bush.*

- ❖ Other Professional Activities:

  - Involvement in uncovering the 1997 City of Miami Voting Fraud case. The election results were overturned by the courts.
  - Chairman and Co-Founder of One Nation Inc.

❖ Publications

**Books:**

- A Divided Union: Structural Challenges to Bipartisanship in America, co-edited Eduardo Gamarra, Patrick Murphy, David Jolly (New York: Routledge, forthcoming 2020)
- Florida Politics: Ten Media Markets, One Powerful State, co-edited Kevin Hill, Susan McManus (Tallahassee: Florida Institute of Government, 2004).
- The Struggle for Peace in Central America: The Arias Plan (Gainesville: University Press of Florida, 1994)
- U.S. Policy in Central America: The Endless Debate (Gainesville: University Press of Florida, 1990)

**Articles and Book Chapter:**

- The Geography of Polarization" (with Patrick J. Villalonga) in a Divided Union: Structural Challenges to Bipartisanship in America.
- "The Structure of Primaries" (with Steve Vancore, Glenn Burhans, Anthony Kusich, Patrick Villolonga) in A Divided Union: Structural Challenges to Bipartisanship in America.
- "Carlos Gimenez Conservative Reforms in Miami Dade County, (with Maria Ilcheva) In Marion Orr and Domingo Morel (eds) Latino Mayors: Political Change in the Postindustrial City, Philadelphia: Temple University Press, 2018.
- Cuban American Partisanship: A Secular realignment?" (with James Watts) In Kyle L. Kreider and Thomas J. Baldino (eds) Minority Voting in the United States, Vol 1: 254-269. Santa Barbara: Praeger, 2016
- "The Obama Doctrine in Cuba" (with Maria Ilcheva) in Hanna S. Kassab and Jonathan Rosen (eds) The Obama Doctrine In the Americans Lanham MD: Lexington Books, 2016.
- "Miami." In Oxford Bibliographies in Latino Studies. Ed. Ilan Stavans. New York: Oxford University Press, 2014. Refereed
- Ch 4: Latino in Florida Politics (with Maria Ilcheva) in Edwin Benton 5 edition of Government and Politics in Florida 2014

- "The Miami Renaissance" in The Roots of Latino Interurban Agency" Rodolfo Rosales and Sharon Navarro (eds.) (Dallas: North Texas Press, 2013)
- "Cuban-Americans." In Oxford Bibliographies in Latino Studies. Ed. Ilan Stavans. New York: Oxford University Press, 2013.
- "Fool Me Once:  Voter Confidence in Florida" (with Maria Ilcheva and Vanessa Brito) Florida Political Chronicle V19, Winter 2008-2009.
- "Cuban Political Power: Challenge and Consequences" Cuban Affairs Quarterly Vol. 2, No. 1 (October 2006). (Electronic Journal)
- "Hispanic Vote in Florida: 2004 Election" (with J.C. Flores and Maria Ilcheva) In De la Garza, Rodolfo O., Louis DeSipio, and David L. Leal (eds.). Beyond the Barrio: Latinos in the 2004 Elections. South Bend, IN: University of Notre Dame Press, forthcoming 2009.
- "Politics and the Challenge of Ethnicity" (with Kevin Hill) In J. Edwin Benton (ed.) Government and Politics in Florida, (3rd ed.) Gainesville: Florida: University Press of Florida, forthcoming 2007.
- "Cuban American Political Power: Challenges and Consequences," Cuban Affairs, Vol. 1, Issue 4 (October 2006).
- "Exiles Power: Cubans in the U.S. Political System" in Ernesto Verdeja, Jorge Romero, and David Plotke (eds.) Cuba and the Valrela Initiative from Dissent to Democratization (New York: New School for Social Research, 2004)
- "Simulating Globalization," International Studies Perspectives, Vol: 5 (August 2004)
- "Florida Hispanic Voters: Regional Concentration, National Origin Diversity, and Partisanship" in Florida's   Politics: Ten Media Market, One powerful State in Hill, MacManus, and Moreno (eds.) (Tallahassee: Florida Institute of Government) 2004
- "South Florida" (with Kevin Hill) in Florida's Politics: Ten Media Market, One powerful State in Hill, MacManus, and Moreno (eds.) (Tallahassee: Florida Institute of Government) 2004
- "Battleground Florida," Co-authored with Kevin A. Hill. In Rudy de la Garza and Louis DeSipio (eds.)  Muted Voices: Latinos and the 2000 Elections, Boulder, Colorado: Westview Press, 2003.
- "Power without a Program: Hispanic Incorporation in Miami," Co-authored with Christopher L. Warren in Ruphus Browning, Dale A.

Marshall, and David H. Tabbs (eds.) Racial Politics in American City (third edition) Boston: Massachusetts: Longman, 2003.

- "A Community or a Crowd: Racial, Ethnic, and Regional Bloc Voting: The Florida House of Representative 1989-98." Co-authored with Kevin A. Hill in Politics and Policy, March 2002.

- "Racial and Partisan Voting in a Tri-Ethnic City: The 1996 Dade County, Florida Mayoral Race." Co- authored with Kevin A. Hill and Lourdes Cue in Journal of Urban Affairs, Winter 2001.

- "Second Generation Cubans." Coauthored with Kevin A. Hill in Susan McManus (ed.) Florida Redistricting, Tallahassee FL: Institute of Government, 2001.

- "Language as a Variable: English, Spanish, Ethnicity and Political Opinion Polling in South Florida." Coauthored with Kevin A. Hill, Journal of Hispanic Behavioral Science, May 2001.

- "Teaching, Using Role Playing Simulation: Bureaucratic Bargaining Revisited. Coauthored with Heidi H. Hobbs in John Bohrer (ed.) New Techniques for Teaching Political Science, New York: Random House, 1999.

- "The Limits of Sovereignty in a Bifurcated World," In Heidi H. Hobbs (eds.) Pondering post- Internationalism, Albany, New York: State University of New York Press, 1999.

- "Cuban-Americans in the 1996 Election." Coauthored with Christopher Warren in Rudy Garcia and Luis DeSipio (eds.) Awash in the Mainstream: Latinos in the 1996 Election, Boulder, Colorado: Westview Press, 1998.

- "Florida Politics and the Challenge of Ethnicity," Coauthored with Christopher Warren and John Stack in Robert Huckshorn (ed.) Government and Politics in Florida (second edition) Gainesville: Florida: University Press of Florida, 1998.

- "Cuban-American Political Empowerment." In Chris Garcia (ed.) Latinos and the United States Political System, Notre Dame, Indiana: University of Notre Dame Press, 1997.

- "Second Generation Cubans." Coauthored with Kevin A. Hill, Hispanic Journal of Behavioral Science, May 1996.

- "Cuban-Americans in Miami Politics: Understanding the Cuban Model." In Wilbur Rich (ed.) The Politics of Minority Coalitions:

Race, Ethnicity, and Shared Uncertainties, Westport Connecticut: Greenwood Press, 1996.

- "Nicaragua," In James Malloy and Eduardo Gamarra (eds.) Latin American and the Caribbean Contemporary Record, New York: Holmes & Meier, 1996.
- "The Endless Debate Revisited: U.S. Policy in Central America." Coauthored with Dario Perez in David Dent (ed.) Handbook of U.S. Latin American Policy, Westport Connecticut: Greenwood Press, 1995.
- "Respectable Intervention: The United Stated and Central American Elections." In John Both and Mitchell Seligson (eds.) Elections and Democracy in Central America, Chapel Hill, North Carolina: University of North Carolina Press, 1995.
- "The Conservative Enclave Revisited: Cuban-Americans in the 1992 Election. Coauthored with Christopher Warren in Rudy de la Garza and Luis DeSipio (eds.) Ethnic Ironies: Latino Politics in the 1992 Election, Boulder, Colorado: Westview Press, 1995.
- The Cuban Community in the 1992 Presidential Election." Harvard Journal of Hispanic Policy, 1992- 1993.
- "Ethnicity & Partisanship: The Case of the 18th Congressional District in Miami," Coauthored with Nicol Rae in Guillermo Gerner Miami Today, Miami, Florida, Florida International University Press, 1992.
- "The Conservative Enclave: Cubans in Florida," Coauthored with Christopher Warren in Rudolfo de la Garza, From Rhetoric to Reality: Latino Politics in the 1988 Election, Boulder, Colorado: Westview Press, 1992.

I am being compensated at $250 per hour for my work in this case.

## Summary

I conclude that SB90 is an appropriate response to Florida's history of absentee ballot fraud, and it will not have racially discriminatory effects. Dr. Kousser argues that Florida Republicans passed this law with discriminatory intent, partly because the Republican Party is an overwhelmingly "white" party. He writes: "since the party was overwhelmingly white and its opposition drew disproportionate support from ethnic or linguistic minorities, the resulting legislation would likely disadvantage minority voters." (Kousser 54.) But he ignores the fact that four of the 24 Republicans in the Florida Senate are Latinos, and that eight of 78 Republican

members of the House represent minority Hispanic Districts.  Throughout his report Dr. Kousser wrongfully equates the interests of Hispanic and African Americans.

In his report Dr. Kousser uses exit poll data "to indicate that race and political parties have been extremely highly correlated in Florida in the 21st Century." (Kousser 37.)  But Dr. Kousser misses that fact that the electoral behavior of Florida Hispanics is far more complicated and nuanced.  Florida Hispanics supported Republican Presidential candidates between 1980-2004 but voted for Obama in 2008 and 2012 and for Clinton in 2016.  Exit polls showed Hispanics slightly favoring Biden (53%) but precinct level analysis shows Trump with a slight edge.

The fairest conclusion of Hispanic partisanship in Florida is that they are a swing vote.  Today both political parties are actively targeting the Hispanic vote.  Recent political developments in Latin America, especially the Cuba SOS movement, the election of a radical leftist government in Peru, and the continuing violations of human rights by the Sandinistas in Nicaragua, have resulted in increased support for Republicans among Florida's Hispanics.

Dr. Kousser also ignores the support the Republican Party receives from Latino communities in South Florida. SB90 passed with unanimous support from Latino members of the Republican caucus in the Senate and the House of Representatives.  All four Hispanic Republican members of the Florida Senate (Ileana Garcia, Manny Diaz, Ray Rodrigues, and Ana Maria Rodriguez) voted in favor, while the three Democrat Hispanics voted against the bill (Janet Cruz, Annette Taddeo, and Victor Torres.)  The bill was approved by the Florida Senate 23-17.  Needless to say, SB90 would not have been approved by the Senate if all four Republican Latinos had voted against the bill.

