IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

| | |
|---|---|
| LEAGUE OF WOMEN VOTERS OF FLORIDA, INC.*, et al.*,<br><br>        Plaintiffs,<br><br>v.<br><br>LAUREL M. LEE, *et al.*,<br><br>        Defendants,<br><br>REPUBLICAN NATIONAL COMMITTEE, *et al.*,<br><br>        Intervenor-Defendants. | Case No. 4:21-cv-00186-MW-MAF |

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF SUMMARY JUDGMENT

1

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................... ii

I.    Introduction ........................................................................1

II.   Statement of Facts ...............................................................3

III.  Relevant Legal Standard ........................................................5

IV.   Argument............................................................................6

      A.   Plaintiffs Lack Standing............................................................6

      B.   The drop box standard, vote-by-mail request provision, and non-solicitation provision pass the *Anderson/Burdick* test ...........................14

      C.   The non-solicitation provision satisfies the requirements of the First Amendment..................................................................24

      D.   The non-solicitation provision is neither vague nor overbroad. .............31

      E.   The notification provision satisfies the requirements of the First Amendment. ..........................................................36

V.    Conclusion.......................................................................43

# TABLE OF AUTHORITIES

## CASES

*Am. Meat Inst. v. United States Dep't of Agric.*, 760 F.3d 18 (D.C. Cir. 2014) ......39

*Anderson v. Celebrezze*, 460 U.S. 780 (1983) ............................................................3

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ...............................................6

*Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320 (2006) ...............19

*Bar-Navon v. Brevard Cty. Sch. Bd.*, 290 F. App'x 273 (11th Cir. 2008) ...............26

*Barnes v. Glen Theatre, Inc.*, 501 U.S. 560 (1991) ...................................................27

*Brnovich v. DNC*, 141 S. Ct. 2321 (2021) ................................................................19

*Broadrick v. Oklahoma*, 413 U.S. 601 (1973) ..........................................................35

*Burdick v. Takushi*, 504 U.S. 428 (1992) ...................................................................2

*Burns v. Town of Palm Beach*, 999 F.3d 1317 (11th Cir. 2021) .............................26

*Burson v. Freeman*, 504 U.S. 191 (1992) ............................................................29, 31

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ...........................................................6

*Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of N.Y.*, 447
    U.S. 557 (1980) ...............................................................................................37

*Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288 (1984) ...........................26

*Common Cause/Ga. v. Billups*, 554 F.3d 1340 (11th Cir. 2009) ............................15

*Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181 (2008) ........................*passim*

*Daunt v. Benson*, 956 F.3d 396 (6th Cir. 2020) .......................................................15

*Democratic Party of Hawaii v. Nago*, 833 F.3d 1119 (9th Cir. 2016) ...................15

*Feldman v. Ariz. Sec'y of State's Off.*, 840 F.3d 1057 (9th Cir. 2016) ...................27

*Fleming v. Delta Airlines*, 359 F. Supp. 339 (S.D.N.Y. 1973) ...............................42

*Frank v. Walker*, 768 F.3d 744 (7th Cir. 2014) ......................................................19

*Friedman v. Am. Guardian Warranty Servs., Inc.*, 837 So. 2d 1165 (Fla. 4th DCA 2003) ...........................................................................................................42

*Ft. Lauderdale Food Not Bombs v. City of Ft. Lauderdale*, 901 F.3d 1235 (11th Cir. 2018) ...................................................................................................28

*Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*, 11 F.4th 1266 (11th Cir. 2021) ...................................................................................................28

*Gochnauer v. A.G. Edwards & Sons, Inc.*, 810 F.2d 1042 (11th Cir. 1987)...........42

*Greater Birmingham Ministries v. Scy' of Ala.*, 992 F.3d 1299 (11th Cir. 2021)..........................................................................................................................19

*Griffin v. Roupas*, 385 F.3d 1128 (7th Cir. 2004) ...................................................17

*Gustafson v. Alloyd Co.*, 513 U.S. 561 (1995) ........................................................33

*Hill v. Colorado*, 530 U.S. 703 (2000) ...................................................................31

*Hodge v. Talkin*, 799 F.3d 1145 (D.C. Cir. 2015)...................................................36

*Hoffman Estates v. Flipside, Hoffman Estates*, 455 U.S. 489 (1982) ....................33

*Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236 (11th Cir. 2020) .............................6

*Knox v. Brnovich*, 907 F.3d 1167 (9th Cir. 2018) ..................................................27

*League of Women Voters of Minn. Educ. Fund v. Simon*, 2021 WL. 1175234 (D. Minn. Mar. 29) ..............................................................................................17

*League of Women Voters v. Cobb*, 447 F. Supp. 2d 1314 (S.D. Fla. 2006)............41

*Luft v. Evers*, 963 F.3d 665 (7th Cir. 2020)......................................................16, 17

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992) ............................................................7

*Mays v. LaRose*, 951 F.3d 775 (6th Cir. 2020)............................................................19

*McCullen v. Coakley*, 573 U.S. 464 (2014)..................................................................30

*McDonald v. Board of Election Comm'rs*, 394 U.S. 802 (1969)........................17, 18

*MicroStrategy Inc. v. Bus. Objects, S.A.*, 429 F.3d 1344 (Fed. Cir. 2005) .............32

*Minn. Voters All. v. Mansky*, 138 S. Ct. 1876 (2018)...............................................29

*Munro v. Socialist Workers Party*, 479 U.S. 189 (1986) ........................................20

*National Institute of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361
      (2018) ......................................................................................................................40

*Nev. Comm'n on Ethics v. Carrigan*, 564 U.S. 117 (2011) .....................................27

*New Ga. Proj. v. Raffensperger*, 976 F.3d 1278 (11th Cir. 2020) ..........................14

*Parker v. Levy*, 417 U.S. 733 (1974)..........................................................................32

*Rosario v. Rockefeller*, 410 U.S. 752 (1973)...............................................................14

*Rumsfeld v. FAIR*, 547 U.S. 47 (2006) ......................................................................25

*Sallah v. BGT Consulting, LLC*, No. 16-81483-CIV, 2017 U.S. Dist. LEXIS
      101639 (S.D. Fla. June 29, 2017)........................................................................42

*Santa Monica Food Not Bombs v. City of Santa Monica*, 450 F.3d 1022 (9th
      Cir. 2006) ...............................................................................................................28

*Smith v. Goguen*, 415 U.S. 566 (1974)........................................................................32

*Timmons v. Twin Cities Area New Party*, 520 U.S. 351 (1997)........................14, 15

*United Food & Com. Workers Loc. 1099 v. City of Sidney*, 364 F.3d 738 (6th Cir. 2004) ...........................................................................................29

*United States v. Salerno*, 481 U.S. 739 (1987).........................................................35

*Walker v. Darby*, 911 F.2d 1573 (11th Cir. 1990) .....................................................6

*Ward v. Atl. Sec. Bank*, 777 So. 2d 1144 (Fla. 3d DCA 2001)................................42

*Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442 (2008) .........16

*Zauderer v. Office of Disciplinary Counsel of Supreme Court*, 471 U.S. 626 (1985) ...........................................................................................................31

## STATUTES AND OTHER AUTHORITIES

Fed. R. Civ. P. 56(a) .................................................................................................5

Fla. Const. art. VI, § 1 ...............................................................................................3

Fla. Stat. § 97.0575.......................................................................................1, 40, 42

Fla. Stat. § 98.271 .....................................................................................................41

Fla. Stat. § 102.031..........................................................................................*passim*

Fla. Law § 101.62 .......................................................................................................1

Fla. Law § 101.69 .......................................................................................................1

FL H.B. 1567 (Apr. 4, 2005) ...................................................................................42

*Merriam-Webster's Dictionary* ...............................................................................34

## I.    <u>Introduction</u>

Plaintiffs League of Women Voters of Florida, Inc. ("LWV"), League of Women Voters of Florida Education Fund ("LWVEF"), Black Voters Matter Fund, Inc. ("BVM"), Florida Alliance for Retired Americans, Inc. ("Florida Alliance"), Cecile Scoon, Susan Rogers, Dr. Robert Brigham, and Alan Madison allege that five sections of Chapter 2021-11, Laws of Florida ("2021 Law") violate federal law. *See* ECF-160.  Only four sections of Florida's election reform legislation remain at issue in this case. *See* ECF 274 at 40-41.

