## DECLARATION OF QUENTIN KIDD, PH.D.

# I. INTRODUCTION

Pursuant to 28 U.S.C. § 1746, I, Dr. Quentin Kidd, declare under penalty of perjury that the following declaration is true and correct:

1.      My name is Quentin Kidd, and I am a tenured professor of political science and dean of the college of social sciences at Christopher Newport University in Newport News, Virginia. I also serve as the Academic Director of the Wason Center for Public Policy. I have been a faculty member at Christopher Newport for 24 years. I have a Ph.D. in Political Science from Texas Tech University and a MA and BA from the University of Arkansas.

2.      I am an expert in American politics, specifically in the areas of political behavior, voting behavior, electoral politics, racial politics, Southern politics, and Virginia politics, having published academic research in all subject areas. I have authored, co-authored or edited five books and over 30 peer reviewed studies and book chapters, and funded research reports, including several on political participation across the south in the context of changes in voting laws and election administration. My scholarship, detailed in a copy of my cv which is attached hereto, has been published by the top university presses and top disciplinary peer-reviewed journals and has been widely cited by scholars across multiple disciplines. I have also conducted nearly 100 survey research projects focusing on public policy and public opinion in Virginia, Georgia, Florida, Texas,

and nationally. I teach courses in American politics, political behavior, political campaigns and elections, and research methods and quantitative analysis.

3.  I have written many op-eds in newspapers and magazines ranging from the New York Times and Washington Post to the Los Angeles Times. I have provided expert analysis and opinion regarding local, state, and national politics, elections, and public policy to newspapers, magazines, websites, radio, and television programs and outlets in the United States, the United Kingdom, Canada, Ireland, France, Germany, Holland, Italy, Columbia, Turkey, and Qatar, Saudi Arabia.

4.  I serve or have served on numerous public boards and commissions including the (Virginia) Governor's Commission on National and Community Service, the Hampton Roads Center for Civic Engagement, the (Virginia) Independent Bipartisan Advisory Commission on Redistricting, the 2019 Commemorative Steering Committee (Virginia), and the Governance/Funding Working Group of Hampton Roads Transit.

5.  In the last four years, I have provided prior expert testimony in *Holloway v. City of Virginia Beach*, No. 2:18-cv-00069, *Jabbour v. Merrill*, No. 1:20-cv-00034-JB-N, *People First of Alabama v. Merrill*, No 2:20-cv-00619-AKK, *Clark v. Edward*, No 20-cv-308-SDD-RLB and *Power Coalition v. Edward*, No. 20-cv-283-SDD-RLB, *Harding v. Edwards*, No 3:20-cv-00495-SDD-RLB, and *Thompson v. Merrill*, No 2:15-cv-783-ECM-SMD. The State of Florida has engaged me to provide expert analysis on several issues related to *League of Women Voters of Florida, Inc. et al. v. Lee et al.*, case number 4:21-CV-186 and consolidated cases 4:21-CV-242, 4:21-CV-187 and 4:21-CV-201. I am receiving $350 per hour for work assisting the State of

Florida in these matters. My compensation is not contingent on either the results of my analysis nor the contents of this report.

## II. SYNOPSIS

6.     I have been asked by counsel for the State of Florida to conduct analysis and form expert opinions on several issues related to Senate Bill 90 (SB90 from here forward). Specifically, I have examined the following questions:

A.     How have Florida's early voting and vote-by-mail (specifically the excuse and notary/witness requirement) rules changed since the 1980s and what would be the impact of these changes on the ease of voting.

B. How does Florida's use of drop boxes compare to use of drop boxes by states across the country, and are the rules governing the use of drop boxes in Florida as spelled out in SB90 Section 29 comparable to the rules of other states that use drop boxes.

C. How do Florida's rules related to ballot collection spelled out in SB90 Section 32 compare to other states related to who is able to assist a voter by collecting and returning their ballot and how many voters a third party can assist.

D. How do Florida's rules related to third party voter registration spelled out in SB90 Section 7 compare to other states related to compensation, deadlines for returning forms, oversight of organizations conducting registration drives, training, and official volunteer systems.

E. How do Florida's rules related to absentee ballot application verification spelled out in SB90 Section 24 compare to other states related to voter identification verification requirements.

F. How do Florida's rules related to the frequency with which a voter must register for an absentee ballot spelled out SB90 Section 24 compare to other states' rules.

G. How do Florida's rules related to 'electioneering' activities around the physical location of polling places while voters are casting ballots spelled out in SB90 Section 29 compare to other states' rules.

7.     In this report I employ standard methods used by political scientists and social scientists when conducting a comparative analysis of laws and rules across time and states regarding the administration of elections. I state clearly the issues being examined in each section. I rely on primary sources where possible (mostly the laws of the particular states) and where needed on secondary sources to analyze the questions. My focus in this report is analyzing changes in Florida's rules as it relates to early voting and vote by mail, and comparing the rules of the fifty states and the District of Columbia as it relates to the several questions outlined above. My goal is to consider changes in Florida's rules and place these changes into a national context.

## III. SUMMARY OF FINDINGS

8.      This analysis shows that when it comes to early voting and vote by mail rules the net impact of changes in law over time has been to make voting easier and more accessible. In the context of the six areas of comparative analysis, Florida is at worst consistent with the average restriction or regulation across the country or at best a leader in terms of providing access to voting opportunities.

9.      When it comes to changes in **early voting** and **vote by mail** rules in Florida since the 1980s, the net impact of the changes has been to make voting easier. Florida law has changed over time from restrictions related to needing an excuse to vote early and needing a notary or witness to no excuse and no witness requirements. Early voting has gone from non-existent to up to two-weeks since it was first instituted in 1998.

10.      When it comes to the new rules in SB90 governing the placement and supervision of secure drop boxes for the return of vote-by-mail ballots, Florida is among only ten states that require **drop boxes** to be available to voters. If you exclude three of the ten states that conduct all of their elections early and by mail (Colorado, Oregon, and Washington), Florida is among only seven states that, while they have no-excuse early voting, still orient their elections in a traditional election-day voting fashion and require the wide-spread availability of drop boxes. If you further exclude Nebraska, which limits the availability of drop boxes to rural counties with populations of 10,000 or less, Florida stands as only one of six states to require the wide-spread availability of drop boxes that doesn't already conduct elections exclusively by mail over a period of multiple weeks. In short, when you consider that a majority of twenty-seven states and

the District of Columbia explicitly prohibit the use of drop boxes, Florida stands among a small group of states that requires them to be widely available.

11.     When it comes to **third-party ballot collection** rules in SB90, Florida stands among the vast majority of states that impose some regulations and restrictions on the number of ballots that an individual can collect and return (ten states have minimal or no restrictions). Among the forty-one states and the District of Columbia that impose some regulations, Florida is less restrictive than over half, by imposing a limit on unrelated individuals to collect and return up to two ballots and allowing immediate family to collect and return an unlimited number of ballots (while also expanding the definition of immediate family to include a grandchild).

12.     When it comes to **third-party voter registration** rules in SB90, Florida's rules are generally consistent with the vast majority of states that impose requirements on third party voter registration organizations. Florida's deadlines, penalties, and other requirements related to pay are the norm. Florida's fourteen-day deadline for returning completed registration forms is longer than the average (which is ten-days), and Florida's notice and disclaimer requirements are not unique among states that require them and certainly not as proscriptive as several of them.

13.     When it comes to **absentee ballot application verification** rules in SB90, Florida's requirements are largely average. The burden to qualify to vote absentee (as is the case in sixteen states) is certainly greater than Florida's no excuse requirement. The burden of having to provide a witness signature (as is the case in two states) is certainly greater than Florida's requirement that does not include a witness signature. The burden of requiring a copy of a photo

identification (as is the case in four states) is certainly greater than Florida's requirement that does not include submitting a copy of a photo identification. In fact, Florida stands in a group of states that simply require that information and eligibility be checked against voter registration records. Only four states (other than the states that conduct all or mostly all-mail elections) have verification checks that are less strenuous.

14.     When it comes to the **frequency of requesting an absentee ballot** rules in SB90, the two-year no-excuse absentee voting rule makes Florida the most lenient state among the thirty-eight states that regulate absentee voting in some way short of no-excuse permanent absentee or all-mail voting.

15.     When it comes to the **electioneering (voter solicitation)** rules in SB90, Florida's regulations and restrictions mirror the vast majority of state rules across the country in prohibiting electioneering with the purpose of influencing voters within a certain space or zone around the polling location.

16.     In sum, in none of the six areas of SB90 examined in this report comparing Florida with the other states of the Union is Florida outside of the norm at worst, and in several of the areas examined here Florida's rules and regulations place the state among the more accessible from a comparative perspective when it comes to voting and access to voting resources. And in the context of early voting and vote by mail, changes in Florida law over the last several decades have made voting fundamentally easier.

## IV. CHANGES IN FLORIDA'S ABSENTEE VOTING RULES HAVE MADE VOTING USING THIS METHOD EASIER IN THE LAST SEVERAL DECADES

17.     The rules around absentee voting (or vote by mail) in Florida have changed substantially since the mid-1990s. The rules have evolved, as Table 1 shows, from a very restrictive process to a much less restrictive process. Prior to 1996 a voter casting an absentee ballot had to qualify under a specific list of excuses and have the envelope containing their ballot notarized or witnessed by two people. Today no qualification excuse is required to cast an absentee ballot, and a voter simply certifies they are registered to vote in Florida and will not vote more than once.

18.     In order to vote an absentee ballot in Florida prior to 1996, a voter had to qualify with one of the following excuses: 1) be unable to vote without assistance; 2) not physically be home in the precinct during the hours of voting; 3) be an election official working at a precinct other than their own; 4) have a religious reason for being unable to attend the polling location on the day of the election; 5) have changed residence to another location in Florida but not in time to change the location of their registration; or 6) have changed residence to another state but not in time to change the location of their registration. In addition to qualifying with one of the six excuses, voters had to sign the security envelope in the presence of a notary or two witnesses eighteen years or older.[1]

---

[1] Florida Statutes Title IX Section 101.64(1), 1995.

