# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
### TALLAHASSEE DIVISION

| | |
|---|---|
| LEAGUE OF WOMEN VOTERS OF FLORIDA, INC., et al., *Plaintiffs*, | |
| v. | No. 4:21-cv-186-MW-MAF |
| | No. 4:21-cv-187-MW-MAF |
| LAUREL M. LEE, in her official capacity as Florida Secretary of State, et al., *Defendants*, | No. 4:21-cv-201-MW-MAF |
| | No. 4:21-cv-242-MW-MAF |
| REPUBLICAN NATIONAL COMMITTEE and NATIONAL REPUBLICAN SENATORIAL COMMITTEE, *Intervenor-Defendants*. | |

## POST-TRIAL BRIEF OF STATE-LEVEL DEFENDANTS AND INTERVENOR-DEFENDANTS[1]

---

[1] The Attorney General joins only in the sections of the brief concerning the third-party voter registration organization provision, *see* Fla. Stat. § 97.0575(3)(a), and the Intervenor-Defendants join all sections except for sections of this brief concerning associational and organizational standing under Article III of the U.S. Constitution. The Attorney General also renews the arguments presented in her Rule 52(c) motion. *See* Tr. 2874:1 – 2875:1.

1

## I.     INTRODUCTION

At issue is whether four provisions of Florida law violate federal law.  The four provisions govern how third-party voter registration organizations ("3PVROs") register voters, *see* Fla. Stat. § 97.0575(3)(a) ("3PVRO provision"); how voters request vote-by-mail ballots, *see* Fla. Stat. § 101.62(1)(a)-(b) ("vote-by-mail request provision"); how supervisors of elections must maintain drop boxes—*one* method for returning vote-by-mail ballots, *see* Fla. Stat. § 101.69(2) ("drop box provision"); and how supervisors of elections protect voters waiting in line within 150 feet of the polls from third-party interference, *see* Fla. Stat. § 102.031(4)(a) ("safe-space provision").  Changes to the **3PVRO provision**, **vote-by-mail request provision**, **drop box provision**, and **safe-space provision** were part of a thirty-two-section election reform bill the Florida Legislature enacted during its 2021 session.  *See* Chpt. 2021-11, Laws of Fla.

True, the election reform bill came on the heels of "one of the most secure [elections] we've seen in Florida," but the "nuances" in the bill were intended to "see Florida continue to be the leader in election security"—to guard against what might "happen in the future to impact our elections."  Exhibit 528 at Tr. 10:16 – 12:11 (House Floor Apr. 28, 2021) (Rep. Massullo); Exhibit 426 at Tr. 62:23 – 63:2 (House Public Integrity and Elections ("PIE") Comm. Mar. 22, 2021) (Rep. Grall discussing undelivered ballots).  Greater uniformity was also of concern, especially

for drop boxes that were used statewide for the first time during the 2020 election cycle. *See, e.g.*, Exhibit 426 at Tr. 68:7-22 (House PIE Comm. Mar. 22, 2021) (Rep. Ingoglia, Sponsor of Bill). As was the need for greater safeguards for vote-by-mail ballots because complaints related to such ballots are frequent—ranging from voter material being sent to old addresses to one person voting another's ballot. *See generally* Exhibit 1557 (providing summary of same).

Notably, the four sets of Plaintiffs before this Court face a high burden when challenging the four, facially neutral provisions of State law. First, the U.S. Constitution empowers the Florida Legislature to make certain policy choices—to set "[t]he Times, Places and Manner of holding Elections." U.S. Const. art. I, § 4; *see also* Fla. Const. art. VI, § 1. Second, while "[i]t is beyond cavil that voting is of the most fundamental significance under our constitutional structure," "[i]t does not follow" "that the right to vote in any manner and the right to associate" "through the ballot are absolute." *Burdick v. Takushi*, 504 U.S. 428, 433 (1992) (internal quotation marks omitted). So "when a state election law provision imposes only 'reasonable, nondiscriminatory restrictions' upon the First and Fourteenth Amendment rights of voters, 'the State's important regulatory interests are generally sufficient to justify' the restrictions." *Id.* at 434 (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 78 (1983)).

Against the broader legal backdrop, this Court must first assess Plaintiffs' standing to sue under Article III of the U.S. Constitution.  Then this Court must address each of their many claims, which this post-trial brief separates into the following categories:   (1) *Anderson/Burdick* claims, (2) standalone Fourteenth Amendment claims, (3) Voting Rights Act ("VRA") Section 2 claims, (4) standalone First Amendment claims, (5) VRA Section 208 claims, and (6) Americans with Disabilities Act ("ADA") claims.  A statement of the case and facts precedes the legal summation to provide regulatory context and summarize, from the State's perspective, the 3,632-page trial transcript and many thousands of pages of exhibits admitted into evidence.

## II.   STATEMENT OF THE CASE AND FACTS

When judging several of the Plaintiffs' claims, this Court should "look[] at the whole electoral system," weighing any alleged burdens with the opportunities to vote provided by the entire election code.  *Luft v. Evers*, 963 F. 3d 665, 671-72 (7th Cir. 2020); *see also Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2339 (2021).  The State thus begins by noting the many ways that Floridians can register to vote and exercise the franchise.  The regulatory background includes a summary of changes made to the State's election laws since 1982, and then highlights changes made through Chapter 2021-11, Laws of Florida, commonly known as Senate Bill

90.   Discussion of the legislative process, Senate Bill 90's evolution, the State's interests, and Plaintiffs' alleged harms follow.

### A.   **Registering to Vote**

Eligible Floridians can register to vote online, from the comfort of their own home, on their mobile phone or tablet, in English or Spanish, using the following website: registertovoteflorida.gov.  *See* Fla. Stat. § 97.0525.  Paper applications are also available through the Florida Department of State, any of the State's sixty-seven supervisors of elections, the Department of Highway Safety and Motor Vehicles, local libraries, certain educational institutions, any entity that issues a hunting or fishing license (like a local Walmart), or through 3PVROs.  *See id.* §§ 97.052(1)(b), 97.052(5), 97.053, 97.057, 97.0575, 97.058, 97.0583, 97.05831.   In addition, uniformed and overseas voters can use federal post card applications.  *See* 52 U.S.C. §§ 20301(b)(2), 20302(a)(2), (4).

Importantly, except for uniformed and overseas voters in certain narrow circumstances, Floridians must register to vote (or update their party affiliation if the election is a closed primary) at least twenty-nine days before a given election to vote in that election.  Fla. Stat. §§ 97.055(1)(a), 97.0555.  Missing the deadline means that a new voter cannot cast a ballot in that election; existing voters who change their party registration before a closed primary election cannot cast ballots either.  *Id.*; *see also* Tr. at 1290:2; Tr. 3183:25; Tr. 3215:20-24; Tr. 3417:22 – 3419:9.

B.   **Casting a Ballot**

Registered Floridians can cast their ballots in one of three ways:  (1) in-person on election day; (2) in-person during early voting; and (3) voting by mail.

Election day voting is open for twelve hours (from 7am to 7pm).  Fla. Stat. § 100.011.  Voters must arrive at their assigned precincts to vote.  *Id*. § 101.045(1).  Voters must bring with them a photo identification with their signature to cast their ballots.  *Id*. § 101.043 (noting twelve different kinds of acceptable identification).

Early voting must begin on the tenth day before a state or federal election and must stay open until the third day before the election.  *Id*. § 101.657(1)(d).  Supervisors have the option to also make early voting available on the fifteenth, fourteenth, thirteenth, twelfth, eleventh, or second day before an election.  *Id*.  Supervisors of elections must designate early voting sites at least thirty days prior to an election, *id*. § 101.657(1)(b), and must keep those sites open for at least eight hours a day, and up to twelve hours a day, *id*. § 101.657(1)(d).  In other words, the State's early voting sites are available to Florida voters for at least eight days and as many as fourteen days; the sites are available for at least sixty-four hours and as many as 168 hours.  Again, as with in-person election day voting, voters must provide identification when voting early.  *Id.* § 101.657(4)(a).

Voting by mail is now available to all Floridians, without excuse, without witness signatures, and without the need for notarization attesting to the voter's

identity. *Id.* § 101.62(1). Supervisors mail ballots to domestic voters as early as forty days before an election and within two business days of receiving a request for a ballot. *Id.* § 101.62(4)(b). Voters can also pick-up vote-by-mail ballots in-person at the supervisor's office, *id.* § 101.62(4)(c)3., or have a designee pick-up their ballots for them. *Id.* § 101.62(4)(c)4. Voters can return their ballots using U.S. Mail, commercial carriers like FedEx and UPS, through drop boxes, or through designees of their choice. *Id.* §§ 101.64; 101.65; 101.69(2)(a); *see also* Tr. 1293:23 – 1294:20. Before Senate Bill 90, voters requesting that their supervisor *mail* a vote-by-mail ballot were not required to provide identification.

### C.   <u>Ease of Voting Since 1982</u>

To be sure, however, voting has become more accessible for all Floridians since 1982. In 1982, Florida voters could vote on election day but there was no statewide early voting. Absentee voting, as the name implies, required voters to meet six narrow excuses to vote through the mail rather than in person. *See* Fla. Stat. § 101.64 (1982) (allowing absentee voting for (1) those unable to vote "without another's assistance," (2) those absent from the jurisdiction, (3) those serving as poll workers, (4) those with religious commitments, (5) those who changed their residence after the close of the voter registration deadline before a given election, and (6) those who moved to another state after the close of voter registration).

Florida added no-excuse, in-person early voting as an option in 2004.  *See* Chpt. 2004-252, § 13, Laws of Fla. (amending Fla. Stat. § 101.657 (2003)).  Over the years, the Florida Legislature has amended the early voting statute to add permissible locations, adjust hours, and include nonpermitted parking requirements.  Chpt. 2019-162, § 10, Laws of Fla.; Chpt. 2013-57, § 13, Laws of Fla; Chpt. 2011-40, § 39, Laws of Fla.; *see also* Exhibit 46 at ¶¶ 24-30; Tr. 2925:16 – 2927:10; Tr. 2943:8 – 2945:15.

The absentee voting requirements—now known as the vote-by-mail requirements—have also eased.  Until 1996, voters had to have their absentee ballots notarized or include the signatures of two witnesses who themselves were registered to vote in Florida.  Chpt. 1996-57, § 4, Laws of Fla.  In addition, voters had to attest that they met one of the statutorily recognized excuses for casting an absentee ballot.  *Id.*  But, in 1996, the Florida Legislature amended section 101.64 to require only one witness signature.  *Id.*  In 2001, the Florida Legislature eliminated the excuse requirement, allowing voters to request and cast vote-by-mail ballots for any reason or no reason at all.  Chpt. 2001-40, § 53, Laws of Fla.  In 2004, the Florida Legislature repealed the witness-signature requirement altogether.  Chpt. 2004-232, § 1, Laws of Fla.  And, in 2019, the Florida Legislature allowed for drop boxes to be used statewide to return vote-by-mail ballots.  Chpt. 2019-162, § 20, Laws of Fla.; *see also* Exhibit 46 at ¶¶ 17-23; Tr. 2925:16 – 2927:10; Tr. 2937:24 – 2939:12.

Ease of voting for all Floridians has resulted in greater participation and representation for Florida's minority voters.  Plaintiffs' expert on "the history of Florida elections and the government's response to Black and Latino participation in those elections" "essentially since reconstruction," seemingly conceded as much. Tr. 840:18-20.  Dr. Austin noted that Black Floridians were elected to Congress and the State Legislature during reconstruction, Tr. 853:14-17; however, Florida had no Black members of Congress or statewide elected officials in 1982.  Tr. 913:18-19; Tr. 914:1-3.  Yet, since 1990, Florida has elected nine Black members of Congress, both Democrats and Republicans, Tr. 913:20-25; a Black, Republican lieutenant governor in 2010, Tr. 914:4-10; and twice voted for President Obama on the statewide ballot in 2008 and 2012, Tr. 914:11-13.  When asked whether this recent history meant that "compared to 1982, it has become easier for Blacks to register and vote in Florida," Dr. Austin said "I would say yes," before hesitating, changing her answer to "no," and then saying "that it's hard to answer those questions with a yes or no answer."  Tr. 914:14-25.  Her initial response was right.

### D.   Senate Bill 90's Changes to the Election Code

### 1.   Summary of Changes

Senate Bill 90 builds on Florida's progress.  Among other things, the bill's thirty-two[2] distinct sections collectively amend the State's voter registration statute to comply with a prior decision of this Court,[3] Chpt. 2021-11, § 3, Laws of Fla; require load and stress testing of the State's online voter registration system to guard against slowdowns,[4] *id*. § 4; mandate that the Department of Highway Safety and Motor Vehicles assist the Department of State in regularly identifying changes in voter addresses, *id*. § 6; direct those running as candidates with no party affiliation to affirm that they have not been members of any political party for the preceding year to mitigate against "ghost" candidacies, *id*. § 12; streamline the process for filling vacancies in party nominations for political offices, *id*. § 15; set a twenty-two-month retention schedule for election material, *id.* § 18; and balance transparency and efficiency in election administration.  *Id.* §§ 19-23, 27, 30-31.

The four provisions at issue here make the following pertinent changes (with deletions in strikethrough and additions in underline for this Court's convenience):

---

[2] Chapter 2021-11, Laws of Florida, has thirty-three sections; however, the last section is simply the effect date for the bill as a whole.  So there are thirty-two substantive sections in the bill.

[3] *Jones v. DeSantis*, 462 F. Supp. 3d 1196, 1244 (N.D. Fla. 2020).

[4] This Court is familiar with the need for load and stress testing generally. *Namphy v. DeSantis*, 493 F. Supp. 3d 1130, 1134 (N.D. Fla. 2020); *see also* Tr. 2818:9 – 2822:10.

- Fla. Stat. § 97.0575 (**3PVRO Provision**)

(3)(a) A third-party voter registration organization that collects voter registration applications serves as a fiduciary to the applicant, ensuring that any voter registration application entrusted to the organization, irrespective of party affiliation, race, ethnicity, or gender, <u>must</u> ~~shall~~ be promptly delivered to the division or the supervisor of elections <u>in the county in which the applicant resides</u> within <u>14 days after completed by the applicant, but not after registration closes for the next ensuing election. A third-party voter registration organization must notify the applicant at the time the application is collected that the organization might not deliver the application to the division or the supervisor of elections in the county in which the applicant resides in less than 14 days or before registration closes for the next ensuing election and must advise the applicant that he or she may deliver the application in person or by mail. The third-party voter registration organization must also inform the applicant how to register online with the division and how to determine whether the application has been delivered</u> ~~48 hours after the applicant completes it or the next business day if the appropriate office is closed for that 48-hour period~~. If a voter registration application collected by any third-party voter registration organization is not promptly delivered to the division or supervisor of elections <u>in the county in which the applicant resides</u>, the third-party voter registration organization is liable for the following fines:.

- Fla. Stat. § 101.62 (**Vote-by-Mail Request Provision**)

(1)(a) The supervisor shall accept a request for a vote-by-mail ballot from an elector in person or in writing. One request <u>is</u> ~~shall be~~ deemed sufficient to receive a vote-by-mail ballot for all elections through the end of the calendar year of the <u>next</u> ~~second ensuing~~ regularly scheduled general election, unless the elector or the elector's designee indicates at the time the request is made the elections <u>within such period</u> for which the elector desires to receive a vote-by-mail ballot. Such request may be considered canceled when any first-class mail sent by the supervisor to the elector is returned as undeliverable.

(b) The supervisor may accept a written, <u>an in-person,</u> or <u>a</u> telephonic request for a vote-by-mail ballot to be mailed to an elector's address on file in the Florida Voter Registration System from the elector, or, if

directly instructed by the elector, a member of the elector's immediate family, or the elector's legal guardian. <u>If an in-person or a telephonic request is made, the elector must provide the elector's Florida driver license number, the elector's Florida identification card number, or the last four digits of the elector's social security number, whichever may be verified in the supervisor's records.</u>; If the ballot is requested to be mailed to an address other than the elector's address on file in the Florida Voter Registration System, the request must be made in writing. <u>A written request must be</u> ~~and~~ signed by the elector <u>and include the elector's Florida driver license number, the elector's Florida identification card number, or the last four digits of the elector's social security number</u>. However, an absent uniformed service voter or an overseas voter seeking a vote-by-mail ballot is not required to submit a signed, written request for a vote-by-mail ballot that is being mailed to an address other than the elector's address on file in the Florida Voter Registration System. For purposes of this section, the term "immediate family" has the same meaning as specified in paragraph (4)(c).

