UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

LEAGUE OF WOMEN VOTERS OF
FLORIDA, INC., et al.,

          Plaintiffs,

          v.

LAUREL M. LEE, in her official
capacity as Florida Secretary of State,
et al.,

          Defendants,

          and

REPUBLICAN NATIONAL
COMMITTEE, and NATIONAL
REPUBLICAN SENATORIAL
COMMITTEE,

          Intervenor-
          Defendants.

Cases Consolidated for Trial:

Nos.:      4:21-cv-186-MW/MAF
            4:21-cv-187-MW/MAF
            4:21-cv-201-MW/MAF
            4:21-cv-242-MW/MAF

## *LEAGUE* PLAINTIFFS' WRITTEN CLOSING STATEMENT AND POST-TRIAL BRIEF

Pursuant to the Court's orders, Plaintiffs in the *League of Women Voters of Florida v. Lee* case, No. 4:21-cv-186, one of four cases that were consolidated for trial before the Court from January 31, 2022 to February 16, 2022, hereby submit this written closing statement and post-trial brief. The *League* Plaintiffs are: League of Women Voters of Florida, Inc. and League of Women Voters of Florida Education

Fund, Inc. (together, the "League"); Black Voters Matter Fund, Inc. ; Florida Alliance for Retired Americans, Inc. ("FLARA"); Cecile Scoon; Dr. Robert Brigham; Alan Madison; and Susan Rogers. The provisions of SB90 that the *League* Plaintiffs challenge are: Fla. Stat. § 97.0575(3)(a), as amended by Section 7 of SB90 (the "Registration Disclaimer Provision"); Fla. Stat. § 101.62(1)(a), as amended by Section 24 of SB90 (the "Vote-By-Mail Request Provision"); Fla. Stat. § 101.69, as amended by Section 28 of SB90 (the "Drop Box Provisions"); and Fla. Stat. § 102.031(4), as amended by Section 29 of SB90 (the "Solicitation Definition"). Together, these four provisions are the "Challenged Provisions."

Accompanying this brief are five appendices meant to aid the Court. **Appendix 1** includes evidence relating to SB90's background, passage, and general justifications. **Appendix 2** is a master chart of the *League* Plaintiffs' standing, summarizing which Plaintiffs have standing for which claims. **Appendix 3** includes evidence relating to the *League* Plaintiffs' standing. **Appendix 4** includes evidence relating to the *League*'s First Amendment claims. **Appendix 5** includes evidence relating to the *League*'s *Anderson-Burdick* claims.

# TABLE OF CONTENTS

BACKGROUND ...................................................................................1

I.   The Challenged Provisions were imposed after increased
     participation by minority and Democratic voters using vote-by-
     mail. ..........................................................................................1

II.  There is no evidence of any significant voter fraud in Florida...........................2

III. Florida's election apparatus did not support SB90 or believe that
     significant changes to the state's voting system were necessary to
     ensure election integrity..............................................................6

IV. Even moderate changes to Florida's election system have
     historically wreaked chaos on voters and election administrators. ...................9

ARGUMENT ...................................................................................11

I.   The *League* Plaintiffs have standing to bring each of their claims. .................11

     A. Legal Standard ......................................................................11

     B. Injury-In-Fact........................................................................14

          1.  Individual Plaintiffs' Standing ...........................................15

               a.  Cecile Scoon's Standing ..........................................15

                    i.   Registration Disclaimer Provision ...........................15

                    ii.  Drop Box Provisions........................................17

                    iii. Vote-By-Mail Request Provision..............................18

                    iv.  The Solicitation Definition .................................19

               b.  Dr. Robert Brigham's Standing.....................................22

                    i.   Drop Box Provisions........................................22

                    ii.  Vote-By-Mail Request Provision..............................24

               c.  Alan Madison's Standing ..........................................25

                    i.   Registration Disclaimer .....................................25

                    ii.  Drop Box Provisions........................................26

                    iii. Vote-By-Mail Request Provision..............................28

               d.  Susan Rogers' Standing .................................................28

          2.  The League's Standing...................................................32

               a.  The League's Associational Standing..............................32

b. The League's Organizational Standing...........................36

  i.  The League's Diversion of Resources Injury ...........................36

  ii. The League's First Amendment Injuries ...................40

3. Black Voters Matter's Organizational Standing ...................42

  a. Black Voters Matter's Diversion of Resources...............................43

  b. Black Voters Matter's First Amendment Injury ...................45

4. The Florida Alliance of Retired Americans' Standing ...................46

  a. FLARA's Associational Standing.......................................47

  b. FLARA's Organizational Standing........................................48

C. Plaintiffs Satisfy the Causation and Redressability Requirements. ...................................................49

1. The Registration Disclaimer Provision ...............................50

2. The Drop Box Provisions ...........................................50

3. The Vote-By-Mail Request Provision...................................51

4. The Solicitation Definition ..........................................52

II. The Registration Disclaimer Provision violates the First Amendment...................................................................54

A. Legal Standard...................................................................54

B. The Registration Disclaimer Provision constitutes compelled speech and undermines Plaintiffs' expression.............................58

C. The Registration Disclaimer Provision is not narrowly tailored.................61

D. The Registration Disclaimer Provision does not serve a compelling public interest. .......................................64

III. The Solicitation Definition violates the First and Fourteenth Amendments. ...................................................68

A. The Solicitation Definition regulates expression, not mere conduct.................................................................68

1. Legal Standard..........................................................68

2. Plaintiffs' line-warming activities are intended to convey a particularized message. ...........................................69

3. Reasonable viewers would understand that a message was being conveyed..........................................................70

B. The Solicitation Definition is unconstitutionally vague ............................. 71

   1. Legal Standard ............................................................................. 71

   2. Evidence and Analysis ................................................................. 72

C. The Solicitation Definition is unconstitutionally overbroad. ..................... 78

   1. Legal Standard ............................................................................. 78

   2. Evidence and Analysis ................................................................. 79

D. The Solicitation Definition is unconstitutional as applied to Plaintiffs' line warming activities. ............................................................ 81

   1. Legal Standard ............................................................................. 81

   2. Evidence and Analysis ................................................................. 82

IV. The Challenged Provisions unduly burden the right to vote. ........................... 85

  A. Legal Standard .................................................................................... 85

  B. The Registration Disclaimer Provision imposes an undue burden on the right to vote ................................................................... 93

   1. Third-Party Voter Registration Organizations have been critical in registering voters in Florida that other means of registration have been unable to reach. .................................. 93

   2. The Registration Disclaimer Provision burdens the right to vote ............................................................................................. 94

     a. The Registration Disclaimer Provision has and will deter voters from registering with Third-Party Voter Registration Organizations. .............................................. 95

     b. Minority and low-income voters often face barriers when registering to vote online, in person, and by mail. ................. 96

     c. The Registration Disclaimer reduces the effectiveness of Third-Party Voter Registration Organizations' efforts ................................................................................. 99

   3. The Registration Disclaimer Provision is not adequately supported by a sufficiently weight state interest. ................. 101

     a. There is no evidence widespread problems with registration forms being delivered late, much less after book closing. ............................................................... 102

    b.   The Registration Disclaimer Provision undermines overall voter registration which cannot possibly achieve the state's purpose............................................103

    c.   The Registration Disclaimer Provision will not instill voter confidence in the voting process............................................105

C. The Vote-By-Mail Request Provision imposes an undue burden on the right to vote............................................107

  1.  The Vote-By-Mail Request Provision burdens the right to vote. ............................................109

    a.   The Vote-By-Mail Request Provision retroactively invalidates hundreds of thousands of VBM requests....................110

    b.   The Vote-By-Mail Request Provision is likely to cause massive confusion and disenfranchisement among voters. ............................................113

    c.   The Vote-By-Mail Request Provision makes requesting a VBM ballot needlessly difficult. ................................................116

    d.   The Vote-By-Mail Request Provision's identification requirement sets up voters for failure. ............................................117

  2.  The Vote-By-Mail Request Provision is not supported by a sufficiently weighty state interest............................................119

    a.   The Vote-By-Mail Request Provision does not promote the state's interest in expanding voter's choices............................119

    b.   The Vote-By-Mail Request Provision is not necessary to prevent fraud. ............................................121

    c.   The Vote-By-Mail Request Provision makes elections much harder to administer for Florida's Supervisors. ..................128

D. The Drop Box Provisions impose an undue burden on the right to vote. ............................................131

  1.  Drop boxes have long been used in Florida with great success. ............................................131

  2.  The Drop Box Provisions burden the right to vote. ............................138

    a.   The monitoring requirement reduces drop box availability and threatens to chill voter turnout. ............................138

    b.   The reduction in drop box hours will make it more difficult for voters to cast their ballots.............................................141

    c.  The reduction in drop box locations imposes undue burdens on low-income, minority voters in particular..................146

    d.  Voters with disabilities are severely burdened when outdoor drop boxes are no longer available. ...................152

  3.  The Drop Box Provisions are not adequately supported by a sufficiently weighty state interest......................................154

    a.  The Drop Box Provisions are not necessary to secure drop boxes: prior to SB90, drop boxes were already secure..................................................................154

    b.  The Drop Box Provisions are not necessary to ensure the law is applied uniformly...........................................158

    c.  The Drop Box Provisions are not necessary to answer voter questions or ensure that ballots are signed and sealed. ....................................................160

E.  The Solicitation Definition unduly burdens the right to vote....................161

  1.  The Solicitation Definition burdens the right to vote..........................162

  2.  The Solicitation Definition is not adequately supported by a sufficiently weighty state interest.....................................167

F.  The Challenged Provisions together impose an undue burden on the right to vote.....................................................168

V.  Injunctive relief is appropriate and will not disrupt election administration. ....................................................173

CONCLUSION .................................................175

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ams. for Prosperity Found. v. Bonta*,
   141 S. Ct. 2373 (2021)......................................................................55

*Anderson v. Celebrezze*,
   460 U.S. 780 (1983)..................................................................*passim*

*Arcia v. Florida Secretary of State*,
   772 F.3d 1335 (11th Cir. 2014) .......................................................14

*Baggett v. Bullitt*,
   377 U.S. 360 (1964).........................................................................72

*Bd. of Airport Comm'rs of City of L.A. v. Jews for Jesus, Inc.*,
   482 U.S. 569 (1987).........................................................................80

*Bourgeois v. Peters*,
   387 F.3d 1303 (11th Cir. 2004) ..................................................65, 66

*Buckley v. Am. Const. Law Found., Inc.*,
   525 U.S. 182 (1999)..................................................................*passim*

*Burns v. Town of Palm Beach*,
   999 F.3d 1317 (11th Cir. 2021), *petition for cert. filed* (No. 21-
   677) ..................................................................................................69

*Burson v. Freeman*,
   504 U.S. 191 (1992) (plurality opinion)..........................71, 82, 90, 91

*Charles H. Wesley Educ. Found., Inc. v. Cox*,
   408 F.3d 1349 (11th Cir. 2005) .......................................................12

*City of Chi. v. Morales*,
   527 U.S. 41 (1999)...........................................................................79

*Coates v. City of Cincinnati*,
   402 U.S. 611 (1971).........................................................................72

*Common Cause/Georgia v. Billups,*
   554 F.3d 1340 (11th Cir. 2009) .......................................................12

*Crawford v. Marion Cnty. Election Bd.,*
   553 U.S. 181 (2008)........................................................85, 87, 91

*Democratic Exec. Comm. of Fla. v. Detzner,*
   347 F. Supp. 3d 1017 (N.D. Fla. 2018) ..........................................161

*Democratic Exec. Comm. of Fla. v. Lee,*
   915 F.3d 1312 (11th Cir. 2019) .......................................................87

*Duke v. Cleland,*
   5 F.3d 1399 (11th Cir. 1993) ...........................................................92

*Fish v. Schwab,*
   957 F.3d 1105 (10th Cir. 2020), *cert. denied,* 141 S. Ct. 965 (2020) ...............91

*Fla. State Conf. of NAACP v. Browning,*
   522 F.3d 1153 (11th Cir. 2008) ..........................................13, 36, 48

*Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale,*
   901 F.3d 1235 (11th Cir. 2018) (*Food Not Bombs I*)...........................68, 69, 70

*Ft. Lauderdale Food Not Bombs v. City of Ft. Lauderdale,*
   11 F.4th 1266 (11th Cir. 2021) (*Food Not Bombs II*)................................14, 81

*Gooding v. Wilson,*
   405 U.S. 518 (1972)........................................................................79

*Grayned v. City of Rockford,*
   408 U.S. 104 (1972)........................................................................71

*Hawkins v. Ford Motor Co.,*
   748 So. 2d 993 (Fla. 1999) ...........................................................136

*Hunt v. Wash. State Apple Advertising Comm'n,*
   432 U.S. 333 (1977)........................................................13, 32, 47

*Jacobson v. Fla. Sec'y of State,*
   974 F.3d 1236 (11th Cir. 2020) ..................................................11, 14

*Janus v. AFSCME*,
   138 S. Ct. 2448 (2018) ........................................................................12

*Konikov v. Orange Cnty.*,
   410 F.3d 1317 (11th Cir. 2005) ..........................................................72

*League of Women Voters of Fla. v. Browning*,
   575 F. Supp. 2d 1298 (S.D. Fla. 2008) ...............................................57

*League of Women Voters of Tenn. v. Hargett*,
   400 F. Supp. 3d 706 (M.D. Tenn. 2019) ........................................56, 68

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) ........................................................................14, 50

*McClendon v. Long*,
   22 F.4th 1330 (11th Cir. 2022) ...........................................................55

*McIntyre v. Ohio Election Comm.*,
   514 U.S. 334 (1995) ..............................................................56, 57, 66

*McLaughlin v. City of Lowell*,
   140 F. Supp. 3d 177 (D. Mass. 2015) ..................................................65

*Meyer v. Grant*,
   486 U.S. 414 (1988) ........................................................................13, 16, 86

*Minn. Voters All. v. Mansky*,
   138 S. Ct. 1876 (2018) .........................................................82, 83, 84

*NIFLA v. Becerra*,
   138 S. Ct. 2361 (2018) ................................................................*passim*

*Norman v. Reed*,
   502 U.S. 279 (1992) ........................................................................86, 87

*Ohio State Conf. of N.A.A.C.P. v. Husted*,
   768 F.3d 524 (6th Cir. 2014), *vacated on other grounds*, No. 14-
   3877, 2014 WL 10384647 (6th Cir. Oct. 1, 2014) ......................92, 98

*Otto v. City of Boca Raton*,
   981 F.3d 854 (11th Cir. 2020) ............................................................58

*Papachristou v. City of Jacksonville*,
    405 U.S. 159 (1972) ...........................................................................78

*R.A.V. v. City of St. Paul*,
    505 U.S. 377 (1992) ...........................................................................61

*Reed v. Town of Gilbert*,
    576 U.S. 155 (2015) ......................................................................81, 82

*Riley v. Nat'l Fed'n of Blind of N.C.*,
    487 U.S. 781, ...........................................................................*passim*

*Shaw v. Hunt*,
    517 U.S. 899 (1996) ...........................................................................65

*Soltysik v. Padilla*,
    910 F.3d 438 (9th Cir. 2018) ..........................................................87, 92

*United Food and Com. Workers Union Loc. 751 v. Brown Group, Inc.*,
    517 U.S. 544 (1996) ...........................................................................36

*United States v. Playboy Ent. Grp., Inc.*,
    529 U.S. 803 (2000) ......................................................................61, 62

*Wakulla Cnty. Absentee Voter Intervenors v. Flack*,
    419 So. 2d 1124 (Fla. 1982) ...............................................................78

*Williams v. Rhodes*,
    393 U.S. 23 (1968) ...........................................................................169

*Wollschlaeger v. Governor, Fla.*,
    848 F.3d 1293 (11th Cir. 2017) .......................................................12, 71

**Statutes**

Fla. Stat. § 97.0575 ................................................50, 59, 63, 94, 96

Fla. Stat. § 101.051 ...........................................................77, 78

Fla. Stat. § 101.62 .........................................25, 107, 115, 123, 148

Fla. Stat. § 101.69 ...........................................2, 134-137, 160

Fla. Stat. § 101.657 ........................................................... 134-135

Fla. Stat. § 101.6103 .............................................................148

Fla. Stat. § 102.031 ..........................................................*passim*

Fla. Stat. § 104.41 ................................................................53

Fla. Stat. § 104.011 .............................................................124

Fla. Stat. § 104.0615 .......................................................84, 168

# BACKGROUND[1]

## I.     The Challenged Provisions were imposed after increased participation by minority and Democratic voters using vote-by-mail.

In the 2020 general election, over 4.8 million Floridians—over 40% of the electorate—voted using a vote-by-mail ("VBM") ballot. Ex. 5, ECF No. 608-1 at 35, Table 5 (Dr. Herron Rpt.). While that was more than in any prior general election, millions and millions of Floridians have used VBM over the past two decades. *Id.*

In 2020, VBM patterns changed in two notable ways. First, Black voters increased their use of VBM substantially. From the 2016 to the 2020 general election, the percentage of Black voters utilizing VBM went from approximately 20% to 40%—that is, a nearly 100% increase in use. *Id.* A whopping 52% of Black voters used a VBM ballot in the 2020 primary. *Id.* The upshot is that while "white voters have traditionally used VBM voting more than Black voters, the White-Black gap in VBM voting rates shrunk" significantly in 2020. *Id.* at ¶ 100.

Second, for the first time in Florida's modern history, Democratic voters' use of VBM ballots in 2020 outpaced Republican voters' use—and by a substantial margin. *Id.* at 38, Tbl. 8. In the 2020 primary, nearly 70% of Democratic voters used a VBM ballot. *Id.* By the 2020 general election, 53% of Democratic voters were

---

[1] An appendix including evidence relating to SB 90's background, passage, and general justifications is attached at Appendix 1.

using a VBM ballot, compared to only 34% of Republican voters. *Id.* These rates are shown below:

Table 8: VBM rates by party affiliation in recent Florida statewide elections

| Election | Democrat | Republican | NPA | Other party |
|---|---|---|---|---|
| 2014 Primary | 42.06 | 44.66 | | |
| 2014 General | 30.73 | 33.32 | 28.81 | 30.29 |
| 2016 Primary | 41.82 | 43.53 | | |
| 2016 General | 29.05 | 30.09 | 25.80 | 28.48 |
| 2018 Primary | 36.78 | 37.44 | | |
| 2018 General | 32.37 | 32.73 | 29.65 | 26.10 |
| 2020 PPP | 40.18 | 55.04 | | |
| 2020 Primary | 68.63 | 48.32 | | |
| 2020 General | 53.31 | 34.78 | 43.70 | 40.60 |

*Id.*

While all Florida voters have been eligible to use VBM voting for the past twenty years, Senator Baxley, SB90's sponsor, expressed concerns about the VBM electorate's expansion in 2020: "The vote-by-mail ballots on this broad scale where we're just practically sending the entire voter file that wants [vote] by mail ballots was really a new experience . . . ." Ex. 6, ECF No. 608-5, at 6 (Burch Rpt.). Of course, that is the purpose of a no-excuse VBM system: any voter who wants to use one may do so. Left unstated but plainly implied is that it was a "new experience" for so many Democratic voters and voters of color to use the VBM system.

## II.   There is no evidence of any significant voter fraud in Florida.

Political scientists agree that voter fraud in American elections is exceedingly rare. *See* Tr. Day 8, 2216:21-2218:10 (Dr. Herron). Even those who have made a concerted effort to find evidence of voter fraud have had difficulty doing so.

President Trump's presidential commission to document voter fraud "was disbanded without finding evidence of" the "systemic voter fraud" that Trump himself so fervidly claimed had occurred. *Id.* Academics who separately studied the 2016 election were unable to find such evidence. Tr. Day 8, 2216:21-2217:12. And "no one's found systematic voter fraud remotely consistent with the claims that were made in the aftermath of the 2020 election." Tr. Day 8, 2207:3-5 (Dr. Herron).

Florida's Supervisors agree that voter fraud is not a problem in Florida. *See, e.g.*, Tr. Day 4, 1268:12-23 & Ex. 109, ECF No. 608-27 (Pasco County Supervisor Brian Corley explaining that "true voter fraud is isolated and infrequent"); Tr. Day 9, 2608:2-21 (Leon County Supervisor Mark Earley explaining that VBM fraud in particular is "very rare," "very isolated," and a "one-off" when it does occur). As Supervisor Corley explained, "most 'anomalies' or 'irregularities' [in elections] are the result of clerical errors by elections' staff who are taxed by extremely long hours in high stress environments." Ex. 109, ECF No. 608-27; *see also* Tr. Day 12, 3255:25-3256:12 (Lee County Supervisor Tommy Doyle agreeing that "perceived fraud in an election is often just a mistake by a voter or a mistake by an election worker"). Similarly, most allegations of "double voting" are not that at all, but rather cases of mistaken identity: there are "hundreds of millions of voters" across the United States, and "when individuals with the same name and birthday live in

3

different states, and it can look like someone voted twice when actually these are two different people." Tr. Day 8, 2215:20-2216:16 (Dr. Herron).

Florida has long had strong measures in place to prevent voter fraud. Supervisor Doyle confirmed this at trial, testifying that, "Florida has some of the strictest election laws in the United States," and he agreed that before SB90, it was difficult to commit fraud in Florida's elections. Tr. Day 12, 3232:21-24, 3255:25-3256:12; *see also* Ex. 212, ECF No. 608-47 (Hillsborough County Supervisor Craig Latimer explaining that before SB90, "we already had strong laws in that enabled us to run our 2020 election with accessibility and integrity"). Florida's Supervisors also agree that Florida's VBM system was secure before SB90. Tr. Day 9, 2606:24-2607:12 (Supervisor Earley). As Supervisor Latimer explained, there were multiple layered security measures in place: "To get a vote by mail ballot, you first off have to be a registered voter. When you register to vote, you are supplying identification and information that the State is able to make a match to verify you are who you say you are. You then have to request that ballot. When we get that ballot back, you had to have signed the oath on the outside of the envelope, and we physically compare that signature to the signatures that we have on file." ECF No. 549-3, 105:18-106:5. Florida also has multiple layers of security in place to prevent double voting. A few years ago, Florida joined ERIC, which allows the state to "identify individuals who appear to be registered to vote in multiple states." Tr. Day 10, 2760:3-5 (Director of

Division of Elections Maria Matthews). This system helps detect any instances of double voting that occur out-of-state, which Supervisor Earley described as "definitely" rare. Tr. Day 9, 2623:19-22. There are also separate intra county-to-county protections in Florida that would stop double voting in the State, *Id.* at 2622:19-2623:4, as well as operate to thwart anyone attempting to vote another's ballot. According to Miami-Dade County Supervisor Christina White, Florida's "voter rolls have never been more accurate and up to date." Tr. Day 5, 1362:18-19.

The 2020 election was celebrated as an extremely successful and secure election. Both Secretary Lee and Director Matthews maintain that Florida voters should "be confident in the integrity of the election system and the security of their vote in the 2020 elections." Tr. Day 10, 2759:2-8 (Director Matthews). Florida's Supervisors universally had confidence in the integrity of the 2020 election, and have no reason to believe that it was infected with voter fraud. *See, e.g.*, Tr. Day 12, 3229:6-12 (Supervisor Doyle); Tr. Day 5, 1333:18-3 (Supervisor White).

And when SB90 was debated in the Legislature, the bill's sponsors could not point to any evidence of voter fraud. As Senator Farmer summarized:

> Q. What evidence do you recall being presented during the debates over SB 90 that indicated that voter fraud was a significant problem in Florida?
>
> A. None. There was no evidence whatsoever presented of any voter fraud problems in the 2020 election.

Tr. Day 5, 1517:23-1518:2 (Senator Farmer); *see also id.* at 1456:9-20 (Rep. Thompson agreeing no such evidence was presented).

### III.   Florida's election apparatus did not support SB90 or believe that significant changes to the state's voting system were necessary to ensure election integrity.

As SB90 made its way through the Legislature, Florida's Supervisors spoke with one voice, opposing the legislation. They did so both through the Florida Supervisor of Elections Association, or FSE, as well as their own statements.

Florida's Supervisors were not consulted before SB90 or HB7041 were introduced, an unusual change from prior election legislation. Tr. Day 9, 2611:16-19 (Supervisor Earley); Ex. 112, ECF No. 608-30 (Supervisor Corley writing to his own representatives, "[n]either of the bill sponsors (nor any member of the legislature) reached out to an SOE on the legislation before it was filed, which is ironic as we are the subject matter experts who actually administer elections"). As the legislation progressed, Supervisors felt there was "reticence about even hearing what we had to say." Tr. Day 9, 2611:16-19, 2616:12-22 (Supervisor Earley); *see also* Tr. Day 5, 1447:9-17 (Rep. Thompson opining that "there was very little regard for the Supervisors' opinions and positions").

The timing and scope of the bills was also a surprise to Supervisors. As Supervisor Latimer explained, "[t]he Governor and Secretary of State and others came out and said what a fantastic election we had run. As a matter of fact, I think

the Governor said we should be a model for the country, and then turned right around and all of a sudden we need election reform." ECF 549-3, 98:17-24 (Supervisor Latimer). Overall, the Supervisors described SB90's passage as "very partisan" in that it "mirrored" the dialogue from one party that there were reasons to "doubt the 2020 election" and to doubt "vote-by-mail" voting. Tr. Day 9, 2613:2-24 (Supervisor Earley); Ex. 149, ECF No. 608-35.

As Supervisor Earley testified, from his perspective, "very little of the true reasoning behind the bill was actually stated." Tr. Day 9, 2614:1-10. "When some of the sponsors of the bill and other people supporting the bill were asked pretty difficult questions about why certain measures were in the bill, their answers didn't really make much sense. . . [I]f that was the reasoning, their answers reflected the true reasoning, then it was, frankly, nonsense." Ex. 149 at 1, ECF No. 608-35. Even Republican Supervisors felt similarly: After SB90 passed, Supervisor Corley wrote to his fellow Supervisors, explaining, "I have so much I want to say about the motives, intent and content of this election bill but to be honest, beyond disillusioned so I'll keep my pie hole shut!" Ex. 115 at 1, ECF No. 608-32.

The FSE, for its part, is a "total bipartisan group" of all 67 Supervisors who are "advocates" for their voters. ECF 549-3, 91:19-24 (Supervisor Latimer). As Supervisor Earley explained, the FSE will advocate against legislation "if we see something that can adversely affect our voters, [or] cause disruptions in our ability

[to run elections]." Tr. Day 9, 2609:25-2610:9. Multiple times throughout the legislative session, FSE issued statements against the bill. *See, e.g.*, Ex. 215, ECF No. 608-50; Tr. Day 9, 2634:7-2636:2 (Supervisor Earley). As FSE's President-elect, Supervisor Earley, explained at trial, "I don't think [FSE] ever made a statement as an association, certainly, that it was a necessary change in statute or necessary bill, just the opposite. I think we said repeatedly it was not." Tr. Day 9, 2670:20-2671:1. And as FSE's former President, Supervisor Latimer, said after the bill passed: "[S]weeping election reform was not needed or requested by Supervisors of Elections. And making a lot of changes all at once has the potential to create voter confusion, more cumbersome administration and bureaucracy, and worst of all, an erosion of the confidence we've worked so hard to earn." Ex. 216 at 257, ECF No. 549-3. As Senator Farmer testified, the Supervisors were "unanimous in their opposition to SB 90, which I found to be extremely significant. Florida is an incredibly diverse state . . . I've never seen 67 different counties' elected officials agree on anything in my time in the Florida Senate . . . ." Tr. Day 5, 1521:4-11.

The Supervisors' positions have not changed in the year since SB90 passed. If Supervisor White "had the option to administer future elections under the law that was in effect prior to Senate Bill 90," she would do so. *Id.* at 1381:6-1382:5. "Our state, my county, was revered as having a near flawless election cycle; record voter turnout; no irregularities, as we've talked about; results substantiated, submitted on

time . . . . So to have that election cycle then conclude with an election reform bill, you know, with all of these various provisions, I think was something that took all of us as administrators off guard. . . . So, in the end of the day, I just don't think that any of it was necessary." *Id*.

## IV.   Even moderate changes to Florida's election system have historically wreaked chaos on voters and election administrators.

Almost exactly ten years before the Florida Legislature passed SB90, it passed a different election omnibus bill that took aim at specific modes of voting. Ten years ago, it was not VBM, but early voting that was the subject of the Legislature's revisions. Those changes came after President Obama's 2008 campaign was particularly effective at motivating Florida Democrats, and particularly Black voters, to vote early in person. Tr. Day 6, 1728:15-1729:2; 1730:12-1731:2 (Dr. Kousser). In the 2008 election, Democrats outpaced Republicans in early in-person voting by more than 20 percentage points (notably, just about the same gap that Florida saw with VBM voting in 2020, *see supra* at Part (I)). *See id.* In response, Florida passed HB1355, which limited early in-person voting by decreasing early voting hours, days, and banning early in-person voting the Sunday before election day, when many Black voters traditionally went to the polls. *See id.* HB1355 was sponsored by the same Senator Baxley who in 2021 also sponsored SB90. *See id.*

HB1355's cutbacks in early voting proved catastrophic for Florida's voters, increasing voting lines all across the state. As Supervisor White testified, "in the

2012 election, there were some precincts that did not close until after 1:00 am on the day after election day." Tr. Day 5, 1371:20-1372:5. As Supervisor Earley described it, even what he considered to be a "moderate decrease in early voting ability" in HB1355 had tremendous consequences. Tr. Day 13, 3507:16-3508:7. "[E]ven that change, I think, resulted – was all over the news. And I know I use – sorry, Your Honor – colorful adjectives, but it was chaos in 2012, and there was substantial changes as a reaction to try and repair the damage to our voters in the 2013 legislative cycle. And, frankly, we warned the legislature of that same potential during the Senate Bill 90 committee hearings." *Id.*

In other words, recent history in Florida has shown—and the Supervisors agree—that a change to one modality of voting has inevitable ripple effects on other forms of voting. If you hit "vote-by-mail in general, if you impact that, then you increase demands" and build pressure on the rest of the system. Tr. Day 9, 2618:22-2619:11 (Supervisor Earley); *see also* Tr. Day 5, 1372:8-13 (Supervisor White explaining effective VBM voting takes pressure off her in-person voting). As Supervisor Earley explained, his county is dependent on multiple forms of voting to administer elections: "[W]e just don't have the capacity, and it would be tough to get the capacity to handle" all in-person elections like Florida used to administer. Tr. Day 13, 3507:4-15.

Dr. Kousser similarly testified that, given Florida's population growth between 1980 and 2020, it is "not physically feasible for everybody to vote on election day" as they had in 1980. Tr. Day 6, 1786:13-1787:2. "And so Florida, which became the third largest state in the country over that period of time – Florida had to find other ways to [] vote in general. Voting by mail is one of them; early in-person voting is another; drop boxes in 2020, or another – one can think of other means as well. . . . Florida [has] had to increase the ways of voting in order to keep the experience of voting anything like what it had been in 1980." *Id.* The upshot, of course, is that Florida's election system is not built for any of its methods of voting to break down without the full system suffering severe consequences.

For the reasons that follow, the Court should find for the *League* Plaintiffs on each of their claims, and invalidate the Challenged Provisions.

## ARGUMENT

### I. The *League* Plaintiffs have standing to bring each of their claims.

#### A. Legal Standard

To have Article III standing, a plaintiff must prove (1) an injury in fact (2) fairly traceable to the defendant's challenged action, (3) that is likely to be redressed by a favorable decision. *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1245 (11th Cir. 2020) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)).

In voting cases, plaintiffs satisfy the injury in fact requirement when subjected to laws that make it more difficult for them to exercise their right to vote—even if they are not ultimately disenfranchised. *See*, *e.g.*, *Charles H. Wesley Educ. Found., Inc. v. Cox*, 408 F.3d 1349, 1352 (11th Cir. 2005) ("A plaintiff need not have the franchise wholly denied to suffer injury."); *Common Cause/Georgia v. Billups*, 554 F.3d 1340, 1351–52 (11th Cir. 2009) ("Even if [plaintiffs] possessed an acceptable form of photo identification, they would still have standing to challenge" law requiring voters "produce photo identification to cast an in-person ballot" because "[r]equiring a registered voter either to produce photo identification to vote in person or to cast an absentee or provisional ballot is an injury sufficient for standing").

Separately, requiring persons or entities to engage in expression they disagree with, or chilling expression they would like to engage in, is an injury-in-fact. *Janus v. AFSCME*, 138 S. Ct. 2448, 2464 (2018) (finding when state or federal government "prevents individuals from saying what they think on important matters or compels them to voice ideas with which they disagree, it undermines [the] ends" that free speech serves). And where the danger "is 'one of self-censorship,' harm 'can be realized even without an actual prosecution,'" so long as, but for the challenged law, the plaintiff "would engage in speech arguably protected by the First Amendment." *Wollschlaeger v. Governor, Fla.*, 848 F.3d 1293, 1305 (11th Cir. 2017) (quoting *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 393 (1988)). Persons or

12

entities are also injured by laws that "limit[] the number of voices that will convey [their] message . . . and, therefore, limit[] the size of the audience they can reach." *Meyer v. Grant*, 486 U.S. 414, 422-23 (1988); *see also Buckley v. Am. Const. Law Found., Inc.*, 525 U.S. 182, 194-95 (1999) (same).