The situation was similar in the Florida House.  All nine Hispanic Republican members voted for the bill (Bryan Avila, David Borrero, Tom Fabricio, Juan Fernandez-Barquin, Daniel Perez, Rene Plasencia, Anthony Rodriguez, Alex Rizo, and Jackie Toledo), while four out of the five Hispanic Democrats voted no (Michael Grieco, Daisy Morales, Carlos Guillermo Smith, and Susan Valdes). Nicholas Duran (D-Miami) did not vote.

**Total Vote in Favor of SB90, Florida Senate**

| Voting Yes/No/NV | Republican | Democrat | Total |
|---|---|---|---|
| Hispanic | 4/0/0 | 0/3/0 | 4/3/0 |
| Non-Hispanic | 19/1/0 | 0/13/0 | 19/14/0 |
| Total | 23/1/0 | 0/16/0 | 23/17/0 |

**Total Voting in Favor of SB90, Florida House**

| Voting Yes/No/NV | Republican | Democrat | Total |
|---|---|---|---|
| Hispanic | 9/0/0 | 0/4/1 | 9/4/1 |
| Non-Hispanic | 68/0/1 | 0/36/1 | 68/36/2 |
| Total | 77/0/1 | 0/40/2 | 77/40/3 |

Dr. Kousser's description of the floor debate in the Florida House sometimes fails to identify Hispanic Republican members, especially those who are supporting election reform. For example, he fails to identify Erik Fresen as a Colombian American member when he quoted him describing the Early Voting system as one that "coddles" voters. (Kousser 28.) Similarly, he properly identifies Alex Diaz de la Portilla as a Cuban American when he quotes his Miami Herald's opinion article attacking Luis Morse for "ramming through" a bill than tightened standards for voting absentee. But Dr. Kousser does not identify the author of the 1998 bill Luis Morse as a Cuban American. (Kousser 20.)

The strong relationship between the Republican Party and Florida Latinos can be demonstrated by looking at election results from Florida's largest county. Miami-Dade is Florida's most Hispanic-populated county. 70% of its residents are Hispanic while Osceola County is about 56% Hispanic. According to the 2020 Census, Miami-Dade County houses 1,848,925 of Florida's Hispanics (5,679,290). Latinos in Miami-Dade represent nearly a third (32.5%) of all Hispanics in Florida.

In the 2020 election, Republicans flipped two majority Hispanic Congressional seats, one majority Hispanic State Senate seat, and two majority State

House seats in Miami-Dade County.  These impressive gains by the GOP were not due to an especially good election cycle, but instead were a return to normalcy after a particularly bad election cycle for Republicans in 2018.  Moreover, former President Donald Trump dramatically reduced his margin of defeat from 290,147 in 2016 to just 85,031 in 2020 in Miami-Dade.

The history of South Florida's three majority Hispanic Congressional Districts reflects the strong support the GOP enjoys among South Florida Hispanics, especially Cuban-Americans.  Three Hispanic majority Congressional seats were drawn in the 2002 reapportionment, and there have been 30 Congressional elections since that date (currently CD 25, CD 26, and CD 27).  The Democrats have won a total of three (Joe Garcia 2012, Debbie Mucarsel-Powell 2018, and Donna Shalala 2016).  The 1992 reapportionment drew two majority Hispanic seats in Florida, and there have been 40 Congressional elections in which the Democrats won only three elections (cited above).  The 2012 reapportionment also created a Hispanic access district in Central Florida (CD 9).  Hispanics only comprised 41.5% of the voting age population in that District.  Congressional District 9 has elected Democrats in five elections: Alan Grayson in 2012 and 2014, and Darren Soto three times (2016, 2018, and 2020).

The history of majority Hispanic districts in the Florida Senate follows the same pattern. Florida has four majority Hispanic State Senate seats (36, 37, 39, 40).  There have been 30 elections in these Hispanic districts since the 1992 reapportionment.  Republicans have won 24 (90%) compared to only three for Democrats Jose Javier Rodriguez (2016), and Annette Taddeo (2017, 2020).  Notably, three Hispanic senators that do not represent Hispanic Majority Districts Victor Torres a Democrat who represents District 15 that is only 45.59% Hispanic voting-age population ("VAP"), Janet Cruz a Democrat from District 18 that is 32.9% Hispanic VAP, and Ray Rodrigues, a Republican who represent District 27 that is 18% Hispanic VAP.  The numbers are also similar for elections in Hispanic majority districts in the Florida House of Representatives.  Of 175 elections since the 1992 redistricting in Hispanic majority district, Republican candidates have won 136 (77.1%) of them. There are 14 Hispanic majority State House seats in Florida (43, 48, 103, 105, 110, 111, 112, 113, 114, 115, 116, 117,118, 119).  Republicans currently hold nine and Democrats five.  It should be noted that House District 62 is held by a Hispanic District (Susan Valdez) and that district has a Latino VAP of 57.78%, Carlos Guillermo Smith, a Democrat, represents House District 49

(Hispanic VAP 36.87%) and House District 50 (25.83% Hispanic VAP) is held by a Latino Republican Rene "Coach P" Plasencia.

## Majority-Hispanic District in Florida 2021[1]

| District | Part of State | Incumbent | Political Party |
|---|---|---|---|
| CD 25 | Miami-Dade, Broward, Hendry, Collier | Mario Diaz-Balart | Republican |
| CD 26 | Miami-Dade, Monroe | Carlos Gimenez | Republican |
| CD 27 | Miami-Dade | Maria Elvira Salazar | Republican |
| SS 40 | Miami-Dade | Annette Taddeo | Democrat |
| SS 39 | Miami-Dade | Ana Maria Rodriguez | Republican |
| SS 37 | Miami-Dade | Ileana Garcia | Republican |
| SS 36 | Miami-Dade | Manny Diaz | Republican |
| SH 43 | Osceola | Kristen Arrington | Democrat |
| SH 48 | Orange | Daisy Morales | Democrat |
| SH 103 | Broward, Miami-Dade | Tom Fabricio | Republican |
| SH 105 | Broward, Collier, Miami-Dade | David Borrero | Republican |
| SH 110 | Miami-Dade | Alex Rizo | Republican |
| SH 111 | Miami-Dade | Bryan Avila | Republican |
| SH 112 | Miami Dade | Nicholas Duran | Democrat |
| SH 113 | Miami-Dade | Michael Grieco | Democrat |
| SH 114 | Miami-Dade | Demi Busatta-Cabrera | Republican |
| SH 115 | Miami-Dade | Vance Aloupis | Republican |
| SH 116 | Miami-Dade | Daniel Perez | Republican |
| SH 117 | Miami-Dade | Kevin Chambliss | Democrat |
| SH 118 | Miami-Dade | Anthony Rodriguez | Republican |
| SH 119 | Miami-Dade | Juan Fernandez Barquin | Republican |

The notion that Florida's Republican Party is overwhelmingly white ignores Florida's history of electing Latino Republicans to statewide office. Robert "Bob" Martinez was elected Florida's first Latino governor in 1992. Mel Martinez was elected Florida's first Hispanic U.S. Senator in 2004, while former Florida House

---

[1] Majority-Hispanic District are those that have more 60% Hispanic VAP.

Speaker Marco Rubio drove Florida's popular Republican Governor Charlie Crist out of the Republican Senatorial Primary (and later the Republican Party) in 2010. The last two Lieutenant Governors of Florida, Carlos Lopez-Cantera (2014) and Jeanette Nunez, (2018) are both Hispanic Republicans from Miami-Dade County.

Dr. Kousser asserts that "members of minority groups have never been elected in Florida in proportion to their population percentage." He continues; "even today, the percentage of Black and Latino State Legislators are well below the proportion of minorities in Florida's population. (Kousser 66.) However, a look at the make-up of the Florida Congressional Delegation and Florida's bi-cameral Legislature does reflect numbers similar to minority groups' proportion of the electorate. The 2020 U.S. Census reports that African Americans comprised 16.9% of the state population. Currently, there are four African Americans in Florida's 27-member congressional delegation (14.8%). In the Florida Senate there are six African Americans, or 15% of the 40 members. Similarly, 17.5% of the Florida House is made up of African American Representatives, which is 21 members of the 120-member chamber. On the other hand, Latinos make up 26.4% of all Floridians but represent only 17.3% of Florida's registered voters.[2] The under-representation of Latinos among Florida registered voters relative to their proportion in the population is a function of citizenship. This is verified by the U.S. Census by looking at Citizen Voting Age Population ("CVAP"), which is a measure of the number of people who are citizens and are of voting age (i.e. the population of people who could register to vote). According to the 2019 Census data the CVAP among Florida's Hispanic is 19.8%. Given that African Americans portion (16.9%) of the population and Latino registration are almost the same, Latino numbers are very similar to African American numbers in terms of representation. Latinos comprised four out of the 27 members of congress from Florida (14.8%), seven out of 40 members of the Florida Senate (17.5%) and 14 out of the 120 Florida House seats (11.6%).

**Foundation of Hispanic Communities**

Florida Latinos' relatively strong support for the Republican Party must be put in the historical context of their political incorporation into Florida's polity. Many assumptions made about Florida Latino communities are simply erroneous or based on antiquated or stereotypical misconceptions. In order to understand Latino

---

[2] Fla. Dep't of State, Fla. Div. of Elections, *Bookclosing Reports - General/Primary Elections*, https://dos.myflorida.com/elections/data-statistics/voter-registration-statistics/bookclosing/bookclosing-reports-regular/ (last visited Sept. 29, 2021).

politics in Florida, one needs to first understand where the Latino population came from as well as when and where they settled. The history of Latinos in Florida is one of rapid political empowerment. Dr. Kousser, when naming the number of Latinos elected to statewide office in Florida, does not mention that Florida is the only state besides New Mexico and Nevada that has elected both a Latino Governor and a U.S. Senator. (Kousser 66.)