The four sections amend the following statute Sections: (1) 97.0575(3)(a), Florida Statutes, which now requires third-party voter registration groups to share truthful, cautionary information with voters ("**notification provision**"); (2) 101.62(1)(a), Florida Statutes, which requires voters to renew their request for a vote-by-mail ballot every election cycle ("**vote-by-mail request provision**"); (3) 101.69(2)-(3), Florida Statutes, which provides a uniform and secure statewide standard for the use of drop boxes used to return vote-by-mail ballots ("**drop box standard**"); and (4) 102.031(4)(a)-(b), Florida Statutes, which prohibits anyone from "engaging in any activity with the intent to influence or effect of influencing a

voter" inside a polling place or within 150 feet of a drop box or entrance of any polling place ("**non-solicitation provision**"). [1]

The Secretary, Attorney General, and Supervisors[2] (collectively "Defendants"), each in their official capacities, move for summary judgment on all remaining counts related to the four statutory provisions. After an initial discussion of the facts and the relevant standard on summary judgment, Defendants begin with a discussion of Plaintiffs' standing to sue. Defendants proceed with a discussion of the First and Fourteenth Amendment claims in Count I, using the *Anderson/Burdick*[3] framework to defend the drop box standard, vote-by-mail request provision, and non-solicitation provision, ECF 160 ¶¶148-60; the First Amendment "speech and expression" claim in Count III directed at the non-solicitation provision, *id.* ¶176; the First and Fourteenth Amendment "overbr[eadth] and vague[ness]" claim in Count IV directed at the non-solicitation provision, *id.* ¶¶178-86; and the First Amendment claims in Counts V and VI directed at the notification provision. *Id.*

---

[1] The Court dismissed Plaintiffs' claims respecting the third-party ballot collection provision (§104.0616) for lack of standing. ECF 274 at 40-41.

[2] Alan Hays and Tommy Doyle, the Supervisors of Elections for Lake County and Lee County, join in the defense of the vote-by-mail request and non-solicitation provisions. Therefore, the Supervisors join sections I-IV(c) of the Motion and Memorandum to the extent those two provisions are at issue.

[3] *See Anderson v. Celebrezze*, 460 U.S. 780 (1983); *Burdick v. Takushi*, 504 U.S. 428 (1992).

¶¶178-201.  References to expert reports, deposition testimony, and declarations are provided to support summary judgment.

## II.   **Statement of Facts**

Article I, Section 4 of the U.S. Constitution states that "[t]he Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof." Florida also retains for itself the manner of conducting non-federal elections. Fla. Const. art. VI, §1.  It is under these specific grants of authority that the 2021 Law was enacted.

The 2021 Law was not enacted in a vacuum. First, it was introduced against the following backdrop: Several attempts to enact last-minute changes to election rules through emergency actions or court order; national attention to allegations of election fraud made in the wake of the 2020 elections; concerns about the fairness of elections, *see* ECF 318-15 at (Ex. D, p.10); and even an incident where an individual impermissibly altered Governor DeSantis' voter registration, Fineout, Gary, Politico, *Florida man charged after altering governor's voter registration*.[4] Then, there is Florida's past history of voting irregularities. *See, e.g.,* ECF 318-1 at 11. Given this context, the Florida legislature revised Florida law to improve election administration, and proactively address issues of voter security and confidence. To

---

[4] https://www.politico.com/states/florida/story/2020/10/28/florida-man-charged-after-altering-governors-voter-registration-1331838.

that end, Senate Bill 90 ("SB90") was introduced on Feb. 3, 2021. ECF 318-8 at 1. The process by which the legislature enacted the law was average in all respects except for the ongoing pandemic, which necessitated some changes to the public engagement process. After four months of amendments and debate, Governor DeSantis signed SB90 on May 6, 2021. *Id.* at 6.[5]

The 2021 Law codifies the simple truth which has been obscured by invective: Voting in Florida is either as easy or easier than voting in most states in the United States. ECF 318-1 ¶¶8-16. Notwithstanding this fact, Plaintiffs filed suit mere moments after the law was signed. *Compare* ECF 1 (*filed* May 6, 2021) *with* ECF 318-8 at 6 (bill approved on May 6, 2021).

Despite Plaintiffs' claims, Florida's election laws further important State interests and remain representative of the norms throughout the United States.  In many cases, Florida law remains more permissive than laws elsewhere. For example, Florida's rules respecting early voting and vote-by-mail have become progressively easier since the 1980s. ECF 318-1 ¶9. Florida's requirement that drop boxes be made available to voters puts Florida in the company of only ten states mandating the provision of this voting method. *Id*. ¶10. Florida's third-party voter registration rules are consistent with the "vast majority of states that impose requirements on" third-

---

[5]    Fla.    Senate,    *CS/CS/CS/SB90:    Elections*,    available    at: https://www.flsenate.gov/Session/Bill/2021/90.

party voter registration organizations ("3PVROs") and Florida's fourteen-day deadline for returning registration forms is longer than the average permitted by other states. *Id*. ¶12. Florida's absentee ballot verification rules are well within the norm of all states and "[o]nly four states (other than states that conduct all or mostly all-mail elections) have [ID] verification checks that are less strenuous" than Florida's. *Id*. ¶13. Florida's rule that a no-excuse absentee ballot be requested every two years "makes Florida the most lenient state among the thirty-eight states that regulate absentee voting in some way short of a no-excuse permanent absentee or all-mail voting." *Id*. ¶14. Finally, Florida's non-solicitation rules "mirror the vast majority of state rules across the country" prohibiting the influencing of voters within a certain distance of a polling place. *Id*. ¶15.

The provisions of the 2021 Law that Plaintiffs challenge are reasonable, rational, and constitutional voting regulations.

## III.   **Relevant Legal Standard**

Summary judgment is appropriate when, as here, "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Disputes are "'genuine'... if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Material" facts are those that might affect the outcome of the case under the governing substantive

law, not those that "are irrelevant or unnecessary." *Id.* The nonmoving party also has an obligation to come forward with "specific facts showing there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "A mere 'scintilla' of evidence supporting the [nonmoving] party's position will not suffice; there must be a sufficient showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990).

## IV.   <u>Argument</u>

Plaintiffs lack standing to pursue their claim. Even assuming that one or more of the Plaintiffs have established standing, this Court should still enter summary judgment in favor of Defendants on the merits of the remaining claims. The drop box, vote-by-mail request, and non-solicitation provisions easily pass the *Anderson/Burdick* test. The non-solicitation provision satisfies the requirements of the First Amendment. Vagueness and overbreadth claims against the non-solicitation provision are without merit. And the First Amendment claims directed at the notification provision are ripe for summary judgment in favor of Defendants.

### A.   **Plaintiffs Lack Standing.**

Plaintiffs during this stage "must prove (1) an injury in fact that (2) is fairly traceable to the challenged action of the defendant and (3) is likely to be redressed by a favorable decision," *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1245 (11th Cir. 2020), "by affidavit or other evidence 'specific facts,' which for purposes of the

summary judgment motion will be taken to be true." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). Because "standing is not dispensed in gross", *id.*, Plaintiffs must establish specific facts for *each* of their claims.

Because incorporated entities have no right to vote, they must prove standing by showing harm to themselves as organizations or to their members. *Jacobson*, 974 F.3d at 1248-49. Associational standing requires that "an organization... prove that its members would otherwise have standing to sue in their own right." *Id*. at 1249 (quotation omitted). Associational standing requires identification of at least one member with standing as an individual. *See id*. Relatedly, "an organization has standing to sue on its own behalf if the defendant's illegal acts impair its ability to engage in projects by forcing the organization to divert resources to counter those [illegal acts." *Id*. at 1250. Specifically, a Plaintiff must show what the organization would "divert resources away *from* in order to spend additional resources on combating" the alleged illegal acts. *Id*.

None of Plaintiffs' experts have quantified the magnitude of any burden on Plaintiffs.  *See* ECF 318-12 at 67:25-68:2 (testifying that he was "not asked to quantify the extent of th[e] impact" of the 2021 Law); ECF 318-13 at 63:12-66:1.[6]

_____

[6] Herron stated that his "objective… in writing [the] expert report was to understand whether, among other things, there were disparate burdens on different groups of voters in Florida, particular race group." ECF 318-13 at 51:16-52:6. He "wasn't asked to comment on magnitudes . . . of these disparate burdens." *Id*.

Thus, for those that do cite some differences across racial groups in terms of use of drop boxes and absentee voting, Plaintiffs fail to provide evidence that they are of any practical, as opposed to statistical, significance. In other words, the statistical evidence is insufficient to demonstrate a concrete, particularized injury.

### 1. League Plaintiffs

LWV and LWVEF Plaintiffs (collectively the "League") allege that they "educate[] citizens about their voting rights and facilitate[] voting including through get-out-the-vote efforts and registration drives." ECF 160 ¶15. The League also alleges that it devotes resources to assisting and encouraging voters at their polling locations through activities such as "encourag[ing] voters to vote and stay in line by providing food and water[.]" *Id.* ¶ 18.