19.    The 1996 statute dropped the qualification requirements, asking voters to swear or affirm that they were qualified electors and were unable to attend the polls on election day (no specific reason was required to be listed) and would not vote more than once. The witness requirement was reduced to one witness eighteen years or older who provided their signature and address.[2]

## Table 1: Changes to Florida's Absentee Voting Rules Since 1995

| | |
|---|---|
| **Rule in 1995 and prior** | Voter certified they are unable to attend the polls on election day under 1 of 6 excuses. Envelope requires voter signature and witness by a notary or two witnesses eighteen years or older. |
| **Rule changed in 1996** | Voter certified they are unable to attend the polls on election day (for any reason). Envelope requires voter signature and one witness eighteen years or older. |
| **Rule changed in 1998** | Voter certified they are unable to attend the polls on election day under 1 of 7 excuses. Envelope requires voter signature, last four of voter's SSN, and witness by a notary or another registered voter (limit five witnesses by any single registered voter). |
| **Rule changed in 2001** | Voter certified they are qualified and registered to vote in Florida and will vote only once. Envelope requires voter signature and one witness eighteen years or older. |
| **Rule changed in 2004** | Voter certified they are qualified and registered to vote in Florida and will vote only once. Envelope requires voters signature only. |

---

[2] Florida Statutes Title IX Section 101.64(1), 1996.

Following a high-profile voter fraud case in Miami, much of it involving absentee ballots, the legislature attempted to tighten the rules around absentee voting.[3] Statutes from 1998 to 2000 required voters to qualify with one of seven excuses, the six prior excuses and a seventh that allowed anyone unable to attend the polls on election day for any reason to vote absentee (essentially, combining the pre-1996 qualification rules and the 1996 any-reason rule). In addition to qualifying with one of the seven excuses, voters had to sign the security envelope in the presence of a notary or one witness who was a registered voter in Florida. No one registered voter could witness more than five ballots for the same election.[4]

20.     The tightened rules around absentee voting from 1998 to 2000 were struck down by the U.S. Justice Department, and so the Florida Legislature revised them in 2001. The 2001 statute dropped any requirement to qualify to vote absentee (no excuse required), and only required voters to certify that they were a qualified and registered voter in Florida and that they would not vote more than one ballot in that election, signed in the presence of one witness who was eighteen years or older who provided their signature and address.[5]

21.     In 2004 Florida dropped the witness requirement and required voters to certify (by signing and dating the outer envelope) that they were a qualified and registered voter in Florida and that they would not vote more than one ballot in a given election.[6]

---

[3] Scott Hiaasen, "Absentee ballots: easy to cast, open to fraud," *Miami Herald*, Oct. 12, 2002, P. A1.
[4] Florida Statutes Title IX Section 101.64(1), 1998-2000.
[5] Florida Statutes Title IX Section 101.64(1), 2001.
[6] Florida Statutes Title IX Section 101.64(1), 2004.

22.     In 2019 the statute changed in a minor way in that the voter's certificate asked for an email address, home telephone number, and mobile telephone number in addition to the signature requirement and date.[7]

23.     The net effect of the changes to the rules around absentee voting (or vote by mail) in Florida since the mid-1990s has been an easing of the burden in two important ways. First, the rules have evolved from a relatively restrictive process whereby a voter had to qualify under a specific and bounded list of excuses. Second, the rules have evolved away from having the outer envelope which contained the voter's ballot notarized or witness by two people to one whereby a voter certifies they are registered to vote in Florida and will not vote more than once. The current policy under SB90 retains the ease and accessibility of absentee voting.

---

[7] Florida Statutes Title IX Section 101.64(1), 2019.

## V. CHANGES IN FLORIDA'S EARLY VOTING RULES HAVE MADE VOTING USING THIS METHOD EASIER IN THE LAST SEVERAL DECADES

24.     The option to vote early in-person did not exist in Florida in a codified way prior to 1998.[8] The rules around early voting have evolved, as Table 2 shows, from a relatively supervised process for voters who were unable to vote on election day to one oriented around convenience for voters while giving elections administrators the flexibility to expand the number of days as needed.

25.     What we now call early voting in Florida was first statutorily created in 1998, and called 'Voting absentee ballots in person' rather than early voting.[9] The statute read in part: "…any qualified and registered elector who is unable to attend the polls on election day may pick up and vote an absentee ballot in person at the office of, and under the supervision of, the supervisor of elections."[10] The 1998 statute essentially codified what had been an informal practice on the part of some county elections supervisors.

26.     In 2004 the legislature standardized the rules around what was now called 'early voting', by requiring elections supervisors to allow voters to vote early in the main or branch office of the supervisor. The law also allowed supervisors to designate other sites such as city hall or a public library as early voting sites so long as they were geographically located such that all voters had

---

[8] Leon County Supervisor of Elections Ion Sancho reportedly first brought early voting to any locality in Florida informally in 1994. See Jennifer Portman, "Elections Bill Heads to Gov. Scott for Signature," *Tallahassee Democrat*, May 4, 2013, P. A1.
[9] Florida Statutes Title IX Section 101.657, 1998.
[10] Id.

equal opportunity to use them. An early voting period was also stipulated, from the 15th day before an election and ending on the day before an election. The law required early voting sites be open eight hours per weekday and an aggregate of eight hours per weekend.[11]

## Table 2: Changes to Florida's Early Voting Rules Since 1995

| | |
|---|---|
| **Rule created in 1998** | At discretion of supervisor of election of locality, voter who is unable to attend polls on election day allowed to pick up and vote an absentee ballot under supervision. Proof of identification required. No dates or window of voting specified, and no hours of voting specified. |
| **Rule changed in 2004** | Process of early voting standardized and mandated. Allows voters to vote early at designated full-service facility of supervisor of elections in locality. Mandated 15-day early voting window (from 15th day before election to day before election). Mandated early voting be provided for 8-hours per week day and an aggregate of 8-hours on each weekend. |
| **Rule changed in 2005** | Mandated 14-day early voting window (window goes from 15th day before election to 2nd day before election). Added requirement that early voting sites be open no sooner than 7 a.m. and close no later than 7 p.m. |
| **Rule changed in 2011** | Mandated 8-day early voting window (window goes from 10th day before election to 3rd day before election), and expanded the hours of early voting to no less than 6 and no more than 12 each day at every voting site. |
| **Rule changed in 2013** | Mandated 8-day early voting window (window goes from 10th day before election to 3rd day before election), but supervisor of elections has discretion to offer it on the 15th, 14th, 13th, 12th, 11th, or 2nd day before election. |

27.    The next year in 2005 the legislature revised the early voting law in mostly minor yet important ways designed to ensure equity in access. The law required early voting locations to be

---

[11] Florida Statutes Title IX Section 101.657, 2004.

declared no later than 30 days prior to an election, required that all early voting locations be opened the same days and same hours, and stipulated an early voting period from the 15th day before an election to the 2nd day before an election (fourteen days of early voting). The law required early voting sites be open no earlier than 7 a.m. and close no later than 7 p.m. The law also gave guidance for elections other than general elections (such as municipal elections and special district elections). Finally, the law stipulated that elections supervisors had to make available the number of early votes cast on a daily basis. Incidentally, the first sentence of the statute changed as well, beginning with "As a convenience to the voter…".[12]

28.     In 2011 the number of early voting days was changed to eight days, beginning on the 10th day before an election that contained state or federal offices and ending on the 3rd day before the election. The number of early voting hours required was changed to between six and twelve each day (including weekends) at each early voting site. This change in the early voting hours requirement amounted to an increase in the available time for early voting on weekends.[13]

29.     In 2013, the most recent year in which the rules have changed, the mandated eight day early voting window from the 10th day to the 3rd day before the election was retained, but additional early voting days were allowed at the discretion of elections supervisors. The statute reads, in part:

> "Early voting shall begin on the 10th day before an election that contains state or federal races and end on the 3rd day before the election, and shall be provided for no less than 8 hours and no more than 12 hours per day at each site during the applicable period. In addition, early voting may be offered at the discretion of the supervisor of elections on

---

[12] Florida Statutes Title IX Section 101.657, 2005.
[13] Florida Statutes Title IX Section 101.657, 2011.

the 15th, 14th, 13th, 12th, 11th, or 2nd day before an election that contains state or federal races for at least 8 hours per day, but not more than 12 hours per day."[14]

30.     The net effect of the changes to the rules around early voting in Florida since the early 1980s has been an increased convenience and thus an easing of the burden because the process has been codified and regulated such that it is predictable and standardized across the state. Prior to 1998, some elections administrators allowed early voting and many did not. In 2004 early voting was mandated, and as of 2013 the rules include a mandatory eight days with an additional six days at the discretion of elections supervisors.

---

[14] Florida Statutes Title IX Section 101.657, 2013.

## VI. SB90 MANDATES THE USE OF DROP BOXES, MAKING FLORIDA AMONG A SMALL MINORITY OF STATES TO REQUIRE THEM

31.     The rules around the use of drop boxes vary from state-to-state, but generally orient around three questions: does a state allow them, does a state mandate them, and does a state prohibit them. The standardized and mandatory process of early voting by Florida is the result of legislation that took effect in 2004.[15] That legislation did not, however, include provisions for the use of drop boxes. In 2019 Florida enacted limited use of drop boxes, which were first used in the 2020 election cycle. The law required secure drop boxes to be placed at the main offices of the supervisor and at each early voting location. The law also allowed for secure drop boxes to be placed at other locations that served as early voting sites so long as the sites were staffed during the early voting hours by an employee or law enforcement officer.[16]

32.     The 2019 law establishing the use of drop boxes did not define the term 'secure', but in describing where drop boxes were required to be located (main office of the supervisor, each branch office of the supervisor, and at early voting sites) and where they could optionally be placed (any other site that would otherwise qualify as an early voting site under S.101.657(1) so long as this other location was staffed), it is clear that the legislature considered the presence of staff or security personnel to be an integral element of security.

33.     Senate Bill 90's drop box provisions essentially tighten and clarify the rules around the use of drop boxes by more clearly defining and describing what the legislature meant by 'secure'. For instance, while SB90 requires drop boxes to be geographically located to ensure

---

[15] The Florida Senate Interim Report 2011-118.
[16] Chpt. 2019-162, Laws of Fla. (2019).

that all voters have an equal opportunity to cast a ballot, it also requires their locations to be set at least 30 days before an election and only allows those locations to be changed to comply with the law.[17] The law requires that drop boxes be continuously monitored by an election worker during normal early voting hours.[18] The law also requires that drop boxes be emptied each day and the ballots collected secured.[19] Finally, the law imposes a civil penalty of $25,000 on election supervisors for non-compliance.[20] These security concerns were very real, driven in part by reports of voter drop boxes being vandalized during the 2020 presidential election.[21]

34.     A fundamental question related to these drop box rules is whether the security provisions are outside of the norm nationally. By any objective measure from a comparative perspective Florida's drop box provisions make it one of a minority of states on the progressive end of the voter-access continuum.