- Fla. Stat. § 101.69 (**Drop Box Provision**)

(2)<u>(a)</u> The supervisor shall allow an elector who has received a vote-by-mail ballot to physically return a voted vote-by-mail ballot to the supervisor by placing the <u>return mail</u> envelope containing his or her marked ballot in a secure drop box. Secure drop boxes shall be placed at the main office of the supervisor, at each <u>permanent</u> branch office of the supervisor, and at each early voting site. Secure drop boxes may also be placed at any other site that would otherwise qualify as an early voting site under s. 101.657(1). <u>Drop boxes must be geographically located so as to provide all voters in the county with an equal opportunity to cast a ballot, insofar as is practicable. Except for secure drop boxes at an office of the supervisor, a secure drop box may only be used</u>; ~~provided, however, that any such site must be staffed~~ during the county's early voting hours of operation and must be monitored in person by an employee of the supervisor's office. <u>A secure drop box at an office of the supervisor must be continuously monitored in person by an employee of the supervisor's office when the drop box is accessible for deposit of ballots</u> ~~or a sworn law enforcement officer~~.

<u>(b) A supervisor shall designate each drop box site at least 30 days before an election. The supervisor shall provide the address of each</u>

drop box location to the division at least 30 days before an election. After a drop box location has been designated, it may not be moved or changed except as approved by the division to correct a violation of this subsection.

(c)1. On each day of early voting, all drop boxes must be emptied at the end of early voting hours and all ballots retrieved from the drop boxes must be returned to the supervisor's office.

2. For drop boxes located at an office of the supervisor, all ballots must be retrieved before the drop box is no longer monitored by an employee of the supervisor.

3. Employees of the supervisor must comply with procedures for the chain of custody of ballots as required by s. 101.015(4).

(3) If any drop box is left accessible for ballot receipt other than as authorized by this section, the supervisor is subject to a civil penalty of $25,000. The division is authorized to enforce this provision.

- Fla. Stat. § 102.031 (**Safe-Space Provision**)

(4)(a) No person, political committee, or other group or organization may solicit voters inside the polling place or within 150 feet of a drop box or the entrance to any polling place, a polling room where the polling place is also a polling room, an early voting site, or an office of the supervisor where vote-by-mail ballots are requested and printed on demand for the convenience of electors who appear in person to request them. Before the opening of a drop box location, a ~~the~~ polling place, or an early voting site, the clerk or supervisor shall designate the no-solicitation zone and mark the boundaries.

(b) For the purpose of this subsection, the terms "solicit" or "solicitation" shall include, but not be limited to, seeking or attempting to seek any vote, fact, opinion, or contribution; distributing or attempting to distribute any political or campaign material, leaflet, or handout; conducting a poll except as specified in this paragraph; seeking or attempting to seek a signature on any petition; ~~and~~ selling or attempting to sell any item; and engaging in any activity with the intent to influence or effect of influencing a voter. The terms "solicit" or

"solicitation" may not be construed <u>to prohibit an employee of, or a volunteer with, the supervisor from providing nonpartisan assistance to voters within the no-solicitation zone such as, but not limited to, giving items to voters, or</u> to prohibit exit polling.

In sum, the 3PVRO provision requires the dissemination of truthful information (much like the tag lines at the end of political commercials "paid for by candidate x," which the U.S. Supreme Court has upheld). The vote-by-mail request provision's allowance for vote-by-mail requests to remain valid for one election cycle, rather than two election cycles, does not take effect until 2023—leaving requests for the 2022 election cycle unchanged. Chpt. 2021-11, § 25, Laws of Florida. The vote-by-mail request provision's identification requirement applies only to requests for ballots being mailed to voters—not requests to pick-up vote-by-mail ballots in-person (when supervisors can add any missing information to the voter rolls). *See* Fla. Stat. § 101.62(4)(c)3. The drop box provision clarifies existing law to provide statewide uniformity regarding drop box locations and availability, thereby adopting the Secretary of State's pre-Senate Bill 90 legal interpretation. And the safe-space provision simply clarifies existing law, requiring supervisors to do nothing differently in their ongoing efforts to maintain order at the polls.

The four provisions being challenged make no mention of race, ethnicity, gender, or age. They apply across the State. All four provisions also affect only the election administration process.

14

## 2.    Legislative Process Used

Senate Bill 90 was itself the product of a lengthy legislative process undertaken (like the 2020 election) amid a global pandemic.  At the time, both the Florida House and Florida Senate separately implemented protocols limiting in-person contact, promoting masking, and requiring testing for many.  *See* ECF No. 481-1, 481-2, 481-3 (providing relevant memoranda); ECF No. 523 (judicially noticing the existence of the protocols); Tr. 1582:4-7 (noting that protocols applied for all bills considered during session); Tr. 3092:3 – 3094:18 (discussing adherence with protocols), 3095:22 – 3096:4 (same), 3099:21 – 3100:20 (same).

Still, the Florida Legislature spent approximately twenty-six and a half hours hearing testimony from stakeholders and the public in committee meetings, asking questions of the bill sponsors, and debating the merits of the bill in committee and on the floor of what became Senate Bill 90.  *See* **Attachment 1** (Chart Showing Legislative Stops & Time Spent).  The Florida House of Representatives spent approximately fourteen and a half hours.  *Id.*  The Florida Senate spent approximately twelve hours.  *Id.*  This was during a sixty-day legislative session during which the Florida Legislature had to spend time passing a budget for the State. Tr. 3087:22 – 3088:9.  So time limits were implemented to accommodate the many people who sometimes shared a common perspective, *see, e.g.*, Tr. 3096:11 –

3097:23, but the process utilized in committee was otherwise unremarkable.  *See, e.g.*, Tr. 3095:22 – 3096:4.

During this time, members of the Florida Legislature also heard from outside groups both during formal committee meetings and after in-private informal meetings.  The groups included several of the litigants and counsel in these cases who shared their version of the facts, talking points, and the like with members of the Florida Legislature.  Tr. 1472:5-20; 1571:10 – 1573:14 (discussing interactions with NAACP, League of Women Voters of Florida, the Democratic Party, LatinoJustice, the ACLU, etc.).

The supervisors of elections participated, usually through the Florida Supervisors of Elections or FSE.  The chair of FSE's legislative committee was Lake County Supervisor of Elections Alan Hays.  Tr. 2673:11-15, 3086:6-8; ECF No. 549-2 at Tr. 182:24 – 183:3.  Having served for six years each in the Florida House and Florida Senate, Tr. 2673:17-24; ECF No. 549-2 at Tr. 182:18-23; Supervisor Hays was, as Leon County Supervisor of Elections Mark Earley agreed, the FSE's point person with the legislature.  Tr. 2673:11-15.  David Ramba was FSE's lead lobbyist—the "quarterback" to Supervisor Hays's "coach."  Tr. 3085:16-19.

Supervisor Hays testified that he saw nothing unusual with the legislative process used to pass Senate Bill 90, including the use of "strike-all" amendments during the legislative process.  ECF No. 549-2 at Tr. 189:6 – 190:10.  While a vocal

critic of the bill in its earlier iterations, Supervisor Hays supported the bill in its final form. *Id.* Tr. 188:1-15.

Mr. Ramba provided more detailed trial testimony concerning the legislative process. He remarked that "basically from experience we know in the years subsequent to a statewide general election, whether it be the governors or the presidential on the general election side of it, there's usually a[n election] bill." Tr. 3101:19-22. The State "usually ha[s] a signature piece of legislation as a result of people's experiences or what they see, think, or hear about the—what occurred during the processes of the election." Tr. 3102:1-4. During the legislative session, Mr. Ramba himself testified on behalf of the supervisors, arranged for the supervisors to testify before the legislative committees, and provided input by marking up versions of Senate Bill 90 with a red pen for "the House sponsor, the Senate sponsor, the House staff and the Senate staff." Tr. 3098:9 – 3099:7.

"On the House side," Mr. Ramba and FSE "had more time with sponsors of the bill and the staff because [given the COVID protocols] [they] didn't have busloads of realtors and cattleman and school kids wanting to come in and take pictures and do tours." Tr. 3100:10-13. Indeed, Mr. Ramba had "six or seven one-hour meetings" with Senate Bill 90's House sponsor, Representative Ingoglia, where the sponsor "would block off [time] for [Mr. Ramba and the FSE]." Tr. 3103:16-17. Mr. Ramba met with Representative Ingoglia "in the evenings" as well. Tr.

3103:18.  And it was Representative Ingoglia who "usually took [Mr. Ramba's] marked up copy of the latest version of the legislation with [his] red pen, and [] disappeared with it," with the redline "showing up in the next iterations of the strike-alls."  Tr. 3103:16-25.  House staff even took a two-hour tour of Supervisor Earley's facility to get a better understanding of the issues in the midst of the legislative session.  Tr. 3108:10-25; Tr. 3523:2 – 3524:4.

On the Senate side, Senators, including Senate Bill 90's sponsor, came to Mr. Ramba's office to meet with supervisors and discuss the bill.  Tr. 3100:2-9.  Mr. Ramba and the FSE otherwise worked closely with Senate staff on the bill, which is not unusual.  Tr. 3109:5-22.

Supervisors also shared their thoughts with the Director of Florida's Division of Elections, Maria Matthews, both before and during the legislative session, which the Department of State then relayed to the Florida Legislature.  Tr. 3398:10-18; Tr. 3399:10-23.  Even those who expressed some frustration with the legislative process, like Supervisor Earley, acknowledged that they had direct, unfettered access to Director Matthews (and even Secretary of State Laurel Lee).  Tr. 2675:4-19.

Specifically, the Department of State serves as "a resource to the legislature on election-related matters."  Tr. 3395:1-2.  Before the 2021 legislative session, the Department of State shared with the Florida Legislature issues concerning the use of drop boxes—"uncertainty" from the supervisors "about the law," and concerns about

"uniformity and security" from the State's perspective.  Tr. 3400:3-8; Tr. 3411:7-21.  Also shared were proposals to "ensur[e] the authenticity of vote-by-mail ballot requests" through the "eliciting [of] more identifying information" from the voter.  Tr. 3400:9-11; 3400:16 – 3401:9; 3402:4-15.   Election fraud complaints were relayed too.  Tr. 3413:15-22; 3458:20 – 3459:21.

In addition, after the 2020 general election, but before the start of the 2021 legislative session, the Department of State satisfied its statutory duty to provide an election recap report to the Florida Legislature—a large data file with required information for each voter.  *See* Fla. Stat. § 98.0981(1)(c).  That report was made available to the public as well.  *Id.* § 98.0981(5).  But this data dump neither came with any summary statistics nor was the Department of State asked to derive any statistics before, during, or after the legislative session (with the exception of a request from the legislature during session concerning the number of Florida voters whose voter registration information does not include their driver's license, Florida ID, or social security numbers).  Tr. 2795:2-12; 2827:3 – 2828:16; Tr. 2830:21 – 2831:8; 3408:2 – 3409:15; *see also* Tr. 2791:2-7; Exhibit 318.

During the session, the Secretary of State also testified at multiple committee workshops to discuss the 2020 election generally, and issues with drop boxes, ballot collection, and vote-by-mail.  Exhibit 445 at Tr. 2:13 – 36:17 (Senate Ethics & Elections Comm. Feb. 16, 2021); Exhibit 1596 at Tr. 5:5 – 52:23 (House PIE Comm.

19

Feb. 9, 2021).  The Department of State, including Director Matthews, otherwise answered questions from legislators and legislative staff about, for example, drop boxes and issues with 3PVROs.  Tr. 3406:22 – 3407:4; 3409:17-25.

The Florida Legislature heard from innumerable other witnesses and sources as well.[5]  Supervisors of elections even answered survey questions posed by the chair of the House Public Integrity and Elections Committee, Representative Grall.  *See, e.g.*, Exhibits 137, 148, 177.  Among other things, the survey questions asked for details about the in-person and vote-by-mail process such as the number of vote-by-mail ballots returned as undeliverable, the staffing of drop boxes, the number of referrals of suspected fraud to state attorney's offices, and the number of provisional ballots cast.  Absent from the survey questions were any requests for information about race, gender, or ethnicity.  Party affiliation was relevant only to determine

---

[5] Exhibit 1596 (House PIE Comm. Feb. 9, 2021) (including Supervisors Peter Antonacci (former Broward), Mark Earley (Leon), Paul Lux (Okaloosa), and Julie Marcus (Pinellas)); *see also* Exhibit 489 at Tr. 107:7-108:2 (Fla. Senate Floor Apr. 22, 2021) (Republican Sen. Travis Hutson stating, "[W]e've taken input from all the supervisors.  My supervisor had some input in the very beginning that has been put into this bill." "Senator Hays texted Senator Boyd during Q&A, and he said he supports the bill." "I will say every step of the way this has been amended.  It is a CS for CS for CS in every step of the way.  I think on both sides of the aisle it had taken some Democratic amendments too.  We've taken good ideas from our supervisors of elections to try and get this to a place where they can feel comfortable."); Exhibit 427 at Tr. 55:8-11 (House Appropriations Comm. Apr. 8, 2021) (Republican bill sponsor Rep. Blaise Ingoglia stating, "I have met with countless voting right[s] organizations.  They've been in my office, their representatives, and we've been working with them along with the process.").

whether affiliation could be determined from the outside of the vote-by-mail envelope, which Senate Bill 90 subsequently proscribed.  *See, e.g.*, Exhibit 426 at Tr. 62:22-63:2 (House PIE Comm. Mar. 22, 2021) (Republican Chairwoman Rep. Erin Grall stating that she noticed "from the survey, about 78,000 ballots were returned as undeliverable from" "54 counties," which was "[a]nother reason to go to the two years" for frequency of vote by mail ballot requests).

The Florida Legislature even had before it the 2012 Miami Dade County Grand Jury Report, which bill sponsor Representative Ingoglia referenced during his remarks on the House floor.  Exhibit 508 at Tr. 23:1-9 (House Floor Apr. 27, 2021); *see also* Exhibit 379.  This should come as no surprise because the report was sent to the Florida Legislature, Exhibit 380, and Florida's history of voter fraud is well documented.  *See generally* Tr. 3301:21 – 3303:17; Tr. 3305:22–3306:2; Tr. 3306:7-16; Tr. 3308:2-8; Tr. 3308:20 – 3309:16; Tr. 3309:19 – 3311:11; Tr. 3311:17-25; Tr. 3315:10-25; Tr. 3320:25 – 3321:10; 3321:20 – 3322:2; 3313:4 – 3314:16; Tr. 3314:17-22; *Fla. State Conf. of the NAACP v. Browning*, 569 F. Supp. 2d 1237, 1251 (N.D. Fla. 2008) (discussing Florida's "rich history of absentee-ballot fraud"); *In re Protest of Election Returns & Absentee Ballots in Nov. 4, 1997 Election for City of Miami*, 707 So. 2d 1170, 1174 (Fla. 3d DCA 1998) ("We expressly hold that substantial competent evidence supported the trial court's finding that extensive

absentee voter fraud affected the outcome of the November 4, 1997, City of Miami Mayoral election.").

In addition, many legislators, including those in leadership positions, were concerned about fraud that goes undetected. *See, e.g.*, Exhibit 425 at Tr. 17:11-24 (Sen. Comm. on Gov't Oversight & Accountability Mar. 10, 2021) (Republican bill sponsor Sen. Dennis Baxley stating with regard to drop boxes, "the challenge is that you don't know what you don't know because many of these boxes were actually in places that no one was providing security over them or observing what was going on there." "So you have to presume, and I don't want to presume. I want us to pull that into a more safe place to drop it."); Exhibit 426 at Tr. 117:5 – 119:12 (House PIE Comm. Mar. 22, 2021) (Republican Rep. Cord Byrd discussing his twenty years' worth of work as an election law attorney in Florida and other states and noting that there is election law fraud and he has seen it); Exhibit 445 at Tr. 17:6-12 (Sen. Ethics & Elections Comm. Feb. 16, 2021) (Secretary Lee testifying that "any issues around fraud get referred to our law enforcement partners who don't, as a matter of course, keep the Department of State informed about what they are or are not working on."); Exhibit 1596 at Tr. 60:2-3 (House PIE Comm. Feb. 9, 2021) (former Broward Supervisor of Elections Pete Antonacci testifying that "[s]upervisors don't have the law enforcement and investigative capacity" to get to the bottom of vote-by-mail fraud).