Organizations may have standing in two ways. First, a membership organization has associational standing to sue on behalf of its members if "its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Fla. State Conf. of NAACP v. Browning*, 522 F.3d 1153, 1160 (11th Cir. 2008); *see also Hunt v. Wash. State Apple Advertising Comm'n*, 432 U.S. 333, 345 (1977).[2] Second, "an organization has standing to sue on its own behalf if the defendant's illegal acts impair its ability to engage in its projects by forcing the organization to divert resources to counteract those illegal acts." *Browning*, 522 F.3d at 1165 (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)). This includes diversion

---

[2] As discussed in Plaintiffs' February 7 filing in response to the Court's specific questions about standing, organizations need not be formal membership organizations to sue on behalf of quasi-members or constituents. ECF No. 557 at 2-3. This issue, however, does not impact the *League* Plaintiffs. Of the three organizational *League* Plaintiffs, two—the League and FLARA—have traditional members who testified to their injuries, and the third—Black Voters Matter—does not rely on associational standing.

not only of money, but also other resources, including volunteer time. *Ft. Lauderdale Food Not Bombs v. City of Ft. Lauderdale*, 11 F.4th 1266, 1287 (11th Cir. 2021) (*Food Not Bombs II*); *Arcia v. Florida Secretary of State*, 772 F.3d 1335, 1341 (11th Cir. 2014); *see also* ECF No. 557 at 6-8 (citing additional cases).

To meet the "fairly traceable" requirement, a plaintiff's injury must be "traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Jacobson*, 974 F.3d at 1253 (quoting *Lujan*, 504 U.S. at 560). To meet the "redressability" requirement, "it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Lujan*, 504 U.S. at 561 (quoting *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 41–42, (1976)). If a plaintiff "is himself an object of the action (or foregone action) at issue, . . . there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it." *Id.* at 561–62.

## B.     Injury-In-Fact

Appendix 2 to this filing contains a chart reflecting which of the *League* Plaintiffs challenge which provisions of SB90, and which bases for standing are applicable to each such claim. Appendix 3 contains tables quoting key testimony regarding the *League* Plaintiffs' injuries from the challenged provisions.

### 1.      Individual Plaintiffs' Standing

Individual Plaintiffs Cecile Scoon, Dr. Robert Brigham, Alan Madison, and Susan Rogers each have standing to challenge one or more of the Challenged Provisions.

### a.      Cecile Scoon's Standing

Cecile Scoon is a resident of Panama City, in Bay County, Florida. Tr. Day 1, 33:7-8. Ms. Scoon is both the President of and a member of the League. *Id*. at 33:22-34:15. Ms. Scoon has standing to challenge all four of the Challenged Provisions: the Registration Disclaimer, the Drop Box Provisions, the VBM Request Provision, and the Solicitation Definition.

### i.      Registration Disclaimer Provision

Ms. Scoon has standing to challenge the Registration Disclaimer Provision because it will force her to engage in speech she does not want to engage in when conducting voter registration. Ms. Scoon has been "personally registering voters" for "about 35, 36 years." Tr. Day 1, 36:14-16. Now, after SB90, when she does so she must communicate the Registration Disclaimer. *See id*. at 48:5-17.

Being required to convey the Disclaimer undermines Ms. Scoon's voter registration efforts. She testified that the Disclaimer is "invalidating all the work that we've done. It's building distrust in the person you are trying to build trust with, . . . making people distrust us when we are trying to build trust, have those conversations

to build the trust, and then you have to turn around and kind of break it down." *Id.* at 49:9-19. Ms. Scoon has personally experienced people's response when she directs their attention to the Disclaimer, and it is oftentimes very negative. She recalled a recent experience interacting with a young man while registering voters at the library: "[H]e was all ready to register to vote; and after he read the warning, he . . . was, like, withdrawing from me. And he says, You know what? I'm going to do it later. I don't – I'm not going to do it now. And he walked away. He did not register." *Id.* at 50:15-51:2. Ms. Scoon testified that having to give the Disclaimer is "frustrating and it's upsetting, and, frankly, I feel a little bit sick to my stomach personally every time I say, Sir or ma'am, would you please look at this sign? I literally feel sick to my stomach." *Id.* at 51:3-16.

The result of the Disclaimer Provision is that Ms. Scoon and the League cannot "register voters as effectively as [they] could before SB90." *Id.* at 52:3-5. "It has made life a lot harder, and some people [in the League] have said they don't want to do voter registration anymore because it's too embarrassing." *Id.* Having to say the Disclaimer is limiting the quantum of speech, and the number of willing speakers, specifically as it relates to Cecile's and the League's voter registration and education efforts. *See Meyer*, 486 U.S. at 422-23; *Buckley*, 525 U.S. at 194-95.

### ii.    Drop Box Provisions

Ms. Scoon has standing to challenge the Drop Box Provisions: she votes using drop boxes, and the Provisions will make it harder for her to vote. She has primarily used drop boxes to vote over the last five to ten years, going after hours, around 8 or 9 p.m. Tr. Day 1, 77:2-10. For Ms. Scoon, being able to return her ballot using a drop box has been "a godsend" given how busy she is, between family obligations, work, and frequent travel. She takes comfort in "know[ing] that I saw with my own eyes I put it in the drop box myself." *Id.* Before the enactment of SB90, Ms. Scoon never saw the primary drop box she used outside the Bay County Supervisors' Office being personally monitored by a staff person. *Id.* at 77:25-78:2.

As a result of the passage of SB90, Ms. Scoon's Supervisor took down the drop box she had primarily used. *Id.* at 82:12-25. A press release from Ms. Scoon's Supervisor confirms both the removal of the box and the direct link to SB90: "The Vote By Mail Drop Box outside of the Supervisor of Elections office has been removed. Due to Florida Senate Bill 90 expected to be signed by the Governor, the office will no longer be allowed to have the Vote By Mail Drop Box except during Early Voting Hours." Ex. 701, ECF No. 608-84.

Returning the ballot using USPS is not a viable alternative for Ms. Scoon, who is not comfortable mailing her ballot. Tr. Day 1, 84:8-85:11. It would also require her to complete her ballot well in advance of election day to ensure it is delivered to

17

election officials in time, but it is important to Ms. Scoon that she has as much

information as possible about the candidates before filling out her ballot:

> I've noted that sometimes candidates mature and evolve during
> the process. Sometimes they evolve in a way that I go, Oh, I like
> that. I wasn't going to vote for them, but maybe I will, you know.
> And sometimes people that I might have thought I was going to
> vote for, Uh, I don't like that answer. That just was not right. And
> then they lost my vote. So I wait.

*Id.* at 84:12-85:20.

### iii.   Vote-By-Mail Request Provision

Ms. Scoon has standing to challenge the VBM Request Provision: she votes

using a VBM ballot, and will be subject to the new provision. Before SB90, Ms.

Scoon "had a standing request" for VBM ballots, and she requested future VBM

ballots using a check box when she returned her ballot. Tr. Day 1, 87:17-23. In Ms.

Scoon's experience as a voter, that system worked "[e]xtremely well. Between it

lasting the four years, where I didn't have to remember every election cycle, it was

also an additional benefit to have the little place on the envelope to check." *Id.* at

87:24-88:3. But SB90 halves the maximum validity period and imposes onerous

verification requirements. As Ms. Scoon testified, "frankly, there are just so many

things that need doing, I'm concerned that I could forget and not request in time, and

then I would be – have a difficult time voting where I would normally do." *Id.* at

89:10-18. Moreover, Ms. Scoon does not remember what form of identification she

provided when she first registered to vote, over 40 years ago. *Id.* at 87:13-16.

### iv.     The Solicitation Definition

Ms. Scoon has standing to challenge the Solicitation Definition, because she previously engaged in line warming activities within 150 feet of polling places, and would continue to do so but for SB90's prohibition. As Ms. Scoon testified, she and other League members have often provided voter support at polling places. While they "usually *set up* outside the 150-foot buffer zone," with a banner identifying them as part of the League and stocking their table with educational materials, Tr. Day 1, 57:1-9, 58:3-12, in a variety of scenarios, Ms. Scoon and other League volunteers her have crossed into the buffer zone to assist voters:

| Testimony | Cite |
|---|---|
| "[I]f we see someone is having any difficulty getting up the steps, opening the door, if they're sweating, . . . it's a small community, you might actually know the person going in. And if you know that they generally need help, you would usually walk up to them and say, Mrs. Smith, I see – you know, can I open the door for you? or How are you doing? And then she might say, you know, I had to wait for my ride, and I couldn't get my meal and my blood sugar is dropping. You know, they would say things like that because the elderly coming in, someone had to bring them. . . . So you just inquire, and you might get an answer, I'm feeling a little bit light-headed. So then you would say, Can I get you a cookie or a candy? You know, it would be wrapped, and you would bring it to them. They'd say yes, and you might bring it to them." | Tr. Day 1, 59:2-22 |
| "Sometimes people are going in and they come to a table, and they say, I'm not comfortable going in. I went and talked to [the elections officials] yesterday, and I don't like how they talked to me. They were talking down to me. I was upset. Can you double-check and make sure I get treated properly? So there are different things that you might be pulled into in that zone and help the person in some way." | Tr. Day 1, 59:23-60:4 |

| | |
|---|---|
| "[T]here have been times if there's a problem with a machine or something, some little delay, you know, they can back up. The line can back up. And sometimes it's really hot. The sun is really out and there's no shade in a lot of these places, and so you would then see the person and you would say, Wow, it's hot. Would you like some water? And we have a cooler with little baby waters in there and there's ice and everything. So I've done that." | Tr. Day 1, 60:19-61:1 |
| "I know, like, if people are upset and they feel like they have been mistreated by the Deputy Supervisor of Elections and they don't want to vote provisionally or something like that, they often come to our table and they say, I don't feel like I'm being treated properly, you know. I'm upset. Can you come in with me and talk with them – with me to the person in charge? And you'd always say yes and go in and have that conversation and support them." | Tr. Day 1, 61:2-9 |

When Ms. Scoon has crossed into the buffer zone to help voters,

> A good portion is physical support, and then others are emotional support. The fact of the matter is that for many persons of color – I said Black people – they have not had a lot of good experiences with the government. The government has often been the police. It's often been somebody in authority who is challenging them: Why are you here? What are you doing? [M]aking them feel uncomfortable and often disrespected. So our presence there and when they ask for our help, we're just providing a little bit of a shield and a vitamin so they feel that, you know, their voice is going to be heard; they're going to be given every consideration. And for those people I think it's education for them and it's also emotional support.

*Id*. at 61:10-24. Voters who Ms. Scoon has been able to help in this way are "[s]o grateful, just like, I am so glad you're here. . . . I was really nervous about this, and I feel much better." *Id*. at 61:25-62:6. Even when Ms. Scoon is unable to resolve an issue, for example when a voter may "have to vote provisionally, or a few times they

couldn't vote at all, just to know that a nonpartisan, unbiased organization stood with them through that process is powerful." *Id*. at 62:16-63:2.

But because of SB90, Ms. Scoon and the League are "absolutely not going to [assist voters in the buffer zone] anymore because the interpretation of what the law means and providing assistance is so broad." *Id*. at 63:3-8. Ms. Scoon and the League are very concerned that the Solicitation Definition is open to a very broad interpretation, and even heard legislators articulate such an interpretation: "Don't do anything. Don't give them water. Don't do anything." *Id*. at 65:13-23. They are concerned that under SB90, someone could accuse them of doing something wrong, and the experience would be very negative, scary, and hurtful for the League's members. They "don't want it to be within the discretion of any particular person to say, It means this, it means that in that moment." *Id*. at 65:23-25. They are even concerned that law enforcement could get involved:

> So rather than go down that negative trail and to expose our members, to expose the potential voter who was trying to vote, and to also not cause distress to the Supervisor of Elections' office trying to discern, What are you doing? Are you interfering in some illegal way? We're just not going to do it.

*Id*. at 63:13-64:22.

### b.   Dr. Robert Brigham's Standing

Dr. Robert Brigham is an 87-year-old resident of Orange County, Florida, Tr. Day 5, 1596:10-22, and a member of the League. *Id.* at 1596:23-1597:4. He has standing to challenge the Drop Box and VBM Request Provisions.

### i.   Drop Box Provisions

Dr. Brigham has standing to challenge the Drop Box Provisions: he votes using drop boxes, and the Provisions will make it harder for him to vote. Dr. Brigham testified that "in the presidential election [in 2020] and the municipal election this year, I voted using a drop box." Tr. Day 5, 1597:14-20. Dr. Brigham stopped voting in person because he had cancer and surgery that left him with a serious and unpredictable incontinence problem. *Id*. at 1597:21-1598:2. As a result, Dr. Brigham "tr[ies] very much not to go to places where there are – where I have to spend time away from bathrooms." *Id*. He cannot predict how long he can be away. He explained, "I often walk my dog around the block. That's maybe a 15- to 20-minute walk, and I lose control in that. Other times I can go an hour, hour and a half. But there is no warning. It just happens." *Id.* at 1598:3-8. When Dr. Brigham has an episode, he immediately goes back home to clean up; he hopes that it will be better the next time he goes out, but it often isn't. *Id.* at 1598:9-12.

As a result of Dr. Brigham's condition, he is very sensitive to lines and delays, and he is particularly concerned that they could prohibit him from voting. As he

explained, "anything that restricts my options impacts me because the more options I have, the more likely I will be to get through the voting process." *Id*. at 1606:7-14. Using a VBM ballot helps Dr. Brigham manage his condition, because it allows him to fill out even quite lengthy ballots at home. *Id*. at 1604:20-1605:6. As a result of bad experiences he has had recently with mail—including a time when he mailed back his property tax and it never got to its destination—Dr. Brigham is unwilling to use USPS to return his VBM ballot. *Id*. at 1604:10-20.

Easy access to drop boxes is accordingly very important to Dr. Brigham. The drop box Dr. Brigham used for the 2020 general election, before SB90, was accessible to him precisely because it "was not in the Supervisor's office; it was across the street. It was out of doors but covered by a tent . . . and it was a drive through and there were signs pointing the way and all." *Id*. at 1603:10-20. That drop box was "busy." *Id*. "There was a line of cars, and we joined that line and eventually made our way." *Id*. When Dr. Brigham voted in a municipal election after SB90, that outdoor drop box was no longer available. Instead, he "had to park the car and go in and physically drop it in the box" in the Supervisor's office. *Id*. at 1598:13-1599:8. Parking was "very difficult," the lot is "relatively small." *Id*. Dr. Brigham is very concerned that if the drop box were indoors for an election as busy as the 2020 general election, it would be difficult for him to vote:

> Each of the cars would have to park before me and that would take extra time. To me time is a really important thing. . . . Then,

> of course, you'd have to go out and get in – walk into the Supervisor's office, and then I don't know how long it would take to drop ballots when there was a line there, but I'd have to join that line. And my situation gets worse when I do physical actions as opposed to sitting [in] the car, so it would have been more difficult for me, definitely.

*Id*. at 1601:18-1602:5. And if Dr. Brigham had an onset of his condition while trying to vote, he would be unable to finish: "I would go home. Stop what I was doing and go home and then hope I could get back another day." *Id*. at 1607:6-13.

### ii.    Vote-By-Mail Request Provision

Dr. Brigham has standing to challenge the VBM Request Provision: for the reasons discussed above, he is a VBM voter and he will be subject to the new Provision, which will make it harder for him to vote.

Now under SB90, to request a VBM ballot, Dr. Brigham will need to provide his driver's license number or the last four digits of his Social Security number, whichever is on file with the Supervisor. But Dr. Brigham does not remember whether he ever provided that information to the Supervisor; he testified that he rarely is willing to supply that sort of information online. Tr. Day 5, 1607:17-1608:8.

The VBM Request Provision also threatens Dr. Brigham's right to vote because, at 87 years old, his "memory is not as good as it used to be" and he is concerned he will forget to make the request every time he has to do it. *Id.* at 1608:13-20; *see also id*. at 1605:14-21 ("I've had some health problems. I feel creakier. I find I misplace things more. I forget some things. It's – it's all the things

you read about happening to older people that I never thought would happen, but they do. And I'm experiencing some of that."). Dr. Brigham explained he may mistakenly think he has requested his ballot, but not realize he has not until close to the election when news about the election increases. *Id*. at 1608:21-1609:9. By then it may be too late. *See* Fla. Stat. § 101.62(2) (requiring VBM ballots be requested at least ten days before election day). It's "hard to say" whether Dr. Brigham would manage to vote if he forgot to request a ballot. Tr. Day 5, 1609:10-25. For the reasons discussed, voting in person poses significant difficulties for Dr. Brigham, and he "would be very worried about" his ability to successfully vote. *Id*.

### c.   Alan Madison's Standing

Alan Madison is a 73-year-old resident of Indian River County. Tr. Day 3, 695:5-10. Mr. Madison has standing to challenge the Registration Disclaimer, the Drop Box Provisions, and the VBM Request Provision.

### i.   Registration Disclaimer

Mr. Madison has standing to challenge the Registration Disclaimer because it will force him to engage in speech he does not want to engage in when he volunteers to conduct voter registration. Mr. Madison has previously volunteered with a Third-Party Voter Registration Organization, helping voters register to vote. *See* Tr. Day 3, 703:3-10. Mr. Madison was reluctant to volunteer again after SB90, because he found the required disclaimer "insulting" and untrue: "obviously, it's not my intent

not to return it on time." *Id*. at 704:10-18. He also worried that "people would be much more reluctant to give me their registration or register with me." *Id*. at 704:10-18. Despite these serious concerns, Mr. Madison has recently gone through training to get ready to register voters with a Third-Party Voter Registration Organization again. *Id*. at 704:10-18. Mr. Madison remains very concerned that "having to give the disclaimer warning will impact [his] ability to" register voters. *Id*. at 705:1-6. "If you're telling somebody you can't guarantee that you're going to get their registration on time so that they can vote, why would they want to give it to you? In conversations with friends and family, I mean, they are all pretty much in agreement that that – that would be a turnoff for them." *Id*. at 704:19-25.

### ii.   Drop Box Provisions

Mr. Madison has standing to challenge the Drop Box Provisions: he votes using drop boxes, and the Provisions will make it harder for him to vote.

In the 2020 general and primary elections, Mr. Madison voted by VBM ballot and returned them using a drop box. Tr. Day 3, 695:5-12. During the 2020 general election, Mr. Madison used a drop box at his county Supervisor's office that was accessible via "a drop slot on the wall outside on the building." *Id.* at 696:19-697:6. Mr. Madison dropped off his ballot around 7 a.m. and there was no one monitoring the drop box; "I don't even think the office was open." *Id.* at 696:19-697:6.

The Drop Box Provisions eliminated the 24-hour drop box that Mr. Madison used in 2020. *See id*. at 697:10-25 (when Mr. Madison voted in 2021 after SB90, the drop box he used in 2020 "was not available"). As a result, Mr. Madison "couldn't drop [his ballot] off when [he] had planned to." *Id*. at 697:10-25. This is in marked contrast to his pre-SB90 experience, when he "could have dropped it off anytime of day or night. If I had an emergency, I could do it at 10 o'clock at night and take care of what was happening the following morning." *Id*. at 699:16-23. Mr. Madison is concerned that, due to personal circumstances that regularly take him away on short notice, this lack of after-hours accessibility will hinder his ability to vote. *Id*. As Mr. Madison explained, "[m]y father-in-law right now is medically and mentally very challenged. We have him down in Boynton Beach, but it requires us periodically, in fact frequently, to go down and help out." Tr. Day 3, 695:13-24. Mr. Madison's father-in-law is "[a]bout an hour and a half" away. *Id*. at 696:9-18. Mr. Madison must visit him "weekly, sometimes more often," often with no advance notice. *Id*.

In Mr. Madison's experience voting after SB90, he had to wait for the Supervisor's office to be open to use the drop box. *Id*. at 699:16-23. Once the office opened, Mr. Madison had to enter the building and hand his ballot to a staff member, rather than depositing it in the box himself. He testified that the experience made him feel "uncomfortable" and "was disconcerting." *Id*. at 698:1-7. He pointed out

that when you vote in person, "nobody takes your ballot once you fill it out; you put it yourself in a machine." *Id*.

Using USPS to return his ballot is not a viable alternative for Mr. Madison who has had "significantly poor experience with the U.S. Postal Service delivering my mail on time, delivering my mail appropriately." *Id*. at 699:24-700:3. Among other issues, he has had "things that I've mailed to others including a thousand dollar bond go missing. . . . So I don't trust the Postal Service like I used to." *Id*. at 700:15-19. In fact, during the 2020 general election, Mr. Madison "didn't receive [his mail ballot] until very late," *id*. at 702:21-22, giving him more reason to doubt USPS, and little time to return his ballot by mail, making his access to drop boxes all the more important so that he can be sure that his ballot arrives in time to be counted.

### iii.    Vote-By-Mail Request Provision

Mr. Madison has standing to challenge the VBM Request Provision because as a vote-by-mail voter, he will be subject to the new Provision. Mr. Madison is concerned that under the new provision, he may forget to renew his request. Tr. Day 3, 702:5-15.

### d.    Susan Rogers' Standing

Susan Rogers is a 66-year-old resident of Pinellas County. Tr. Day 4, 1088:8-9, 12-13. Ms. Rogers has standing to challenge the VBM Request Provision, which will make it harder for her to exercise her right to vote.

Ms. Rogers has severely impaired vision and has voted by mail in every Florida election since 2012. *Id.* at 1091:3-17. Ms. Rogers testified that, as a result of her condition, she has no central vision. *Id.* at 1089:7-18. "I have to magnify things or have things read to me. I'm not mobile. I don't drive, obviously. And I have to pretty much stay in my familiar world." *Id.* Ms. Rogers' vision impairment makes voting in person extraordinarily difficult. "Obviously, I have to arrange for transportation and pay for transportation to go to the polling place, and then I'm a little lost anytime I leave my home in terms of navigating and getting around. And then reading, I can't read the ballot. So I have to use devices or have someone assist me in reading it and in filling parts of it out." *Id.* at 1091:19-1092:3.

Ms. Rogers' vision impairment also makes it far more difficult for her to request a VBM ballot. Before SB90, to renew her request for a VBM ballot, she checked a box on the VBM ballot that she returned indicating she wanted to continue receiving VBM ballots. *Id.* at 1095:4-9. But SB90 eliminated that option, even as it dramatically shortened the validity period for each VBM request. As a result, Ms. Rogers "[does not] know for certain" how she will request a ballot. *Id.* at 1095:25-1096:6." She testified that she has "tried to do a little research" as to how she would attempt to request the ballot online or by filling out "a printed form that I would have to print, or make a phone call and provide information." *Id.* But it is not clear to her

how she would make that request in the future because of her condition. *Id.* at 1095:25-1096:6.

Each of the options available to Ms. Rogers—requesting by phone, online, or in writing—will be extraordinarily burdensome due to her vision impairment. *See id.* at 1096:14-1102:1. Ms. Rogers' phone, which she receives because she is disabled and indigent, "doesn't have a lot of adaptive features [or] accessibility features to it," so it is very difficult for her to use and she cannot see anything on it. *Id.* at 1096:14-21, 1097:8-9. To find out what phone number to call, Ms. Rogers must access her Supervisor's website on her iPad, using multiple applications and accessibility features to magnify the screen and read the page's text, requiring numerous steps, screen taps, and changes between applications. *Id.* at 1097:8-24. Often, she accidentally taps a link while doing so and must "go back and start all over again." *Id.* at 1100:7-12. Ms. Rogers must then manually enter that phone number on her phone, which she cannot see. *Id.* at 1099:16-18. Ms. Rogers ends up dialing the wrong number "all the time," and must often start again from scratch. *Id.* at 1100:7. Renewing online would be no better—the Pinellas County Supervisor's website is "not that adaptable for the visually impaired," making it very difficult for Ms. Rogers to use. *Id.* at 1100:18-1101:8. Nor is printing the form and mailing it an option: Ms. Rogers does not have a printer, and she would have extraordinary difficultly reading the printed form. *Id.* at 1101:14-1102:1.

Ms. Rogers also worries she may forget to make the request for a ballot. She testified: "As I get older, I'm more forgetful. My vision also impacts my memory. . . . I used to be able to sort of take a snapshot of something. I have a photographic memory of things. And now that I can't see as well, that doesn't happen as well." *Id*. at 1102:12-1103:5. Unlike voters without visual impairments, even writing a note to herself as a reminder is a multi-step and burdensome process, that may ultimately be ineffectual. As Ms. Rogers explained, "to make notes or use a calendar, I have a very large calendar that takes up about half the wall. I have to write things on there with Magic Marker to remind me of things, and that takes a lot of extra work. And I have to always switch my glasses so that I can read what I'm writing and/or put it in notes or do some other task to write down what it is I'm supposed to do. And then I have to be able to find it and have it read to me with VoiceOver or what have you. And it's just one more task in my daily life that isn't necessary given the way it was such a simple system before that you could just request your ballot every year by checking a box." *Id*.

Reminder notices in the mail, should Ms. Rogers' Supervisor send them, would do little to help her. As she testified: "I really can't read any of my mail that I get at the mailbox. I have to – it's a daunting process when I get mail because I can't even spot read as I could maybe even two years ago what it might pertain to, so I have to go through the whole process of putting whatever mail I have behind a

Magnifier, a canopy reader, or take a picture of it or something to try to figure out what it is." *Id*. at 1103:6-16. And while it is true that Ms. Rogers previously, once, voted early in person in 2012, her vision has worsened since then, and it would be far more difficult for her to vote in person now. *Id*. at 1094:18-20.

### 2.   The League's Standing

The League of Women Voters of Florida, Inc. and the League of Women Voters of Florida Education Fund, Inc. (together, "the League") are two affiliated non-profit organizations that share the same members, leadership, and staff. Tr. Day 4, 1120:14-1121:6. The League has standing to challenge all four of the Challenged Provisions: the Registration Disclaimer, the Drop Box Provisions, the VBM Request Provision, and the Solicitation Definition. The League has standing both on behalf of its injured members and based on its own direct injuries.

### a.   The League's Associational Standing

The League has "thousands" of natural persons as members. Tr. Day 1, 34:19-20. Members of the League "possess all of the indicia of membership in an organization." *Hunt*, 432 U.S. at 344. They pay "membership dues," which help finance the League's activities. Tr. Day 4, 1121:19-20. They elect the Board of Directors which governs the League. *Id.* at 1121:21-1122:3. And "League members direct the organization's priorities," such as by telling the League what legislative priorities the League should focus on. *Id.* at 1122:4-11.

The League's members range from Floridians in their 80s to student members. Tr. Day 1, 34:21-35:14. Their members are located across the state, from "the Panhandle all the way down to the lower Keys." Tr. Day 4, 1121:7-10. League members "belong to both organizations" that are plaintiffs in this case—that is, the League of Women Voters of Florida, Inc., and the League of Women Voters of Florida Education Fund, Inc. *Id*. at 1121:5-6.

Among the League's thousands of members, many regularly use VBM ballots and utilize drop boxes, Tr. Day 1, 69:18-21, 70:4-72:4, and will be directly affected by the VBM Request and Drop Box Provisions. Approximately 600 League members engage in voter registration efforts, Tr. Day 4, 1131:4-9, all of whom must deliver the Disclaimer Provision at the time they do so. And the League has members who have offered assistance to Florida voters in the buffer zone at the polls, Tr. Day 1, 59:2-60:4, but will no longer do so because of the Solicitation Definition, *id*. at 63:3-8, as well as members who may themselves need assistance at the polls, *see id.* at 34:21-35:3 (the "typical League member" "is about 70 or maybe a little bit north of 70 . . . and we have many members in their 80s, also"); *id*. at 70:6-71:2 ("We have many members that are getting elderly or more disabled . . . . some of our members were not as mobile as they were before and requiring assistance, driving them from point A to point B, a lot more assistance.").

League members injured by each of the challenged provisions testified at trial about their League membership and injuries resulting from SB90. In addition to being individual plaintiffs, Cecile Scoon is a League member who is injured by all four Challenged Provisions, *supra* Part I.B.1.a, and Dr. Robert Brigham is a League member who is injured by the Drop Box and VBM Request Provisions, supra *Part I.B.1.b.*

Catherine Teti is also a League member injured by VBM Request Provision. *See* Tr. Day 5, 1587:21-25 (testifying to League membership). Ms. Teti is 76 years old and a registered voter in Hillsborough County. *Id.* at 15807:12-16, 1588:7-8. She has been voting by mail for several years, including in 2020. *Id.* at 1588:24-1589:6. She does not remember what form of identification she used when she registered to vote in 1980. *Id.* at 1590:2-5. Ms. Teti has significant mobility issues that make it hard for her to vote in person. *Id.* at 1589:7-15. Before SB90, Ms. Teti renewed her requests for VBM ballots using a check box on the envelope when she returned her mail-in ballot: "I [would] just check it, and I get the ballot for the next session – the next election." *Id*. at 1590:8-13. Ms. Teti did not know that the Legislature had changed the law and that her request would expire. "I thought they said if I kept checking it, it would go on forever." *Id*. at 1590:21-24. Ms. Teti is not sure how she will request a ballot now. "[H]owever you do it will be much more complicated than that, I'm sure. . . . I don't know quite how they're going to require you to do it. . . .

I don't know how I would request it otherwise, when you have to do it, where you have to do it, how you have to do it. I guess we'll find out." *Id*. at 1590:25-1591:8. And Ms. Teti is worried she will forget to renew her request. *Id*. at 1591:14-21.

If that happens, and Ms. Teti does not receive a VBM ballot, it would be very hard for her to vote in person due to her mobility issues. *Id.* at 1591:22-1593:4. To walk, Ms. Teti must use a cane, a walker, or a scooter. *Id.* at 1589:16-25. With her cane, she cannot "climb stairs unless there is a handrail," and she "can't step over curbs." *Id.* at 1592:6-9. She "was off someplace with a cane and dropped it and couldn't pick it up, and I had to wait until someone walked by that I could ask to pick the cane up for me." *Id.* at 1592:9-11. She "can't stand very long with just a cane"—not even long enough to brush her teeth—so if there was a line, she "would wear out very shortly." *Id.* at 1592:7-12. The walker is not an option to go vote, because "neither my husband or I can really get it into the car." *Id.* at 1592:23-24. That leaves the scooter, but "[t]he problem with the scooter, of course, is it can't do curbs." *Id.* at 1593:3-4.

The League also meets the final two prongs of associational standing. The interests at issue in this suit are germane to the League's purpose—to register and empower Florida's voters. Tr. Day 1, 33:23-34:12. Through this lawsuit, the League seeks to ensure (1) it can effectively register voters, (2) it can continue to assist voters at the polls, and (3) its members can vote without unnecessary barriers, all of which

are centrally germane to its purpose and give the League a clear stake in this litigation. *See, e.g.*, *United Food and Com. Workers Union Loc. 751 v. Brown Group, Inc.*, 517 U.S. 544, 555-56 (1996) ("*Hunt*'s second prong . . . raises an assurance that the association's litigators will themselves have a stake in the resolution of the dispute"). As the Eleventh Circuit has held, when the relief sought is injunctive—as it is here—individual participation of the organization's members is "not normally necessary." *Browning*, 522 F.3d at 1160 (quoting *United Food*, 517 U.S. at 546). Thus, the League has proven it has associational standing for each of the Challenged Provisions.

### b.      The League's Organizational Standing

The League has also suffered its own direct organizational injuries which independently give it standing, including diversion of resources resulting from the Challenged Provisions, as well as First Amendment injuries arising from the Registration Disclaimer and the Solicitation Definition Provisions.

### i.      The League's Diversion of Resources Injury

The League has diverted resources to address each of the Challenged Provisions. Those resources have been diverted from the League's fundraising efforts, its redistricting work, and its Amendment 4 campaign. Because both League entities share the same members, staff, and leadership, Tr. Day 4, 1121:2-6, any diversion of resources on behalf of League staff, leadership, or members is a

diversion for both organizations. The Challenged Provisions had a strong and immediate impact on the League's operations. The League "had to move very, very quickly" to respond to the law because "there were changes in the law that affected our operations and how [we did] the things we regularly did." *Id.* at 1122:12-21.