Florida's Latino politics is shaped largely by its proximity to Latin America, but Hispanic-Americans' political preferences are also shaped by the politics of their country of origin. Historian Gerald Poyo points outs that, "[b]ecause of its proximity to the island, Florida became a traditional gathering point for dissatisfied Cubans seeking to influence the political situation in their homeland." Hispanics in Florida trace their origins to the founding of St. Augustine on September 8, 1565 – the oldest continuously inhabited European settlement in the contiguous United States. But when pundits and journalists discuss the state's Latino political heritage, they tend to skip past 1565 and focus on the mass exodus of Cuban refugees in the early 1960s in the aftermath of Castro's Revolution. But to do so ignores the rich and important history of Florida Hispanics in the nineteenth and early twentieth centuries. Latino leaders and their concern for their home countries played an important role in shaping state politics. And Latino politics in Florida took a far different path than in California, Illinois, or New York.

Joseph Marion Hernandez, Florida's first territorial delegate to Congress, was the first Hispanic member of the United States House of Representative, sworn in on January 3, 1823. At that time the Hispanic population of Florida was probably fewer than 5,000. As the territorial delegate, Hernandez was instrumental in getting Congress and the Monroe administration to verify the old Spanish land grants in Florida. His efforts in easing the transition from Spanish to Anglo-American jurisprudence allowed many Hispanic families in Florida to obtain U.S. recognition of their Spanish land grants. This was a sharp contrast to Latinos in California and Texas, where many families lost their properties or faced a multi-generation legal battle to obtain legal recognition of their properties.[3] Hernandez later became a member and the presiding officer of the Territorial House of Representatives. Although his dreams of holding national office ended after an unsuccessful

---

[3] Nick Linville, *Cultural Assimilation in Fronter Florida: The Life of Joseph Marion Hernandez*, MA/Non-Thesis Paper, U. of Fla. (Apr. 23, 2004).

campaign for the U.S. Senate in 1845, Hernandez remained active in local politics, serving as mayor of St. Augustine in 1848.

Another prominent Hispanic resident of St. Augustine was Father Felix Varela who was born in Cuba in 1788 but raised by his grandfather in Florida. Varela, who had returned to Cuba to study for the priesthood, was exiled from the island when, as a delegate to the Cortes of Cadiz, he signed a petition to the Spanish Crown demanding the independence of Latin America and published an essay calling for the abolition of slavery in Cuba. He would eventually settle in New York City where he was the pastor of a parish that ministered to newly arrived Irish immigrants. Varela would return to Florida after his retirement as Vicar General of the Diocese of New York. Varela and Hernandez were not only instrumental in influencing public policy, they also maintained the political connection between Florida and Cuba after the state's annexation to the United States.

This link between Cuba and Florida was reinforced after the major influx of political refugees from Cuba caused by the Ten-Year War (1868-1878). While the emigrating Havana elite moved to New York City, those of more modest means settled in Key West, Florida.[4] By 1870, only about 1,100 had immigrated. But after the Spanish required all military age males to enlist with loyalist "volunteers," migration to Key West intensified. The son of the Cuban Independence leader, Carlos Manuel de Cespedes, directed the evacuation of Cubans to Key West. By 1873 Cubans constituted the majority of the population in Key West.[5] The Cuban migrants contributed to the booming Key West economy by establishing over two dozen cigar factories in the city. This demographic and economic shift allowed De Cespedes to be elected Mayor of Key West in 1876. This was significant at the time, because Key West was the largest and wealthiest city in Florida. For the next two decades, Key West would elect several Cuban immigrants to the Florida House of Representatives including Fernando Figueredo (1885), M.O. Delgado (1888), M.R. Moreno (1888), and Jose Pompez (1892).[6] These Cuban elected officials were all committed to the independence of Cuba. For example, Jose Pompez was a lawyer and a cigar factory owner who – along with Figueredo, Delgado, and Moreno – was on the board of directors of the Key West Chapter of Jose Marti's Cuban

---

[4] Gerald E. Poyo, *Key West in Cuban Ten Years Wars*, Fla. Hist. Q., Jan. 1979, at 289, 290.

[5] *Id.*

[6] Robert L. Ward, *Membership of the Florida House of Representatives by Counties 1845-2012*, Fla. House of Reps. (2012).

Revolutionary Party. He was elected to the Florida House in 1892 and served until his death in 1897. His son, Alex Pompez, was an executive in Negro league baseball who owned the Cuban Stars and New York Cubans franchises from 1916 to 1950.

The golden era of Key West's profitable cigar industry ended with a devastating fire on April 1, 1886. The fire destroyed 614 houses and 18 cigar factories. Many of the owners took advantage of the fire to relocate their factories to Ybor City in Tampa. Producing cigars in Key West had become increasingly costly due to rising labor unrest, transportation costs and increased trade unionism. Spanish capitalist Vincent Martinez Ybor designed his operation on the outskirts of Tampa as a company town to prevent labor organizing.[7] Ybor City quickly became the new "cigar city" as most of the cigar manufacturers abandoned Key West over the next two decades. Immigrants, mainly from Cuba, Spain, and Italy, flocked to the new city as the cigar industry produced thousands of well-paying jobs. Ybor City became a unique phenomenon in the early twentieth century American South: a prosperous town almost entirely populated and owned by immigrants. Ferdie Pacheco, also known as the "fight doctor," wrote a compelling memoir of his youth growing up in this vibrant immigrant community.[8] He writes affectionately of a multiethnic and multiracial area with a strong sense of community populated by ethnically based mutual aid societies.

Ybor City, because of its growing immigrant population and prosperous cigar industry, replaced both St. Augustine and Key West as the center of Hispanic politics in Florida. Ybor City's increasing importance in Cuba's exile politics was recognized by Jose Marti, who in 1892 founded the Cuban Revolutionary Party and drafted its principles in Tampa. Marti, the apostle of Cuban independence, would visit the city over twenty times in his lifetime. He would pay frequent visits to the cigar factories, holding meetings and fundraisers among the workers for the great cause of "Cuba Libre." The cigar workers would offer a portion of their wages for the sacred mission. The Tampa City Council was dominated by Cuban immigrants who were Marti's loyalists and members of his Cuban Revolutionary Party, including Ramon Rubiera de Armas, Emilio Pons, Candido Martinez Ybor and Ramon Rivero Y Rivero. Underscoring the fact that Latino politics in Tampa, Key

---

[7] Gerald Poyo, *With All, and for the Good of All: The Emergence of Popular Nationalism in the Cuban Communities of the United States, 18-48-1898*, Duke U. Press, 1989, at 74.

[8] Ferdie Pacheco, *Ybor City Chronicles: A Memoir*, U. Press of Fla., 1994-98.

West, and St. Augustine was dominated by the politics of the homeland 120 years ago, these dynamics still hold true today.

The Great Depression and automation in the cigar factories brought an end to the well-paying jobs in the factories of both Ybor City and Key West.  Many of its residents left their old neighborhoods for West Tampa, or in the case of Key West, points north as the city Latino populations assimilated.  Cuban immigrants married other ethnic Catholics, especially Spaniards, Italians, and Poles.  The Ybor City Cuban sandwich replaced the traditional pork with salami as a nod to intra-ethnic marriages.  Columbian restaurants and many of the old buildings survived awaiting the revival of the old Latino neighborhoods as entertainment and tourist districts.

The next generations of Hispanic politicians in Florida were examples of this process of cultural and political assimilation.  Key West continued to send Cuban immigrants to the State legislature such as Judge Juan Francisco "John" Busto 1916-1924, but they no longer ran on a platform of Cuban independence or as members of Marti's Cuban Revolution Party. Instead, they ran in "white" Democratic primaries.  The first Latino to serve in the Florida Senate was Arthur "Kitty" Gomez whose life appears to be an "American Dream" success story.  He was born to immigrant parents in Key West in 1889.  At 21, Gomez was an apprentice barber who could neither read nor write.  His life changed when he met "a lady from the mainland" who paid a high school principal to teach him.  He passed the eighth-grade exams in less than a year.  A famous Florida jurist named Jefferson Browne took an interest in the young barber and permitted him to use his law library.  Three years later, Gomez successfully passed the Florida bar.  He was later elected to the Florida House of Representatives in 1914 and then re-elected in 1916 with little opposition.  In 1930 he ran for State Senate against a long-time incumbent Democrat in a four-county district comprised of Collier, Hendry, Lee, and Monroe counties.  He beat his opponent by running a successful grassroots campaign, walking door to door, shaking hands, and meeting with voters.[9]  In 1932 he ran unsuccessfully for governor, receiving just 3.44% of the vote.

It would take another generation before Florida's Robert "Bob" Martinez became the first person of Spanish descent to be elected Governor of Florida.  His family roots were firmly planted in the Ybor City immigrant community.  His grandparents were Spanish immigrants who had come to Tampa looking for work

---

[9] Vernon Lamme, Florida Lore Not Found in the History Books! (Baker County Historical Society 1973) (unpublished manuscript).

among the cigar workers of Ybor City. His mother was a seamstress, and his father was a waiter at the famous Columbia Restaurants. Like many other Spanish/Cuban/Italian families at the time, the family moved to West Tampa as Ybor City slowly faded and emptied. Martinez went to the University of Tampa and then taught civics at a local high school. He entered politics through the teacher's union. He became the executive director of the Hillsborough Classroom Teachers Association and was instrumental in the political/legal battle to win collective bargaining rights for teachers. He was elected mayor of Tampa in 1979. The mayor's office is nonpartisan, but Martinez was a well-known Democrat, though he took advantage of a high-profile visit by Ronald Reagan to Tampa in 1983 to switch parties. In 1986 he was elected Florida Governor as a Republican.

Elvin Martinez was another Democrat from West Tampa. A Cuban American, he represented West Tampa from 1966 to 1998, although it was never a majority Hispanic district. He was instrumental in obtaining state support for the redevelopment of Ybor City as an entertainment and tourist destination. He worked with his fellow Cuban Americans in Miami to support the seven remaining cigar factories in Tampa, arguing that cigars should be exempt from tobacco taxes to protect what he described as a "dying industry."

## The *Boleteros*

The center of Florida's Hispanic politics shifts to Miami-Dade County in the late 1980s and 1990s. The election of Ileana Ros-Lehtinen as the first Latina member of the U.S. House of Representative in 1989 marked a turning point for the political empowerment of Florida Latinos. But by that time, Miami-Dade voters had grown accustomed to Spanish-surname candidates on their ballots for local races. This era of Hispanic ascendancy was ushered in by politicians such as Maurice Ferre, who was elected to the Florida House of Representatives in 1966 and was Mayor of the City of Miami from 1973-1985. Ferre was the first Puerto Rican born Mayor in the United States and the first Latino Mayor of Miami.