During depositions it became clear that the League's efforts will remain unaffected by the 2021 Law. The League confirmed that it does not believe the line-warming provisions of the 2021 Law apply outside the non-solicitation zone and that League activities are typically conducted outside the non-solicitation zone. *See* ECF 318-21 at 62:9-17.

Supervisors confirmed that they do not allow any third-party assistance within the non-solicitation zone, nor will they in the future. *See* ECF 318-29 at 85:10-20 (confirming that Supervisor trains staff to ensure that "no one... interact[s] with a voter in the... no-solicitation zone"). Supervisor Alan Hays testified that if a voter

waiting in line has "a physical need, we're certainly going to address it" without third-party assistance. ECF 318-26 at 198:13-22.

In addition, the League's allegations about diversion of resources ring hollow. The League confirmed that its advocacy against the adoption of the 2021 Law was "part of... normal operations" and that it regularly devotes organizational resources to educating voters about legal changes. *See* ECF 318-23 at 37:18-38:1. 39:9-11; *id.* at 54:10-20. In short, the League continues making the same commitments it has made in the past.

Finally, the League identified no members burdened by the vote-by-mail request or drop box provisions of the 2021 Law. *See* ECF 318-23 at 46:14-22; *id.* at 48:20-24.

### 2. *Black Voters Matter*

 BVM alleges that its "goal is to increase power in communities of color." ECF 160 ¶28.  The organization alleges it "engag[es] in get-out-the-vote activities." *Id.*

During deposition, BVM confirmed that it is not a membership organization. ECF 318-22 at 38:20-24. Therefore, BVM can only prove standing under an organizational theory. To that end, BVM could not give any definitive examples of what other projects' funds were diverted to issues respecting the 2021 Law. *See id.* at 61:9-63:1 (claiming funds were diverted from Tennessee but giving no concrete

examples of what would have been done with those funds and instead opining that there might have been additional staff hired in Tennessee); *id.* at 63:6-64:24 (stating that the money "could have" "possibly" been spent on other programs). When an organization cannot sufficiently explain the activities from which it has diverted resources in response to a change in law, it has failed to prove organizational standing. *Jacobson*, 974 F.3d at 1269.

Moreover, BVM confirmed that it is not challenging the notification provision. *See* ECF 318-22 at 35:23-36:13.

### 3. Florida Alliance

Florida Alliance claims to have a membership of "almost 200,000 retirees from public and private sector unions, community organizations, and individual activists in every county in Florida." ECF 160 ¶29. However, during depositions, Florida Alliance could not point to a single member burdened by the 2021 Law.

Florida Alliance confirmed that it has never attempted to assess its members' voting habits and that it has no information on the number of members who plan to vote by mail, use drop boxes, or require assistance at polling locations in 2022. Sauers Depo., ECF 318-24 at 51:17-52:18. It is not aware of any threatened or actual enforcement actions against its members related to the 2021 Law. *Id.* at 45:7-25. When questioned about harms to its members stemming from the drop box standard, vote-by-mail request provision, and non-solicitation provision, Florida Alliance

could only point to the possibility that some unidentified members could experience confusion or distress. *Id.* at 46:6-48:5. It could not identify which specific members would be unable to vote in 2022 under the 2021 Law. *Id.* at 79:2-6.

Furthermore, Florida Alliance confirmed it has not diverted funds in response to the 2021 Law, nor has it expended any resources urging members to vote by mail. *Id.* at 34:1-4, 48:8-11, 49:10-23. It has not yet made plans to educate its members about the recent changes to state law. *Id.* at 42:3-9, 50:16-51:2. Moreover, Florida Alliance confirmed that it is not challenging the notification provision. *Id*. at 33:15-18.

### 4. Cecile Scoon

Ms. Scoon is a lawyer, member of the LWV, and LWV's President. ECF 160 ¶ 32. She alleged she has assisted with voter registration efforts and assisted voters near polling places. *Id.*

But Ms. Scoon identified no harm that she will suffer in her individual capacity as a result of the 2021 Law. Ms. Scoon confirmed that the notification requirement "doesn't prevent me from" telling a voter that their registration application will likely be delivered on time, and admitted that she has not yet attempted to register any voters using the new disclaimer. ECF 318-19 at 22:21-23:1, 27:15-19. She further conceded that the non-solicitation provision "shouldn't" impact her ability to hand out food or water to voters in line, *id.* at 60:6-13, and that

the drop box standard has not changed the fact that there are still "several opportunities" to cast a vote in Florida.  *Id.* at 47:14-22.  Ms. Scoon's fears of harm are speculative.

### 5. Robert Brigham

Dr. Brigham is an Orange County voter with a health condition that makes it difficult for him to wait in line to vote.  ECF 160 ¶34.  He used a drop box to return his ballot in the 2020 general election.  *Id.*  "In upcoming elections," Dr. Brigham alleges, the drop box standard will burden "his right to vote and adversely impact him because he will have reduced opportunities to access a drop box."  *Id.*  Not so.

The Orange County Supervisor of Elections "intends to have... as many dropbox opportunities available as existed in 2020," ECF 318-53 at #6, and Dr. Brigham does not possess any information that suggests otherwise.  ECF 318-20 at 33:22-23.  As Dr. Brigham acknowledged, the drop box he used during daylight hours in October 2020 was staffed, and that location at the supervisor of elections' office must still be provided under the 2021 Law.[7]  *Id.* at 32:7-10, 58:24-59:13.  So Dr. Brigham will have access to drop boxes in upcoming elections, and recognizes that either he or another person can pick up his ballot from the Supervisor rather than

---

[7] This Court can take judicial notice under FRE 201 that sunset in the Orlando-area during the second half of October 2020 was before 7pm.  *See, e.g.*, https://www.sunrise-and-sunset.com/en/sun/united-states/orlando/2020/october (Nov. 7, 2021).

having it mailed. *Id.* at 53:13-21.  He also testified that the non-solicitation provision "doesn't affect me at the moment" but "might in the future," which is insufficient. *Id.* at 16:1-4.

### 6.  *Alan Madison*

Mr. Madison is a voter in Indian River County, Florida, who "assists with third-party voter registration efforts to help register voters in his community."  ECF 160 ¶35.  Mr. Madison voted by mail during the 2020 general election and returned his ballot using a drop box.  *Id.*

Indian River County "does not anticipate any changes to drop-box locations" because of the 2021 Law.  ECF 318-52 at #3.  Mr. Madison testified that he "couldn't be specific about" why he believes otherwise.  ECF 318-18 at 19:1-17.

The 2021 Law will also have limited, if any, effect on Mr. Madison's assisting 3PVROs.  ECF 160 ¶ 35.  His efforts have been sporadic, at best, and he has no plans to continue assisting with these efforts. ECF 318-18 at 61:25-62:23, 66:6-11. Significantly, Mr. Madison has never registered as a 3PVRO,[8] which indicates his lack of continuing interest in registration activities and shows that he suffers no harm as an individual voter from 3PVRO activities. He also claims that the vote-by-mail request provision could cause him to miss his opportunity to vote if he forgets to

---

[8] Fla. Dep't of State, *Third Party Voter Registration Organizations*, https://tpvr.elections.myflorida.com/.

apply on time, but this neglects his opportunity to vote early or on Election Day in-person. *Id.* at 20:14-22.

### B. The drop box, vote-by-mail request, and non-solicitation provisions pass the *Anderson/Burdick* test.

#### 1. *Need to quantify a burden and show that it outweighs the State's interests.*

The Constitution "provides that States may prescribe [t]he Times, Places and Manner of holding Elections...." *Burdick*, 504 U.S. at 433. The *Anderson/Burdick* test is therefore supposed to make it more difficult for federal courts to overturn state election laws, not less so. The whole point of the *Anderson/Burdick* line of cases is that, although voting is a fundamental right, most election rules are *not* subject to strict scrutiny. *Burdick*, 504 U.S. at 433. "States—not federal courts—are in charge of setting [election] rules," *New Ga. Proj. v. Raffensperger*, 976 F.3d 1278, 1284, 1279-80 (11th Cir. 2020), and rules that govern how, when, and where voters must vote are "inevitabl[e]" and "necessar[y]," and "must be... substantial" if elections "are to be fair and honest" and "orderl[y]." *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997). Contrary to Plaintiffs' position, "no one is 'disenfranchised'" if they fail to heed reasonable time, place, and manner voting rules. *New Ga. Proj.*, 976 F.3d at 1282. Any inability to vote is "not caused by [the rules], but by [voters'] own failure to take timely steps to [comply]." *Rosario v. Rockefeller*, 410 U.S. 752, 758 (1973).