35.     Senate Bill 90 makes Florida one of only ten states to **require** the use of drop boxes.[22] Senate Bill 90 says "The supervisor shall allow an elector who has received a vote-by-mail ballot to physically return a vote-by-mail ballot to the supervisor by placing the return mail envelope containing his or her marked ballot in a secure drop box."[23] As Table 3 shows, the other nine

---

[17] Chpt. 2021-11, Laws of Florida at 23 (2021).
[18] Id.
[19] Id.
[20] Id.
[21] See for example: https://www.usatoday.com/story/news/nation/2020/10/20/ballot-drop-box-set-fire-california-100-ballots-damaged/5992101002/, https://www.washingtonpost.com/local/va-politics/mailboxes-broken-into-in-central-virginia-sparking-worries-about-missing-absentee-ballots/2020/10/05/39b3ded8-0744-11eb-a166-dc429b380d10_story.html, https://foxbaltimore.com/news/local/election-security-concerns-after-week-of-reported-issues, https://www.newsbreak.com/news/2351137285828/voting-drop-box-vandalized-in-ontario,
[22] Nebraska requires counties with populations of less than 10,000 to maintain at least one secure drop box starting at least 10 days before the election.
[23] Chpt. 2021-11, Laws of Florida at 23 (2021).

states (excluding Nebraska) that require the use of drop boxes are: Washington, Oregon, Colorado, Nebraska, New Jersey, Maryland, Kentucky, Georgia, and Virginia.

## Table 3: Use of Drop Boxes Across the United States

| Required | Allowed | Prohibited |
|---|---|---|
| Washington** | California | Alabama |
| Oregon** | Montana | Alaska |
| Colorado** | Utah | Arkansas |
| New Jersey | Arizona | Connecticut |
| Maryland | New Mexico | Delaware |
| Kentucky | Minnesota | Idaho |
| Georgia | Iowa | Kansas |
| Virginia | Illinois | Louisiana |
| **Florida** | Michigan | Maine |
| Nebraska* | Indiana | Mississippi |
| | Pennsylvania | Missouri |
| | Vermont | Nevada |
| | Massachusetts | New Hampshire |
| | Hawaii | New York |
| | | North Carolina |
| | | North Dakota |
| | | Ohio |
| | | Oklahoma |
| | | Rhode Island |
| | | South Carolina |
| | | South Dakota |
| | | Tennessee |
| | | Texas |
| | | District of Columbia |
| | | Wisconsin |
| | | Wyoming |
| | | West Virginia |

* Required only in counties with population of 10,000 or fewer.
** All elections are mail-only, with no in-person voting.

36.     A comparison with Virginia's law related to drop boxes is instructive here because both Florida's and Virginia's legislatures passed laws related to the administration of elections in 2021, including requiring the use of drop boxes. A June 8, 2021 article in the *New York Times* described Virginia as becoming a "voting rights bastion" as a result of its new law.[24] The new Virginia law requires drop boxes for the first time in the state's history. Drop boxes are required to be located at the general registrar's office and at satellite offices in operation for an election. The law requires drop boxes to be accessible, secured, and ballots to be collected daily.[25]

37.     While the Florida and Virginia provisions related to drop boxes are not mirror images of one another, they are largely similar, and given that both states have moved in the direction of expanding a voter's ability to deliver their ballots via drop boxes since 2019 (or 2021), both could arguably be described as progressive reforms.

38.     As Table 1 shows, fourteen states allow ballot drop boxes but do not require them, which means voters in those states do not have the same codified access to drop boxes as voters do in Florida. In fact, in many of these states drop boxes are used in jurisdictions at the discretion of elected officials or election administrators. Over half of all states and the District of Columbia (twenty-seven) prohibit the use of drop boxes. If the use of drop boxes is considered an expansion of voting rights, then Florida is among the minority of states (10 of 51, or about 20%) that guarantees access to drop boxes.

---

[24] "Virginia, The Old Confederacy's Heart, Becomes a Voting Rights Bastion", New York Times April 2, 2021 (updated June 8, 2021) at https://www.nytimes.com/2021/04/02/us/politics/virginia-voting-rights-northam.html
[25] Chpt. 522, Laws of Virginia (2021).

## VII. SB90's THIRD PARTY BALLOT COLLECTION RULES MAKE FLORIDA ONE AMONG THE VAST MAJORITY OF STATES THAT IMPOSE SOME REGULATION, BUT LESS RESTRICTIVE THAN OVER HALF OF STATES THAT HAVE RESTRICTIONS

39.     The rules around ballot collection vary from state-to-state, but generally are oriented around two areas: defining who can assist a voter by collecting and returning their ballot and defining how many voters a third party can assist. The baseline acceptable limits that may be placed upon the practice of ballot collecting was established by the United States Supreme Court's July 2021 decision in *Brnovich v. Democratic National Committee*, which upheld Arizona's law limiting the practice to only someone in a close relationship with the voter (family, caregiver, etc.) who is able to return the ballot.[26]

40.     By comparison, SB90s ballot collection provision allows <u>anyone</u> to return up to two completed absentee ballots in addition to their own.[27] The law also allows a person to collect and return any number of their immediate family member's ballots, and expands the definition of immediate family member to include a grandchild.[28]

41.     As Table 4 shows, Florida is among forty-one states and the District of Columbia that imposes some regulations or restrictions on ballot collection, and certainly does not rank among the most restrictive of this group. For instance, four states (Alabama, Oklahoma, Pennsylvania, and Tennessee) only allow voters themselves to return ballots.[29] Seventeen states emphasize the

---

[26] See https://www.supremecourt.gov/opinions/20pdf/19-1257diff_khlo.pdf.
[27] Chpt. 2021-11, Laws of Florida at 27 (2021).
[28] Id.
[29] Oklahoma does exempt spouses from any restrictions (26 Okl. Stat. Ann. § 14-108, 108.1).

## Table 4: Third-Party Ballot Collection Rules Across the United States

| Only voters may return ballots | Emphasis on voter with some exceptions for family, officials, or defined associate (limits) | Third parties may collect / return ballots (limits) | No restrictions specified / minimal restrictions |
|---|---|---|---|
| Alabama | Alaska | Arkansas (2) | Hawaii |
| Oklahoma[1] | Arizona | California | Idaho |
| Pennsylvania | Connecticut | Colorado (10) | Mississippi |
| Tennessee | District of Columbia | Delaware | New York |
| | Georgia (10) | **Florida (2)** | Rhode Island |
| | Indiana | Illinois | Utah |
| | Massachusetts | Iowa | Vermont |
| | Michigan | Kansas | Washington |
| | Missouri | Kentucky | Wisconsin |
| | Montana (6) | Louisiana (1) | Wyoming |
| | Nevada | Maine (5) | |
| | New Hampshire | Maryland | |
| | New Mexico | Minnesota (3) | |
| | North Carolina | Nebraska (2) | |
| | Ohio | New Jersey (3) | |
| | Texas | North Dakota | |
| | Virginia | Oregon | |
| | | South Carolina | |
| | | South Dakota | |
| | | West Virginia (2) | |

[1] Spouses may also return ballots

responsibility of the voter in returning their own ballot, but allow for limited ballot collection by close family (the definition of close family varies), government officials, or defined associates (such as caregivers or someone living in the same household as the voter).[30] In addition to family, Indiana also allows the voter's attorney to qualify.[31] Two states that impose familial or defined associate limits also impose a limit on the total number of ballots that any one individual

[30] Arizona, Georgia, Louisiana, Massachusetts, Michigan, Missouri, Nevada, New Hampshire, New Mexico, North Carolina, Ohio, and Texas.
[31] See Ind. Code 3-11-10-1.

may return. Georgia limits the total number of ballots any individual may return to ten, and Montana limits the number to six.

42.     Florida is among a group of twenty states that allow third parties to collect and return ballots, and impose varying conditions on those third parties. For instance, nine of those states impose limits on the number of ballots that can be collected ranging from one (Louisiana) to ten (Colorado).[32] The remaining eleven states of this group of twenty that allow third parties to collect and return ballots impose few if any limits on the number of ballots that can be collected but to varying degrees impose other minimal regulations and restrictions. Finally, ten states have no codified regulations or restrictions on who can collect and return absentee ballots other than the voters themselves.

43.     Florida under SB90 is among the vast majority of states that impose some regulations and restrictions on the number of ballots that an individual can collect and return. However, among those forty-one states that impose some regulation, Florida is less restrictive than over half. Florida's limit is two in addition to the voter's own, but there is no limit placed on the number of additional ballots that an individual can return from immediate family members. Additionally, SB90 expanded the definition of immediate family to include a grandchild.[33]

---

[32] Maine limits the number of absentee ballots that can be issued to a third party until at least one of these ballots (21-A M.R.S.A § 753-B). South Dakota requires the third party to notify election officials if they are acting as an agent for more than one voter (S.D. Codified Laws § 12-19-2.2).
[33] Chpt. 2021-11, Laws of Florida at 27 (2021).

## VIII. SB90's THIRD PARTY VOTER REGISTRATION RULES ARE GENERALLY CONSISTENT WITH THE VAST MAJORITY OF STATES THAT IMPOSE REQUIREMENTS ON THIRD PARTY VOTER REGISTRATION ORGANIZATIONS

44.     Rules governing third party registration efforts vary across the United States, but generally address issues such as compensation for volunteers participating in registration drives, deadlines for returning registration forms, registration organizations conducting drives, training for volunteers and organization, and whether or not a state has an official volunteer system in place.[34]

45.     Table 5 summarizes the third-party registration rules across the United States. Florida is among twelve states to require third party voter registration organizations to register with the state, although the individuals who are volunteering with the organization are not deputized as volunteer registrars by Florida as they are in some other states (such as Texas).

46.     The majority of states, including Florida, do not require training either for the organization or the individuals conducting voter registration drives. The most stringent state regarding training is Colorado, which requires voter registration drive organizers to complete training and take a test, and to also train all of their volunteers.[35] Illinois requires training for volunteers who want to become deputy registrars, while Delaware requires training for volunteers who wish to register voters using the Delaware state registration form but not the federal form.[36]

---

[34] See https://nationalvoterregistrationday.org for an overview of each state's rules.
[35] See https://www.sos.state.co.us/pubs/rule_making/CurrentRules/8CCR1505-1/Rule14.pdf.
[36] See https://nationalvoterregistrationday.org/toolkit-for-individuals/rules-for-voter-registration-drives/.