Some were also concerned about the potential for fraud in the future. *See, e.g.*, Exhibit 528 at Tr. 86:16-87:2 (House Floor Apr. 28, 2021) (Republican Chairwoman Rep. Erin Grall noting how the Governor's personal voter registration was changed, and stating "[r]ight now anyone on Facebook can change your party, your address, and even your name in the voter records if they pick your birthday up from a Facebook account. And they can change your address. They have your vote-by-mail ballot mailed to the new address with no verification of the request. We can do much better. We need two-factor identification for every interaction on your voting account, all changes, and vote-by-mail request[s]. This is the standard of every secure consumer account database.").

### 3. Evolution of the Bill

With the participation of many in the legislative process, the bill itself evolved. Mr. Ramba estimated that "if you read the bill, [he and the FSE] c[ould] go through probably 80 percent of the provisions that have a tweak that were [the FSE's] suggestions." Tr. 3122:16-18.

Among many other changes, earlier versions of the vote-by-mail request provision would have cancelled all existing requests in 2021, affecting municipal elections and the 2022 election cycle. Tr. 3117:17 – 3118:3; Tr. 3157:15 – 3160:5; Exhibits 383, 384. Drop boxes would have been banned altogether. Tr. 1578:6-11; Tr. 3118:4-16. The Florida House proposed requirements for voters to present

specific forms of identification at drop boxes or a signed attestation.  Tr. 1578:12-17.  A voter returning a vote-by-mail ballot for a family member or friend would be required to provide a declaration naming them as the designee to return the ballot.  Tr. 1579:13-18.  Return of secrecy sleeves that accompany vote-by-mail ballots would have become mandatory.  Tr. 1578:23 – 1579:5.  Supervisors would have been limited to only using the elector's "most recent" signature in the registration books during the vote-by-mail signature verification process; then supervisors would have been required to use a signature within the preceding 4 years, or if a "wet signature is not available from the preceding 4 years" the  "most recent wet signature" on record.  Tr. 3118:17 – 3119:7.

The final version of the bill, however, was quite different.  The Florida Legislature chose to tilt the balance towards access more so than security.  Even Democratic legislators thanked their Republican colleagues for working with them and stakeholders from across the spectrum—some of whom included some of the Plaintiffs in this litigation—to increase access and amend the legislation throughout the legislative session.  *See, e.g.*, Exhibit 427 at Tr. 51:11-13 (House Appropriations Comm. Apr. 8, 2021) (Democratic Rep. Ben Diamond, stating "I appreciate the changes, Representative [Ingoglia], that you made as a result of the strike all."); *see id.* at Tr. 52:16-20 (Democratic Rep. Tracie Davis stating, "I would like to put on the record that I know the sponsor of this bill [Ingoglia] has been working with all

the stakeholders, and I appreciate that. This bill has changed from the last time I have seen it and witnessed it and it's going into a decent direction."); *see also id.* at Tr. 55:8-11 (House Appropriations Comm. Apr. 8, 2021) (Republican bill sponsor Rep. Blaise Ingoglia noting that he's been working with representatives of the many voting rights organizations).

### 4. State Interests Served

#### a. Contemporaneous Legislative Record

As detailed in the approximately forty-minute video excerpt provided to this Court, the Florida Legislature contemporaneously discussed the interests served by the provisions at issue. *See* Exhibit 1604. There are other examples throughout the legislative record.[6]

---

[6]*See, e.g.*, Exhibit 426 at Tr. 34:11-37:4 (House PIE Comm. Mar. 22, 2021) (Democratic Rep. Susan Valdes asking for the reason for the legislation on the heels of "an amazing election cycle" and Republican bill sponsor Rep. Blaise Ingoglia responding that there were some Florida-specific problems, as well as problems in other states, and noting that "[w]e should never always have to wait for a problem to occur to head off that problem."); Exhibit 425 at 15:25-16:23 (Fla. Sen. Comm. on Gov't Oversight & Accountability Mar. 10, 2021) (Republican bill sponsor Sen. Dennis Baxley stating, "I'm not a person that likes to wait for a problem." "I'm all about staying ahead of whatever problems could develop." "Do we have to wait for a debacle? Why can't we take something that's working well and put guard rails on it and keep it safe, so it doesn't have a debacle and create all this discord?"); Exhibit 426 at Tr. 68:7-22 (House PIE Comm. Mar. 22, 2021) (Republican bill sponsor Rep. Blaise Ingoglia stating, "[T]here were plenty of Supervisors of Elections that were - - just thought it was carte blanche for them to do whatever they want when it came to drop boxes," and "the Florida Legislature has the authority to come back and say no, this is what the intent is."); Exhibit 429 at Tr. 9:24-10:5 (House State Affairs Comm. Apr. 19, 2021) (Republican bill sponsor Rep. Blaise Ingoglia stating,

"[W]hen we wrote ballot drop boxes into law last time, they were not used as intended.  It was the intent that they were going to be manned.  But what we found out that the 67 different Supervisors of Elections were implementing the law 67 different ways.  So the first thing is that brings standard and uniformity to it."); Exhibit 528 at 85:23-86:2 (House Floor Apr. 28, 2021) (Republican Chairwoman Rep. Erin Grall stating, "[i]n 2020 we had supervisors who went directly against guidance of the Department of State and kept poorly secured drop boxes open.  The security provided was not acceptable.  We can do better.  That's what this bill seeks to do.  This bill makes sure that we have integrity around the drop box process and addresses the concerns that were presented to the Committee."); Exhibit 1596 at Tr. 59:5-60:4 (House PIE Comm.  Feb. 9, 2021) (former Broward County Supervisor of Elections Pete Antonacci testifying that in Broward County, "it was very common for people to deposit multiple ballots at the same time.  By multiple, I mean in the tens and tens of ballots.  People coming in with stacks of ballots and putting them in the receptacle.  If I could urge you all to do anything, I would urge you to outlaw the possession of more than X.  Whatever that X number is." "Supervisors don't have the law enforcement and investigative capacity" to determine whether people dropping off that many vote by mail ballots were doing it for "free or for remuneration"); *see id.* at Tr. 116:14-117:2, 117:18-20 (Democratic Rep. Allison Tant stating, "I love the fact that our lockboxes were manned.  I think that would go a lot to some of the concerns about ballot harvesting as well as everything, and security overnight, things of that nature.  Our lockboxes were manned and supervised.  People who had questions have their questions answered.  I was actually there when that happened.  How many places around the state were there unmanned lockboxes?  Because I really hope that that is a fixture for our elections in the future for busy people who don't have time to come in" and commenting that "the idea of lockboxes being left outside" was "a huge concern.  I would want them to be brought inside."); *see id.* at Tr. 117:4-17 (Leon County Supervisor of Elections Mark Earley testifying that "I know there is more than a small number [of supervisors], I think, that has had lockbox or drop boxes at their front door, right at their building for a long period of time, a very long period of time.  And typically they've never been staffed." "I think most [supervisors have switched over to having staffed the drop box.  But I could not give you an exact number."); *see id.* at Tr. 117:12-15 (Leon County Leon County Supervisor of Elections Mark Earley testifying that his elections workers staffing the drop boxes were able to "keep a lot of people from just putting the blank ballot in there without an envelope at all.  We could never count that because there is no signature to verify."); *see id.* at Tr. 117:21-118:6 (Okaloosa County Supervisor of Elections Paul Lux testifying that he "personally will never have a drop box that is not manned by somebody" because he "was

Trial testimony from witnesses (Mr. Ramba and Director Matthews) also makes plain that the legislature heard from election administrators both before and during session concerning the bill and the interests served. *See supra*.

The trial testimony of Director Matthews and others put a finer point on the interests. Director Matthews testified that each of the four provisions at issue serve important interests that together improve election integrity and voter confidence.

### b.    3PVRO Provision

Director Matthews analogized the **3PVRO provision** "to informed consent by a doctor." Tr. 3417:8. The information provided through this provision "let[s] the voter know that" "their voter registration may not make it [to election administrators] in time" "for them to either be registered, if they are a new registrant," or for them to update their information if they are an already registered voter. Tr. 3417:7-13. The voter is also told that he or she has other options to register such as through the State's online portal, "which is real-time registration" that ameliorates any risk of missing the book closing deadline *and* allows the voter to track the status of his or her application. Tr. 3417:14-21.

The 3PVRO provision's notification requirement did not originate in a vacuum. Rather, there had been numerous complaints of 3PVROs missing the book

---

concerned that [he] could not protect th[e] ballots" inside, or "which voters to contact" if "someone were to sabotage the box").

closing deadline.  *See, e.g.*, Tr. 3421:14-21; 3421:25 – 3422:4; Exhibit 1556 at 7-24, 45-46, 51-52, 57-60, 61-62, 73-74, 123-24.   Complaints further pointed to such organizations changing voter registration information—such as the voter's address and party affiliation—without the voter's consent.  *See, e.g.*, Tr. 3422:7-16; 3423:2-20.  Informing voters of other more timely and reliable options such as the voter registration website made sense.

It also made sense to include in the 3PVRO provision a requirement that such organizations deliver forms either to the Division of Elections or the county where the applicant resides.   This provision shifts the burden of processing voter registration forms away from a handful of supervisors in "high metro areas where a voter drive [might be] conducted" because "people [are] coming in from all over the state" to attend a particular event.  Tr. 3426:13-20.  This provision was a priority of the State's supervisors of elections.  Tr. 3120:6-18.

### c.     Vote-by-Mail Request Provision

Director Matthews explained that the **vote-by-mail request provision** furthers the State's interests as well.  The requirement that voters provide the last four digits of their social security number, their driver's license number, or their Florida ID number "add[s] another layer of" "authentication [for] someone who is requesting a vote-by-mail ballot" through the mail.  Tr. 3427:22 – 3428:4; *see also* Exhibit 1557.  It is another way for the State to "ensure that only the voter is the one

that is asking for that vote-by-mail ballot to minimize any type of potential for voter fraud."   Tr. 3429:1-3; *see also* Tr. 3213:13-20.[7]   Those without the requisite identification on file can update their information; supervisors can—and have used—the Driver and Vehicle Information Database or DAVID to verify the driver's license number of voters, *see, e.g.*, Tr. 3210:10 – 3211:22; *or* voters can request a vote-by-mail ballot in person by providing the forms of identification required to vote in-person.   Tr. 3428:6-12; *see also* Fla. Stat. § 101.62(4)(c)3.   On its face, then, the new identification requirement better aligns the identification requirements for voting by mail with those for in-person voting. *See supra.*

The vote-by-mail request provision's requirement that voters renew their vote-by-mail ballots once every election cycle (beginning in 2023) makes sense too. As Lee County Supervisor of Elections Tommy Doyle noted, this change aligns the vote-by-mail deadlines for all Florida voters.   Tr. 3214:4-11.   In addition, this change allows for election administrators to have "more current information" on file.   Tr. 3432:2-3; 3437:17-21.   Having more current information is important for voters "such as military and overseas voters, students, seasonal service workers," and college students.   Tr. 3432:4-8.   As Director Matthews explained (and Supervisors

---

[7] The existing safeguards for those requesting a vote-by-mail ballot depend on information that is publicly available.   Tr. 3431:1-2.   Voter signatures can also be publicly available; these signatures are used to corroborate whether the person requesting the ballot was the one who then cast the ballot.   Tr. 3429:14-21.

Doyle and Miami-Dade County Supervisor of Elections Christina White corroborated), the systems used to capture voter movements are not perfect; a voter must take some affirmative step like changing a driver's license to trigger the mechanisms that result in a change of address being captured and an existing vote-by-mail request being cancelled. *See, e.g.*, Tr. 3207:23 – 3208:2; 3433:8-10; 3187:18-19 ("I think at the end of the day it all has to originate with that voter"). Without this voter-initiated action, the vote-by-mail ballot continues being sent to the address on file. Tr. 3188:19-22.[8] Before Senate Bill 90, that ballot would have been sent to the address on file for a maximum of four years. Senate Bill 90 changes that to a maximum of two years, which was Florida law as recently as 2010. *See* Fla. Stat. § 101.62(1)(a) (2010).

More generally, the changes made through the vote-by-mail request provision should help with voter confidence. The State receives frequent complaints related to the vote-by-mail process. The complaints range from people receiving vote-by-mail materials when they have moved, receiving vote-by-mail materials for others who do not live at their address, to people receiving ballots that they did not ask for

---

[8] There are similar problems for deceased voters, especially where the names or dates of birth on the voter roll do not match those on the death certificate. Tr. 3448:18 – 3449:17 (discussing "Margaret Smith" versus "Peggy Smith" who might "shave a couple of years off [her birth year]"); 3473:15 – 3474:7; *see also* Exhibit 1562 at 621-35 (receiving election materials for deceased wife), 667-75 (receiving election materials for deceased father).

from their supervisor of elections or did not remember requesting because such request was made a number of years ago, to people having completed ballots turned into supervisors without their consent, and to people voting in more than one state. Tr. 3436:11-13; 3437:3-12; 3477:16 – 3478:8; Exhibits 143, 1557.[9]  The changes made should result in fewer mistakes (or malfeasance) because of the additional authentication requirement and more current information.  And mistakes actually made would persist for a maximum of two years—not four years.

### d.    Drop Box Provision

Changes to the **drop box provision** were necessary too.  The 2020 election cycle was the first statewide election where supervisors were statutorily mandated to make drop boxes available for voters to return their vote-by-mail ballots.  *See* Fla. Stat. § 101.69(2) (2019).  The statute then in effect prompted endless questions of the Department of State concerning the statute's meaning.  Tr. 3438:19-25; *see also* Tr. 3105:1-25; Exhibit 1576.  The Department was also aware of incidents of vandalism with drop boxes in the run-up to the contentious 2020 general election. Tr. 3439:6-9.  This confluence of questions and concerns prompted the Department to issue a guidance memorandum providing the State's interpretation of the drop box

---

[9] Organizations such as the Voter Participation Center, the Center for Voter Information, and Civitech make things worse by blanketing the State with inaccurate vote-by-mail request forms to the consternation of supervisors and voters alike.  *See* Tr. 1299:7-19; 1301:4 – l302:6; Tr. 1303:13-18; Tr. 3447:7 – 3448:5.

statute then in effect.  Tr. 3438:2 – 3438:3.  Not all supervisors followed the guidance.  Tr. 3439:1-3.

The need for uniformity and security animates the State's interest in the drop boxes, as does the voter benefit that comes from having someone physically available to voters as they use the drop box.  Director Matthews testified to this effect.  Tr. 3400:18 – 3401:9.  Supervisor Doyle echoed the security concerns when discussing why he discontinued the use of unstaffed twenty-four-hour drop boxes.  Tr. 3202:23-25, 3203:6-24.

Supervisor White, whose office followed the State's guidance memorandum in 2020,[10] Tr. 3156:3-9, summed up the benefits of the drop box provision with the following three points:  (1) it serves as "an added layer of security" either to deter incidents or ensure there are witnesses to any incident, Tr. 3154:2-15; (2) it "aide[s] in voter confidence" because her constituents appreciate handing their ballots to an actual person, Tr. 3154:16-20; and (3) with staff helping voters ensure that their

---

[10] More specifically, Supervisor White had staffed drop boxes, available during early voting hours at the early voting sites during the 2020 general election. She had two drop boxes available the day before the election and on election day, i.e., outside the early voting window, at two libraries that her office had determined qualified as "branch offices" for purposes of the then-effective drop box provision. In 2022, because of Senate Bill 90, Supervisor White does not anticipate using these two libraries the day before the election and on election day because the new drop box provision now refers to "permanent branch office."  But Supervisor White agreed that it is her office (together with the local board of county commissioners) that determines whether to open or designate a facility as a "permanent branch office."  Tr. 3185:13 – 3187:6.

vote-by-mail ballot was signed, it contributes to Miami-Dade County's continuing reduction in the rejection rate for vote-by-mail ballots (where "the largest reason is for a voter not signing the ballot"). Tr. 3155:15-21; Exhibit 390.