To address the Registration Disclaimer Provision, the League updated its voter registration policies, including updating a quiz that each member must take before they can register voters. *Id.* at 1129:4-18. Any member who wants to engage in voter registration must now re-take the quiz as a result of SB90 to ensure they know how to comply with the Registration Disclaimer Provision. *Id.* The League also created notices of the Registration Disclaimer, in multiple languages, for members to display and explain when registering voters: "We asked them to show this notice wherever they are registering people to vote" and "directed our members to tell them about it." *Id.* at 1132:19-1133:19. The League has also hosted numerous trainings for members on how to comply with the Registration Disclaimer Provision, and will continue to do so as it ramps up voter registration activities for this election cycle. *Id.* at 1134:21-1135:6. The training is essential, because "some of these people have been registering voters for decades, so [it is] not easy to change something you've been doing for 20, 30 years." *Id.* The League "spent weeks working" on the training, and "some people have said they don't want to do voter registration anymore because it's too embarrassing" to give the Disclaimer. Tr. Day 1, 52:10-14.

To combat the remaining Challenged Provisions, the League has put "hours and hours" into creating informational materials for members to understand the changes to VBM and the Solicitation Definition. Tr. Day 4, 1126:6-1127:7. Ms. Scoon has personally spent "many, many hours, researching the law, writing up information, guidelines, writing PowerPoints, revising the PowerPoints, having talks on our lunch-and-learn," and hosting webinars about the changes. Tr. Day 1, 91:25-92:16. The League has "received tons of calls and emails about SB 90" that its staff and leadership must divert resources to answer. Tr. Day 4, 1125:20-21, 1128:8-15. It has given several educational presentations to its members on how to comply with the VBM Request, Drop Box Provisions, and Solicitation Definition Provisions, and will continue to in the future. *Id.* at 1125:8-1126:4, 1128:8-21.

The impact of SB90 goes far beyond ordinary changes to election laws and the resources the League has had to devote to addressing it have been commensurately and unusually substantial. "[W]e did so much more planning, development and execution than we would have done with any other law." *Id.* at 1140:23-1141:7. The League's Executive Director has personally put "hundreds of hours" of time into SB90 compliance and education efforts. *Id.* at 1135:7-11. Other staff, volunteers, and leadership have also diverted significant time to address SB90. *Id.* at 1135:7-1136:2. The League does not "do that with every change in the law. There's changes every year. We've never done that before." Tr. Day 1, 107:19-

108:7. The League has had to "put triple-time effort into the process because there's many more questions that come . . . with the changes with Senate Bill 90. So it's not really continuing the same. It's different in quantity and quality." *Id.* at 130:18-25.

All of this time and effort has come at the direct expense of the League's other priorities. The League's Executive Director has personally been unable to spend as much time as she otherwise would have on grant applications and fundraising because of the time spent addressing SB90, and as a result, the League does not "have as many grants this year as we have [had] in the past." Tr. Day 4, 1136:3-18, 1137:7-1138:4. The League has also had to divert resources away from redistricting and responding to Amendment 4, which restored voting rights to many citizens who have completed felony sentences. *Id.* at 1136:19-1137:6, 1138:5-1139:3, 1139:12-1140:11. Ms. Scoon leads the Amendment 4 project, but because of SB90 has not been able to dedicate the time necessary to the project, and "[w]hen Cecile's not available, like, physically not available because she's working on SB 90, the returning citizens project/Amendment 4 stuff suffered." *Id.* at 1139:12-1140:11; *see also* Tr. Day 1, 93:5-25 ("[W]orking on Senate Bill 90 and all the trainings took directly . . . from doing the work and the training on Amendment 4 with many of the people that I work with, the volunteers, our interns, and many of our pro bono lawyers who seek additional advice . . . . That's been a direct hit, and many other topics that we want to work on."). This negative impact on the League's activities

will continue, as it continues to divert mission-critical resources to SB90 education and compliance efforts. Tr. Day 4, 1140:12-20; *see also* Tr. Day 1, 94:20-25.

### ii.    The League's First Amendment Injuries

The Registration Disclaimer Provision also directly injures the League by compelling it to engage in speech that it otherwise would not, by reducing the effectiveness and quantum of the League's political speech, and by harming the League's reputation. And the Solicitation Definition directly injures the League by causing it to self-censor its activities near polling places.

### 1.    The Registration Disclaimer Provision injures the League by compelling its volunteers to speak.

The Registration Disclaimer Provision injures the League by requiring it to engage in speech that it would not otherwise engage in, speech that it considers false and misleading. *See* Tr. Day 1, 46:5-47:24, 183:23-184:5; *see also supra* Part I.B.1.a.i. But for that Provision, the League would not tell prospective voters it might not deliver their registration forms on time. *See*, *e.g.*, Tr. Day 1, 51:17-52:2. The Disclaimer also directly undermines the League's efforts to register voters: "You are sitting at the table, and you are trying to row the boat this way, and the sign [with the disclaimer] is going the opposite direction." *Id.* at 96:16-20.

2. **The Registration Disclaimer Provision reduces the effectiveness and amount of the League's speech, and harms the League's reputation.**

The Registration Disclaimer Provision also directly injures the League by reducing the amount and effectiveness of the League's expression relating to voter registration, and by harming the League's reputation.

Because of the Provision, the League's voter registration activities are less effective, take longer, and lead to fewer registered voters. *See*, *e.g*., Tr. Day 1, 52:3-53:14. Individuals have refused to register with the League after viewing the disclaimer. *Id.* at 50:12-51:1. And the League has fewer members who are willing to do voter registration as a direct result of the Registration Disclaimer. Tr. Day 4, 1131:1-14; *see also* Tr. Day 1, 52:13-14 (some League members have refused to do registration "because it's too embarrassing" to deliver the Disclaimer). As a result, the League will have fewer conversations with voters about the importance of voter registration and voting. Tr. Day 4, 1131:15-1132:17.

The need to deliver the Disclaimer also harms the League's reputation. The League is a "trusted" brand in Florida for voter registration, and it is "very harmful for [it] to have to give those kind of warnings" that it might not deliver registration forms on time. Tr. Day 1, 49:3-19. The Registration Disclaimer Provision will "absolutely" impact the League's reputation. *Id.* at 52:15-18. And that reputational harm is entirely unwarranted, because out of the thousands and thousands of forms

that the League has turned in for Florida voters over the past ten years, only six were turned in after the deadline (then ten days) by which Third-Party Voter Registration Organizations are required to submit such forms—the result of a hurricane, and (once) a one-day miscalculation of the deadline—and the League has *never* submitted a form past book closing. *Id.* at 46:5-47:24.

### 3. The Solicitation Definition causes the League to self-censor its activities at polling places.

The Solicitation Definition directly injures the League by requiring it to self-censor its activities at polling places. Before SB90, the League directly assisted Florida voters in the buffer zone outside polling places. Tr. Day 1, 59:2-61:1; *see also supra* Part I.B.1.a.iv. Because of the Solicitation Definition, the League is self-censoring and will no longer provide any kind of assistance within the 150-foot buffer zone. Tr. Day 1, 63:9-16; *see supra* Part I.B.1.a.iv. The Solicitation Definition is therefore injuring the League by preventing it from engaging in activities that it would otherwise undertake.

### 3. Black Voters Matter's Organizational Standing

Black Voters Matter is a nonpartisan organization working across the country, including in Florida, to build power in Black communities. Tr. Day 7, 1979:17-25. It engages in direct electoral mobilization and voter outreach work, as well as organizing around issues that affect Black communities such as environmental justice, economic justice, police accountability work, and more. *Id.* at 1980:10-22.

Black Voters Matter has standing to challenge the Drop Box, the VBM Request, and Solicitation Definition Provisions, based on its own direct injuries.

### a.   Black Voters Matter's Diversion of Resources

Black Voters Matter has diverted resources to address the Drop Box, VBM Request, and Solicitation Definition Provisions. Those resources have been diverted from Black Voters Matter's staffing in other Southern states and from its issue advocacy work in Florida.

SB90 has required Black Voters Matter to educate its staff and partner organizations about the Solicitation Definition and what it prohibits. Tr. Day 7, 1989:5-12. Black Voters Matter has also begun to conduct virtual town halls and prepare informational materials to educate voters about the Drop Box and VBM Request Provisions. *Id.* at 1999:5-9, 2002:7-15. Those provisions require a significant amount of education to ensure voters are able to navigate the changes and new requirements. *Id.* at 2002:7-15. Black Voters Matter's efforts will include training, "texting and emailing, and social media messaging, radio advertisements . . . a range of communication tactics in order to communicate what's fairly complex in some cases, these provisions that have changes, and for some people it's a change in the way that they've been doing things for years, if not decades." *Id.* at 1989:13-1990:2, 2002:16-2004:9.

"[A]ll of that requires a significant voter education effort which requires []
time and energy and financial resources that we otherwise would not have to expend
and which puts a burden on us as an organization." *Id.* The kind of education that
SB90 requires is also more expensive to do than traditional voter outreach because
the messages are longer and they require more frequency. *Id.* As a result of the
Challenged Provisions, Black Voters Matter anticipates spending more money on
voter education in Florida in 2022 than it did even in 2020, a presidential election
year. *Id.* at 2010:1-12. And Black Voters Matter has had to hire two additional staff
members to assist with voter education in Florida. *Id.* at 2010:18-2011:8.

Black Voters Matter's activities in response to SB90 are a substantial change
for the organization. While it previously did some voter education on the mechanics
of voting, "the nature of that communication is significantly different" after SB90.
*Id.* at 2019:14-23, 2020:20-21.

> There is a substantive difference between saying, … don't forget,
> you know, you can drop off your ballot via drop box and saying,
> Hey, you know, you can drop it off, but keep in mind that the
> locations are less than before and the hours are different. You
> can't go, you know, after work or in nontraditional hours. Oh,
> and by the way, there might be somebody there monitoring you.
> You know, it's night and day between the type of communication
> that we had to do before and what we'll have to do now. . . . SB
> 90 creates a whole other mega universe of changes that have to
> be communicated.

*Id.* at 2019:14-2020:21.

Black Voters Matter's response to the Challenged Provisions will come at the direct expense of its other programs, in Florida and elsewhere. Its need to increase staffing in Florida in response to SB90 means that it could not hire additional staff in Tennessee, leaving that state "shorthanded." *Id.* at 2011:15-20. And its need to focus on voter education takes away resources from its issue advocacy work in Florida specifically, as well, including organizing around environmental justice and police accountability. *Id.* at 2012:23-2014:3. "[I]t's a frustrating situation to have to divert resources from the other work that we could be doing in order to deal with provisions that are wholly unnecessary and which are going to have a negative impact on Black voters and Black voter turnout." *Id.*

### b.   Black Voters Matter's First Amendment Injury

Black Voters Matter also has standing to challenge the Solicitation Definition because it has caused it to self-censor its prior activities at polling places. Before SB90, Black Voters Matter engaged in what it calls "voter comfort" activities at polling places in Florida, which involved providing water, food, cell phone chargers and encouragement to voters. Tr. Day 7, 1981:1-1982:5, 1983:10-16, 1984:3-11. As part of those activities, the organization's own staff members, including its Executive Director, engaged with and provided assistance to Florida voters within the 150-foot buffer zone outside polling places. *Id.* at 1985:7-24, 1986:3-8. These activities have "an impact in helping people to stay in line, to engage in the process

45

of voting." *Id.* at 1981:1-1982:5, 1984:22-24, 1991:14-1992:8. They also "send[] a message about celebrating the voting experience." *Id.* "Part of the purpose is to communicate to voters that they matter, even as they are waiting in long line." *Id.*

As a result of SB90's Solicitation Definition, Black Voters Matter will no longer allow staff or volunteers to assist voters within the 150-foot buffer zone. *Id.* at 1986:9-23. It is concerned about the potential for arbitrary enforcement given the Solicitation Definition's expansive language, particularly because Black Voters Matter has previously experienced arbitrary enforcement of prior solicitation laws, such as when Florida Supervisors have told them that their shirts saying "Black Voters Matter" contain a partisan statement. *Id*. at 1986:24-1988:25. If SB90 were not the law, Black Voters Matter would continue to offer assistance to voters within the buffer zone, as it has in the past. *Id*. at 1992:9-12.

### 4.    The Florida Alliance of Retired Americans' Standing

The Florida Alliance of Retired Americans (FLARA) has standing to challenge the Drop Box, VBM Request, and Solicitation Definition Provisions. It has standing both on behalf of its injured members and based on its own direct injuries.

### a.     FLARA's Associational Standing

FLARA has associational standing to challenge the Drop Box, VBM Request, and the Solicitation Definition Provisions based on injuries to its members, including testifying witness and FLARA President William Sauers.

FLARA has approximately 200,000 members across Florida, from Pensacola to Miami. Tr. Day 5, 1618:7-20. FLARA's members "possess all of the indicia of membership in an organization." *Hunt*, 432 U.S. at 344. FLARA's member dues primarily finance FLARA activities. Tr. Day 5, 1619:4-11. FLARA's members elect its Board of Directors, which governs FLARA. *Id.* at 1620:3-4. And FLARA's members direct the organization's priorities. *Id.* at 1620:5-6.

The average FLARA member is between 65 to 95 years old. *Id.* at 1619:1-3, Some of FLARA's members have disabilities or are homebound. *Id.* at 1622:19-23. Many FLARA members traditionally with a VBM ballot, *id.* at 1620:14-16, and use drop boxes, *id.* at 1637:2-3. FLARA also has members who vote at the polls and who are likely to need assistance when doing so. *Id.* at 1628:7-25.

FLARA's President William Sauers is one member who is injured by the Drop Box, VBM Request Provision, and Solicitation Definition Provisions. Mr. Sauers is a member of FLARA. *Id.* at 1618:23-24. He has consistently voted with a VBM ballot, has historically used drop boxes, and wishes to use drop boxes in the future. *Id.* at 1620:17-18, 1625:6-11, 1625:21-22. But St. Lucie County, where Mr. Sauers

lives, is reducing drop box locations and hours as a result of the Drop Box Provisions, which will make it harder for Mr. Sauers to vote. *Id.* at 1616:8-10; Ex. 5 tbl. 24, ECF No. 608-1. And Mr. Sauers will need to make new, more frequent requests for mail ballots as a result of the VBM Request Provision. Tr. Day 5, 1623:18-23. Should Mr. Sauers have to vote in person, such as if he forgets to request a VBM ballot, he would likely need assistance at the polls due to his heart and lower back conditions—assistance that is less likely to be available because of the Solicitation Definition. *Id*. at 1627:19-1628:6.

Finally, the interests at issue in this suit are germane to FLARA's purpose. FLARA exists to advocate for retirees, which it typically does through its advocacy and lobbying efforts. *Id.* at 1617:25-1618:6. FLARA's members cannot make their voices heard through their elected officials and accomplish the organization's purposes if they cannot successfully cast their ballots. And just as with the League, because FLARA seeks purely injunctive relief, participation by individual FLARA members is not necessary. *Browning*, 522 F.3d at 1160.

### b. FLARA's Organizational Standing

FLARA also has organizational standing to challenge the Drop Box, VBM Request, and Solicitation Definition Provisions. FLARA's mission is to "advocat[e] for retirees" and educate elected officials on legislation that affects Florida's seniors. Tr. Day 5, 1617:25-1618:6. FLARA will have to divert resources to address the Drop

Box, VBM Request, and Solicitation Definition Provisions if they survive this lawsuit. In particular, FLARA will need to educate its members about the Drop Box and VBM Request Provisions, so that its members can still request mail ballots and know how to return them. *Id.* at 1624:7-16, 1627:5-13. And FLARA will educate its members about the need to shift to VBM (for those members that previously voted in person) if the Solicitation Definition stands so that assistance is not available at polling places. *Id.* at 1629:12-17.

The resources needed to conduct that education will have to be diverted from FLARA's core mission of issue advocacy work on behalf of retirees. *Id.* at 1618:3-6. FLARA did not traditionally spend its resources teaching its members about the mechanics of voting, and it must make choices about how it asks its members and volunteers to spend their limited time. *Id.* at 1630:7-22. As a result, when FLARA spends time educating its members about the mechanics of voting, it must spend less time on its core advocacy and lobbying efforts. *Id.* at 1629:18-1631:11.

### C.    Plaintiffs Satisfy the Causation and Redressability Requirements.

Plaintiffs satisfy the causation and redressability requirements as to each of the Challenged Provisions, because their injuries are traceable to the challenged action of the defendants—namely, their enforcement of an unconstitutional law— and would be redressed by a favorable decision against those defendants. *E.g.*,

*Lujan*, 504 U.S. at 561. The Court previously addressed this issue in its Order on

Motions to Dismiss, ECF No. 274, and nothing has changed since then.

### 1.    The Registration Disclaimer Provision

Plaintiffs' injuries from the Registration Disclaimer Provision are directly

traceable to Defendants Lee and Moody, who are tasked by Florida law with

enforcing that Provision, and redressable by relief against those Defendants. ECF

No. 274 at 26; *see* Fla. Stat. § 97.0575(4) ("If the Secretary of State reasonably

believes that a person has committed a violation of this section, the secretary may

refer the matter to the Attorney General for enforcement. The Attorney General may

institute a civil action for a violation of this section or to prevent a violation of this

section. An action for relief may include a permanent or temporary injunction, a

restraining order, or any other appropriate order."). Director Matthews confirmed

the existence of this enforcement mechanism, which is the only mechanism in the

statute for enforcing the Disclaimer requirement. *See* Tr. Day 10, 2778:5-7. If the

Court enjoins Defendants Lee and Moody from enforcing that provision, Plaintiffs

will be free to stop providing the Disclaimer, and their injuries will be redressed.

### 2.    The Drop Box Provisions

Plaintiffs' injuries from the Drop Box Provisions are directly traceable to

Defendant Lee, who has specific authority to enforce those provisions by fining any

Supervisor who does not comply with them, as well as to the Supervisors, who are

the officials who decide where and when drop boxes will be made available in their counties. ECF No. 274 at 20-21. Plaintiffs' injuries from the Drop Box Provisions are redressable by relief against those same Defendants, in the form of an order enjoining enforcement of the Drop Box Provisions. *Id.* Multiple Supervisors testified that were it not for the Drop Box Provisions and the $25,000 fine, they would offer additional drop box locations or hours. *See, e.g.*, Tr. Day 4, 1251:23-1252:1 (Supervisor Scott: I would have gone for 40 drop boxes if it weren't for Senate Bill 90."); Tr. Day 5, 1367:9-12 (Supervisor White: "As a result of Senate Bill 90's change, . . . [Miami-Dade] will have two fewer boxes on Monday and Tuesday"— the day before election day and election day). An order enjoining the Supervisors and Defendant Lee from enforcing the Drop Box Provisions would redress Plaintiffs' injuries from those provisions.

### 3.    The Vote-By-Mail Request Provision

Plaintiffs' injuries from the VBM Request Provision are directly traceable to the Supervisors, and redressable by relief against them, because it is the Supervisors who enforce that provision. ECF No. 274, at 24. Trial testimony confirmed the Supervisors' role in enforcing the VBM Request Provision and thus in causing Plaintiffs' injuries from it. *See, e.g.*, Tr. Day 5, 1352:9-18 (Supervisor White explaining the VBM Request Provision will require her office to treat all of the hundreds of thousands of existing vote-by-mail requests as expired on January 1,

2023, and after every general election thereafter). An order enjoining the Supervisors from enforcing that provision would directly redress those injuries.

### 4. The Solicitation Definition

Plaintiffs' injuries from the Solicitation Definition are traceable to the Supervisors, who enforce the prohibition of "solicitation" within buffer zones outside polling places, and redressable by an injunction against the Supervisors. ECF No. 274 at 24-25; Fla. Stat. § 102.031(4)(a). Testimony from the Supervisors confirmed that they and their staff are responsible for enforcing this provision. *See, e.g.*, Tr. Day 5, 1376:8-1377:11 (Supervisor White explaining it is the "essential poll workers" employed by her office who enforce this provision). An order enjoining the Supervisors from enforcing the new definition would therefore redress Plaintiffs' injuries from it.

Defendants have argued that the causation and redressability requirements are not met with respect to the Solicitation Definition because some Supervisors testified that even before SB90, they enforced an absolute prohibition on contact with voters near polling places, without attempting to ascertain whether that contact involved "solicitation" as Florida law defines it. *See* Tr. Day 10, 2875:2-2880:25 (argument of Defendant Lee's counsel); *id.* at 2884:23-2886:10 (argument of Defendant White's counsel). In particular, Defendants have emphasized Supervisor White's

testimony that even if SB90 were repealed, she would not change her policy barring all contact with voters within 150-feet of the polls. *See* Tr. Day 5, 1392:12-14.

The record demonstrates, however, that not every Supervisor followed the absolutely-no-contact policy Supervisor White described. The Court heard from multiple witnesses about line-warming activities they conducted within the buffer zone before SB90 was enacted. *See, e.g.*, Tr. Day 1, 60:19-61:1 (Ms. Scoon has offered water to voters waiting in line); Tr. Day 7, 1985:7-24, 1986:3-8) (Mr. Albright has personally engaged with and provided assistance to Florida voters within the 150-foot buffer zone). Even in Miami-Dade, Supervisor White's policy has not been consistently applied by her staff: the Hispanic Federation handed out pizza within the 150-foot buffer zone at a Miami-Dade polling place in 2018. Tr. Day 3, 810:18-811:4. And both Ms. Scoon and Mr. Albright testified that they and their organizations will no longer conduct such activities after SB90, because of the change to the Solicitation Definition. Tr. Day 1, 63:3-8; Tr. Day 7, 1986:9-23.

Moreover, even for Supervisors like Supervisor White who attempt to prohibit *all* contact within the buffer zone, it still makes a significant difference to Plaintiffs whether their conduct constitutes prohibited "solicitation" or not. A violation of the Florida election code is punishable as a "misdemeanor of the first degree." Fla. Stat. § 104.41. If activity constitutes "solicitation" under the Solicitation Definition, it is a criminal offense, enforceable by deputy sheriffs at polling places who are "subject

to all lawful commands of" the polling place staff that report to the Supervisors. *See* Fla. Stat. § 102.031(2), (4)(a). In contrast, the other provisions that Supervisor White relies upon in enforcing a broader prohibition on any conduct do not involve criminal liability in the first instance, but merely authorize the issuance of "lawful commands" and the taking of "reasonable action," such as removing disruptive persons. *Id.* § 102.031(1), (4)(d).

It is one thing for Plaintiffs to engage in line-warming activities at the risk that a poll worker may order them to stop; it is quite another to commit a crime and risk arrest. Plaintiffs have reasonably engaged in self-censorship in the face of potential criminal liability. *E.g.*, Tr. Day 1, 63:3-8; Day 7, 1986:9-23. The potential for such liability is traceable to the Supervisors' enforcement of the Solicitation Definition, and it is redressable by an order enjoining the Supervisors from doing so.

## II.   The Registration Disclaimer Provision violates the First Amendment.

The Registration Disclaimer Provision violates Plaintiffs' First Amendment rights. Appendix 4 contains tables quoting key testimony regarding the invalidity of the Provision under the First Amendment.

### A.   Legal Standard

The Registration Disclaimer Provision is subject to strict scrutiny as a law that "compel[s] individuals to speak a particular message." *NIFLA v. Becerra*, 138 S. Ct. 2361, 2371 (2018); *see also Riley v. Nat'l Fed'n of Blind of N.C.*, 487 U.S. 781, 795

(1988). "When the government 'compel[s] speakers to utter or distribute speech bearing a particular message,' . . . such a policy imposes a content-based burden on speech and is subject to strict-scrutiny review." *McClendon v. Long*, 22 F.4th 1330, 1337-38 (11th Cir. 2022). As Plaintiffs have previously explained, ECF No. 583, and Defendants have conceded, ECF No. 582, it makes no difference that Plaintiffs may comply with the Registration Disclaimer Provision by displaying a written sign or disclaimer rather than through literal speech—the same was true in both *NIFLA* and *McClendon*. *See NIFLA*, 138 S. Ct. at 2369; *McClendon*, 22 F.4th at 1333-34.

As Plaintiffs explain in their separately filed Response to the Court's Order Requesting Briefing on specific questions related to First Amendment scrutiny, ECF No. 647, the applicable standard is strict scrutiny rather than exacting scrutiny. Exacting scrutiny applies to laws that involve the "compelled disclosure of *affiliation with* groups engaged in advocacy," which operates as a "restraint on freedom of association." *Ams. for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2382 (2021) (quoting *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 462 (1958)) (emphasis added); *see also* ECF No. 647 (addressing additional cases).[3]

---

[3] This distinction makes little practical difference because, as the Supreme Court held in *Bonta*, exacting scrutiny requires narrow tailoring just as strict scrutiny does, and even "a substantial relation to an important interest is not enough to save a disclosure regime that is insufficiently tailored." *Bonta*, 141 S. Ct. at 2384. Thus, for the reasons given below, the Registration Disclaimer Provision could no more survive exacting scrutiny than strict scrutiny.

The Registration Disclaimer Provision, in contrast, requires Plaintiffs to express a message—that they might not deliver voter registration forms on time, and the voter can register to vote in other ways—with which Plaintiffs disagree and consider misleading, and which simultaneously undermines their registration efforts. The Registration Disclaimer is analogous to the law in *NIFLA*, which compelled pro-life pregnancy centers to express a message—that women could get low cost care, including abortion care, elsewhere—that, even if factually true, directly undermined the centers' work and was contrary to their values. *See* 138 S. Ct. at 2371 ("By requiring petitioners to inform women how they can obtain state-subsidized abortions—at the same time petitioners try to dissuade women from choosing that option—the licensed notice plainly 'alters the content' of petitioners' speech.").

The Registration Disclaimer Provision is also not subject to *Anderson-Burdick*, because it "does not control the mechanics of the electoral process," but is rather "a regulation of pure speech." *McIntyre v. Ohio Election Comm.*, 514 U.S. 334, 345 (1995). "[E]ncouraging others to register to vote' is 'pure speech,' and, because that speech is political in nature, it is a 'core First Amendment activity." *League of Women Voters of Tenn. v. Hargett*, 400 F. Supp. 3d 706, 720 (M.D. Tenn. 2019) (quoting *League of Women Voters of Fla. v. Browning*, 863 F. Supp. 2d 1155,

1158 (N.D. Fla. 2012)) (alteration in original).[4] *NIFLA* is explicit that laws "compelling individuals to speak a particular message," including by posting a message, are classic, content-based speech restrictions at the core of the First Amendment's protections. 138 S. Ct. at 2371. Under *McIntyre*, such restrictions are not subject to *Anderson-Burdick* balancing, even in the electoral context. *See* 514 U.S. at 345. And while *McIntyre* applied exacting rather than strict scrutiny, that was because that law at issue in that case prohibited only *anonymous* speech, and thus functioned as a "disclosure requirement," requiring that any speech be accompanied by the disclosure of the speaker. *Id.* at 336, 348.

Absent some categorical exception, the Registration Disclaimer Provision is therefore subject to strict scrutiny. *NIFLA*, 138 S. Ct. at 2371. No such exception applies. The Court has already held that the speech at issue is not commercial. ECF No. 636 at 2; ECF No. 380 at 18. And as explained in Plaintiffs' separately filed Response to the Court's Order Requesting Briefing on specific questions related to First Amendment scrutiny, there is no basis for applying lesser scrutiny as

---

[4] In contrast, in *League of Women Voters of Fla. v. Browning*, 575 F. Supp. 2d 1298, 1322 (S.D. Fla. 2008), the court applied *Anderson-Burdick* to a voter-registration regulation that did "not place any direct restrictions or preconditions on" organizations' "interactions with prospective voters," but "simply regulates an administrative aspect of the electoral process--the handling of voter registration applications by third-party voter registration organizations *after* they have been collected from applicants." Here, the Registration Disclaimer Provision *does* place "direct restrictions or preconditions" on Plaintiffs' interactions with prospective voters, by requiring Plaintiffs to deliver the disclaimer with which they disagree. *Id.*

professional speech or an informed consent requirement, either. ECF No. 647; *Otto v. City of Boca Raton*, 981 F.3d 854, 867 (11th Cir. 2020) (holding that there is no professional speech exception to strict scrutiny).

Under strict scrutiny, the Registration Disclaimer Provision may be upheld only if "the government proves that [it is] narrowly tailored to serve compelling state interests." *NIFLA*, 138 S. Ct. at 2371. "This stringent standard reflects the fundamental principle that governments have 'no power to restrict expression because of its message, its ideas, its subject matter, or its content.'" *Id.* (quoting *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015)). As the Eleventh Circuit has recently emphasized, "[l]aws or regulations almost never survive this demanding test." *Otto*, 981 F.3d at 862.

### B.    The Registration Disclaimer Provision constitutes compelled speech and undermines Plaintiffs' expression.

The Registration Disclaimer Provision constitutes compelled speech, because it forces Plaintiffs and other Third-Party Voter Registration Organizations to deliver a message they would not otherwise deliver. In particular, they must notify voters "that the organization might not deliver the application to the division or the supervisor of elections in the county in which the applicant resides in less than 14 days or before registration closes for the next ensuing election and must advise the applicant that he or she may deliver the application in person or by mail," and "must

also inform the applicant how to register online with the division and how to determine whether the application has been delivered." Fla. Stat. § 97.0575(3)(a).

Multiple witnesses testified that, were it not for the Registration Disclaimer Provision, they would not tell potential voters that they might not deliver their voter registration forms on time, nor provide information about other ways to register. As Ms. Scoon explained, "I do not think that warning that I may not turn in the voter registration application on time is accurate or fair. I would never make that statement, but the law is forcing me to do this." Tr. Day 1, 51:24-52:5; *see also id.* at 271:21-272:1 (Rosemary McCoy: "I would never tell an individual that I might not do what I am required to do by law. I would never tell anyone that. That's a contradiction. It's a – it's a – makes a person feel as though they can't trust you. It's unworthy for me to even say to a person. I would never do that.").

The remaining portion of the required disclaimer, requiring organizations to inform voter of other ways to register, likewise requires them to convey information they would not otherwise convey, and thereby undermines they work, by "impl[ying] that they shouldn't register with us" and increasing the risk that "they may say in their head they are going to do it later, but they haven't done it up until then, so the chances of them doing it go way down." *Id.* at 49:20-50:1, 102:16-22.

And being required to convey the disclaimer directly undermines Plaintiffs' own expression, in which they encourage potential voters to register. Providing the

disclaimer is "invalidating all the work that we've done. It's building distrust in the person you are trying to build trust with, . . . making people distrust us when we are trying to build trust, have those conversations to build the trust, and then you have to turn around and kind of break it down." *Id.* at 49:9-19. The disclaimer gives potential voters "pathways to not take the moment when you are talking to them and take advantage of that good energy and that communication. They could just put it off and do it later, and that's – we are very concerned about that." *Id.* at 48:5-17.

Plaintiffs have personally witnessed how the disclaimer can dissuade potential voters who would have otherwise registered with Plaintiffs' help, making them unwilling to do so after reviewing the disclaimer. *Id.* at 50:15-51:12. And Supervisors agree that the disclaimer undermines and interferes with voter registration organizations' work. Tr. Day 4, 1168:2-24 (Supervisor Scott: "[Y]ou're telling people that you are conducting a voter registration drive and your whole intent is to help people in your community to get registered to vote, but now you are required to say to them that you might not turn in the form, that is – obviously that would, you know, erode trust."); Tr. Day 9, 2668:10-15 (Supervisor Earley: to ask a voter to complete a form, then say, "You shouldn't trust that I'm going to do the right things with it, that would not help my cause of registering voters").

### C.   The Registration Disclaimer Provision is not narrowly tailored.

Defendants did not meet their burden to prove that the Registration Disclaimer Provision is narrowly tailored. *NIFLA*, 138 S. Ct. at 2371. To meet the narrow tailoring requirement, the challenged law must be "*necessary* to serve the asserted [compelling] interest." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 395 (1992) (quoting *Burson v. Freeman*, 504 U.S. 191, 199 (1992) (plurality opinion)) (emphasis and alteration in original). "If a less restrictive alternative would serve the Government's purpose, the legislature must use that alternative." *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 804, 813 (2000).

Here, as in many compelled speech cases, a less-restrictive alternative is obvious: Florida could disseminate its desired message itself. As the Court explained in *Riley*, a law compelling speech is not narrowly tailored where "the State may itself publish" information via an advertising campaign instead of compelling private parties to speak, and thereby "communicate the desired information to the public without burdening a speaker with unwanted speech." 487 U.S. at 800; *see also NIFLA*, 138 S. Ct. at 2376 (holding compelled disclosure unconstitutional even under intermediate scrutiny because rather than compelling speech, the state "could inform the women itself with a public-information campaign").