The first generation of Latino politicians had to contend with the powerful Jewish political machine in Miami-Dade County. The foot soldiers in this political machine were the so-called "Condo Commandos," consisting of tens of thousands of retired Jewish voters living in condominiums in northeast Miami-Dade and on Miami's beaches. They were expertly organized by Democrat Anne Ackerman, who made the Jewish voters living in the condominiums the county's most important voting bloc. A veteran of Mayor John Daley's Chicago machine, Ackerman brought tried and true organizational methods from Chicago to Miami-Dade. At the height

of their influence, the condos accounted for an estimated 40,000 votes[10] and the heavily Jewish precincts in the Northeast and on the beaches posted turnouts of 90 percent or more.[11]  Candidates came to her for her blessing, expertise, and advice. Among the pilgrims to Ackerman's waterfront condos were Jimmy Carter, Walter Mondale, and Michael Dukakis.  The mobilization of these elderly condominium voters was aided by local Democratic politicians who encouraged election supervisors to put voting locations in the lobbies or recreation rooms of many of the large condominiums – the polling site was literally an elevator ride away.

The political power of the condos began to decline with the changing demographics of Miami-Dade and by the time of Anne Ackerman's death in 1989, it was estimated that she personally commanded only 2,000 votes.[12]

Hispanic politicians, activists, and consultants began encouraging elderly Hispanics voters to use absentee ballots.  Originally, absentee ballots were designed for voters who were disabled, too sick to go to polls, or for those who were traveling. Absentee ballots became a way to negate the turnout advantage enjoyed by the condo commandos.  The convenience of voting by mail appealed both to campaigns and voters.  Issues that often suppress elderly turnout, such as inclement weather or transportation to the polls were no longer of concern.  By August of 1996, the Miami-Dade mayoral election saw over 11,000 voters or 4.4% of the electorate vote by absentee ballot.  Campaigns would offer assistance to voters in requesting ballots, filling them out, and mailing them to the election department.  It became common practice in the 1990s for candidates walking Hispanic neighborhoods to give elderly Hispanic voters an absentee ballot request form.  Campaign activists and workers, called *boleteros,* would specialize in assisting voters through the process, from requesting the ballot to mailing it in.  This network of campaign workers soon became a staple of any political campaign in the county's Latin neighborhoods. These *boleteros* were easily identifiable with their colorful campaign *nom de guerre*: *el ciego*, *los jimaguas*, *la panameña*, and *el cojo*.

Dr. Kousser gets his dates wrong when he says: "Soon after 2001, no excuse absentee ballots, or simply vote by mail ("VBM") became a major part of the

---

[10] *U.S. Election: Old Folks Flock to Dukakis on Word of 'Condo Queen'*, The Times London, Mar. 8, 1988).

[11] Ray Lynch, *Anne Ackerman, 75, Influential South Florida Activist*, S. Fla. Sun-Sentinel, May 2, 1989.

[12] L.A. Times, May 2, 1989.

Republican campaign strategy." (Kousser 5.)  In fact, absentee voting was already well-established in Miami-Dade, Florida largest county – in the mid-1990s.  As campaigns became more reliant on absentee ballots for an edge, especially in close elections, the network of professional paid workers specializing in the collection of absentee ballots grew.  It was commonplace for *boleteros* to guarantee campaigns a certain number of absentee ballots in return for getting hired by the campaign.

The system was ripe for abuse.  The first prominent case revolves around the 1993 Hialeah mayoral election. Nilo Juri, a Republican State Representative, lost a close election (273 votes) to Hialeah's long-time mayor, Raul Martinez.  Juri suspected fraud because, despite winning the election day poll, he lost the absentee count by a two to one count (1,274 votes).  Juri was able to produce experts that found hundreds of ballots that had been forged with tracing paper and erasable ink.[13] The judge ordered a new election, ruling that both sides had tampered with ballots. Raul Martinez won the special election.

The most important vote scandal came during the early days of the *boleteros* was the city of Miami's 1997 mayoral election.  This case revealed the susceptibility of absentee balloting to fraud.  The Miami-Dade Grand Jury investigating vote fraud was unequivocal about the 1997 election, stating that "The Mayoral election for that year was plagued with widespread ballot fraud.  Many absentee ballots were filled out by *boleteros* and even one absentee ballot was cast in the name of a voter who was already dead."[14]

Elections like the 1993 Hialeah mayoral election were decided by the absentee vote.  Nearly 12% of the 44,000 votes cast came from absentee voters, the largest proportion of any race in city history.[15]  The ensuing investigation and criminal trial convicted and sentenced one Miami City Commissioner, his chief of staff Jorge Luis De Goti, and his chief of staff's father, Jose De Goti, to jail for vote fraud.  City Commissioner Humberto (Bert) Hernandez and his team faked rental receipts to help cover for people who voted absentee in Miami but lived elsewhere.  During the vote-fraud trial, evidence showed that more than 100 people who lived outside of Miami used phony local addresses to vote absentee.  The court noted that uncontradicted

---

[13] Francisco Alvarado, *Florida Republicans' Ballot Fraud 2012*, Miami New Times, Oct. 11, 2012.

[14] Final Report of the Miami-Dade County Grand Jury, In Circuit Court of the Eleventh Judicial Circuit of Florida, Spring Term 2012.

[15] Miami Herald Special Report, *Dubious Tactics Snared Votes for Suarez, Hernandez*, Miami Herald, Jan. 11, 1998.

statistical evidence presented by my colleague and former business partner Kevin Hill, Ph.D., a political scientist and expert in research methodology and statistical analysis, "indicated that the amount of fraud involved in the absentee ballots was of such consequence so as to have affected the outcome of the election.  Dr. Hill concluded it was "reasonable" that the absentee ballot deviation in favor of Suarez resulted only from voting fraud, ruling out "almost every other conceivable possibility to a high degree of probability."[16]   Commissioner Hernandez was sentenced to a year in jail, the maximum penalty, for trying to cover up voter fraud in the November 1997 election.  He also pled guilty to a federal charge of conspiracy to commit bank, wire and mail fraud, less than two weeks after a Florida judge sentenced him to a year in prison for the voter fraud misdemeanor.

In addition to the commissioner and his staff, 54 campaign workers (*boleteros*) had findings of guilt entered against them.[17]   Dr. Kousser is dismissive about the conspiracy, stating in his report that only "Four campaign workers were arrested." (Kousser 19.)  But in a civil lawsuit filed by the mayoral candidate who lost the election, the judge found so much fraud in absentee ballots that he threw out all the absentee ballots cast in the election.  As a result, the original losing candidate was eventually declared the winner of the 1997 Miami mayoral election.  The *Miami Herald* even won a Pulitzer Prize for "its detailed reporting that revealed pervasive voter fraud in a city mayoral election that was subsequently overturned."

The grey eminence (*éminence grise*) of the City of Miami vote fraud case was Bert Hernandez's uncle and political consultant, John Lasseville.  He was among the first political consultants to specialize in Hispanic campaigns in Miami.  Lasseville was a strong advocate of promoting the use of absentee ballots among elderly Hispanics.  He worked closely with Maurice Ferre in his numerous campaigns and promoted Miami's new rising political star – his nephew "Bert" Hernandez.  Lasseville's wife, Aracely Lasseville, was originally charged with vote fraud; her sentence was eventually reduced to a plea deal.[18]

---

[16] *In Re the Protest of Election Returns & Absentee Ballots in the November 4, 1997, Election for the Miami*, 707 So. 2d 1170, 1172 (Fla. 3d DCA 1998).

[17] *Id.*

[18] Seven people were originally charged in this case the commissioner, his father Humberto Hernandez, his aunt Aracely Lasseville, his chief of staff Jorge Luis de Goti; De Goti's father, Jose De Goti Sr; Jorge De Goti, and Jose de Goti's wife, Annette De Goti.

The 1997 City of Miami vote fraud case was not an isolated incident. Miami-Dade's election was plagued with rumors and allegations of fraud. One of the cases involved Rafael Antonio Velasquez, a former candidate for the Florida House. Velasquez was arrested and convicted in 2003 in a high-profile voter fraud case that made national headlines after he admitted to voting twice illegally while holding a green card. Velasquez maintains the incident was an accident, claiming that the county elections office mistakenly sent him a voter registration form after he moved to Miami from Germany. He filled it out thinking he was allowed to vote.

Velasquez was also convicted in federal court on two counts of making false statements on a naturalization application. He served three years' probation.

Well-documented abuses of absentee ballots continued after the 1997 Miami vote fraud case. The City of Miami case centered around ineligible voters, specifically those living outside the city, fraudulently voting in a city election. This was a conspiracy masterminded by Miami City Commissioner Hernandez and involving over fifty *boleteros*. But other forms of abuse continued, specifically making fraudulent requests for an absentee ballot, ballot harvesting, and aggressive and inappropriate chasing of absentee ballots.

In May 2013, Congressman Joe Garcia's chief-of-staff and top political strategist, Jeff Garcia, went to jail after being implicated in a sophisticated scheme to manipulate the previous year's primary elections by submitting hundreds of fraudulent absentee-ballot requests. Congressman Garcia was Florida's first Cuban American Democratic congressman. He resigned and plead guilty to orchestrating a plot involving the submission of hundreds of fraudulent absentee ballot requests during the primary in 2012. Garcia was sentenced to 90 days in prison and 18 months of probation (he served 65 days and 3 months of house arrest). The campaign manager had directed the political campaign to request some 1,800 absentee ballots without voters' permission, breaking Florida election laws that require voters or their immediate family to ask for the ballots themselves. The fraudulent absentee-ballot requests that rolled into the county elections department's website continued a trend of campaigns using technology to take advantage of the convenient online system.

About a month after the November 2012 general election in which Garcia defeated incumbent David Rivera, a grand jury convened by the state attorney's office disclosed that the county's election department had identified more than 2,500 fraudulent absentee-ballot requests submitted through its website for the Aug. 14, 2012, primary election. None of the ballots were mailed.