14

In sum, *Anderson/Burdick* requires Plaintiffs to satisfy a two-step inquiry, with each step imposing a heavy burden. First, Plaintiffs must prove that the challenged laws inflict a cognizable burden on their rights and quantify the burden's severity. *Timmons*, 520 U.S. at 358. The "extent of the burden... is a factual question on which the [plaintiff] bears the burden of proof," *Democratic Party of Hawaii v. Nago*, 833 F.3d 1119, 1124 (9th Cir. 2016), and the plaintiff must "direct th[e] Court to… admissible and reliable evidence that quantifies the extent and scope." *Common Cause/Ga. v. Billups,* 554 F.3d 1340, 1354 (11th Cir. 2009). Second, Plaintiffs must show that the burden outweighs the State's proffered interests. *Timmons*, 520 U.S. at 358. Only when an election law "subject[s]" voting rights "to 'severe' restrictions" does a court apply strict scrutiny. *Burdick*, 504 U.S. at 434. Election laws that "impose[] only 'reasonable, nondiscriminatory restrictions'" are "'generally'" justified by "'the State's important regulatory interests.'" *Id.* There is no constitutional right to be free from "the usual burdens of voting." *Crawford*, 553 U.S. at 198.

These steps must be rigorously applied to prevent *Anderson/Burdick* from "trading precise rules and predictable outcomes for the imprecision and unpredictability of how the judicial-assignment wheel turns." *Daunt v. Benson*, 956 F.3d 396, 425 (6th Cir. 2020) (Readler, J., concurring). The test is not an invitation for courts to simply weigh "whether a rule is beneficial, on balance"; that "political

15

question" must be resolved by legislators, not judges.  *Luft v. Evers*, 963 F.3d 665, 671 (7th Cir. 2020).  The *Anderson/Burdick* framework should almost always favor upholding State election laws because "[o]ur founding charter never contemplated that federal courts would dictate the manner of conducting elections."  *Jacobson*, 974 F.3d at 1269.

Four additional points bear mention.

*First*, Plaintiffs' burden is especially high here because they must prove that the 2021 Law violates *Anderson/Burdick* on its face.  Plaintiffs' claim is facial because they ask this Court to invalidate the challenged provisions across the board, not on a case-by-case basis. *See* ECF 160 ¶¶ 179-80 (alleging that the non-solicitation provision is "unconstitutionally overbroad" and deserves "facial invalidation"); *see Crawford*, 553 U.S. at 189.

Because Plaintiffs challenge the 2021 Law on its face, Plaintiffs "bear a heavy burden of persuasion." *Crawford*, 553 U.S. at 200.  They must prove that "'no set of circumstances exists under which the Act would be valid,' *i.e.*, that the law is unconstitutional in all of its applications." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008). This standard is not met when "the statute has a plainly legitimate sweep." *Crawford*, 553 U.S. at 202 (cleaned up). Even a showing that a provision imposes "an unjustified burden on *some* voters" cannot justify invalidating "the entire" provision. *Id.* at 203. Plaintiffs' arguments

16

about "burdens tied to the peculiar circumstances of individual voters"—essentially all their arguments—are thus irrelevant for purposes of their facial *Anderson-Burdick* claim. *League of Women Voters of Minn. Educ. Fund v. Simon*, 2021 WL 1175234, at *9 (D. Minn. Mar. 29).

In fact, burdens that do not affect voters generally are never relevant under *Anderson/Burdick*.[9] *See* (ECF 107-1 at 10-12); *see McDonald v. Board of Election Comm'rs*, 394 U.S. 802 (1969) (holding that voters may be treated differently so long as they are not "absolutely prohibited from exercising the franchise."); *see also Griffin v. Roupas*, 385 F.3d 1128, 1130 (7th Cir. 2004).

*Second*, when assessing whether a law burdens the right to vote, courts must consider "the landscape of all opportunities that [the State] provides to vote." *Mays*, 951 F.3d at 785; *accord Luft*, 963 F.3d at 672 ("whole electoral system"). In *New Georgia Project*, for example, the Eleventh Circuit faulted the district court for not considering how the "numerous avenues" for voting in Georgia "mitigate the... impact" of the challenged provision.  976 F.3d at 1281-82.  Florida has provided, if anything, even more avenues.  Florida's "many... provisions that make it easy to vote cut in its favor" under *Anderson/Burdick*. *Luft*, 963 F.3d at 675.   And those

---

[9] As the Court rejected the broader argument at the motion-to-dismiss stage, (ECF 274 at 38-40) Defendants raise a narrower point about facial challenges. Defendants reserve the right to pursue arguments relating to *McDonald*, 394 U.S. 802 for appeal. *See* ECF 175-1 at 7-10.

provisions, considered as a whole, mean that strict scrutiny cannot possibly apply because no one in Florida is "totally denied a chance to vote" by the 2021 Law. *Mays*, 951 F.3d at 787.[10]

*Third*, Plaintiffs cannot get around the defects of their *Anderson/Burdick* claim by asserting a "cumulative impact" theory—*i.e.*, arguing that the challenged provisions are constitutional in isolation but together constitute a severe burden.

Initially, the challenged provisions are all reasonable, nondiscriminatory regulations of the kind that *Anderson/Burdick* deems perfectly constitutional. Adding them together is just summing zeroes.

Moreover, the challenged provisions do not cumulate, legally or logically. In any given election, a voter can vote using only one method. A person who wants to vote early in-person is not affected by a regulation that affects voting by mail; a person who wants to wait in line on election day is not affected by the regulation of drop boxes; and so on. The only burdens that could possibly cumulate are burdens that affect the *same method* of voting, and Plaintiffs identify precious few of those. Thus, a "cumulative impact" theory cannot justify the relief that Plaintiffs seek. If

---

[10] In fact, mail voting regulations do not implicate the right to vote at all. *See* ECF 175-1 at 7-10; *McDonald*, 394 U.S. at 807. Because this Court rejected that argument at the motion-to-dismiss stage, ECF 274 at 37, Defendants are raising a narrower point about how the Court must consider all the ways that Floridians can vote. Defendants reserve their broader argument for appeal.

the unconstitutionality derives only from the provisions' cumulative force, then the defect should be remedied by invalidating only *one* of the challenged provisions. Otherwise, the Court would be granting Plaintiffs relief beyond that necessary to remedy any injury. *See Ayotte v. Planned Parenthood*, 546 U.S. 320, 328 (2006). In any event, if every challenged provision must be invalidated to remedy the constitutional problem, then Plaintiffs necessarily lose because they lack standing to challenge the ban on ballot-harvesting, ECF 274 at 23-24, one of the provisions that they identified as contributing to the cumulative effect.

*Fourth*, on the other side of the scale, *Anderson/Burdick* treats the State's interests as a "legislative fact" so long as they are reasonable. *Frank v. Walker* (*Frank I*), 768 F.3d 744, 750 (7th Cir. 2014). States need not submit "any record evidence in support of" its interests. *Common Cause/Ga.*, 554 F.3d at 1353; *Greater Birmingham Ministries v. Sec'y of Ala*, 992 F.3d 1299, 1334 (11th Cir. 2021). States can rely on "post hoc rationalizations," can "come up with [their] justifications at any time," and have no "limit[s]" on the type of "record [they] can build in order to justify a burden placed on the right to vote." *Mays v. LaRose*, 951 F.3d 775, 789 (6th Cir. 2020).

Relatedly, States can pass election reforms to prevent fraud without compiling concrete evidence of past fraud—let alone concrete instances of fraud in their State. States can act prophylactically to stop fraud before it starts. *See Brnovich v. DNC*,

141 S. Ct. 2321, 2348 (2021) ("[I]t should go without saying that a State may take action to prevent election fraud without waiting for it to occur and be detected within its own borders."); *Munro v. Socialist Workers Party*, 479 U.S. 189, 195 (1986). States can rely on evidence from other jurisdictions, court decisions, general history, or common sense. *Common Cause/Ga.*, 554 F.3d at 1353; *Frank I*, 768 F.3d at 750. The Supreme Court has held that the "risk of voter fraud" is "real" and that "the prevention of fraud" is a "strong and entirely legitimate state interest." *Crawford*, 553 U.S. at 194, 196; *Brnovich*, 141 S. Ct. at 2348, 2340.

Nor is fraud prevention the only interest that can justify election reforms. *Brnovich*, 141 S. Ct. at 2348. States can act to reduce the risk of "pressure and intimidation." *Id.* States also have a legitimate interest in "improv[ing] and moderniz[ing] election procedures" that they believe are "antiquated" or "inefficient." *Id.* at 191. Promoting "orderly administration" and decreasing "voter confusion" are also legitimate state interests, *Brnovich*, 141 S. Ct. at 2345, as is the "independent" interest in protecting election "'integrity'" and restoring "voter confidence" which in turn "encourages citizen participation in the democratic process." *Id.* at 197.