47.     While every state and the District of Columbia allows third party registration drives to pay volunteers, none allow payment to be tied to the number of registrations collected. The vast majority of states (36) have a return deadline for voter registration by third party registration drives other than the normal registration deadline, including Florida. These non-standardized return deadlines are triggered by the moment a voter registration is collected by a third party, ranging from "immediate" (Connecticut) to up to thirty-days (Louisiana and Hawaii). Florida's fourteen-day return deadline is longer than the average return deadline among states that have them, which is ten-days.

48.     At least seven states have a notice or disclaimer requirement or recommendation either codified or in the rules for how third-party organizations are allowed to conduct registration drives. Under SB90, Florida requires a third-party voter registration organization to inform the applicant that they may not deliver the application sooner than the 14-day return deadline (mentioned above), and to inform the applicant of their options to either return their application in-person sooner or to register online.[37] It is important to note, SB90 does not mandate a precise script but rather requires a basic set of factual information be provided. This approach is consistent with the practice of other states that have such rules, but is also less stringent than some. For example, Georgia requires third party organizations to display a poster at registration sites or hand voters a form with information about their rights and expectations regarding registering to vote, including that they can register in alternative ways.[38]

---

[37] Chpt. 2021-11, Law of Fla. At 8 (2021).
[38] See required handout at:
https://sos.ga.gov/admin/uploads/Required_Voter_Registration_Notices_Handout.pdf.

**Table 5: Third Party Voter Registration Rules Across the United States**

| | Yes | No | Notes |
|---|---|---|---|
| **Has official volunteer (deputy registrar) system** | 8 | 40* | * New Hampshire and Wyoming do not allow third party registration; North Dakota does not have voter registration requirements.<br>* Delaware requires registration for the Delaware application but not the federal application.<br>* Registration is required in Florida, but volunteers are not deputized registrars.<br>* Registration for deputized registrars is available but not required in Illinois. |
| **Requires training** | 9 | 39* | * New Hampshire and Wyoming do not allow third party registration; North Dakota does not have voter registration requirements.<br>* Delaware requires training for the Delaware application but not the federal application.<br>* Illinois requires training for volunteers who wish to be deputized registrars.<br>* Colorado requires volunteers to be trained and pass a test. |
| **Organizational registration or reporting required** | 12* | 36 | * New Hampshire and Wyoming do not allow third party registration; North Dakota does not have voter registration requirements.<br>* Kansas requires reporting for groups requesting more than 25 registration forms.<br>* Missouri requires registration for paid registration solicitors. |
| **Return deadline other than normal registration deadline** | 36* | 12 | * New Hampshire and Wyoming do not allow third party registration; North Dakota does not have voter registration requirements.<br>* Average return deadline for states that have one is 10-days.<br>* Connecticut's return deadline is "immediately" upon completion of application. |
| **Pay allowed** | 48* | 0 | * New Hampshire and Wyoming do not allow third party registration; North Dakota does not have voter registration requirements.<br>* Delaware allows for paid registration solicitors of the federal application but not for the Delaware application.<br>* No state allows payment based upon the number of applications collected. |
| **States with some notice/disclaimer rules** | | | Alabama, Arkansas, California, Colorado, Georgia, Florida, Iowa, Virginia |

* Denotes which group Florida is in for each topic.
Note: Wisconsin third-party registration rules require registrants to provide a proof-of-residence document to the volunteer registering them. This requirement makes any third-party registrations efforts nearly impossible as few people carry photo copies of required documents.

49.     In its *2021 Guidelines for Conducting Voter Registration Drives*, the Virginia

Department of Elections tells third party organizations and representatives under the section

titled 'Rules of the Road: Best Practices Overview': "When approaching individuals, introduce

yourself and the organization you represent, explain your purpose, the qualifications to vote in

Virginia, and whether or not you will deliver the completed application for the applicant. You

should inform voters that Virginia has online voter registration and address update available on

the ELECT website for those with a Virginia driver's license or DMV ID card. This information

will be helpful to an applicant who wishes to ensure their application is delivered in real time

directly to their local voter registration office."[39]

50.     The state of California guidelines requires third party organizations and individuals to

acknowledge they understand the rules, among them that if they mail a voter registration card to

someone unsolicited that they must also include a letter telling the recipient that they can

disregard the card.[40]

51.     Under the 'Frequent Questions' section of its *Voter Drive Guide*, Alabama provides the

following information is for applicants: "Just because the citizen turned in a voter registration

application does not necessarily mean he/she is registered to vote. Once the application has been

processed by the citizen's local Board of Registrars, he/she should receive an acknowledgement

from the Registrars indicating the status of his/her application. This acknowledgement will

usually be a voter information card confirming that he/she is registered to vote. However, if the

---

[39] https://www.elections.virginia.gov/media/formswarehouse/veris-voter-
registration/voterregistrationdrives/2021-Guidelines-for-Voter-Registration-Drives-[Final]-(1).pdf.
[40] https://elections.cdn.sos.ca.gov/guides/guide-to-vr-drives.pdf.

application was incomplete, the citizen may receive a letter requesting additional information to complete his/her application. If the citizen is unsure about the status of his/her application, the citizen should call his/her local Board of Registrars or visit alabamavotes.gov."[41]

52.     In its guide *Conducting a Voter Registration Drive*, Arkansas recommends third party organizations should "Thank individuals for applying and advise them that they are not fully registered until their applications are processed by the county clerk. Applicants should call the county clerk's office if they have not received certification of registration in two weeks (same info on back of voter application)."[42]

53.     Iowa requires individuals and groups collecting absentee ballot request forms to use an official (proscribed by the Secretary of State) absentee ballot request form with receipt. The receipt portion of the form must be given to the applicant upon completion of the form, and it contains a notice to the applicant about the potential partisan activities of the organizer and what the requirements are for turning in their application.[43]

54.     In sum, Florida's rules under SB90 regarding third party registration are generally consistent with the vast majority of states that impose requirements on third party voter registration organizations. Florida's deadlines, penalties, and other requirements related to pay are the norm. Florida's fourteen-day deadline for returning completed registration forms is

---

[41] https://www.sos.alabama.gov/sites/default/files/voter-pdfs/VoterDriveGuidelines.pdf.
[42] https://www.sos.arkansas.gov/uploads/elections/voter_drive.pdf.
[43] https://sos.iowa.gov/elections/pdf/absenteeballotapprec.pdf.

longer than the average, and Florida's notice and disclaimer requirements are not unique among states that require them and certainly not as proscriptive as several of them.

## IX. SB90's REQUIRMENTS REGARDING ABSENTEE BALLOT APPLICATION VERIFICATION PLACES NO MORE THAN AN AVERAGE BURDEN ON VOTERS

55.     The absentee ballot application verification rules vary from state-to-state, ranging from no verification because the state does not require it to states that require voters to qualify to vote absentee and further provide copies of photo identification and/or notarization to accompany the application.

56.     As Table 6 shows, Florida is one among twenty-six states that check a voters information against voter registration records to determine eligibility to vote absentee. Nine states either have no requirements because they conduct all-mail elections or minimal verification requirements. Seventeen states require voters to qualify to vote absentee with an acceptable excuse.

57.     Of the twenty-six states that check a voter's information against voter registration records, eleven require voters to sign the application and then verify the signature against the signature on the registration record. The other fifteen states, including Florida, predominantly rely on other information in the application to verify eligibility, including driver's license numbers or other identification numbers.

58.     Two of the twenty-five states that check voter information against registration records require applicants to include a copy of a photo identification (South Dakota and Wisconsin). Four of the twenty-five states, including Florida, require applicants to include on their applications either their state driver's license number, state-issued identification number, or last four of their social security number (Minnesota, Georgia, and Montana in addition to Florida).

**Table 6: Absentee Ballot Application Verification Rules Across the United States**

| | |
|---|---|
| **No absentee ballot application required (all-mail elections)** | Colorado, Hawaii, Oregon, Utah, Washington |
| **Minimal verification** | Alaska, District of Columbia, North Dakota, Vermont |
| **Information and eligibility checked against voter registration records** | **Florida**\*, Kansas, Maine, Maryland, Minnesota, Nebraska, Nevada, New Mexico, North Carolina, Ohio, Oklahoma, South Dakota\*\*, Virginia, Wisconsin\*\*, Wyoming |
| **Signature verification in addition to checking information and eligibility against voter registration card** | Arizona, California, Georgia, Idaho, Iowa, Illinois, Michigan, Montana, New Jersey, Pennsylvania, Rhode Island |
| **Voters must 'qualify' to vote absentee with an acceptable excuse** | Alabama\*\*, Arkansas, Connecticut, Delaware, Indiana\*, Kentucky, Louisiana, Massachusetts, Mississippi, Missouri, New Hampshire, New York, South Carolina\*, Tennessee, Texas, West Virginia |

\*   Requires voter to provide driver's license number, state issued ID number, or last four of social security number.
\*\* Requires copy of photo identification and/or notarization accompany application.

59.     Of the sixteen states that require voters to qualify to vote absentee, Indiana also requires the applicant to include either their driver's license number, state-issued identification number, or last four of their social security number. Alabama requires applicants to include a copy of photo identification and a signature of a notary or witness.

60.     In terms of burden, Florida's requirements are largely average. The burden to qualify to vote absentee (as is the case in sixteen states) is certainly greater than Florida's no excuse requirement. The burden of having to provide a witness signature (as is the case in two states) is certainly greater than Florida's requirement that does not include a witness signature. The burden of requiring a copy of a photo identification (as is the case in four states) is certainly greater than Florida's requirement that does not include submitting a copy of a photo identification. In fact, Florida stands in a group of states that simply require that information and eligibility be checked against voter registration records. Only four states (other than the states that conduct all or mostly all-mail elections) have verification checks that are less strenuous.

## X. SB90's NO-EXCUSE ABSENTEE VOTING RULE MAKES FLORIDA THE MOST LENIENT STATE AMONG THOSE WHO REGULATE ABSENTEE VOTING

61.     Rules related to how often voters must request an absentee ballot vary across the country ranging from no-excuse permanent absentee voting to voters being required to qualify and request an absentee ballot each election. Florida has no-excuse absentee voting, and its rule under SB90 that voters have to request an absentee ballot only once for all elections through the end of the calendar year of the next regularly scheduled general election makes it the most lenient among the thirty-eight states that impose some restrictions on who can request an absentee ballot and for how long.[44]

62.     As Table 7 shows, thirteen states and the District of Columbia have some form of no-excuse permanent absentee voting, which means voters have to request an absentee ballot only once or all voters are automatically mailed a ballot each election.[45] Four states have no-excuse time-limited absentee voting, with Florida's time-limit being the longest of those. In addition to its 1-year time-limit, Alaska allows voters who are deemed to live in remote areas where they do not have reasonable access to a polling location to be placed on a permanent absentee voter list. Eleven states allow citizens with permanent disabilities or seniors above a certain age to be placed on permanent absentee voting lists, and four other states have time-limited absentee voting lists for citizens who are permanently disabled, sick, absent from the state for a certain period of time that includes the election, or seniors above certain ages.