Given the State's 7p.m. deadline for receipt of vote-by-mail ballots, Supervisor White further explained that her "staff is instructed to make sure that they're approaching any car that happens to be in line" to use a drop box on election night and take "in their possession the ballots of all of those voters that are waiting in line." Tr. 3156:23 – 3157:6. Cameras cannot do the same.

### e.    Safe-Space Provision

Finally, the **safe-space provision** did not change much. It was much amended during the legislative process, but the final version enacted as part of Senate Bill 90 simply clarified existing law. Because the safe-space provision does not work in isolation, it is important to note that a different provision gives each supervisor the broad ability to maintain order at the polls. *See* Fla. Stat. § 102.031(1). That provision is not being challenged in these four consolidated cases. Nor is the provision that prohibits someone from soliciting a voter within the safe space with offers of assistance. *Id.* § 101.051(2).

The safe-space provision itself furthers the State's interest in ensuring that its voters are not harassed or intimidated while they are in line waiting to cast a ballot. Tr. 3439:22 – 3440:2. "Aggressive and intrusive behavior" outside of polling places

is not uncommon with campaigners, bullhorns, loud music, fights, food trucks, and reporters vying for the attention of voters.  Tr. 1387:15 – 1391:2; 3440:3-8; *see also* Exhibit 382.  Many supervisors thus prohibit any interaction within the 150-feet safe-space zone; that was true before Senate Bill 90's enactment.  Tr. 1379:2-5; 1392:5-14.  Assistance for disabled voters and for language minorities is still available.  Tr. 1392:16 – 1393:5; 3204:22 –3205:5; *see also* Fla. Stat. §§ 101.715(1) (mandating that all polling places "be accessible and usable by people with disabilities"); 101.051(1) (allowing electors needing assistance to bring with them a person of their choice).

### 5.     Harm to Plaintiffs

On the other side of the balance are Plaintiffs' alleged harms.  Plaintiffs, for their part, have not produced a single person who can credibly claim being disenfranchised because of Senate Bill 90.  Claims of burden include the farcical, like Mr. Madison who walks his dog for hours each day and has standing tee-times each week but cannot find the time to vote after passage of Senate Bill 90.  Tr. 711:14-22.  Claims also include the unbelievable, like those claiming they will forget to ask for a vote-by-mail ballot once every election cycle but remembered to join a federal lawsuit minutes after Governor DeSantis signed Senate Bill 90 into law.  *See, e.g.*, Tr. 712:24 – 713:11.

Plaintiffs' experts instead opine about the harm.

**Dr. Herron and Dr. Smith** attempt to show that some of the provisions of Senate Bill 90 disproportionately impact various demographic groups, including Black voters.  But their analysis is often based on limited data from only a few counties that are not representative of the State of Florida or its diverse racial make-up.  Dr. Herron and Dr. Smith also presented result-oriented analyses that fail to demonstrate the specific impacts the provisions at issue will have on minority groups—much less the magnitude of such impact.  Theoretical notions of a possible increase in the "cost of voting" is used as a substitute for an actual or imminent burden—an actual or imminent injury—even though the literature recognizes that costs of voting are specific to an individual's particular circumstances.  *See, e.g.*, ECF No. 467-5 at 14.

Specifically, as to the **vote-by-mail request provision**, Dr. Herron began his quantitative analyses by reviewing vote-by-mail rates by race from the 2014 Primary Election through the 2020 General Election.   He recognized that "VBM voting was relatively high among all race groups in the 2020 Primary and the 2020 General[,]" but he emphasized that, "considered historically, the increase in VBM voting in these two elections was greater for Blacks and Other race voters than for White and Hispanic voters."  *Id.* at 36.   He conspicuously failed to note in his report that, throughout the time-period he analyzed, white voters used vote-by-mail more than

Blacks during all of the elections, including the 2020 primary and general elections. *See id.* at Table 6; Tr. 2322:22-25.

Dr. Smith similarly emphasized what he termed the "explosion" in the use of vote-by-mail by Black voters from 2016 (20.62 percentage points for Black voters versus 15.42 percentage points for white voters), but he failed to acknowledge the consistently high vote-by-mail usage by white voters.  ECF No. 467-7 at 38-39.

Dr. Smith also provided an analysis of the new identification ("ID") requirements for vote-by-mail requests.  Based on data from the Department of State, he tried to determine the percentages of voters among demographics who did not have various types of ID on file with their supervisors of elections.  Inconveniently, the data showed that more white voters lacked ID on file than Black or Hispanic voters.  Despite this conclusion, Smith claimed he was not able to link the various files to the statewide database, so he was "unable to render an opinion as on what these data mean for disparate impact." *Id.* at 55.  Then, based on an email chain from the Department of State, he concluded that some of that data prior to a new system implemented after the enactment of Help American Vote Act ("HAVA") was unverified.  Using an analysis of only post-HAVA data, he *assumed* that Blacks (30.2%) and Hispanics (21.5%) are more likely not to have a driver's or SSN on file than whites (13.6%).  Assumption aside, the post-HAVA data (i.e., data from 2006 to the present) consisted of only 13,315 voters out of Florida's approximately

14,276,772 voters—or .09% of Florida voters. *Id.* at 57-61. From these assumptions and small cherry-picked dataset, he concluded: "Because of SB 90's new exact-match ID requirements for registered voters who want to request a VBM ballot" "disproportionately affects voters of color, it will lead to less opportunities for Black and Hispanic registered voters to receive a VBM ballot." *Id.* at 170.

Here, Dr. Smith's statistical evidence presents "a distorted picture [that] can be created by dividing one percentage by another." *Brnovich*, 141 S. Ct. at 2345. It is no different than the example *Brnovich* gave in the context of a voter identification law: "If 99.9% of whites had photo IDs, and 99.7% of blacks did, it could be said that blacks are three times as likely as whites to lack qualifying ID (0.3 ÷ 0.1 = 3), but such a statement would mask the fact that the populations were effectively identical." *Id.* Such statistical manipulation is not enough to turn a facially neutral election law into an unlawful one. *Id.* at 2343-45.

For the **drop box provision**, Dr. Herron purported to analyze statewide disparate impacts among demographic groups by analyzing drop box usage data from only five counties—Sarasota, Santa Rosa, Columbia, Madison, and Franklin—which he admitted "are not among the largest and most racially diverse counties in Florida, e.g., Miami-Dade County and Broward County, both of which are in southeast Florida." ECF No. 467-5 at 49. He then performed statistical analyses of various groups of these counties, including, at one time, only the two smallest (i.e.,

Madison and Franklin).  *See id.* at 48-65.  From this restricted analysis of only a handful of counties, he broadly concluded: SB 90 "has raised the cost of VBM voting in Florida and thus the overall cost of voting in the state.  The burdens of SB 90's restrictions on drop boxes will fall disproportionately on Black voters, voters affiliated with the Democratic party, and younger voters." *Id.* at 65.

Dr. Smith's analysis of the purported disparate impact of the drop box provision was even more limited; he studied just Columbia and Manatee Counties. Ultimately, Dr. Smith only provided the limited conclusion that his analysis "indicates that during the 2020 General Election, in Columbia County and Manatee County, voters of color (and in Manatee County, voters with disabilities), were disproportionately more likely to drop off their VBM ballots outside the mandated days VBM drop boxes must be made available under SB 90."  ECF No. 467-7 at 137.  That is it.

Once again, the important story is the one not told.  Because statewide data was unavailable, Dr. Herron and Dr. Smith were only able to speak to a handful or less of Florida's sixty-seven counties—and none of its most populous or racially diverse.  Again, other than an increase in the theoretical "cost of voting," neither Dr. Herron nor Dr. Smith identified what specific burden or impact the new drop box provision places on any specific demographic group.  Nor did they assess the magnitude or size of any purported disparate impact.

For the **3PVRO provision**, Dr. Herron reviewed demographic data from a confidential statewide voter file produced by the Department of State and 3PVRO-registered voter data produced by counties.   Based on his review of both data sources, he concluded that "Black and Hispanic registered voters in Florida use 3PVRO registration more heavily than Whites; and, Democratic registered voters in Florida use 3PVRO registration more heavily than Republicans."  ECF No. 467-5 at 108.  Based on that, he concluded that the 3PVRO notification provision "has raised the cost of registering to vote in Florida with the assistance of these organizations" and the "burdens associated with these costs will fall more heavily on Black registered voters in comparison to White registered voters and on Democratic registered voters in comparison to Republican registered voters."  *Id.* at 92-108.

Similarly, Dr. Smith took statewide data from the Division of Elections and determined the percentage of 3PVRO usage among various demographic groups. Because Blacks (10.9%) and Hispanics (9.6%) used 3PVROs more than whites (1.87%), Dr. Smith concluded that the new 3PVRO provisions will disproportionately impact persons of color. He also analyzed 3PVRO usage across counties and concluded that the disproportionate impact holds up in all but one county (Osceola) of sixteen counties analyzed.  *See* ECF No. 467-7 at 31-36.

Yet again, neither Dr. Herron nor Dr. Smith identified what specific burden or impact the new 3PVRO provision places on any specific demographic group of

registered voters, other than some theoretical "cost of voting" which can only be determined at the individual level.  *See* Tr. 2592:1-6.  Nor did they assess the magnitude or size of any purported disparate impact.

Stripped to their essence, these are Plaintiffs' claims of burden.

## III.   SUMMATION

Based on these facts, the State is entitled to judgment against all Plaintiffs. Plaintiffs have not carried their burden of establishing standing for each claim in each case.  Nor have Plaintiffs carried their burden of establishing that the four provisions at issue fail the *Anderson/Burdick* test, violate the Fourteenth Amendment, violate Section 2 of the VRA, violate the First Amendment, violate Section 208 of the VRA, or violate the ADA.  This section summarizes the legal standards for each category of claims, and answers this Court's legal questions, before briefly discussing the application of those standards.  Rather than repeating in detail the State's interests or Plaintiffs' alleged harms, this section references the discussion above where appropriate.

### A.   <u>Standing</u>

Standing is an irreducible constitutional minimum. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).  Plaintiffs must establish standing for each of their claims. *See Davis v. FEC*, 554 U.S. 724, 734 (2008).  Plaintiffs cannot rely on the standing of those in the consolidated cases—cases other than their own—to satisfy this

minimum.  *See Butler v. Dexter*, 425 U.S. 262, 267 n.12 (1976).  The theories for standing are varied but still come down to Plaintiffs establishing some actual or imminent injury, that the provision(s) at issue cause(s), and that an order from this Court can remedy.  Individual standing, associational standing, and organizational standing based on a diversion of resources theory are relevant here.  *See, e.g.*, *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977); *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1249 (11th Cir. 2020).  Each is discussed in turn.  A brief synopsis of Plaintiffs' inability to establish standing follows.  But neither the defense nor this Court bears the burden of connecting all of the standing dots for Plaintiffs.  *See Lujan*, 504 U.S. at 561 ("The party invoking federal jurisdiction bears the burden of establishing" standing.).

## 1.    Individual Standing

To establish standing, an individual plaintiff must prove (1) an injury in fact (2) that is fairly traceable to the challenged action of the defendant and (3) that is likely to be redressed by a favorable decision.  *Id.* at 560-61.  Each standing "element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation."  *Id.* at 561.  At the trial stage, "allegations of injury resulting from the defendant's conduct" "must be supported adequately by the evidence adduced at trial."  *Id.* (internal quotation marks omitted).

An injury in fact is "an invasion of a legally protected interest which is (a) concrete and particularized; and (b) actual or imminent, not conjectural or hypothetical." *Id.* at 560 (cleaned up). When a plaintiff is seeking prospective relief to prevent future injuries, the plaintiff must prove that his or her threatened injuries are "certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 401 (2013). "[H]ighly attenuated chain[s] of possibilities" do not "satisfy the requirement that threatened injury must be certainly impending." *Id.* at 410; *see also Ga. Republican Party v. SEC*, 888 F.3d 1198, 1203 (11th Cir. 2018) (Plaintiff's "generalized allegations of *possible* future injury" "are not sufficient to establish *certainly impending* injury." (cleaned up, emphasis in the original)).

Injuries must also be traceable to the defendant's actions and a favorable decision must redress the injuries. *Lujan*, 504 U.S. at 560-61. Traceability depends on whether there is a "causal connection" between the plaintiff's injuries and the defendant's actions. *Focus on the Family v. Pinellas Suncoast Transit Auth.*, 344 F.3d 1263, 1273 (11th Cir. 2003). Redressability depends on whether there is a "likely," as opposed to a "speculative," chance that the plaintiff's injuries will be "redressed by a favorable decision" against the defendant. *Loggerhead Turtle v. Cnty. Council of Volusia Cnty.*, 148 F.3d 1231, 1253 (11th Cir. 1998).[11]

---

[11] In *Common Cause/Georgia v. Billups*, the Eleventh Circuit held that "a denial of equal treatment is an actual injury even when the complainant is able to overcome [a] challenged barrier." 554 F.3d 1340, 1351 (11th Cir. 2009). Therefore,

## 2.    Associational Standing

An organizational plaintiff may sue on behalf of its own members. To have associational standing, (1) at least one member of the organization must have standing to sue in his or her own right, (2) the interests that are at stake in the case must be germane to the organization's purpose, and (3) neither the claim asserted nor the relief requested requires the participation of individual organization members in the lawsuit.  *See Friends of the Earth, Inc. v. Laidlaw Envt'l Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000); *Hunt*, 432 U.S. at 343.

It bears emphasizing that for an organizational plaintiff to have associational standing, the organizational plaintiff must identify at least one of its members that have or will suffer an injury from the defendant's actions.  *See Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009); *Jacobson*, 974 F.3d at 1249; *Ga. Republican Party v. SEC*, 888 F.3d at 1204.  Even though it might be *possible* or *likely* that *many* organizational members will suffer an injury from the defendant's actions, the organizational plaintiff must still identify *at least one* member who will suffer an

---

the plaintiffs in that case were able to challenge Georgia's voter-ID law, even though they may have had an appropriate voter-ID, and even though the barrier imposed might have been slight.  *Id.*  The injury was the denial of equal treatment, not the ultimate inability to obtain a benefit.  *Id.* (citing *Ne. Fla. Chapter of Assoc. Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993)).  Even so, that injury—the denial of equal treatment—must still be concrete, particularized, and non-hypothetical.  *Id.* (referencing *Charles H. Wesley Educ. Found., Inc. v. Cox*, 408 F.3d 1349, 1352 (11th Cir. 2005)).

injury.[12]   Moreover, courts cannot accept an organizational plaintiff's self-descriptions of its membership.   *Ga. Republican Party*, 888 F.3d at 1204 (referencing *Summers*, 555 U.S. at 499); *see also Summers*, 555 U.S. at 499 ("Without individual affidavits, how is the court to assure itself that the Sierra Club, for example, has 'thousands of members' who 'use and enjoy the Sequoia National Forest'?").

An organizational plaintiff can sometimes establish associational standing where it has constituents but not traditional members.   *E.g.*, *Hunt*, 432 U.S. at 343. But not any constituent will do.   An organizational plaintiff can only sue on behalf of constituents with some "indicia of membership" in the organization, like the ability to finance the organization's activities (including the costs of lawsuits), elect members of the organization, and serve in the organization.   *Id.* at 344-45.   In other words, the constituents must "possess the means to influence the priorities and activities" that the organizational plaintiff represents.   *Doe v. Stincer*, 175 F.3d 879, 886 (11th Cir. 1999); *see also Greater Birmingham Ministries v. Alabama*, 161 F.