Defendants, who have the burden, offered absolutely no evidence suggesting that Florida could not adequately serve whatever interests the Registration

Disclaimer Provision serves by speaking itself instead of compelling Plaintiffs to do so. Defendants in compelled speech cases often argue that an advertising campaign would be less effective than compelling others to carry their message, but that argument fails—even under intermediate scrutiny—without "evidence to that effect." *NIFLA*, 138 S. Ct. at 2376; *see also Playboy Ent. Grp.*, 529 U.S. at 816 ("When a plausible, less restrictive alternative is offered to a content-based speech restriction, it is the Government's obligation to prove that the alternative will be ineffective to achieve its goals."). Defendants offered no evidence suggesting that advertising would not be a sufficient alternative to the Registration Disclaimer Provision. Defendants may think that requiring Third-Party Voter Registration Organizations to spread Florida's message will work better, but Florida "cannot co-opt" private organizations "to deliver its message for it" even if they believe doing so would be more effective. *NIFLA*, 138 S. Ct. at 2376.

Nor did Defendants address another obvious less-restrictive alternative: including whatever disclaimers or information they desire on the voter registration form itself. The "most commonly" used voter registration form by Third-Party Voter Registration Organizations is a statewide form whose content is set by the Department of State's Elections Division. Tr. Day 10, 2779:3-11, 2779:25-2780:4; *see also* Ex. 872, ECF No. 464-13. That form includes a full half page of instructions and information drafted by the Division, including detailed information about

"Where to Register," the "Deadline to Register," and "Identification (ID) Requirements" to register, along with warnings that it "is a 3rd degree felony to submit false information" and that much of the submitted information will become public record. Ex. 872, ECF No. 464-13. If Florida wanted to warn voters that Third-Party Voter Registration Organizations may not turn in their forms on time and inform them of other ways to register, such as online (which the form does not mention), Florida could have added that information to the form itself, alongside the existing information and warnings. Defendants—who have the burden—offered no explanation for why that alternative would not suffice.

Finally, to the extent that Defendants believe the Registration Disclaimer Provision is justified by concerns about Third-Party Voter Registration Organizations' late return of registration forms, they also failed to prove that the less-restrictive alternative of simply "vigorously enforce[ing]" the prior laws requiring timely return was inadequate. *See Riley*, 487 U.S. at 800. The Secretary has long had the authority to fine organizations that do not timely return voter-registration forms, and to refer such organizations to the Attorney General for civil enforcement. Fla. Stat. § 97.0575(3)(a)(1), (4); Tr. Day 10, 2768:15-24. Yet, reflecting the fact that late return of voter registration forms by third parties is not actually a serious problem in Florida, *see infra* Part II.D, those enforcement mechanisms have been rarely utilized. The Secretary has often waived fines it could

63

impose, even on the very few organizations that have repeatedly turned in forms beyond the ten (now fourteen) day deadline to which such organizations are subject. Tr. Day 10, 2769:16-20; Ex. 783, ECF No. 608-94; Ex. 134, ECF No. 608-34; Ex. 1546, ECF No. 608-110; Ex. 1547, ECF Nos. 608-111 and -112. The Attorney General has pursued no enforcement actions against Third-Party Voter Registration Organizations since 2012, ECF No. 402, at 31 ¶ 17 (stipulation), and the Attorney General's office is not "aware of any instances in which the AG has pursued injunctive relief" or "any restraining orders" against Third-Party Voter Registration Organizations, ECF No. 549-1 at 69:9-15.

Defendants offered no explanation of why, if they were really concerned about late-submitted voter registration forms, they could not have addressed the issue within this existing legal framework, rather than forcing *all* Third-Party Voter Registration Organizations to express a misleading disclaimer with which they disagree, and which undermines their work. Indeed, Attorney General Moody's office did not even "have a view on whether the enforcement mechanisms applicable to third-party voter registration organizations were adequate before the enactment of Senate Bill 90." ECF No. 549-1, at 44:1-8.

### D. The Registration Disclaimer Provision does not serve a compelling public interest.

The Registration Disclaimer Provision also does not serve any compelling public interest. Defendants have the burden to show such an interest. *NIFLA*, 138 S.

Ct. at 2371. The sole evidence they put forward on the subject was Director Matthews' testimony that the provision's purpose is to "let[] the voter know that . . . their voter registration may not make it in time . . . for them to either be registered, if they are a new registrant, or for a change to their voter application to make it in time, so that they have options" and know about other ways to register. Tr. Day 13, 3417:7-21. This interest is not a compelling public interest for at least four reasons.

*First*, there is no evidence the Legislature was actually motivated by the interest Director Matthews described. Laws "cannot withstand strict scrutiny based upon speculation about what 'may have motivated' the legislature." *Shaw v. Hunt*, 517 U.S. 899, 908 n.4 (1996). For something "[t]o be a compelling interest, the State must show that the alleged objective was the legislature's 'actual purpose'" for the challenged law. *Id.* (quoting *Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 730 & n.16 (1982)). Thus, "after-the-fact explanations cannot help a law survive strict scrutiny" under the First Amendment. *McLaughlin v. City of Lowell*, 140 F. Supp. 3d 177, 190 (D. Mass. 2015); *see also Bourgeois v. Peters*, 387 F.3d 1303, 1323 (11th Cir. 2004) (rejecting defendant's effort "to engage in *post hoc* rationalizations of its policy" in the context of a First Amendment challenge). And the legislative record is devoid of any indication of what may have motivated the Legislature in enacting the Registration Disclaimer Provision—the Legislature simply did not discuss it.

*Second*, as a matter of law, "[t]he simple interest in providing voters with additional relevant information does not justify a state requirement that a [speaker] make statements or disclosures she would otherwise omit." *McIntyre*, 514 U.S. at 348; *see also Riley*, 487 U.S. at 798 (holding "the State's interest in full disclosure" of the portion of charitable solicitations that a fundraiser actually gives to a charity "is not as weighty as the State asserts").

*Third*, there is no evidence of any significant problems in Florida caused by Third-Party Voter Registration Organizations' untimely return of registration forms.[5] Supervisor White, in charge of Florida's largest county, testified that she is not "aware of any incidents since [she] became Supervisor in 2015 in which a voter in Miami-Dade was prevented from voting because a third-party voter registration organization turned in their voter registration form late." Tr. Day 5, 1343:7-12. No voter has "ever complained to [Supervisor White's] office about late-delivered voter registration forms from a third-party voter registration organization." *Id.* at 1343:13-16. Similarly, Supervisor Scott, who is in charge of elections in Florida's second-

---

[5] There are two senses in which forms may be returned "late," and only one of them carries even the potential for negative consequences. No one is even potentially harmed if a Third-Party Voter Registration Organization turns in a form after the fourteen-day (previously ten-day) deadline, so long as the form is turned in before book closing. *See, e.g.*, Tr. Day 10, 2766:7-9 (Director Matthews acknowledging that "[i]f a form is turned in after the 10 or now 14-day deadline, but before book closing, the voter can still vote"). And even in the *exceedingly* rare instance where a form is turned in after book closing, at least one Supervisor testified that he would count that voter's ballot. Tr. Day 9 at 2669:10-18 (Supervisor Earley).

largest county, is not "aware of any issues or problems with third-party voter registration organizations in Broward County," does not "have any pending complaints or pending problems with such organizations in Broward County," and is not "aware of any issues from 2018 or 2016 with third-party voter registration organizations in Broward County." Tr. Day 4, 1162:24-1163:10; *see also* ECF No. 549-2, at 129:4-8 (similar testimony from Supervisor Hays). The Secretary's history of waiving fines for late-returned forms, and the failure of the Attorney General to pursue injunctive relief or restraining orders, *supra* Part II.C,  confirms that Florida simply did not have any serious problem with late-returned registration form.

*Finally*, there is no evidence that potential voters are not already aware of the information that the Registration Disclaimer conveys. *See Riley*, 487 U.S. at 799 (explaining charitable donors were "undoubtedly aware that solicitations incur costs, to which part of their donation might apply"). The registration form itself already informs voters that they may "register to vote by completing this application and delivering it in person or by mail to any supervisor of elections' office, office that issues driver's licenses, or voter registration agency . . . or the Division of Elections." Ex. 872, ECF No. 464-13. The form even provides the mailing address for every Supervisor's office in the state. *See id.* Absent evidence that voters "do not already know" the information that the Registration Disclaimer seeks to convey, there can be no adequate justification for the warning requirement. *NIFLA*, 138 S.

Ct. at 2377; *see also Hargett*, 420 F. Supp. 3d at 730 (holding that "disclaimer requirements serve no compelling state interests" where there were "hypothetical situations in which individuals might be harmed by their confusion" absent the disclaimer, but "no evidence that such situations are likely or common").

### III.   The Solicitation Definition violates the First and Fourteenth Amendments.

The Solicitation Definition regulates expression, including Plaintiffs' line warming activities, not mere conduct. The Solicitation Definition is unconstitutional for three reasons: it is vague, it is overbroad, and it is unconstitutional as applied to Plaintiffs' line warming activities. Appendix 4 contains tables quoting key testimony regarding invalidity of the Solicitation Definition.

### A.   The Solicitation Definition regulates expression, not mere conduct.

### 1.   Legal Standard

"Constitutional protection for freedom of speech 'does not end at the spoken or written word.'" *Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*, 901 F.3d 1235, 1240 (11th Cir. 2018) (*Food Not Bombs I*) (quoting *Texas v. Johnson*, 491 U.S. 397, 404 (1989)). The First Amendment also encompasses a right to engage in "expressive conduct." *Id.* (quoting *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1270 (11th Cir. 2004)).

To determine whether conduct is expressive, the Court must ask two questions: "(1) whether an intent to convey a particularized message was present,

and (2) whether the likelihood was great that the message would be understood by those who viewed it." *Burns v. Town of Palm Beach*, 999 F.3d 1317, 1336 (11th Cir. 2021), *petition for cert. filed* (No. 21-677) (cleaned up) (quoting *Johnson*, 491 U.S. at 404). In considering the second question, the Court considers "whether the reasonable person would interpret" the conduct as conveying "some sort of message, not whether an observer would necessarily infer a specific message." *Food Not Bombs I*, 901 F.3d at 1240 (quoting *Holloman*, 370 F.3d at 1270) (cleaned up). Courts consider five factors, among others: (1) whether the plaintiff intends to distribute literature or hang banners in connection with the expressive activity, (2) whether the activity will be open to all, (3) whether the activity takes place in a traditional public forum, (4) whether the activity addresses an issue of public concern, and (5) whether the activity "has been understood to convey a message over the millennia." *Burns*, 999 F.3d at 1344–45.

### 2. Plaintiffs' line-warming activities are intended to convey a particularized message.

Testimony from Plaintiffs and others demonstrates that the line-warming activities that organizations conduct in the buffer zone outside Florida polling places, and that are regulated by the Solicitation Definition, are intended to convey a particularized message. Plaintiff and League President Cecile Scoon testified that the League's line-warming activities are intended to "provid[e] a little bit of a shield and a vitamin so they feel that, you know, their voice is going to be heard; they're

going to be given every consideration. And for those people I think it's education for them and it's also emotional support." Tr. Day 1, 61:10-24. Executive Director Cliff Albright testified that Plaintiff Black Voters Matter's "voter comfort" activities are directed to "sending a message about celebrating the voting experience. . . . [P]art of the purpose is to communicate to voters that they matter, even as they are waiting in long lines." Tr. Day 7, 1981:1-1982:5, 1984:18-25, 1991:14-1992:8. A representative of the NAACP testified that the organization engages in line-warming activities to "to show [voters] the importance of staying in line to cast their most precious and priceless right, and that's their vote." Tr. Day 2, 517:4-11. There was no contrary evidence.

### 3. Reasonable viewers would understand that a message was being conveyed.

Evidence before the Court also makes clear that a reasonable person would interpret Plaintiffs' line-warming activities as expressing a message, and that reasonable people have indeed done so. *Food Not Bombs I*, 901 F.3d at 1240. Ms. Scoon testified that voters have responded to her line-warming activities by being "[s]o grateful, just like, I am so glad you're here. . . . I'm so glad you're here. Thank you. I was really nervous about this, and I feel much better"—a response that reflects an understanding of the League's message of support, not merely its concrete assistance. Tr. Day 1, 61:25-62:6. Mr. Albright testified that he "heard directly from voters saying, you know, that [Black Voters Matters' voter comfort activities] helped

them to be able to stay in line or – or, if not even in necessarily helping them to stay in line, *encouraging* them to stay in line." Tr. Day 7, 1984:12-17 (emphasis added). This reaction from voters, too, directly confirms that they understood the message that these activities were meant to convey.

Plaintiffs also presented evidence addressing the *Burns* factors. Plaintiffs testified that their activities are accompanied by a banner and educational materials. Tr. Day 1, 57:1-19. Their activities at the polling places are open to all, and they strive to help anyone who seems to be having difficulty. *Id.* at 59:2-22. Their activities take place on public sidewalks, a traditional public forum. *See Burson v. Freeman*, 504 U.S. 191, 196 (1992) (plurality op.). They address voting, a central issue of public concern. And public demonstrations and celebrations have, indeed, long been used to convey a message.

### B.   The Solicitation Definition is unconstitutionally vague.

#### 1.   Legal Standard

"It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). A law is impermissibly vague in violation of the Due Process Clause "if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits," or "if it authorizes or even encourages arbitrary and discriminatory enforcement." *Wollschlaeger*, 848 F.3d at 1319

(quoting *Hill v. Colorado*, 530 U.S. 703, 732 (2000)). This analysis is conducted with a particularly skeptical eye when a law "abut[s] upon sensitive areas of basic First Amendment freedoms." *Baggett v. Bullitt*, 377 U.S. 360, 372 (1964). The "Constitution demands a high level of clarity from a law if it threatens to inhibit the exercise of a constitutionally protected right, such as the right of free speech." *Konikov v. Orange Cnty.*, 410 F.3d 1317, 1329 (11th Cir. 2005) (citing *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 499 (1982)).

## 2. Evidence and Analysis

The Solicitation Definition is unconstitutionally vague as a matter of law. It criminalizes conduct based on third parties' subjective reactions to it, making it impossible for anyone to know when they might be violating the law. It prohibits not only activities carried out with an intent to influence voters, but also activities that have the "effect of influencing a voter," regardless of the actor's intent. Fla. Stat. § 102.031(4)(b) (emphasis added). Its focus on others' reactions to conduct resembles the law invalidated by the Supreme Court in *Coates v. City of Cincinnati*, 402 U.S. 611 (1971). There, the Court held that a law making it unlawful for individuals to assemble on public property and engage in conduct that was "annoying to persons passing by" was unconstitutionally vague, explaining that because "[c]onduct that annoys some people does not annoy others," it was impossible for someone to determine whether they were violating the law. *Id.* at 612,

614. Likewise here, where the law prohibits conduct based on its subjective effect on potentially any voter who witnesses it, Plaintiffs have no way of determining whether their activities will be considered "solicitation." Moreover, the law criminalizes conduct based on whether it is intended to or does "influenc[e] a voter," but does not define what is meant by "influenc[e] a voter." Fla. Stat. § 102.031(4)(b). The text leaves open the possibility, if not the likelihood, that it prohibits "influencing a voter" to stay in line, "influencing a voter" to cast a ballot, and "influencing a voter" to participate in democracy.

Testimony from the officials tasked with enforcing the Solicitation Definition confirms it is unworkably vague. Supervisor White testified that "in Miami-Dade . . . it can be impossible to discern what is solicitation, what is not solicitation. . . . [I]t is so impossible with the volume of sites and the volume of people that we are dealing with out there to discern who is engaging in activity to influence, who is not, you know, who is providing nonpartisan assistance, who is not." Tr. Day 5, 1376:8-1377:11. "[T]o put this type of interpretation on my essential poll workers who have . . . been to training for less than a day I think is something that can be handled wildly inconsistent in those locations." *Id.* Supervisor Earley's staff's immediate reaction to the new definition was that it "is very vague. What does 'intent to influence' mean?" Ex. 748, ECF No. 634-20. Supervisor Earley himself "would tend it agree it's somewhat vague." Tr. Day 13, 3512:24-3513:3. And Director Matthews testified

that "it's very hard to distinguish" solicitation from other contact with voters, and that whether conduct such as a non-partisan group distributing water would constitute solicitation would depend on the "facts and circumstances" so that you "can't draw, you know, a straight line on that." Tr. Day 10, 2813:18-24, 2184:11-20. That analysis, Director Matthews acknowledged, must be performed by usually temporary employees at more than 6,000 polling places, reporting to 67 different Supervisors. *Id.* at 2815:12-23.

Given this testimony from those tasked with enforcing and interpreting the Solicitation Definition, it is no surprise that Plaintiffs and other groups are highly uncertain about what the Solicitation Definition does and does not prohibit. Ms. Scoon testified that in her experience, "the understanding of the individual deputies, Supervisors of Elections of what the law requires and the paperwork that needs to be done varies fairly significantly." Tr. Day 1, 63:9-64:23. This, she explained, creates an unacceptable risk that "someone says you're doing something wrong, and then there could be a disagreement or . . . you're called out, and that would be very negative for our League members and very hurtful, just very scary. And it's possible that a Supervisor of Elections person could call the law enforcement." *Id.* To avoid that problem, "[w]e're just not going to do" line warming within the buffer zone anymore. *Id.*; *see also, e.g.*, Tr. Day 3, 746:10-25 (Hispanic Federation does not know what is allowed under the new definition, and as a result, it has "veteran

canvassers that have been with us a long time that have already said that they are fearful of being sent to do line-warming activities."). As Mr. Albright explained, Black Voters Matter has previously experienced arbitrary and unjustified interpretations of the law by poll workers, who have objected to their shirts, which "say Black Voters Matter" and "have said, Oh, you can't wear that shirt and engage and interact with people in line because that's partisan activity, when, in fact, there is nothing partisan about just the simple statement that Black Voters Matter." Tr. Day 7, 1987:11-17.

In the face of the vague Solicitation Definition, some Supervisors have resorted to overbroad enforcement, prohibiting *all* contact with voters in the buffer-zone. Director Matthews explained that, while under the Solicitation Definition, "a nonpartisan group can encourage voters to stay in line without discussing any candidate or issue as long as they are not harassing or soliciting the voter," "[t]he problem is enforcement and people following it." Tr. Day 10, 2813:18-24. She explained that "most Supervisors take a very hard line because it's very hard to distinguish, and voters don't like to be disturbed while they are in line." *Id.* Supervisor White confirmed that "the reason or part of the reason why [she] prohibit[s] any activity within the 150 feet is that [the Solicitation Definition] would be so difficult to apply consistently to individual incidents." Tr. Day 5, 1377:12-16 ("Yes, I can agree with that."); *see also id.* at 1378:4-13 ("I don't know if I would

agree with that the definition is hard to interpret, but I think it's hard to administer. It is difficult for my staff to know what exactly it is that you are doing, what your intentions are to be able to apply it consistently."). Similarly, Supervisor Latimer acknowledged that he does not believe the Solicitation Definition prohibits giving food or water to voters in line, but he still would prohibit a nonpartisan volunteer from doing so, because "'I don't have any idea what that person is talking to the voter about." ECF No. 549-3 at 47:11-20, 169:10-23, 170:9-22, 190:5-12.

Some Supervisors' prohibition of all contact with voters in the buffer zone may be an understandable response to the difficulties in applying such a vague provision, but it is contrary to Florida law. In justifying her blanket prohibition, Supervisor White pointed—in addition to the Solicitation Definition—to her authority to "maintain order" at the polls. Tr. Day 5, 1373:19-24 ("There's two pieces of – two provisions within the statute that we rely on. It's the no solicitation allowed within that zone. And then there is another statute that I cannot tell you number off the top of my head, but it also a – it provides us the ability to maintain order – the responsibility, rather, to maintain order outside the polls.").

There are two provisions in Florida law that allow a Supervisor to maintain order at the polls, but neither supports a flat prohibition on all contact with voters in the buffer zone. First, Fla. Stat. § 102.031(1) provides that "[e]ach election board shall possess full authority to maintain order at the polls and enforce obedience to

its lawful commands during an election and the canvass of the votes." Fla. Stat. § 102.031(1). Second, Fla. Stat. § 102.031(4)(c) provides that "[t]he supervisor or the clerk may take any reasonable action necessary to ensure order at the polling places, including, but not limited to, having disruptive and unruly persons removed by law enforcement officers from the polling room or place or from the 150-foot zone surrounding the polling place." *Id.* § 102.031(4)(c).

Those general provisions must be construed in the context of the more specific provision in the very same statutory section providing that "[n]o person, political committee, or other group or organization may solicit voters inside the polling place or within 150 feet of a drop box or the entrance to any polling place," and defining solicitation in the Solicitation Definition that follows. *Id.* § 102.031(4)(a). If the Legislature's intention was to ban *all* contact with voters in the buffer zone, it could easily have said so, rather than crafting the Solicitation Definition. And if the maintain-order provisions allowed a complete ban on all contact with voters, then the Solicitation Definition and Provision would be surplusage. Rather than justifying a complete, prophylactic ban on all contact with voters, the maintain-order provisions are properly read to allow Supervisors to address actual "disruptive and unruly" behavior should it occur.[6]

---

[6] A separate provision, Fla. Stat. § 101.051(1), was also referenced at trial. That provision specifically addresses assistance to a voter "in *casting* his or her vote,"

The factual record thus confirms what was already clear as a matter of law: the Solicitation Definition is a vague provision that provides too little notice of what is and is not prohibited. The Supervisors tasked with enforcing it find it impossible to apply consistently, and the Director of the Elections Division of the Department of State is unable to say what types of conduct are and are not permitted under it. The Solicitation Definition thus "permits and encourages an arbitrary and discriminatory enforcement of the law"—precisely what the vagueness doctrine prohibits. *Papachristou v. City of Jacksonville*, 405 U.S. 159, 170 (1972).

### C.    The Solicitation Definition is unconstitutionally overbroad.

### 1.    Legal Standard

The overbreadth doctrine is premised on the notion that free-speech "freedoms need breathing space to survive," because "persons whose expression is constitutionally protected may well refrain from exercising their rights for fear of

---

including involvement in the voting process itself, specifically reading "without suggestion or interference, the titles of the offices to be filled and the candidates therefor and the issues on the ballot," and "retir[ing] to the voting booth for the purpose of casting the elector's vote according to the elector's choice." *Id.* Section 101.051 also prohibits "solicit[ing] any elector in an effort to provide" that particular form of assistance in casting a vote. *Id.* § 101.051(2). This provision addresses with "extreme particularity" assistance in the actual casting of a vote, an act "of such personal character that [it] may not be delegated" absent specific authority. *Wakulla Cnty. Absentee Voter Intervenors v. Flack*, 419 So. 2d 1124, 1126-27 (Fla. 1982). The assistance Plaintiffs would provide but for the Solicitation Definition is not of that character, and none of the Supervisors who testified relied upon § 101.051 in justifying their prohibitions on contact with voters outside polling places.

criminal sanctions provided by a statute susceptible of application to protected expression." *Gooding v. Wilson*, 405 U.S. 518, 521-22 (1972) (quoting *NAACP v. Button*, 371 U.S. 415, 433 (1963)). As a result, the "government may regulate in the area only with narrow specificity," and speech regulations must "be carefully drawn or be authoritatively construed to punish only unprotected speech and not be susceptible of application to protected expression." *Id*. at 522. "[T]he overbreadth doctrine permits the facial invalidation of laws that inhibit the exercise of First Amendment rights if the impermissible applications of the law are substantial when 'judged in relation to the statute's plainly legitimate sweep.'" *City of Chi. v. Morales*, 527 U.S. 41, 52 (1999) (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 612-15 (1973)).

### 2. Evidence and Analysis

Evidence before the Court demonstrates that Plaintiffs' own activities near polling places are expressive conduct entitled to First Amendment protection. *Supra* Part III.A. But regardless, the Solicitation Definition facially prohibits a great deal expressive conduct near polling places, by prohibiting any conduct that has the intent or effect of "influencing a voter," without limitation or explanation of what kind of influence is impermissible. Fla. Stat. § 102.031(4). The Solicitation Definition therefore also "threatens others not before the court—those who desire to engage in legally protected expression but who may refrain from doing so rather than risk

prosecution or undertake to have the law declared partially invalid." *Bd. of Airport Comm'rs of City of L.A. v. Jews for Jesus, Inc.*, 482 U.S. 569, 574 (1987) (quoting *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 503 (1985)). The scope of the Solicitation Definition's prohibition is not limited to conduct like the Plaintiffs', but extends to any activity within 150-feet of a polling place that might be seen as intended or actually influencing voters in any way—a scope that necessarily includes a great deal of protected expressive activity.

There is no adequate justification for the Solicitation Definition's broad prohibition. Rather, as Director Matthews explained, the concerns it was intended to address are far narrower: complaints "about harassment, not just an abstraction but a harassment in terms of people – loud noises, being approached, that sort of thing." Tr. Day 13, 3474:8-17. Harassment, however, was already separately addressed, including by the provision allowing for the removal of "disruptive and unruly persons" from the areas around polling places. Fla. Stat. § 102.031(4)(c). The Solicitation Definition is therefore overbroad because it nearly "reaches the universe of expressive activity" rather than "merely regulat[ing] expressive activity . . . that might create problems." *Bd. of Airport Comm'rs*, 482 U.S. at 574.

**D.    The Solicitation Definition is unconstitutional as applied to Plaintiffs' line warming activities.**

**1.    Legal Standard**

In evaluating an as-applied challenge under the First Amendment, the Court "must first decide whether the [challenged law] is content neutral or content based, for a content-neutral regulation of expressive conduct is subject to intermediate scrutiny, while a regulation based on the content of the expression must withstand the additional rigors of strict scrutiny. *Food Not Bombs II*, 11 F.4th at 1291. A law is content based whenever it "applies to particular speech because of the topic discussed or the idea or message expressed," or "draws distinctions based on the message a speaker conveys." *Reed*, 576 U.S. at 163. Thus, if the restrictions a law imposes "depend entirely on the communicative content of the" expression, it is content based. *Id.* at 164. "A law that is content based on its face is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of 'animus toward the ideas contained' in the regulated speech." *Id.* at 165 (quoting *Cincinnati v. Discovery Network, Inc.*, 507 U.S. 401, 429 (2015)). And "a speech regulation targeted at specific subject matter is content based even if it does not discriminate among viewpoints within that subject matter." *Id.* at 169.

In general, where a law imposes content-based restrictions on speech, it "can stand only if [it] survive[s] strict scrutiny, 'which requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve

that interest." *Id.* at 171 (quoting *Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 734 (2011)). This standard also applies to content-based laws that restrict speech in "traditional public forums"—"parks, streets, sidewalks, and the like"—and "designated public forms," which the government has intentionally opened up for expression. *Minn. Voters All. v. Mansky*, 138 S. Ct. 1876, 1885 (2018). In contrast, in a "nonpublic forum," that is, "a space that 'is not by tradition or designation a forum for public communication,'" a restriction is lawful if it is reasonable and viewpoint neutral. *Id.* (quoting *Perry Ed. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46 (1983)).

### 2.    Evidence and Analysis

The Solicitation Definition is a content-based regulation of Plaintiffs' expressive conduct, because it prohibits activities depending on whether they are engaged in "with the intent to influence or effect of influence a voter," Fla. Stat. § 102.031(4)(b), a determination that depends on the content of the message expressed.

Moreover, the Solicitation Definition regulates Plaintiffs' conduct in a traditional public forum: the public streets and sidewalks outside polling places. *Mansky* makes clear that "parks, streets, sidewalks, and the like" are classic examples of a public forum. 138 S. Ct. at 1885. And a plurality of the Supreme Court held in *Burson v. Freeman*, 504 U.S. 191, 196 (1992), that a regulation of expressive

activity outside polling places "bars speech in quintessential public forums." *Mansky* did nothing to change this, because it held only that the *inside* of a polling place "qualifies as a nonpublic forum" because it is "government-controlled property set aside for the sole purpose of voting. 138 S. Ct. at 1886. In so holding, *Mansky* expressly distinguished "the interior of the polling place" from "its environs," and reasoned that the government had "an interest more significant, not less, *within*" the polling place than outside it. *Id.* at 1887.

Thus, the Solicitation Definition's regulation of Plaintiffs' expressive conduct is subject to strict scrutiny, which it cannot survive. The sole state interest offered by Defendants to justify the Solicitation Definition is concern "about harassment, not just an abstraction but a harassment in terms of people – loud noises, being approached, that sort of thing." Tr. Day 13, 3474:8-17. But as explained above, the Solicitation Definition is not narrowly tailored to address that concern, because poll workers already had separate authority to remove "disruptive and unruly persons" from the areas around polling places. Fla. Stat. § 102.031(4)(c).

Even if the area around a polling place were a nonpublic forum, the Solicitation Definition would still be unconstitutional as an unreasonable restriction. *See Mansky*, 138 S. Ct. at 1888. While "there is no requirement of narrow tailoring in a nonpublic forum, the State must be able to articulate some sensible basis for distinguishing what may come in from what must stay out." *Id.* In *Mansky*, the Court

invalidated as unreasonable a prohibition on expressive apparel in polling places that provided insufficient guidance as to what was and was not prohibited. *Id.* at 1888-92. That same problem is present here: as explained above, *supra* Part III.B, the Solicitation Definition provides no meaningful guidance as to what sort of expressive conduct is or is not permitted in the buffer zone. Moreover, while *Mansky* did state that a sufficiently clear regulation to prohibit "partisan discord" within polling places would survive scrutiny, *id.* at 1891, the Solicitation Definition extends far more broadly in both space and subject matter, governing not only the polling place but the area around it, and prohibiting not only partisan speech but also nonpartisan speech that might influence a voter in any respect.

Nothing in *Mansky* or any other case suggests that such a broad prohibition constitutes a "reasonable" restriction on speech, even in a nonpublic forum. The Court heard ample testimony about the importance of Plaintiffs' expression and the fact that voters appreciate and are grateful for it. *See, e.g.*, Tr. Day 1, 61:10-62:6; Tr. Day 7, 1981:1-1982:5, 1984:22-24, 1991:14-1992:8. Any concerns about harassment or intimidation were already addressed by existing, narrower prohibitions. *See* Fla. Stat. §§ 102.031(4)(c), 104.0615(2). The Solicitation Definition is therefore unconstitutional as applied Plaintiffs' line warming activities even if the areas around polling places are a nonpublic forum.

## IV.   The Challenged Provisions unduly burden the right to vote.

The Challenged Provisions unduly burden the right to vote under the *Anderson-Burdick* standard. An appendix with charts of key testimony addressing these claims is attached as Appendix 5.

### A.   Legal Standard

Under the *Anderson-Burdick* test, a court evaluating a claim that a state law burdens the right to vote must undertake a two-step process. At the first step, a court considers whether and to what extent a challenged law burdens the right to vote. *See Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983). A law may impose minimal burdens, serious or significant burdens, or severe burdens. Under controlling Supreme Court authority, *Anderson-Burdick* requires consideration of whether a statute "imposes 'excessively burdensome requirements' on *any class of voters*." *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 202 (2008) (controlling op.) (quoting *Storer v. Brown*, 415 U.S. 724, 738 (1974)) (emphasis added). In *Crawford* itself, for example, the "relevant" burdens were "those imposed on persons who are eligible to vote but do not possess a current photo identification" and that "[t]he fact that most voters already possess a valid driver's license . . . would not save the statute." *Id.* at 202 (controlling op.); *see also id.* at 199; *id.* at 212-14 (Souter, J., dissenting) (similar); *id.* at 239 (Breyer, J., dissenting) (similar).

Laws regulating the electoral process may also burden the right to vote by impairing the ability of individuals and organizations to engage in political expression. *See Buckley*, 525 U.S. at 191-97; *Meyer*, 486 U.S. at 422-23. Laws that limit "the number of voices who will convey [a] message and the hours they can speak and, therefore, limits the size of the audience" that an organization may reach impose a heavy burden on First Amendment rights, and "the burden that [a state] must overcome to justify" such a law is "well nigh insurmountable." *Meyer*, 486 U.S. at 422-23, 425; *see also Buckley*, 525 U.S. at 191-92.[7]

Once a court determines the character and magnitude of the burden, the court should move onto step two: considering the strength of the state interests and whether they justify the burden at issue. The standard that the state must meet varies depending on the court's determination at the first step of the magnitude of the burden that the law imposes on the relevant class or classes of voters. If the burden imposed is severe, the law is subject to strict scrutiny. *Norman v. Reed*, 502 U.S.

---

[7] It is not entirely clear what standard the Supreme Court was applying in *Meyer* and *Buckley*. *Meyer* subjected the challenged law to "exacting scrutiny." *Meyer*, 486 U.S. at 420, 425. *Buckley*, however, cited both *Meyer* and *Anderson* in striking down a similar law, holding that "the restrictions in question significantly inhibit communication with voters about proposed political change, and are not warranted by the state interests (administrative efficiency, fraud detection, informing voters) alleged to justify those restrictions." *Buckley*, 525 U.S. at 192. Whether these cases are properly understood as applications of the *Anderson-Burdick* framework or as imposing exacting scrutiny under the First Amendment makes no concrete difference in this case: either way, as explained below, Defendants have failed to justify the burdens that the challenged laws impose.