The chronic abuse of absentee ballots in Miami-Dade is illustrated in the case of Sweetwater commissioner Isolina Maroño (La China).  She was charged with violating a county ordinance outlawing the possession of multiple absentee ballots from the May 2017 Sweetwater election – an election she lost.  She was accused of having three ballots.  This is not the first time Isolina Maroño has been involved in a controversy over absentee ballots.  In 2007, she and city commissioner Manuel Duasso were detained with several absentee ballots in a vehicle they were riding in. Investigators determined that the collection of absentee ballots was a common practice in Sweetwater.  At the time, there was no law against collecting other people's ballots.  Since then, Miami-Dade County enacted an ordinance barring anyone from retrieving two or more absentee ballots that do not belong to them or to close relatives.  Maroño was rumored to be heavily involved in several political campaigns including the 2012 Republican Primary for state representative.  The losing state house candidate Paul Crespo claims "a well-known absentee-ballot machine that is connected to important city elected officials" of corrupted his race". Crespo alleges this 'machine' targeted vulnerable seniors at six small assisted-living facilities including a house located across the street from Sweetwater City Hall.[19]

The Sweetwater case, while not a vast conspiracy compared to the 1997 City of Miami Case or the 2012 Jeff Garcia case, does show the resilient nature of *boletero* culture.  It should be noted that Isolina Marona ran the absentee ballot campaign of her son, former Sweetwater mayor Manny Maroño.  Mayor Maroño did 40 months in jail for accepting thousands of dollars in kickbacks in exchange for supporting sham government grant applications.

Sasha Tirador, the self-proclaimed "Absentee Ballot Queen," is another prime example of *boletero* culture.  Tirador specialized in absentee ballot campaigns and since 2004 has been a much sought-out political consultant in Miami-Dade, establishing her reputation as an absentee ballot expert in the rough and tumble world of Hialeah politics.  Authorities suspected that Tirador, with the blessing of Hialeah politicians, used the Hialeah Housing Authority as a veritable vote bank.  In 2008, prosecutors investigated allegations that campaign workers for U.S. Rep. Lincoln Diaz-Balart were trying to collect ballots from supporters of Diaz-Balart's opponent, former Hialeah Mayor Raul Martinez. Among those investigated: Sasha Tirador.

---

[19] Francisco Alvarado, *"Florida Republicans'' Ballot Fraud 2012*, Miami New Times, Oct. 11, 2012.

She was not charged in any ballot harvesting investigations.  Tirador helped Steven Bovo in his run for county commission in 2012, where absentee ballot fraud was rampant, but said she'd complained to him in July after hearing that another member of his campaign was offering ballot-broker services to some of her judicial candidates. [20]  Tirador is still active in Hialeah and Miami Dade Elections.  In 2019 she managed the entire slate of commission candidates for Hialeah Mayor Carlos Hernandez, winning two of the four races.  She is managing several campaigns in the 2021 Hialeah municipal election.

Hialeah was the focus of several ballot harvesting schemes during the 2012 elections as well.  Deisy Cabrera pleaded guilty to charges of being an absentee ballot broker (*boletera*) as part of a massive absentee voter fraud scheme.  Her notebook contained the names and addresses of over 500 voters who were mostly elderly Hispanics in Hialeah.  The lists, entitled "Deisy's Voters," reportedly included information as to whether the voter was illiterate, blind, deaf, or had Alzheimer's.  She was sentenced to one year of probation.

Deisy Penton de Cabrera, 56, was arrested on two counts of violating an ordinance prohibiting the possession of more than two ballots belonging to other people and one count of absentee-ballot fraud, a third-degree felony, according to an arrest warrant.  Cabrera was working for the Carlos Gimenez County mayoral campaign, the Steve Bovo County commission campaign, plus several other judicial campaigns.  Surveillance spotted her collecting absentee ballots from numerous residences in Hialeah, delivering 19 absentee ballots to a post office, and delivering absentee ballot requests to the Miami-Dade Elections Department. Detectives also followed Cabrera as she stopped at assisted living facilities and a nursing home, where she allegedly filled out a ballot for an elderly woman who was unresponsive with a brain tumor.  When Cabrera was stopped, she was found to have 12 absentee ballots which were signed, sealed, and appeared completed, the warrant said.

Sergio "El Tio" Robaina (the uncle of a former Hialeah mayor) was charged with illegally collecting absentee ballots, a misdemeanor, and with felony voter fraud charges for allegedly filling out a ballot against the wishes of two voters – one of them a woman with dementia.  Robaina pleaded guilty to misdemeanor charges of illegal possession of absentee ballots and was sentenced to one year of probation.  In a sworn statement from a Miami-Dade police detective who arrested Robaina, he

---

[20] Melissa Sanchez & Enrique Flor, *Ballot-Fraud Probe: Bovo Now Says He Did Hear of Aide's Political Involvement*, Miami Herald, Sept. 11, 2012.

went to the Hialeah home of a man identified as "G.M." to help him and his mother fill out their absentee ballots.  "G.M." stated that neither he nor his mother had any input into which candidates were designated on their ballots.  At one point, "G.M." told Robaina that he wanted to vote for a specific candidate, but Robaina responded "no."  "He voted whom he wanted to vote, and then asked them to sign the back of the absentee ballot," State Attorney Katherine Fernandez-Rundle said.  Investigative documents claim Robaina, also known as "El Tio," touched more than 200 absentee ballots and illegally dropped them off for voters.

A Florida appeals court in 2014 rejected a constitutional challenge to the Miami-Dade Ordinance that restricts the collection of absentee ballots.  This challenge was based on the case of Hialeah's Robaina, who claimed the county law was unconstitutional and unfair to elderly Hispanic voters who rely on friends to deliver their absentee ballots.  The ruling was an important victory for Miami-Dade County, which in 2011 passed the ordinance amid fears of growing election fraud.  Under the ordinance, a person can only turn in two absentee ballots other than their own: one belonging to an immediate family member, and another belonging to a voter who has signed a sworn statement designating that person as responsible.  The Third District Court of Appeals issued the ruling without a written opinion, which means that Robaina was unable to appeal his case to the Florida Supreme Court.

The Hialeah cases would never have become public because, according to Florida Statute at the time Cabrera and Robaina did nothing illegal.  Instead, Cabrera and Robaina were arrested and prosecuted under a local Miami-Dade Ordinance passed in 2011 that made it a criminal misdemeanor for one person to possess any ballots that do not belong to them or an immediate family member.  The genesis of these local ordinances (sponsored by Cuban American republican Rebecca Sosa, and unanimously passed by the Miami-Dade Commission, comprised of seven Hispanics and four African Americans) was the case of Judith Thompson, a disabled Jamaican American voter.  According to press accounts Thompson was denied a ballot in the November 2, 2010, election because poll workers told her she had already cast an absentee ballot.[21]  The problem was Thompson had never voted absentee in her life. Feeling upset about being "disenfranchised" Thompson went to the authorities, but there was little that they could do.  However, the Miami-Dade Ethnics Commission

---

[21] Alvarado, *supra* note 19.

investigators looked at Thompson's ballot and two others.  They found that the signatures did not match, and that fraud had almost certainly occurred.[22]

The Thompson case illustrates the difficulty of detecting voting fraud.  Weak criminal sentences provide little deterrence against recidivism, and proving an intent to defraud is difficult. After all, the infamous Bert Hernandez only received a one-year sentence for masterminding a criminal conspiracy to steal the 1997 Miami mayoral election.  Given this, law enforcement has little incentive to make voter fraud a priority.

The Gladys Coego fraud case suggests a certain level of naiveté among Supervisors of Elections.  Coego was a temporary worker in the Miami-Dade County Elections Department during the November 2016 election.  She was hired by a temp agency to work as an elections support specialist.  Her job was to open, count and sort vote-by-mail absentee ballots at the Miami-Dade election office in Doral. Fellow workers saw her marking absentee ballots for Miami-Dade Mayoral candidate Raquel Regalado, who failed in her bid to oust incumbent Carlos Gimenez. She used a pen which she smuggled into the ballot-sorting room inside her purse. Over the course of two days, the defendant repeatedly and unlawfully voted in the mayoral election, against the wishes of the legitimate electors.  She pleaded guilty to filling out the mail-in ballots of other voters in favor of Republican Mayoral candidate Raquel Regalado.  While she admitted to altering the ballots of at least two individuals, detectives believe that Coego likely fraudulently marked numerous other absentee ballots.  She was sentenced to two years of house arrest.

One of the most common forms of absentee ballot abuse is the pressure that campaign workers and candidates place on voters, especially the elderly and the disabled, to return their ballots.  In the 2019 Miami municipal election, there were several allegations claiming commission candidate Alex Diaz de la Portilla was harassing elderly voters at the Three Round Towers, a trio of apartment buildings for the elderly in Miami's Allapattah neighborhood.  Police were called twice in the span of a week over allegations by residents claiming that Diaz was coercing elderly voters to cast their absentee ballots for him.  The first incident occurred on October 16, 2019, when Miriam Rodriguez, the building's association president confronted three Diaz de la Portilla campaign workers after residents complained to her that the campaign workers were scaring them and "forcing (them) to vote for Diaz de la

---

[22] *Id.*

Portilla."[23]  According to Rodriguez, the three *boleteros* she confronted in the lobby included a woman wearing a Diaz de Portilla campaign shirt, a man wearing a custom made, off-duty Miami-Dade Fire Rescue t-shirt, and an armed man in a Miami Police Department uniform who identified himself as Diaz de la Portilla's bodyguard.  One of the residents, Zolay Tamayo, accused Diaz de la Portilla campaign workers of forcing her to mail her ballot without casting a vote when she indicated she was going to vote for one of Diaz de la Portilla's opponents.

Police were called a day later when Diaz de la Portilla showed up at the building with the three campaign workers.  Before police arrived at the building, associate president Miriam Rodriguez and the candidate got in a heated exchange in the lobby in front of a small crowd of elderly residents.  Diaz de la Portilla and his entourage were forced to leave when it was determined that he only had permission to canvass in one of the three towers.  A week later, another resident of the Three Round Towers, Eva Pena, accused a Diaz de la Portilla campaign worker of pushing her and slapping her cell phone from her hands after Pena accused Diaz de la Portilla of mishandling absentee ballots.[24]

These incidents of trespassing and assault at the public housing complex are only a few examples in a series of accusations against Diaz de la Portilla's commission campaign.  In May 2019, a leaked WhatsApp group chat shows that members of his campaign discussed destroying or stealing absentee ballots from voters supporting one of his opponents.  In one case, someone wrote "Byebye" below a photo of a ballot marked for Diaz de la Portilla's opponent. Another person in the chat responded "Eliminada" ("eliminated" in Spanish).[25]   As a State Representative, Diaz de la Portilla passionately opposed efforts to tighten Florida laws regulating absentee ballots.  His passionate opposition as a state representative to tightening Florida law regulating absentee ballots after the 1997 scandal was cited by Dr. Kousser in his report (Morgan Kousser 20).