## 2.   *Plaintiffs' inability to quantify burdens is fatal.*

Plaintiffs rely on expert reports to establish that a burden exists. That work is flawed. Plaintiffs' experts concede that they never quantified the burdens. This

failure to quantify the burdens is fatal.  Without some attempt at quantification, this Court can neither judge the alleged burdens against the pre-2021 Law baseline nor balance the burden against the State's interests.

First, Plaintiffs' experts have relied upon a number of assumptions in their reports that are not supported by any identified evidence. For example, several of their experts assume *ipso facto* that the 2021 Law was intended to reduce Black and Hispanic voting rates given that turnout for those groups was elevated in 2020 but provide no evidence supporting that proposition.  ECF 318-4 at 6 (analyzing Herron report); ECF 318-9 at 179:23-180:20 (explaining that while legislators did not express discriminatory intent in passing the 2021 Law, she considered the absence of evidence meaningful). Others present data, such as the fact that the ballots of Black voters were rejected at a higher rate than whites in 2000, without exploring plausible non-discriminatory reasons.  ECF 318-4 at 9.  These experts extrapolate extensively from 2020 voting trends, when data from other non-pandemic years is likely more relevant. *Id.* at 6 (noting that Black voters were "significantly less likely" to have another person deliver their ballot in 2008).  Experts need to justify the analytical choices they make; these experts have not.

In addition to the methodological flaws with Plaintiffs' experts' reports, they also failed to quantify the alleged burden that the 2021 Law imposes on Florida voters.  Dr. Burton refused to speculate on the extent of the law's effect, claiming

that he was "not asked to quantify the extent of that impact."  ECF 318-12 at 67:25-68:2. Although Dr. Herron alleged that the provisions of the 2021 Law challenged here raised the cost of voting in Florida, he refused to quantify the extent of that effect, calling it "a question for the court."  ECF 318-13 at 63:12-66:1. Simply alleging the directionality of a change is not enough when courts also require a demonstration of the severity of the alleged burden.  This error is fatal.

### 3. *The State's interests are substantial.*

While Plaintiffs have provided little, if anything, to balance for purposes of *Anderson/Burdick*, the State has much to support the 2021 Law.

As Director of the Florida Division of Elections Maria Matthews states in her declaration, incorporated by reference here, each of the provisions being challenged furthers important State's interests. Matthews Declaration, ECF 318-54 ¶¶15-16. In sum, the "main focus" of the drop box standard "was to ensure the security of those boxes" by providing for continuous monitoring while they are in use, which did not constitute "a significant change" from prior practice. ECF 318-30 at 49:6-21, 90:8-91:16. Matthews explained that the personal information now required by the vote-by-mail request provision is "just another layer of security to ensure that the person who is asking for the ballot is entitled to ask for it," akin to "multi-factor authentication." *Id.* at 58:5-24.  Moreover, the shortened vote-by-mail request period helps minimize mistakes that could undermine public trust in the system.

ECF 318-54 ¶¶ 22-25.  She testified that the notification provision provides "another way of letting the voter be informed . . . that they have options" for how to return their ballots, ECF 318-30 at 127:25-129:2, and that "the whole point" of the non-solicitation provision to ensure that "those who come to vote are not harassed in any way that might be trying to influence them."  *Id.* at 160:6-23.  Since 3PVROs serve as fiduciaries for voters, Matthews explains that they must provide voters with truthful information no matter the effect on the 3PVRO itself, and she testifies that the notification provision serves the State's interest in ensuring as many eligible Floridians are timely registered as possible.  ECF 318-54 ¶¶ 17-21.

Dr. Moreno's expert report lends further support for the State's interests.  Dr. Moreno explains how the 1993 Hialeah mayoral election was marred by "hundreds of ballots... forged with tracing paper and erasable ink," and how the 1997 Miami mayoral election "was plagued with widespread ballot fraud."  ECF 318-6 at 19.  Prior to the 2021 Law, local jurisdictions were forced to take matters into their own hands; Miami-Dade County, for example, adopted a local ordinance prohibiting individuals from possessing multiple absentee ballots.  *Id.* at 22.  Moreno concluded that the 2021 Law "is an appropriate response to Florida's history of absentee ballot fraud" and "will not have racially discriminatory effects."  *Id.* at 7.

Dr. Kidd's expert report places Florida's 2021 Law in context.  Kidd explains that Florida has, since 1982, made voting easier.  Florida once required an excuse to

vote early in addition to notarization and witness requirements, but now permits universal early voting with nothing beyond the voter's own certification that they are properly registered.  ECF 318-1 at 6, 9.

Indeed, Kidd discusses how Florida's standards for voting remain more lenient than those in most of the country.  After the 2021 Law, Florida is now one of only ten states that affirmatively *requires* drop boxes to be provided to voters, and it is "less restrictive than over half" of all states in its restrictions on the persons authorized to return absentee ballots.  *Id.* at 6-7.  Two states require a witness signature for voting absentee, and four states require a copy of the voter's photo ID; Florida requires neither.  *Id.* at 7-8.

## C. The non-solicitation provision complies with the First Amendment.

Under the non-solicitation provision, individuals cannot "engag[e] in any activity with the intent to influence or effect of influencing a voter" within a "150 feet" buffer zone.  Fla. Stat. §102.031(a)-(b).  Plaintiffs contend that the non-solicitation provision, as applied to the distribution of food and water by people not on the Supervisor's staff, violates the First Amendment.  This claim is flawed as a matter of law and fact. Distributing food and water is conduct, not speech. Even if it were speech, the non-solicitation provision survives any form of scrutiny.

### 1. *The facts support summary judgment.*

24

Plaintiffs' challenge to the non-solicitation provision suffers a fatal defect: testimony from the Supervisors.   Supervisors consistently explain that the non-solicitation provision in the 2021 Law *does not require them to do anything differently than they did during the 2020 general election*.  *See* ECF 318-27 at 168:1-8 ("[W]e have never allowed any sort of activity other than exit polling... within the no-solicitation zone... and we are going to continue our policy moving forward."); Bennett Depo., ECF 318-28 at 107:9-13 (reporting that no groups provided food or water to Manatee County voters in 2020).

Supervisors also favor the non-solicitation provision's 150-foot buffer to manage polling places.  Some can get raucous. ECF 318-25 at 246-47 (detailing "[a]ggressive and [i]ntrusive" campaigning at polling sites).

### 2.   *The non-solicitation provision does not implicate the First Amendment.*

Facts aside, the non-solicitation provision does not implicate the First Amendment because it regulates only non-expressive conduct. The First Amendment does not protect "conduct," even though most conduct is "'in part initiated, evidenced, or carried out by means of language.'"  *Rumsfeld v. FAIR*, 547 U.S. 47, 62 (2006). While regulating conduct imposes "incidental" burdens on speech, that unsurprising fact "hardly means that the law should be analyzed as one regulating... speech rather than conduct." *Id*. Conduct must be "inherently expressive" for it to be speech.  *Id.* at 66.  Stated differently, conduct must express

an "identifiable" message, *Bar-Navon v. Brevard Cty. Sch. Bd.*, 290 F. App'x 273, 276 (11th Cir. 2008), to the average person. *Burns v. Town of Palm Beach*, 999 F.3d 1317, 1347 (11th Cir. 2021). This test is not a low bar: An "expansive" definition of expressive conduct would allow a "limitless variety of conduct" to be labeled speech because it is "possible to find some kernel of expression in almost every activity a person undertakes." *Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 570 (1991) (cleaned up); *see Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 294 n.5 (1984) (rejecting that "all conduct is presumptively expressive" and placing the burden on the plaintiff).

Distributing food and drink near a polling place is not inherently expressive. Such assistance could mean "Stay in line" or "Thanks for voting," but it could also mean "You look thirsty/hungry," "It's hot/cold outside," "We'd like to get rid of these extras," "Come visit our church," "Would you like to buy some water?", "Try a free sample of this brand," or "Vote for my candidate." It could mean the distributor is serving the recipients for innumerable personal reasons without intending to convey any message whatsoever. A recipient cannot tell what message, if any, is being expressed without additional speech—a telltale sign that the conduct is "not… inherently expressive." *FAIR*, 547 U.S. at 66. Recipients might "understand the distribution... as merely a means to carry out an otherwise-conveyed message"—"something like 'vote!' or 'voting is important.'" *Lichtenstein*, 489 F.

26

Supp. 3d at 767.  But without that extra speech, a recipient could only "speculate" what "discernible message" or non-message is being expressed by the "mere act" of distributing food and drink. *Id*. at 767-68.