---

[44] Chpt. 2021-11, Laws of Fla. at 18-21 (2021).
[45] An up-to-date summary of every state's rules can be found at:
https://tracker.votingrightslab.org/issues/21AbsenteeVtg#Q.

Finally, nineteen states have rules that require voters to request an absentee ballot for each election in which they wish to vote absentee. In several of these states, voters also have to qualify to vote absentee with an acceptable excuse. In five of these states (Massachusetts, Michigan, Minnesota, Missouri, and Pennsylvania) voters can be placed on a permanent list to receive the application to vote absentee, but not the ballot itself.

## Table 7: Absentee Ballot Requesting Rules Across the United States

| | |
|---|---|
| **No excuse permanent absentee voting or all-mail elections** | Arizona, California, Colorado, District of Columbia, Hawaii, Illinois (2022), Maryland, Montana, New Jersey, Nevada, Oregon, Utah, Washington |
| **No excuse time-limited absentee voting** | Alaska (1-year)**, **Florida** (up to nearly 2-years), South Dakota (1-year), Virginia (1-year) |
| **Permanent absentee voting for disability / seniors only** | Alabama, Connecticut, Delaware, Kansas, Louisiana, Mississippi, New York, Rhode Island, Tennessee, West Virginia, Wisconsin |
| **Time-limited absentee voting for disability / seniors only** | Georgia (election cycle - disabled or elderly), North Carolina (1-year - sick or disabled), Oklahoma (1-year - absent or disabled), Texas (1-year, elderly or disabled) |
| **No provision / must request each election** | Arkansas, Idaho, Indiana, Iowa, Kentucky, Maine, Massachusetts*, Michigan*, Minnesota*, Missouri*, Nebraska, New Hampshire, New Mexico, North Dakota, Ohio, Pennsylvania*, South Carolina, Vermont, Wyoming, |

\*   Voters can be placed on a permanent list to receive the application for an absentee ballot, but not the ballot itself.
\*\* Alaska allows voters who are deemed to live in remote areas where they do not have reasonable access to a polling place to be placed on a permanent absentee voter list.

63.     The no-excuse absentee voting rule under SB90 makes Florida the most lenient state among the thirty-eight states that regulate absentee voting in some way short of no-excuse permanent absentee or all-mail voting.

## XI. SB90's ELECTIONEERING PROVISIONS MIRROR THE VAST MAJORITY OF STATE RULES THAT PROHIBIT ELECTIONEERING THAT IS AIMED AT INFLUENCING VOTERS WITHIN A DEFINED SPACE AROUND A POLLING LOCATION

64.     Every state regulates political activities around the physical location of polling places while voters are casting ballots, otherwise known as electioneering. These rules generally regulate what activities are or are not allowed within a certain space or zone around the polling location. Florida's regulations defined in SB90 are consistent with the vast majority of state's rules.

65.     As Table 8 shows, the electioneering-free zones mandated by the various states range from within the physical space of the building in which voting is taking place to as wide as 300 yards (the equivalent of two football fields) away from the building. Florida's zone of 150 feet places it among the majority of states (twenty-seven) that impose electioneering-free zones of between 100-150 feet.

66.     Prior to the enactment of SB90, Florida prohibited among other things seeking votes, and/or contributions, distributing political or campaign materials, conducting polls, seeking signatures on petitions, or attempting to sell anything.[46] Restrictions of these sorts, while they may vary in their specificity and detail, are almost universal across states. Florida added to these prohibitions in SB90 "and engaging in any activity with the intent to influence or effect of influencing a voter."[47]

---

[46] Chpt. 2021-11, Laws of Florida at 24-25 (2021).
[47] Id., at 25.

**Table 8: Electioneering Rules Across the United States**

| | |
|---|---|
| **Prohibited within building** | New Hampshire, Vermont, Washington |
| **Prohibited between 10-75 feet of building** | Alabama, Arizona, Connecticut, Delaware, Indiana, Missouri, North Carolina, Pennsylvania, Rhode Island, Virginia, Washington, D.C. |
| **Prohibited between 100-150 feet of building** | Arkansas, California, Colorado, **Florida**, Georgia, Idaho, Illinois, Kentucky, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Montana, Nevada, New Jersey, New Mexico, New York, North Dakota, Ohio, Oregon, South Dakota, Tennessee, Texas, Utah, West Virginia, Wisconsin |
| **Prohibited between 200-250 feet of building** | Alaska, Hawaii, Kansas, Maine, Nebraska, South Carolina |
| **Prohibited 300 feet or greater from building** | Iowa, Louisiana (300 yards), Oklahoma, Wyoming |

67.     This broader language is also not uncommon, and is included in almost every state's rules governing electioneering. For instance:

- Wisconsin's law says in part: "'Electioneering' is defined as any activity which is intended to influence voting at an election."[48]

- Arizona's law says in part: "'Electioneering' occurs when a person knowingly, intentionally, and verbally expresses support for, or opposition to, a candidate or

---

[48] Wis. Stat. § 12.03 (2013)

ballot measure on the ballot in that election, or a political party with one or more candidates who appear on the ballot in that election, in order to induce or compel another person to vote in a particular manner or to refrain from voting."[49]

- Maine's law says in part: "On public property within **250 feet** of the entrance to the voting place as well as within the voting place itself, a person may not influence another person's decision regarding a candidate or question that is on the ballot for the election that day; or attempt to influence another person's decision regarding a candidate or question that is on the ballot for the election that day."[50]

- Massachusetts' law says in part: "no person shall solicit votes for or against, or otherwise promote or oppose, any person or political party or position on a ballot question, to be voted on at the current election. No campaign material intended to influence the vote of a voter in the ongoing election, including campaign literature, buttons, signs, and ballot stickers, may be posted, exhibited, circulated, or distributed in the polling place, in the building where it is located, on the building walls, on the premises where the building stands, or within 150 feet of an entrance door to the building."[51]

- Michigan's law says in part: "A person shall not persuade or endeavor to persuade a person to vote for or against any particular candidate or party ticket or for or against any ballot question that is being voted on at the election."[52]

---

[49] Ariz. Rev. Stat. § 16-515 (2021).
[50] Me. Stat. tit. 21-A, §682 (2019).
[51] Mass. Gen. Laws ch. 54, § 65 (2021).
[52] Mich. Comp. Laws §§ 168.744, 168.744a (2021).

- Montana's law says, in part: "A person may not aid or promote the success or defeat of any candidate or ballot issue to be voted upon at the election."[53]

68.     In sum, Florida's electioneering provisions in SB90 mirror the vast majority of state rules that prohibit electioneering that is attempting to influence voters within a certain space or zone around the polling location.

---

[53] Mont. Code Ann. § 13-35-211 (2021).

## XII. CONCLUSION

69.     The simple conclusion of this analysis is the following: early voting and absentee voting in Florida has become easier and more convenient over time. Additionally, the rules in SB90 governing drop boxes, third-party ballot collection, third-party voter registration, absentee ballot application verification, frequency of requesting an absentee ballot, and voter solicitation at the polling location when compared with the other states' and the District of Columbia's rules show in none of the six areas is Florida outside of the norm. In several of the areas Florida's rules and regulations place the state among the more accessible from a comparative perspective when it comes to voting and access to voting resources.

70.     Specially, to reiterate the findings of this analysis:

- The net impact of changes in **early voting** and **vote by mail** rules in Florida since the 1980s has been to make voting easier. Florida law has changed over time from restrictions related to needing an excuse to vote early and needing a notary or witness to no excuse and no witness requirements. Early voting has gone from non-existent to up to two-weeks since it was first instituted in 1998.

- Florida stands among a small group of states that require **drop boxes** to be widely available to voters.

- When it comes **third-party ballot collection**, Florida stands among the vast majority of states that impose some regulations and restrictions on the number of ballots that an individual can collect and return, but is less restrictive than over half.

- Florida's **third-party voter registration** rules are generally consistent with the vast majority of states that impose requirements on third party voter registration organizations.

- Florida's **absentee ballot application verification** requirements are largely average.

- Florida's two-year no-excuse absentee voting rule related to the **frequency of requesting an absentee ballot** makes it the most lenient state among the thirty-eight states that regulate absentee voting in some way short of no-excuse permanent absentee or all-mail voting.

- Florida's **electioneering (voter solicitation)** regulations and restrictions mirror the vast majority of state rules across the country in prohibiting electioneering that is attempting to influence voters with a certain space or zone around the polling location.

I reserve the right to supplement this report in light of additional facts, testimony, and/or materials that may come to my attention.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.


Executed this 29th day of September, 2021.


_____

Quentin Kidd, Ph.D.

# QUENTIN KIDD
## CURRICULUM VITAE

### CURRENT:

Dean of the College of Social Sciences and Founding Director of the Judy Ford Wason Center for Public Policy at Christopher Newport University.

### FORMAL EDUCATION:

Ph.D.       Political Science, Texas Tech University, 1998.
M.A.        Political Science, University of Arkansas, 1993.
B.A.        Political Science, University of Arkansas, 1991.

### CONTINUING EDUCATION:

Management & Leadership in Education, Harvard University, 2018.
Council of Colleges of Arts and Sciences New Deans Workshop, 2016.

### ACADEMIC APPOINTMENTS:

Professor of Political Science, Christopher Newport University, 2012-present
Associate Professor of Political Science, Christopher Newport University, 2003-2012
Assistant Professor of Political Science, Christopher Newport University, 1997-2003

### ADMINISTRATIVE MANAGEMENT AND LEADERSHIP:
Dean of College of Social Sciences, 2017-present

Leadership Responsibilities: Responsible for the overall organization, administration, personnel management, fiscal management and coordination of academic programs and instructional activities of the College, comprising half of all graduates, nearly 80 full-time faculty, around 35 part-time faculty, 9 staff, and a budget of approximately $8.5 million.