---

[12] In *Georgia Republican Party v. SEC*, the Eleventh Circuit explained that in *Florida State Conference of the NAACP v. Browning*, it held that "organizations need not identify particular members who would be harmed because future 'probabilistic injuries' to unidentified members were sufficient if at least one member was certain to get injured in the end."   *Ga. Republican Party*, 888 F.3d at 1204 (referencing 522 F.3d 1153, 1162-64 (11th Cir. 2008)).   However, the *Georgia Republican Party* Court noted that after the Supreme Court decided *Summers v. Earth Island Institute*, this kind of "probabilistic injuries" theory no longer sufficed. *Id.* (referencing 555 U.S. at 499).

Supp. 3d 1104, 1115 (N.D. Ala. 2016) ("[T]he Court questions whether a mere 'constituent' with an injury can confer associational standing without actual membership or 'indicia of membership.'").

Suing on behalf of non-member beneficiaries is not allowed. *See Ne. Ohio Coal. for the Homeless v. Blackwell*, 467 F.3d 999, 1010 n.4 (6th Cir. 2006) (holding that the organizational plaintiff, which assists homeless individuals, cannot sue on behalf of any nonmember homeless individual).

### 3.    Organizational Standing

An organizational plaintiff can also sue on its own behalf under a diversion-of-resources theory. *See Jacobson*, 974 F.3d at 1249. Under this theory, the organizational plaintiff suffers a concrete and demonstrable injury when it diverts resources away from its activities to combat the effects of the defendant's actions. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378-79 (1982).

Crucially, the organizational plaintiff must identify the activities that it diverted resources away from in order to combat the effects of the defendant's actions; an organizational plaintiff cannot merely state that it will have to divert resources from an activity to another. *Jacobson*, 974 F.3d at 1250 (holding that the organizational plaintiffs failed to explain "what activities" they diverted "resources away *from* in order to spend additional resources on combatting" a Florida election law (emphasis in the original)); *NAACP v. City of Kyle*, 626 F.3d 233, 238 (5th Cir.

2010) (holding that the organizational plaintiffs failed to identify "any specific projects that" were "put on hold or otherwise curtail[ed] in order to respond to the" defendant's actions). This way, a court can determine whether the organizational plaintiff suffered a concrete and demonstrable injury or a mere "setback to the organization's abstract social interests." *Havens Realty Corp.*, 455 U.S. at 379.[13]

Sometimes a diversion of time could constitute an injury. *See, e.g.*, *Arica v. Fla. Sec'y of State*, 772 F.3d 1335, 1341-42 (11th Cir. 2014). But litigation costs should not be considered a diversion of resources for an organizational plaintiff whose mission is to engage in litigation. In *Shelby Advocates for Valid Elections v. Hargett*, the Sixth Circuit addressed whether an organizational plaintiff had standing to sue based on a diversion-of-resources theory. 947 F.3d 977, 982 (6th Cir. 2020). The court concluded that the plaintiff "did not divert resources from its mission to prepare for litigation in this case. The alleged diversionary actions—spending money to bring, fund, and participate in this litigation, and spending its resources to

_____

[13] For example, the plaintiff organizations in *Florida State Conference of the NAACP v. Browning* explained that they diverted resources away from "registration drives and election-day education and monitoring" to combat the defendant's actions. 522 F.3d 1153, 1116 (11th Cir. 2008) (stating that, for example, resources would have been "spent on registration drives and election-day education and monitoring"); *see also Arica v. Fla. Sec'y of State*, 772 F.3d 1335, 1341-42 (11th Cir. 2014) (stating that the plaintiff organizations diverted resources away from "voter registration and education" to combat the defendant's actions).

address the voting inequities and irregularities throughout the county—do not divert resources from its mission.  That is its mission." *Id.* (cleaned up).

An organizational plaintiff also cannot "bootstrap" its way into standing by inflicting harm on itself based on fears of hypothetical future harm, *Clapper*, 568 U.S. at 416, and the organizational plaintiff cannot cause its own injury, *Swann v. Sec'y of State*, 668 F.3d 1285, 1288 (11th Cir. 2012).

### 4.   Plaintiffs' Standing in the Four Cases

Numerous Plaintiffs testified that they regularly reviewed and updated their educational materials, presentations, trainings, policies, and procedures to remain in compliance with the law.   *See, e.g.*, Tr. 231:4-11, 417:7-12; 799:11-16.   While certain organizations provided specifics about the costs they directly attributed to SB 90, many others simply stated that although they necessarily would update such items, SB 90 required more significant changes than had occurred in the past.  *See, e.g.*, Tr. 250:2-5 (Poder Latinx explaining that previous updates were minor and SB 90 changes are different).  First, several of those organizations were founded in 2019 or 2020, so they have no basis to make that assertion.  *See* Tr. 187:1-2 (Poder Latinx founded July or August 2019); 293:5-7 (Harriet Tubman incorporated October 2020); 380:5-8 (Equal Ground founded May 2019).  Second, as to the remaining organizations, such bald assertions are not sufficient to confer standing.

### a.   Self-Inflicted Harms Are Not Injuries.

Certain Plaintiffs have alleged that in response to Senate Bill 90's voter-registration-disclaimer provision they have incurred additional burdens in creating and administering disclaimer-acknowledgment forms.  For example, the corporate representative from Florida Rising Together agreed that although SB 90 did not require the organization to undergo such a procedure, "it is something that we have opted to do to be able to prove that we're in compliance with SB 90."  Tr. 2058:23 – 2059:4.  Similarly, Poder Latinx asks registrants to complete an affirmation form certifying that Poder Latinx provided them with the disclaimer. *See* Tr. 205:11 – 206:22.  The time and expense that such organizations have expended on these forms is gratuitous and should not be considered as part of the injury analysis.  As Plaintiff Florida Rising Together admits, these documents are not required by Senate Bill 90.  Furthermore, there is no evidence of a need for such forms, as no Plaintiff testified that they had been asked, or that they thought it likely that they would be asked, to provide evidence that it had given the disclaimer to registrants.  Likewise, Plaintiffs failed to justify such alleged burdens when there is testimony that a simple printout posted on a table—a de minimis cost—would be sufficient.  *See* Tr. 233:12-15 (acknowledging that Senate Bill 90 does not specify whether the disclaimer can be made orally or in writing).

Similarly, certain Plaintiffs testified that they spent time and resources misinforming their constituents.  For example, Black Voters Matter promulgated informational materials that were inaccurate.  Tr. 2008:7-16.  In a similar vein, the representative for Equal Ground Education Fund testified that the organization updated its educational materials and website to state that SB 90 prohibited providing food and water to voters.  Tr. 423:11-17.  The representative admitted, however, that Equal Ground had not confirmed that interpretation with Supervisors of elections, and it could not be sure of its accuracy as a result.  Any expenditure of time or resources spent on providing inaccurate information to staff, volunteers, or constituents cannot serve as the basis for an injury traceable to Senate Bill 90.

### b.       Speculative Harms Are Not Sufficient.

Various 3PVRO Plaintiffs argued that the 3PVRO provision, specifically the disclaimer, would cause reputational harm to their organization.  Many of these Plaintiffs, however, admitted that they had not provided the disclaimer to potential applicants.  *See, e.g.*, Tr. 388:15-17 (Equal Ground); 788:1-5 (Hispanic Federation); 1495:24 – 1495:1 (UnidosUS).  Furthermore, several organizations admitted that they had not timely submitted completed voter registrations applications in the past.  *See, e.g.*, Tr. 47:6-9 (League of Women Voters); 201:18-23 (Poder Latinx); 732:2-7 (Hispanic Federation); 1419:6-9 (UnidosUS).  The disclaimer is therefore accurate.

Some testified that the presence of drop box monitors would intimidate people from voting. *See, e.g.*, Tr. 79:2-7 (Ms. Scoon describing how the presence of a drop-box monitor could "make them feel unwelcomed and intimidated and uncomfortable"). Despite that contention, several Plaintiffs admitted that they had successfully used monitored drop boxes without incident. *See, e.g.*, Tr. 116:19 – 117:19 (Ms. Scoon describing a conversation with a drop-box monitor while depositing her ballot). Likewise, these Plaintiffs acknowledged that government officials are present when voting in person, and that they were not intimidating in that context. *See, e.g.*, Tr. 172:4-25 (Ms. Scoon agreeing that she did not feel intimidated by the presence of election officials when she cast her vote in person in the past). Given the weight of such countervailing evidence, speculation that some voters may be intimidated by the presence of monitors at drop boxes is insufficient to establish standing.

### c.    Plaintiffs' Challenges to the Safe-Space Provision Are Not Redressable.

Plaintiffs must also demonstrate redressability for any alleged injury, which requires "a substantial likelihood that the requested relief will remedy the alleged injury in fact." *Vt. Ag. of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 771 (2000) (quotations omitted). As far as their challenges to the **safe-space provision** are concerned, they fail to show any likelihood of redress.

50

The safe-space provision prohibits individuals from "engaging in any activity with the intent to influence or effect of influencing a voter" within a "150 feet" safe zone for voters.  Fla. Stat. §102.031(4).  Plaintiffs argue that this provision changed Florida law to prohibit Plaintiffs from providing food, water, or other assistance to voters waiting in line in the 150-feet safe space, allegedly in violation of the First Amendment.  Only their as-applied challenge to this provision under the First Amendment remains.  But to demonstrate standing, Plaintiffs needed to show that their challenge to the safe space provision is redressable in each of the sixty-seven counties of Florida.   And they needed to challenge Florida Statutes sections 102.031(1) and 101.051(2) to obtain the relief they seek.  They did neither.

During trial, the supervisors of elections testified that the safe-space provision does not require them to do anything differently within the 150-feet buffer zone than they did prior to the enactment of Senate Bill 90.[14]  Several supervisors also testified that enforcement of a 150-feet safe space helps them maintain order at polling places pursuant to their authority under section 102.031(1).  *See supra*.

---

[14] *See, e.g.*, Tr. 1234:9-13 (Broward County Supervisor of Election Joe Scott's testimony); 1293:7-10 (Pasco County Supervisor of Elections Brian Corley's testimony); 1374:7-10, 1379:2-8, 1392:5-14 (Miami-Dade County Supervisor of Elections Christina White's testimony); 3205:24-3206:15 (Lee County Supervisor of Elections Tommy Doyle's testimony), ECF No. 549-2 at 198:14-20, 199:23-200:5 (Lake County Supervisor of Elections Alan Hays' testimony), ECF No. 549-3 at 48:11-50:5 (Hillsborough County Supervisor of Elections Craig Latimer's testimony).

Because the supervisors' limitations on conduct in the 150-feet safe space will not change if the safe-space provision is enjoined, Plaintiffs' as-applied claims are not redressable, and thus fail for lack of Article III standing. *Harp Adver. Ill., Inc., v. Village of Chicago Ridge, Ill.*, 9 F.3d 1290, 1292 (7th Cir. 1993) ("[Plaintiff] suffers an injury" "but winning the case will not alter that situation."); *Fla. Family Policy Council v. Freeman*, 561 F.3d 1246, 1255-58 (11th Cir. 2009) (holding that a nonprofit group lacked redressability where "the chill wind from [the other unchallenged provision would] still blow" even if plaintiffs were successful).

Separately, Plaintiffs' argument that Section 208 of the VRA preempts the safe-space provision because it allegedly prevents Plaintiffs from "providing non-partisan assistance to voters in line to vote" "with disabilities and [voters] needing language assistance," ECF No. 439 at 14, fails for similar reasons.  Plaintiffs cannot satisfy the redressability prong for Article III standing when they challenge one provision of law (section 102.031(4)(b)), but another provision of law not challenged in this litigation (section 101.051(2)) still serves as a bar to relief. Subsection (2) broadly provides that no one may "solicit any elector in an effort to *provide assistance to vote* pursuant to subsection (1)." Fla. Stat. § 101.051(2) (emphasis added).  Subsection (1), in turn, describes the assistance that is permitted for blind, disabled, or illiterate voters: any such voter may "request the assistance of two election officials or some other person of the elector's own choosing" "to assist

the elector in casting his or her vote."  Fla. Stat. § 101.051(1).[15]

Thus, even if the safe space provision prohibits approaching blind, disabled, or illiterate voters to assist them in the non-solicitation zone, the existence of this alternative statutory provision (not challenged in this action) precludes relief for Plaintiffs under Section 208.  The Eleventh Circuit agrees.  *See, e.g.*, *KH Outdoor, L.L.C. v. Clay Cnty., Fla.*, 482 F.3d 1299, 1303 (11th Cir. 2007) ("Any injury [plaintiff] actually suffered" "is not redressible because [their actions] failed to meet the requirements of other statutes and regulations not challenged."); *Freeman*, 561 F.3d at 1255-58 (nonprofit group lacked redressability in challenging a canon of judicial conduct but not the related statute "requir[ing] the same thing").

## B.   <u>Anderson/Burdick</u>

"States—not federal courts—are in charge of setting [election] rules."  *New Ga. Project v. Raffensperger*, 976 F.3d 1278, 1284 (11th Cir. 2020).  Contrary to the Plaintiffs' position, voters are not disenfranchised if they fail to heed reasonable time, place, and manner restrictions.  *Id.* at 1282; *see also Rosario v. Rockefeller*,

---

[15] Equally problematic for Plaintiffs is the fact that this provision expressly permits the very assistance that Section 208 requires: assistance to blind, disabled, or illiterate voters by a person of the voter's choice.  *Compare* 52 U.S.C. § 10508 ("Any voter who requires assistance to vote by reason of blindness, disability, or inability to read or write may be given assistance by a person of the voter's choice."), *with* Fla. Stat. § 101.051(1) ("Any elector" "who requires assistance to vote by reason of blindness, disability, or inability to read or write may request the assistance of two election officials or some other person of the elector's own choice" "to assist the elector in casting his or her vote.").

410 U.S. 752, 758 (1973).  Under *Anderson/Burdick*, the burden on the right to vote is weighed against the State's proffered justifications for the burden.[16]  *Anderson*, 460 U.S. at 789; *Burdick*, 504 U.S. at 434.  When an election law imposes a severe burden, the election law must be narrowly tailored to serve a compelling state interest.  *Burdick*, 504 U.S. at 434.  But where, as here, the election law is reasonable and nondiscriminatory and imposes only a minimal (if any) burden on the right to vote, the election law need only be justified by an important state interest.  *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 191 (2008).  The State further maintains that the Supreme Court's decision in *McDonald v. Board of Election Commissioners of Chicago* governs the vote-by-mail analysis and, under *McDonald*, unless a restriction on vote-by-mail "absolutely prohibit[s]" someone from voting, the right

---

[16] In a request for supplemental briefing, this Court asked whether the *Anderson/Burdick* analysis changes depending on whether the Plaintiffs' claims implicate First Amendment or Equal Protection rights.  ECF No. 630.  The question highlights some issues of concern with the *Anderson/Burdick* test.

Generally speaking, the First Amendment protects specific rights, and, as such, has specific tests to protect those rights.  The Equal Protection Clause, too, protects specific rights and has specific tests to protect those rights as well.  The same goes for the Fourteenth Amendment, generally.  Outside of the election context, those are the prevailing standards.

But in the election context, *Anderson/Burdick* flattens these tests and merges the constitutional rights together.  "The Supreme Court's cases have equivocated over which provision of the Constitution mandates this balancing test."  *Fish v. Schwab*, 957 F.3d 1105, 1122 n.3 (10th Cir. 2020).  And it is unclear how the Constitution mandates such a test.  *See id.* (collecting and discussing cases).

to vote is not implicated.  394 U.S. 802, 809 (1969).  But this Court has rejected the argument, and so the State proceeds with the *Anderson/Burdick* analysis.

### 1.    Plaintiffs' Burdens

Those asserting facial challenges to an election law "bear a heavy burden of persuasion." *Crawford*, 553 U.S. at 200.  Laws will only be invalidated when they are "unconstitutional in all of [their] applications" and have no "plainly legitimate sweep." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008).  Burdens on some voters cannot justify an invalidation of the entire law.  *See Crawford*, 553 U.S. at 203.  When analyzing the burden imposed by an election law, the burden must also be considered together with State-provided alternatives to the challenged election law, *New Ga. Project*, 976 F.3d at 1281 (considering alternatives to absentee voting); *Crawford*, 553 U.S. at 199 (considering use of "provisional ballots that will ultimately be counted").  But because different election laws produce different burdens, the burdens produced by a single election law should be viewed individually. *Eu. v. San Francisco Cnty. Democratic Comm.*, 489 U.S. 214, 222-33 (1989) (evaluating each challenged election law separately).