279, 280 (1992); *see also Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1318 (11th Cir. 2019) ("A law that severely burdens the right to vote must be narrowly drawn to serve a compelling state interest."). Burdens that are less than severe are subject to a sliding scale under which the court must "identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule," and in so doing, consider both the "*legitimacy* and *strength* of each of those interests." *Anderson*, 460 U.S. at 789 (1983) (emphasis added). "In passing judgment," the court "also must consider the extent to which those interests *make it necessary* to burden the plaintiff's rights. *Id.* (emphasis added).

The upshot is that even laws that have less than severe burdens must be justified by state "interest[s] *sufficiently weighty* to justify the limitation." *Norman*, 502 U.S. at 288–89 (emphasis added); *see also Crawford*. 553 U.S. at 191 (controlling op.) ("However slight" the burden on voting may appear, it still "must be justified by relevant and legitimate state interests 'sufficiently weighty to justify the limitation.'"). Some courts have conceived of this requirement as one of "fit," under which the law must actually advance the state interests in question. *See*, *e.g.*, *Soltysik v. Padilla*, 910 F.3d 438, 448 (9th Cir. 2018). Under no circumstances are burdens on the right to vote evaluated under a traditional rational basis standard, which simply asks if the law is conceivably rationally related to the state's purported interest.

*Anderson* and *Burdick* are themselves instructive in how to evaluate and weigh burdens and the corresponding state interests. In *Anderson*, the Court considered an Ohio statute that required all candidates for President, including major party candidates and independent candidates, to file a statement of candidacy and nominating petition by late March to appear on the ballot in November. 460 U.S. at 799. The plaintiff argued this deadline made it more difficult in practice for independent candidates to successfully access the ballot. *Id.* at 790.

At step one, the Court found the law imposed a burden on "identifiable segment" of voters and candidates. *Id.* at 792. While it did *not preclude* independent candidates from accessing the ballot, the burden was meaningful simply because it made ballot access more difficult: "When the primary campaigns are far in the future and the election itself is even more remote, the obstacles facing an independent candidate's organizing efforts are compounded. Volunteers are more difficult to recruit and retain, media publicity and campaign contributions are more difficult to secure, and voters are less interested in the campaign." *Id.*

The Court then embarked on a detailed examination of each of the proffered state interests for the law at step two. The state claimed three interests: (1) increasing voter education, (2) treating partisan and independent candidates equally, and (3) ensuring political stability. The Court took the first interest—voter education—and asked:

- **Is voter education a legitimate interest? Yes.** "There can be no question about the legitimacy of the State's interest in fostering informed and educated expressions of the popular will in a general election." *Id.* at 796.

But the Court did not stop there. It then asked:

- **Does anything undermine this state interest? Yes.** "The validity of this asserted interest is undermined by the State's willingness to place major-party nominees on the November ballot even if they never campaigned in Ohio." *Id.* at 798.

- **Does the law actually promote voter education? No.** "It is also by no means self-evident that the interest in voter education is served at all by a requirement that independent candidates must declare their candidacy before the end of March in order to be eligible for a place on the ballot in November." *Id.*

- **Is this law necessary to have informed voters? No.** "In the modern world it is somewhat unrealistic to suggest that it takes more than seven months to inform the electorate about the qualifications of a particular candidate." *Id.* at 797.

The Court then turned to the second proffered state interest: treating independent and major party candidates equally. The Court leapfrogged the inquiry into whether the state interest was a legitimate one, and asked:

- **Does law serve the interest of treating candidates equally? Does this law put candidates on equal footing? No.** We "find no merit in the State's claim that the early filing deadline serves the interest of treating all candidates alike . . . the reasons for requiring early filing for a primary candidate are inapplicable to independent candidates in the general election." *Id.* at 799.

The Court then moved onto the third interest: ensuring political stability. It asked:

- **Is this interest a legitimate one? No.** The Court explained the state has an interest in preventing unrestrained factionalism, but it does not have an interest in suppressing political competition against the major parties. *Id.* at 802-04.

- **Does the deadline actually serve the interest of ensuring political stability? No.** "If the deadline is designed to keep intraparty competition within the party structure, its coverage is both too broad and too narrow. . . Moreover, the early deadline for filing as an independent may actually impair the State's interest in preserving party harmony." *Id.* at 805.

*Anderson* demonstrates that, when faced with even a non-severe burden on the right to vote, the court must ask whether (1) the state interest proffered for the law is a legitimate state goal, and if so, (2) whether the law actually serves that interest, and (3) whether the law is necessary to accomplish that interest.

Similarly, the *Burdick* Court, which found only a "slight" burden on the right to vote from a ban on write-in voting in Hawai'i, did not apply rational basis review; again, it applied the balancing test: "Because we have already concluded that the burden is slight, the State need not establish a compelling interest to tip the constitutional scales in its direction." 504 U.S. at 439. But the Court still took a close look at the law and evidence before it, before concluding that, in that case, the state's specific interest in "averting divisive sore-loser candidacies," was a legitimate state goal and that "[t]he prohibition on write-in voting is a *legitimate means* of" accomplishing that goal; and that, in that particular case, "the State's interests *outweigh* petitioner's *limited interest* in waiting until the eleventh hour to choose his preferred candidate." *Id.* (emphasis added). The Court further found that the prohibition was a necessary component of that state's larger election system, emphasizing that: "Hawaii further promotes the two-stage, primary-general election

process of winnowing out candidates[] by permitting the unopposed victors in certain primaries to be designated office-holders. This focuses the attention of voters upon contested races in the general election. *This would not be possible, absent the write-in voting ban*." 504 U.S. at 439 (emphasis added). Thus, although the burden was slight, the Court still considered whether the ban was necessary to further the state's interests.

*Crawford* did not change this analysis. While *Crawford* finds that deterring voter fraud is a legitimate state interest, it does *not* hold that voter fraud is a sufficiently weighty state interest to justify all voting restrictions, or that courts never need to require evidence of voter fraud, evidence of how the law will prevent voter fraud, or whether the law is necessary to prevent voter fraud. *See, e.g.*, *Fish v. Schwab*, 957 F.3d 1105, 1126 (10th Cir. 2020), *cert. denied*, 141 S. Ct. 965 (2020) (cleaned up) (holding that while interests in "protecting the integrity of the electoral process" or "safeguarding voter confidence" are "legitimate [interests] in the abstract," there is "no concrete evidence that those interests make it necessary to burden the plaintiff's rights in this case").[8]

---

[8] In *Crawford*, the Court was not presented with concrete evidence of the relevant burdens, and "on the basis of the evidence in the record it [was] not possible to quantify either the magnitude of the burden" "or the portion of the burden imposed on them that is fully justified." 553 U.S. at 201.

Moreover, in *Anderson-Burdick* cases, "[t]he existence of a state interest . . . is a matter of proof." *Duke v. Cleland*, 5 F.3d 1399, 1405 n.6 (11th Cir. 1993). It is not enough for state officials to assert in briefing that a law is justified—they must offer "record . . . evidence as to the state's interests in promulgating" the challenged law. *Id.* at 1405. As other circuits have explained, courts need not accept a state's justifications at face value, particularly where those justifications are "speculative," otherwise it "would convert *Anderson-Burdick* . . . into ordinary rational-basis review wherever the burden a challenged regulation imposes is less than severe." *Soltysik*, 910 F.3d at 448–49 (citing *Pub. Integrity All., Inc. v. City of Tucson*, 836 F.3d 1019, 1024-25 (9th Cir. 2016) (en banc)).

Finally, that other states may employ similar laws in their election schemes cannot sufficiently justify any law at issue here. *Anderson-Burdick* requires an individualized assessment of the specific state's law in question and the burdens it imposes. Consistent with the Supreme Court's directive that challenges to laws under this framework "cannot be resolved by any 'litmus-paper test' that will separate valid from invalid restrictions," *Anderson*, 460 U.S. at 789, courts recognize that states' election laws are not fungible. State voter identification laws, for example, are not universally constitutional or unconstitutional—rather, an individual assessment of each state's law and the burdens it imposes is required. *See, e.g.*, *Ohio State Conf. of N.A.A.C.P. v. Husted (Husted III)*, 768 F.3d 524, 547 n.7 (6th Cir.

2014) (explaining, "we do not find that other states' electoral laws and practices are relevant to our assessment of the constitutionality or legality" of Ohio law), *vacated on other grounds*, No. 14-3877, 2014 WL 10384647 (6th Cir. Oct. 1, 2014).

**B.    The Registration Disclaimer Provision imposes an undue burden on the right to vote.**

**1.    Third-Party Voter Registration Organizations have been critical in registering voters in Florida that other means of registration have been unable to reach.**

Third-Party Voter Registration Organizations have successfully registered voters in Florida for many years. Since 2012, over 6.7 million individuals registered to vote in Florida. Tr. Day 8, 2300:22-24. Of those, records demonstrate that at least 7.36 percent or 500,000 of those voter registrations were achieved via Third-Party Voter Registration Organizations. However, that number does not "fully capture the total number of times the voter has relied on a" Third-Party Voter Registration Organization. *Id*. at 2302:5-24 (Dr. Herron testifying that "[i]f an individual who is already registered moves or updates his or her registration, that person will get a new form of registration . . . [I]t won't include [Third-Party Voter Registration Organization] because that will have been superseded. So that means the total number of interactions that registered voters have had with [Third-Party Voter Registration Organizations] is greater than 491,000.").

And while voters of all races and party affiliations register to vote through Third-Party Voter Registration Organizations, the evidence demonstrates that Black

and Hispanic voters register through these organizations at significantly higher rates than white voters. *Id.* at 2303:16-23. As of August 2021, 15 percent of Black voters and over 11 percent of Hispanic voters registered to vote through Third-Party Voter Registration Organizations after January 2012 as compared to approximately 3 percent of white voters. *Id.* at 2304:5-11. Democratic voters also register through Third-Party Voter Registration Organizations at higher rates than Republican voters – 10.48 percent as compared to 3.9 percent, respectively. *Id.* at 2306:16-22.

## 2.    The Registration Disclaimer Provision burdens the right to vote

SB90's Registration Disclaimer Provision requires that Third-Party Voter Registration Organizations inform applicants at the time that the application is collected that (1) the organization "might not deliver" the registration form on time and, (2) there are other means of voter registration available that do not involve the organization. Fla. Stat. § 97.0575 (3)(a) (2021). The Registration Disclaimer Provision has and will continue to deter potential voters from registering with Third-Party Voter Registration Organizations. Black, Hispanic, and Democratic voters will be disproportionately burdened, Tr. Day 8, 2313:2-8, with some number not registering to vote at all as a result. *See* Tr. Day 6, 1779:18-1780:5 (Dr. Kousser testifying the Registration Disclaimer Provision "could be expected to decrease the registration of people of color in Florida").

> **a.    The Registration Disclaimer Provision has and will deter voters from registering with Third-Party Voter Registration Organizations.**

The burdens imposed by the Registration Disclaimer Provision are not hypothetical. Since SB90 was enacted, voters have declined to register to vote upon hearing the Disclaimer. For example, during a recent event, Ms. Scoon attempted to register an individual to vote. As Ms. Scoon explained, the young man was "all ready to register to vote; and after he read the warning, he kind of got a little quizzical look on his face and was, like, withdrawing from me. And he says, [y]ou know what[,] I'm going to do it later. . . He did not register." Tr. Day 1, 50:15-51:2; *see also* Tr. Day 5, 1237:3-11 (Supervisor Scott testifying he has received feedback from Third-Party Voter Registration Organizations that, upon delivering the Disclaimer, potential voters have declined to register with the organization by saying they will register online). In other words, there is already evidence that the Registration Disclaimer Provision is working precisely as Plaintiffs feared – it is "send[ing] a message to the potential registrant that [registering through the Third-Party Voter Registration Organization] is a risky proposition." Tr. Day 8, 2332:24-2333:7.

And while voters who decline to register upon hearing the Disclaimer may say they will register later, the data suggests they are unlikely to do so. Dr. Herron and Dr. Smith conducted a study on how a prior law, HB 1355, which imposed restrictions on Third-Party Voter Registration Organizations, affected overall voter

registration in Florida by analyzing voter registration rates pre- and post-HB1355. Tr. Day 8, 2295:13-21. The study found a decline in *overall* voter registration. *Id*. at 2296: 3-15. In other words, the "individuals who [were] affected by HB 1355's restrictions on did not simply switch to another form of voter registration . . . they basically didn't register to vote." *Id*. There is no reason to think that the effects of SB90 will be any different, especially given that Third-Party Voter Registration Organizations often direct their outreach to individuals who would otherwise face barriers to registering to vote on their own and those unlikely to be reached by Supervisors. *See*, *e.g*., Tr. Day 4, 1162:12-19 (Supervisor Scott); Tr. Day 9, 2665:23-2666:11 (Supervisor Earley); Tr. Day 5, 1343:3-6 (Supervisor White); Tr. Day 1, 213:18-23 (Mr. Garces); *Id*. 262:1-17 (Ms. McCoy)

> **b.  Minority and low-income voters often face barriers when registering to vote online, in person, and by mail.**

Third-Party Voter Registration Organizations are often local, grassroots organizations comprised of "volunteers from the community who [are] more trust[ed] than government agencies." Tr. Day 4, 1162:12-19 (Supervisor Scott). As a result, they are often "able to reach potential voters that … may not be able to be reached by government agencies." *Id*. As Supervisor Earley testified, Third-Party Voter Registration Organizations "absolutely" provide valuable assistance to voters and reach voters that his office does not. Tr. Day 9, 2666:8-11 ("I just got a report from staff that we are getting roughly 100 or so [voter registration applications] from

[Third-Party Voter Registration Organizations] [] that we are missing" in our "outreach efforts."); *see also* Tr. Day 5, 1343:3-6 (Supervisor White acknowledging that Third-Party Voter Registration Organizations can "help to reach potential voters who otherwise might not register to vote"). To effectively reach low-income minority voters, Third-Party Voter Registration Organizations often conduct outreach in high-density areas with high foot-traffic, such as supermarkets, libraries, convenience stores, laundromats, bus stations, and concerts. *See, e.g.*, Tr. Day 7, 2035:22-2036:8 (Ms. Mercado); Tr. Day 5, 1409:6-10 (Mr. Nordlund); Tr. Day 1, 195:7-16 (Mr. Garces); Tr. Day 1, 260:7-8 (Ms. McCoy).

Many Third-Party Voter Registration Organizations focus their efforts on registering low-income, Black, and Hispanic Floridians who would otherwise experience barriers to registering to vote online, in person, or by mail. Registering to vote online can be a barrier for voters who lack access to the internet or a computer. Tr. Day 1, 262:1-17; *see also* Tr. Day 1, 272:19-273:2 (Ms. McCoy of Harriet Tubman Freedom Fighters explaining that, but for SB90, she would not tell voters how to register online "because of the population that we work with, and the population we work with are mainly low income, and many low-income people, you know, might – that could be a barrier"). This is the case for tens of thousands of Black and Hispanic Floridians. As Mr. Cooper testified, 19 percent of Black households and 15 percent of Hispanic households do not have broadband internet

at home, Tr. Day 2, 623:14-20, a metric used to denote socioeconomic status, *id*. at 623:24-624:7. And 10 percent of Black households and 5 percent of Hispanic households do not have a computer, smartphone, or tablet. Ex. 10, ECF No. 608-16 at 62. Floridians with disabilities may also find it difficult to register online due to challenges navigating the voter registration form. *See* Tr. Day 2, 449:10-14 (Disability Rights Florida); Tr. Day 4, 1100:13-1101:8 (Ms. Rogers, a legally blind voter, describing how the Pinellas Supervisor's website is "not that adaptable for the visually impaired").

Likewise, registering to vote in person can be a barrier for the 114,000 Black and 126,000 Hispanic households without access to a vehicle. Tr. Day 2, 629:17-19. As can using the mail to register to vote, for those who lack access to a printer to print the voter registration form. *See* Tr. Day 4, 1101:9-1102:1. And even if a voter is able to get a hard copy of the registration form, the cost to  purchase an envelope or a stamp to mail it in may be a barrier. *See, e.g*., Tr. Day 1, 262:1-17 (Ms. McCoy); Tr. Day 2, 621:9-16 (Mr. Cooper testifying that in 2019 Black unemployment rate averaged 7.2%); Ex. 10, ECF No. 608-16 at 9 ("For working age (18-64) Floridians, 9.7% of Whites live in poverty, compared to 16.3% of African Americans and 12.6% of Latinos.").

For minority and low-income voters, Third-Party Voter Registration Organizations may be their only viable option to register to vote. If they are deterred

from registering with those Organizations' assistance because of the Registration Disclaimer Provision, they may be foreclosed from registering all together. Ultimately, the restrictions on Third-Party Voter Registration Organizations will severely burden minority and low-income voters who, but for Third-Party Voter Registration Organizations, may be unable to register to vote.

### c. The Registration Disclaimer reduces the effectiveness of Third-Party Voter Registration Organizations' efforts.

The Registration Disclaimer Provision will also reduce the effectiveness of Third-Party Voter Registration Organizations because individuals will be less willing to associate with them to volunteer to register voters. The Provision therefore "decreases the pool of potential" voter registration volunteers, and thus "cut[s] down 'the size of the audience'" that Third-Party Voter Registration Organizations can reach. *Buckley*, 525 U.S. 194-95 (quoting *Meyer*, 486 U.S. at 422-23). And, for those that do still register voters, the Provision will require more time to explain the disclaimer and answer voter questions, decreasing their reach. The likely consequence will be that fewer Floridians—particularly Black and Hispanic and low-income Floridians—are registered to vote.

For many people, registering voters is a way to serve their communities. Tr. Day 4, 1164:20-1165:13. But now, because of SB90, less people are willing to engage in that service. *See e.g.*, Tr. Day 4, 1131:1-1131:14; Tr. Day 4, 1164:20-1165:13; Tr. Day 1, 52:3-14. Moreover, the Registration Disclaimer Provision will

require volunteers and canvassers to spend more time with each applicant to explain the Disclaimer and answer questions. As a result, they will not be able to register as many voters. Mr. Nordland testified, "Having to tell a voter a disclaimer, plus also probably hav[ing] to explain a disclaimer in plain English or Spanish" will take more time to complete the registration "and their production rates would probably become lower than what they were before [SB90]." Tr. Day 5, 1423:14-19. This is not mere speculation. Third-Party Voter Registration Organizations are already experiencing the impact. Ms. Mercado of Florida Rising Together testified, "We have seen a decrease in the number of forms. So prior to SB90, on average a voter registration canvasser would collect around 300 forms a week. They work 29 hours a week. And since the passage of SB90, they're collecting more like an average of 100 forms a week. So we are seeing just the number of voter registration forms that they typically collect in an hour has gone down significantly." Tr. Day 7, 2039:11-17.

In practice, this means that each week 200 fewer people are being registered to vote just from one Third-Party Voter Registration Organization. This will impact not only Black and Hispanic voters, but also Democratic voters who register through Third-Party Voter Registration Organizations at rates that far exceed Republican voters. *See* Ex. 5, ECF No. 608-1 at 101-02 (Dr. Herron explaining among post-January 2012 voter registrations in the August 2021 statewide voter file, the Democratic third-party voter registration rate was 10.48 percent as compared to

Republican rate of 3.97 percent). Dr. Herron analyzed third-party voter registration lists produced by 20 Florida counties in discovery. Taking Leon County as an example, Dr. Herron found "Democratic affiliates make up 52.8 percent of registered voters but 64.6 percent of such voters who registered via [Third-Party Voter Registration Organizations]. In contrast, in every Florida county in the table, Republican affiliates are disproportionately unrepresented among [third-party registrants]. Again consulting Leon County, [Republican voters] make up 26.1 percent of registered voters but only 8.8 percent of [third-party] registered voters." *Id*. at 107. Because individuals who affiliate with the Democratic party register at high rates with Third-Party Voter Registration Organizations, Democratic voters will be disproportionately burdened by the Registration Disclaimer Provision.

### 3. The Registration Disclaimer Provision is not adequately supported by a sufficiently weight state interest.

To justify the Registration Disclaimer Provision, the State claimed an interest in informing applicants of the risks of registering through a Third-Party Voter Registration Organization and providing information on the other ways a voter can register on their own, thereby instilling voter confidence in the process. Neither of these interests can justify the burdens imposed on voters as a result of the Provision.

### a. There is no evidence widespread problems with registration forms being delivered late, much less after book closing.

Director Matthews stated that the purpose of the Registration Disclaimer Provision is to inform applicants that, by registering through a Third-Party Voter Registration Organization, they risk their form not being delivered on time to vote, and to provide the applicant with information on other ways to register that do not involve the organization. The implication being that Third-Party Voter Registration Organizations frequently return registration forms past book closing, thus preventing voters from voting. But, in reality, the evidence shows it is incredibly rare for a voter to be unable to vote because a registration form was delivered past book closing.

In 2020, 59,805 voters registered or updated their registration through a Third-Party Voter Registration Organization. Ex. 5, ECF No. 608-1 at 94. Of the 67 Supervisors, 64 are unaware of *any* voter in their county who was unable to vote in 2020 because a Third-Party Voter Registration Organization returned a registration form past book closing (or not at all). *See* Ex. 546, ECF No. 462-47 through Ex. 612, ECF No. 463-13. Supervisors also testified to this fact. Supervisor Latimer stated he is not aware of any voters who were not registered in time to vote in an election in 2016, 2018, or 2020 because of a Third-Party Voter Registration Organization. ECF No. 549-3 at 56:6-16.; *see also* Tr. Day 5, 1343:7-12 (Supervisor White testifying that since becoming supervisor in 2015 she is unaware of any instance of a voter being unable to vote because a Third-Party Voter Registration Organization returned

an application after book closing); ECF No. 549-2 at 129:4-8 (Supervisor Hays explaining he is unaware of "any incident in Lake County where a voter was prevented from voting because of a third-party voter registration organization turning in a registration application late"). Simply put, it is exceedingly rare for a Third-Party Voter Registration Organization to return a registration form past book closing. The overwhelming majority return forms on time, and it is incredibly misleading to suggest to voters otherwise.

> **b.   The Registration Disclaimer Provision undermines overall voter registration which cannot possibly achieve the state's purpose.**

Director Matthews testified that voters should be informed that if they do not "feel comfortable" having a Third-Party Voter Registration Organization return their form, they can deliver it themselves "and ensure also that it gets in timely." Tr. Day 13, 3417:7-21. But, as discussed, many voters who register through Third-Party Voter Registration Organizations would otherwise not register or would experience barriers to registering on their own, including the act of returning a registration form. *See supra* at Part IV.B.2.b. Thus, some voters who are deterred from registering with a Third-Party Voter Registration Organization will not be able to register at all. *See id*. Ms. Rosemary McCoy knows this well—she directs Harriet Tubman Freedom Fighters' voter registration efforts, which target low-income Floridians who would otherwise face barriers to registering. Tr. Day 1, 262:1-17. She testified that if you

give someone a registration form to turn in, there is "zero" chance they will. Tr. Day 1, 276:21-277:6. "[V]oter registration is not on the forefront of people['s] minds. That's why they haven't registered to vote." *Id*.; *see also id.* at 49:20-50:1 (Ms. Scoon testifying that when you are trying to convince someone to register to vote and you give the disclaimer, "they may say in their head they are going to do it later, but they haven't done it up until then, so the chances of them doing it go way down"). Consistent with this, the data shows that when restrictions are placed on Third-Party Voter Registration Organizations, overall voter registration decreases. *See* Tr. Day 8, 2295:13-21, 2296:3-15. In other words, there is no reason to believe that a potential voter who is dissuaded by the Disclaimer will register using another method; it is just as and perhaps more likely that they will fail to register entirely.

The other ways to register to vote that SB90 requires Third-Party Voter Registration Organizations to advise potential voters about are methods that impose substantial burdens for many of the very populations that those organizations are so successful at registering, almost certainly because those other methods can be so problematic for those voters. For example, Mr. Nordlund of Unidos testified, "when the state launched their online website, we got a lot of complaints from voters that couldn't navigate that website and were turned away from wanting to vote – registering to vote." Tr. Day 5, 1494:16-22. And those methods have their own reliability issues. For example, Director Matthews acknowledged that the State's

online voter registration system has malfunctioned on the final night prior to book closing in the 2018 *and* 2020 general elections. Tr. Day 10, 2780:11-24; *see also id.* at 2803:5-10. Yet SB90 does not direct that *that* information be shared with voters.

In sum, there is no evidence that warning prospective voters that registering with a Third-Party Voter Registration Organization and implicitly encouraging them to register using another method will actually help ensure Floridians successfully register to vote. There *is* ample evidence, however, that the Registration Disclaimer Provision not only impedes Third-Party Voter Registration Organizations in their efforts to register voters, but also will operate to depress registration among precisely the Floridians that are least likely to be registered by other means.

### c.   The Registration Disclaimer Provision will not instill voter confidence in the voting process.

The state has a legitimate interest in instilling voter confidence in the voting process. But the record demonstrates that voters do not lack confidence in the voting process or in Third-Party Voter Registration Organizations. Within the last 10 years, over 500,000 voters have registered with the help of Third-Party Voter Registration Organizations. Tr. Day 8, 2301:5-8. And in 2018 and 2019 alone, over 159,000 voters registered to vote that way, amounting to over 10 percent of all Florida voter registrations in that period. Ex. 5, ECF No. 608-1 at 94. This "revealed behavior" makes clear that tens of thousands of Floridians value Third-Party Voter Registration Organizations and have confidence in the system. *See* Tr. Day 8, 2333:14-16.

One reason Third-Party Voter Registration Organizations are valuable is because they make registering to vote easier, thus lowering the cost of voting. *Id.* at 2295:2-6. And when the costs of voting are lower, turnout is higher. *Id.* at 2227:1-4. High voter turnout is certainly a sign of confidence in the system. However, the Registration Disclaimer Provision erodes trust and confidence by painting a misleading picture of Third-Party Voter Registration Organizations that discourages voters from registering through the organizations. *See, e.g.*, Tr. Day 4, 1168:2-24 (Supervisor Scott testifying that Third-Party Voter Registration Organizations register voters with the "whole intent . . . to help people in your community to get registered to vote, but now you are required to say to them that you might not turn in the form, that is – obviously that would, you know, erode trust"); Tr. Day 1, 49:9-19 (Ms. Scoon testifying that the Registration Disclaimer Provision "invalidate[s] all the work that [the League has] done. It's building distrust in the person you are trying to build trust with"). When that happens, potential voters must either find a new way to register or not register at all. That makes the entire registration process more costly, and when the process is more costly, voter turnout decreases. Tr. Day 8, 2226:19-22. It simply cannot be the case that the Registration Disclaimer Provision can deter voters from registering with Third-Party Voter Registration Organizations while also instilling voter confidence in the process. Nor is there any evidence in the record that would justify a finding to the contrary.

106

**C.     The Vote-By-Mail Request Provision imposes an undue burden on the right to vote.**

As discussed above, *supra* Background Part I, in Florida's 2020 elections Black and Democratic voters substantially increased their use of mail ballots, with significantly more Democratic voters casting mail ballots than Republicans for the first time in Florida's modern history. Ex. 5 at 38 tbl. 8, ECF No. 608-1 (Dr. Herron Rep.). This reversal had significant consequences for future elections: Before SB90, once a voter made a VBM ballot request, that request was deemed a standing request for a VBM ballot, valid through the end of the calendar year of the second-ensuing general election. Fla. Stat. § 101.62 (2020).[9] This system had been in place for the past decade, *see* Ex. 383, ECF No. 608-75, enabling Florida voters to carry their request for a VBM ballot from one general election to the next seamlessly.

Following the 2020 general election, registered Democratic voters in Florida had an "800,000 vote lead over Republicans" in terms of standing VBM requests "because [Democrats] had voted by mail in such numbers in the 2020 election. . . ." Tr. Day 6, 1768:10-15 (Dr. Kousser). It is widely acknowledged that voters on the standing list are "far more likely to vote" than those who are not. Tr. Day 4, 1211:17-1212:3 (Supervisor Scott); *see also* Tr. Day 9, 2492:12-2493:7 (Dr. Smith testifying

---

[9] Voters could opt out of the standing request and limit their request for a VBM ballot for a single election only. Fla Stat. § 101.62(a). And even if a voter had a standing request for a VBM ballot, they were free to choose to vote in person instead in any given election. Tr. Day 9, 2621:12-24 (Supervisor Earley).

to the increased turnout effects of being on such a standing list). The effects of this were already clear by the 2021 municipal elections. As Supervisor Scott explained, "we've seen directly that there was an increase in voter participation in [the 2021] municipal elections as a result of more people requesting vote-by-mail ballots for the 2020 cycle." Tr. Day 4, 1211:17-1212:3. Thus, coming out of the 2020 election, Democratic voters in Florida were positioned to continue to outpace Republican voters in VBM ballot returns in future elections.

Under SB90, however, all of Florida's standing VBM requests will be deleted from the system on January 1, 2023. *See*, *e.g.*, Tr. Day 4, 1187:2-6 (Supervisor Scott describing how "the list of people that we have built up now will get completely wiped away"). This is not a flaw but a feature of the bill as designed. SB90's sponsor, Senator Baxley, proclaimed that Florida needed a "fresh start" on the VBM list. Ex. 6, ECF No. 608-5 at 27 (Dr. Burch Rep.). Senator Gruters, the Chairman of the Republican Party of Florida, Tr. Day 11, 3132:11-15, was even more honest in his assessment about the reason of the need for this "reset": in a text that he sent to the sponsor of SB90's counterpart HB 7041, Representative Ingoglia, in late April 2021, the Senator stated, "[Republicans] cannot make up that ground" in VBM requests, and that failing to "reset" the VBM list would be "devastating" for Republicans, particularly in down ballot and local races, "put[ting] at risk all Republican nonpartisan candidates." Ex. 874, ECF No. 468-2.

Although Senator Gruters hoped to wipe out the list immediately, SB90 provides the reset he and his fellow Republicans sought, beginning on January 1, 2023, and after every general election thereafter. As discussed further below, the impact, particularly for off year and local elections, is likely to be severe.

### 1.    The Vote-By-Mail Request Provision burdens the right to vote.

SB90's new VBM request scheme will be devastating for Florida's voters. It will retroactively invalidate likely hundreds of thousands of pre-existing requests for VBM ballots for the 2024 general election cycle. For millions of other voters who have relied on Florida's standing request system for the past decade—and would have otherwise automatically received a VBM ballot for future elections in 2023 and onward—the new system will require each voter to remember to renew their request to VBM about two months after every general election to continue receiving VBM ballots. As multiple Supervisors (and voters) testified, many Floridians are unlikely to realize their request has been invalidated, or that they need to affirmatively make a new request when they do, until it is too late.

SB90 also now requires that every single time a voter makes a VBM request, they must supply an identification number for the Supervisor's Office to verify, even though the Supervisors lack the ability to reliably verify such identification numbers for *three million* Florida voters, jeopardizing those voters' ability to request a VBM ballot at all. This directly affects hundreds of thousands of senior voters, many of

whom have mobility issues that make access to VBM voting critical to ensure they can exercise the franchise. The system is lawless, chaotic, and overwhelmingly likely to result in disenfranchisement.

While these burdens will be felt on all Florida VBM voters (of which there were 4.8 million in 2020, *see* Ex. 5 tbl. 5, ECF No. 608-1 (Dr. Herron Rep.)), the burdens will be severe for voters who depend on VBM to cast their ballots, including millions of senior voters and voters with disabilities. Finally, because this law has severe partisan effects (by disproportionately and quantifiably harming Democratic voters), this law is not the kind that can be described as reasonable and nondiscriminatory.

### a. The Vote-By-Mail Request Provision retroactively invalidates hundreds of thousands of VBM requests.

By invalidating all requests for VBM ballots at the end of the 2022 calendar year, SB90 retroactively invalidated what were likely hundreds of thousands of pre-existing requests Florida voters had already made to receive a VBM ballot for the 2024 general election cycle. In the 2020 general election, Florida voters made a record number of VBM ballot requests. Ex. 5 at 25, ECF No. 608-1 (Dr. Herron Rep.). Supervisor Mark Earley testified that, in just Leon County, 67,000 voters returned a VBM ballot in that election, and of those voters, "90 -- 85 percent roughly," checked a box on their ballot return envelope requesting that they receive a VBM ballot for the next two election cycles. Tr. Day 9, 2624:14-2625:5. But for

SB90, those requests would have been good through the 2024 election cycle. But SB90 "prevents" the Supervisors from honoring those requests, and in Supervisor Earley's words, "cancels a request that I think many [voters] were expecting to be on record and honored in the 2024 cycle." Tr. Day 9, 2325:19-2327-11. Supervisor Earley confirmed that those voters were "already essentially promised" that they "would get those" ballots. *Id.* Because of SB90, all of those requests will now become invalid as of January 1, 2023. Voters who had expected ballots after that date based on requests they made prior to SB90 will not receive them.