The behavior of Alex Diaz de la Portilla at the Three Round Towers and the 2019 Miami City election is in keeping with his past behavior regarding electoral law.  In 2001, the Florida Elections Commission imposed a $311,000 fine on then

---

[23] Manuel Madrid, *Alex Diaz de la Portilla Accused of Trespassing, Voter Intimidation at Senior Housing Complex*, Miami New Times, Oct. 22, 2019.

[24] Manuel Madrid, *Woman Says Man in Diaz de la Portilla Shirt Assaulted Her at Senior Housing Complex*, Miami New Times, Oct. 25, 2019.

[25] Madrid, *supra* note 23.

Senator Diaz de la Portilla after finding him guilty of 311 violations of the law. Days later, 295 criminal charges were lodged against him. These violations resulted from his victory in the December 14, 1999, special election for Florida Senate. He was acquitted of the criminal charges by a Miami jury in 2002. Subsequently an appeals court scrapped all but 17 of the 311 violations, leaving Diaz de la Portilla facing maximum fines of $17,000.[26]

The attempts by political campaign to manipulate the Mail by Vote system are not limited just to Miami-Dade County. The Palm Beach Post accused a Palm Beach County commissioner and a Florida House member of taking "advantage of gaping holes in Florida's vote-by-mail law to pressure and cajole voters in their living room"[27] The newspaper began the investigation after Palm Beach County Election Supervisor Susan Bucher complained to local prosecutors of possible vote fraud.

Authorities became suspicious after Mark Bernard, running for county commission, and Al Jacquet, running for state House, received disproportionate numbers of absentee votes in several Boynton Beach and Delray Beach precincts. Bernard and Jacques, working together, received nearly half their votes from mail-in ballots. This compared with an average of just one-third received by all candidates in the August 2016 election. In fact, Bernard and Jacquet received more votes than all the candidates combined in the Democratic primary for U.S. Senate at the top of the ballot.[28] The Post found that Ballots may have been requested without voters' knowledge. It was also found that Bernard and Jacquet used daily updates from the Supervisor office to visit and pressure voters. The candidates and their campaign workers were accused of filling out ballots for the voters. Finally, once the mail-in ballots were signed and sealed, voters said they gave the ballots to the candidates of the campaign workers for delivery. Despite these allegations, prosecutors found that Bernard and Jacquet had not broken any Florida law. It should be noted that in Miami-Dade County both candidates could have been charged with a criminal misdemeanor for retrieving two or more absentee ballot.

---

[26] Lucy Morgan, *Ethics Case Drags on Over Senator's Claims of Poverty*, Tampa Bay Times, Aug. 25, 2005.

[27] Alexandra Seltzer & Lulu Ramadan, *Winning Candidates Helped Voters Fill Out Their Ballots*, Palm Beach Post, Mar. 10, 2017.

[28] *Id.*

Evidence and allegations of electoral fraud extend well beyond Miami-Dade, Broward, and Palm Beach Counties.

In 2016, the Seminole County Supervisor of Elections Office received five stolen, forged, absentee ballots.[29]

In the 2016 race for Sheriff of Putman County, thirty-two felons voted without their civil rights having been restored; three persons voted who were not residents of Putnam County; and one person voted who had voted in two states.[30]  In an earlier Liberty County election, the trial court found that the "witnesses painted a picture of promiscuous vote buying and other conduct on the part of certain individuals indicating intentional wrongdoing and gross negligence, all of which affected the integrity of the election."  This prompted the Florida Supreme Court to say that "although the will of the electorate must be protected, so must the sanctity of the ballot and integrity of the election.  Courts cannot ignore fraudulent conduct which is purposely done to foul the election or corrupt the ballot."[31]

And most striking, in the run-up to the 2020 election the Honorable Mark Early, Supervisor of Elections for Leon County, submitted an Elections Fraud Complaint to the Secretary of State, alerting the Secretary that a Florida Voter Registration Application was collected for a voter who was deceased.[32]  Supervisor went on to explain:

> "However, we have now found more serious and concerning issues.  On November 19, 2019 we discovered at least one case of a new FVRA collected for a voter who was recently deceased.  The new FVRA contained handwriting that did not match the handwriting on the voter's previous applications, and the voter's signature did not match the voter's previous on file.  The Department of State performs verification of social security number and driver's license numbers provided on FVRAs, and in this

---

[29] Martin E. Comas, *Seminole Elections Office Receives Five Stolen, Forged Absentee Ballots*, Orlando Sentinel, Oct. 31, 2016.

[30] *Kinney v Putnam Cty. Canvassing Bd.*, 253 So. 3d 1254 (5th DCA 2018).

[31] *Bolden v. Potter*, 452 So. 2d 564, 567 (Fla 1984).

[32] See Ex. A attached hereto with this report.

case the Department of State returned a message to our office that the person is deceased."

"We welcome the opportunity to discuss this situation and answer any questions that are bound to arise regarding the details of these voter registration applications.  I am hopeful that one of the end results of this process is to reduce the amount of erroneous forms that we are receiving from this 3rd Party Voter Registration Organization.  It is my obligation to report fraudulent attempts to register to vote.  It is also my duty to maintain accurate voter rolls, and the large increase to unverifiable and incomplete forms we are receiving from this group only serve to undermine our efforts to serve the voters of Leon County, and to undermine the public trust in the integrity of our elections process."[33]

## Impact of the *Boleteros*

Miami-Dade's *boletero* culture has had a significant negative impact on Florida politics.  First, absentee ballot abuses have damaged the integrity of the election process.  The highly competitive nature of South Florida elections often results in very close elections with small margins of victory.  In November 2020, Republican Ileana Garcia defeated incumbent Democrat Jose Javier Rodriguez 104,630 to 104,598, a margin of just 32 votes.  In the 2019 Miami Beach municipal election there was a two-vote margin between the second-place finisher Steven Meiner (2,327) and the third-place finisher Michael Barrineau (2,325) to determine who would go to the runoff with first place finisher Kristen Rosen Gonzalez (3,705).  Meiner won the runoff election.  In another Miami Beach commission race only 108 votes separated David Richardson from an outright victory in the first round.  A few dozen fraudulent absentee ballots could be the difference between victory and defeat in many South Florida elections.

Second, some unscrupulous campaigns use intimidation to pressure elderly and disabled voters to cast their absentee ballots.  The two most common types of implied intimidation are to use off duty police officers to canvass voters who have not yet returned their absentee ballots, as we saw with the Three Round Towers in

---

[33] *Id.*

the City of Miami.  In May 2007, Sweetwater election incumbent mayor Manny Maroño was facing a spirited challenge from former Sweetwater police officer Marcos Villanueva.  Villanueva's campaign was being managed by Sasha Tirador. Maroño was chasing absentee ballots with the off-duty Sweetwater police chief and one of his officers, both in uniforms and both armed.  The second common method is to use management and officials from the housing authority to canvass voters – a practice prevalent in large cities that have housing authorities, such as Miami and Hialeah.  A visit from a housing authority manager has been used to imply that your status as a resident in public housing may be jeopardized if you do not vote correctly. Robaina had forty ballots from residents of the Hialeah Housing Authority when he was arrested by authorities.  The elderly and disabled are viewed by *boleteros* as easy targets in their vote harvesting schemes. Deisy Cabrera entered a guilty plea after she was accused of involvement in Hialeah's 2012 vote fraud scandal.  She was found with a notebook which contained the names and addresses of over 500 voters who were mostly "vulnerable" elderly Hispanics in Hialeah.

Third, there seems to be an association between election fraud and public corruption.  Many of the elected officials mentioned in this report for their involvement in unethical or illegal voter abuse later find themselves facing more serious accusations of public corruption.

Fourth, election fraud impacts on the integrity of the Florida judiciary.  County and circuit judges are elected in races that are devoid of candidate partisan identification, which helps guides voters in their choices.  These low profile, down ballot races are highly susceptible to unwarranted influence because voters are more likely to regard the recommendations of those assisting them with the ballot.  It is common practice for political consultants retained in judicial races to conduct aggressive absentee ballot campaign on these down ballot contests.  It should be noted that the Hialeah absentee ballot scandal of 2012 can partly be traced to a dispute between Tirador and Anamary Pedrosa over judicial campaigns.

**Impact of SB90**

Plaintiffs contend that SB90 should be overturned because of its discriminatory effects on minority voters.  This ignores the fact that Miami-Dade County, which is over 69% Hispanic and 18% Black/African American, made it a criminal misdemeanor for individuals to retrieve two or more absentee ballots and prohibits individuals from holding ballots that do not belong to the voter or to a close relative.

| HISPANIC OR LATINO ORIGIN BY SPECIFIC ORIGIN ACS 2019 | Column1 | Column2 | |
|---|---|---|---|
| | Number | % of Total Population | |
| Total Population | 2,716,940 | 100% | |
| Not Hispanic or Latino | 830,576 | 31% | |
| Black or African American Alone | 416,126 | 15% | |
| White Alone | 347,010 | 13% | |
| Hispanic or Latino | 1,886,364 | 69% | |
| Mexican | 58,415 | 2% | |
| Puerto Rican | 98,436 | 4% | |
| Cuban | 986,926 | 36% | |
| Dominican (Dominican Republic) | 70,052 | 3% | |
| Central American | 264,355 | 10% | |
| South American | 352,604 | 13% | |
| Other Hispanic or Latino | 55,576 | 2% | |

That 2011 ordinance has had no negative impact on the numbers of either Hispanics or Blacks voting absentee. The table above shows how diverse Miami-Dade County is and that it is 84% minority majority.  The ordinance has not harmed any of the demographic groups in Miami-Dade County from Voting by Mail.  In fact, since the passage and implementation of the ordinance, an analysis of VBM in Florida's urban counties shows Miami-Dade County roughly in the middle in the percentage of voters voting by mail.  It should be noted that this Miami-Dade Ordinance was sponsored by Rebecca Sosa, a Hispanic woman.  It was also approved by a Board of County Commission in which Blacks comprised four of the 13 members.