Rather than expression, distributing material accomplishes a utilitarian goal: It gives thirsty people drink and hungry people food. As Plaintiffs admit, they do this so that voters will stay in line and vote; people who are hungry or thirsty, the logic goes, might leave the line early. While Plaintiffs believe that their conduct facilitates voting, "facilitating voting" is "not... communicating a message." *Feldman v. Ariz. Sec'y of State's Off.*, 840 F.3d 1057, 1084 (9th Cir. 2016).  That is true even if Plaintiffs' conduct is "the product of deeply held personal belief," has "social consequences," and "discloses" their approval of voting (or their disapproval of lines). *Nev. Comm'n on Ethics v. Carrigan*, 564 U.S. 117, 126-27 (2011).

In fact, courts have held that far more direct methods of facilitating voting are not expressive conduct.  Collecting and returning absentee ballots is not speech. *See Knox v. Brnovich*, 907 F.3d 1167, 1181 (9th Cir. 2018).  Neither is collecting or returning voter-registration applications. *See Voting for Am.*, 732 F.3d at 391 & n.4. Groups in those cases also argued that their actions conveyed a message of support for voting, voters, and the democratic process. *See, e.g.*, *Knox*, 907 F.3d at 1181; *Feldman*, 840 F.3d at 1083.  Plaintiffs cannot explain why providing food and water to people in line communicates this message but helping people vote does not.

27

The Eleventh Circuit's decisions in *Food Not Bombs* are instructive. Agreeing with the Ninth Circuit, the Eleventh Circuit explained that the expressive nature of "food distribution" can only be "decided in an as-applied challenge." *Ft. Lauderdale Food Not Bombs v. City of Ft. Lauderdale* (*FNB I*), 901 F.3d 1235, 1241 (11th Cir. 2018) (citation omitted).  That is because food distribution is not "on its face an expressive activity." *Santa Monica Food Not Bombs v. City of Santa Monica*, 450 F.3d 1022, 1032 (9th Cir. 2006); *accord Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale* (*FNB II*), 11 F.4th 1266, 1292 (11th Cir. 2021) ("[M]ost social-service food sharing events will not be expressive.").  The Eleventh Circuit concluded that certain "food sharing events" for homeless people in public parks were expressive only after considering "five… factors." *FNB I*, 901 F.3d at 1242; *Burns*, 999 F.3d at 1343. The contextual factors in *Food Not Bombs* are simply not met in this context. *See Burns*, 999 F.3d at 1343-47 (deeming other conduct not expressive because the factors in *FNB I* were mostly absent).  Unlike public parks, polling places are not hubs for free speech or association; and unlike the homeless, voters are not an identifiable group with a well-known need for free food and drink. *Cf. FNB I*, 901 F.3d at 1242-43.

In sum, the 2021 Law regulates only conduct.  The non-solicitation provision thus does not implicate the First Amendment at all (and prohibiting the non-solicitation of voters obviously survives rational-basis review).

28

### 3.     Even if the non-solicitation provision implicates the First Amendment, it passes scrutiny.

The non-solicitation provision applies only in nonpublic forums, so it need only be "reasonable in light of the purpose served by the forum: voting." *Minn. Voters All. v. Mansky*, 138 S. Ct. 1876, 1886-88, 1883 (2018) (cleaned up).   As relevant to Plaintiffs, the law applies inside polling places and within a buffer zone of 150 feet.   *See* Fla. Stat. §102.031(a).   The interiors of polling places are obviously nonpublic forums. *Id.* at 1886. And this Court should hold that, on election day, "the parking lots and walkways leading to the polling places are nonpublic forums." *United Food & Com. Workers Loc. 1099 v. City of Sidney*, 364 F.3d 738, 750 (6th Cir. 2004).   As the U.S. Supreme Court explained in *Mansky*, its fractured decision in *Burson v. Freeman* did not resolve "whether the public sidewalks and streets surrounding a polling place qualify as a nonpublic forum."   *Mansky*, 138 S. Ct. at 1886. Justice Scalia, who provided the fifth vote in *Burson*, persuasively documented the long tradition of treating them as such.   *See* 504 U.S. 191, 214-16 (1992) (Scalia, J., concurring).   A majority of the U.S. Supreme Court cited his opinion approvingly in *Mansky*, stressing that States have long restricted speech "in and around polling places on Election Day." 138 S. Ct. at 1883. These buffer zones are appropriate given "the special governmental interests surrounding... polling places," the need for a "bright-line prophylactic rule," and the fact that the non-

solicitation provision imposes no limit on Plaintiffs' ability to "communicate [their] message through [actual] speech." *Hill*, 530 U.S. at 728-29.

The non-solicitation provision would still be subject to only intermediate scrutiny, even if it regulated expressive conduct in a *public* forum. The provision is content and viewpoint neutral: It prohibits "any activity" with the forbidden intent of influencing voters. Fla. Stat. §102.031(b); *see FNB II*, 11 F.4th at 1291-94 (explaining why a prohibition on "the provision of food... in order to meet [the public's] physical needs" was content and viewpoint neutral). The provision resembles a time, place, or manner restriction—a quintessential content-neutral law. *See McCullen v. Coakley*, 573 U.S. 464, 479 (2014). Food and drink can be distributed, just not at a certain place (near polling places) at a certain time (during elections); and whatever message the distribution communicates can still be uttered, just not in a certain manner (by distributing food and drink). *See Clark*, 468 U.S. at 294-95. Content-neutral regulations of expressive conduct "need only satisfy the 'less stringent' standard from *O'Brien*"—*i.e.*, "intermediate scrutiny." *FNB II*, 11 F.4th at 1294. They need only "'promote[] a substantial government interest that would be achieved less effectively absent the regulation.'" *FAIR*, 547 U.S. at 67.

The non-solicitation provision survives strict scrutiny as well. In *Burson*, a plurality of the Supreme Court concluded that Tennessee's buffer-zone law satisfied strict scrutiny. 504 U.S. at 211. Similar reasoning applies here because States have

a "compelling interest" in protecting voters from "confusion," "undue influence," "fraud," "pressure," and "intimidation." *Id.* at 199; *Brnovich*, 2021 WL 2690267, at *13. States must be able to enact prophylactic provisions—rather than rely on *ex post* prosecutions—because improper influence can be subtle, hard to detect, and damaging to the electoral process in ways that cannot be undone. *See Burson*, 504 U.S. 191, 206-07 (1992) (plurality). Florida's provision is especially narrow because it regulates only the distribution of material with "the intent to influence or effect of influencing a voter." Fla. Stat. §102.031(b); *see Williams*, 553 U.S. at 293-94 (scienter requirement bolsters constitutionality).

### D. The non-solicitation provision is neither vague nor overbroad.

Plaintiffs' unconstitutional vagueness and overbreadth arguments directed at the non-solicitation provision must also fail.

#### 1. The non-solicitation provision provides reasonable notice of what is permitted.

A law is unconstitutionally vague under the Fourteenth Amendment's Due Process Clause where it "fails to provide people with ordinary intelligence a reasonable opportunity to understand what conduct it prohibits" or because it "authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 732 (2000). "[R]easonably clear lines" between proscribed and permitted conduct are all that is required to pass muster under the Due Process

Clause. *Smith v. Goguen*, 415 U.S. 566, 574 (1974). Generally, the U.S. Supreme Court is reluctant to declare statutes void for vagueness. *See Parker v. Levy*, 417 U.S. 733, 757 (1974).

Plaintiffs assert that the non-solicitation provision is unconstitutionally vague because it fails to draw a line separating proscribed from permitted speech and conduct within the non-solicitation zone. ECF 160 ¶¶179-86. Their argument hinges on the words "any activity" and "influence," which they argue "leav[es] them to guess" "what activities are permitted or prohibited," meaning there is effectively no limit to the kinds of activities that could be criminalized within that perimeter. *Id.* ¶¶121, 183. They warn that "[t]he possibilities of prohibited activities are virtually limitless, ranging from speaking words to a voter to handing them water bottles or food." *Id.* at ¶183. These arguments do not withstand scrutiny.

The non-solicitation provision's text reveals it cannot reasonably be interpreted to criminalize "any activity" within the no-solicitation zone—and Plaintiffs point to no language beyond the two words "any activity" that reasonably prohibits, *inter alia*, the nonpartisan provision of food, water, or a chair to a voter.