Accomplishments:

- Fundraising: Negotiated and secured $1,000,000 matching endowed gift ($2,000,000 total) to support scholarships for students in the College.
- Strategic Planning: Oversaw the first strategic plan in the College's history.
- Fundraising: Played a central role in the fundraising and establishment of an endowed professorship ($500,000+) in Jewish studies.
- Research: Initiated the first of what is planned to be an annual national survey on leadership values and attitudes. The study is designed to be a highlight study for the Department of Leadership and American Studies (annual budget of $35,000).
- Fundraising for Research: Raised initial $50,000 research startup funds from private industry to established the Center for Education Policy and Research within the College.
- Administrative Work: Successfully completed the first outside chair search in the history of the College in the Department of Economics.
- Faculty Life: Initiated a junior faculty (pre-tenure) research incubator as a format to encourage and support junior faculty research.

- Faculty Life: Began a series of faculty socials (three per semester) as a way to bring faculty together in a social and non-working setting.
- Research: Initiated discussion with faculty in Sociology, Psychology, Communication, and Political Science about establishing an interdisciplinary research program in health-related fields.
- Curricular: Initiated a discussion with department chairs on the "just right major", and whether our curriculum in the social sciences includes enough courses that teach analytics skills (such as programming or data analytics) that students will need on the job market.
- Facilities: Initiated the redesign and construction of facilities in the College to allow for better utilization of space.

Vice Provost for Undergraduate Education, 2014-2017

Leadership Responsibilities: As senior vice provost, served as a member of the senior academic leadership team responsible for working collaboratively with other senior administrators and faculty on strategic academic planning and implementation of the University's academic vision and mission.

Accomplishments:
- Worked closely with University provost to develop the academic affairs budget (just above $50 million)
- Conducted provost-level interviews of candidates for faculty positions and negotiated offers when Provost was unavailable.
- Provided management and oversight of annual evaluation calendar and process for all 285 University faculty.
- Provided management and oversight of faculty tenure and review process.
- Served as administrative coordinator for the various faculty curriculum review and oversight committees.
- Collaborated with other University leadership on compliance with Commission on Colleges of the Southern Association of Colleges and Schools (SACCOC) requirements.
- Worked with Faculty Senate on University initiatives and University Handbook changes.
- Responsible for policy and administrative oversight of the following units: Honors Program, Center for Community Engagement, Center for Effective Teaching, and Study Abroad and International Programs.
    - Oversaw implementation of new Christopher Newport study center at the University of Glasgow and exchange program with Beijing Normal University.
    - Negotiated exchange programs between Christopher Newport and Tsinghua University and Shanghai University of Political Science and Law in China, and Kozminski University in Poland.
    - Oversaw expansion of Study Abroad office staff and doubling of number of students studying abroad from approximately 200 to 400 per year.
- Served as Christopher Newport's liaison to State Council of Higher Education for Virginia (SCHEV) Provost-level Academic Affairs and Planning committee.
- Served as University Ombudsman.
- Served on Christopher Newport's SACSCOC reaccreditation leadership team.

- Participated in fundraising activities in support of University's comprehensive campaign "Defining Significance" (raised $67 million).

<u>Chair, Department of Government and Public Affairs, 2008-2014</u>

Leadership Responsibilities: Responsible for the overall organization, administration, fiscal management and coordination of academic programs and instructional activities of the department of 400 majors, 13 full-time, 10 part-time faculty, 1 staff and a budget of just over $50,000.

Accomplishments:
- Hired 7 new faculty (5 tenure track and 2 lecturers) in the Department, including dramatically broadening the diversity profile of faculty.
- Evaluated faculty for pre-tenure, tenure, post-tenure, and promotion review.
- Conducted annual reviews of all full-time faculty for merit purposes.
- Regularly evaluated teaching performance of part-time and adjunct faculty.
- Led Department through major curriculum evaluation and program redesign.
- Initiated Departmental and academic major program evaluation.
- Developed schedule of classes and dynamically adjusted schedule during enrollment to eliminate student-scheduling problems.

<u>Founding Director, Judy Ford Wason Center for Public Policy, 2007-Present</u>

Leadership Responsibilities: Initiated the original concept of and fundraising for the establishment of the Wason Center for Public Policy. To date have raised ≈$2.2 million in private donations, including ≈$600,000 in endowments, to support the Wason Center.

Accomplishments:
- Grew the Wason Center from a one-person operation to a 3-staff and 100-student operation.
- Opened a 24-station fully-operational survey research laboratory on campus.
- Awarded ≈$400,000 in grants and contracts to conduct research on public policy topics ranging from quality of life and transportation to fish and wildlife surveys.

## FUNDRAISING AND GRANTS:
- Actively participated in many aspects of advancement as part of Christopher Newport's first comprehensive campaign, *Defining Significance* (total of $67 million raised), including initiating the fundraising for an endowed Professorship in Jewish Studies ($500,000+) and participated in direct fundraising for gifts and endowed scholarships for study abroad and other programs and scholarships.
- Secured a $1,000,000 matching endowed gift ($2,000,000 total) to support scholarships in the College of Social Sciences.
- Participated in the fundraising discussions that resulted in the lead gift to establish the Reiff Center for the Study of Human Rights and Conflict Resolution (to date Center endowed at ≈$1 million).

- Lead the fundraising ($50,000) to establish the Center for Education Research and Policy in the College of Social Sciences.
- Lead all fundraising, and grant and contract awards, related to the Wason Center for Public Policy (to date ≈$2.6 million).

## AREAS OF RESEARCH INTEREST:

Civic Participation, Political Behavior, and Political Change.

## PUBLICATIONS:

Books (5):

2012 *The Rational Southerner: Black Mobilization, Republican Growth and the Partisan Transformation of the American South*. Oxford University Press. (co-authored with MV Hood III and Irwin L. Morris).

- Nominated for the **V.O. Key Award** for outstanding book on Southern Politics, the **Ralph Bunch Award** for best scholarly work exploring the phenomenon of ethnic and cultural pluralism, and the **Leon D. Epstein Award** for research on political organizations and parties.
- Soft cover edition 2014

2012 *A Simple Guide to SPSS® for Political Science*. Belmont, CA: Wadsworth (textbook co-authored with Lee Kirkpatrick)

2011 *Civic Participation in America*. New York: Palgrave Macmillan
- Soft cover edition 2013

2000 *American Government: Readings from Across Society*. New York: Longman. (Editor)

1999 *Government and Politics in Virginia: The Old Dominion at the 21st Century.* Needham Heights, MA: Simon & Schuster. (Editor)

Refereed Journal Articles and Book Chapters (22):
    Double-blind Reviewed Articles on Politics (12):

2020 "Switching Sides but Still Fighting the Civil War in Southern Politics," in *Politics, Groups, and Identities* (Summer 2020 publication), (Christopher A. Cooper, M.V. Hood III, Scott Huffmon, H. Gibbs Knotts, and Seth C. McKee, co-authors).

2019 "Ready for Hillary: Sexism in the Evaluations of the 2016 Presidential Candidates," in *The Forum* 17(2): 295-313, (Rachel Bitecofer and Michelle Barnello, co-authors).

2015 "Tea Leaves and Southern Politics: Explaining Tea Party Support Among Southern Republicans" in *Social Science Quarterly* 96: 96-112, (M.V. Hood III and Irwin L. Morris, co-authors).

2015 "Race and the Tea Party in the Old Dominion: Split-Ticket Voting in the 2013 Virginia Elections" in *PS: Political Science and Politics* 48: 107-114, (M.V. Hood III and Irwin L. Morris, co-authors).

2008 "Two Sides of the Same Coin? Employing Granger Causality Tests in a Time Series Cross-Section Framework" in *Political Analysis* 16:324-344, (M.V. Hood III and Irwin L. Morris, co-authors).

2008 "The Real (lack of) Difference Between Republicans and Democrats: A Computer Word Score Analysis of Party Platforms, 1996-2004" in *PS: Political Science and Politics* 41:519-525.

2007 "Black Voters, Black Candidates, and Social Issues: Does Party Identification Matter?"

      *Social Science Quarterly*, 88: 165-176, (Herman Diggs, Mehreen Farooq, and Megan Murray, three student co-authors).

2003 "A Report on the Reintroduction of the Elephas maximus in the Southern United States: Explaining the Rise of Republican State Parties, 1960-2000." *American Politics Research* 31: 1-34, (M.V. Hood III and Irwin L. Morris, co-authors).

2001 "The Key Issue: Constituency Effects and Senatorial Roll Call Voting on Civil Rights." *Legislative Studies Quarterly* 26: 599-621, (M.V. Hood III and Irwin L. Morris, co-authors).

1999 "Of Byrd[s] and Bumpers: Using Democratic Senators to Analyze Political Change in the South, 1960-1995." *American Journal of Political Science* 43: 465-487, (M.V. Hood III and Irwin L. Morris, co-authors).

1997 "More on Postmaterial Values and the Environment." *Social Science Quarterly* 78: 36-43, (Aie-Rie Lee, co-author).

1997 "Postmaterial Values and the Environment: A Critique and Reappraisal." *Social Science Quarterly* 78: 1-15 (Aie-Rie Lee, co-author).

      <u>Double-blind Reviewed Articles on the Discipline and the Scholarship of Teaching (3):</u>

2006 "Civic and Political Leadership Education." *Academic Exchange Quarterly*, 10: 77-81, (R. Marc Johnson, Sean O'Brien, and Thomas Shields, co-authors).

1999 "Texas Graduate Programs in Political Science: A Research Note." *Texas Journal of Political Studies* 21: 65-71, (Nelson C. Dometrius, M.V. Hood III, and Kurt A. Shirkey, co-authors).

1998 "Bugs in the NRC's Doctoral Program Evaluation Data: From Mites to Hissing Cockroaches." *PS: Political Science & Politics* 31:829-835, (Nelson C. Dometrius, M.V. Hood III, and Kurt A Shirkey, co-authors).

      <u>Peer Reviewed Book Chapters (7):</u>

2012 "Partisan Change in the American South: From Radical Fringe to Conservative Mainstream." In *Oxford Handbook of Southern Politics*, Charles S. Bullock, III and Mark J. Rozell, editors. New York: Oxford University Press. (M.V. Hood III and Irwin Morris, co-authors).

2011 "The Rintroduction of Elephas Maximus to the Southern United States: The Rise of Republican State Parties (Updated)." In *Controversies in Voting Behavior, 5th ed.* Richard Niemi, Herbert Weisberg and David Kimball, eds. Washington, DC: Congressional Quarterly. (M.V. Hood III and Irwin Morris, co-authors).

*2004   How It Happened! The 2004 Race for the White House as Reported by The New York Times*. New York: Longman. (A supplement with commentary bound in all 2004 editions of Longman's *American Government: Continuity and Change*.)