As discussed above, Plaintiffs in these consolidated cases struggle to establish a burden on their right to vote or for the members of their respective organizations. *See supra*.  Statistical sophistry by Dr. Herron and Dr. Smith does not establish a burden either because neither expert looks at the effect on the State as a whole and

even their limited analysis fails to articulate a magnitude of "cost" (their proxy for burden) imposed by any of the four provisions at issue.  *See supra.*

### 2.    Defendant's State Interests

On the other side of the balance, the State's interests are substantial and compelling.  *Anderson/Burdick* requires the State to establish a compelling interest only when Plaintiffs establish a severe burden.  *Crawford*, 553 U.S. at 190.  If the election law imposes only a minimal burden, the law need only be justified by an important State interest.  *Burdick*, 504 at 434.  Regardless, the State has a compelling interest in "maintaining fairness, honesty, and order" in an election, *Green v. Mortham*, 155 F.3d 1332, 1335 (11th Cir. 1998); avoiding confusion, deception, and even frustration of the democratic process, *Cowen v. Sec'y of Ga.*, 2022 U.S. App. LEXIS 390, at *13 (11th Cir. 2022); and preventing voter fraud and preserving the integrity of its election process, *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006).  A State may rely on "post hoc rationalizations" to justify its interests.  *Mays v. LaRose*, 951 F.3d 775, 789 (6th Cir. 2020).

But there must be only a rational connection between a law and its stated objective for purposes of the *Anderson/Burdick* inquiry.  It is difficult to determine a law's ability to achieve its stated objectives when *Anderson/Burdick* does not require States to provide evidence to support their interests.  *See Brnovich*, 141 S. Ct. at 2343 (holding that a State is not required to provide evidence to support its

State interest); *Crawford*, 553 U.S. at 194-95 (same); *Common Cause/Ga.*, 554 F.3d at 1353 (holding that neither *Anderson* nor *Burdick* nor *Crawford* imposes an evidentiary burden on the State to satisfy its State interest).

Here, as detailed above, the State has specific interests in the four provisions. The Florida Legislature discussed these interests before passing Senate Bill 90; the Secretary of State's Office and various supervisors provided detailed testimony concerning these interests at trial as well. *See supra.*

### 3.   Partisan Considerations and Effects

In addition, to answer a question this Court posed, *Anderson/Burdick* does not and cannot gauge, measure, or determine partisan considerations behind a nondiscriminatory election law.  The test merely weighs an alleged constitutional injury against purported State interests.  As such, partisan considerations carry no weight in that balancing act.  So long as a nondiscriminatory election law is supported by valid neutral justifications, and so long as the State interests outweigh the alleged injury, the election law is constitutional—regardless of partisanship. *See Crawford*, 553 U.S. at 204.

Indeed, nothing in the Constitution prohibits partisan considerations behind election laws.  In fact, the Constitution expressly vests the power to regulate the "Times, Places and Manner" of elections in political entities.  U.S. Const. art. I, § 4. "To hold that legislators cannot take partisan interests into account" when approving

57

an election law "would essentially countermand the Framers' decision to entrust" election regulation to such "entities." *Rucho v. Common Cause*, 139 S. Ct. 2484, 2488 (2019).   If partisan considerations are not a proxy for impermissible discrimination, such as race-based discrimination, partisan considerations behind an election law are constitutionally permissible.  *See Brnovich*, 141 S. Ct. at 2335 (noting that the district court distinguished between partisan and racial considerations behind election laws); *Rucho*, 139 S. Ct. at 2503 (holding that "securing partisan advantage" is a "permissible intent," which "does not become constitutionally impermissible, like racial discrimination, when that permissible intent 'predominates'").

Even assuming some partisan considerations are acceptable, but other partisan considerations are off limits, there exists no manageable standard to make that determination.  It is unclear, for example, in a 100-person legislative body, with two evenly split political parties, whether a 51-49 vote split evidences a lack of partisan considerations behind an election law.  Or whether a 60-40 vote split similarly evidences a lack of partisan considerations.  Or whether the partisan statements of an election law's sponsor can provide the intent behind the election law's supporters.  Or whether five, ten, twenty, thirty, forty, or fifty legislators' partisan statements behind an election law establishes unconstitutional partisan considerations.

Again, even assuming that some partisan considerations are acceptable, but other partisan considerations are off limits, *Anderson/Burdick* is a poor analytical tool to measure partisan considerations—partisan motivations, purposes, or intent. *Anderson/Burdick* does not contain the analytical factors, like *Arlington Heights* factors, to gauge those partisan considerations.  The *Anderson/Burdick* inquiry would "present line-drawing problems"—"judges must decide how much partisan dominance is too much."  *Jacobson*, 974 F.3d at 1260 (emphasis and internal quotation marks omitted).  So it is difficult to see how *Anderson/Burdick* can reach that determination.

To be sure, the Supreme Court in *Crawford* stated that if partisan considerations "provide the only justification" behind a nondiscriminatory election law, "we may also assume that" the election law "would suffer the same fate as the poll tax at issue in *Harper* [*v. Virginia State Board of Elections*]."  553 U.S. at 203. This statement, however, is dicta.  And to the extent that the Court *assumed* that sole partisan considerations would doom a nondiscriminatory election law under *Harper*, that may not be the case.  In *Harper*, the Court stated that "[w]ealth, like race, creed, or color, is not germane to one's ability to participate intelligently in the electoral process," and that lines "drawn on the basis of wealth or property, like those of race, are traditionally disfavored."  383 U.S. 663, 668 (1966) (cleaned up).  But partisan considerations do not share the same disfavor of race-based or wealth-based line

drawing. Unlike race-based considerations, nothing in the U.S. Constitution prohibits partisan considerations. And unlike wealth-based considerations, case law does not find partisan considerations an improper motivation. *Cf. Rucho*, 139 S. Ct. at 2491 (noting that the Supreme Court has never struck down a redistricting plan as an unconstitutional partisan gerrymander).

That said, in the instant case, the record clearly shows that Senate Bill 90 was not passed with pure partisan intent. *See Crawford*, 553 U.S. at 204. As explained above, numerous valid neutral justifications support Senate Bill 90. *See supra*.

## C.   **Fourteenth Amendment**[17]

Plaintiffs' standalone Fourteen Amendment claims fare no better than their *Anderson/Burdick* claims. Intentional discrimination claims under the Fourteenth Amendment require proof of both an intent to discriminate and actual discriminatory effect. *Greater Birmingham Ministries v. Sec'y of Ala.*, 992 F.3d 1299, 1321 (11th Cir. 2021). "There are two prongs" to this analysis. *Id.* Under the first prong, a plaintiff "must show that the State's decision or act had a discriminatory purpose and effect." *Id.* (internal quotation marks omitted). Under this prong, the State must be afforded a presumption of good faith. *Abbott v. Perez*, 138 S. Ct. 2305, 2324 (2018); *N.C. State Conf. of the NAACP v. Raymond*, 981 F.3d 295, 303 (4th Cir.

---

[17] Some of the Plaintiffs also pled Fifteenth Amendment claims. The test used is the same as that for Fourteenth Amendment claims. Thus, the arguments remain the same.

2020) (holding that the district court "failed to give effect to the Supreme Court's presumption of legislative good faith").

If the plaintiff satisfies the first prong, then under the second prong, the State must "demonstrate that the law would have been enacted without this racial discrimination factor." *GBM*, 992 F.3d at 1321 (internal quotation marks omitted); *Brooks v. Miller*, 158 F.3d 1230, 1242 (11th Cir. 1998) (holding that Georgia's majority-vote requirement in primary elections would have been adopted, absent discriminatory motives, because it had "ample 'good government' reasons" for its passage). This case cannot proceed beyond the first prong.

Under the first prong, the *Arlington Heights* factors control. 429 U.S. at 266-68; *GBM*, 992 F.3d at 1321. One factor is the impact of the governmental action. 429 U.S. at 266. "Sometimes a clear pattern, unexplainable on grounds other than race, emerges from the effect of the state action even when the governing legislation appears neutral on its face." *Id.* But "small disparities" "do not, standing alone, establish a pattern, unexplainable on grounds other than race." *GBM*, 992 F.3d at 1322 (cleaned up). State-provided measures that alleviate a purported disparate impact should be considered when evaluating this factor. *Raymond*, 981 F.3d at 309-10 (finding that while "minority voters disproportionately lack the types of ID required by" the challenged voter-ID law, the law provides many avenues to "make

its impact as burden-free as possible" (cleaned up)); *Lee v. Va. State Bd. of Elections*, 843 F.3d 592, 603 (4th Cir. 2016) (same).

Another factor is historical background. *Vill. of Arlington Heights*, 429 U.S. at 267. That said, "past discrimination cannot, in the manner of original sin, condemn" the State from "enacting otherwise constitutional laws about voting." *GBM*, 992 F.3d at 1325 (quoting *Mobile v. Bolden*, 446 U.S. 55, 74 (1980)). And although a State might have had a past filled with discrimination, the discrimination at issue should be tied to the challenged law. *See I.L. v. Alabama*, 739 F.3d 1273, 1287 (11th Cir. 2014) (holding that, while Alabama has a "long history of racial discrimination," the challenged constitutional amendment was adopted for economic, not racial, reasons).

Additional factors include the specific sequence of events leading up to the challenged decision, and procedural and substantive departures from the normal legislative process. *Vill. of Arlington Heights*, 429 U.S. at 267. For example, when evaluating the legislative process of the N.C. General Assembly, the Fourth Circuit concluded that five days of debate, with time permitting for public comment, and thirteen out of twenty-four amendments being adopted—including several proposed by the challenged law's opponents—constituted a normal legislative process. *Raymond*, 981 F.3d at 305-06. While it may be suspicious that the election law ended on party-line votes, or even if every minority legislator voted against the law,

there may be "valid neutral justifications (combatting voter fraud, increasing confidence in elections, and modernizing [the State's] elections procedures)" for rejecting proposed amendments and for ultimately approving the law.  *GBM*, 992 F.3d at 1326-27; *Raymond*, 981 F.3d at 307-08.

Legislative history is another relevant factor, "especially where there are contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports."  *Vill. of Arlington Heights*, 429 U.S. at 268.  That said, the Eleventh Circuit has recently expressed that "determining the intent of the legislature is a problematic and near-impossible challenge" and that "it is also questionable whether the sponsor speaks for all legislators."  *GBM*, 992 F.3d at 1324.  "The Supreme Court has" "repeatedly cautioned" "against placing too much emphasis on the contemporaneous views of a bill's opponents"; "speculations and accusations of" "opponents simply do not support an inference of the kind of racial animus discussed in" "*Arlington Heights*."  *Butts v. NYC*, 779 F.2d 141, 147 (2d Cir. 1985).

Foreseeability and knowledge of disparate impact are also factors to consider. "[C]oncerns regarding fraud" do not morph from a legitimate state interest into a "façade for racial discrimination" whenever the legislature fails to cross some imaginary evidentiary threshold. *Democratic Nat'l Comm. v. Regan*, 904 F.3d 686, 719 (9th Cir. 2018).   A legislature's knowledge that a law will have disparate

impacts is not intentional discrimination. *See Friends of Lake View Sch. Dist. Inc.*

*No. 25 of Phillips Ctny. v. Beebe*, 578 F.3d 753, 761-62 (8th Cir. 2009).

Here, as discussed above, the impact of the challenged law is minimal. *See*

*supra.* The historical background—especially since 1982—shows that Florida is not

always perfect, but it continues making progress. *Id.* The State's errors in recent

years are not related to race. *Id.* Its recent success depended on all Floridians,

regardless of race, voting through one of three convenient methods, in record

numbers, during the midst of a global pandemic. *Id.* And race is not a simple proxy

for partisanship, because Florida has Black Republicans and Black Democrats, and

Hispanic Republicans and Hispanic Democrats, which makes it hard for anyone to

impose burdens on particular minorities for partisan advantage. Finally, the

sequence of events leading to the passage of Senate Bill 90, and the statements of

key legislators during the legislative process, together with the legislative record as

a whole, underscore the efforts made to solicit input from all interested stakeholders

to improve the final bill.

Separately, the Florida Rising Together Plaintiffs' request for bail-in under

Section 3(c) of the Voting Rights Act requires a response as part of the Fourteenth

Amendment discussion. Section 3(c) of the Voting Rights Act permits judicial

oversight in the appropriate case.[18]  "To trigger bail-in, § 3(c) requires that (a) violations of the Fourteenth or Fifteenth Amendments (b) justifying equitable relief (c) have occurred (d) within the State or its political subdivisions." *Perez v. Abbott*, 390 F. Supp. 3d 803, 813 (W.D. Tex. 2019) (citing 52 U.S.C. § 10302(c)). Importantly, "triggering violations for bail-in relief must be violations of Fourteenth and Fifteenth Amendment protections against *intentional* racial discrimination in voting." *Id*. at 814-15 (emphasis added); *see also Jeffers v. Clinton*, 740 F. Supp. 585, 589 (E.D. Ark. 1990) (three-judge court).  Therefore, the only claims in this case that could possibly give rise to Section 3(c) relief are the intentional discrimination claims and not the claims under Section 2 of the Voting Rights Act or the *Anderson/Burdick* test.  *See Perez*, 390 F. Supp. 3d at 814.  As argued above, Plaintiffs have failed to prove intentional racial discrimination and are entitled to no relief under Section 3(c).

## D.    Section 2 of the VRA

Just like the Fourteenth Amendment, Plaintiffs cannot show a violation of Section 2 of the VRA.  That section is violated when, "based on the totality of circumstances, it is shown that the political processes leading to nomination or

---

[18] This assumes that Section 3(c) is a constitutional delegation of authority to the judiciary.  There are significant federalism and dual sovereignty concerns that arise under Section 3(c).  Section 3(c) also appears to be an improper delegation of authority under Article I, § 4 of the U.S. Constitution.

election in the State or political subdivision are not equally open to participation by members" of a protected classification "in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 52 U.S.C. § 10301. As the Supreme Court explained in *Brnovich v. Democratic National Committee*, a Section 2 violation is based on whether the "totality of circumstances" evidences that "voting is [not] 'equally open.'" 141 S. Ct. at 2338-39. To determine the "totality of circumstances," the Court compiled a non-exhaustive list of five factors. *Id.* at 2338.

The first factor is the size of the burden imposed by a challenged election law. *Id.* It is a "highly relevant" factor. *Id.* The Court acknowledged that voting may cause some inconveniences, such as traveling to a voting precinct, placing an absentee ballot in a mailbox, or following voting directions. *Id.* "But because voting necessarily requires some effort and compliance with some rules, the concept of a voting system that is 'equally open' and that furnishes an equal 'opportunity' to cast a ballot must tolerate the 'usual burdens of voting.'" *Id.* (quoting *Crawford*, 553 U.S. at 198).

The second factor is the degree to which a voting rule departs from what was standard practice when Section 2 was amended in 1982. *Brnovich*, 141 S. Ct. at 2338. The Court stated that this serves as a useful benchmark to gauge burdens on the right to vote. *Id.* at 2338-39. The Court doubted whether, when Congress

amended the VRA in 1982, it "intended to uproot facially neutral time, place, and manner regulations that have a long pedigree or are in widespread use in the United States." *Id.* at 2339.

The third factor is the size of any disparities in a rule's impact on members of different racial or ethnic groups. *Id.* "[S]mall differences should not be artificially magnified." *Id.* While racial or ethnic groups might "differ with respect to employment, wealth, and education, even neutral regulations, no matter how crafted, may well result in some predictable disparities in rates of voting and noncompliance with voting rules." *Id.* But, the Court cautioned that "the mere fact [that] there is some disparity in impact does not necessarily mean that a system is not equally open or that it does not give everyone an equal opportunity to vote." *Id.*

The fourth factor is the opportunities provided by a State's entire system of voting when assessing the burden imposed by an election law. *Id.* When "a State provides multiple ways to vote, any burden imposed on voters who choose one of the available options cannot be evaluated without also taking into account the other available means." *Id.*

The final factor is the strength of the State interests served by an election law. *Id.* "Rules that are supported by strong state interests are less likely to violate" Section 2. *Id.* at 2340. Preventing voting fraud is a strong state interest: "[f]raud can affect the outcome of a close election, and fraudulent votes dilute the right of

citizens to cast ballots that carry appropriate weight. Fraud can also undermine public confidence in the fairness of elections and the perceived legitimacy of the announced outcome." *Id.* Another "valid and important" interest is "[e]nsuring that every vote is cast freely, without intimidation *or undue influence*." *Id.* (emphasis added).