Many other Florida counties used the same checkbox request system in the 2020 general election, allowing voters to request a VBM ballot for 2022 and 2024 when they returned their 2020 general election ballot. For example:

| Citation | Witness | Testimony |
|---|---|---|
| Tr. Day 4, 1285:18-1286:9 | Supervisor Corley | "Q. And before SB90, were voters in Pasco County able to renew a request for a vote-by-mail ballot by checking a box on the envelope when they returned their ballot?<br>A. Yes, sir, on the return certificate envelope. Yes, sir.<br>Q. Was that a popular method in Pasco County?<br>A. Yes, I would say so.<br>Q. Did many voters use that method?<br>A. Yes, sir." |
| ECF No. 549-3, 59:25-60:5, 83:22-84:10, 135:12- | Supervisor Latimer | Hillsborough County used to have the checkbox method for requesting a VBM ballot. Many of the county's voters used that option before SB90. |

| 14, 137:7-12 | | |
|---|---|---|
| Tr. Day 5, 1590:8-13 | Catherine Teti (Hillsborough County) | Hillsborough voter explaining, "when you get the vote-by-mail ballot, there's a little box on the envelope that says, Please send me a mail ballot for next election. And I just check it, and I get the ballot for the next session -- the next election." |

Even in counties that did not utilize a checkbox method for requesting ballots in the 2020 general election, there are still voters who will have their VBM request retroactively invalidated under SB90. In counties like Miami-Dade, which held municipal elections in the spring of 2021, there were voters who requested VBM ballots before SB90 was enacted. As Supervisor White explained, at the time those requests were made, they were valid "[t]hrough the end of 2024," but because of SB90 they "will be inactivated as of January 1, 2023," "two years earlier." Tr. Day 5, 1350:9-1351:3.

As Supervisor Earley confirmed, Florida's Supervisors were uniformly opposed to the retroactive invalidation of voters' existing VBM ballot requests, a position they made "abundantly clear" to the Legislature. Tr. Day 9, 2628:16-23; *see also* ECF No. 549-3, 110:11-25 (Supervisor Latimer explaining that "wip[ing] out all of the request for vote by mail [that are on file]" is an "extremely onerous" thing to do). It is not hard to see why the Supervisors opposed this change. As Supervisor Earley explained, when you retroactively invalidate requests for VBM ballots, "the biggest concern is the potential and likely disenfranchisement of voters who, in their

mind, they have their request in; they are going to get their ballot like they have previously . . . and they have got a history of doing that, and now that would not be honored." Tr. Day 9, 2327:15-2328:9. This retroactive invalidation of voters' VBM ballot requests poses a severe burden on the right to vote.

### b. The Vote-By-Mail Request Provision is likely to cause massive confusion and disenfranchisement among voters.

Even among Florida voters who will not have their VBM ballot requests retroactively invalidated, Supervisors agree that SB90 is likely to cause both massive confusion, and will, in some cases, result in disenfranchisement.

As Supervisor White explained, "when vote-by-mail ballot[] [requests] lasted for two general election cycles, . . . a voter who requested a vote-by-mail ballot in a presidential election cycle would also get a vote-by-mail ballot for the next midterm election cycle automatically." Tr. Day 5, 1348:20-1349:20. That system was so seamless, that, as Supervisor Doyle explained, "[s]ome people think" their vote-by-mail request "is permanent." Tr. Day 12, 3214:18-19. Under SB90, however, "if a voter requested a mail ballot in the lead-up to a presidential election, they would not get mail ballots for subsequent elections anymore." Tr. Day 5, 1348:20-1349:20 (Supervisor White).

While most Supervisors intend to try to educate voters about the change, they know they cannot possibly be able to reach all of their voters. Broward County Supervisor Scott, for example, will do "[e]verything we can" to inform voters that

their VBM requests will are set to newly expire, but "none of these types of communication are very effective," and there is "not a chance" that his office can reach all affected voters. Tr. Day 4, 1187:7-1190:2. Supervisor White, too, plans to do an education campaign, but knows she won't reach all of her voters and fully expects to get calls from voters asking, "Where's my ballot?" when they do not get a ballot they were expecting. Tr. Day 5, 1353:12-1354:23. As Supervisor White explained, "hopefully" those voters realize their request has now expired before the deadline for requesting VBM ballots, which is ten days prior to the election, has passed. Tr. Day 5, 1353:12-1354:23. Supervisor Earley, too, expects that in many cases voters won't "notice [their ballot] hasn't shown up until all the hoopla surround[ing] election day," at which point it may be too late to request a VBM ballot. Tr. Day 9, 2327:15-2328:9.

For voters who "can't get out to use -- to the polls, which is generally why they request a vote-by-mail [ballot]" in the first place, the situation is untenable. Tr. Day 9, 2627:15-2628:9 (Supervisor Earley). This includes the "[e]lderly, infirm, people with disabilities, people that have to work multiple jobs or long hours, people that are out of our county, obviously -- that's the original genesis of vote-by-mail." *Id*. at 2633:20-2634:6 (Supervisor Earley). Supervisor White, too, expects the change will "have grave impacts on voting accessibility," and voters who miss the deadline to request "may lose their opportunity to vote. The elderly, voters with

disabilities and our overseas military would be most affected. . . ." Ex. 383, ECF No. 608-75. Florida is home to a substantial senior voter population, many of whom are "creatures of habit" who will be "slow to react" to this change. Tr. Day 5, 1623:5-17 (FLARA President, William Sauers). And the older a voter is, the more likely they are to rely on VBM ballots. Ex. 5 at 40, ECF No. 608-1 (Herron Rep.).

The Court heard from many voters who depend on VBM ballots to vote. They include Susan Rogers (Day 4), Catherine Teti (Day 5), Robert Brigham (Day 5), Naomi Slaughter (Day 7), and Amy Zukeran (Day 7). They are only a representative sample of the 2.7 million Floridians with disabilities who need access to VBM ballots to vote. Tr. Day 2, 598:25-599:2 (Dr. Cooper); *see also* Tr. Day 1, 457:15-458:6 (Mr. DePalma, Disability Rights Florida, describing barriers to in-person voting for Floridians with disabilities). Particularly for these classes of voters, this provision imposes a severe burden on the right to vote.

Notably, even if voters *do* realize that they will not receive an anticipated mail ballot, Supervisors anticipate many will not "discover that [until] late in the game" because of the "expectation that they've already requested one" and thus not request a VBM ballot until right before—if not after—the 10-day pre-election deadline to do so. *See* Tr. Day 9, 2633:1-11, 2630:25-2631:21 (Supervisor Earley). This is a meaningful change. Before SB90, every voter who had a standing request for a VBM ballot would be sent one no later than 33 days before the election, Fla. Stat. §

115

101.62(4)(b), giving them weeks to return their ballot. But voters can and do request VBM ballots up to ten days before the election for all kinds of reasons, and voters who receive ballots closer to the election can quickly find themselves in a difficult—or even impossible—situation. USPS cannot guarantee that it will deliver ballots in less than five days, and Supervisors recommend voters allow for "at least a week" of mail time for their ballot to be delivered back to the Supervisor's Office. Tr. Day 9, 2633:1-11, 2630:25-2631:21 (Supervisor Earley). The voters most at risk of having a late ballot are voters who are "out of state or a long geographic distance away from [their] county"—in other words, voters who could not vote in-person at the polls, even if they wanted to. Tr. Day 9, 2632:10-24 (Supervisor Earley).

### c. The Vote-By-Mail Request Provision makes requesting a VBM ballot needlessly difficult.

Even for voters who hear their Supervisor's plea to submit a new request for a VBM ballot, doing so will be significantly more difficult than it has been in the past. Before SB90, many Florida counties used the checkbox system to allow voters to request future VBM ballots, where voters returning VBM ballots would simply "check the box" on their ballot's return envelope to continue their standing request for VBM ballots. As Supervisor Earley testified, the checkbox system was "absolutely" secure: "[W]e only honored that request if we approved the ballot for tabulation. So if we're going to count the ballot because the signature matches and all the safeguards are in place for making sure that was a valid ballot, certainly it

seemed like a good way to request ballots." Tr. Day 9, 2623:23-2624:4, 2625:11-18. As a result of SB90, Supervisors can no longer offer that option. *See, e.g.*, Tr. Day 4, 1285:18-1286:9 (Supervisor Corley eliminating his check box option).

Particularly for voters with disabilities, requesting a VBM ballot via the checkbox was a "very simple" way to continue their request. Tr. Day 4, 1095:15-17, 1095:19-23 (Susan Rogers). While requesting a VBM ballot online or by telephone many not impose substantial burdens on all voters), those methods can be severely burdensome for many of Florida's disabled voters. *See, e.g.*, Tr. Day 4, 1096:14-1100:12, 1100:13-1101:8, 1101:9-1102:1 (Ms. Rogers, a voter who is legally blind, describing severe challenges with having to make such a request online or by phone); Tr. Day 7, 2083:3-2084:3 (Ms. Slaughter, a voter with several mental health challenges, describing the difficulties of the same).

### d. The Vote-By-Mail Request Provision's identification requirement sets up voters for failure.

SB90 also imposes a new identification requirement that threatens to prevent hundreds of thousands of voters from being able to successfully request a VBM ballot. While SB90 requires Supervisors to match a voter's identification number (a driver's license, state identification, or last four digits of a Social Security number) to a number that the Supervisors have on file for the voter, the Supervisors do not have *any* of those numbers on file for nearly 500,000 Florida voters, most of whom registered to vote before 2006, before any of those numbers were requested on a

voter registration form. Tr. Day 10, 2785:6-16 (Director Matthews). In Leon County alone, there are "over 13,000 voters" who do not have any of these numbers on file with the Supervisor's Office. Many are older voters "who registered before those [numbers] were required." And "a little over half of those 13,000, 7,000 and some, are frequent vote-by-mail voters." *Id*. at 2649:17-2650:10. There are similarly 22,000 such voters in Miami-Dade County who do not have any identification number on file with the Supervisors' Office and thus could not successfully request a VBM ballot under SB 90. Tr. Day 5, 1364:21-1365:1-6 (Supervisor White).

There are an additional *three million* Florida voters who have only one of those identification numbers on file with the Supervisor's Office. Tr. Day 9, 2516:13-19 (Dr. Smith). Those voters "would have to remember what they used when they registered to vote." If they guess incorrectly, the Supervisors' offices are "not be able to process" the voters' request for a mail ballot. Tr. Day 4, 1174:21-1175:6 (Supervisor Scott). Voters, too, often do not know which identification numbers are on file with their Supervisor's Office. *See, e.g*., Tr. Day 5, 1590:2-5 (when asked what identification number she used to register to vote, Ms. Teti responded, "I don't remember. That was in 1980."). Supervisor Earley testified that he would not know the answer for his *own* voter registration information if he did not have the capability to look up his own voter file in his own database. Tr. Day 9, 2650:18-24. In sum, under the shortened lifespans of VBM requests under SB90,

voters must remember or otherwise divine what number their Supervisor has on file for them each time they request a VBM ballot. Ultimately, the shortened duration of those requests and the new identification requirement work together in dangerous ways to make Florida's VBM system one that is designed to fail voters. *See infra* at Part IV(F).

> ## 2. The Vote-By-Mail Request Provision is not supported by a sufficiently weighty state interest.

The interests that the state has put forward to justify the VBM Request Provision range from the ludicrous (expanding voter's choices) to others that fall apart upon a brief inspection (preventing fraud). In addition, the VBM Request Provision also imposes significantly more work and more expense on Florida's Supervisors, who opposed this law for the reasons explained above, and for the havoc it will wreak on their offices.

> ### a. The Vote-By-Mail Request Provision does not promote the state's interest in expanding voter's choices.

In support of the VBM Request Provision, SB90's sponsor, Senator Baxley, stated again and again that its purpose was to expand voter's choices in how they could vote, implying that having a standing request for a VBM ballot meant that a person could not vote in person if they wanted to:

| Citation | Witness | Testimony |
|---|---|---|
| Ex. 6, ECF No. 608-5 at 38 | Dr. Burch (Report) | When pressed on this provision, Senator Baxley stated: "I truly believe we will have a more secure process when people can decide each year what manner in which they |

| | | |
|---|---|---|
| | | would like to vote… **You can choose every year how you want to vote**…. If you want to vote the same way you can, or you have all the other options of how to vote." |
| Ex. 6, ECF No. 608-5 at 39 | Dr. Burch (Report) | Senator Baxley: The problem with the current law is that "**[y]ou're stuck with that choice. Everybody should be able to choose** each year how they want to vote as far as I'm concerned." |
| Ex. 6, ECF No. 608-5 at 27 | Dr. Burch (Report) | Senator Stewart: "Regarding your section 7, regarding your urgency to retroactively invalidate a voter's request for a vote by mail ballot… what was your position on putting this into the bill?" <br><br> Senator Baxley: "That's **really about just fresh start**. Fresh start, everybody gets to choose and will get it on a pattern." |

Expanding voter's choices for how to vote is a legitimate state interest. But the VBM Request Provision does not advance it. As Secretary Lee explained to the Senate Ethics and Elections Committee prior to SB90's enactment, "even if you've requested that vote by mail ballot and have it in hand, you can still vote in person." Ex. 6 at 39, ECF No. 608-5 (Dr. Burch Rep.). Supervisor Earley testified to the same point: Prior to SB90, if a voter requested to receive a VBM ballot for several elections, they could always cancel the request, or they could change their mind about voting with a VBM ballot in a given election and vote in person. Tr. Day 9, 2621:12-24. In other words, as Supervisor Earley stated at trial, this articulated state interest is "nonsense." "How does making it harder to vote by mail improve your options?" Tr. Day 9, 2643:24-2644:7.

**b.     The Vote-By-Mail Request Provision is not necessary to prevent fraud.**

The second articulated state interest offered for the VBM Request Provision is to ensure that VBM ballots are not sent to outdated addresses after a voter has moved or died. This was the explanation offered by Director Matthews at trial. Tr. Day 13, 3431:21-3432:14. The implication is that those ballots might end up in the hands of new residents who live at that location, who may then try to vote them. But although Florida has over 14 million voters, millions of whom have had standing requests for VBM ballots for years, there is *no* evidence that this was a problem prior to SB90. And this purported state interest is further directly undermined by the fact that, while SB90 was on the floor, sponsors rejected amendments that would have made it easier for Supervisors to keep voters' address up to date, such as automatically synching the Department of Motor Vehicles' databases with the Supervisors' database. Instead of accepting those amendments, which may have *actually* addressed concerns about any gaps in the system, the Legislature took a hatchet to voters' existing VBM requests.

*First*, Director Matthews' concern about ballots going to outdated addresses is, in the words of Supervisor White, "very overblown." Tr. Day 12, 3188:19-3189:9. While the Director expresses concern that a voter (and particularly a college student) may move and not "let their Supervisor of Elections know that they've moved," Florida's election system does not depend on college students keeping their

121

Supervisors up-to-date on their latest move. Florida's election system is much smarter than that.

As Supervisor White described, there are various interlocking methods to make sure that the Supervisors have current information about their voters, none of which depend on a voter letting their Supervisor know that they have moved. They include "the national change of address" or NCOA process, "which compares the voter registration system addresses to the addresses that the post office has on file." Tr. Day 5, 1363:8-23. As a result, "[a]nytime a voter makes a change with their office, not necessarily [with the Supervisors themselves, they will] be notified about that from the post office." Tr. Day 5, 1363:8-23. Similarly, if a voter updates their address with the Department of Motor Vehicles, the Supervisors are notified and can update their system. Tr. Day 5, 1363:8-23. If a voter goes to serve on jury service and notifies the court that they've changed their address, that comes to the Supervisors. Tr. Day 5, 1363:8-23.

Florida is also now part of the ERIC system, which helps keep information up to date even with people that have left the state. Tr. Day 5, 1363:8-23. As Supervisor White testified, "the list maintenance activities in the state of Florida have come a very long way and, you know, the voter rolls have never been more accurate and up to date." *Id*. at Day 5, 1362:12-23. Other Supervisors agree that there are extensive

procedures in place to make sure that VBM ballots are delivered to the correct address. *See* Tr. Day 9, 2640: 2-10, 2643:7-12, 2642:9-19 (Supervisor Earley).

Even if a Supervisor is unaware that a voter has moved and tries to send a ballot to their old address, USPS will return the ballot to the Supervisor as undeliverable, and the Supervisor will "invalidate the [standing] request" to vote-by-mail at that address, both for that election and "for the future." *Id*. at Day 9, 2640: 2-10 (Supervisor Earley). Notably, under Florida law ballots also cannot be forwarded to a voter's new address, even if a voter has otherwise requested that USPS forward their mail. Tr. Day 9, 2643:3-6 (Supervisor Earley); Fla. Stat. § 101.62(4)(c)(1).

It is also not credible to suggest that Supervisors are sending ballots to voters who have died. As Supervisor Scott explained, his office receives death notifications for his county's voters "within a week or two." Tr. Day 4, 1243:12-22. He discounted this explanation for the VBM Request Provision, which effectively implies that Supervisors would send dead voters ballots "for four years, [which] just sounds like a wacky conspiracy theory and not something that would actually happen. . . . We would not allow ballots to continue to go out to somebody who has passed away." Tr. Day 4, 1243:12-22; *see also* Tr. Day 9, 2641:18-2642:8 (Supervisor Earley similarly explaining Supervisors receive regular reports of voters who have died, and they "absolutely" remove those voters from the rolls and cancel any standing

request the voter may have had for a VBM ballot); Tr. Day 5, 1364:10-16 (Supervisor White explaining her office removes deceased voters "from their voter registration system within seven days of being notified" of their death).[10]

*Second*, and relatedly, there is no evidence that Florida has an issue with individuals illegally voting ballots that show up to an incorrect address. Secretary Lee testified to the Florida State Senate Committee on Ethics and Elections in February 2021 that she was not personally aware of any instance of voter fraud in which someone received a ballot that was not intended for them and voted it anyway. Tr. Day 10, 2763:1-9. Nor is there an epidemic of college students voting their classmates' ballots after they have moved. Supervisor White, for one, is not "aware of any problem of college students in Miami-Dade voting other college students' vote-by-mail ballots because they received them at their dorm room." As far as she knows, "that's never happened." Tr. Day 12, 3183:3-12. Supervisor Earley, too, whose county is home to a large student population, has never had to submit a fraud complaint related to VBM voting of any sort. Tr. Day 13, 3506:10-23.

---

[10] While Director Matthews suggested that matching voter registration records and death records is not a "flawless" system because women might "fudge" their birth date on their voter registration form because they are worried about "getting older," there is absolutely no basis to suggest that voters regularly, or ever, "shave a couple years off" their birth date on their voter registration form to appear younger. Tr. Day 13, 3448:7-3449:3. To do so would be a crime. Fla. Stat. § 104.011(b).

*Even if* a ballot were delivered to an outdated address, something that happens very infrequently, there is no evidence those ballots are then voted. Instead, when it happens, new residents tend to call the Supervisors office to advise them of the issue. As Supervisor White testified, the reality is that VBM ballots being delivered to addresses once a voter no longer lives there, "doesn't happen all that often. I think that these circumstances of this occurring are very overblown, but the few that I know of that have, you know, called our office, have understood and, you know, we give them the instruction that we will start the address confirmation process." Tr. Day 12, 3188:19-3189:9. But even if a new resident *did* receive such a ballot and decide that this was their chance to commit voter fraud, there are multiple security measures in place to keep that ballot from being counted. They include signature verification procedures that have "proven very effective," Tr. Day 9, 2643:12-23 (Supervisor Earley); Day 5, 1371:14-16 (Supervisor White); ECF No. 549-2, at 60:2-7 (Supervisor Hays); they include all of the notification procedures that operate to alert Supervisors when a voter has moved or died; and for a voter who has moved, they also include the likelihood that the fraudulent voter would be discovered when the actual voter attempts to vote themselves. *See* Tr. Day 9, 2622:2-15 (Supervisor Earley discussing system which keeps track of each voter who has voted, and how they voted).

In the end, no Supervisor testified that they understood how the VBM Request Provision would prevent fraud or otherwise improve the system. To the contrary:

| Citation | Witness | Testimony |
|---|---|---|
| Day 4, 1272:6-11, 1273:14-20 & Ex. 110 | Supervisor Corley | "I'm **literally befuddled** as to why we would tweak a system that performed exceedingly well. The current Vote By Mail (VBM) statutes (e.g. policies and procedures) … worked extremely well in Pasco County and to my knowledge, all of Florida. The provision that voids all vote by mail requests will not only **impact millions of Florida voters** but will cause an **unfunded mandate of millions of dollars** to the taxpayers of our great state. As such, **I can think of no legitimate reason to make the sweeping and arbitrary changes contained in SB90!**" |
| ECF No. 549-2, at 150:12-21, 150:24-151:22 | Supervisor Hays | Supervisor Hays is not "aware of any instance of voter fraud that would have been prevented had people had to renew their requests for ballots every election cycle." Supervisor Hays also has "several different safeguards" to "ensure that voters who move are no longer able to vote from their previous address." <br><br> "Q: And in your opinion are those safeguards sufficient to prevent against fraud that might be caused by somebody moving? <br> A: Well, **I've not seen any instances of fraud**, so I guess one could conclude that they probably are." |
| Day 12 3256:20-3257:15 | Supervisor Doyle | "Q. Before SB90, a vote-by-mail request, as you said earlier, was good for two election cycles; correct? <br> A. Yes. <br> Q. And that system worked well? <br> A. Yes. <br> … |

| | | Q. And **you would agree with me that SB90's change to the vote-by-mail request period from two election cycles to one election cycle was unnecessary; correct? A. Yes, sir.**" |
|---|---|---|
| ECF 549-3, 139:21-24, 168:9-18, 188:14-189:5. | Supervisor Latimer | Supervisor Latimer does not agree that it increases the security of elections. "[SOEs] really didn't want it to go to one, we wanted it to stay at two. And **there was no logic to do that**, to take it to one." |

*Third*, and finally, the state's assertion that this provision was aimed at making sure that Supervisors had voters' correct and current information on file is directly undermined by the fact that SB90's sponsors rejected amendments to the bill that would have made it even easier for Supervisors to keep voters' addresses updated and would have actually furthered that purpose. In one instance, for example, Senator Brandes (a Republican who opposed SB90), suggested an amendment that would update a voter's addresses in the voter database *automatically* after the voter changed their address on their driver's license (rather than simply notifying the Supervisors, as is current practice). As Dr. Burch explained in her expert report, that amendment failed, as did four others that were aimed at making it easier for the Supervisors to update voters' addresses. Ex. 6 at 37-38, ECF No. 608-5. If this was the problem the Legislature was actually trying to solve, it is illogical that they rejected these amendments.

### c. The Vote-By-Mail Request Provision makes elections much harder to administer for Florida's Supervisors.

The VBM Request Provision will also strain Florida's Supervisors, making it harder for them to administer elections. The Legislature was fully aware of this: at the time it was considering this provision of SB90, the association of Florida Supervisors of Elections wrote: "Lawmakers should [] be aware that this would come at significant cost to taxpayers, as Supervisors will be required to send mailings to millions of voters to let them know that their request is no longer valid. In addition, requiring voters to renew their request for mail ballots every election cycle, instead of every two election cycles, also has financial impact, resulting in twice as much clerical work to process the requests." Tr. Day 9, 2634:7-2636:2. A year later, the Supervisors have stood by that assertion:

| Citation | Witness | Testimony |
|---|---|---|
| Tr. Day 4, 1188:3-13, 1190:6-1191:6 | Supervisor Scott (Broward County) | The VBM Request Provision "could also **cause us to get a flood of late requests** as we're approaching an election, and when we get within a couple of weeks of an election, we could end up getting flooded with requests that would be – there's a number of **different logistical challenges** that we could face…" Rather than "improve the administration of elections in Broward County," the VBM Request Provision "**hurts the process**." The new provision is "going to require the office to take **excessive administrative steps and to expend a lot of resources** in order to allow people to continue voting by mail." |
| ECF 549-3, 74:13-21, | Supervisor Latimer | The VBM Request Provision will put "a **tremendous administrative burden** on our |

128

| 142:2-7, 167:16-21 | (Hillsborough County) | office with just having to process these things every cycle, as opposed to every two cycles, and the additional information that's required that we have to verify, so it will cause an administrative burden." The Hillsborough SOE is going to have "to **hire additional people** to keep up with the workload, additional temporary employees" to re-process those requests. |
| --- | --- | --- |
| Tr.   Day   9, 2636:19-2338:12 | Supervisor Earley   (Leon County) | The VBM Request Provision makes it harder for Supervisors to plan for elections. Prior to SB90, Supervisors knew the universe of the "standing set of requests" to vote-by-mail and could plan accordingly. Supervisor Earley has "**spent decades making these formulaic election plans where you look at the turnout in various methodologies" and adjusting resources accordingly**. But if "we don't have a request for vote-by-mail for this upcoming election cycle, we have to assume they may go vote early or in person election day" and have enough resources in place for that contingency. **"[W]e're going to have to have bigger buffers to account for much more error in our formulas in our planning**. So a lot more resources – more resources will definitely have to be devoted to the different areas, but, you know, likely more ballots -- I mean, more envelopes even ordered because we don't know where the impact might be. We don't want to be short." |
| Tr.   Day   5, 1353:12-1354:23 | Supervisor White (Miami-Dade County) | The VBM Request Provision "puts us at a major disadvantage. . . . **It hinders our ability to plan**. . . . So if I know now that I have 400,000 people on the vote-by-mail list, then, you know, I can plan for close to that .… But when that gets cut off, and we're back to zero, and I have to rely on these voters replying back and getting back onto the list, **it puts us at a disadvantage because how many ballots am I printing, envelopes, instructions, postage [] on the meter with the post office? What do I plan for? Am I going** |

|  |  | **to plan for all of those people actually, you know, getting the notification and replying?** . . . And then the other thing is here comes 2024; right? And people are starting to think about the election. They're getting campaign material in the mail. You know, Oh, okay, election's coming up. Where's my ballot? They didn't get their ballot. They were expecting their ballot. So then they call our office, and we explain to them that the law changed; you're no longer on the list, and at that point they request one, which hopefully they do it in time because it's ten days prior to the election. That's the deadline to request. But just **taking that type of volume and shifting it so close to the election is certainly something that I'm concerned about**." |

In the end, all the VBM Request Provision does is decimate Florida's VBM system. Ultimately, the Supervisors expect that this change will "without a doubt" reduce turnout in off-year and municipal elections. *See, e.g.*, Tr. Day 4, 1211:17-1212:3 (Supervisor Scott); Tr. Day 5, 1349:21-8 (Supervisor White); Tr. Day 9, 2647:14-2648:23 (Supervisor Earley testifying to the downstream effects on turnout). In other words, this provision does exactly what Senator Gruters wanted it to do: reduce turnout in the local elections where Republicans were "at risk" because of the ground they had lost in VBM requests.

While partisan motivations in itself may not doom a law, *see* ECF No. 646, they do shed light on the Legislature's true purpose, particularly when the law works exactly as the majority party expected: to harm the minority party. Because neutral

justifications do not sufficiently justify the law for all the reasons stated above, this Court should find it imposes an undue burden on the right to vote.

### D. The Drop Box Provisions impose an undue burden on the right to vote.

#### 1. Drop boxes have long been used in Florida with great success.

For over a decade, long before Florida law *required* the use of drop boxes, counties throughout the state provided drop boxes for voters to return their VBM ballots. In 2008, then Pinellas County Supervisor of Elections Debra Clark installed the first ballot drop box in Florida. Tr. Day 6, 1745:18-24. One year later, Hillsborough County began using drop boxes. ECF No. 549-3 at 35:14-22. By 2012, Pinellas County had 14 drop boxes and many counties soon followed its lead. Tr. Day 6, 1745:18-24; *see also* Tr. Day 1, 77:5-7 (Ms. Scoon explaining that for the past five to ten years, she has "primarily used the [Bay County] drop box for my ballot and it would be after hours"). In 2020, there were approximately 488 drop boxes in Florida, with approximately 65 drop boxes across 48 counties available 24 hours per day. Tr. Day 8, 2290:23-2291:13. In many cases, Supervisors made drop boxes available from the first day VBM ballots were mailed to voters through election night. *See, e.g.*, ECF No. 549-2 at 65:4-18; Ex. 234 at 4, ECF No. 608-61 (Palm Beach County Supervisor Wendy Link offered four 24-hour drop boxes from September 19, 2020 through November 3, 2020).

Drop boxes were exceedingly popular with Florida voters: In 2020, at least 1.3 million ballots were cast via drop box. Tr. Day 8, 2158:25-2159:8 (Dr. Herron explaining "that's approximately 31 percent of all vote-by-mail ballots in the 46 counties for which I have data"); *see also* Tr. Day 9, 2616:6-7 (Leon County Supervisor Mark Earley testifying that voters "love the ability to use [drop boxes] as a method for returning a vote by mail ballot"); ECF No. 549-3 at 104:21-105:4 (Supervisor Latimer testifying that nearly half of voters who used VBM in Hillsborough County used drop boxes); Ex. 234 at 3, ECF No. 608-61 (Supervisor Link explaining her "office received an overwhelming amount of positive feedback from voters who used our secure drop boxes."). This was also true for 24-hour drop boxes. Lee County Supervisor Tommy Doyle, for example, testified that for "one weekend during the 2020 election [Lee County] had an overnight drop box." Tr. Day 12, 3203:3-5, 3203:21-22. The drop box was installed on Friday and on Sunday when Supervisor Doyle checked the drop box, "it was very full." *Id.*

Drop boxes were especially popular with Black and Democratic voters. As Dr. Herron testified, "the evidence that I have suggests that [ ] Black voters are more likely to use drop boxes than White voters; that Democratic affiliates are more likely to use drop boxes than Republican affiliates; and that young voters are more likely to use drop boxes than older voters." Tr. Day 8, 2282:17-21, 2283:5-9; *see also* Ex. 5, ECF No. 608-1 at 58 (Dr. Herron explaining his analysis shows "Republican

132

[vote-by-mail] voters . . . tend to use drop boxes less than Democratic [vote-by-mail]

voters.").

Not only are drop boxes popular with voters, they are also popular with

Supervisors:

| Citation | Witness | Testimony |
|---|---|---|
| Tr. Day 5, 1251:23-1252:1 | Supervisor Scott | "Q. Would you have more drop boxes were it not for Senate Bill 90? A. Absolutely. I would have gone for 40 drop boxes if it weren't for Senate Bill 90." |
| Tr. Day 9, 2655:23-2656:5, 2659:17-20 | Supervisor Earley | Drop boxes help ensure that a VBM ballot arrives in time to be counted: "I would much rather have a vote-by-mail ballot put in one of our drop boxes than in the U.S. Mail system." |
| ECF No. 549-2, at 78:24-79:13 | Supervisor Hays | Lake County had a 24-hour drop box before SB 90 "[b]ecause one of our goals when I took office was to do everything that we could do to enhance the election day experience for everyone, whether it be the voter, whether it be the election worker or whether it be my full-time staff or my temporary staff. And by providing that convenience of 24-hour access that is secure, we felt like that was the right thing to do. And I had consulted with supervisors in other counties who had very successfully used it, and so we decided to install one here and used it very successfully." |
| Ex. 234, ECF No. 608-61 at 3 | Supervisor Link | Palm Beach County offered 46 drop boxes during the 2020 general election and four were available 24 hours a day. "[Supervisor Link's] office offered secured drop boxes to its voters in order to make voting as accessible and convenient as possible." |
| Ex. 213, ECF No. 608-48 | Supervisor Latimer | "We should be looking for cost-effective ways to expand [drop box] use, including the use of secure 24-hour drop boxes with camera surveillance[.]" |

Despite the widespread success of drop boxes, SB90 places severe restrictions on their use. Under SB90, drop boxes must be continuously monitored, in person by an employee of the Supervisor. Fla. Stat. § 101.69(2)(a) (2021). If a drop box is left unattended, the Supervisor is subject to a fine of $25,000. *Id*. at § 101.69(3). SB90 also restricts when and where drop boxes may be located—"Except for secure drop boxes at an office of the supervisor, a secure drop box may only be used during the county's early voting hours of operation." *Id*. at Fla. Stat. § 101.69(2)(a). Early voting begins on the tenth day before a statewide or federal election and ends the third day before the election and Supervisors have the option to offer early voting beginning the fifteenth day before a statewide or federal election or the second day before an election. *Id*. at § 101.657(1)(d). Early voting hours may be no less than eight hours and no more than twelve hours per day. *Id*. As a result of SB90's drop box restrictions, there will be a significant reduction in drop box availability for voters in Florida and that reduction will burden voting rights for countless voters who depend on drop boxes to successfully vote. These restrictions are not supported by sufficiently weighty state interests that can justify the burdens they impose on the right to vote.