31



Before the ordinance took effect in the 2010 General Election, about 134,598 voters in Miami-Dade voted absentee.  In 2020, nearly 270,000 voted absentees. Moreover, in Miami-Dade 43.8% of VBM, which is higher than Duval (27.9%), Leon (40.9%), and Orange (42.8%) counties, but lower than Pinellas (61.7%), Broward (49.3%), Hillsborough (47%) and Osceola (44.02%). (Appendix Table 1) This ordinance, which prohibited the bundling of absentee ballots, had no demonstrable impact on the number of voters using VBM in Miami-Dade County.





| Primary Elections: Absentee Portion of Total Vote | | | | | | |
|---|---|---|---|---|---|---|
| Year | Miami-Dade | Broward | Duval | Hillsborough | Leon | Palm Beach | Pinellas |
| 2010 | 37.8% | 21.6% | 24.3% | 22.7% | 19.6% | 18.7% | 58.9% |
| 2012 | 37.7% | 35.9% | 22.5% | 32.7% | 22.0% | 9.8% | 73.2% |
| 2014 | 47.8% | 39.5% | 31.1% | 51.0% | 24.4% | 27.8% | 76.5% |
| 2016 | 47.0% | 41.1% | 25.0% | 54.1% | 25.6% | 36.1% | 75.9% |
| 2018 | 42.6% | 33.6% | 15.6% | 44.4% | 23.2% | 32.8% | 67.3% |
| 2020 | 62.0% | 67.2% | 35.3% | 68.3% | 57.3% | 69.0% | 83.7% |
| General Elections: Absentee Portion of Total Vote | | | | | | |
| Year | Miami-Dade | Broward | Duval | Hillsborough | Leon | Palm Beach | Pinellas |
| 2010 | 26.9% | 17.7% | 19.1% | 20.3% | 18.7% | 16.0% | 51.5% |
| 2012 | 27.8% | 22.4% | 19.9% | 31.0% | 20.4% | 21.2% | 53.9% |
| 2014 | 34.7% | 25.7% | 20.1% | 34.4% | 21.0% | 21.4% | 57.1% |
| 2016 | 30.3% | 24.1% | 17.0% | 31.3% | 20.4% | 22.7% | 50.7% |
| 2018 | 32.9% | 26.6% | 16.9% | 35.5% | 19.3% | 26.3% | 55.0% |
| 2020 | 43.8% | 49.3% | 27.9% | 47.0% | 40.9% | 49.8% | 61.7% |

There is nothing in SB90 that prevents campaigns from running ethical and effective VBM campaigns. Campaigns are free to mail out absentee ballot requests to voters, canvass absentee voters, send direct mail encouraging VBM, phone absentee voters and contact voters through an array of social media platforms. Dr. Kousser points out in his report that the Carlos Gimenez "sent out 50,000 absentee ballot request forms during his 2012 reelection campaign." (Kousser 21.) In that election 2012 Miami-Dade Mayoral, the legitimate VBM campaign of Gimenez's campaign was tainted by allegations and rumors that they hired *boleteros*. I was a paid consultant on the 2012 Gimenez campaign as well as Gimenez's two other mayoral campaigns (2011, 2016). I was brought in on the VBM campaign in 2016

after the allegations.  I was directly involved with the Gimenez campaign to run successful VBM without using ballot brokers in 2016.  Dr. Kousser writes in his report that "By 2011, mail ballots provided the edge in a Miami mayoral election and the resulting runoff."  (Kousser 21.)  However, Gimenez who edged out Julio Robaina, the nephew of El Tio Sergio Robaina, 51% to 49%, lost the absentee ballots in the run-off 40,172 to 41,183.  Gimenez also lost among absentee ballots in the May 24, 2011, Primary Election 20,552 to 29,262.  The 2011 Mayoral Race was not decided by absentee ballots, even though they were a significant part of the vote. Gimenez was able to minimize Robaina's advantage among those voters.

Dr. Kousser writes that "despite plentiful evidence of irregularities in previous elections, and despite no public evidence of substantial fraud or other problems in the 2020 election, the Republicans who had controlled the Florida legislature since before 2000 only changed VBM practices after Democrats, particularly Blacks and Latino, greatly increased their use of VBM in 2020."  (Kousser 36.)  First, Dr. Kousser concedes in this passage what everybody who follows Florida politics knows, and what so much evidence in my report demonstrates: that there is "plentiful evidence of irregularities in previous elections."

More serious is Dr. Kousser's accusations that the Republican legislature passed SB90 because Democrats had a breakthrough year employing VBM in the 2020 Presidential election – a form of voting with which Republicans had past success.  Dr. Kousser claims the Republican legislature is now trying to reverse this trend by discouraging VBM through SB90, because it seeks to suppress Blacks and Latinos VBM.

I have no way of knowing the intention of the Florida legislature, but I know with certainty the following:

1.  The Miami-Dade Ordinance contains similar restrictions on ballot harvesting as SB90, and the Miami-Dade Ordinance did not suppress Black or Latino voting by mail in Miami-Dade County.

2.  The Miami-Dade Ordinance passed not only with the support of, but co-sponsorship from, Black and Latino County Commissioners Esteban Bovo, Audrey Edmonson, Jose Diaz, Barbara Jordan, Jean Monestime, Dennis Moss, Rebecca Sosa (Prime Sponsor), and Xavier Suarez.

3.  Latino Republicans in both the State House and Senate supported SB90.

4.  Republicans have no need to suppress the Latino vote. Republicans did quite well among Latino voters and won a majority of Latino majority districts for Congress, State House of Representatives, and Florida Senate.

5.  The VBM campaign in 2020 occurred under unique circumstances. The Republican nominee for president questioned the integrity of VBM nationally and there was a pandemic in which many voters felt uncomfortable voting early or at their home precinct.

6.  Republicans won Florida by 371,686 in 2020 – their largest margin of victory since 2004 when it was 380,000.

7.  The most effective way to encourage Voting by Mail is to guarantee the integrity of the process.

# Appendix

## Absentee Ballot Miami-Dade

| | | Primary Elections | |
|---|---|---|---|
| **Year** | **Number of Abs Cast** | **Total Votes Cast** | **Absentee Portion of Total Vote** |
| 06 | 41,148 | 174,841 | 23.50% |
| 08 | 56,552 | 189,878 | 29.80% |
| 10 | 82,395 | 218,063 | 37.80% |
| 12 | 87,865 (approx) | 250,873 | 37.7% (approx) |
| 14 | 90,254 | 188,724 | 47.80% |
| 16 | 128,524 | 273,515 | 47.00% |
| 18 | 129,639 | 304,440 | 42.60% |
| 20 | 262,813 | 423,888 | 62.00% |
| | | General Elections | |
| **Year** | **Number of Abs Cast** | **Total Votes Cast** | **Absentee Portion of Total Vote** |
| 06 | 66,798 | 411,562 | 16.20% |
| 08 | 177,492 | 875,639 | 20.30% |
| 10 | 134,598 | 501,241 | 26.90% |
| 12 | 247,285 | 889,743 | 27.80% |
| 14 | 185,208 | 533,879 | 34.70% |
| 16 | 305,137 | 1,005,940 | 30.30% |
| 18 | 269,662 | 819,641 | 32.90% |
| 20 | 510,968 | 1,166,203 | 43.80% |

## Leon County

| | | Primary Elections | |
|---|---|---|---|
| **Year** | **Number of Abs Cast** | **Total Votes Cast** | **Absentee Portion of Total Vote** |
| 08 | 10,224 | 47,428 | 21.60% |
| 10 | 11,580 | 59,101 | 19.60% |
| 12 | 11,691 | 53,134 | 22.00% |
| 14 | 11,045 | 45,298 | 24.40% |
| 16 | 16,474 | 64,263 | 25.63% |
| 18 | 17,771 | 76,684 | 23.17% |
| 20 | 43,669 | 76,268 | 57.25% |
| | | General Elections | |
| **Year** | **Number of Abs Cast** | **Total Votes Cast** | **Absentee Portion of Total Vote** |
| 08 | 29,255 | 145,538 | 20.10% |
| 10 | 18,896 | 100,797 | 18.74% |
| 12 | 30,340 | 148,873 | 20.40% |
| 14 | 22,892 | 109,025 | 21.00% |
| 16 | 31,625 | 155,182 | 20.40% |
| 18 | 27,308 | 141,162 | 19.34% |
| 20 | 67,224 | 164,323 | 40.90% |

## Hillsborough County

| Primary Elections | | | |
|---|---|---|---|
| Year | Number of Abs Cast | Total Votes Cast | Absentee Portion of Total Vote |
| 10 | 28,649 (Approx) | 126,141 | 22.71% (Approx) |
| 12 | 36,559 (Approx) | 111,693 | 32.7% (Approx) |
| 14 | 64,444 | 126,427 | 51.00% |
| 16 | 83,038 | 153,626 | 54.10% |
| 18 | 97,667 | 219,739 | 44.44% |
| 20 | 155,691 | 227,843 | 68.33% |

| General Elections | | | |
|---|---|---|---|
| Year | Number of Abs Cast | Total Votes Cast | Absentee Portion of Total Vote |
| 10 | 65,595 (Approx) | 322,785 | 20.32% (Approx) |
| 12 | 168,383 (Approx) | 545,134 | 31% (Approx) |
| 14 | 130,159 | 378,490 | 34.40% |
| 16 | 190,973 | 609,901 | 31.31% |
| 18 | 187,442 | 527,424 | 35.53% |
| 20 | 337,249 | 717,302 | 47.00% |

## Duval County

| Primary Elections | | | |
|---|---|---|---|
| Year | Number of Abs Cast | Total Votes Cast | Absentee Portion of Total Vote |
| 06 | 12,753 | 98,545 | 12.94% |
| 08 | 24,953 | 101,367 | 24.61% |
| 10 | 28,263 | 116,504 | 24.25% |
| 12 | 24,650 | 109,422 | 22.52% |
| 14 | 29,074 | 93,489 | 31.09% |
| 16 | 41,234 | 164,875 | 25.01% |
| 18 | 26,189 | 167,708 | 15.61% |
| 20 | 57,612 | 162,987 | 35.34% |

| General Elections | | | |
|---|---|---|---|
| Year | Number of Abs Cast | Total Votes Cast | Absentee Portion of Total Vote |
| 06 | 30,050 | 226,069 | 13.29% |
| 08 | 83,336 | 417,948 | 19.93% |
| 10 | 50,049 | 262,676 | 19.05% |
| 12 | 82,528 | 414,313 | 19.91% |
| 14 | 54,905 | 273,462 | 20.07% |
| 16 | 74,861 | 439,941 | 17.01% |
| 18 | 64,550 | 382,774 | 16.90% |
| 20 | 138,448 | 496,406 | 27.90% |