*First*, contrary to the Plaintiffs' decision to read "any activity" in isolation, the canons of construction mandate that "[w]ords of a statute are not to be interpreted in isolation; rather a court must look to the provisions of the whole law and to its object and policy." *MicroStrategy Inc. v. Bus. Objects, S.A.*, 429 F.3d

1344, 1363 (Fed. Cir. 2005). When the phrase "any activity" is construed reasonably in the context of the surrounding text and the provision as a whole, the text is unambiguous in what it prohibits: Partisan efforts of individuals or campaigns to pressure or influence voters' decisions within the buffer zone.

*Second*, when, as here, general terms or phrases are included in a series of more specific items, the general term should be interpreted to have meaning akin to the more specific surrounding terms and in light of the surrounding provisions. *See, e.g.*, *Gustafson v. Alloyd Co.*, 513 U.S. 561, 575 (1995). Using this canon, it is apparent that the non-solicitation provision does not prohibit innocent, nonpartisan assistance to voters waiting in line. Instead, the provision targets efforts to influence the decisions of voters near polling locations.

Notably, the "any activity" restriction itself is qualified by the phrase "with the intent[11] to *influence* or effect of *influencing* a voter," demonstrating that the provision does not extend to ordinary, run-of-the-mill activities like innocently giving voters a drink of water—rather, the restriction narrowly targets activities that have a reasonable likelihood of swaying a voter's decision on how to vote. Fla. Stat. § 102.031(4)(e) (emphasis added).

---

[11] The U.S. Supreme Court "has recognized that a scienter requirement may mitigate a law's vagueness, especially with respect to the adequacy of notice to the complainant that his conduct is proscribed." *Hoffman Estates v. Flipside, Hoffman Estates*, 455 U.S. 489, 499 (1982). Accordingly, the scienter requirement of "intent to influence... a voter" alleviates any alleged vagueness that may exist.

It follows that merely giving water to voters waiting in line would not be viewed as an activity "with the effect of influencing a voter." Certainly, the legislature did not need to engage in the unwieldy exercise of spelling out every potential way that individuals or political groups could influence or attempt to influence voters approaching a polling location—due process does not demand that level of enumeration to prohibit obviously unsuitable conduct in all its various permutations. Nor is that level of detail necessary to guard against the de minimis risk of inconsistent enforcement. Instead, because the non-solicitation provision identifies the prohibited conduct through its plain text and clear purpose, the provision is not unconstitutionally vague.

*Third*, even if the phrase "any activity" *is* vague when viewed in isolation, as Plaintiffs assert, the series of prohibited activities immediately preceding the provision, coupled with its broader context, reveal exactly the kinds of "activities" the statute prohibits, and manifests an unmistakable purpose of prohibiting partisan solicitation near polling locations, defeating Plaintiffs' vagueness arguments. This is because the "any activity" language comes from the definition of the terms "solicit" and "solicitation" under the provision. Dictionaries confirm that "solicit" is ordinarily understood to mean to entreat, approach with a request or plea, urge, or entice to action. *E.g.*, *Solicit*, *Merriam-Webster's Dictionary*, https://www.merriam-webster.com/dictionary/solicit ( November 9, 2021). Importantly, the word does not

ordinarily include the mere act of giving assistance. Items included in the non-solicitation provision's list of prohibited actions preceding the provision bolsters this interpretation. Fla. Stat. §102.031(4)(e).

*Finally*, contrary to Plaintiffs' foreboding, the carveout for supervisors' volunteers and employees bolsters the Secretary's interpretation because it confirms the exact kinds of activities the statute permits and thus does not restrict: "providing *nonpartisan* assistance to voters within the no-solicitation zone such as… giving items to voters." Fla. Stat. §102.031(4)(e) (emphasis added). Restricting assistance within the zone to nonpartisan activities again helps Defendant's argument that the legislature was primarily concerned with restricting partisan activities.

### 2. *The overbreadth claims must fail.*

Because Plaintiffs' Count V pleads vagueness and overbreadth together, Defendants discuss the overbreadth doctrine here.[12] The doctrine prohibits regulation of substantially more protected speech than is necessary to achieve regulatory purposes. *See Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973). A regulation's overbreadth "must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." *Id*. at 615. Overbreadth is, however, a "manifestly[] strong medicine" sparingly employed by courts "as a last

---

[12] The U.S. Supreme Court has "not recognized an 'overbreadth' doctrine outside the limited context of the First Amendment." *United States v. Salerno*, 481 U.S. 739, 745 (1987).

resort." *Id.* at 613. If "a limiting construction has been or could be placed on the challenged statute," the statute is saved. *Id.* at 613.

*First*, as described in the above analysis of vagueness, the 2021 Law does not prohibit the kinds of activities that Plaintiffs allege.

*Second*, even if the non-solicitation provision prohibits expressive conduct, as the Plaintiffs allege, that speech would still not be protected from regulation because the statute clearly regulates polling locations, which are nonpublic forums subject to content-based speech restrictions, including political advocacy prohibitions.[13]  *See Mansky*, 138 S. Ct. at 1885-86.  If the regulations of a nonpublic forum are reasonable, they are lawful; a separate overbreadth analysis is not appropriate. *See Hodge v. Talkin*, 799 F.3d 1145, 1171 (D.C. Cir. 2015). Here, the statute plainly targets partisan activities with the intent or effect of influencing a voter, which is essentially identical to political advocacy that the Supreme Court has said may be restricted in polling locations.  *See id.*

### E.  The notification provision complies with the First Amendment.

Plaintiffs argue that the notification provision unconstitutionally infringes upon their political speech and compels them to speak in furtherance of the government's message, undermining Plaintiffs' credibility.  *See* ECF 160 ¶ 190, 198-

---

[13] The U.S. Supreme Court's First Amendment precedent permits states to create "nonpublic forums." *See supra* at 29-30.

200.  Plaintiffs are wrong for three reasons.  First, Plaintiffs' Court IV claim should fail because the notification provision does not infringe on any speech.  Second, because the notifications Plaintiffs must provide are non-controversial factual statements, they are subject to minimal scrutiny, easily satisfied here.  *See Zauderer v. Office of Disciplinary Counsel of Supreme Court*, 471 U.S. 626, 650-52 (1985).  Third, even if the required notifications warrant a more searching review, the State meets this burden because the disclaimers advance its substantial interest in ensuring that 3PVROs fulfill their statutory obligation to serve as fiduciaries to the voters they assist with registration. *See Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of N.Y.*, 447 U.S. 557, 564 (1980).

### 1.   *The Notification Provision Does Not Abridge Speech.*

Plaintiffs claim the notification provision is a "content-based regulation of speech" that is "not narrowly tailored to serve any compelling state interest."[14]  ECF 160, ¶192.  Not so.  It does not "limit[]the number of voices who will convey [Plaintiffs'] message and the hours they can speak" nor "limit[] the size of the

---

[14] Plaintiffs brought a compelled speech claim and do not allege content discrimination. Even if the notification provision *were* a content-based restriction subject to strict scrutiny, which it is not, it furthers the State's compelling interest in ensuring that 3PVROs fulfill their statutory obligation to serve as fiduciaries to the voters they assist with registration. *See infra* at 40-43.  And it is narrowly tailored to serve the State's interests because it only applies in situations where 3PVROs have contact with potential registrants and merely requires them to provide voters with truthful information.

audience they can reach." *Meyer v. Grant*, 486 U.S. 414, 422-3 (1988). It simply requires more information for potential registrants to help them ensure their applications will be received on time, and leaves Plaintiffs with the same ability to communicate with voters as they had before the 2021 Law. "The first question in any free speech analysis is whether the [law] complained of implicates speech at all - if [it] does not abridge speech, clearly the analysis ends and the [law] is upheld." *Praise Christian Ctr. v. Huntington Beach*, 2006 U.S. Dist. LEXIS 114637, at *6 (C.D. Cal. 2006). Plaintiffs' claim fails on its face because the provision does not "infringe" speech whatsoever. "Abridge" means "[t]o reduce or contract[.]" Black's Law Dictionary, p. 9 (5th Ed. 1979). The notification provision does not "reduce" or "contract" speech; it simply requires 3PVROs to provide truthful information to voters. As such, by its own terms, the notification provision does not even implicate the First Amendment.

### 2. *The required disclaimers satisfy minimal scrutiny.*

*Zauderer*'s two-part analysis applies to non-controversial factual statements like the ones required here. Under the *Zauderer* test, This Court must first "assess the interest motivating the" required disclaimers, and then "assess the relationship between the government's identified means and its chosen ends." *Am. Meat Inst. v. United States Dep't of Agric.*, 760 F.3d 18, 23, 25 (D.C. Cir. 2014) (holding that

"*Zauderer* in fact does reach beyond problems of deception" to reach other disclosure mandates).

Florida's interest is simple but compelling:  protecting its voters through the dissemination of truthful information so that as many voters as possible may register and vote.  *See* ECF 318-54 at ¶¶15-16.