1999 "Virginia's Governor: Curator of the Political Museum Piece." In Quentin Kidd, ed., *Government  and Politics in Virginia: The Old Dominion at the 21st Century.* Needham Heights, MA: Simon & Schuster (Laura Van Assendelft, co-author).

1999 "The General Assembly: Coping with Change and Tradition." In Quentin Kidd, ed. *Government and Politics in Virginia: The Old Dominion at the 21st Century.* Needham Heights, MA: Simon & Schuster (Connie Jorgensen, co-author).

1997 "Environmental Policy in Texas: Opportunities and Challenges for the 21st Century." In Mark Somma, ed., *Texas Policy and Politics*. Needham Heights, MA: Simon & Schuster

(Evan J. Ringquist, co-author).

1997 "Black Gold and Texas Tea: The Energy Industry in Texas." In Mark Somma, Ed., *Texas Policy and Politics*. Needham Heights, MA: Simon & Schuster (Evan J. Ringquist, co-author).

Research Reports (14)                                                      * Grant Funded

2019, "Feasibility Study of Retirement Savings Programs for Virginia." Wason Center for Public Policy, Christopher Newport University, Newport News, Virginia.*

2018, "Understanding Hampton Roads: A Snapshot of What We Care About." Wason Center for Public Policy, Christopher Newport University, Newport News, Virginia.*

2017, "Public Opinion & Environmental Policy in the Commonwealth." Wason Center for Public Policy, Christopher Newport University, Newport News, Virginia, with Rachel Bitecofer & Katelyn Hoisington.*

2016, "The Cost of Retiring in Virginia." Wason Center for Public Policy, Christopher Newport University, Newport News, Virginia, with Jia Yu.*

2015, "Virginia Millennials Come of Age." Wason Center for Public Policy, Christopher Newport University, Newport News, Virginia, with Tom Kramer & Sarah Miller.

2015, "Commonwealth of Contrasts: A Political Typology of the Virginia Electorate." Wason Center for Public Policy, Christopher Newport University, Newport News, Virginia, with Tom Kramer and Sarah Miller.

2014, "Envision Hampton Roads." Wason Center for Public Policy, Christopher Newport University, Newport News, Virginia, with Chris Bonney.*

2014, "Results of the 2013-2014 Virginia Hunter Survey." Wason Center for Public Policy, Christopher Newport University, Newport News, Virginia.*

2014, "Results of the 2013-2014 Virginia Trapper Harvest Survey." Wason Center for Public Policy, Christopher Newport University, Newport News, Virginia.*

2014, "Results of the 2013-2014 Virginia Waterfowl Hunter Survey." Wason Center for Public Policy, Christopher Newport University, Newport News, Virginia.*

2014, "South Hampton Roads Midtown and Downtown Tunnels Tolls Survey." Wason Center for Public Policy, Christopher Newport University, Newport News, Virginia.*

2013, "Offshore Wind Energy: Regulations and Market Distortions in the EU and US." Christopher Newport University, Newport News Virginia, with Thomas Hall.*

2013, "A Report on the Views of Newport News Residents of the Virginia Living Museum and the City's Arts and Cultural Attractions." Wason Center for Public Policy, Christopher Newport University, Newport News, Virginia.*

2010, "The Present and Future of Transportation in Hampton Roads." Wason Center for Public Policy, Christopher Newport University, Newport News, Virginia.*

Invited, Commissioned, and other Non-refereed Essays and Chapters (14):

2017, "How to win elections under Trump? Democrats may have figured it out." November 10. *The Washington Post*, B1, with Rachel Bitecofer.

2016, "Students Are Inconsistent Voters for a Reason." *New York Times*. March 22, 2016. http://www.nytimes.com/roomfordebate/2016/03/22/do-college-students-votes-really-matter-in-an-election.

2015, "Afterword." In *Mark Warner the Dealmaker: From Business Success to the Business of Governing*, Will Payne, Mt. Pleasant, SC: The History Press.

2014, "Virginia's Ethics Rules for Public Officials: The Need for Reform" *The Virginia News Letter* Vol. 90 (1), with Meyrem Baer.

2014, "Bob and Maureen McDonnell: Middle Class in the Governor's Mansion." January 23. *The Washington Post*, B1.

2012, "Accessible Redistricting," *Virginia Issues & Answers* 17 (Winter): 10-11.

2010, "Civic Engagement: A Topic as Old as Jefferson and as New as Today," *Choice* 47(May).

2008, "The Purpling of Virginia." *Richmond Times-Dispatch*, E-1

2007, "Mitt Romney." *San Diego Union-Tribune*, G1.

2007 "Love Lost? Byrd-era Values and Suburban Virginia Voters." *New Dominion* 1(3): 67-71.

2004 "The Virginia GOP's Responsibility Gap." April 4. *The Washington Post*, B1.

2003 "What We Don't Hear May Be Bad For Our Democracy." October 12. Newport News *Daily Press*, K1.

2003 "The Failed Transportation Tax: A Simple Message From Voters?" *The Virginia News Letter* Vol. 79 (1).

1996 "Verification/Replication: A Graduate Student's Perspective." *PS: Political Science & Politics* 29(3):415.


Encyclopedic Entrees (8):

1996 "The Cold War" in George Kurian, ed., *Encyclopedia of the Democratic Party*. Armonk, NY: M.E. Sharpe, Inc.

1996 "Carl B. Albert" in George Kurian, ed., *Encyclopedia of the Democratic Party*. Armonk, NY: M.E. Sharpe, Inc.

1996 "Thomas S. Foley" in George Kurian, ed., *Encyclopedia of the Democratic Party*. Armonk, NY: M.E. Sharpe, Inc.

1996 "Franklin Pierce" in George Kurian, ed., *Encyclopedia of the Democratic Party*. Armonk, NY: M.E. Sharpe, Inc.

1996 "Henry T. Rainey" in George Kurian, ed., *Encyclopedia of the Democratic Party*. Armonk, NY: M.E. Sharpe, Inc.

1996 "The Cold War" in George Kurian, ed., *Encyclopedia of the Republican Party*. Armonk, NY: M.E. Sharpe, Inc.

1996 "Frederick H. Gillett" in George Kurian, ed., *Encyclopedia of the Republican Party*. Armonk, NY: M.E. Sharpe, Inc.

1996 "Thomas B. Reed" in George Kurian, ed., *Encyclopedia of the Republican Party*. Armonk, NY: M.E. Sharpe, Inc.


Other Non-refereed publications (1):

2001 *LongmanParticipate.com* – content author for Simulation and Comparative sections.


Book Reviews (19):

2007 *Devolution and Black State Legislators,* by Tyson King-Meadows and Thomas F. Schaller. *Perspectives on Politics 5(4): 829-830.*

2007 *A New Kind of Engagement?,* by Cliff Zukin, et al. *Choice* 45 (March).

2007 *Common Ground: Committee Politics in the U.S. House of Representatives,* by John Baughman. *Choice* 45 (March).

2006 *Politics in the New South,* edited by Charles E. Menified and Stephen D. Shaffer. *Choice* 44 (March).

*2005 Senate Procedures and Practices,* by Martin B. Gold. *Choice* 43 (June).

*2005 Counting Votes: Lessons From the 2000 Presidential Election in Florida,* edited by Robert P. Watson. Choice 42 (January).

*2003 Congress and Defense Spending: The Distributive Politics of Military Procurement*, by Barry S. Rundquist and Thomas M. Carsey. Choice 41 (September).

*2002 Change and Continuity in the 2000 Elections*, by Paul R. Abramson, John H. Aldrich, and David W. Rohde. Choice 40 (September).

*2002 Government and Politics in Tennessee*, by William Lyons, John m. Scheb, and Billy Stair. Choice 39 (June), 2002.

*2001 Partisan Linkages in Southern Politics: Elites, Voters, and Identifiers*, by Michael A. Maggiotto and Gary D. Wekkin. Choice 38 (February).

*2001 Realignment and Party Revival: Understanding American Electoral Politics at the Turn of the Twenty-first Century*, by Arthur Paulson. Choice 38 (January).

*2000 Before the Vote: Forecasting American National Elections*, by James E. Campbell and James C. Garand, eds. Choice 37 (June).

*2000 Methods and Models A Guide to the Empirical Analysis of Formal Models in Political Science*, by Rebecca B. Morton. Choice 37 (March).

*2000 Assessing the New Federalism State Database*. Web Site. Choice 37 (January).

*1999 Opensecrets*. Web Site. Choice 36 (Special Supplement III) p. 182.

*1999 Short of the Glory: The Fall and Redemption of Edward F. Prichard Jr.,* by Tracy Campbell. *Choice* 36 (March).

*1999 Tennessee Government and Politics: Democracy in the Volunteer State*, by John R. Vile and Mark Byrnes, eds. *Choice* 36 (February).

*1999 Center for Responsive Politics*. Web Site. *Choice* 36 (February).

*1995 On The Make: The Rise of Bill Clinton*, by Meredith L. Oakley. *Texas Journal of Political Studies* 17(Spring/Summer): 84.

## WORK IN PROGRESS:

"License to Drive" – in the early stages of a book-length study examining the evolution of the driver's license from a sheet of paper giving permission to operate a modernized vehicle in the early 1900s to effectively a national identification card containing federally mandated biometric information today.

## PAPERS AND ACTIVITIES AT PROFESSIONAL MEETINGS (most recent 10 of 45):

"Polarized Politics and Evaluation Criteria for Supreme Court Nominees: Lessons from the Gorsuch Nomination." (with Rachel Bitecofer and Rich Vining). Presented at the Annual Meeting of the American Political Science Association, August 2018.

"Polarized Politics and Evaluation Criteria for Supreme Court Nominees: Lessons from the Gorsuch Nomination." (with Rachel Bitecofer and Rich Vining). Paper presented at the Annual Meeting of the Western Political Science Association, April 2018.

"It's Not the Message: Partisan Cues in a Polarized Era." (with Rachel Bitecofer). Paper presented at the Annual Meeting of the Southern Political Science Association, January 2018.

"Seeing is Believing: The Role of Geographic Proximity in Mitigating Partisan Attitudes Toward Environmental Issues." (with Rachel Bitecofer and Andrew Kirkpatrick). Paper presented at the Annual Meeting of the Southern Political Science Association, January 2018.

"Ready for Hillary: Sexism in the Evaluations of the 2016 Presidential Candidates." (with Rachel

Bitecofer and Michelle Barnello). Paper presented at the Annual Midwest Political Science Association Conference, April 2017.