For example, an election law that requires voters, who vote in person, to vote in their assigned precinct furthers several "important state interests": the law "helps to distribute voters more evenly among polling places and thus reduces wait times," ensures that "each voter receives a ballot that lists only the candidates and public questions on which he or she can vote," and leads to an "orderly administration" of the election, which "tends to decrease voter confusion and increase voter confidence in elections." *Id.* at 2345. As another example, an election law that restricts the types of people who can collect an absentee ballot furthers the compelling interest in preserving the integrity of the State election process: the law limits "the classes of persons who may handle early ballots to those less likely to have ulterior motives," which "deters potential fraud and improves voter confidence." *Id.* at 2347; *id.* at 2348 (noting that "third-party ballot collection can lead to pressure and intimidation").

As an additional note, the Court stated that the State is not required to show through evidence that an election law "is absolutely necessary or that a less

restrictive means would not adequately serve the State's objectives." *Id.* at 2345-46.  The Court explained that the State "may take action to prevent" a purported harm "without waiting for it to occur and be detected within its own borders." *Id.* at 2348; *id.* ("Section 2's command that the political processes remain equally open surely does not demand that a State's political system sustain some level of damage before the legislature can take corrective action." (cleaned up)).

In these four consolidated cases, as detailed above, Senate Bill 90 cannot be said to violate Section 2 of the Voting Rights Act.  The size of the burden imposed through the four provisions at issue here remains indeterminate, at best; Senate Bill 90 itself reflects a marked improvement in accessibility (and security) from Florida law in 1982; the elections remain open to all people of all races, and Plaintiffs fail to untangle alleged impacts on racial minorities from broader issues of wealth, education, and employment; and the State's interests in Senate Bill 90 remain both substantial and compelling.  *See supra*.  In sum, Senate Bill 90 is precisely the kind of law that passes muster under *Brnovich*.

### E.    First Amendment

Plaintiffs seemingly allege every species of First Amendment claim in these four consolidated cases.  For the most part, the claims take issue with the **3PVRO provision** and the **safe-space provision**.  None should succeed.

### 1.    Conduct and Speech

The First Amendment protects speech, not conduct.  *See Rumsfeld v. FAIR*, 547 U.S. 47, 62 (2006).  Although conduct regulation might incidentally burden speech, that "hardly means that the law should be analyzed as one regulating" "speech rather than conduct."  *Id.*  Though it is "possible to find some kernel of expression in almost every activity a person undertakes," this "is not sufficient to bring the activity within the protection of the First Amendment."  *Dallas v. Stanglin,* 490 U.S. 19, 25 (1989).

The Supreme Court has long rejected "the view that an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea."  *United States v. O'Brien*, 391 U.S. 367, 376 (1968).  Conduct must be "inherently expressive" to qualify as speech, *Rumsfeld*, 547 U.S. at 66, and must also express an "identifiable" message to the average person, *Bar-Navon v. Brevard Cnty. Sch. Bd.*, 290 F. App'x 273, 276 (11th Cir. 2008).  Content-neutral regulations of expressive conduct "need only satisfy the 'less stringent' standard from *O'Brien*"—*i.e.*, "intermediate scrutiny."  *City of Erie v. Pap's A.M.*, 529 U.S. 277, 289 (2000).  The regulations need only "promote[] a substantial government interest that would be achieved less effectively absent the regulation."  *Rumsfeld*, 547 U.S. at 67.

To assist with this inquiry, the Eleventh Circuit recently articulated a two-part

70

test for determining whether activities are expressive: "(1) whether an intent to convey a particularized message was present, and (2) whether the likelihood was great that the message would be understood by those who viewed it." *Burns v. Town of Palm Beach*, 999 F.3d 1317, 1336 (11th Cir. 2021) (cleaned up).  Thus, beyond demonstrating that Plaintiffs *intended* to convey a particular expressive message through their conduct, the second prong also requires demonstrating that a "reasonable person would interpret" the conduct as communicating "some sort of message."  *Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*, 901 F.3d 1235, 1240 (11th Cir. 2018) (internal quotation marks omitted).

In determining whether there is a "great likelihood" that an activity would be understood by those viewing it to be communicating a particular message, the Eleventh Circuit has also identified five contextual factors: (1) whether the plaintiff distributes literature or hangs banners in connection with the expressive activity, (2) whether the activity will be open to everyone, (3) whether the organization conducts its activities in a traditional public forum "historically associated with the exercise of First Amendment rights," (4) whether the activity addresses an issue of public concern, and (5) whether the activity "has been understood to convey a message over the millennia." *Burns*, 999 F.3d at 1344–45 (cleaned up).[19]

---

[19] Because it is relevant to the **safe-space provision**, the State notes that polling places have long been recognized as nonpublic forums subject to special limitations on First Amendment activities, in contrast with traditional public forums

Plaintiffs' as-applied challenge to the **safe-space provision** fails.   Even assuming Plaintiffs are correct that this provision prohibits them from conducting line-warming activities in the non-solicitation zone, this is merely a regulation of conduct that "facilitates voting" rather than conduct expressing a message, as confirmed at trial.   Because Plaintiffs did not demonstrate a "great likelihood," *Burns*, 999 F.3d at 1337, that these line-warming activities are understood by those viewing them to communicate any identifiable message in any of Florida's sixty-seven counties, their argument that the safe-space provision regulates inherently expressive conduct fails.   Plaintiffs' argument is further undermined by this regulation's limited application to activities "in *and around* polling places on Election Day," *Minn. Voters All. v. Mansky*, 138 S. Ct. 1876, 1883 (2018) (emphasis added), where States have long regulated speech in the same way they regulate

---

like public parks. *See Minn. Voters All. v. Mansky*, 138 S. Ct. 1876, 1886-88, 1883 (2018).   Courts have affirmed that this principle extends to zones surrounding polling places. *See, e.g.*, *United Food & Com. Workers Loc. 1099 v. City of Sidney*, 364 F.3d 738, 750 (6th Cir. 2004) (holding that on election day "the parking lots and walkways leading to the polling places are nonpublic forums").   Regulations such as this serve a compelling interest; they maintain a zone of serenity around the polling place so voters may exercise their fundamental rights free from interference. *Cf. Citizens for Police Accountability Pol. Comm. v. Browning*, 572 F.3d 1213, 1220-21 (11th Cir. 2009) (recognizing need for "a zone of order around the polls" because it is "probable that some—maybe many—voters faced with running the gauntlet will refrain from participating in the election process merely to avoid the resulting commotion" (emphasis omitted)).   Indeed, "facilitating voting" is "not" "communicating a message." *Feldman v. Ariz. Sec'y of State's Off.*, 840 F.3d 1057, 1084 (9th Cir. 2016).

72

polling places as nonpublic forums.  Plaintiffs have not provided evidence to the contrary that is specific to any individual, organization, or county in Florida.

In other words, Plaintiffs have yet to prove an as-applied challenge.  And even if the Court were to determine that, in some counties of Florida, or for some Plaintiffs, the safe-space provision regulates expressive conduct in a public forum (which it does not), this provision easily satisfies intermediate scrutiny[20] because of the State's "compelling interest" in protecting voters from "confusion," "undue influence," "fraud," "pressure," and "intimidation," *Burson v. Freeman*, 504 U.S. 191, 199-200 (1992) (plurality opinion). *See supra*. (outlining State's numerous weighty interests in protecting voters in the 150-feet safe space).

## 2.    Vagueness and Overbreadth

Because Plaintiffs plead their vagueness and overbreadth claims together, both will be addressed here.  An unconstitutionally vague statute either "fails to provide people with ordinary intelligence a reasonable opportunity to understand what conduct it prohibits" or "authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 732 (2000).  A statute

---

[20] Indeed, the safe-space provision is akin to a content-neutral time, place, or manner restriction.  *See McCullen v. Coakley*, 573 U.S. 464, 479 (2014).  All are welcome to continue interacting with voters, just not at a certain place (within 150 feet of polling places), at a certain time (during elections); and whatever message the activity communicates can still be uttered, just not in a certain manner (that seeks to "solicit" or otherwise makes it difficult for supervisors to maintain order).  *See Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 294-95 (1984).

need not contain "meticulous specificity"; a statute that is "marked by flexibility and reasonable breadth" will withstand a vagueness challenge. *Grayned v. City of Rockford*, 408 U.S. 104, 110 (1972) (internal quotation marks omitted).  As such, a statute must be read in context, as a whole. *Id.*  Courts are generally reluctant to declare statutes void for vagueness.  *See Parker v. Levy*, 417 U.S. 733, 757 (1974).

An unconstitutionally overbroad statute, in turn, prohibits more protected speech than is necessary. *See Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973). The statute's overbreadth "must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep."  *Id.* at 615.  But, if a "limiting construction has been or could be placed on the challenged statute," the statute is saved.  *Id.* at 613.  Courts are reluctant to declare statutes overbroad. *Id.* (describing an overbreadth challenge as "manifestly[] strong medicine").

As explained above, the **safe-space provision** is neither vague nor overbroad. *See supra*.  The safe-space provision clarifies existing election laws and creates a "floor" that prohibits significantly less speech than what many supervisors of elections already prohibit under Florida Statutes section 102.031.  *See supra*.

The Harriet Tubman Plaintiffs further allege that the **3PVRO provision** is void for vagueness because it does not specify the penalties for noncompliance. They are wrong.

Again, "[v]agueness arises when a statute is so unclear as to what conduct is applicable that persons of common intelligence must necessarily guess at its meaning and differ as to its application." *United States v. Gilbert*, 130 F.3d 1458, 1462 (11th Cir. 1997) (internal quotation marks omitted).   The new 3PVRO provision is codified in section 97.0575(3) of the Florida Statutes.  Fines do not apply for failure to notify voters of their rights under the 3PVRO provision.  Fla. Stat. § 97.0575(3)(a)1.-3. (providing fine schedule for other violations).

Subsection 97.0575(4), however, specifies that:

> If the Secretary of State reasonably believes that a person has committed a violation of this section, the secretary may refer the matter to the Attorney General for enforcement. The Attorney General may institute a civil action for a violation of this section or to prevent a violation of this section. An action for relief may include a permanent or temporary injunction, a restraining order, or any other appropriate order.

The reference to "section" in 97.0575(4)—which pre-dated Senate Bill 90—is to the entirety of section 97.0575.  There is nothing vague about the consequences to 3PVROs for non-compliance with the new notification requirement.  3PVROs may be subject to a civil action brought to prevent the violation by means of a permanent or temporary injunction, restraining order, or other appropriate order—all well within the province and expertise of the courts.  Indeed, when the constitutionality of subsection 97.0575(4) was challenged shortly after it was enacted in 2011, this

Court found that it was "unobjectionable." *Women Voters of Fla. v. Browning*, 863

F. Supp. 2d 1155, 1166-67 (N.D. Fla. 2012).

### 3.   First Amendment and *Anderson/Burdick*

#### 1.   The Registration Delivery Requirements are Constitutional.

Election regulations that impose a severe burden on expressive or

associational rights are generally subject to strict scrutiny. *Wash. State Grange*, 552

U.S. at 451.  However, "the collection and handling of voter registration applications

is not inherently expressive activity." *League of Women Voters of Fla. v. Browning*,

575 F. Supp. 2d 1298, 1319 (S.D. Fla. 2008); *Knox v. Brnovich*, 907 F.3d 1167, 1181

(9th Cir. 2018) (same).  As the Fifth Circuit explained, "no court of appeals has held

receipt and delivery of voter registration forms alone entitled to First Amendment

protection." *Voting for Am., Inc. v. Steen*, 732 F.3d 382, 391 n.3 (5th Cir. 2013).

Because "there is nothing 'inherently expressive' about receiving a person's

completed application and being charged with getting that application to the proper

place," "rational basis scrutiny is appropriate" for such delivery requirements. *Id.* at

392 (internal quotation marks omitted).

As a general proposition, courts should be cautious in subjecting election laws

to strict scrutiny: that would "tie the hands of States seeking to assure that elections

are operated equitably and efficiently." *Burdick*, 504 U.S. at 433.  "If a statute

imposes only modest burdens" "then 'the State's important regulatory interests are

generally sufficient to justify reasonable, nondiscriminatory restrictions' on election procedures." *Wash. State Grange*, 552 U.S. at 452 (quoting *Anderson*, 460 U.S. at 788).  Thus, "[l]esser burdens" "trigger less exacting review." *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997).  This less-searching examination is slightly more exacting than rational basis review. *Green Party of Tenn. v. Hargett*, 767 F.3d 533, 546 (6th Cir. 2014); *see also Ohio Council 8 Am. Fed'n of State v. Husted*, 814 F.3d 329, 335 (6th Cir. 2016) (same).

Furthermore, the Supreme Court has adopted "a more relaxed standard to electoral regulations which do not place a *direct or substantial* burden on First Amendment rights." *Browning*, 575 F. Supp. 2d at 1321 (emphasis added); *see, e.g.*, *Timmons*, 520 U.S. at 363 (applying relaxed standard of constitutional scrutiny to uphold Minnesota law banning fusion candidacies because it did not "directly limit [their] access to the ballot").  Particularly where a law "does not place any direct restrictions or preconditions on" "interactions" between voters and 3PVROs, but instead "simply regulates an administrative aspect of the electoral process—the handling of voter registration applications by third-party voter registration organizations *after* they have been collected from applicants," such a law does not severely burden First Amendment rights. *Browning*, 575 F. Supp. 2d at 1322 (emphasis in the original).  This kind of limited burden imposed on Plaintiffs' rights may thus be justified by "sufficiently weighty" or important regulatory interests of

77

the State in imposing the challenged provisions. *Id.* at 1323.[21]

Additionally, "the First Amendment does not entail a right to achieve the speaker's goals (no matter how laudable) or to seek to achieve them in any way the speaker desires." *Lichtenstein v. Hargett*, 489 F. Supp. 3d 742, 772 (M.D. Tenn. 2020). "The question is not whether the Law conflicts with Plaintiffs' preferences for [voter registration] *tactics* or stands to some extent in the way of Plaintiffs' *goal*. The question as to the applicability of the First Amendment, instead, is whether the Law restricts 'expressive conduct,' *i.e.*, as the Fifth Circuit put it, political discussion

---

[21] Although the Middle District of Tennessee in *League of Women Voters v. Hargett* determined that exacting scrutiny should be applied to a restriction on "the collection and submission of applications" for purposes of finding likelihood of success on the merits, *see* 400 F. Supp. 3d 706, 728 (M.D. Tenn. 2019) (quoting *League of Women Voters v. Cobb*, 447 F. Supp. 2d 1314, 1332 (S.D. Fla. 2006)), that case relied solely on *Cobb* for this proposition, which should be given less weight than the Southern District of Florida's contrary reasoning in *League of Women Voters of Florida v. Browning*, 575 F. Supp. 2d at 1298, that followed *Cobb*. And the Middle District of Tennessee later distinguished *Hargett* in *Lichtenstein v. Hargett* when it determined that Plaintiffs bear the burden of explaining why particular activities constitute speech, rather than relying on "voter engagement" generally to bring the activity within the ambit of core political speech. *See* 489 F. Supp. 3d 742, 770 (M.D. Tenn. 2020). Indeed, *Lichtenstein* approvingly cited the Fifth Circuit for the proposition that restrictions on returning completed voter registration applications do not implicate the First Amendment because "the underlying expressive conduct" "does not implicate a third-party's right to process the application," and thus "the actual expression is not being limited" by the restriction. *Id.* at 771 (quoting *Voting for Am., Inc. v. Andrade*, 488 F. App'x 890, 898 n.13 (5th Cir. 2012)); *see also id.* at 772 (approvingly citing *Steen*, 732 F.3d at 392, for the proposition that a law restricting delivery of voter registration applications did not run afoul the First Amendment because it did not "restrict political discussion or burden the exchange of ideas").

or the exchange of ideas." *See id.* at 773 (emphasis in the original).