The State has suggested that Florida law prior to SB90 already required that all drop boxes be physically monitored. But the plain text of the pre-SB90 provision

did not require physical staffing of drop boxes at Supervisor offices or early voting sites. This provision of the statute states in full:

> The supervisor shall allow an elector who has received a vote-by-mail ballot to physically return a voted vote-by-mail ballot to the supervisor by placing the envelope containing his or her marked ballot in a secure drop box. Secure drop boxes shall be placed at the main office of the supervisor, at each branch office of the supervisor, and at each early voting site. Secure drop boxes may also be placed at any other site that would otherwise qualify as an early voting site under s. 101.657(1); provided, however, that any such site must be staffed during the county's early voting hours of operation by an employee of the supervisor's office or a sworn law enforcement officer.

Fla. Stat. § 101.69(2) (2020). The statute contemplated four locations for drop boxes: (1) the main office of the supervisor, (2) the branch office of the supervisor, (3) early voting sites, and (4) "any other site that would otherwise qualify as an early voting site" under Fla. Stat. § 101.657(1). This fourth category includes sites that would be eligible to be an early voting site, such as a library or courthouse, but were not ultimately chosen as sites for early voting.

Under a plain reading of the statute, the first three locations—the main office, a branch office, or an early voting site—need only have a "[s]ecure drop box." Fla. Stat. § 101.69(2). It was only at the fourth category of sites, where "[s]ecure drop boxes may also be placed . . . provided, however, that any such site must be staffed during the county's early voting hours of operation by an employee of the supervisor's office or a sworn law enforcement officer." *Id.* In other words, the

statute by its plain language treated drop boxes at Supervisors' offices and early voting sites differently than drop boxes placed at other sites. In the former category, drop boxes needed only be secure, while the latter category, should the county choose to operate drop boxes at those sites, required both that the drop boxes be secure and that they be staffed by a county employee or law enforcement.

While the Legislature did not define what it means for a drop box to be "secure," the statute communicates that a drop box could be "secure" without staffing by an employee or law enforcement. If those terms were meant to be synonymous, the Legislature would not have written that "[s]ecure drop boxes may also be placed at [otherwise eligible early voting sites]; provided, however, that any such site must be staffed during the county's early voting hours of operation by an employee of the supervisor's office or a sworn law enforcement officer." *Id.* Reading "secure" to mean "physically staffed" would render the last provision of the statute superfluous. But "[s]tatutory interpretations that render statutory provisions superfluous are, and should be, disfavored." *Hawkins v. Ford Motor Co*., 748 So. 2d 993, 1000 (Fla. 1999) (quotation and citation omitted).

The pre-SB90 statute also plainly permitted drop boxes at eligible early voting sites outside of early voting hours. The only statutory restriction on such sites was the requirement that they be "staffed during the county's early voting hours of

operation"—a requirement that did not preclude them from being made available at other times, as well. *See* Fla. Stat § 101.69(2) (2020).

However, just a few days before early voting was scheduled to begin in the 2020 general election, counsel Brad McVay sent a letter to the Supervisors stating that the Department of State now interpreted Fla. Stat. § 101.69 to require physical staffing was for *all* drop boxes, no matter their location. Ex. 278, ECF No. 608-66. Mr. McVay's letter also told the Supervisors for the first time that they could not offer drop boxes outside of early voting hours except at their own offices. *Id.*

Some Supervisors declined to follow the guidance because they did not believe it was a reasonable interpretation of Florida law. *See* Tr. Day 10, 2800:5-7 ("[Q.] There were Supervisors who, despite [the drop box Q &A letter] monitored their drop boxes by video; correct? A. Yes."); *see also id.* at 2811:20-2812:17 (Director Matthews testifying that "some Supervisors did offer drop boxes other than at their offices outside of early voting days and hours during the 2020 election," including "offering such drop boxes on the day before the election"). Supervisor Link made a request for an advisory opinion regarding 24-hour drop box monitoring to the Division of Elections but ultimately decided to withdraw the request "although [she] continue[d] to believe there is no legal authority for such a rule." Tr. Day 10, 2805:17-21; *see also* Ex. 869, ECF No. 608-98.

### 2.    The Drop Box Provisions burden the right to vote.

SB90's restrictions on drop boxes have led to significant reductions in drop box hours and locations, unduly burdening the right to vote for the over 1.3 million voters who voted via drop box in 2020. Tr. Day 8, 2158:25-2159:15 (explaining "any restrictions on drop box voting [will] affect" the 1.3 million voters who cast their vote-by-mail ballot via drop box in 2020). And the restrictions will disproportionately burden Black, Democratic, young, and disabled voters.

### a.    The monitoring requirement reduces drop box availability and threatens to chill voter turnout.

SB90's monitoring provision has had a chilling effect on many Supervisors. To avoid the risk of being fined $25,000 for leaving a drop box unattended, some are staffing drop boxes with more than one employee; others are limiting the hours of drop box availability or reducing drop box locations all together. These changes have and will continue to unduly burden voting rights for over one million Floridians.

In Broward County, Supervisor Scott will staff his drop boxes "would have to be at least two people at all times because we have to be prepared for somebody to go and, you know, relieve themselves if they need to." Tr. Day 4, 1204:18-1205:22. Similarly, Supervisor Earley testified that "in many instances" he has to staff two employees at each drop box "because Senate Bill 90 requires – well, penalizes Supervisors potentially [with] a $25,000 fine, which is just unbelievable, if we don't

maintain that continuous monitoring or staffing of the drop box." Tr. Day 9, 2660:1-11. To staff these drop boxes, Supervisors must expend significant resources that would otherwise go to expanding access to voting for more Floridians.

Supervisor Scott testified he would like to offer 40 drop boxes on the day before and on election day, Tr. Day 4, 1251:15-22, but he is unable to because of SB90. As Supervisor of one of the most populous counties in Florida, Supervisor Scott is able to reallocate funds to double staff his drop boxes, but others are unable to do so, including those who previously staffed drop boxes in their counties using grant funds, which are now separately prohibited by SB90. In Palm Beach County for example, Supervisor Link used grant funds in 2020 to "implement and staff 25 drop boxes throughout the county during early voting, and or drive-through drop boxes at the Main Supervisor of Election's Office on the day before Election Day and on Election Day." Ex. 234, 608-61 at 6. Moving forward, however, Supervisor Link will no longer make drop boxes available 24 hours a day at her main offices because of the expense required to do so by SB90's Drop Box Provisions. *Id.*

For many smaller counties, 24-hour drop box monitoring is simply not an option. Take, for example, Bradford County: Supervisor Amanda Seyfang explained that "I could not give up one of my staff members to just sit at our drop box all day long, nor could I afford with my budget to hire another staff member just to do that." Ex. 214, ECF No. 608-49 at 5. "There's no way a county my size could afford it."

*Id*. As Supervisors have made clear, reductions in drop box availability, as a result of SB90's monitoring requirement, will reduce opportunities for voters to vote. *See* Ex. 234, ECF. No 608-61 at 6 (Supervisor Link). "This will particularly burden voters with mobility limitations, other voters with disabilities, and voters who are immunocompromised." *Id*.

Drop box monitoring also threatens to have a chilling effect for many voters who view this form of monitoring as an uncomfortable, and in some cases, intimidating, experience. This is particularly true of Black or Hispanic voters, many of whom have experienced mistreatment and harassment from government officials, including while attempting to exercise their right to vote. As Mr. Velez Burgos of Hispanic Federation testified, "[Y]ou're asking voters to go up to a ballot box with someone that's there standing and looking at them, and to some voters that might look like voter intimidation, especially when we're talking about Latino communities. You're talking about people that will probably be wearing some type of security outfit just in front of the mailbox, and I think that can be a dissuasion." Tr. Day 3, 821:24-822:6; *see also* Tr. Day 7, 2049:13 (Ms. Mercado testifying that "some member[s] have expressed frustration and dismay [with the Drop Box Provisions]"); Tr. Day 7, 1997:20-21 (Mr. Albright testifying that in person monitoring will have a "chilling effect" on Black voters).

The in-person monitoring also threatens to intimidate voters with mental health issues, such as severe anxiety. *See* Tr. Day 7, 2097:12-2098:12, 2099:6-8. Other voters, as well, are likely to find the experience troubling. *See*, *e.g.*, Tr. Day 3, 698:1-7 (Plaintiff Alan Madison describing the experience of handing his VBM ballot to a staffer as "[d]isconcerting. I felt uncomfortable handing my ballot to someone else . . . . [E]ven during [in person voting] when you go in, nobody takes your ballot once you fill it out; you put it yourself in a machine.").

### b. The reduction in drop box hours will make it more difficult for voters to cast their ballots.

Because of the requirement that drop boxes be continuously physically monitored, many Supervisors across Florida – in large and small, rural and urban counties – will no longer offer 24-hour drop boxes. *See* Tr. Day 8, 2291:14-20, 2292:14-17. Dr. Herron testified that at the time of his report, 14 counties indicated that they were reducing drop box hours as a result of SB90. *See, e.g.*, Tr. Day 13, 3500:24-3501:2 (Supervisor Earley explaining "there's some talk from Supervisors about potentially getting rid of those drop boxes because it's just not worth the threat to them. It's kind of unprecedented from our perspective."); Ex. 221, ECF No. 549-3 at 119:4-20 (Supervisor Latimer explaining that he does not plan to offer a 24-7 drop box in 2022 because of the cost to "have somebody physically monitor it" as now required by SB90); Tr. Day 12, 3180:1-8 (Supervisor White explaining she will have two less drop boxes on the Monday before and on election day because of

SB90). After Dr. Herron submitted his report, four additional counties indicated they will no longer offer 24-hour drop boxes. *See* Ex. 1597, ECF No. 480-70; *see also* Ex. 1598, ECF No. 480-71; Ex. 1600, ECF No. 480-73; Ex. 1602, ECF No. 480-75. And an additional twelve supervisors who previously offered at least one 24-hour drop box indicated that while they have not made a final decision regarding the final hours or availability of drop boxes in their county for future elections, they do not currently plan to make any drop box available for the deposit of ballots on a 24/7 basis. *See* Ex. 892, ECF. No. 464-24 at 6; *see also* Ex. 893, ECF No. 464-25 at 5; Ex. 894, ECF No. 464-26 at 5; Ex. 895, ECF No. 464-27 at 5; Ex. 899, ECF No. 464-31 at 5; Ex. 904, ECF No. 464-36 at 5; Ex. 930, ECF No. 464-62 at 5; Ex. 935, ECF No. 464-67 at 5; Ex. 942, ECF No. 464-74 at 5; Ex. 943, ECF No. 464-75 at 5; Ex. 946, ECF No. 464-78 at 5; Ex. 948, ECF No. 464-80 at 5. In total, 41 counties no longer plan to offer 24-hour drop boxes in the future.

In the 2020 general election over 21 percent of ballots (over 109,000 ballots) were cast via drop box before early voting began. Tr. Day 8, 2287:2-24 (Dr. Herron noting that "the true number is of course larger than that, and that's because I only have data on [27] counties"). Because of drop box reductions, many voters who deposited their ballots before early voting began in 2020 will no longer have that option moving forward.

These reductions threaten to burden nearly any voter who voted by drop box in 2020 – or who would use a drop box to vote in the future. *See* Tr. Day 8, 2158:25-2159:8. But minority voters, Democratic voters, and voters with disabilities will be disproportionately impacted by these reductions. Many Black and Hispanic voters work in the hospitality and service industries where they have little flexibility in their schedules and often work second and third shifts. As Mr. Velez Burgos explained, many Hispanic voters "especially in Florida, have odd hours in terms of work. They have late hours. They work, for example, in the airport industry or they work in the service industry at Disney at night in hotels. We also have a lot of people that have two jobs." Tr. Day 2, 735:17-736:3. Because of their nontraditional hours, "a lot of people [ ] would actually vote at night on their way … to work, or sometimes they are coming back from work in the morning and they are able to drop off the ballot." *Id*. Similarly, Representative Smith explained that many within his working-class constituency, one third of whom are Hispanic or Latino, Tr. Day 7, 1867:22, "work in the hospitality industry [and] due to low wages and low benefits, they have multiple jobs, and they work weeknights; they work weekends," *id*. at 1877:23-1878:11. This is also the case for many voters in Indian River County's rural migrant-farm community who often work 12-hour shifts, 5-7 days per week. Tr. Day 1, 527:2-16; *see also* Tr. Day 9 2476:14-25 (explaining that "there are a lot of

migrant farm workers [in Indian River County]. And I suspect there are a lot of people who have difficulty dropping off a ballot during normal business hours.").

Because of rigid work schedules, many Black and Hispanic voters are unable to return their ballot to a drop box during normal business hours. For these voters, having access to a 24-hour drop box is critical to ensuring they are able to successfully cast their ballot. As Mr. Albright, Executive Director of Black Voters Matter explained, after-hour drop box access is crucial for Black voters who work shift jobs and may not have the ability to access a drop box during business hours. Tr. Day 7, 1994:18-1995:13; s*ee also* Tr. Day 1, 216:20-217:5 (Mr. Garces of Poder Latinx testifying that many members of the Latinx community work for Disney, Universal, and the airport and many work late hours, so having a drop box available 24/7 allows them to deliver their ballot when they get off from work – sometimes at 3 a.m.); Tr. Day 1, 71:6-12 (Plaintiff Scoon noting that "many people have obligations during the day that make it really difficult [to vote] during regular business hours," such as "people that do shift work"). For voters who have a lack of flexibility in their schedules, SB90's restrictions on drop box hours "means that individuals who might want to use a drop box at a point that is no longer permitted by SB90 will be burdened, and they will be disproportionately burdened compared to the regular drop box users." Tr. Day 8, 2294:9-17; Tr. Day 7, 2049:4-7 (Ms. Mercado of Florida Rising Together explaining restrictions on drop box hours

impacts their members because they can no longer "drop off [their ballot] after their third shift at work."); *see also* ECF No. 549-3 at 111:16-112:3 (Supervisor Latimer recognizing that the Drop Box Provisions "makes [returning VBM ballots] harder because it starts to limit the hours that you can have drop boxes available to just the early voting hours instead of outside those hours").

These restrictions will also burden those who have familial obligations that make it difficult to access a drop box during normal business hours. For example, Plaintiff Alan Madison, who lives in Indian River County, votes by mail using a drop box because his father-in-law has extensive health issues and Mr. Madison travels to care for him regularly, often with no advance notice. Tr. Day 3, 695:13-24, 695:25-696:5, 696:9-18. During the 2020 general election, Mr. Madison deposited his ballot in the 24-hour drop box at the Supervisor's Office before the office opened. In his county's 2021 local election, which took place after SB90, the 24-hour drop box was no longer available and he had to wait for the office to open before he could deliver his ballot. Tr. Day 3, 699:6-15, Ex. 911, ECF No. 464-43. Because of the change in drop box hours, if Mr. Madison had a family emergency, his ability to cast his ballot would be impacted. *Id*.

### c. The reduction in drop box locations imposes undue burdens on low-income, minority voters in particular.

In addition to requiring that drop boxes be staffed, the Drop Box Provisions sharply restrict where they may be offered outside of early voting days and hours, including on the day before and on election day itself. These restrictions impose a significant burden on Florida voters. In fact, since SB90 was enacted, twelve counties have already reduced drop box locations. Tr. Day 8, 2291:14-20; *see also* Ex. 1599, ECF No. 480-72. Because SB90 prohibits drop boxes outside of early voting hours of operations unless they are located at an office of the supervisor, some Supervisors must remove drop boxes previously available on the Monday before and on election day. This restriction, in combination with the restrictions on drop box hours, will severely burden the right to vote for thousands of Floridians, especially in the last week before the election when it is too late to mail a ballot.

Simply put, "the fewer [the drop box] locations, the more that some people have to travel" to access a drop box. Tr. Day 8, 2293:22-2294:5. This is especially true for Black VBM voters who are more likely to use a drop box than white VBM voters, Tr. Day 8, 2268:16-25, and are also less likely to have access to a vehicle, Tr. Day 2, 629:3-8. As Dr. Cooper testified, 10.4 percent of Black households and 7.3 percent of Latino households in Florida do not have access to a vehicle as compared to 4.8 percent of White households. *Id.* That amounts to approximately 114,000 Black households and 126,000 Latino households without access to a

vehicle. *Id.* For these voters – and individuals who have fewer resources, individuals who have disabilities, individuals who are blind, individuals who are older and less mobile – having to travel greater distances to access a drop box imposes an undue burden on their right to vote. Tr. Day 8, 2231:7-16.

This is especially true for "individuals who vote with drop boxes on [ ] the Monday before election day" who will be "disproportionately burdened[.]" Tr. Day 8 2285:19-25. Take Miami-Dade County as an example. In the 2020 general election, it offered four drop boxes on the Monday before and on election day – two at the Supervisor's offices and two at local libraries in other parts of the county. Tr. Day 5, 1366:5-1367:8. As a result of SB90, Supervisor White is no longer able to offer drop boxes on those days at any location that is not a permanent Supervisor Office. Therefore, Miami-Dade County will have two fewer drop boxes on the Monday before and on election day. Tr. Day 5, 1367:9-12. Miami-Dade is the most populous county in Florida with 1.5 million registered voters. Ex. 5, ECF No. 608-1 at 73:195. It is also one of the most racially heterogenous counties in Florida. Tr. Day 8, 2289:18-20, 2290:5-11. Given its size, the "ratio of voters to potential drop box location[s] is high" and VBM voters in Miami-Dade are "particularly burdened" by SB90's drop box restrictions, Tr. Day 8, 2289:18-20, 2290:5-11, as it will mean an even greater number of voters at each drop box location.

A reduction in drop boxes right before election day is particularly troublesome because Florida law requires that all VBM ballots be received by 7 p.m. on election day to be counted. Fla. Stat. § 101.6103(2) (2021). USPS guidelines state that ballots should be placed in the mail at least one week before election day. However, under Florida law, the last day to request a VBM ballot is the tenth day before an election, and the deadline for the Supervisor to mail VBM ballots is eight days before an election. Fla Stat. § 101.62(2).

In practice, "[a]ny voter who received a ballot within a week of an election, even if the voter were to turn around and fill it out immediately, could not return the ballot via mail and still be compliant with Postal Service guidelines." Tr. Day 8, 2248:3-10. Similarly, "[i]f a voter has a vote-by-mail ballot and chooses to wait to vote until close to election day in order to gain information about the candidates and other issues on the election," that voter could not place the ballot in the mail and still comply with USPS guidelines. Tr. Day 8, 2248:13-18.

In 2020, approximately 29.07 percent of all drop box submissions (over 150,000 ballots) were cast within a week of election day. Tr. Day 8, 2287:2-24. If voters were to mail their ballot during that last week, there is a great risk it would not be received in time to be counted. *See* Ex. 5, ECF No.608-1 at 70. Supervisor White recognized the risk that poses: "[A]s of Thursday, Friday [before election

day], we are telling [voters] it's not worth the risk [of mailing their ballot] and to bring it in." Tr. Day 5, 1369:14-22.

Even voters who follow USPS Guidelines risk their ballot arriving late due to issues with the postal service. Tr. Day 8, 2250:2-19; *see* Tr. Day 3, 702:21-22 (Mr. Madison explaining he did not receive his VBM ballot until very late last election cycle). Given the ongoing issues with USPS, many voters are simply not willing to risk placing their ballot in the mail. *See, e.g.*, Tr. Day 5, 1603:10-20 (Dr. Brigham testifying he uses drop boxes because of issues he has had with his mail, including having "mailed in my property tax and it [ ] never got there"); Tr. Day Tr. 3 at 700:15-19 (Mr. Madison testifying to his poor experiences with the mail, including having "things that I've mailed to others including a thousand dollar bond go missing. I've had packages and letters delivered to me that belong to other people. So I don't trust the Postal Service like I used to."); Tr. Day 1, 84:8-85:11 (Ms. Scoon testifying she has "a lot of concern to use the Postal Service. I'm not comfortable putting my ballot in the mail…."). This mistrust of the mail is especially true for Black voters. As Dr. Smith testified, "[W]e know that African-Americans are more distrustful of the U.S. Postal Service, and there's good reason here in Florida to understand why with respect to mail delivery rates and the timing that the U.S. Postal Service suggests – takes to both request and deliver mail" especially when "you,

149

yourself, may not regularly be getting your mail through the U.S. Postal Service." Tr. Day 8, 2412:14-2413:8.

Issues with USPS delivering ballots after election day is an ongoing issue that Supervisors recognize. Supervisor Earley testified that there are "a lot of failure points" with the USPS. Tr. Day 9, 2655:23-2656:5, 2659:17-20. Even in 2020, Supervisor Earley's office would receive ballots from USPS that were from the *2018* general election. *Id.* In Leon County, the most common reason a ballot is rejected is because it arrived too late to be counted. Tr. Day 9, 2659:13-16. In fact, in "[e]very election [in Florida] there are thousands of ballots" that are rejected for arriving after 7 p.m. on election day. Tr. Day 8, 2249:2-6; *see also* Ex. 7, ECF No. 608-6 at 91:135 ("Scholars have shown that thousands of late [vote-by-mail] ballots are rejected by [supervisors] because they arrive in the mail after the state's deadline, including in Florida."). This is especially true for minority voters – studies show "rejected [VBM] ballots are disproportionately higher among minority voters than white voters in Florida." Ex. 7, ECF No. 608-6 at 91:135. Data also shows that Black voters are more likely than White voters to return their VBM ballots to a drop box before and after early voting. Tr. Day 9, 2479:11-2480:2.

Because of the concern about late delivery, Supervisor Earley "would much rather have a vote-by-mail ballot put in one of our drop boxes than in the U.S. Mail system." Tr. Day 9, 2655:23-2656:5; *see also* ECF No. 549-2 at 97:2-18 (Lake

County Supervisor Hays explaining that "the U.S. Postal Service is notorious for tardy deliveries."); *id*. at 103:18-104:1 ("It would be my opinion that the USPS box is subjecting those ballots to an unnecessary chance of being misplaced or disfigured or destroyed or lost or anything else that would preclude those votes from being counted."). In contrast, voters are "guaranteed on-time delivery" when they deposit their ballot into a drop box. Tr. Day 8, 2247:3-9, 2248:13-18; *see also* ECF No. 549-2 at 79:14-21 ("[I]f a vote-by-mail ballot is placed in a drop box on the day before election day, that ballot will be counted."). That is not the case for ballots placed in the mail. *See* Tr. Day 8, 2247:16-22 (Dr. Herron testifying, "[A] vote-by-mail ballot in the mail is subject to Postal Service delivery schedules, and I would say there are two points here: One is . . . that the voter can no longer control delivery because the Postal Service has the ballot; and, in addition, Postal Service can be late, and so there is a risk of a late ballot anytime you put a ballot in the postal system"); *see also* ECF No. 549-2 at 79:14-21 (Supervisor Hays cannot be sure that "a vote-by-mail ballot that is placed in a mailbox on the day before election day will be counted."); Tr. Day 4, 1202:22-1203:10 (Broward County Supervisor Scott testifying he would not recommend that a voter place their ballot in the mail on the day before election day or on election day; "the only way to know that the ballot is going to reach us those last two days would be to deposit it in a drop box").

While the risks of placing a ballot in the mail are known by voters and Supervisors alike, many voters, especially those with inflexible work schedules and transportation issues, have few choices. This is especially true when drop box locations are cut on the Monday before election day, as is the case in Miami-Dade, and when drop box hours are significantly reduced, as is the case throughout Florida. Some voters simply will not be able to get to a drop box because of the further distances and reduced hours.

### d. Voters with disabilities are severely burdened when outdoor drop boxes are no longer available.

The requirement to staff drop boxes at all times has also led some Supervisors to eliminate outdoor drop boxes outside their offices. ECF No. 549-2 at 90:9-21, 91:7-12. When outdoor drop boxes are no longer available, all drop box voters are impacted, but elderly voters and voters with disabilities are severely burdened.

Approximately 2.7 million Floridians have disabilities, amounting to 16 percent of all voting age Floridians. Tr. Day 2, 598:25-599:2, 632:19-22. In 2020, many individuals with disabilities and physical ailments were able to cast their ballot via outdoor drop boxes, in some cases without having to leave their car because of the availability of drive-through drop boxes. Tr. Day 9, 2462:21-2463:7. Take for example, Dr. Brigham: Dr. Brigham is 87 years old and votes by mail because of incontinence caused by rectal surgery. Tr. Day 5, 1596:10-22, 1597:21-1598:2. In the 2020 general election, Dr. Brigham cast his ballot via an outdoor drive through

drop box in Orange County. *Id*. at 1599:10-1600:5. For the 2021 municipal election, the outdoor drop box was no longer available, and Dr. Brigham had to vote inside of the Supervisor's office. Tr. Day 5, 1598:13-1599:8. To vote, Dr. Brigham had to park in a lot that was "relatively small" and in a parking space "was very difficult to maneuver" before walking inside to deposit his ballot. Tr. Day 5, 1601:18-1602:5. The act of walking inside of the Supervisor's Office increased the risk that Dr. Brigham would have an onset of his condition. Tr. Day 5, 1601:18-1602:5 ("[M]y situation gets worse when I do physical actions as opposed to sitting [in] the car[.]"). While Dr. Brigham did not face lines in 2021, that is unlikely to be the case in the future if elections are even close to as busy as they were in 2020. *See* Tr. Day 5, 1600: 9-15, 1601:18-1602:5 (Dr. Brigham explaining in the 2020 general election, there was a line of cars of voters waiting to deposit mail ballots into the drop box. If the drop box were indoors for an election as busy as the 2020 general election, "each of the cars would have to park before me and that would take extra time" before walking inside of the Supervisor's Office and waiting in line to deposit his ballot).

When a county only provides an indoor drop box, voters with disabilities, who face barriers delivering their ballot in person, including "inaccessible parking sites and drop off locations at in-person polling places, so in terms of the number of spaces offered or the specifications and dimensions of those spaces," Tr. Day 2, 457:15-458:6, are severely burdened. *See also* Ex. 234, ECF No. 608-61 at 6 (Supervisor

Link explaining "if some or all of the outdoor drop boxes are moved indoors, votes with mobility limitations will have more difficulty accessing the indoor drop boxes").

### 3. The Drop Box Provisions are not adequately supported by a sufficiently weighty state interest

State Defendants assert three interests for the Drop Box Provisions: (1) to ensure that drop boxes are secure; (2) to ensure that the law is uniformly applied; and (3) to have someone at the drop box in case a voter has a question. None justify the burdens placed on Floridians' right to vote.

### a. The Drop Box Provisions are not necessary to secure drop boxes: prior to SB90, drop boxes were already secure.

Director Matthews stated that the purpose of the Drop Box Provisions are to ensure drop boxes are secure and monitored and to prevent bad actors from vandalizing the drop boxes. Ensuring the security of drop boxes is a legitimate state interest, but there is no evidence that the Drop Box Provisions actually serve that interest, or are necessary to achieve that interest. Before SB90, some Supervisors secured drop boxes using video surveillance, some used in person monitoring, and others used a combination of both. Ex. 5, ECF No. 608-1 at 78:205. The evidence proves that those forms of monitoring worked. When Supervisors were asked in discovery to produce evidence of security issues related to drop boxes, they had none. *Id*. at 78:206. That is because there were no security issues related to drop

boxes in Florida despite the differing forms of drop box monitoring. During trial,

Supervisor after Supervisor testified to this:

| Citation | Witness | Testimony |
|---|---|---|
| Tr. Day 4, 1204:6-17 | Supervisor Scott | Broward County "didn't have any problems" at its video-monitored drop boxes. "[T]here wasn't any kind of vandalism or any kind of, you know, issues that were reported to us. And so it seemed to work very, very well." |
| Tr. Day 5, 1334:25-1335:4, 1368:6-8 | Supervisor White | Supervisor White is not "aware of any problems with voter fraud in Miami-Dade . . . that specifically involved drop boxes in 2020."<br><br>Miami-Dade did not "have any problems with vandalism or attempted vandalism" of drop boxes in 2020. |
| ECF No. 549-3, 30:11-14; 42:25-43:6 | Supervisor Latimer | Drop boxes were secure before SB 90: Hillsborough "utilize[d] a large, probably two, two and a half foot by two and a half foot box with a lock on it and a seal, has a slit in the top to be able to put return vote-by-mail ballots in."<br><br>Hillsborough County not aware of any violations of election law or instances of vandalism at drop boxes in 2020 |
| Tr. Day 9, 2664:8-13, 2655:15-22 | Supervisor Earley | Supervisor Earley is not aware of any vandalism or tampering with drop boxes occurring in his county or anywhere else in Florida.<br><br>The idea that drop boxes can't be trusted is a "misinformation campaign that's always been inflamed by partisan interest." |
| ECF No. 549-2, at 70:16-22 | Supervisor Hays | "Q. . . . To your knowledge, from 2017 until you hired an independent security firm, during the time when the drop box was only monitored via video surveillance, was there any suspicion of activity such as destruction of the box or stealing of the ballots inside the box?<br>A None whatsoever." |

| Tr. Day 12, 3259:13-3260:10 | Supervisor Doyle | Supervisor Doyle is unaware of vandalism, theft, or fraud related to any drop box in Lee County in 2020. He also did not receive any complaints from voters who had submitted their ballot in the drop box saying that their ballot had not been counted. |

When asked, Director Matthews was also unable to identify a single incident regarding drop box tampering or vandalism in the 2020 election in Florida. Tr. Day 10, 2806:5-2808:18, 2810:9-13; Ex. 775, ECF No. 608-93. The *only* incident Director Matthews was able to recall in her attempts to support the state's position involved a USPS mailbox. *Id*. And as Director Matthews acknowledged, "Senate Bill 90 does not provide for the staffing of mailboxes." *Id*.

There is also no evidence that monitoring drop boxes would in fact reduce tampering or vandalism, as compared to video monitoring. As Supervisor Scott explained, the people who will staff Broward County's drop boxes "are generally not people who would violently confront somebody if somebody wanted to do harm to the drop box. The people that we hire are not the type of people that would be prepared to take on a violent confrontation." Tr. Day 4, 1206:2-1207:9. Supervisor Scott went on to say, if someone attacked the drop box, "we would want to protect the life of the employee first and we would ask the – you know, we would advise our employees to stay safe and to, you know, not to put themselves in any – in any physical jeopardy." *Id.* The person would be "told to call the police" in the event of an attack, just as someone monitoring by video would. *Id*. Similarly, Supervisor

156

Latimer explained that having drop boxes physically monitored does not prevent tampering; monitors do not necessarily "have had time to respond" to keep someone from causing harm to the box. ECF No. 549-3 at 192:21-193:18.

Director Matthews also argued that the Drop Box Provisions achieve the interest of ensuring voter confidence. But voters do not lack confidence in drop box voting. The fact that 1.3 million voters cast ballots via drop box makes that apparent, as does the "repeated position feedback" Supervisors received from voters about drop boxes. *See* Ex. 234, ECF No. 608-61 at 3; *see also* Tr. Day 9, 2616:6-7. Even Senator Baxley who sponsored SB90, said "we had excellent, excellent conducted election and very high credibility." Ex. 453, ECF 461-62, at 6:10-14. And while voters do not lack confidence in drop box voting, the massive changes caused by SB90 may in fact spur a wave of distrust in the system. As Supervisor Latimer noted, "making a lot of changes all at once has the potential to create voter confusion. . . and worst of all, an erosion of the confidence we've worked so hard to earn." Ex. 216 at []. Ultimately, as Supervisor Earley explained, the concern about distrust in drop boxes is nothing more than "misinformation campaign that's always been inflamed by partisan interest." Tr. Day 9, 2655:15-22. This, of course, cannot be a legitimate basis to burden voting rights. Otherwise, legislatures and partisan actors hoping to restrict voting rights could simply manufacture a basis to do so.

Finally, during the legislative hearings on SB90, sponsor Senator Baxley was asked to point to an incident of drop box tampering and he too could not name a single one. Instead, he claimed that "there's a responsibility for chain of responsibility for handling these ballots and whatever gets put in that box." Ex. 428, ECF No. 461-36 at 108. But there were safeguards in place to protect ballots deposited in drop boxes before SB90. Those safeguards are the same safeguards used when ballots are returned via the mail. Tr. Day 5, 1397:17-20. As Supervisor Scott explained, "Once the ballot gets to us, whether it comes through the Postal Service or if it comes from a drop box, when it reaches our office it goes through the same process where we – where we scan the envelope and capture the voter's signature." Tr. Day 4, 1208:21-24. And those safeguards worked. Even Defendants' own witness, Supervisor White, testified that she is "confident that" the signature matching "process works." Tr. Day 5, 1371:14-16.