## Orange County

| Primary Elections | | | |
|---|---|---|---|
| Year | Number of Abs Cast | Total Votes Cast | Absentee Portion of Total Vote |
| 12 | 39,064 | 114,284 | 34.20% |
| 14 | 54,149 | 116,833 | 46.30% |
| 16 | 57,654 | 132,775 | 43.42% |
| 18 | 66,377 | 194,809 | 34.10% |
| 20 | 112,790 | 208,257 | 54.20% |

| General Elections | | | |
|---|---|---|---|
| Year | Number of Abs Cast | Total Votes Cast | Absentee Portion of Total Vote |
| 12 | 135,667 | 470,192 | 29.00% |
| 14 | 107,478 | 313,666 | 34.30% |
| 16 | 159,291 | 556,134 | 28.60% |
| 18 | 140,228 | 479,203 | 29.30% |
| 20 | 279,795 | 653,106 | 42.80% |

## Pinellas County

| Primary Elections | | | |
|---|---|---|---|
| Year | Number of Abs Cast | Total Votes Cast | Absentee Portion of Total Vote |
| 06 | 18,912 | 95,516 | 19.80% |
| 08 | 36,686 | 77,422 | 47.40% |
| 10 | 86,835 | 147,410 | 58.90% |
| 12 | 102,625 | 140,231 | 73.20% |
| 14 | 114,272 | 149,301 | 76.53% |
| 16 | 131,992 | 173,871 | 75.90% |
| 18 | 138,354 | 205,561 | 67.30% |
| 20 | 179,512 | 214,490 | 83.70% |

| General Elections | | | |
|---|---|---|---|
| Year | Number of Abs Cast | Total Votes Cast | Absentee Portion of Total Vote |
| 06 | 50,316 | 208,564 | 24.12% |
| 08 | 184,164 | 468,447 | 39.31% |
| 10 | 159,562 | 309,856 | 51.50% |
| 12 | 248,927 | 461,806 | 53.90% |
| 14 | 203,862 | 356,941 | 57.11% |
| 16 | 254,453 | 502,113 | 50.70% |
| 18 | 241,541 | 439,456 | 55.00% |
| 20 | 348,000 | 564,284 | 61.70% |

## Osceola County

| Primary Elections | | | |
|---|---|---|---|
| Year | Number of Abs Cast | Total Votes Cast | Absentee Portion of Total Vote |
| 14 | 10,116 | 21,391 | 47.30% |
| 16 | 20,578 | 38,262 | 53.80% |
| 18 | 22,504 | 43,699 | 51.49% |
| 20 | 35,790 | 53,974 | 66.30% |

| General Elections | | | |
|---|---|---|---|
| Year | Number of Abs Cast | Total Votes Cast | Absentee Portion of Total Vote |
| 12 | 25,447 | 108,919 | 23.36% |
| 14 | 22,242 | 69,034 | 32.21% |
| 16 | 45,167 | 142,700 | 31.65% |
| 18 | 43,893 | 116,111 | 39.52% |
| 20 | 76,465 | 173,695 | 44.02% |

## Broward County

| Primary Elections | | | |
|---|---|---|---|
| Year | Number of Abs Cast | Total Votes Cast | Absentee Portion of Total Vote |
| 08 | 19,011 | 108,626 | 17.50% |
| 10 | 33,324 | 154,460 | 21.60% |
| 12 | 42,244 | 117,604 | 35.92% |
| 14 | 44,835 | 113,631 | 39.45% |
| 16 | 77,315 | 188,230 | 41.07% |
| 18 | 91,181 | 271,340 | 33.60% |
| 20 | 213,216 | 317,160 | 67.22% |

| General Elections | | | |
|---|---|---|---|
| Year | Number of Abs Cast | Total Votes Cast | Absentee Portion of Total Vote |
| 08 | 137,401 | 739,861 | 18.57% |
| 10 | 75,453 | 426,973 | 17.67% |
| 12 | 170,959 | 762,345 | 22.42% |
| 14 | 121,973 | 474,620 | 25.71% |
| 16 | 203,525 | 843,767 | 24.12% |
| 18 | 190,199 | 715,519 | 26.58% |
| 20 | 475,526 | 964,444 | 49.30% |

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 29th day of September, 2021.

_____
Dario Moreno

#14196044



**MARK S. EARLEY**
SUPERVISOR OF ELECTIONS
LEON COUNTY, FLORIDA

**DUPLICATE**

December 5, 2019

Starting in September 2019, my office received many Florida Voter Registration Applications (FVRA) from a Third Party Voter Registration Organization (3PVRO) 3P16-65, New Florida Majority Education Fund. Starting in November, this organization now makes weekly drops of hundreds of registration forms and at times over a thousand. This is many more registration forms than our office normally receives this time of year, between August and December of an "off" election year.

While processing these forms, my staff noticed several instances of FVRAs for voters who already registered, but with minor changes in critical voter information, such as dates of birth, driver's license, and addresses. We assumed that 3PVRO registration agents were assisting voters and transcribing information incorrectly, or that voters who do not trust the registration agents might be supplying incorrect information.

However, we have now found more serious and concerning issues. On November 19, 2019 we discovered at least one case of a new FVRA collected for a voter who was recently deceased. The new FVRA contained handwriting that did not match the handwriting on the voter's previous applications, and the voter's signature did not match the voter's previous signatures on file. The Department of State performs verification of social security number and driver's license numbers provided on FVRAs, and in this case the Department of State returned a message to our office that the person is deceased.

On November 19, 2019 as a pattern of potential problems became apparent, my staff began documenting concerns with specific FVRAs from 3P16-65. On November 19 and November 20, we attempted to contact the voters listed herein, and we found that in many cases the phone numbers provided on the FVRAs were disconnected or invalid phone numbers, which is odd for applications so recently collected. Normally, newly collected FVRAs would have data elements that are current and correct.

P.O. BOX 7357   TALLAHASSEE FL 32314-7357   (850) 606-VOTE (8683)   FAX (850) 606-8601   WWW.LEONVOTES.ORG

Seven examples are listed below and an explanation of the issues we discovered with each example. Collaborating documentation is attached on the following pages thereafter, with a note explaining which cases the documentation relates to and how.

Additionally, attached is a packet received by our office for this organization from September 12, 2019. The packet includes a letter from Victricia Chandler, the Chief of Staff for the Organization, stating that two canvassers had been removed from the organization because the organization had determined that the canvassers had forged registration applications. Copies of the supposedly forged applications are included as well. Her contact phone number is listed as (786)525-1540.

You will also find a copy of an "Elections Fraud Complaint" that we are filing with the Department of State regarding two specific voter registration applications, Tinika McNeil and her mother Foriest McNeil. Tinika McNeil was previously registered in Gadsden County (VID# 104261440). This registration was removed by the Gadsden County Supervisor of Elections on 07/23/2019, following the death of Tinika McNeil. Our office received a new voter registration application on 11/08/2019 for Tinika McNeil, signed 11/05/2019, and collected by third party voter registration organization 3P16-65. All pertinent information on the new application matched the decedent's prior voter registration record, except the handwriting and the signature differed significantly.

We welcome the opportunity to discuss this situation and answer any questions that are bound to arise regarding the details of these voter registration applications. I am hopeful that one of the end results of this process is to reduce the amount of erroneous forms that we are receiving from this 3rd Party Voter Registration Organization. It is my obligation to report fraudulent attempts to register to vote. It is also my duty to maintain accurate voter rolls, and the large increase in unverifiable and incomplete forms we are receiving from this group only serves to undermine our efforts to serve the voters of Leon County, and to undermine the public trust in the integrity of our elections process.

12/4/19

Mark S. Earley, Supervisor of Elections

P.O. BOX 7357    TALLAHASSEE FL 32314-7357    (850)606-VOTE(8683)    FAX (850)606-8601    WWW.LEONVOTES.ORG

# ELECTIONS FRAUD COMPLAINT

*Voter Fraud Hotline Telephone number 1-877-868-3737*

Under section 97.012(15), Florida Statutes, the Department of State has authority to conduct preliminary investigations into any allegations of irregularities or fraud involving voter registration or voting, or candidate or issue petition activities. The Department may then report its findings to the Office of Statewide Prosecution or to the State Attorney for the judicial circuit in which the alleged violation occurred for prosecution, where warranted.

Please return the completed complaint form to:   *Florida Department of State, Office of the General Counsel*
*1st Floor, R.A. Gray Building*
*500 S. Bronough Street*
*Tallahassee, Florida 32399-0250*

You will receive a written response from the Department of State at the end of its investigation.

## PERSON BRINGING COMPLAINT

Name **Mark S. Earley**

Address **2990-1 Apalachee Pkwy**

County **Leon**

E-mail Address **vote@leoncountyfl.gov**

Day Phone **850-606-8683**    Evening Phone

City **Tallahassee**

State **FL**    Zip Code **32301**

## PERSON OR ENTITY AGAINST WHOM COMPLAINT IS BROUGHT (limit one person/entity per form)

Name **3PVRO 3P16-65**

**New Florida Majority Education Fund**

*Person's title of office or position held or sought if applicable*

Address **10800 Biscayne Blvd Ste 1050**

County **Miami-Dade**

Work Phone **305-754-0118**

*Name of Governmental Office or Private Entity/Office*

City **Miami**

State **FL**    Zip Code **33161**

Have you filed this complaint with the (check all that apply):

| | Yes | No |
|---|---|---|
| State Attorney's Office | ☑ Yes | ☐ No |
| Office of Statewide Prosecution | ☐ Yes | ☑ No |
| Florida Department of Law Enforcement | ☐ Yes | ☑ No |
| Florida Elections Commission | ☐ Yes | ☑ No |
| Florida Commission on Ethics | ☐ Yes | ☑ No |