There is also a direct link between the means and chosen ends.  It is undisputed that 3PVROs sometimes deliver forms late.  *Id.* at ¶¶17-21; *see* ECF 318-27 at 165:6-66:4 (eight applications were submitted late by a 3PVRO thereby "prevent[ing] them from voting in that presidential preference primary").  Late delivery can result in voters missing the deadline to register before an election.  *Id.*  Providing Florida voters more information about the registration process, including referring them to a website so that they can meet registration fast approaching deadlines, directly furthers the State's interests.  *Id.*

The State's chosen means is also consistent with the statutorily imposed fiduciary duty that 3PVROs owe to voters and which HTFF does not challenge here. Specifically, the three disclosures from 3PVROs: (1) inform voters that the 3PVRO may fail to deliver the voter's registration application to the appropriate supervisor within 14 days or before registration closes, (2) inform voters how to register to vote online, and (3) inform voters how to check the delivery status of the voter's

application. *See* Fla. Stat. §97.0575(3)(a). All three disclaimers empower the voters to make informed decisions.[15]

Plaintiffs might analogize this case to *National Institute of Family & Life Advocates v. Becerra*. 138 S. Ct. 2361. That comparison is without merit. The notification provision and the registration activities of 3PVROs are *complementary*, not diametrically opposed; the State is requiring 3PVROs to advance a goal that they already support (voter registration) in an additional manner (informing voters about the online registration option and how to check their status). Again, Plaintiffs do not contend that the information they must provide is inaccurate; it is slightly more information than they would volunteer.

### 3. The Required Voter Registration Disclaimer Satisfies Heightened Scrutiny Because It Directly Advances the State's Interest in Enforcing Fiduciary Duties.

Even if this Court determines that more searching scrutiny is merited and applies the *Central Hudson* test, Florida's history of regulating each 3PVRO "as a fiduciary to the applicant," Fla. Stat. §97.0575(3)(a), underscores the State's interest in requiring disclaimers.

Specifically, 3PVRO communications with voters are conceptually closer to commercial speech than to protected political expression, subjecting the notification

---

[15] Indeed, the League entities, the only remaining Plaintiffs that are registered 3PVROs, readily admit that they have, on multiple occasions, failed to submit applications before the applicable deadlines. *See* ECF 318-21 at 93:22-94:20.

provision to the intermediate scrutiny reserved for commercial speech rather than the strict scrutiny reserved for political speech. So if this Court rejects the *Zauderer* test, it should apply *Central Hudson*, asking: (1) Is the communication misleading or related to unlawful activity?; (2) If not misleading, is there a substantial state interest supporting the regulation?; (3) Does the regulation directly advance the asserted state interest?; and (4) Could the asserted interest be served as well by a more limited regulation of speech?  *See Central Hudson*, 447 U.S. at 563-64.

As the State does not allege Plaintiffs' communications with voters are misleading, the analysis begins with the State's interest in requiring disclosure.

Florida has a long history of protecting voters by regulating voter registration activity. In 1995 Florida implemented the provisions of the National Voter Registration Act, permitting 3PVROs to collect applications. "Prior to 1995, only state officials and individuals deputized by supervisors of elections as registrars could collect voter registration applications in Florida." *League of Women Voters v. Cobb*, 447 F. Supp. 2d 1314, 1317 (S.D. Fla. 2006) (citation omitted). The 1995 rules included a number of requirements, such as a written oath required to be "acknowledged by the supervisor [or deputy] and filed in the office of the supervisor" including "a clear statement of the penalty for false swearing." Fla. Stat. §98.271(2)(a) (1993). These requirements evolved into a "fiduciary" relationship,

underscoring the State's history of caution when allowing 3PVROs to conduct voter registration activities. *See* 2005 Legis. Bill Hist. FL H.B. 1567 (Apr. 4, 2005).

The notification requirements at issue "directly advance" the State's substantial interest in enforcing the fiduciary duties that 3PVROs owe to voters. *Central Hudson*, 447 U.S. at 564. "Florida courts recognize a breach of fiduciary duty claim at common law." *Gochnauer v. A.G. Edwards & Sons, Inc.*, 810 F.2d 1042, 1049 (11th Cir. 1987). Fiduciaries have a variety of enforceable duties to their beneficiaries, including "the duty to disclose material facts." *Sallah v. BGT Consulting, LLC*, 2017 U.S. Dist. LEXIS 101639, at *13 n.5 (S.D. Fla. June 29, 2017). Florida courts also recognize fiduciary duties "to inform the customer of the risks involved." *Ward v. Atl. Sec. Bank*, 777 So. 2d 1144, 1147 (Fla. 3d DCA 2001). This duty is particularly important when "one party has information which the other party has a right to know because" one party is a fiduciary. *Friedman v. Am. Guardian Warranty Servs., Inc.*, 837 So. 2d 1165, 1166 (Fla. 4th DCA 2003). Section 97.0575 ensures that 3PVROs abide by each of these fiduciary duties when registering voters.

Notifications—disclaimers—in furtherance of fiduciary duties are not unusual. Courts have recognized a fiduciary duty of airlines to warn passengers of potential risks from flying with them, especially given the need for passengers to trust the airlines transporting them. *See, e.g.*, *Fleming v. Delta Airlines*, 359 F. Supp.

42

339 (S.D.N.Y. 1973) (holding that airline was negligent in failing to warn passengers of forecasted turbulence).

3PVROs bear a similar responsibility. 3PVROs know, or should know, of the possibility of late-delivered applications based on experience, *see* ECF 318-27 at 165:6-66:4, and thus have a duty to warn voters of that possibility when voters entrust them with their applications. Florida has not prohibited 3PVROs from communicating with voters or collecting their applications; it has simply required them to notify voters of the *possibility* of late delivery and of the *availability* of the online registration option. The choice of which route to pursue still lies where it should: With the voter.

## V.    <u>Conclusion</u>

For the foregoing reasons, this Court should enter summary judgment against Plaintiffs on all counts.

Respectfully submitted,

BRADLEY R. MCVAY (FBN 79034)
General Counsel
Brad.McVay@dos.myflorida.com
ASHLEY E. DAVIS (FBN 48302)
Deputy General Counsel
Ashley.Davis@dos.myflorida.com
Florida Department of State
R.A. Gray Building Suite 100
500 South Bronough Street
Tallahassee, Florida 32399-0250
Phone: (850) 245-6536
Fax: (850) 245-6127

*/s/ Bilal Ahmed Faruqui*
BILAL AHMED FARUQUI
Senior Assistant Attorney General
Florida Bar Number 15212
WILLIAM H. STAFFORD III
Special Counsel
Florida Bar Number 70394
Office of the Attorney General
General Civil Litigation Division
State Programs Bureau
PL – 01 The Capitol
Tallahassee, Florida 32399-1050

43

*/s/ Mohammad Jazil*
Mohammad O. Jazil (FBN: 72556)
mjazil@holtzmanvogel.com
Gary V. Perko (FBN: 855898)
gperko@holtzmanvogel.com
Holtzman Vogel Baran Torchinsky &
Josefiak PLLC
119 S. Monroe St. Suite 500
Tallahassee, FL 32301
Phone No.: (850) 274-1690
Fax No.: (540) 341-8809

Phillip M. Gordon (VA Bar: 96521)*
pgordon@holtzmanvogel.com
15405 John Marshall Hwy
Haymarket, VA 20169
Phone No. (540)341-8808
Fax No.: (540) 341-8809
*Admitted *pro hac vice*

*Counsel for Secretary Lee*

(850) 414-3757
Bilal.Faruqui@myfloridalegal.com
William.Stafford@myfloridalegal.com

*Counsel for Attorney General Moody*

*/s/ Andy Bardos*
Andy Bardos (FBN 822671)
GRAYROBINSON, P.A.
Post Office Box 11189
Tallahassee, Florida 32302-3189
Phone: 850-577-9090
andy.bardos@gray-robinson.com

*Counsel for Defendants, Supervisors of
Elections for Lake and Lee Counties*

## CERTIFICATE OF COMPLIANCE

I certify that the foregoing complies with the size and font requirements in the

local rules; however, the foregoing, combined with the accompanying memorandum

of law, exceeds the allowable word limits. The undersigned has filed a motion to exceed the word limits. That motion was granted and increased the word limits up to 10,000 words. *See* ECF No. 317. The accompanying memorandum complies with the Court's order as it contains only 9,986 words.

*/s/ Mohammad Jazil*

## CERTIFICATES OF SERVICE

I certify that on November 12, 2021, I served the foregoing on all counsel of record through this Court's CM/ECF system.

*/s/ Mohammad Jazil*