"Electoral Implications of Racial Resentment in the South (and Beyond): The Case of Clinton v. Trump" (with M.V. Hood and Irwin L. Morris). Paper presented at the Annual Meeting of the American Political Science Association, Philadelphia, PA, September 1-4, 2016.

"Candidate Race and Perceptions of Candidate Ideology: The Tea Party, Racial Resentment, and the 2014 Elections in the Palmetto State" (with M.V. Hood and Irwin L. Morris). Paper presented at the Citadel Symposium on Southern Politics. Charleston, SC, March 3-4, 2016.

"Racial Resentment and the Tea Party: Taking Regional Differences Seriously" (with M.V. Hood and Irwin L. Morris). Poster presented at the Annual Meeting of the American Political Science Association, Chicago, IL, September 2-5, 2015.

"Millennial Civic Engagement" (with students Sarah Miller and Dagney Palmer). Poster presented at the Annual Meeting of the Midwest Political Science Association, Chicago, IL, April 7-10, 2015.

"Race and the Tea Party in the Palmetto State: Tim Scott, Nikki Haley, Bakari Sellers and the 2014 Elections in South Carolina" (with M.V. Hood and Irwin L. Morris). Paper presented at the Annual Meeting of the Southern Political Science Association Meeting, New Orleans, LA, January 15-17, 2015.

## SURVEY RESEARCH AND SURVEYS CONDUCTED:

Conducted nearly 100 regional, statewide, and national surveys focusing on politics and public policy topics for public consumption, media organizations, and research.

## DETAILS ON GRANTS FOR RESEARCH (≈$365,000):

Hampton Roads Transportation Planning Organization ($15,978) to conduct a survey of users of the Capital to Capital bike trail in Williamsburg, Virginia, 2019.

Hampton Roads Community Foundation ($25,000) to conduct a regional forward-looking quality of life survey in Hampton Roads, Virginia, 2018.

AARP Work and Save Study #CNT0009935 ($50,000) to conduct an economic analysis of the cost of establishing a work and save program in Virginia, 2018.

AARP Retirement Study #CNT0006626 ($8,000) to conduct an economic analysis of the projected cost to live in retirement in Virginia over the next 10 years, 2016.

Virginia Environmental Endowment Grant #16-15 ($13,500) to conduct a statewide survey of Virginia residents on environmental attitudes, 2016.

Hampton Roads Planning District Commission ($29,000) to conduct a region-wide survey focusing on public policy values and preferences, 2015.

Virginia Department of Game and Inland Fisheries ($79,000) to conduct surveys of hunters and trappers in Virginia, 2014.

Dominion Resources Renewable Portfolio Standards Research and Development Partnership ($50,000) for "Overview of Offshore Wind Energy in the United States and the European Union (Tom Hall, Co-Principle Investigator), 2012.

Hampton Roads Transportation Planning Organization ($40,000) to conduct focus groups in Hampton Roads on transportation, 2010.

Virginia Environmental Endowment Grant #08-11 ($40,000) to conduct the Virginia Environmental Attitudes Survey, 2009, 2010, and 2011.

Faculty Research Grant ($1, 945) from Christopher Newport University for "Words as

Data: Determining the Ideological Position of Political Parties from Convention Acceptance Speeches", 2004.

Faculty Research Grant ($1,750) from Christopher Newport University for "Race as an Issue in Southern Gubernatorial Races: 1950-2000", 2001.

## EXPERT WITNESS

*Holloway v. City of Virginia Beach*, No. 2:18-cv-00069 (2019)
*Jabbour v. Merrill*, No. 1:20-cv-00034-JB-N (2020)
*People First of Alabama v. Merrill*, No 2:20-cv-00619-AKK (2020)
*Clark v. Edward*, No 20-cv-308-SDD-RLB and *Power Coalition v. Edward*, No. 20-cv-283-SDD-RLB (2020)
*Harding v. Edwards*, No 3:20-cv-00495-SDD-RLB (2020)
*Thompson v. Merrill*, No 2:15-cv-783-ECM-SMD (2020)

## TEACHING AREAS OF INTEREST/SPECIALIZATION (undergraduate):

American Politics:    American Politics, Political Behavior, Virginia Politics, Political Parties, Political Campaigns and Elections, and Virginia Government and Politics.
Methodology:    Methods of Social Science Research, Quantitative Analysis

## TEACHING AND RELATED EXPERIENCE:

Courses Taught:
GOVT 100 Political Thought and Society, Christopher Newport University.
GOVT 101 Power and Politics in America, Christopher Newport University.
GOVT 202 State and Local Politics, Christopher Newport University.
GOVT 351 Methods and Tools of Social Science Research, Christopher Newport University.
GOVT 352 Research Methods and Quantitative Analysis, Christopher Newport University.
GOVT 363 Judicial Process, Christopher Newport University.
GOVT 354 Political Campaigns and Elections, Christopher Newport University.
GOVT 333 Legislative Politics, Christopher Newport University.
GOVT 344 The Presidency, Christopher Newport University.
GOVT 454 American Political Behavior, Christopher Newport University.
GOVT 552 Advanced Quantitative Analysis (graduate), Christopher Newport University.
HONR 490 Problems in the Modern World, Christopher Newport University.
HONR 335: The Good Society, CNU study abroad course at Harris Manchester College, University of Oxford.

## ACTIVITIES AND SERVICES:

To Community:
Board Member, **United Jewish Community of the Virginia Peninsula**, 2020 to present (Newport News, Virginia)
Board Member, **Riverside Regional Health System Foundation**, 2019 to present (Newport News, Virginia)
Committee member, **757 Recovery & Resilience Action Framework Committee**, Hampton Roads Alliance, 2019 to present (Norfolk, Virginia)
Member, **Governance/Funding Working Group of Hampton Roads Transit**, 2019 to present (Norfolk, Virginia).
Board Member, **Rodef Sholom Temple**, 2019 to present (Newport News, Virginia).

Committee member, **Logistics Committee of the 2019 Commemoration Steering Committee**, 2016 to present (Virginia statewide).

Advisor, **Independent Bipartisan Advisory Commission on Redistricting** (appointed by Governor Bob McDonnell, the commission's job was to propose new redistricting maps to the Governor and General Assembly), January 2011 to April 2011 (Virginia statewide).

Board Member, **Hampton Roads Center for Civic Engagement** (a non-partisan organization to promote greater citizen participation in politics and public policy in Hampton Roads, Virginia), 2007 to 2012 (Hampton Roads regional).

Board Member, **Blogs United** (a non-partisan organization to promote ethical behavior in the pursuit of citizen participation in the political process), 2008 to 2015 (Virginia statewide).

Appointed to (elect chair January 2005) the **Governor's Commission on National and Community Service**, April 2002 (appointed by Governor Mark Warner and reappointed 2003, 2004, and 2005) (statewide).

Faculty Chair, College Leaders Program of the Sorensen Institute at The University of Virginia, 1999-2016.

Invited speaker, approximately four dozen invited talks per year, locally to statewide and Washington D.C.

Guest and/or quoted in various local, regional, national and international radio and television on topics related to elections, politics, and public policy.

To Department & University:

University Budget Advisory Committee, Christopher Newport, 2010-2014 & 2017 to present.

Chair, Luter School of Business Dean Search Committee, Christopher Newport University, 2015.

Chair, Provost Search Committee, Christopher Newport, 2014.

Chair, Liberal Learning Core Curriculum Task Force, Christopher Newport, 2011-2012.

Chair, Department of Government, Christopher Newport, 2008-2014.

Member, American Studies Development Committee, Christopher Newport, 2005-2006.

Coordinator, Prestigious Scholarships Mentoring Program, Christopher Newport, 2003-present.

Co-Chair, Faculty Council on Liberal Learning, Christopher Newport, 2004-2006.

Senator, Faculty Senate of Christopher Newport, 2000-2006 (member of Executive Committee 2002-2003 and 2005-2006, Secretary 2003-2004 academic year).

Co-Chair, Task Force on Curriculum and Academic Life, Christopher Newport, 2002-2004.

Dean William Parks Colloquia, Christopher Newport, fall 2000-spring 2004 (Chair 2001-2004).

Member, Undergraduate Degrees Committee, Christopher Newport, 1998-2002.

Member, Committee for the Library of the 21st Century, Christopher Newport, 2001-2002.

Member, General Education Council, Christopher Newport, 1999-2002.

Member, Online Faculty Advisory Committee, Christopher Newport, 1999-2001.

Member, Student Assessment Committee, Christopher Newport, 1999-2000.

Member, International Studies Committee, Christopher Newport, 1998-2000.

Served as member of over three dozen search committees at Christopher Newport.

To Discipline:

Served on Executive Committee of the Undergraduate Education Division of the American Political Science Association, 2004-2013 [Treasurer, 2007-2013].

Served on Annual Meetings Committee of the American Political Science Association, 2006-2008.

Book Review Editor, *Journal of Political Science Education*, Fall 2005-2012.

Division Chair for the Undergraduate Education Division of the 2005 American Political Science Association Annual Meeting, Washington, D.C., September 1-4, 2005.

Grader, American Government Advanced Placement exam, Summers 2002 and 2004.

Book and web page reviewer for *Choice*, 1998-2011.

Manuscript reviewer for *Legislative Studies Quarterly*, *Social Science Quarterly*, *American Journal of Political Science, American Politics Quarterly*, and the *Journal of Politics*, October 1996 to present.

### RECENT PROFESSIONAL MEMBERSHIPS:

Council of Colleges of Arts and Sciences, American Conference of Academic Deans, American, Southern, Southwestern, and Midwestern Political Science Associations, American Association of Public Opinion Researchers, Virginia Association of Political Scientists.

### AWARDS AND HONORS:

*Outstanding Faculty Award,* State Council of Higher Education for Virginia, 2014 (extremely competitive statewide)

*Annual Faculty Award for Excellence in Scholarship*, Christopher Newport University, 2013 (given annually by the University Provost – nominated by faculty committee).

*Dr. Wolfgang Pindur Award for Service in Academia and Practice*, 2013 (given annually by the Hampton Roads chapter of the American Society of Public Administration).

*Alumni Society Award for Excellence in Teaching and Mentoring*, Christopher Newport University, 2008 (annually awarded to one member of the faculty – nominated by chair or dean and selected by panel of alumni).

*Professor of the Year*, Christopher Newport University, 2002-2003, 2003-2004, 2005-2006 (annual award to one member of the faculty - nominated and selected by students).

Honored by the American Political Science Association at its annual meeting in 2002, 2003, and 2006 for teaching.