The **3PVRO provision**'s registration delivery requirements do not restrict expressive conduct or political discussion of any kind. The 3PVRO provision's delivery requirements merely require 3PVROs to get applications to the right place in a timely fashion after Plaintiffs' speech has already taken place. Because 3PVRO's expressive activities are not regulated by these ordinary delivery requirements, *see Steen*, 732 F.3d at 391, they are subject to rational basis review, and easily survive given the State's weighty interests. *See supra*.

And even if the delivery requirements implicate associational freedom, Plaintiffs failed to show that the requirement imposes any more than a modest burden on 3PVROs. Voters are no less likely to utilize 3PVROs because of additional regulations imposed on the back end. If a 3PVRO suffers reputational damage, it will be because of its own failure to correctly process applications. Reputational damage caused by an organization's failure to lawfully perform the services in which it allegedly specializes is not a constitutional violation. By contrast, the State has more than "sufficiently weighty" interests in having registration applications delivered to the county of residence. *See supra*.

More fundamentally though, *Anderson/Burdick* is only concerned with burdens on the right to vote; the delivery requirement creates no burden on voting rights whatsoever. As long as 3PVROs follow the law in delivering applications on

time to the county of residence, the outcome will be the same as before Senate Bill 90: voters will still be registered and be able to vote.  In fact, by ensuring that voters' registration applications are timely delivered to the proper county, the delivery requirement reduces the burden on voting by increasing the likelihood a registration will be delivered to the right location and thus that a voter will be able to vote.

Finally, viewpoint discrimination is a subset of the broader category of content discrimination, and "[g]overnment regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Harbourside Place, LLC v. Town of Jupiter*, 958 F.3d 1308, 1318 (11th Cir. 2020) (internal quotation marks omitted).  Not only is the delivery requirement not viewpoint discrimination—it is not even content discrimination.  3PVROs are not required to deliver applications to the voter's county of residence "because of the topic discussed or the idea or message expressed," because no topic is discussed or message expressed in the course of that delivery.  *Id.*  States "have an interest in protecting the integrity, fairness, and efficiency of their ballots and election processes," *Timmons*, 520 U.S. at 364, which includes the delivery of registration applications.

### 2. The Registration Disclosure Requirement is Constitutional.

Although *Anderson/Burdick* typically governs First Amendment challenges to election laws, when election regulations do "not control the mechanics of the

electoral process" but instead regulate "pure speech," an "exacting scrutiny" test applies. *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 345-47 (1995) (requiring that a prohibition of pure speech be "narrowly tailored to serve an overriding state interest"). However, disclaimer and disclosure requirements in the context of election laws like Senate Bill 90's disclosure requirement are treated more leniently than the outright prohibition of speech seen in *McIntyre*. *See id.* at 353 (noting that because *Buckley v. Valeo* addressed "mandatory disclosure[s] of campaign-related expenditures," *Buckley*'s more lenient standard did not apply to the "prohibition of anonymous campaign literature" at issue in *McIntyre* (citing 424 U.S. 1 (1976) (per curiam)); *see also The Real Truth About Abortion, Inc. v. FEC*, 681 F.3d 544, 553 (4th Cir. 2012) ("[B]ecause disclosure requirements occasion a lesser burden on speech, it is constitutionally permissible to require disclosure for a wider variety of speech than mere electioneering.").[22]

Specifically, even though "disclaimer and disclosure requirements may burden the ability to speak," because they "do not prevent anyone from speaking,"

----

[22] Although this Court has determined that *Zauderer*'s test for mandatory disclosure of non-controversial factual information does not govern here, ECF No. 294 at 31, the State maintains this test should apply to the speech at issue here because 3PVROs have professional employees who profit from their participation in voter registration activities, and particularly considering the unique fiduciary responsibilities that Florida law imposes upon them in relation to prospective registrants, and the significant overlap between this obligation and common law fiduciary responsibilities imposed in the commercial context.

they are subjected to *Buckley*'s version of "exacting scrutiny" which requires a "substantial relation between the disclosure requirement and a sufficiently important governmental interest."   *Citizens United v. FEC*, 558 U.S. 310, 366-67 (2010) (internal quotation marks omitted).   Under that test, mandatory disclosure of information is justified "based on a governmental interest in provid[ing] the electorate with information about the sources of election-related spending" and in helping citizens "make informed choices in the political marketplace."  *Id.* at 367 (internal quotation marks omitted); *see also Worley v. Cruz-Bustillo,* 717 F.3d 1238, 1243 (11th Cir. 2013) (affirming constitutionality of Florida's disclosure and disclaimer requirements under exacting scrutiny "even where those regimes have costs that potentially decrease[] both the quantity and effectiveness of the group's speech." (internal quotation marks omitted)); *id.* at 1244 (observing that "every one of our sister Circuits who have considered the question" "have applied exacting scrutiny to disclosure schemes").

Importantly, the compelled disclaimers at issue in *Buckley* and *Citizens United* implicate core political speech under the First Amendment, where the protected interest is at its zenith.   Despite this, the disclosure requirements were upheld because they imposed a lesser burden on speech than laws prohibiting or restricting speech.  *Citizens United*, 558 U.S. at 366-67; *see also Buckley*, 424 U.S. at 14-15 ("Discussion of public issues and debate on the qualifications of candidates are

integral to the operation of the system of government established by our Constitution."); *see also id.* ("'[T]here is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs," "of course including discussions of candidates.'" (quoting *Mills* v. *Alabama*, 384 U.S. 214, 218 (1966))).

The **3PVRO provision**'s disclosure requirement is similarly supported by the State's important interests in informing the public about the risks of entrusting 3PVROs with voter registration applications and of alternative means for registering. *See supra*. The consequences for voters from deliveries of applications after book closing are severe: voters are denied the opportunity to vote in that election. Like the record evidence in *Citizens United* demonstrating that independent groups were "hiding behind dubious and misleading names," *Citizens United*, 558 U.S. at 367 (internal quotation marks omitted), the record here shows that 3PVROs frequently return registration applications late, bolstering the State's interest in informing the public of these risks. *See supra*.

Yet unlike *Buckley* and *Citizens United*, the disclosure requirement is far less intrusive on political speech than disclaimers the Supreme Court has determined survive exacting scrutiny. The disclosure requirement is not the kind of core political speech at issue in *Buckley* and *Citizens United*. It is not speech advocating for the election or defeat of candidates, or even to influence elections at all. And

while Plaintiffs have repeatedly argued that the disclaimer provision forces them to communicate a message with which they disagree (i.e., that they might not deliver the application on time) and that is antithetical to the mission of their organizations, the same is true for political committees forced to communicate that their message is not endorsed by a candidate or the candidate's committee.  *See, e.g.*, 11 C.F.R § 110.11.

Finally, *NIFLA v. Becerra*, 138 S. Ct. 2361 (2018), does not apply to the 3PVRO disclosure requirement because that case did not involve election-related speech at all.  *Gaspee Project v. Mederos*, 13 F.4th 79, 95 (1st Cir. 2021) ("The election-related context implicated here is alone sufficient to distinguish *NIFLA*.").[23]

---

[23] This Court's order for supplemental briefing on *NIFLA* indicated that, based on Director Matthews' testimony, it appeared Defendants were suggesting Plaintiffs' registration activities should be treated like other professional conduct (e.g., informed consent in the medical context) for purposes of First Amendment scrutiny. *See* ECF No. 636.  To be clear, Director Matthews testified that informed consent by a doctor is a useful analogue for understanding the general purpose and operation of the disclosure requirement, *see* Tr. at 3417:4-21, not that the same analytical framework should govern here. But if the Court determines that *NIFLA* applies to the disclosure requirement, the State argues that the notice required in *NIFLA*, which was *not* held to be professional conduct, is distinguishable from Senate Bill 90's disclosure requirement because in *NIFLA* "the notice [was] not tied to a procedure at all" but applied to "all interactions" "regardless of whether a medical procedure is ever sought, offered, or performed."  138 S. Ct. at 2373.  By contrast, Senate Bill 90's disclosure is directly tied to 3PVROs' professional conduct, i.e., the act of collecting a voter registration application for delivery: it is only required to be communicated "at the time the application is collected," Fla. Stat. § 97.0575(3)(a). Even under *NIFLA*, the disclosure provision should not be subject to strict scrutiny.

F.   <u>Section 208 of the VRA</u>[24]

Plaintiffs argue that section 208 of the VRA preempts provisions of Senate Bill 90.   Preemption happens when "compliance with both federal and state regulations is a physical impossibility," or where the challenged state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona v. United States*, 567 U.S. 387, 399 (2012).   When a State has traditionally regulated a particular field, preemption is not presumed. *Fla. E. Coast. Ry. v. City of W. Palm Beach*, 266 F.3d 1324, 1328 (11th Cir. 2001); *see also* U.S. Const. art. I, § 4 (giving States the power to regulate elections).

As discussed above, Plaintiffs failed to demonstrate at trial that Section 208 of the VRA preempts the 2021 Law.   Section 101.051(1) of the Florida Statutes provides the very same assistance as Section 208 and is not at issue before this Court. *Compare* 52 U.S.C. § 10508 ("Any voter who requires assistance to vote by reason of blindness, disability, or inability to read or write may be given assistance by a person of the voter's choice."), *with* Fla. Stat. § 101.051(1) ("Any elector" "who requires assistance to vote by reason of blindness, disability, or inability to read or write may request the assistance of two election officials or some other person of the elector's own choice" "to assist the elector in casting his or her vote.").

---

[24] Although this Court disagreed, the State maintains that Section 208 does not provide a private right of action to Plaintiffs.

Because federal law and state law exist in harmony, Plaintiffs necessarily fail on their Section 208 claim.

Finally, Plaintiffs separately fail to demonstrate that the safe space provision prevents blind, disabled, or illiterate voters from being accompanied by a person of their own choice to assist them in the 150-feet safe space. To the contrary, testimony at trial confirmed that such assistance by a person of the voter's choice in the safe space and at the voting booth is "not solicitation" but rather merely "assisting the voter." Tr. 3205:13-19, and that Senate Bill 90 did nothing to change that assistance, *see* Tr. 3205:21-23. Plaintiffs offer no evidence beyond their own speculative *ipse dixit* that the safe space provision will prevent any blind, disabled, or illiterate voters from obtaining this assistance that Florida law mandates.

### G.   ADA Claims

Finally, the ADA claims are meritless. The ADA only requires states "to make 'reasonable modifications' that would not fundamentally alter the nature of the service or activity of the public entity or impose an undue burden." *Bircoll v. Miami-Dade Cnty.*, 480 F.3d 1072, 1082 (11th Cir. 2007) (quoting *Tennessee v. Lane*, 541 U.S. 509, 531-32 (2004)). The ADA does not mandate the use of any particular technology or any specific accommodation, so long as every individual has an "opportunity to participate in and benefit from the aid, benefit or service that is" "equal to that afforded others." 28 C.F.R. § 35.130(b)(1)(ii)-(iii); *see also* 45

C.F.R. § 84.4(b)(1)(ii)-(iii).  To succeed on their ADA claims, Plaintiffs are required to put forward evidence that a qualified individual with a disability was excluded from participation or denied a benefit because of the disability.  *Silberman v. Miami Dade Transit*, 927 F.3d 1123, 1134 (11th Cir. 2019).  They have not done so.

Nor have Plaintiffs shown that there is a supervisor of elections, anywhere in Florida, who either intends to place drop boxes or polling places in non-ADA compliant buildings or refuse reasonable accommodations to those who request them.  *Cf.* Tr. 3204:16 – 3205:5 (affirming that Lee County's voting machines, polling locations, indoor facilities, and buildings are all accessible to voters with disabilities, and that Supervisor Doyle has never denied a request for an ADA accommodation).  Supervisors are expected to follow the law; Plaintiffs have not proven otherwise.  *See* Fla. Stat. §§ 101.715(1) (mandating that all polling places "be accessible and usable by people with disabilities"); 101.051(1) (allowing electors needing assistance to bring with them a person of their choice); *cf. Harding v. Edwards*, 484 F. Supp. 3d 299, 317 (M.D. La. 2020) (dismissing plaintiffs' ADA claim because the "electoral scheme already provides a means for absentee by mail voting by disabled voters").

## IV.   CONCLUSION

In 2020, Florida had a safe and secure election, with high voter turnout and timely results, during a global pandemic.  It was not, however, a perfect election.

There is no such thing as a perfect election.  As such, the State maintains the right—and indeed the obligation—to continue assessing and refining its election code.  That is what Florida did through Senate Bill 90.  Only four sections of that bill remain at issue before this Court in what began as facial challenges but have morphed since.  Neither the law nor the evidence justifies Plaintiffs' continued attacks on the State's prerogative to set the time, place, and manner of its elections.  This Court should thus enter judgment for the defense in all four cases.

Respectfully submitted by:

/s/      *Mohammad O. Jazil*
Mohammad O. Jazil (FBN: 72556)
mjazil@holtzmanvogel.com
Gary V. Perko (FBN: 855898)
gperko@holtzmanvogel.com
Holtzman Vogel Baran Torchinsky &
Josefiak PLLC
119 S. Monroe St. Suite 500
Tallahassee, FL 32301
(850) 274-1690
(540) 341-8809 (fax)

Phillip M. Gordon (VA Bar: 96521)*
pgordon@holtzmanvogel.com
15405 John Marshall Hwy
Haymarket, VA 20169
(540) 341-8808
(540) 341-8809 (fax)

BRADLEY R. MCVAY (FBN 79034)
General Counsel
Brad.McVay@dos.myflorida.com
ASHLEY E. DAVIS (FBN 48032)
Deputy General Counsel
Ashley.Davis@dos.myflorida.com
Florida Department of State
R.A. Gray Building Suite 100
500 South Bronough Street
Tallahassee, Florida 32399-0250
(850) 245-6536
(850) 245-6127 (fax)

*Admitted *pro hac vice*

*Counsel for Secretary Laurel M. Lee*

/s/      *Benjamin J. Gibson*
Benjamin J. Gibson FBN 58661
bgibson@shutts.com
Daniel E. Nordby FBN 14588
dnordby@shutts.com
George N. Meros Jr. FBN 263321
gmeros@shutts.com
Frank A. Zacherl FBN 868094
fzacherl@shutts.com
Amber Stoner Nunnally FBN 109281
anunnally@shutts.com
Tara R. Price FBN 98073
tprice@shutts.com
SHUTTS & BOWEN LLP
215 South Monroe Street, Ste. 804
Tallahassee, Florida 32301
Tel: (850) 241-1717

Tyler Green* Utah Bar No. 10660
tyler@consovoymccarthy.com
Cameron T. Norris*  Tenn. Bar No. 33467
cam@consovoymccarthy.com
Steven C. Begakis*
steven@consovoymccarthy.com
Daniel Shapiro
daniel@consovoymccarthy.com
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423

*Admitted pro hac vice

*Counsel for Intervenor-Defendants
Republican National Committee and
National Republican Senatorial
Committee*

ASHLEY MOODY
Attorney General

/s/  *Bilal A. Faruqui*
WILLIAM H. STAFFORD III
Senior Assistant Attorney General
Florida Bar Number 70394
BILAL AHMED FARUQUI
Senior Assistant Attorney General
Florida Bar Number 15212
Office of the Attorney General
General Civil Litigation Division
State Programs Bureau
PL – 01 The Capitol
Tallahassee, Florida 32399-1050
(850) 414-3785
William.Stafford@myfloridalegal.com
Bilal.Faruqui@myfloridalegal.com

*Counsel for Ashley Moody,*
*Florida Attorney General*

Dated:  February 26, 2022

## **CERTIFICATE OF COMPLIANCE**

I CERTIFY that the foregoing complies with the size and font requirements of the local rules.

/s/    *Mohammad O. Jazil*
Attorney

## **CERTIFICATE OF SERVICE**

I CERTIFY that on February 26, 2022, a true and correct copy of the foregoing

was filed via CM/ECF, which served a copy on all parties of record.

/s/      *Mohammad O. Jazil*
Attorney