### b.   The Drop Box Provisions are not necessary to ensure the law is applied uniformly.

The second state interest articulated by the State is that the Drop Box Provisions ensure that Florida law is applied uniformly. But there is no reason that the means of offering and securing drop boxes must be the same across Florida. Florida consists of 67 counties that differ in geography, size, and population density. And, as a result, the way that the different counties manage their elections are necessarily different in a multitude of ways: one size does not necessarily fit all, and

the state provides no basis for concluding that, in the case of drop boxes, there is a reason why every county must provide for them in precisely the same way.

For example, Miami-Dade County has over 1.5 million registered voters whereas Bradford County has just over 18,000 registered voters. Ex. 5, ECF No. 608-1 at 72. In 2020, Miami-Dade was able to offer 33 drop boxes all monitored in person. *Id*. at 80. Bradford County had only one drop box that was monitored by video surveillance. *Id*. What works in one county may not work in another county. *See* Tr. Day 12, 3262:1-4 (Supervisor Doyle agreeing that "in-person drop box monitoring and its costs might affect different counties differently"). It is because of these differences that Supervisors did not uniformly monitor drop boxes in-person 2020. But every Supervisor ensured that their drop boxes were secure. And there were no issues with drop box tampering or vandalism, despite some monitoring in person and others via video surveillance. Thus, while the monitoring may have been different, the results were the same.

In any event, the Drop Box Provisions do not actually promote uniformity in any meaningful way. True, the Drop Box Provisions require that all drop boxes be staffed at all times that they are open, and they limit where and when drop boxes may be offered other than at Supervisors' own offices. But the Drop Box Provisions do not provide uniformity with respect to when and where drop boxes will be offered. Each Supervisor still may individually decide whether to place drop boxes

at sites that could be, but are not, early voting sites, and for what hours to make drop boxes available at their office or offices. *See* Fla. Stat. § 101.69(2)(a). The only thing that the Drop Box Provisions make uniform are the requirement that they be staffed at all times, and the limitation on where they may be offered outside of early voting hours And that requirement will cause inequities in drop box access because, while larger counties, such as Broward County, have the resources to provide in person monitoring, smaller counties simply do not. *See e.g.* Ex. 214, ECF No. 608-49 (Bradford County Supervisor Seyfang explaining "there's no way a county my size could afford [all day drop box monitoring]"); Tr. Day 12 at 3262:1-4 (Supervisor Doyle acknowledging that in person drop box monitoring costs may affect different counties differently).

### c. The Drop Box Provisions are not necessary to answer voter questions or ensure that ballots are signed and sealed.

The third articulated state interest for the Drop Box Provisions is to provide voters with an opportunity to have an employee available to answer questions about their ballot and to ensure that ballots are signed and sealed.

Again, the Drop Box Provisions are simply not necessary to achieve that goal. As Supervisor Scott testified, having a staff member at the drop box to remind voters to sign and seal their ballot is "not the most efficient way to do that." "[O]ur drop boxes do have a sign on them and it does have it painted on the box for a reminder. We also have signs and flags that we place around the drop box to remind people to

sign and make sure that their envelope is signed and sealed before they drop it in the drop box. So it's not – that's not the way. If I had a choice, that's not the way I would chose to use those resources. I wouldn't choose to use the resources to have two people standing there to tell a voter to sign and seal their envelope." Tr. Day 4, 1206:19-1207:9. Indeed, the State could achieve its purpose of ensuring ballots are signed and sealed without imposing restraints on drop box access, thus burdening the right to vote for thousands of Floridians.

While the Secretary has previously claimed that in-person monitoring at drop boxes is responsible for the decreased rate of VBM ballot rejection in 2020, that decrease is instead likely attributable to the new requirement that Supervisors offer the voter a chance to cure their signature or prove their identity if the ballot is missing a signature. *See Democratic Exec. Comm. of Fla. v. Detzner*, 347 F. Supp. 3d 1017, 1022 (N.D. Fla. 2018).

### E.     The Solicitation Definition unduly burdens the right to vote.

The Solicitation Provision, which functionally restricts assistance that voters can receive at the polls from nonpartisan groups, threatens to burden any of Florida's voters at the polls, but imposes a particularly severe burden on senior Florida voters and voters with disabilities, who depend on this assistance. It also imposes a disproportionately severe burden on Black and Hispanic voters, who are substantially more likely to have to stand in a long line to vote in Florida as compared

161

to their white counterparts. Nor are the burdens imposed sufficiently justified by the state's asserted interest in preventing intimidation and harassment at the polls.

### 1.   The Solicitation Definition burdens the right to vote.

Florida has a history of long lines at the polls. As Supervisor White testified, "historically there have sometimes been very long lines to vote in person in Miami-Dade," with voters "waiting for many hours to vote in some instances." Tr. Day 5, 1371:20-1372:5. And the last time that the Legislature moved to restrict voting in any remotely analogous way to SB90, "in the 2012 election [which immediately followed], there were some precincts in Miami-Dade that did not close until after 1 a.m. on the day after election day." Tr. Day 5, 1371:20-1372:5. While Florida has not recently seen lines as dramatic as they were in 2012, "long lines have continued to be very common, especially in major election cycles." Day 7, 1917:14-1918:6 (Rep. Eskamani). And the burdens that SB90 now places on VBM voting, including through the VBM Request and Drop Box Provisions, will drive more voters to the polls, making it more likely that more Florida voters will once again encounter burdensome long lines. *See infra* Part IV.F.

Compared to white voters, Black and Hispanic voters are more likely to encounter long lines—and to have to wait in the longest lines—in order to vote. Tr. Day 9, 2565: 3-12 (Dr. Smith explaining, we "know that those lines are not equally distributed across different groups of voters. Racial and ethnic voters, particularly

Black and Hispanic voters, face longer wait times at their polling locations."); Ex. 12 ¶ 74 (Dr. Austin articulating same). This trend has also persisted across elections. Tr. Day 9, 2541:3-11, 2542:12-24 (Dr. Smith). Voter assistance organizations are also acutely aware of this fact. Black Voters Matter, for example, targets its voter comfort activities specifically to "polling places that tend to have longer lines" which tend to be more likely in Black communities rather than white communities. Tr. Day 7, 1982:6-1983:9. "You know, very often in a White community, you're able to just walk right in and walk right on out. But in our communities, in Black communities, for your voters, we often see these lines, again, whether it's 30 minutes or an hour long, or in, you know, worst-case scenarios, four-, five-hour long lines." Tr. Day 7, 1982:6-1983:9.

Unsurprisingly, many voters are deterred from voting entirely when the lines become unsustainable. Ex. 12 ¶ 73 (Dr. Austin). In academic terms, this is called "balking" which is when a voter does not join a line "because of other time commitments [voters] don't want to bear that cost."  Tr. Day 9, 2537: 2-9 (Dr. Smith). Voters may also leave a line due to excessive wait times, which is known as "reneging."  Tr. Day 9, 2537:3-11 (Dr. Smith). Excessive wait times also render voters less likely to vote in future elections. Tr. Day 9, 2544:15-24 (Dr. Smith). And certain voters are more likely to find it difficult to wait in longer lines to vote. This includes older voters and voters with disabilities, both of whom are most likely to

need or benefit from assistance at the polls when they encounter such a line. As the President of FLARA explained, Florida seniors often need assistance at the polls, whether because of physical limitations, or the risk of dehydration: "[I]f a retiree had to wait [without assistance], it would be very easy for them to be dehydrated and disoriented." Tr. Day 5, 1628:7-20 (William Sauers). There are also 2.7 million disabled persons in Florida, Tr. Day 2 598:25-599:2 (Dr. Cooper), many of whom need assistance at the polls, Tr. Day 10, 2744:4-13 (Disability Rights Florida).

Assistance within the 150-foot buffer zone is critical, particularly when voters encounter long lines. First, voters can get caught inside the buffer zone for extended periods when machines stop working or when poll workers run out of ballots. But separately, from the perspective of "the person that's within that buffer zone . . . . when they first showed up, and the line was outside the zone . . . their stomach was already full with food and water or their phones were fully charged. But now . . . they've gotten inside the buffer zone, maybe an hour, maybe two hours, maybe three hours later, and now it's more important that they get that support. . . . [I]t's just as important that we be able to provide the support to folks inside that buffer zone as much as outside the buffer zone." Tr. Day 7, 1993:3-1994:12 (Cliff Albright, Black Voters Matter).

Historically, Florida's civic and nonpartisan organizations have provided precisely that kind of assistance to voters, including when and where they have

needed it most. *See, e.g.*, Tr. Day 1, 59:2-61:1 (League providing nonpartisan assistance to voters within buffer zone); Tr. Day 7, 1985:7-24, 1986:3-8 (Black Voters Matter doing same); Tr. Day 3, 810:18-25 (Hispanic Federation doing same). As the League's President, Ms. Scoon, described, there are times when voters get caught in the buffer zone waiting to vote in very hot weather, and the League has offered water and other support to those voters to help them sustain and stay in line to vote. *See* Tr. Day 1, 60:19-61:1.

These efforts are widespread across Florida, as Florida's elected officials have recognized. *See, e.g.*, Tr. Day 5, 1565:15-18 (Senator Farmer describing how "minority interest groups often staffed highly populated polling places where they knew long lines would exist and they would be there to hand out water and typically energy bars to voters."); Tr. Day 5, 1468:21-1469:6 (Rep. Thompson describing how "[d]uring the primaries in August when it's very, very hot, there were nonprofit organizations who would give people umbrellas to protect them from the Florida sun"). In Florida in particular, this work has become crucial to making sure voters are able to successfully exercise their right to vote. "[W]hen a volunteer is there to offer a bottle of water in the heat or an umbrella in the rain, you know, sometimes that can be the encouragement that someone needs to stick it out and stay in line until they cast their vote." Tr. Day 7, 2045:21-2046:10 (Andrea Mercado).

Under SB90, these nonpartisan groups no longer plan to provide this type of assistance to voters. *See, e.g.*, Tr. Day 1, 63:3-8 (League no longer plans to provide assistance because of SB90's Solicitation Definition); Tr. Day 7, 1986:9-23 (similar, Black Voters Matter). As a consequence, "[t]here will inevitably be some people who aren't able to get these services who will, in fact, wind up leaving the line because of [Plaintiffs'] inability and the inability of others to provide these services." Tr. Day 7, 1986:20-23 (Black Voters Matter).

The evidence demonstrates that the Supervisors or their staff will not adequately fill this gap. *See, e.g.*, Tr. Day 5, 1379:9-11 (Supervisor White's poll workers "do not" "hand out water to voters waiting in line to vote"); ECF 549-3, 48:3-13 (Hillsborough Supervisor's Office does not distribute food, water, umbrellas, or anything of the sort to voters waiting in line to vote). This is consistent with Florida voters' experiences: In instances where voters with disabilities have received assistance at the polls, it is typically from "civic engagement organizations that were posted outside" – not from employees of the Supervisors' Offices. Tr. Day 10, 2744:18-2745:1 (Olivia Babis). Even if Supervisors *want* to provide such assistance, they are not well equipped to do so. Many lack resources or time to assist voters who need it, a reality that has motivated Plaintiffs to provide that necessary support. *See, e.g.*, Tr. Day 7 1990:3-1991:13 (Black Voters Matter describing, how in past years, they have "provided water to poll workers because they were unable

to get such support" for themselves); Tr. Day 5, 1468:21-1469:6 (Rep. Thompson explaining how this requirement is "giving the Supervisor's staff more work to do during the elections when they are very, very busy"). The League's President, Ms. Scoon, explained why she fears Supervisors cannot realistically fill this gap:

> [M]y experience has been things can get very, very busy for Supervisors of Elections. . . . I've not seen that they have the ability to just post someone there to look and make things smoother and give water … They're busy inside calling, things happen, the machine needs to be checked, you know, whatever activities are going on inside. I don't see an easy capacity for the busy Supervisors of Elections on a busy day, which is voting day -- any of the voting days, I don't see them designating someone to just do that easily. I think it's not going to work very well. And in many places it won't happen at all because their primary goal, I imagine, is get people in and get people out, get them voted.

Tr. Day 1, 66:24-67:13.

### 2.    The Solicitation Definition is not adequately supported by a sufficiently weighty state interest.

Defendants' sole articulated interest in the Solicitation Definition is to prevent harassment or intimidation at the polls. Tr. Day 13, at 3474:8-17 (Director Matthews). The *League* Plaintiffs do not dispute this is a legitimate state interest, but the Solicitation Definition is not remotely necessary to achieve that end. *See Anderson*, 460 U.S. at 789 ("In passing judgment," the court "also must consider the extent to which those interests *make it necessary* to burden the plaintiff's rights.) (emphasis added).

167

Despite the fact that line warming has a long history in Florida, there is *no* evidence that nonpartisan groups in Florida have harassed or intimidated voters while providing food, water, and general assistance to the polls. When asked, Director Matthews could not recall any complaints about nonpartisan groups distributing resources at the polls. Tr. Day 13, 3474:8-17. Similarly, when asked about this provision on the House Floor, Representative Ingoglia admitted, "[w]e've never said that any non-profit organization is trying to influence votes." Ex. 530 at 30, ECF No. 462-31. The line warming restrictions were also not something the Supervisors had asked the Legislature to address. Tr. Day 11, 3131:17-3132:2 (David Ramba).

Most importantly, however, the state already has clear tools to deal with harassment at the polls. Poll workers already have separate authority to remove "disruptive and unruly persons" from the areas around polling places. Fla. Stat. § 102.031(4)(c). And Florida law separately prohibits voter intimidation. *Id.* § 104.0615(2). Under these circumstances, the Solicitation Definition, which acts as a broad and blanket ban on general polling place assistance, unduly burdens the right to vote.

### F.   The Challenged Provisions together impose an undue burden on the right to vote.

In considering the burden imposed by the Challenged Provisions, the Court must consider their combined effects, and not merely evaluate each in isolation. *See*

*Williams v. Rhodes*, 393 U.S. 23, 24-25 (1968) (invalidating "series of election laws" that "[t]ogether . . . make it virtually impossible for any party to qualify on the [presidential election] ballot except the Republican and Democratic Parties"); *see also* ECF No. 558 at 5-7 (citing additional cases). The Challenged Provisions work together – from registration to the ballot box – to make the entire process of voting more difficult and burdensome, particularly for minority, disabled, and elderly voters. The burdens begin at the start of the voting process—registration—where SB90 begins "siphoning off people who could potentially become a registered voter." Tr. Day 4, 1215:12-22. It then continues like a "domino effect" systemically making it more and more difficult for voters to cast their ballot. Tr. Day 3, 738:6-15. As Dr. Kousser testified, "[T]he whole is greater than the sum of the parts. If you simply take – pull apart a law and do it provision by provision, you underestimate the total effect of the law." Tr. Day 6, 1694:22-1695:9.

The burdens begin with the Registration Disclaimer Provision's misleading warning, which will deter some voters from registering with Third-Party Voter Registration Organizations. *Supra* Part IV.B.2.a. The voters most impacted by this provision are those who experience barriers registering using other methods and those who are less likely to be reached by Supervisors, or to reach out for help. *See* Tr. Day 4, 1253:1-10 (Supervisor Scott: "You know, the people who are most likely to get caught up by this are also the same people who probably, you know, would be

169

maybe too intimidated to reach out and ask for help."). As a result, some voters will be unable to register to vote.

SB90 then makes it more difficult to request a VBM ballot by retroactively invalidating *all* pre-existing requests Florida voters already made for the 2024 general election cycle; requiring that voters request a VBM ballot twice as often as previously; and requiring voters provide an identification number to receive a VBM ballot. *Supra* Part IV.C.1. These provisions work in tandem to raise the cost of voting by mail. But the cost is not felt equally by all voters. For some voters—particularly those who are disabled—voting by mail is the only realistic option they have to cast their ballot. *See, e.g.*, *supra* Parts I.B.1.d (Susan Rogers), I.B.2.a (Catherine Teti). If, as a result of SB90, they forget to do so, they may be disenfranchised.

For those voters who are able to overcome the roadblocks to request a VBM ballot, the Drop Box Provisions will make it harder for some to return their ballots. This is because, as a result of SB90, there are fewer drop boxes available and many that are still available will be open for less hours, giving voters fewer options to return their ballots. *Supra* Part IV.D.2; Tr. Day 4, 1216:5-18. Some impacted voters will be disenfranchised, some will choose not to vote, and others will choose to vote in person.

SB90, however, also will make voting in person more burdensome. Florida's current system simply cannot handle an influx of voters voting in person. In the past,

170

when in-person voting made up a larger share of total votes cast, Florida notoriously saw extremely long lines. As Supervisor White testified, "[H]istorically there have sometimes been very long lines to vote in person in Miami-Dade," with voters "waiting for many hours to vote in some instances." Tr. Day 5, 1371:20-1372:5. The last time the Legislature revised its election laws to anywhere near the extent it has done so with SB90, the result was absurdly long lines, with "some precincts that did not close until after 1 a.m. on the day after election day." *Id.*; *see also supra* at Part IV.E.1. And the Supervisors "warned" the Legislature SB90 could cause this to happen again. Tr. Day 13, 3507:16-3508:7 (Supervisor Earley). Even Director Matthews acknowledged Florida's history of long lines at polling places. Tr. Day 13, 3463:22-3464:5.

As Dr. Herron explained, "the restrictions on vote-by-mail voting, to the extent it burdens vote-by-mail voters and causes some of them to vote in person, will also burden individuals who vote in ways other than vote-by-mail, i.e., in person. That's because if vote-by-mail voters vote in person, then they risk causing congestion in polling places." Tr. Day 8, 2151:6-22. And as supervisor after supervisor testified, in order to keep lines short at polling places, voters need to vote by mail. *See e.g.,* Tr. Day 4, 1210:10-17 (Supervisor Scott testifying, in the "most recent elections . . . a lot more people voting by mail[.] [That caused a] great reduction in how many people are coming to our early voting sites as well as voting

on election day, and we have not had those complaints of long lines in the recent election[.]"); Tr. Day 5, 1372:8-13 (Supervisor White testifying that she is "sure" that "lines have been shorter more recently" "in part because more voters are voting by mail instead of in person." "[E]very voter who votes by mail potentially one fewer person in line on election day."); Ex. 216, ECF No. 608-51 at 1 (Supervisor Latimer explaining that "encouraging vote by mail is one of the ways we avoid lines at in-person voting"); Tr. Day 13, 3507:4-15 (Supervisor Earley explaining that if 100 percent of voters voted on election day "[t]hat would be a bad thing. We saw a very small version of that in 2012, and we just don't have the capacity, and it would be tough to get the capacity to handle that….So it would be a huge change. There would be lines. There would be a lot of angry voters").

The Solicitation Definition, which prevents organizations from providing assistance within 150 feet of a polling place, will then make it more difficult for voters to withstand the long lines. *Supra* Part IV.E.1. When that happens, some voters will likely decide to leave the polling place without casting a ballot.

Ultimately, each of the Challenged Provisions does not operate in a vacuum. Rather, they work together to make the entire voting system more difficult and burdensome for all Florida voters, particularly those most marginalized.

## V.   Injunctive relief is appropriate and will not disrupt election administration.

As testimony at trial established—and as common sense demonstrates given the nature of the provisions at issue—granting the injunction that the *League* seeks would not disrupt the state's election administration process for the 2022 elections occurring later this summer and fall.[11]

**The Registration Disclaimer:** By its own nature, the Registration Disclaimer has its greatest effect not on election administrators, but on Third-Party Voter Registration Organizations, who must deliver the warning. While an injunction against the Disclaimer would prevent the Secretary and Attorney General from pursuing enforcement actions against such organizations for not delivering the warning, such an injunction is hardly disruptive to the State. The Supervisors, for their part, believe an injunction against the Disclaimer "wouldn't impact us either way." Tr. Day 13, 3501:7-15 (Supervisor Earley); Tr. Day 12, 3165:21-3166:6 (Supervisor White agreeing, "I don't see how that would impact our work one way or the other"). Supervisor Earley, however, did believe that such an injunction would help Third-Party Voter Registration Organizations, "and we value that partnership." Tr. Day 13, 3501:7-15.

---

[11] Out of deference to the Supervisors, who are conducting municipal elections in March and early April, the *League* Plaintiffs recommend the Court enter an injunction that takes effect April 15, 2022.

**The Vote-by-Mail Request Provision:** Because the VBM standing list remains honored through the end of calendar year 2022, an injunction against the VBM Request Provision would have little to no effect on the 2022 elections. Tr. Day 13, 3498:10-3499:4 (Supervisor Earley explaining an injunction would have a "minimal impact" for 2022). While Supervisor Earley's office has already taken 2024 VBM requests out of his system, "it would be a fairly straightforward process to put those back on . . . It would certainly be easier than trying to reach out to the voters after the 2022 general election and ask them again if they would like all that – you know, they would like ballots for that election because I think most of them still think they have that request standing." Tr. Day 13, 3498:10-3499:4. Separately, an injunction against the identification requirements would have only a "[m]inimal impact" Supervisors' operations; at present, it would only require them to take down a form requesting identification information from voters. Tr. Day 13, 3497:8-3498:2 (Supervisor Earley).

**The Drop Box Provisions:** An injunction against the Drop Box Provisions would not only *not* harm the Supervisors' Offices, it "would have a pretty significant impact in a positive way." Tr. Day 13, 3499:17-3501:2 (Supervisor Earley). As Supervisor Earley described, removing the $25,000 fine "would make it less problematic or less likely for me to have to try and find staffing to have double staffing so that if one person left, we could have somebody there for that brief

interval. So that would be a help." *Id.* at 3495:25-3496:19. Supervisor Earley also has a small post office box that functions like a drop box that "I'd prefer not to have to take that down because we do get some correspondence in there…. [I]t would be nice not to have to take it down." *Id.* at 3496:12-19, 3497:7.

**The Solicitation Definition**: An injunction against the Solicitation Definition would have "negligible impact" on Supervisor Offices. Tr. Day 13, 3499:5-16. This makes sense in light of the evidentiary record that nonpartisan groups have never harassed or intimidated voters at the polls. *See supra* at Part IV.E.

Overall, an injunction prohibiting enforcement of the Challenged Provisions will improve, rather than disrupting, election administration. As Supervisor White testified at trial, if she had the "option to administer future elections under the law that was in effect prior to Senate Bill 90," she would do so. Tr. Day 5, 1381:6-9.

## CONCLUSION

For the above reasons, the Court should hold each of the Challenged Provisions unconstitutional, and enter a permanent injunction prohibiting Defendants from enforcing them.

Respectfully submitted this 26th day of February, 2022.

/s/ Frederick S. Wermuth
Frederick S. Wermuth
Florida Bar No. 0184111
Thomas A. Zehnder
Florida Bar No. 0063274
KING, BLACKWELL, ZEHNDER
& WERMUTH, P.A.
P.O. Box 1631
Orlando, FL 32802-1631
Telephone: (407) 422-2472
fwermuth@kbzwlaw.com
tzehnder@kbzwlaw.com

Marc E. Elias
Elisabeth C. Frost*
David R. Fox*
Lalitha D. Madduri*
Christina A. Ford
Francesca Gibson*
ELIAS LAW GROUP LLP
10 G Street NE, Suite 600
Washington, DC 20002
Telephone: (202) 968-4490
melias@elias.law
efrost@elias.law
dfox@elias.law
lmadduri@elias.law
cford@elias.law
fgibson@elias.law

*Admitted Pro Hac Vice*

*Counsel for League Plaintiffs*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on February 26, 2022 I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel in the Service List below.

/s/ Frederick S. Wermuth
Frederick S. Wermuth
Florida Bar No. 0184111

*Counsel for League Plaintiffs*

## SERVICE LIST

Bradley R. McVay
Ashley E. Davis
Colleen E. O'Brien
William D. Chappell
Florida Department of State
RA Gray Building
500 South Bronough Street, Ste. 100
Tallahassee, FL 32399
Telephone: 850-245-6531
brad.mcvay@dos.myflorida.com
ashley.davis@dos.myflorida.com
colleen.obrien@dos.myflorida.com
david.chappell@dos.myflorida.com

Mohammad O. Jazil
Gary V. Perko
Holzman Vogel Baran Torchinsky &
Josefiak PLLC
119 S. Monroe Street, Suite 500
Tallahassee, FL 32301
Telephone: 850-567-5762
mJazil@holtzmanvogel.com

William H. Stafford, III
Bilal A. Faruqui
Karen A. Brodeen
Rachel R. Siegel
William Chorba
Office of the Attorney General
PL-01 The Capitol
Tallahassee, Florida 32399
Telephone: 850-414-3785
william.stafford@myfloridalegal.com
bilal.faruqui@myfloridalegal.com
karen.brodeen@myfloridalegal.com
rachel.siegel@myfloridalegal.com
william.chorba@myfloridalegal.com

*Counsel for Defendant Ashley Moody*

177

gperko@holtzmanvogel.com

Phillip M. Gordon
Kenneth C. Daines
Holzman Vogel Baran Torchinsky &
Josefiak PLLC
15405 John Marshall Hwy.
Haymarket, VA 20169
Telephone: 540-341-8808
pgordon@holtzmanvogel.com
kdaines@holtzmanvogel.com

*Counsel for Defendant Laurel M. Lee*

Robert C. Swain
Diana M. Johnson
Alachua County Attorney's Office
12 SE First St.
Gainesville, FL 32602
Telephone: 352-374-5218
bswain@alachuacounty.us
dmjohnson@alachuacounty.us

*Counsel for Defendant Kim A. Barton*

Edward P. Cuffe
Susan Erdelyi
Marks Gray, P.A.
1200 Riverplace Blvd, Ste. 800
Jacksonville, FL 32207
Telephone: 904-807-2110
sse@marksgray.com
pcuffe@marksgray.com

*Counsel for Defendants Christopher Milton, Mark Anderson, Amanda Seyfang, Sharon Chason, Tomi S. Brown, Starlet Cannon, Heather Riley, Shirley Knight, Laura Hutto, Carol Dunaway, Travis Hart, Grant Conyers, Janet Adkins, Charles Overturf, Tappie Villane, Vicky Oakes, William Keen, Jennifer Musgrove, Dana Southerland, Deborah Osborne, Joseph Morgan, Bobby Beasley and Carol Rudd*

Frank M. Mari
John M. Janousek
Roper, P.A.
2707 E. Jefferson St.
Orlando, FL 32803

Ronald A. Labasky
Brewton Plante PA
215 S. Monroe Street, Ste. 825
Tallahassee, FL 32301
Telephone: 850-222-7718

Telephone: 407-897-5150
fmari@roperpa.com
jjanousek@roperpa.com

*Counsel for Defendants Mark Negley,*
*Connie Sanchez, John Hanlon, Marty*
*Bishop, Heath Driggers, Lori Scott,*
*Kaiti Lenhart, and Penny Ogg*

rlabasky@bplawfirm.net

John T. LaVia
Gardner, Bist, Bowden, Bush, Dee,
Lavia & Wright, P.A.
1300 Thomaswood Drive
Tallahassee, FL 32308
Telephone: 850-385-0070
jlavia@gbwlegal.com

*Counsel for Defendants Chris H.*
*Chambless, Vicki Davis, Mary Jane*
*Arrington, Gertrude Walker and Lori*
*Edwards*

Andy V. Bardos
James T. Moore, Jr.
GrayRobinson PA
301 S. Bronough St, Ste. 600
Tallahassee, FL 32301
Telephone: 850-577-9090
andy.bardos@gray-robinson.com
tim.moore@gray-robinson.com

*Counsel for Defendant Jennifer J.*
*Edwards, Leslie Swan, Alan Hays,*
*Tommy Doyle, Michael Bennett,*
*Wesley Wilcox, Joyce Griffin, Brian*
*Corley, Christopher Anderson and*
*Paul Stamoulis*

Stephen M. Todd
Office of The County Attorney
601 E. Kennedy Blvd., 27th Floor
Tampa, FL 33602
Telephone: 813-272-5670
todds@hillsboroughcounty.org

*Counsel for Defendant Craig Latimer*

Jon A. Jouben
Kyle J. Benda
Hernando County
20 N. Main Street, Ste. 462
Brookesville, FL 34601-2850
Telephone: 351-754-4122
jjouben@co.hernando.fl.us
kbenda@co.hernando.fl.us

Kelly L. Vicari
Pinellas County Attorney's Office
315 Court Street, 6th Floor
Clearwater, FL 33756
Telephone: 727-464-3354
kvicari@pinellascounty.org

*Counsel for Defendant Julie Marcus*

*Counsel for Defendant Shirley Anderson*

Kia M. Johnson
Escambia County Attorneys Office
221 Palafox Place, Ste. 430
Pensacola, FL 32502
Telephone: 850-595-4970
kmjohnson@myescambia.com

*Counsel for Defendant David H. Stafford*

Dale Scott
Bell & Roper, P.A.
2707 E. Jefferson St.
Orlando, Florida 32803
Telephone: 407-897-5150
dscott@bellroperlaw.com

*Counsel for Defendant Maureen Baird*

Robert Shearman
Geraldo F. Olivo
Henderson, Franklin, Starnes & Holt, P.A.
1715 Monroe Street
Ft. Myers, Florida 33901
Telephone: 239-334-1346
robert.shearman@henlaw.com
jerry.olivo@henlaw.com

*Counsel for Defendants Aletris Farnam, Diane Smith, Brenda Hoots,*

Benjamin Salzillo
Nathaniel A. Klitsberg
Joseph K. Jarone
Brendalyn V.A. Edwards
115 South Andrews Ave., Ste. 423
Ft. Lauderdale, FL 33301
Telephone: 954-357-7600
bsalizzo@broward.org
nklitsberg@broward.org
jkjarone@broward.org
breedwards@broward.org

*Counsel for Defendant Joe Scott*

Craig D. Feiser
Jason Teal
Mary Margaret Giannini
117 W. Duval Street, Suite 480
Jacksonville, Florida 32202
Telephone: 904-255-5052
cfeiser@coj.net
mgiannini@coj.net

*Counsel for Defendant Mike Hogan*

Mark Herron
S. Denay Brown
Patrick O'Bryant
Messer Caparello & Self, P.A.
2618 Centennial Place
Tallahassee, Florida 32308
Telephone: 850-222-0720
mherron@lawfla.com
dbrown@lawfla.com
pobryant@lawfla.com

*Counsel for Defendant Mark Earley*

*Therisa Meadows, Tammy Jones and
Melissa Arnold*

Gregory T. Stewart
Elizabeth D. Ellis
Kirsten H. Mood
Nabors, Giblin & Nickerson, P.A.
1500 Mahan Drive, Suite 200
Tallahassee, FL 32308
Telephone: 850-224-4070
gstewart@ngnlaw.com
eellis@ngnlaw.com
kmood@ngnlaw.com

*Counsel for Defendant Paul Lux*

W. Kevin Bledsoe
London L. Ott
123 W. Indiana Avenue, Room 301
Deland, Florida 32720
Telephone: 386-736-5950
kbledsoe@volusia.org
lott@volusia.org

*Counsel for Defendant Lisa Lewis*

Michael B. Valdes
Oren Rosenthal
Miami-Dade Attorney's Office
Stephen P. Clark Center
111 N.W. 1st Street, Suite 2810
Miami, Florida 33128
Telephone: 305-375-5620
michael.valdes@miamidade.gov
oren.rosenthal@miamidade.gov

*Counsel for Defendant Christine
White*

Nicholas Shannin
Shannin Law Firm
214 S. Lucerne Circle East
Orlando, Florida 32801
Telephone: 407-985-2222
nshannin@shanninlaw.com

*Counsel for Defendant Bill Cowles*

Morgan Bentley
Bentley Law Firm, P.A.
783 South Orange Ave., Third Floor
Sarasota, Florida 34236
Telephone: 941-556-9030
mbentley@thebentleylawfirm.com

*Counsel for Defendant Ron Turner*

Ashley D. Houlihan
Palm Beach County Supervisor of
Elections
240 S Military Trail
West Palm Beach, FL 33416
Telephone: 561-656-6200
ashleyhoulihan@votepalmbeach.gov

Ronald A. Labasky
Brewton Plante PA
215 S. Monroe Street, Ste. 825
Tallahassee, FL 32301
Telephone: 850-222-7718
rlabasky@bplawfirm.net

*Counsel for Defendant Wendy Link*

Benjamin J. Gibson
Daniel E. Nordby
George N. Meros, Jr.
Amber S. Nunnally
Frank A. Zacherl
Shutts & Bowen LLP
215 S. Monroe St., Ste. 804
Tallahassee, FL 32301
Telephone: 850-241-1720
bgibson@shutts.com
dnordby@shutts.com
gmeros@shutts.com
anunnally@shutts.com
fzacherl@shutts.com

Daniel J. Shapiro
Cameron T. Norris
Tyler R. Green
Steven C. Begakis
Consovoy McCarthy, PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
Telephone: 703-243-9423
daniel@consovoymccarthy.com
cam@consovoymccarthy.com
tyler@consovoymccarthy.com
steven@consovoymccarthy.com

*Counsel for Intervenor Defendants
Republican National Committee and
National Republican Senatorial
Committee*