# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
### TALLAHASSEE DIVISION

LEAGUE OF WOMEN VOTERS OF
FLORIDA, INC., et al.,

     Plaintiffs,

     v.

LAUREL M. LEE, in her official capacity as
the Secretary of State of Florida, et al.,


     Defendants.

Case No. 4:21-cv-186-MW-MAF

Consolidated for trial with

Case No. 4:21-cv-201-MW-MJF

Case No. 4:21-cv-187-MW-MAF

Case No. 4:21-cv-242-MW-MAF


## *NAACP* AND *FLORIDA RISING TOGETHER* PLAINTIFFS' JOINT POST-TRIAL BRIEF, INCLUDING PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................1

FINDINGS OF FACT ...........................................................................................3

I. PARTIES ....................................................................................................3

    A. Plaintiffs ..........................................................................................3

    B. Defendants .....................................................................................13

II. EXPERTS .................................................................................................14

    A. Plaintiffs' Experts .........................................................................14

    B. Plaintiffs' Rebuttal Experts ..........................................................22

III. HISTORICAL BACKGROUND TO SB 90 ..............................................24

    A. Florida's History of Racially Discriminatory Voting Laws and Practices Prior to the Voting Rights Act of 1965 ...............................24

    B. Voting Discrimination After the Voting Rights Act of 1965 Through the 2000 General Election .................................................................30

    C. Recent Developments ....................................................................35

    D. Effects of Racial Discrimination in Florida .................................49

IV. FLORIDA'S ELECTION LAWS PRIOR TO SB 90 ...............................59

    A. Voter Registration .........................................................................59

    B. Vote-by-Mail Application Process ................................................61

    C. Use of Drop Boxes ........................................................................63

    D. Polling-Place Assistance ...............................................................65

V. THE 2020 GENERAL ELECTION ...........................................................67

    A. Unprecedented Turnout and Use of Vote-by-Mail, Particularly Among Black and Latino Voters ..........................................................67

    B. Absence of Voter Fraud ................................................................71

    C. Absence of Issues with Voter Registration Organizations.................75

    D. Widespread Praise of 2020 Election and Florida Election Code ........77

VI. CHALLENGED PROVISIONS OF SB 90 ................................................82

    A. VBM Application Requests ...........................................................82

i

B.    Vote-by-Mail Application Restriction ................................83

C.    3PVRO Compelled Disclaimer ..................................84

D.    Voter Registration Delivery Restriction.........................85

E.    Drop Box Restrictions ............................................86

F.    Polling-Place Assistance Restriction.............................88

VII.    THE PASSAGE OF SB 90 ....................................................90

A.    SB 90's Introduction and Evolution in the Senate and House...........91

B.    Sponsors' Inability to Justify Major Election Law Changes or the Specific Challenged Provisions............................................107

C.    Legislators' Awareness That SB 90 Would Burden Voters .............118

D.    Legislators' Awareness That SB 90 Would Have a Discriminatory Impact....................................................................122

E.    Procedural and Substantive Departures from the Ordinary Legislative Process...................................................................129

VIII.    IMPACT OF SB 90 ON FLORIDA VOTERS .........................................164

A.    Calculus of Voting Framework....................................164

B.    The Challenged Provisions Burden All Florida Voters ...................166

IX.    INJURIES TO PLAINTIFFS .....................................................206

A.    Florida NAACP.....................................................206

B.    Common Cause .....................................................210

C.    Disability Rights Florida ..................................................211

D.    Florida Rising Together ..................................................214

E.    Poder Latinx ..............................................................219

F.    Equal Ground ............................................................225

G.    Hispanic Federation....................................................230

H.    UnidosUS ................................................................238

X.    THE DEFENDANT'S CASE....................................................244

A.    Witnesses.................................................................244

B.    Defendants' Defense of SB 90 .........................................253

**CONCLUSIONS OF LAW** .................................................................**259**

I.      PLAINTIFFS HAVE ESTABLISHED STANDING TO SUE. ................259

        A.      NAACP Plaintiffs Have Established Standing. ...............................271

        B.      FRT Plaintiffs Have Established Standing.......................................283

II.     THE CHALLENGED PROVISIONS OF SB 90 WERE PASSED WITH
        RACIALLY DISCRIMINATORY INTENT IN VIOLATION OF THE
        FOURTEENTH AMENDMENT, FIFTEENTH AMENDMENT AND
        SECTION 2 OF THE VOTING RIGHTS ACT...........................................310

        A.      Voting Laws Passed with Racially Discriminatory Intent Violate the
                Fourteenth Amendment, Fifteenth Amendment, and Section 2 of the
                Voting Rights Act.............................................................................310

        *B.*    SB 90 was Enacted with Discriminatory Intent and Effect under
                *Arlington Heights* ............................................................................313

III.    SB 90 HAS DISCRIMINATORY EFFECTS IN VIOLATION OF
        SECTION 2 OF THE VOTING RIGHTS ACT.........................................329

        A.      Legal Principles................................................................................329

        B.      Applying the *Brnovich* and *Gingles* Factors, the Challenged
                Provisions Have Discriminatory Effects...........................................331

IV.     THE CHALLENGED PROVISIONS ARE UNCONSITUTTIONAL
        UNDER THE FIRST AND FOURTEENTH AMENDMENTS ...............340

        A.      Legal Standard.................................................................................340

        B.      The Challenged Provisions Unduly Burden Florida Voters Right to
                Vote and Are Not Justified by Any Purported State Interest...........347

        C.      The State's Interest in the Challenged Provisions is Pretextual, or Is
                At Least Insufficient to Justify the Burdens on Voters....................363

V.      FIRST AMENDMENT CHALLENGES TO LINE RELIEF PROVISION
        ........................................................................................................367

        A.      Legal Standard – Expressive Conduct ..............................................367

        B.      Application – Expressive Conduct....................................................370

        C.      Application – Overbreadth ...............................................................376

        D.      Legal Standard – Vagueness ............................................................377

    E.     Application – Vagueness.................................................378

VI.   the challenged provisions violate the americans with disabilities act........381

    A.     Legal Standard...........................................................381

    B.     DRF May Sue Defendants for Violations of the ADA ....................383

    C.     The Drop Box Provision Will Deny Voters with Disabilities' Access to Drop Boxes...........................................................384

    D.     The VBM Application Provision Will Deny Individuals with Disabilities Access to Vote-By-Mail. ................................387

    E.     Enforcement of the Line Relief Provision Will Deny Individuals with Disabilities Equal Access to In-Person Voting. ................................392

VII.  THE LINE RELIEF PROVISION OF SB 90 IS PREEMPTED BY SECTION 208 OF THE VOTING RIGHTS ACT .....................................396

     THE REGISTRATION DISCLAIMER PROVISION VIOLATES THE FIRST AMENDMENT AS COMPELLED SPEECH ...............................399

    A.     Legal Principles................................................................399

    B.     The Registration Disclaimer Provision Violates the First Amendment ......................................................................401

IX.   FIRST AMENDMENT CHALLENGE TO REGISTRATION DISCLAIMER PROVISION BASED ON PLAINTIFFS' RIGHTS TO FREEDOM OF ASSOCIATION ................................................414

X.    FIRST AMENDMENT CHALLENGES TO VOTER REGISTRATION DELIVERY RESTRICTION .......................................................416

    A.     Legal Principles................................................................416

    B.     The Registration Delivery Restriction Violates the First Amendment Under Exacting Scrutiny ..................................................418

    C.     Plaintiffs Are Entitled to Injunctive Relief .......................................422

XI.   THE NEED FOR BAIL-IN RELIEF UNDER SECTION 3 OF THE VOTING RIGHTS ACT ........................................................424

    A.     Legal Principles................................................................424

    B.     Application .......................................................................426

# INTRODUCTION

Plaintiffs in the *NAACP* (21-cv-187) and *Florida Rising Together* (21-cv-201) cases respectfully submit these Joint Proposed Findings of Fact and Conclusions of Law following a 14-day bench trial of the four above-captioned consolidated cases, in which the Plaintiffs challenge various provisions of the Florida voter suppression statute known as SB 90.  As set forth in detail below, the evidence presented at this consolidated trial demonstrated that each of the provisions of SB 90 challenged by the *NAACP* and *Florida Rising Together* Plaintiffs—namely, Section 28 (the "Drop Box Provision"), Section 29 (the "Line Relief Provision"), Section 24 (the "VBM Application Provision" and "VBM Request Identification"), and Section 7 (the "Registration Disclaimer Provision" and "Registration Delivery Provision") (collectively, the "Challenged Provisions")—is unlawful and invalid on each of the statutory and constitutional grounds Plaintiffs alleged. Declaratory and injunctive relief prohibiting the implementation of each of these Challenged Provisions therefore should be granted.

The trial evidence demonstrated that SB 90—in a pattern set by the many other discriminatory voting laws in Florida that preceded it—was enacted in a discriminatory backlash against the unprecedented surge in minority voters' usage of voting by mail and the organized assertion of their voting power in the election of 2020. Lacking any legitimate impetus or justification, the Challenged Provisions

impose severe and unwarranted burdens on the voting rights of all Florida voters, but particularly upon Black and Latino voters and voters with disabilities, in violation of their constitutional and statutory rights under the First and Fourteenth Amendments, the Voting Rights Act of 1965 ("VRA"), and the Americans with Disabilities Act ("ADA"). Each of the organizational Plaintiffs has already been injured, and will continue to be injured, through diversion of its resources from other critical tasks; and the Black and Latino voters and voters with disabilities who are the Plaintiffs' members will likewise be harmed by SB 90, along with Florida voters at large, if the Challenged Provisions are not enjoined.

The burden the Challenged Provisions impose on Florida voters serves no legitimate state interest, nor can the restrictions they impose on Plaintiffs' right to engage in expressive conduct by registering voters and providing voting-line relief withstand constitutional scrutiny. The Challenged Provisions should be invalidated and enjoined for what they are, and what the trial evidence exposes them to be:  a reactionary and racially tinged campaign to make it harder for Florida voters—and particularly minority voters—to exercise their right to vote.  Plaintiffs are entitled to relief against Defendants on all claims.

# FINDINGS OF FACT

## I.   PARTIES

### A.   Plaintiffs

#### 1.   *Florida State Conference of Branches and Youth Units of the NAACP*

1.      Plaintiff FLORIDA STATE CONFERENCE OF BRANCHES AND YOUTH UNITS OF THE NAACP ("Florida NAACP") is an advocacy organization. Tr. 506:4-8 (Brown). The Florida NAACP's approximately 12,000 members are predominately Black and other minority individuals; they include registered voters who reside throughout the state and who plan to vote in future elections in 2022.  Tr. 508:20-21, 510:4-11 (Brown); Tr. 1951:24-1952 (Slater).

2.      The Florida NAACP's mission is to ensure the political, social, educational, and economic equality of all persons and to eliminate race-based discrimination. Tr. 506:6-8 (Brown).  For decades, Florida NAACP has engaged in statewide voter registration drives, get-out-the-vote programs, "Souls to the Polls" events, line relief efforts, public education and trainings about the voting process, candidate forums, partnerships with members of the faith-based community, and other advocacy to support voting rights, all as part of its civic participation work. Tr. 510:16-517:11 (Brown); Tr. 1953:22-1954:8 (Slater).

3.      As a result of SB 90, the Florida NAACP's members will face increased burdens on voting rights, including reduced drop box access, added hurdles for

requesting a VBM ballot, and increased hardships for in-person voters waiting in longer lines.  Furthermore, the Florida NAACP has been forced to divert resources from its core programming to respond to SB 90; to create new educational materials to inform its members about SB 90 and its consequences; and to forgo central features of its civic engagement mission, such as providing items of relief to voters waiting in line.

### 2. *Common Cause*

4.    Plaintiff COMMON CAUSE is a nonpartisan, nonprofit citizen lobby with approximately 55,000 members in Florida.  Tr. 539:17-20 (Albert). Common Cause advocates for policies at the state and local level to ensure that elections are free, fair, and accessible.  Tr. 539:3-7 (Albert).

5.    Common Cause also encourages and supports voter participation in elections by, among other things, engaging in voter education and outreach efforts; acting as a lead coordinator for the nonpartisan Florida Election Protection Coalition; monitoring and correcting election-related disinformation online; and funding translation of election information into Spanish and Haitian Creole for non-English-speaking voters. *Id.* at 540:6-23, 542:5-18 (Albert).

6.    As a result of SB 90, Common Cause has already spent $10,000 on new educational resources to inform voters how they can vote.  Tr. 544:9-24 (Albert).

4

7.     In addition, Common Cause has determined that it will have to hire at least two additional community organizers to inform and educate voters about their rights as they are affected by the new law. Tr. 554:1-545:20 (Albert).   The organization estimates that the additional organizers will cost a minimum of $100,000, which Common Cause would have otherwise devoted to public education and advocacy concerning the redistricting process in Florida.   Tr. 557:20-558:6 (Albert).

8.     The Challenged Provisions make it substantially more difficult for Common Cause to engage in its civic engagement mission in Florida.   Tr. 558:4-12 (Albert).

### 3.     *Disability Rights Florida*

9.     Plaintiff DISABILITY RIGHTS FLORIDA ("DRF") is an independent, nonprofit corporation designated by law as Florida's federally funded protection and advocacy system ("P&A system") for individuals with disabilities. Tr. 434:18-20 (DePalma).  In this capacity, DRF advocates, educates, investigates, and litigates to protect and advance the rights of people with disabilities. Tr. 437:12-15 (DePalma).

10.     DRF's constituents include every Floridian with a disability. Tr. 440:24 (DePalma); ECF No. 467-10 ¶ 26 (Decl. of William S. Cooper).  DRF works to increase the political participation of individuals with disabilities, including by

addressing barriers that voters with disabilities face while voting and by increasing opportunities for people residing in a range of congregate facilities to vote.  Tr. 441:22-442:2 (DePalma).  DRF engages in legislative and public advocacy on these issues, directly engages with and trains election officials and voters on expanding voting accessibility, promotes robust voter registration, and engages in voter hotline and voter education efforts. Tr. 442:6-10, 442:19-443:6 (DePalma).

11.    As a result of SB 90, DRF has commissioned an accessibility audit, which will cost DRF approximately $82,000;  it will review the websites of all 67 Supervisors of Elections to assess whether they are compatible with screen readers and accessible for people with disabilities, now that voters will have to request VBM ballots twice as often using these websites.  Tr. 468:23-469:15, 472:21-473:10, 474:7-24 (DePalma); Tr. 2731:5-7, 2731:11-13 (Babis).

12.    To educate its constituents about SB 90, and to minimize the impact of SB 90's Challenged Provisions, DRF has been forced to divert time, money, and resources away from other activities.  Tr. 474:20-24 (DePalma); Tr. 2731:24-2732:5, 2732:1-2733:4, 2733:11-24, 2734:3-6, 2734:18-2736-3, 2736:15-2737  (Babis). DRF has also developed new educational resources explaining SB 90's changes to Florida's voting laws, which will cost between $5,000 and $9,000.  Tr. 475:14-476:1, 476:8-477:8 (DePalma).   DRF will distribute these materials to ADA

coordinators at the city and county level, SOEs' offices, and not-for-profit organizations.  Tr. 476:20-22 (DePalma).

### 4.    *Florida Rising Together*

13.    Florida Rising Together ("FRT") is a nonprofit organization dedicated to expanding democracy, advocating for historically marginalized communities, and building a state where all families can thrive.  Tr. 2032:20-22 (Mercado).  FRT focuses on various issues, including democracy, housing justice, and climate action. *Id*. at 2033:17-18.  As part of its mission to expand democracy, FRT engages in voter registration, voter education, and election protection work.  *Id.* at 2034:3-8.

14.    FRT was created as a result of a merger of two former nonprofit organizations, New Florida Majority Education Fund and Organize Florida Education Fund.  Tr. 2032:23-2033:1 (Mercado).  FRT's predecessors each registered over 100,000 Florida voters, and over 85% of those registered by the New Florida Majority Education Fund were people of color.  *Id.* at 2035:2-15, 2035:20-21.  In 2020, FRT's predecessors and their partners provided assistance to voters at polling places in Miami-Dade, Broward, Palm Beach, Duval, Orange, Osceola, and Hillsborough Counties.  *Id.* at 2046:11-21.  An FRT predecessor also sent out 14,000 vote-by-mail application forms to Florida voters.  *Id.* at 2050:25-2051:15.

15.    FRT engages with voters in several counties throughout the State of Florida.  For example, FRT registers voters in Miami-Dade, Broward, Orange,

Osceola, Gadsden, and Duval Counties.   Tr. 2036:9-13 (Mercado).   FRT has registered more than 2,000 individuals and aims to register 100,000 voters by October 2022.  *Id.* at 2034:24-2035:1, 2044:15-2045:9.

16.     FRT is a membership organization.  Members of FRT may participate in FRT's activities by identifying issues in their communities, by helping to educate elected officials about such issues, by volunteering their time, and by attending FRT membership meetings.  Tr. 2033:21-2034:2 (Mercado).

17.     As discussed further herein (*see infra*, Findings of Fact, Section IX.E), in response to SB 90, FRT has:  (i) spent staff time and resources educating voters about how to cast their ballots and have their votes counted in light of SB 90's changes to the law; (ii) hired three additional quality control managers; and (iii) ended its efforts to produce voter education materials that help Floridians apply to vote by mail.  FRT has taken these actions at the expense of its other programs, including the lost opportunity to hire more frontline organizers for its vaccine education, democracy education, and eviction support programs.

### 5.     *Poder Latinx*

18.     Poder Latinx is a fiscally sponsored project of Tides Advocacy.  Poder Latinx is a civic and social justice organization dedicated to building the political power of the Latinx community through its civic engagement, community organizing, and leadership development programs.  Tr. 187:18-188:4 (Garces).

19.    Poder Latinx's civic engagement program aims to build the political power of the Latinx community through voter registration, voter education, voter turnout, and voter protection.  Tr. 190:10-191:22 (Garces).  It primarily engages with voters in eight counties, including Orange, Osceola, Seminole, Lake, Polk, Lee, Palm Beach, and Volusia Counties.  Tr. 187:1-2; 193:12-16 (Garces).

20.    Poder Latinx was founded in 2019.  Since then, Poder Latinx has registered over 40,000 Florida voters.  *Id.* at 191:11-13; 234:6-7.  Poder Latinx's voter turnout program in 2020 knocked on 105,000 doors ahead of the 2020 election. *Id.* at 191:9-18; 193:17-24.

21.    As discussed further herein (Section XI.B), in response to SB 90, Poder Latinx has ended its vote-by-mail application assistance program and has diverted its staff and funding to its voter registration program and to voter outreach for its language assistance and drop box education efforts.  Poder Latinx has taken these steps at the expense of its ability to invest in its organizational infrastructure or hire additional staff members to further its mission of empowering the Latinx community and organizing around key issues.

### 6.    *Equal Ground*

22.    Equal Ground Education Fund ("Equal Ground") is a non-profit organization founded to empower Black voters.  Tr. 381:4-11; 17-24 (Burney-Clark).

23.     Since 2019, Equal Ground has conducted voter registration, education, and mobilization work, focusing on Orange, Pinellas, Seminole, and Volusia counties.  Tr. 382:25-383:2; 384:10-14 (Burney-Clark).  "Souls to the Polls," one of Equal Ground's primary voter mobilization efforts, reached about 60,000 parishioners across more than 20 Florida counties in 2020.  *Id.* at 395:7-19.  In 2020, Equal Ground's voter education materials reached approximately 500,000 voters.  *Id.* at 404:16-18.

24.     As discussed further herein (*infra* Findingsfo Fact, Section IX.F), in response to SB 90, Equal Ground has ended its voter registration and voter mobilization "Souls to the Polls" program and has diverted staff and funding to dramatically expanding its voter education program to educate voters about how to cast their ballots and have their votes counted in light of SB 90's changes to the laws.

### 7.     *Hispanic Federation*

25.     Hispanic Federation is a 501(c)(3) organization whose mission is to advance and empower the Latino community through its programming on the environment, health care, education, immigration, economic empowerment, and civic engagement.  Tr. 717:10-20 (Velez Burgos).

26.     Through its civic engagement program, Hispanic Federation engages in voter registration, "get out the vote" activities ("GOTV"), and voter education.  Its program is meant to ensure the representation of the Latino community's interests

in government by helping Latinos get involved in elections and civic participation. Tr. 719:1-720:11 (Velez Burgos).

27.    Hispanic Federation has member agencies, all of which are nonprofit organizations.  Tr. 718:21-719:2, 780:14-18 (Velez Burgos).  Hispanic Federation provides subgrants to those agencies, provides training, and assists them with capacity development.  *Id.* 718:21-719:2, 785:2-5.  During the 2020 election, Hispanic Federation supported the civic engagement activities of its member agencies by providing funding for polling place assistance activities.  *Id.* at 780:14-23; 784:8-13; 810:13-17.

28.    Hispanic Federation primarily engages with voters in Broward, Hillsborough, Lake, Miami-Dade, Orange, Osceola, Polk, Seminole, and Volusia Counties.  *Id.* at 722:8-17.  During the 2016 and 2020 election cycles, Hispanic Federation registered over 78,000 voters.  *Id.* at 726:3-21.  During the 2020 election cycle alone, Hispanic Federation's voter education and GOTV programs engaged with about 520,000 voters—226,000 of whom voted by mail—in all 67 counties in Florida.  *Id.* at 722:18-723:14; 737:23-738:1.

29.    As discussed further herein (*infra* Findingsfo Fact, Section IX.G), in response to SB 90, Hispanic Federation will divert resources from its voter education and GOTV programs to accommodate its need to hire additional canvassers and quality control staff.  Hispanic Federation will take these actions at the expense of

its ability to:   (i) reach voters in additional Florida counties; (ii) invest in its infrastructure and current staff; and (iii) expand its civic engagement program to Pennsylvania.

### 8.   *UnidosUS*

30.     UnidosUS is a 501(c)(3) organization whose mission is to "create an America where Latino contributions are respected and where they are able to pursue their version of the American dream."   It pursues this mission through issue advocacy and civic engagement programs, including voter registration, voter education, and "get out the vote" activities.  Tr. 1404:4-1405:17 (Nordlund).

31.     UnidosUS has 17 affiliate Latino nonprofit organizations that provide social services to the communities they serve.  Each affiliate pays annual dues to UnidosUS.  UnidosUS provides support to its affiliates with their voter registration work.  Tr. 1404:21-1405:11; 1411:14-1413:7 (Nordlund).

32.     UnidosUS primarily engages with voters in Broward, Lake, Miami-Dade, Orange, Osceola, Seminole, and Volusia Counties.   Tr. 1409:22-25 (Nordlund).   Its Florida affiliates engage with voters in Brevard, Broward, Hillsborough, Orange, Osceola, and Miami-Dade Counties.   Tr. 1413:4-7 (Nordlund).  Since 2012, UnidosUS has registered over 300,000 voters in Florida, including 72,000 voters in 2020.  *Id.* at 1409:11-15; 1413:8-13.  In 2020, UnidosUS also helped about 25,000 Florida voters vote by mail.  *Id.* at 1485:16-21.

33.    As discussed further herein (*infra* Findingsfo Fact, Section IX.H), in response to SB 90, UnidosUS has diverted staff and funding to its voter registration program and to expanding its voter education program with respect to the vote-by-mail application requirements in particular.  UnidosUS will take these actions at the expense of its issue advocacy campaigns and its overall ability to register more Latino voters.

### B.    Defendants

34.    The Secretary of State, Laurel Lee, is the chief election official in the State of Florida.  *See* Fla. Stat. § 97.012; *see also* Tr. 2758:7-9 (Matthews).  The Secretary's duties consist of, among other things, "[o]btain[ing] and maintain[ing] uniformity in the interpretation and implementation of the election laws."  Fla. Stat. § 97.012(1).  To achieve that end, she may adopt "uniform standards for the proper and equitable interpretation and implementation" of the election laws.  *Id.* Defendant Lee's statutory responsibilities also include managing voter registration and overseeing third-party voter registration organizations.  *Id.* § 97.0575.

35.    Director of Elections Maria Matthews was the only employee of the Secretary of State's office who testified.

36.    The remaining Defendants are the Supervisors of Elections for each of Florida's 67 counties.  The Supervisors are responsible for administering elections in their respective counties.  Among other election administration responsibilities,

13

the Supervisors are charged by law with enforcing SB 90's drop box restrictions, Fla. Stat. § 101.69(2), vote-by-mail identification requirement, *id.* § 101.62, and restriction on polling-place assistance, *id.* § 102.031(4)(c).

37.   The following Supervisors testified during trial:

- Craig Latimer by designation (Hillsborough);

- Alan Hays by designation (Lake);

- Joe Scott (Broward);

- Brian Corley (Pasco);

- Christina White (Miami-Dade);

- Mark Earley (Leon); and

- Tommy Doyle (Lee).

38.   The Republican National Committee and the National Republican Senatorial Committee are Defendant-Intervenors.  *See* ECF No. 402 (Joint Stip.) at 2.

## II.   EXPERTS

### A.   Plaintiffs' Experts

#### 1.   *Dr. Morgan Kousser*

39.   Dr. Morgan Kousser is Emeritus Professor of History and Social Science at the California Institute of Technology where he served as a tenured professor from 1975 until his retirement in 2020.  Tr. 1671 (Kousser).  He received

his B.A. in history from Princeton University, and his master's and a Ph.D. in history from Yale University.   ECF No. 608-25 (Kousser Rpt.); Tr. 1671 (Kousser).

40.     Dr. Kousser's work has focused on, among other things, American politics, particularly Southern politics; minority voting rights; educational discrimination, race relations, and the legal history of those subjects.   ECF No. 608-25 ¶ 3 (Kousser Rpt.); Tr. 1672-1673 (Kousser). At Cal-Tech, Dr. Kousser taught courses on American history, U.S. Supreme Court history, and historical and quantitative methodology, among others. Tr. 1672-1673 (Kousser).

41.     Dr. Kousser is the author of two books and numerous scholarly articles. His books include *The Shaping of Southern Politics: Suffrage Restriction and the Establishment of the One-Party South, 1880-1910,* which concerned the connection between party politics and the disfranchisement of African-Americans and poor whites in the late 19th and early 20th centuries; and *Colorblind Injustice: Minority Voting Rights and the Undoing of the Second Reconstruction.* ECF No. 608-25 ¶ 3 (Kousser Rpt.); Tr. 1673 (Kousser).  For 12 years he was the editor of a scholarly journal, *Historical Methods*, which addresses quantitative methods in social scientific approaches to history. Tr. 1674 (Kousser).

42.     Dr. Kousser has also testified twice before Congress on voting rights, most recently in 2019.   ECF No. 608-25 ¶ 6 (Kousser Rpt.). He previously has

provided expert testimony in approximately 50 voting rights cases. Tr. 1675 (Kousser).

43.    In this case, Dr. Kousser was asked to examine the evidence he would typically consider as a historian to analyze the reasons for the adoption of SB 90, and to make that analysis available to the finder of fact.  Tr. 1680-1681 (Kousser).

44.    Dr. Kousser was accepted as an expert in American political and legal history, the history of racial discrimination in voting, and historical and quantitative methodology.  Tr. 1675:5-16 (Kousser).

### 2.    *Dr. Traci Burch*

45.    Dr. Traci R. Burch is an Associate Professor of Political Science at Northwestern University and Research Professor at the American Bar Foundation. Tr. 920:16-19, 921:3-7 (Burch); *see also* ECF No. 608-5 at 69 (Burch Rpt.).  She received her Ph.D. in Government and Social Policy from Harvard University in 2007.  Tr. 920:8-12, 22, 24; 912:2 (Burch); *see also* ECF No. 608-5 at 69 (Burch Rpt.).  Dr. Burch works in the areas of political behavior, political participation, and barriers to voting.  Tr. 921:10-11 (Burch).

46.    She also works on issues of race and ethnic politics, which is the broad study of racial group interactactions.   Dr. Burch's studies also focus on discrimination, public opinion about race and racial issues, how public opinion and

political behavior vary by race, and the history of race and racial politics.  Tr. 922:17-24 (Burch).

47.    Dr. Burch is widely regarded as an expert on political behavior and political participation.  ECF No. 608-5 at 1 (Burch Rpt.).  This is Dr. Burch's sixth engagement as an expert witness and the fourth such engagement for which she has testified at trial.  Tr. 926:5-6 (Burch); *see also* ECF No. 608-5 at 2 (Burch Rpt.).  Dr. Burch previously testified at trial and in a deposition in a case in *Jones v. DeSantis* (Consolidated Case No. 4:19-cv-300 (N.D. Fla.)); at trial and in a deposition in North Carolina state court (*Community Success Initiative v. Timothy K. Moore* (Case No. 19-cv-15941, N.C. Superior Court, Wake County)); and at trial and in a deposition in *People First of Alabama v. John Merrill*, Case No. 2:20-cv-619 (N.D. Ala.).  ECF No. 608-5 at 3 (Burch Rpt.).  The trial courts relied on Dr. Burch's expert testimony, and she was cited in the opinions in both *Jones* and *People First*.  *See* ECF No. 608-5 at 3 (Burch Rpt.).

48.    At trial, Professor Burch was accepted by the Court as an expert in political science and social policy, particularly race and ethnic policies, legislative processes and political behavior and discriminatory barriers to voting.  Tr. 927:24-928:7 (Burch).

### 3.   *William S. Cooper*

49.     Dr. William Cooper is an independent demographic expert and private consultant.  He received his B.A. in Economics from Davidson College.  Tr. 584:21-22 (Cooper).   Mr. Cooper has 35 years of experience in demographic analysis, including the evaluation of U.S. Census Bureau data (including the decennial Census, the American Community Survey, and other data).   Tr. 578:20-579:5, 580:18-21; 583:1-6 (Cooper).  He also has expertise in data regarding socioeconomic characteristics, disparities, and potential barriers to voting among racial, ethnic, and socioeconomic groups.  Tr. 583:10-584:20; 586:24-587:7 (Cooper).

50.     Mr. Cooper has testified at trial as an expert witness in approximately 45 cases, dating back to 1987, and has given expert deposition testimony or provided an expert report in dozens more cases, including on behalf of the City of Quincy, Florida, defendants in a VRA Section 2 lawsuit.  Tr. 585:14-586:7 (Cooper); *see Baroody v. City of Quincy*, 4:20-cv-217-AW-MAF (N.D. Fla. June 7, 2020).   Mr. Cooper also served as a redistricting and demographic expert for the plaintiffs in *Calvin v. Jefferson County Board of Commissioners*, a one-person, one-vote suit in which Plaintiffs prevailed on summary judgment.   Tr. 587:8-22, 588:14-22 (Cooper); *see* 172 F. Supp. 3d 1292, 1298, 1314-26 (N.D. Fla. 2016).  Mr. Cooper has also provided expert reports or declarations in voting rights cases in Glades County, Florida, and DeSoto County, Florida.  Tr. 587:23-588:4 (Cooper).

18

51.     Mr. Cooper has provided demographic consulting services to many civil rights organizations, nonprofit groups, and state and local governments.  Tr. 579:11-582:25 (Cooper).  For example, in 2001 and 2011, Mr. Cooper served as one of several redistricting consultants to Miami-Dade County, advising its County Commission and School Board.  Tr. 581:3-10 (Cooper).  Mr. Cooper also provided demographic advice and developed voting plans for a number of counties and municipalities in Mississippi, Washington state, Virginia, and Utah, and provided expert demographic services to the State of Maryland and Governor of Pennsylvania. Tr. 581:14-25 (Cooper).

52.     Courts have acknowledged Mr. Cooper as a leading demographic expert in voting rights and redistricting cases.  *E.g., Caster v. Merrill*, consolidated with *Singleton v. Merrill*, Nos. 2:21-cv-1291, 2:21-cv-1530 2022 WL 265001, *33, *57-58 (N.D. Ala. Jan. 24, 2022) (three-judge district court) (finding Mr. Cooper's testimony "highly credible," noting that Mr. Cooper has "spent the majority of his professional life drawing maps for redistricting and demographic purposes," and crediting Mr. Cooper's reports and his live testimony as "clear," "consistent," and well-explained).

53.     At trial, Plaintiffs tendered Mr. Cooper as an expert to testify concerning demographics and socioeconomic data, Tr. 588:5-7 (Cooper), and this

Court qualified Mr. Cooper as an expert based on his experience and his provision of information useful to the finder of fact.  Tr. 593:5-594:13 (Cooper).

### 4. *Dr. Sharon Austin*

54.    Dr. Sharon Austin is a Professor of Political Science at the University of Florida.   She received a Ph.D. in political science from the University of Tennessee at Knoxville in 1993.  ECF No. 608-18 at 1 (Ex. A to Austin Rpt.).

55.    Since 1992, Dr. Austin's research has focused on various aspects of American politics and public policy, including minority voter participation and the barriers to such participation.  She has authored numerous articles, books, and book chapters on the topic of minority voter participation.  ECF No. 608-17 ¶¶ 6-7 (Austin Rpt.).

56.    At trial, Dr. Austin was accepted by the Court as an expert on the history of voting rights and discrimination in Florida.  Dr. Austin provided testimony about Florida's longstanding history of responding to Black and Latino voters' progress in exercising their right to vote by enacting laws that seek to disenfranchise them.  Tr. 851:7-916:19 (Austin).

### 5. *Dr. Daniel Smith*

57.    Dr. Smith is a Professor and Chair of Political Science at the University of Florida.  He received his doctorate in Political Science from the University of Wisconsin-Madison in 1994.  He is also President of ElectionSmith, a consulting

firm that specializes in empirical research on voting and election administration in the United States.  Tr. 2341:3-4, 2342:25-2343:2 (Smith); ECF No. 467-7 ¶ 2 (Smith Rpt.).

58.    For nearly thirty years, Dr. Smith has conducted research on electoral politics in the American states, focusing on the effect of political institutions on political behavior.  Tr. 2343:24-3244:10 (Smith).  He has written extensively on election administration in the American states, has published over 100 articles and book chapters, including many that have appeared in top peer-reviewed journals, as well as two books.  ECF No. 467-7 ¶ 3 (Smith Rpt.); Tr. 2345:8-10 (Smith).  Dr. Smith has taught undergraduate and graduate courses focusing on American political institutions, voting and election administration, and political behavior in the American states, including Florida.  Tr. 2344:11-24 (Smith).  A substantial portion of his academic research has focused on elections and voting in Florida, including research on efforts to strip voter registrations of potential non-citizens, restrictions on in-person voting, and wait-times at polling places.  Tr. 2348:16-2350:8 (Smith). A substantial portion of his research has dealt with issues of voter access as they relate to race and ethnicity.  Tr. 2351:9-11 (Smith).

59.    Dr. Smith has testified before the U.S. Senate and state legislatures, including Florida, on voting and election issues.  Tr. 2353:3-2354:5 (Smith).  He has

also previously served as an expert in election-related litigation in multiple states, including Florida.  ECF No. 467-7 ¶ 4 (Smith Rpt.); Tr. 2354:6-2356:23 (Smith).

60.     At trial, Plaintiffs tendered, and the Court accepted, Professor Smith as an expert in election administration, voter access, and voter participation in the U.S. and the State of Florida, in particular.  Tr. 2357:7-12 (Smith).

61.      At trial, Dr. Smith testified that the Challenged Provisions of SB 90 impose severe burdens on voting by eligible Florida voters generally, and that those burdens will disproportionately impact Black and Latino voters and voters with disabilities.

### B.     Plaintiffs' Rebuttal Experts

#### 1.     Dr. Michael McDonald

62.     Dr. Michael McDonald is a Professor of Political Science at the University of Florida.  He received a Ph.D. in Political Science from the University of California at San Diego.  ECF No. 461-23 at 1 (McDonald CV).

63.     For over 20 years, Dr. McDonald's work has focused on election administration, election data, and political methodology.  He has authored numerous books, book chapters, peer-reviewed articles, law review articles, and reports in these fields. Tr. 3581:15-19; 3582:18-24 (McDonald); ECF No. 461-23 at 2-12.  His extensive experience in elections administration includes work advising the U.S. Election Assistance Commission, the Department of Defense, and several state

elections administrators.  Tr. 3584:14-3585:18 (McDonald); ECF No. 461-23 at 10-12; 14-16 (McDonald CV); ECF No. 634-3 at 2-3 (Decl. of Michael McDonald).  He has also previously served as an expert in election-related litigation in multiple states.  Tr. 3587:5-3588:8 (McDonald); ECF No. 461-23 at 14-15 (McDonald CV).

64.    Dr. McDonald's publications include work in the areas of election administration and typology analyses—including 50-state comparisons—and process tracing.  Tr. 3582:13-3584:9 (McDonald).

65.    At trial, Dr. McDonald was accepted by the Court as an expert in election administration, comparative election administration, and political science methodologies with respect to the opinions he offers in his expert report.  Tr. 3589:9-22 (McDonald).   He provided rebuttal testimony in response to Dr. Kidd.   In particular, Dr. McDonald testified that Dr. Kidd's expert report is unreliable because of analytic deficiencies and inconsistencies in the methodologies that Dr. Kidd used to conduct his analysis.  Tr. 3590:16-3591:22 (McDonald); ECF No. 634-3 at 3-5 (Decl. of Michael McDonald).  As a result, Dr. Kidd's report provides incomplete and misleading comparisons of Florida's election laws to those in other states.  Tr. 3590:16-24 (McDonald); ECF No. 634-3 at 3-5 (Decl. of Michael McDonald).

## III.   HISTORICAL BACKGROUND TO SB 90

### A.   Florida's History of Racially Discriminatory Voting Laws and Practices Prior to the Voting Rights Act of 1965

66.   Throughout Florida's history, and dating back to Reconstruction, racial and ethnic minorities have faced discriminatory barriers to voting.  *See* Tr. 934:13-935:2 (Burch); ECF No. 608-5 at 8-19 (Burch Rpt.); *see also* Tr. 902:21-22 (Austin); Tr. 1692:24-1693:5 (Kousser).

67.   In 1865, as part of its attempt to rejoin the United States after the Civil War, Florida proposed a new constitution limiting the right to vote to only "free white males."   Tr. 851:12-17; 857:22-24 (Austin).   Congress rejected this constitution and required Florida to allow Black males to register and vote, leading to significant Black voter participation.  *Id*. at 851:23-852:8; 858:1-4 (Austin).  By 1867, the number of Black voters surpassed the number of white voters.  *Id*. at 852:8-14 (Austin).

68.   During its 1868 Constitutional Convention, Florida attempted to dilute the Black vote using various means, including by ensuring white control of the legislature and giving the governor authority to appoint county officials, thereby guaranteeing white citizens would control positions of power.  Tr. 853:24-853:11 (Austin); ECF No. 608-17 ¶ 20 (Austin Rpt.).

69.     Despite these efforts to dilute the Black vote in Florida's 1868 Constitution,[1] Black citizens managed to achieve some representation, due to the federal government's oversight of elections at that time.  In 1870, Josiah Walls, a former slave and Union soldier, became Florida's first Black member of Congress, and 19 Black people were elected to the Florida legislature.  Tr. 853:14-17 (Austin); ECF No. 608-17 ¶ 21 (Austin Rpt.).  Even in the 1880s, there was a vigorous Republican party in the state, which captured over 40 percent of the statewide vote in 1888.  Tr. 1695:22-1696:4 (Kousser).

70.     Examination of how Florida achieved disenfranchisement after this period of Black political participation reveals strategies that have recurred throughout Florida's history, including in the passage of SB 90.  One such strategy was to implement seemingly small, incremental changes in voting laws that ultimately result in substantial disenfranchisement.  Tr. 1694:9-21 (Kousser);  ECF No. 608-25 ¶¶ 30-34 (Kousser Rpt.)); *see also* Tr. 934:13-935:2 (Burch); ECF No. 608-5 at 8-19 (Burch Rpt.).

71.     For example, efforts to enact a poll tax in Florida's 1885 Constitutional Convention failed, as did an effort to pass it by legislation in 1887.  Tr. 1696: 22-25;

---

[1] Such efforts included, for example, the governor being given authority to appoint county officials, thereby guaranteeing white citizens would control positions of power.  Tr. 853:24-853:11 (Austin); ECF No. 608-17 ¶ 20 (Austin Rpt.).

1697:9-11 (Kousser).  However, the 1887 legislature did succeed in passing a bill that required voters to re-register to vote every year and to present their registration certificate when they voted – similar to a voter ID requirement.  Tr. 1697:11-16 (Kousser).  The 1887 legislature also passed an intercensal gerrymander of the state legislature.  Tr. 1697: 9-24 (Kousser).

72.    These barriers to voting and political participation, combined with efforts to reject Black voters' ballots for small mistakes and other irregularities, successfully disenfranchised voters and resulted in a major change in the composition of the Florida legislature in the 1888 election.  It became overwhelmingly Democratic, with the number of Republican and Independent legislators dropping from 31 in 1887 to 14 in 1889.  Tr. 1701: 8-9 (Kousser);  ECF No. 608-25 ¶ 33 (Kousser Rpt.).  The new 1889 legislature then was finally able to pass a poll tax as a suffrage requirement, along with an "eight-box" law that disfranchised illiterate voters by requiring them to deposit separate ballots for each office in a different ballot box.  Tr. 1698:22-25, 1699: 1-8 (Kousser);  ECF No. 608-25 ¶ 33 (Kousser Rpt.); *see also* ECF No. 608-5 at 8-9 (Burch Rpt.).

73.    After seizing control, white Democrats continued making changes in voting laws to entrench their power.  In 1901, Florida adopted the runoff primary in response to fears that Black candidates might win elections in multi-candidate fields.  At that time, Black people made up 44 percent of the population.  ECF No. 608-17

¶ 30 (Austin Rpt.).  Under a runoff primary, if no candidate received a majority of the vote in the first primary, the top two vote-getters would compete in a runoff. Even Black and Latino candidates who had received the most votes in the first primary often lost runoff elections when competing against White candidates.  Tr. 859:22-25 (Austin); ECF No. 608-17 ¶ 30 (Austin Rpt.).

74.    White Democrats further entrenched their power by enacting lengthy residency requirements and, in 1915, a literacy test with a grandfather clause exempting most white citizens.  Only white people were permitted to vote in primaries.  Tr. 855:1-9 (Austin); ECF No. 608-17 ¶ 22 (Austin Rpt.); ECF No. 608-7 at 9 (Smith Rept.).

75.    These measures had their intended effect.  Between 1888 and 1892, Black male turnout in Florida dropped from 62 percent to 11 percent.  Tr. 855:17-23 (Austin); ECF No. 467-12 ¶ 23; Tr. 1699:15-19 (Kousser); ECF No. 608-25 ¶ 33 (Kousser Rpt.).

76.    Florida similarly made efforts to dilute the vote of Latino people, including through language discrimination, resulting in disproportionately less representation.  Tr. 859:4-8 (Austin).  In 1822, Florida elected its first Latino as a territorial delegate to Congress, Joseph Marion Hernandez, who served until March 1823.  Tr. 856:5-10 (Austin).  After Hernandez, no Latino was elected to Congress from Florida until 1989.  ECF No. 608-17 ¶ 27 (Austin Rpt.).  Moreover, as of 1980,

Florida had only one Latino in the state legislature, Elvin Martinez. *Id.* at 856:22-25 (Austin).

77.    In the Jim Crow era of the 20th Century, violence—often state-sanctioned—limited Black voter registration and turnout.  ECF No. 608-5 at 9-10 (Burch Rpt.); *see also* Tr. 955:10-14 (Austin).  For example, in 1920 in Ocoee, Florida, a man was lynched, "an estimated 30–60 people were killed," and "[n]early all Black homes and churches . . . were burned to the ground" after a Black man attempted to vote earlier that day.  ECF No. 608-5 at 9-10 (Burch Rpt.); Tr. 935:6-936:3 (Burch); *see also* Tr. 955:10-14 (Austin); Tr. 1707:7-11 (Kousser) ("During a lot of the period, . . . there were lynchings that took place.").

78.    Also during this time, Florida did not elect a single Black state legislator between 1888 and 1969.  Florida had no Black member of Congress between 1877 and 1993.  Tr. 1705:15-20 (Kousser).

79.    Political campaigns during this period made overt appeals to racism as a winning tactic.  George Smathers used racial appeals to defeat Claude Pepper in 1950.  Particularly after *Brown v. Board of Education*, campaigns for governor revolved around racial issues.  For example, in 1964, Haydon Burns charged that Robert King High, who was his major opponent in the Democratic primary, was the "candidate of the NAACP."  Tr. 1705:18-25, 1706: 1-6 (Kousser).

80.     Appeals to race were so pervasive in Florida elections that even LeRoy Collins, widely viewed as a moderate, said when he took office in 1965 that Florida was "just as determined as any other Southern state" to maintain racial segregation. Collins toed the line on appeals to segregation at that time, even though he was widely viewed later as more liberal on racial matters.  Tr. 1706: 1-15 (Kousser); ECF No. 608-25 ¶¶ 35-36 (Kousser Rpt.).

81.     Segregation in all public accommodations was widespread at the time, but in schools it was uniform and universal.  No public university or college in Florida desegregated before 1958 (the same year as Alabama).  Even in 1970, the first Republican governor of Florida since Reconstruction, Claude Kirk, closed the Manatee public schools rather than integrate them.  Tr. 1706:20-25, 1707:1-14 (Kousser); ECF No. 608-25 ¶ 36 (Kousser Rpt.).

82.     The U.S. Commission on Civil Rights, a commission created by the Civil Rights Act of 1957 to study allegations of discrimination, made several findings that few Black citizens were registered to vote in Florida.  *Id*. at 861:3-13 (Austin).  For example, the Commission found that few Black voters were registered to vote in Gadsden, a predominantly Black county.  *Id*. at 861:19-23 (Austin).  In 1958, only seven out of over 10,000 voting-age Black citizens were registered to vote in Gadsden County, and in 1960 again only seven out of over 12,000 voting-age Black citizens were registered in the county.  *Id*. at 861:24-862:5 (Austin).  The

Commission concluded that the low number of registrants was, in part, the result of an environment of terror and other intimidation tactics taking place in the county to prevent voter registration. *Id*. at 862:8-11 (Austin).

### B. Voting Discrimination After the Voting Rights Act of 1965 Through the 2000 General Election

83.     The Voting Rights Act of 1965 outlawed overt discriminatory voting practices that had prevented Black and Latino people from voting in states like Florida. *Id*. at 862:13-25 (Austin). To comply with the VRA, Florida was required to amend its 1885 Constitution, and Florida thereafter ratified a new constitution in 1968 permitting Black and Latino people to vote. *Id*. at 862:15-25 (Austin). After the VRA's enactment, the statewide Black voter registration rate increased, growing to almost 60 percent in 1971. *Id*. at 863:9 (Austin); ECF No. 608-17 ¶ 38 (Austin Rpt.).

84.     In response to this progress, the Florida legislature once again took steps to dilute the votes of Black and Latino voters. Tr. 938:23-939:3 (Burch). One example was the use of gerrymandering tactics. The 1968 Constitution required that redistricting take place every decade based on population changes. *Id*. at 864:3-6 (Austin). Beginning in 1970 and in subsequent decades thereafter the legislature attempted to draw districts to prevent Black and Latino voters from electing minority representatives. ECF No. 608-17 ¶¶ 39-41 (Austin Rpt.); ECF No. 608-5 at 12-13

(Burch Rpt.).   In 1977, Florida's 160-person legislature had only three Black representatives and no Black senators.  Tr. 864:17-20 (Austin).

85.    In 1975, five counties in Florida—Collier, Hardee, Hendry, Hillsborough, and Monroe Counties—were brought under the preclearance requirements of the Voting Rights Act because fewer than half of the adults were registered to vote and more than 5 percent of the population was non-English speaking.  ECF No. 608-17 ¶ 44 (Austin Rpt.); ECF No. 608-5 at 10 (Burch Rpt.).

86.    The use of at-large elections for local governing bodies in Florida also was a continued strategy of discrimination to exclude Black and Latino candidates from holding elected office after the 1965 Voting Rights Act.  ECF No. 608-5 at 13-14 (Burch Rpt.).  At-large elections typically required runoffs.  Tr. 859:17-18 (Austin).  Additionally, at-large elections were run citywide or countywide, thereby requiring more resources for a campaign and placing Black and Latino candidates at a disadvantage.  Tr. 860:3-7 (Austin).

87.    The 1965 Voting Rights Act was strengthened in 1982, but racial discrimination in voting continued in Florida.  From 1983 through 2020, there have been some 133 voting rights legal actions of all sorts, at least 64 of which have resulted in findings of discrimination or settlements that acknowledged discrimination; *see* ECF No. 608-5 at 11-15 (Burch Rpt.).  At least five of these cases were decided not only under Section 2 of the Voting Rights Act, but also under the

Fourteenth or Fifteenth Amendments, indicating a finding of intentional discrimination.  Tr. 1708:19-25, 1709:14-22 (Kousser); ECF No. 608-25 ¶ 39 (Kousser Rpt.).

88.    At-large elections also continued to account for many post-1983 court findings of voting discrimination.  Tr. 1710:5-25, 1711:1-23 (Kousser); ECF No. 608-25 ¶¶ 40-43 (Kousser Rpt.); ECF No. 608-5 at 13-14 (Burch Rpt.).  A notable example was litigation over at-large elections in Miami-Dade where the Southern District of Florida found in 1992 that Dade County's at-large structure discriminated against Black and Latino voters by making it more difficult for them to elect representatives of their choice.  The court ordered the commission to change from an at-large structure to thirteen single-member districts.  ECF No. 608-17 ¶ 46 (Austin Rpt.).  *See Meek v. Dade County*, 805 F. Supp. 967, 994 (S.D. Fla. 1992), *aff'd in part, rev'd in part on other grounds,* 985 F.2d 1471 (11thCir. 1993).  Among numerous additional examples was litigation in Bradford County, where a federal court in 1989 ruled that "the at-large election system currently in place in Starke is driven by racial bias and that the at-large system will continue to deny [Black citizens] equal access to the City's political process." ECF No. 608-25 ¶ 40 (Kousser Rpt.).

89.    Florida's criminal legal system also perpetuated some of Florida's Jim Crow practices which disenfranchised persons with felony convictions. A 1974

effort to allow individuals to have their voting rights restored after completing their sentences was ruled unconstitutional under the Florida Constitution. Two subsequent governors, Reuben Askew and Bob Graham, took it upon themselves to grant executive clemency to thousands of people during their time in office, but this was drastically reversed by the subsequent two governors, Bob Martinez and Lawton Chiles. Tr. 1707:15-25-1708:1-17 (Kousser).

90.     Litigation to create majority-minority districts in the 1990 redistricting cycle resulted in the election of three Black representatives to Congress—the first Black representatives from Florida to serve in Congress since Reconstruction. It also allowed the election of two Latino representatives to Congress. *Id.* at 869:7-14 (Austin); *see DeGrandy v. Wetherell,* 794 F. Supp. 1076 (N.D. Fla. 1992). In addition, Black and Latino representation increased to ten Black and nine Latino state legislators in the late 1980s and early 1990s. Tr. 869:7-14 (Austin).

91.     In response to the increased representation, Florida took numerous steps to dilute the votes of Black and Latino people leading up to the 2000 election. Tr. 869:18-21 (Austin). Florida purged its voter rolls in ways that disproportionately eliminated voters of color. *Id*. at 869:22-23 (Austin); *see* ECF No. 608-5 at 15-16 (Burch Rpt.). For example, in Miami-Dade County 65 percent of names purged were Black even though Black citizens made up only 20 percent of the population. *Id*. at 870:9-11 (Austin); ECF No. 608-5 at 15 (Burch Rpt.).

92.    While Florida's 2000 election was most notorious for its close count and the chaotic recount that followed, Florida also ran the 2000 general election in a way that disadvantaged Black and Latino voters.  In 2000, the Secretary of State hired a company to attempt to match persons with felony convictions in other states with persons on the voting rolls in Florida.  The matching procedure was deeply flawed, leading to large numbers of erroneous purges.  A study by the U.S. Commission on Civil Rights, ECF No. 608-24, called Florida's purge process a "recipe for disenfranchisement" and found that Black voters were ten times more likely to be placed on the purge list than white voters.  ECF No. 608-25 ¶ 44 (Kousser Rpt.); Tr. 1712:22-25-1713:1-14 (Kousser).

93.    In April 2001, the U.S. Commission on Civil Rights issued a report highlighting many issues with Florida's operation of the 2000 general election.  The Commission found, *inter alia*, that:

- Officials did not ensure that all precincts received adequate resources, especially tdhose precincts catering to Black and Latino voters;

- Police sweeps and roadblocks in Black neighborhoods intimidated many Black voters;

- Old and defective election equipment was found in poor precincts;

- Language assistance when required and requested was not provided;

- Persons with disabilities faced accessibility problems at polling sites;

- Insufficient funds were appropriated for voter education.

ECF No. 608-24 at 1.

34

94.    In June 2001, the Commission issued another report adopting and expanding upon these findings titled "Voting Irregularities in Florida During the 2000 Presidential Election." *Id*.  This June 2001 report found credible evidence of violations of Section 2 of the Voting Rights Act and the disenfranchisement of people of color, in addition to those with disabilities or limited English proficiency. *Id*.  The report also noted that voters in low-income and minority areas waited in line for hours waiting for confirmation of their registration status; long waits did not exist in high-income areas. *Id*. at 8.

95.    In February 2001, the National Opinion Research Center began its own review, commissioned by a media consortium, of thousands of uncounted ballots cast in Florida during the 2000 election. *Id*. at 2.  The media consortium, like the Commission, found widespread voter disenfranchisement, including that Black, Latino, and older voters were significantly more likely to have their votes rejected than white voters. *Id*.

## C.    Recent Developments

### 1.    *Recent Developments in Absentee Ballot Usage*

96.    Until 2020, Republicans in Florida were more likely to use absentee ballots than Democrats. This trend began after the 1988 election, when vote-by-mail ballots made the difference in a narrow victory by the Republican candidate for U.S. Senator.  ECF No. 608-25 ¶ 52 (Kousser Rpt.); Tr. 1715:8-15 (Kousser).

97.     Before 1997, only those who planned to be out of town, were sick or had a disability, could vote using absentee ballots.  A few months after a legal challenge expanded the allowable reasons for voting "absentee," absentee ballots became central to a scandalous mayoral election in Miami.  A federal judge threw out the election results and reversed the outcome of the election.  In response, the legislature approved a bill in 1998 that restricted applications for and deposits of absentee ballots.  But the same law explicitly recognized the right of the two major political parties (unlike nonpartisan volunteers) to appoint up to 40 "absentee ballot coordinators," who could apply for and witness the ballots of an unlimited number of citizens.  ECF No. 608-25 ¶ 53 (Kousser Rpt.).

98.     As white Floridians continued to vote by mail in larger numbers, the legislature, far from restricting it because of "fraud" concerns, expanded it.  The Florida legislature passed SB 1118 (Florida Election Reform Act of 2001), which introduced no-excuse absentee ballot voting.  Tr. 877:11-17 (Austin).  SB 1118 eliminated the requirement that a voter had to be out of town or sick or disabled to cast an absentee ballot.  Essentially, absentee ballots became vote-by-mail ballots at that point. Tr. 1716:3-12 (Kousser).  The change to no-excuse absentee ballot voting

was expected to favor white voters more than Black or Latino voters.  Tr. 879:2-13 (Austin).[2]

99.     In a June 2002 report, the U.S. Commission on Civil Rights stated that the Florida Election Reform Act of 2001 had failed to address several of the Commission's recommendations from its June 2001 report, including the following:

- Remove the burden from the voter to prove registration status;

- Allow automatic restoration of voting rights to former felons who satisfied their sentences;

- Enhance services to give complete access to the voting booth to individuals with disabilities.

ECF No. 608-24 at 14.

100.    In 2004, Florida also promulgated SB 2566, which had several provisions designed to encourage voting by absentee ballot, such as eliminating a previous requirement that signatures on absentee ballots had to be witnessed.  Tr. 879:17-23 (Austin); CF No. 608-17) ¶ 63 (Austin Rpt.).  The Republican-majority legislature also passed a law that facilitated the daily tracking of absentee ballots by candidates and political parties, which allowed campaigns to pursue absentee voters to encourage return of the absentee ballots.  ECF No. 608-25 ¶ 57 (Kousser Rpt.);

---

1.     Additionally, SB 1118 mandated a voter responsibility statement that required voters to study the candidates and the relevant issues.  *Id*. at 877:25-878:2 (Austin).  The Florida legislature repealed the voter responsibility statement in response to a lawsuit challenging the provision and equating the requirement to a literacy test.  *Id*. at 878:3-9 (Austin); *Major v. Sawyer*, No. 4:01-cv-10088 (S.D. Fla. 2001).

Tr. 1717:6-13 (Kousser).  A report for the State Senate found that "voters casting absentee ballots in the 2006 election were predominantly Republican, with 55.5% voting absentee while only 33.3% of Democrats voted absentee."  Tr. 1717:14-19 (Kousser); ECF No. 608-25 ¶¶ 59, 63, n. 56 (Kousser Rpt.).

101.    The Republican party and local candidates, especially in Miami-Dade County, would send out tens of thousands of absentee ballot request forms to areas they thought likely to vote Republican. Political operatives would then call people who had sent in applications, knock on their doors, and send mailers, to get them to return the absentee ballots.  Tr. 1716:17-25 (Kousser).  For example, Republican Miami-Dade County Mayor Carlos Gimenez sent out 50,000 absentee ballot request forms during his 2012 reelection campaign.  ECF No. 608-25 ¶ 57 (Kousser Rpt.). Republicans promoted the practice of permanent absentee voting, comprising 45% of the permanent absentee voters in Miami-Dade, even though they represented only 30% of registered voters in the county.  ECF No. 608-25 ¶ 57 (Kousser Rpt.).

102.    Table 1 of Dr. Kousser's report, ECF No. 608-25, shows Republican and Democratic usage of vote-by-mail (VBM), compared to early in-person voting (EIP), in general elections from 2014-2020.  In other words, the table examines overall pre-election voting by party, and compares how VBM usage compared to EIP usage, by party.  As Table 1 shows, the number of votes cast by mail for Republicans prior to 2020 generally grew and was higher as an overall percentage

of "convenience voting," than for Democrats.  ECF No. 608-25 ¶¶ 59-60 & Table 1 (Kousser Rpt.).

103.    In contrast, in 2020, for the first time, VBM voting was markedly higher among Democrats than Republicans as a percentage of convenience voting.  Despite COVID-19, the percentage of Republican pre-Election Day voters rose only about six percentage points, and the percentage of Republican pre-Election day voters using VBM remained steady in 2020, compared to 2016.  By contrast, among Democrats, pre-election day voting rose by nearly ten percentage points, and of those, VBM usage jumped by 21 percentage points.  ECF No. 608-25 ¶ 61 & Table 1 (Kousser Rpt.).

104.    The Florida legislature made no changes in vote-by-mail requirements between 2013 and 2020. Tr. 1722: 13-22 (Kousser).

105.    Demographic breakdowns of VBM usage between 2016 and 2020 similarly show a very large increase in the percentage of Black voters using VBM in 2020 compared to 2016, and a somewhat smaller, but still very large increase in the percentage of Latino voters using VBM in 2020 compared to 2016.  Tr. 1724:4-9 (Kousser) (referencing ECF No. 608-6 (Smith Rpt.), Table 5).

106.    Because the core of the Republican party in Florida is white, the implication in comparing Table 1 of Dr. Kousser's report and Table 5 of Dr. Smith's report is that the increase in the proportion of white persons who voted by mail in

2020 compared to 2020 was almost entirely among white Democrats.  Tr. 1723:19-25–1725:1-12 (Kousser).  "So a big ethnic effect, a racial effect, and a big partisan impact of voting by mail in 2020."  Tr. 1725:13-14 (Kousser).

## 2. Recent Developments in Early In-Person Voting

107.   Early in-person voting (EIP) was imported from Texas to Florida in 1994 by Ion Sancho, a long-time Supervisor of Elections in Leon County.   Tr. 1727:14-20 (Kousser).

108.   In 1998, the legislature authorized voters to deliver absentee ballots to the offices of county elections supervisors.   In 2004, the legislature authorized Supervisors of Elections to expand EIP to public libraries or city halls.  It could be provided for up to 12 hours per day and for up to 15 days.  Tr. 1727:21-1728:1-4 (Kousser).

109.   In 2005, the same year that the Florida legislature facilitated the partisan exploitation of VBM, the legislature limited EIP voting to governmental buildings and for only eight hours per day and a total of eight hours on weekends.  Tr. 1728:5-9 (Kousser); ECF No. 608-25 ¶¶ 63-64 (Kousser Rpt.).  Before the party-line vote on the bill limiting EIP voting (HB 1567), the bill attracted fiery debate from Democrats, mainly in the Black Caucus.  ECF No. 608-25 ¶ 64 (Kousser Rpt.).

110.   In 2008, Barack Obama led a spirited campaign in Florida, and particularly emphasized EIP. The EIP rate in 2008 was 32%, nearly double that of

40

2004, even though turnout in those two elections was roughly similar.  ECF No. 608-25 ¶ 66 (Kousser Rpt.); Tr. 1729:15-25 (Kousser).  A report by the Florida Senate noted that Democrats cast 52 percent of EIP ballots in the 2008 election.  ECF No. 608-25 ¶ 66 (Kousser Rpt.); Tr. 1729:1-5 (Kousser).  In 2008, more than half of Black votes were cast using EIP.  ECF No. 608-25 ¶ 66 (Kousser Rpt.).

111.   A Republican crackdown on EIP voting soon followed.  In 2011, then-Rep. Dennis Baxley (R), who later became the chief sponsor of SB 90, sponsored HB 1355, which cut the required number of days of EIP voting from 12-14 down to eight days, and particularly banned EIP on the weekend before Election Day, when Black churches, especially in 2008, had made "Souls to the Polls" widespread.  ECF No. 608-5 at 11-12, 17-20 (Burch Rpt.); Tr. 944:20-947:4 (Burch); Tr. 885:6-18, 886:1-3, 886:24-887:8 (Austin).  Studies showed that minority voters were more likely to go to the polls on the Sunday that HB 1355 eliminated and that the law would disproportionately affect minority voters.  ECF No. 467-7 at 10-12 (Smith Rpt.); Tr. 944:20-947:4 (Burch).

112.   HB 1355 capped total EIP hours at 96, and allowed local supervisors to offer EIP voting for as few as 48 hours.  ECF No. 608-25 ¶ 67 (Kousser Rpt.).  Florida sought to justify HB 1355 as preventing "fraud"; however, there was no evidence of widespread fraud in the 2008 Florida election.  *Id*. at 885:19-24 (Austin).

113.   HB 1355 also made the work of volunteer voter registration groups more difficult.  It sought to reduce the amount of time third-party voter registration organizations ("3PVROs") had to submit voter registration applications from 10 days to 48 hours.  Tr. 885:8-14 (Austin).  According to testimony in 2012 before a subcommittee of the Senate Judiciary Committee, 3PVROs at that time registered twice the percentage of Blacks and Latinos as they did white voters.  ECF No. 608-25 ¶ 69 (Kousser Rpt.).

114.   Rep. Michael Caldwell (R) declared that he favored disenfranchising anyone who did not vote in the new, reduced period.  ECF No. 608-25 ¶ 71 (Kousser Rpt.).

115.   Although HB 1355 clearly constituted a change in many election laws, Florida did not submit it to the Department of Justice for preclearance until compelled by a federal lawsuit.  ECF No. 608-25 ¶ 72 (Kousser Rpt.).  Legislators also expressed concerns in debate about minority voter suppression and that the bill would not receive preclearance.  ECF No. 608-5 at 18-20, 57-58 (Burch Rpt.); Tr. 947:13-956:16 (Burch).

116.   The legislative history of HB 1355 is particularly noteworthy because the legislator who sponsored both HB 1355 and SB 90, Senator Baxley, offered statements reflective of racial resentment in justifying the need for the bills.  ECF

No. 608-5 at 19-20, 55-59 (Burch Rpt.); Tr. 945:6-17, 949:13-954:12, 1041:24-1046:21 (Burch); ECF No. 461-98.

117.   Racial resentment is characterized by the beliefs "that Blacks do not try hard enough to overcome the difficulties they face and that they take what they have not earned."  ECF No. 608-5 at 19-20, 55-59 (Burch Rpt.).  Racial resentment is distinct and distinguishable from a generic belief in the value of self-reliance or independence; it can be inferred when these beliefs are brought up specifically in the context of a discussion about race and policy preferences that affect a particular race. Tr. 953:9-20, 1041:24-1045:4 (Burch).

118.   Importantly, racial resentment is not simply an expression of a particular trope or stereotype: attitudes of racial resentment are shown to affect behavior.  Tr. 952:2-953:7, 1041:24-1046:21, 1083:19-1084:24 (Burch); ECF No. 608-5 at 19-20, 58-59 (Burch Rpt.).  Scholarly literature and research "links racial resentment [and] attitudes of racial resentment to policy preferences." *See id.*

119.   "[S]everal members of the Florida legislature justified their support of H.B. 1355 by stating that voting should be more difficult, and that a convenient form of voting rewards the politically inept."  ECF No. 608-5 at 19-20 (Burch Rpt.); Tr. 949:13-954:12, 1042:24-1046:21 (Burch).

120.   For example, during the debate over HB 1355, State Rep. Erik Fresen (R) criticized the existing system, which he said "coddles" voters, while Sen. Mike Bennett (R) declared:

> Do you read stories about the people in Africa? The people in the desert, who literally walk two and three hundred miles so they can have the opportunity to do what we do, and we want to make it more convenient? How much more convenient do you want to make it? Do we want to go to their house? Take the polling booth with us? This is a hard-fought privilege. This is something people die for. You want to make it convenient? The guy who died to give you that right, it was not convenient. Why would we make it any easier? I want 'em to fight for it. I want 'em to know what it's like. I want them to go down there, and have to walk across town to go over and vote.

ECF No. 608-25 ¶ 71 (Kousser Rpt.).

121.   With respect to HB 1355, then-Representative Baxley made statements invoking a lack of initiative, which is indicative of racial resentment  ECF No. 608-5 at 58(Burch Rpt.).

122.   As with SB 90, significant changes to HB 1355 were put into the bill through a strike-all amendment "the day before the amendment was taken up by the Senate Rules Committee, such that there was less time to analyze and prepare comments regarding the proposed changes."  ECF No. 608-5 at 19-20 (Burch Rpt.); Tr. 953:24-956:16, 957:17-958:8 (Burch).

123.   Once HB 1355 was submitted for preclearance, a three-judge court for the District of Columbia found that minority voters would be disproportionately

affected by the changes in EIP.  It also found a discriminatory effect in the elimination of the first five days of EIP voting.  ECF No. 608-25 ¶ 73 (Kousser Rpt.); Tr. 886:12-21 (Austin).

124.  A separate lawsuit was filed challenging the restrictions on third party voter registration in HB 1355.  The district court invalidated this provision, finding that the 48-hour requirement placed an undue burden on 3PVROs.  ECF No. 608-17 ¶ 69 (Austin Rpt.).

125.  Despite the constraints on EIP voting in 2012, the Obama campaign encouraged a method of voting that rarely had been used before – urging supporters to deposit VBM ballots at the offices of county supervisors.  Because it was not technically "early voting," Supervisors could extend the hours of "in-person absentee voting," and demand was so heavy that the Miami-Dade supervisor of elections allowed people to use the method on both the Sunday and Monday before election day.  ECF No. 608-25 ¶ 77 (Kousser Rpt.).  The long lines for people attempting to use this method of voting stretched around the block at many polling places, and supervisors' websites in Broward and Miami-Dade posted wait times of as long as six hours.  ECF No. 608-25 ¶ 76 (Kousser Rpt.); Tr. 1739:23-25–1740:1-6 (Kousser).  When 400 people were still in line to vote at 5 p.m. on Sunday in Doral, workers passed out water and granola bars to people in line.  ECF No. 608-25 ¶ 77

(Kousser Rpt.).  Nevertheless, the long lines helped to reduce EIP voting by 225,000 in 2012 compared to 2008.  ECF No. 608-25 ¶ 78 (Kousser Rpt.).

126.   The outcry over long lines created by HB 1355 convinced the legislature to reinstate two weeks of EIP voting in 2013. Tr. 893:1-8 (Austin).  At the same time, the legislature ignored nearly all the recommendations made by a grand jury recommendation to add restrictions to VBM ballots, although the 2012 election had found some instances of VBM frauds or irregularities. ECF No. 608-25 ¶ 78 (Kousser Rpt.).  The legislature continued to ignore most of these recommendations for the next eight years, until Democrats adopted VBM in larger proportions than Republicans.  ECF No. 608-25 ¶ 79 (Kousser Rpt.).

### 3.   *Recent Developments in Felon Disenfranchisement*

127.   Despite the positive changes HB 7013 brought to early voting, Florida, again continued to take action that negatively impacted minority voters.  This court, for example, found Florida's signature matching statute unconstitutional in 2018. *Democratic Exec. Comm. of Fla. v. Detzner*, 347 F. Supp. 3d 1017, 1031-32 (N.D. Fla. 2018); ECF No. 608-5 at 12 (Burch Rpt.).  This litigation was filed against the backdrop of Black and Latino voters being more likely to have their ballots rejected than White voters because the signatures did not match.  Tr. 897:3-8, 898:19-20 (Austin); ECF No. 608-17 ¶ 85 (Austin Rpt.).

128.   The legislature's response to Amendment 4 provides another recent illustration of Florida's racially discriminatory voting practices.  Prior to 2019, the Florida constitution permanently disenfranchised any citizen convicted of a felony offense unless their voting rights were restored by executive clemency.  The policy was adopted in the post-Civil War era as a means of disenfranchising former slaves, and it continued to disproportionately affect Black and Latino Floridians given racially disparate rates of felony convictions.  ECF No. 608-5 at 17 (Burch Rpt.).

129.   In the two decades leading up to the 2018 adoption of Amendment 4, the legislature strongly resisted efforts to change Florida's disenfranchisement laws. Fifty-three bills were introduced over 20 years, almost none of which received a committee hearing.  ECF No. 608-25 ¶ 47 (Kousser Rpt.).

130.   In 2018, Florida's citizens voted overwhelmingly to end the discriminatory policy by passing Amendment 4. ECF No. 608-17 ¶ 87 (Austin Rpt.). But almost immediately upon its passage, the Florida legislature took steps to limit Amendment 4's impact and to preserve felony disenfranchisement to the greatest extent possible through SB 7066, which required former felons to pay fees owed to the State before having their voting rights restored.  Tr. 899:3-11 (Austin); ECF No. 608-5 at 17-20 (Burch Rpt.).

131.   The requirement to pay all fines and fees as a condition of restoring the franchise that was subsequently imposed by SB 7066, according to Dr. Daniel Smith,

meant that Black individuals with felony convictions would be "less likely to be able to re-gain their voting rights, as compared to comparable white individuals with felony convictions, as a result of the amount of outstanding legal financial obligations ("LFOs") tied to a felony conviction." ECF No. 608-5 at 17-18 (Burch Rpt.). This disparity stems from the fact that Black returning citizens are more likely to owe money on LFOs and are more likely to owe more than $10,000 than white returning citizens. *See id.* As a result, about 15 percent of Florida's Black voting-age population is disenfranchised due to a conviction history, compared to about 6 percent for the State's non-Black population. Tr. 899:14-18 (Austin).

132. Florida also continued to repeatedly seek to purge its voter rolls in ways that disproportionately impacted voters of color.

133. In 2004, Florida planned to remove 48,000 "suspected felons" based on an inaccurate list that overrepresented Black voters. In 2012, Governor Rick Scott attempted to purge 2,700 supposed noncitizen voters, who were overwhelmingly minorities. The vast majority of the individuals on the list turned out to be citizens. ECF No. 608-25 ¶¶ 44-45 (Kousser Rpt.); Tr. 1713:15-20– 1714:5-25 (Kousser). As Dr. Kousser noted, "The series of purges, one after another – 2000, 2004, 2011, '12, is an indication of continued problems with voting discrimination differentially affecting minority groups in Florida." Tr. 1714:22-25 (Kousser).

### 4.     Other Recent Developments

134.   Additional instances of voting discrimination specifically targeting Florida's growing Latino population have included:

- As Osceola County saw growing numbers of persons of Puerto Rican origin, the county voted to replace single-member districts with at-large elections, to forestall election of Latinos to the County Commission. The U.S. Department of Justice filed and won a lawsuit in 2006 finding this change violated the Voting Rights Act.   ECF No. 608-25 ¶ 41 (Kousser Rpt.).

- Osceola County also entered into a consent decree in 2002 requiring the County to take numerous steps to ensure that Latinos had access to Spanish-language voting materials, including the appointment of bilingual coordinators before each election to investigate allegations of poll worker hostility toward Latino voters. *Id*. at ¶ 42.

- In 2018, Puerto Rican plaintiffs in 32 counties successfully sued under Section 4(e) of the Voting Rights Act because the counties had failed to provide required election materials in Spanish. *Id*. at ¶ 43.

### D.     Effects of Racial Discrimination in Florida

135.   The history of racial discrimination in voting in Florida is useful in assessing whether SB 90 will have a discriminatory effect.  It is important to understand, however, that as described supra at Section III, racial discrimination in voting is not something that stopped long ago during Reconstruction or the passage of the Voting Rights Act, but carries through almost up to the present. Tr. 1828:18-25–1829:1-8 (Kousser).

136.   As Dr. Burch explained during her trial testimony, Florida's long history of racial disenfranchisement in voting is relevant for a number of reasons.

Tr. 936:7-938:17 (Burch).  First, these historical practices can affect the present in the form of path dependence, *i.e.*, the notion that current laws and policies are not made in a vacuum.  Second, past politics can set up the politics of the present, including opening or closing avenues of thinking and shaping ideology; particularly for those members of Florida's electorate who were born before 1965.  In these ways, the practices and politics within Florida, even dating back many decades, can affect ideologies and ways of thinking in the present. Tr. 936:7-938:17 (Burch).

137.   Racial discrimination in Florida election law has had tangible effects in Florida's Black and Latino communities.

138.   As previously mentioned, in terms of representation in elected office, between 1889 and 1993, no Black person served in Congress; between 1823 and 1989, no Latino person served in Congress.  Only two Black persons have held statewide office in Florida's history: Supreme Court Justice Joseph Hatchett, who had previously been appointed to the office, in 1974; and Republican Jennifer Carroll, who was elected lieutenant governor in 2010.  Between 1823 and 1989, no Latino person served in Congress.  There have been four Cuban-American Republicans elected to statewide office, two to the U.S. Senate and two to lieutenant governor.  Tr. 1834:14-1835:18 (Kousser); ECF No. 608-25 ¶ 162 (Kousser Rpt.).

139.   Additionally, Florida is often unresponsive to the particularized needs of minorities.  One example is Florida's refusal to expand Medicaid under the

Affordable Care Act.  Florida's rate of uninsured adults is high for a large modern state, and the percentage of uninsured children is considerably higher for Blacks and Latinos than for non-Hispanic whites.  Also, Black Floridians have their drivers' licenses suspended at 1.6 times their proportion in the population, which makes it more difficult to get to work or get a good job.  And, the "War on Drugs" has resulted in systematic discrimination against minorities in Florida.   Tr. 1835:21-1836:19 (Kousser);  ECF No. 608-25 ¶¶163-64 (Kousser Rpt.).

140.   Minority groups in Florida also bear the effects of past discrimination that hinders their ability to participate in the political process.  As Dr. Kousser noted, racial and ethnic minorities in Florida have less access to personal transportation. They tend to work at jobs with less flexible schedules.  There is statistical evidence that Blacks in particular, and Latinos to an extent, are less likely to have drivers' licenses than non-Hispanic whites.  Past discrimination has resulted in lower levels of education and lower income for Blacks and Latinos than non-Hispanic whites. As Dr. Kousser noted, "greater amounts of [education and income] make it easier to be flexible to get to places, to read through materials and have access to computers and all of the things that you might have to do if the election law's changed, even just to download forms."  Tr. 1833:2-25; 1834:1-10; ECF No. 608-25 ¶¶160-61 (Kousser Rpt.).

141.   Indeed, voters of color in Florida continue to face a number of socioeconomic disadvantages that make it especially difficult to access the right to vote.  Tr. 598:2-12, 599:6-600:11 (Cooper); Tr. 2391:17-25 (Smith); ECF No. 608-16, ¶¶ 22-25, 31-34 (Cooper Rpt.); Tr. 598:2-12 (Cooper).  Based on demographic statistics from the U.S. Census Bureau's 2019 American Community Survey ("ACS"), it is clear that non-Hispanic Whites outpace Blacks and Latinos in the state of Florida across "almost all key variables of socioeconomic status" and across a "wide range of data points." ECF No. 608-16 ¶ 10 (Cooper Rpt.); Tr. 591:9-12, 597:5-22, 598:4-9 (Cooper).  This includes metrics such as levels of educational attainment, poverty, income, and economic security, telecommunications access (e.g., broadband Internet), and vehicle access.  Tr. 598:6-9; (Cooper) ECF No. 608-16 ¶¶ 23, 33, Exs.D-1 & D-2 (Cooper Rpt.).  These state-level disparities by race and ethnicity "are, in general, replicated at the county level in Florida."  ECF No. 608-16 ¶ 25 (Cooper Rpt.); Tr. 631:22-632:10 (Cooper).

142.   With respect to economic standing, there is a substantial poverty gap between non-Hispanic White, non-Hispanic Black, and Hispanic/Latino Floridians. The overall White poverty rate is 9.2%, about half the 19.5% Black poverty rate and less than two-thirds of the 17.5% Hispanic/Latino poverty rate.  Further, White median household income in Florida is 46.7% higher than Black median household income and about a quarter higher than Hispanic/Latino median household income.

52

Per capita income disparities in Florida are even more pronounced, with White per capita income nearly twice that of Black per capita income and Hispanic/Latino per capita income.   The disparity in poverty rates persists across subgroups, including the subpopulations of persons ages 18-64, persons ages 65 and over, and female-headed households with children.   ECF No. 608-16 ¶ 23(a) (Cooper Rpt.); Tr. 614:15-616:9 (Cooper).

143.   With respect to levels of educational attainment and English-language proficiency, White Floridians ages 25 and over are substantially more likely to have a high school diploma or a bachelor's degree as compared to Black and Hispanic/Latino Floridians.   The percentage of White Floridians who have not completed high school by age 25 is 6.9%, compared to 15.3% and 20.4% of their Black and Hispanic/Latino counterparts, respectively.   And the percentage of White Floridians with at least a bachelor's degree by age 25 is 34.5%, compared to just 19.6% and 25.7% of their Black and Hispanic/Latino counterparts, respectively. ECF No. 608-16 ¶ 23(b) (Cooper Rpt.); Tr. 618:25-620:9 (Cooper).   Only a small fraction of White Floridians (1.7%) and Black Floridians (5.9%) speak English "very well"; however, lack of English-language proficiency jumps more than one-third (35.6%) of Hispanics/Latinos Floridians.   ECF No. 608-16 ¶ 23(b) (Cooper Rpt.); Tr. 620:12-21 (Cooper).

144.   With respect to employment, the Black unemployment rate in Florida (7.2%) is substantially higher than the White unemployment rate in Florida (4.1%). ECF No. 608-16 ¶ 23(c) (Cooper Rpt.); Tr. 621:8-16 (Cooper).  Moreover, Black (48.5%) and Hispanic/Latino (48.4%) Floridians in the workforce are, relative to their White counterparts (33.2%), overrepresented in economic sectors that require workers to work late shifts or work inflexible hours (e.g., service occupations; natural resources, construction, and maintenance; and production, transportation, moving). ECF No. 608-16 ¶ 23(c) (Cooper Rpt.); Tr. 622:19-22 (Cooper).   In contrast, Black (28.9%) and Hispanic/Latino (28.3%) Floridians in the workforce are, relative to their White counterparts (42.5%), underrepresented in white-collar management and professional occupations.  ECF No. 608-16 ¶ 23(c) (Cooper Rpt.); Tr. 622:4-13 (Cooper).

145.   With respect to transportation access, only 4.8% of White households in Florida lack a vehicle; by contrast, 10.4% of Black households and 7.3% of Hispanic/Latino households lack a vehicle.  ECF No. 608-16 ¶ 23(d) (Cooper Rpt.); Tr. 629:3-11 (Cooper).  This percentage differential equates to a 134,000-household vehicle access deficit for Black and Hispanic/Latino households relative to White households in Florida.  ECF No. 608-16 ¶ 33-34 (Cooper Rpt.); Tr. 629:12-630:4 (Cooper).

146.   Patterns of transportation to work also show disparities: "About 7.7% of Whites carpool (7.0%) or take public transportation (0.7%) to work, while 13.2% of Black workers carpool (9.2%) or take public transportation (4.0%) and 14.2% of Latino workers carpool (12.4%) or take public transportation (1.8%) to their place of employment."  ECF No. 608-16 ¶ 23(d) (Cooper Rpt.); Tr. 630:9-18 (Cooper).

147.   Travel times to work also reflect a racial disparity, with 4.0% of White citizens of voting age having round-trip commutes of 2 hours or more, compared to rates of 6.6% and 4.9% for their Black and Hispanic/Latino counterparts, respectively.  ECF No. 608-16 ¶ 24 (Cooper Rpt.); Tr. 630:19-631:12 (Cooper).

148.   With respect to telecommunications, nearly 9 in 10 White households in Florida (88.8%) have a broadband internet subscription, while only 80.1% Black households and 84.7% of Hispanic/Latino households in Florida have broadband access.  ECF No. 608-16, ¶ 23(d) (Cooper Rpt.);  Tr. 628:18-23 (Cooper).  Black households also trail Latino and white households in terms of having a computer, smartphone or tablet.  Tr. 623:9-20 (Cooper).

149.   Voter registration rates in Florida reflect a racial/ethnic gap.  Voter-eligible Black and Hispanic/Latino citizens in Florida are registered to vote at lower rates than non-Hispanic/Latino White citizens in Florida—about 12 percentage points lower for Black citizens and about 18 percentage points lower for

Hispanic/Latino citizens.  ECF No. 608-16 ¶¶ 17-18 (Cooper Rpt.);  Tr. 607:17-608 (Cooper).

150.   Another factor useful in assessing the likely effect of SB 90 is the existence of racially polarized voting in Florida, described at Sections III.A-B.. Trial Tr. 1829:9-12.  As discussed above, Florida has used practices or procedures that tend to enhance the opportunity for discrimination, such as at-large elections.  Tr. 1829:13-22 (Kousser);  ECF No. 608-25 ¶¶ 157-159 (Kousser Rpt.).  And as already noted in discussing the racial climate of Florida politics, Florida has a continuing pattern of racial appeals in political campaigns.  *Supra* at Section III.

151.   The "constant back and forth" of progress and then backlash has not made it easier for Black and Latino voters to vote today compared to four decades ago:

> When Black and Latino elected officials are made, when Black and Latino registration increases, there always is a response that—even with legislation that has some positive aspects, there always ends up being some type of response to make it hard for African-Americans and Latinos to register and to turn out.  So I can't honestly say that 40 years later that it's easier to register to vote because African-Americans and Latinos are constantly fighting these barriers.

Tr. 916:11-19 (Austin).

152.   Dr. Kousser testified to the importance of considering the impact of changes in election law as a whole, rather than determining impact only by analyzing each provision in isolation.  Tr. 1694:22–1695:12 (Kousser).  The anticipated impact

of each of SB 90's challenged provisions was discussed at length by the legislature. The restrictions on VBM were anticipated to make it more difficult to use just after the first election in which Black voters dramatically increased their reliance on VBM.  Similarly, limiting the hours and availability of drop boxes was expected to particularly hurt people who work irregular hours, have more than one job, or otherwise have more difficulty taking time off.  The restrictions on activities of 3PVROs were anticipated to make it more difficult for Black, Latinos and other minorities to register to vote.  The new definition of "solicit" as applying to efforts to provide food, water and other assistance to persons standing in line to vote was predicted to have a more onerous impact on Black and Latino voters who are more likely to have lengthy wait times, based on Florida's election experience.  Just as combining the new 8-box law with a poll tax in the late 19th century magnified the discriminatory impact of each, the discriminatory effect of implementing all of SB 90's restrictions at once is likely to be greater than the effect of any one of them taken singly.  Tr. 1824:12-1825:11 (Kousser);  ECF No. 608-25 ¶ 145 (Kousser Rpt.).

153.   The legislature heard repeated statements emphasizing the likely discriminatory effect of SB 90. *See generally* Appendix J.  For example, on April 22nd in Senate floor debate, Senator Lori Berman (D) said: "The restrictions in this legislation, including those related to drop box and access to voter assistance, will

have a disparate impact on Black voters." Tr. 1826:10-15 (Kousser); ECF No. 461-98 at 100:11-13.

154.   In the same floor debate, April 22, Senator Shevrin Jones (D) was talking about the third-party voter registration provision, and said "you and I both know that this will likely have a chilling effect on the willingness of potential electors [to] participate in voter registration drives . . . Members, we know that minorities are more likely to register to vote through third-party voter organizations." Tr. 1826:19-25 – 1827:1 (Kousser); ECF No. 461-98 at 15:4-8; 17:7-12.

155.   In the floor debate on April 29, Representative Patricia Williams (D) said that the drop box provision "deters people of color from voting, number one, because we work more, our hours are longer, we have more people living in home with us.  So the number of ballots that we can drop off deters us from voting. The numbers of hours we work, because the drop box that would not be there 24 hours as it normally would be, that deters us from voting."  Tr. 1827:5-15 (Kousser); ECF No. 462-29 at 65:15-21.

## IV.   FLORIDA'S ELECTION LAWS PRIOR TO SB 90

### A.   Voter Registration

156.   It has been stipulated in this case that "between 2009 and November 5, 2021, 2,149,709 voter registration applications were received by Florida's Supervisors of Elections from 3PVROs." ECF No. 402 at 34, ¶ 30.

157.   3PVROs play an important role in registering voters. Tr. 3501:16-17 (Earley); Tr. 3215:12-13, 3241:25-3242:3 (Doyle).  3PVROs help reach voters who might not otherwise register to vote with their county supervisor of elections. Tr. 1162:12–15 (Scott; Tr. 1343:3–6 (White); Tr. 2666:6–11 (Earley).

158.   All eligible voters in Florida can register to vote using a state-issued statewide voter registration form.  ECF No. 464-13; Tr. 2778:22-2779:8 (Matthews).  Florida voters may also register using an online voter registration system.   Tr. 2780:8-10 (Matthews).  This online voter registration system has previously crashed right before crucial deadlines.  For example, it crashed right before book closing in the 2018 general election, and there were voters who were unable to access it right before book closing.   Tr. 2803:5-10 (Matthews).   The system also malfunctioned in 2020 on the final night prior to book closing for the general election, resulting in voters being unable to access it that night.  *Id*. at 2780:11-24 (Matthews: stating the system "had some challenges" and that it is "not uncommon that there are a lot of people who will . . . try to register at the last minute").

159.   Prior to 2006, Floridians could register to vote without providing a driver's license, social security number, or a state identification number.   Tr. 2763:17-2764:2 (Matthews); ECF No. 465-88 (SOS RFA No. 22).

160.   Florida law permits 3PVROs to engage in voter registration.  Fla. Stat. § 97.0575(1).  3PVROs are required to register with the Department of State.  *Id.*; Tr. 2765:4-6 (Matthews).   Plaintiffs FRT, UnidosUS, Equal Ground, Hispanic Federation, and Poder Latinx are all registered 3PVROs.  ECF No. 466-82 at 43, 90, 103, 118.

161.   Prior to SB 90, 3PVROs had to submit a voter registration application by the earlier of (1) 10 days after the application was collected or (2) the next book closing deadline.  *See League of Women Voters of Fla. v. Browning*, 575 F. Supp. 2d 1298, 1304–05 (S.D. Fla. 2008); *see also League of Women Voters of Fla. v. Browning*, 863 F. Supp. 2d 1155, 1167–68 (S.D. Fla. 2012) (imposing 10-day deadline after invalidating HB 1355's 48-hour deadline); Tr. 2765:19-23 (Matthews).  If a 3PVRO did not submit applications on time, the Department of State had the authority to fine the 3PVRO or refer the matter to the Attorney General for enforcement.  Tr. 2766:10-2768:24 (Matthews).

162.   Prior to SB 90, 3PVROs could return voter registration applications to any Supervisor of Elections, who could process the application and register the voter using the Florida Voter Registration System (FVRS).  Tr. 3244:1-7 (Doyle); ECF

No. 549-2 (Hays Dep.) at 174:11-175:1;  ECF No. 549-3 (Latimer Dep.) at 182:10-182:24;  Tr. 3185:2-7 (White) (the Miami-Dade supervisor's office "for years" was able to handle the out-of-county registrations).   If a 3PVRO submitted a voter registration after the deadline but before book closing, the office would still be able to register the voter.  Tr. 2668:19-23 (Earley).  Even if a registration is submitted after book closing, a voter may be able to vote using a provisional ballot.  ECF No. 549-3  (Latimer Dep.) at 57:12-15.

163.   Florida has processes in place to identify voters who have died and voters who appear on the voter registration list in multiple states.  Tr. 2759:18-20, 2760:9-19 (Matthews); Tr. 1363:22-1364:16 (White).  SB 90 did not change those processes.  Tr. 2761:13-14 (Matthews).

### B.    Vote-by-Mail Application Process

164.   Numerous existing safeguards ensure VBM integrity, including signature match requirements, ballot receipt deadlines, voter registration validation requirements, prohibitions on forwarding VBM ballots, and post-election vote-by-mail audits.   Tr. 2200:3-2201:24 (Herron); ECF No. 467-1 ¶ 58 (Herron Rpt.).

165.   Before SB 90, the Florida legislature had consistently made it easier for voters to vote by mail.   In 2001, the legislature eliminated the "for cause" requirement for casting a vote-by-mail ballot.  Tr. 877:11-17 (Austin).

166.   Across Florida, voters had various ways to request a vote-by-mail ballot.   Voters could register to vote even without a driver's license, state identification number or social security number on file.  ECF No. 465-88 (SOS RFA No. 22).  After enactment of SB 90, such voters would not have an identification number in the system and would be unable to request a vote-by-mail ballot Tr. 2505:10-19 (Smith).

167.   Prior to SB 90, a VBM request would be valid for up to two general election cycles.  Most voters opted to receive VBM ballots for two general election cycles rather than a single election or election cycle.  Tr. 1347:20-1348:5 (White).

168.   For voters who had requested a VBM ballot, some Supervisors provided a check box on the return envelope so that the voter could re-request a VBM ballot.  ECF No. 549-3 (Latimer Dep.) at 59:25-60:5; Tr. 1285:18-21 (Corley).

169.   Counties in Florida that had "check-the-box" provisions on the back of a vote-by-mail envelope which allowed voters to request a VBM ballot continually had higher voter participation.  Tr. 2492:5-21 (Smith).  Higher voter participation has been seen not only in general elections but in municipal and special elections that do not have as high a turnout typically because they are off cycle.    Tr. 2493:3-7 (Smith).

### C.     Use of Drop Boxes

170.     Some counties in Florida have offered drop boxes since the mid- to late-2000s, and the availability of drop boxes has increased over time.   Tr. 2396:7-19, 2396:24-2397:2 (Smith); ECF No. 608-14 ¶ 24 (Smith Suppl. Rpt.).

171.   Drop boxes may have first been employed in Florida in 2008 by long-time Pinellas County Supervisor of Elections Deborah Clark, a Republican. Supervisor Clark deployed 14 drop boxes in the 2012 election at libraries, tax collectors branch offices, and elsewhere.  ECF No. 608-25 ¶ 82 (Kousser Rpt.).

172.   Faced with constraints on EIP voting in 2012, the Obama campaign urged supporters to deposit VBM ballots at the offices of county supervisors. Because it was not technically "early voting", Supervisors could extend the hours of "in-person absentee voting", and demand was so heavy that the Miami-Dade supervisor of elections allowed people to use the method on both the Sunday and Monday before election day. Tr. 1739:8-25 (Kousser); ECF No. 608-25 ¶ 77 (Kousser Rpt.).  When 400 people were still in line to vote at 5 p.m. on Sunday in Doral, workers passed out water and granola bars to people in line.  *Id.*  The success of this method of voting may be considered the inspiration for the more widespread adoption of drop boxes in Florida.  *Id.*

173.   In November, 2013, when Secretary of State Ken Detzner issued a directive attempting to limit drop boxes to elections offices or branches, Supervisor

Clark and other SOEs protested, and Secretary Detzner backed down.  ECF No. 608-25 ¶ 82 (Kousser Rpt.).

174.   In 2019, Florida expressly authorized the use of drop boxes for the return of vote-by-mail ballots.  That provision stated:

> The supervisor shall allow an elector who has received a vote-by-mail ballot to physically return a voted vote-by-mail ballot to the supervisor by placing the envelope containing his or her marked ballot in a secure drop box.  Secure drop boxes shall be placed at the main office of the supervisor, at each branch office of the supervisor, and at each early voting site.  Secure drop boxes may also be placed at any other site that would otherwise qualify as an early voting site under s. 101.657(1); provided, however, that any such site must be staffed during the county's early voting hours of operation by an employee of the supervisor's office or a sworn law enforcement officer.

Fla. Laws ch. 2019-162 § 20.

175.   During the 2020 election cycle, every county in Florida made drop boxes available to voters.  Tr. 2791:17-2792:4 (Matthews).  In several counties, drop boxes were monitored by video surveillance.   Tr. 2800:5-7 (Matthews).  Approximately 485 drop boxes were offered throughout the state.   Tr. 2453:17-2454:25 (Smith); s*ee also* ECF No. 467-1 at Table 24 (Herron Rpt.).

176.   Several counties made drop boxes available outside of early voting hours.  Tr. 2812:11-17 (Matthews).  For example, Miami-Dade County offered drop boxes on the Monday before election day and on election day itself, including at locations other than the Supervisor's offices.   Tr. 1366:18-1367:1 (White).

According to Supervisor White, "thousands of people deliver their ballots in those final days" before an election.  *Id.* at 1370:1-7.

177.   Prior to the 2020 election, the Department of State suggested to Supervisors that *all* drop boxes had to be "staffed" in person and that drop boxes other than the ones at Supervisors' offices could only be open during early voting hours.  ECF No. 608-98; ECF No. 608-11.  That letter, however, was not legally binding.  *See* Tr. 2798:14-2799:21 (Matthews).  Many counties made drop boxes more broadly available using only video surveillance.   Tr. 2251:2-4, 2291:7-13 (Herron); ECF No. 608-6 ¶¶ 138-39 (Smith Rpt.).

### D.   Polling-Place Assistance

178.   Florida has historically seen long lines at the polls on Election Day. During the 2012 election, more than 200,000 Floridians did not cast their ballots due to long lines at the polls, and Florida voters waited for an average of 39 minutes.  Tr. 2541:3-5 (Smith). Black and Hispanic/Latino voters in Florida wait in line longer than white voters: for example, one study of elections from 2008 to 2014 found that Black voters waited about twice as long as white voters; another study found that polling locations with larger numbers of Hispanic/Latino voters were more likely to close late.  ECF No. 608-17 ¶¶ 73-74; Tr. 2541: 3-11, 2548:30-2549:21 (Smith).

179.   These trends continue today, particularly in certain communities.  Tr. 1371:20-1372:5 (White) (voters in Miami-Dade County have sometimes waited

many hours to vote; some precincts did not close until after 1 a.m. in 2012);  Tr. 3507:6-25 (Earley) (reduction in early voting in 2011 resulted in "chaos" in 2012 on election day); Tr. 1235:8-20 (Scott (in 2020 voters in a "problematic" vehicle line in Broward County could not cast a ballot after 7 p.m. even if they were on line at 7 p.m.).

180.   Organizations, including several Plaintiffs, have historically been allowed to provide food, water, umbrellas, chairs, and other items to individuals waiting in line to vote to make the experience more comfortable.  Tr. 422:4-15, 400:10-401:8 (Burney-Clark);  Tr. 741:25-742:1 (Velez Burgos); Tr. 2045:13-2046-10 (Mercado);   Tr. 515:14-21, 516:11-15 (Brown);  Tr. 1957:18-1958:24, 1959:6-192 (Slater).

181.   Prior to SB 90, Florida law prohibited the "solicitation" of voters within 100 feet of a polling place.  The law defined "solicitation" as "including, but not limited to, seeking or attempting to seek any vote, fact, opinion, or contribution; distributing or attempting to distribute any political or campaign material, leaflet, or handout; conducting a poll except as specified in this paragraph; seeking or attempting to seek a signature on any petition; and selling or attempting to sell any item."  Fla. Stat. § 102.031(b) (2020).

182.   Miami-Dade County claims to have barred *all* activity (other than exit polling) within 150 feet of a polling place before SB 90 took effect.  Supervisor

White explained that she believes two statutory provisions authorize this "rule": (1) the non-solicitation provision and (2) Fla. Stat. § 102.031(1), which provides that "[e]ach election board shall possess full authority to maintain order at the polls and enforce obedience to its lawful commands during an election and the canvass of the votes."   Tr. 1373:16-1375:2 (White).   Notwithstanding, multiple Plaintiffs have provided food and water to voters in Miami-Dade County within the 150-foot zone. Tr. 2046:11-2047:3 (Mercado); Tr. 7 742:16-743:24, 784:8-13, 810:9-25 (Velez Burgos).

## V.   THE 2020 GENERAL ELECTION

### A.   Unprecedented Turnout and Use of Vote-by-Mail, Particularly Among Black and Latino Voters

183.   Approximately 14.2 million Floridians are active registered voters.  Tr. 2763:10-16 (Matthews).

184.   The 2020 general election had the highest voter turnout ever reported in Florida. *See* Tr. 1339:13-23 (White); *accord id.* Tr. 2604:25-2605:1 (Earley) (testifying a "record" number of votes—about 159,000-160,000—were cast in Leon County).   More than 11 million ballots were cast, including more than 1.3 million and 1.7 million ballots by Black and Latino voters, respectively.   ECF No. 465-88 (SOS RFA Nos. 4-8); ECF No. 608-25 ¶ 84 (Kousser Rpt.).

185.   Of the over 11 million ballots cast in the 2020 general election, 4.8 million were VBM ballots—more than in any prior election.   ECF No. ¶¶ 37-38 (Joint Stip.); ECF No. 465-88 (SOS RFA Nos. 9-10); Tr. 2763:1-3 (Matthews).

186.   Numerous Supervisors of Elections confirmed the popularity of VBM. ECF No. 549-2 (Hays Dep.) at 55:20-23; Tr. 1171:13-14 (Scott);   Tr. 1339:13-1340:21, 1347:5-7 (White); *see also* ECF 549-3 (Latimer Dep.) at 19:16-20; Tr. 1285:15-17, 1263:4-6 (Corley).  In Leon County, about 40 percent of all votes cast during the election were by VBM, a record for the county.  Tr. 2604:17-2605:4, 2624:13 (Earley).  Leon County also experienced a record in the number of vote-by-mail requests in 2020.  *Id*. at 2624:16.

187.   The number of VBM ballots cast by Latino and Black voters increased far more dramatically than the increase for white voters from 2016 to 2020, with the number of Black VBM ballots cast increasing nearly 100 percent, from a rate of 19% to 41%.   Tr. at 2409:1-13, 2407:16-2408:5 (Smith); Tr. 960:22-961:15, 1083:19-1084:24 (Burch); ECF No. 608-5 at 21-22 (Burch Rpt.).  By contrast, white voters increased their use of mail voting by only about 53% (from 29% to 44.5%).  ECF No. 608-6 at Table 5 (Smith Rpt.).

188.   This shift to increased VBM voting for Blacks and Latinos was not an aberration due to the unique circumstances of 2020, since voters, once they grow accustomed to a new form of voting, tend to continue using it.  Tr. 2417:13-2418:14;

2414:6-2415:21 (Smith); *see also* Tr. 2605:8-15 (Earley) ("[P]eople that hadn't been introduced to vote-by-mail saw that it was easy and secure and something they felt comfortable doing."); Tr. 1169:7-11 (Scott (noting voters who vote by mail for the first time "plan to continue voting by mail in the future because they've discovered how convenient it is"). This is particularly true when the method lowers the overall cost of voting. *See* Tr. 2416:24-2417:11 (Smith);  Tr. 2157:23-2158:13 (Herron).

189.    During the 2020 election, more than 500,000 and 700,000 VBM ballots were cast by Black and Latino voters, respectively—more than in any prior election, and twice the rate of prior VBM voting.  ECF No. 465-88 (SOS RFA Nos. 11-16); ECF No. 467-7 ¶¶ 53-54; 112; Tab.5 (Smith Rpt.).

190.    Several Florida counties in particular saw large numbers of Black and Latino voters taking advantage of VBM and early voting.   Tr. 900:1-2, 900:13-19, 901:24-902:11 (Austin).  In Palm Beach County, for example, 53.6% of Black voters voted early in person and 33.4% of Black voters voted by mail.  ECF No. 608-17 ¶ 90 & tbl. 2.  In Lee County, 30.7% of Latino voters voted early in person and 60.9% of Latino voters voted by mail.  *Id.* ¶ 92 & tbl. 3.

191.    Of the more than 4.8 million VBM ballots cast in the 2020 Florida general election, more than 1.5 million—approximately 29 percent—were returned to a drop box.  Tr. 2410: 22-25 (Smith); ECF No. 465-88 (SOS RFA No. 17); ECF

No. 467-7 at 85; Tr. 2159: 4-5 (Herron); ECF No. 467-1 ¶ 123 (Herron Rpt.); ECF No. 402 ¶ 43.

192.   In Miami-Dade County, 31% of voters who voted by mail (nearly 162,000 voters) used a drop box to return their ballots.   ECF No. 608-80; Tr. 1340:17-1342:7 (White).

193.   Black voters were less likely than other racial groups to return their VBM ballots to the post office and were more likely than other racial groups to return their ballots to drop boxes.  Tr. 2159:20-25, 2256:11-13, 2256:17-21 (Herron); ECF No. 467-1 ¶¶ 177, 215(Herron Rpt.); Tr. 960:17-961:8 (Burch); ECF No. 608-5 at 22-23 (Burch Rpt.); ECF No. 467-7 ¶ 137 (Smith Rpt.).

194.   According to the 2020 Cooperative Election Study ("CES"), an estimated 56.2 percent of Black Floridian respondents who voted by mail reported returning ballots to the post office, a U.S. mailbox, or their mailman, compared with 58.9 percent of white respondents and 75.8 percent of Latino respondents.  ECF No. 608-5 at 23 (Burch Rpt.); Tr. 960:17-961:8 (Burch); *see also* Tr. 2412:17-2413:8 (Smith).  These statistics are in-line with documented concerns about the reliability and timeliness of mail delivery and disproportionately higher VBM rejection rates among minority voters in Florida as compared to white voters in the state.  ECF No. 608-6 ¶¶ 135, 137 (Smith Rpt.).

195.   Black respondents in one county also reported dropping their VBM ballots off at drop boxes or at the main election office at the highest rates.  ECF No. 608-5 at 23 (Burch Rpt.).  Furthermore, based on available data, voters of color dropped off VBM ballots in drop boxes outside of the early voting period, which the Drop Box Provision significantly restricts, at higher rates than other racial groups. Tr. 2482:1-10, 2483:4-9 (Smith); ECF No. 608-6 ¶ 223 (Smith Rpt.).

### B.   Absence of Voter Fraud

196.   There is no evidence of systematic voter fraud relating to the 2020 elections in Florida.  Tr. 2207:2-5, 2210:18-21, 2217:7-12 (Herron); ECF No. 608-5 at 36-38 (Burch Rpt.); Tr. 2420:23-2421:1 (Smith).

197.   There is no evidence that states that conduct elections fully by mail have increased rates of voter fraud.  Tr. 2218:11-23 (Herron).

198.   A majority of SOEs did not report any concerns regarding voter fraud occurring in the 2020 General Election in Florida.  Tr. 2221:16-2222:25 (Herron). Of the 11 SOEs who did report concerns regarding voter fraud incidents, the most common incident reported involved double voting, which is not something SB 90 addresses.  Tr. 2223:1-7 (Herron).

199.   With regard to the safety of drop boxes, the SOEs unanimously admitted that they "did not detect, or receive reports of, any tampering or voter fraud involving Drop Boxes, including 24/7 Drop Boxes, in [their] county in connection

with the 2020 general election." *See* Appendix E; Exs. 882–948 SOE Responses to

NAACP Plaintiffs' Requests for Admissions No. 1; *see also* Tr. 2420:18-2421:21

(Smith); ECF No. 608-6 ¶ 139 (Smith Rpt.).  SOEs also communicated to the House

Public Integrity and Election Community following the 2020 General Election that

they found no substantiated evidence of ballot harvesting or other voter fraud

associated with drop boxes. *See* ECF No. 608-6 ¶ 139 (Smith Rpt.); Tr. 2421:2-12

(Smith).   At trial, SOEs acknowledged the absence of vandalism or tampering

incidents involving drop boxes.  *See, e.g.*,  Tr. 2664:8-13 (Earley);  Tr. 1204:5-8

(Scott.

200.    According to the Heritage Foundation's database, of the 108 million

ballots cast in statewide elections in Florida from 2004 to 2020, there are only 15

incidents of voter fraud.  Tr. 2220:14-15 (Herron).  That is a rate of .0000139.  *See*

*id.*

201.    Supervisors confirmed the absence of voter fraud in the 2020 election.

*See* Appendix C (SOE  RFA 1–3) (vast majority of SOEs admitting the 2020

elections were secure).   For example, Supervisor Corley testified that the 2020

elections in Pasco County were "secure" and that he was not aware of any

widespread fraud in the county. Tr. 1261:6-7, 1261:14-16 (Supervisor Corley).

After the 2020 election, Supervisor Corley wrote a December 2020 statement stating

that he "learned through research and speaking to [his] colleagues that true voter

fraud is isolated and infrequent." ECF No. 608-27. Furthermore, he stated that most

discrepancies are not the result of fraud:

> Research has also confirmed that most "anomalies" and
> "irregularities" are the result of clerical errors by elections' staff
> who are taxed by extremely long hours in high stress
> environments, and the fact that elections' administration is
> highly dependent on temporary staff with steep learning curves
> in short time frames.

*Id*. He agrees with those statements even now. Tr. 1268:23, 1269:9 (Supervisor

Corley).

202.   Supervisor Earley "absolutely" had confidence in the integrity of the

2020 election and testified to "no real big problems." Tr. 2606:1-2, 2606:12-19

(Earley). Supervisor Earley also was not aware of any widespread vote fraud in

Leon County in 2020 related to VBM ballots, and he believed that any voting related

fraud is "minimal," "very isolated," and "a one-off." *Id*. at 2607:18-20, 2608:5-8.

He also testified that voter fraud related to VBM ballots is "very rare" in Florida. *Id*.

at 2608:21. Supporting his belief is the fact that he has never submitted an election

fraud complaint related to VBM voting even with the significant number of college

students (roughly 90,000) in Leon County. Tr. 3506:12-23 (Earley).

203.   Supervisor Latimer likewise believed that the 2020 election, in both

Hillsborough County and all of Florida, was secure and successful due to the "secure

physical premise," cybersecurity, logic and accuracy tests, and the post-election

audit. ECF No. 549-3 (Latimer Dep.) 95:8-25. He was not aware of any widespread

73

fraud in Hillsborough County in any prior election since 2010. *Id*. at 177:16-17. Nor was he aware of any fraud in Hillsborough County related to drop boxes. *Id*. at 107:1.

204. Supervisor Hays also was not aware of any widespread voter fraud in Lake County or Florida in the 2020 elections relating to VBM ballots. ECF No. 549-2 (Hays Dep.) at 62:14-21. He was satisfied with the security of the VBM process in the 2020 elections in Lake County. *Id*. at 60:8-13. Furthermore, due to existing safeguards, he had not seen any instances of voter fraud with respect to voters who have moved but were voting from their previous address. *Id*. at 151:17-21.

205. Defendant White could not identify any instance of voter fraud in Miami-Dade County in 2020. Tr. 1334:10-24 (White). Supervisor White credits drop boxes with improving voter confidence in the election. *Id.* at 1341:21-1342:7 (White).

206. Likewise, the Secretary of State has admitted that during legislative hearings, she testified to not being aware of any instance of fraud in 2020 where a voter voted using someone else's VBM ballot. ECF No. 465-88 (SOS RFA No. 45).

207. The Florida Office of the Attorney General testified to having no view on whether the 2020 elections were successful in Florida or whether VBM was secure in the 2020 election because the Office does not administer elections and instead deferred to what has been said by election officials. ECF No. 549-1 (Guzzo

Dep.) at 29:18-24, 37:12-17, 37:21-38:1.   Elizabeth Guzzo, the Director of Legislative Affairs at the Office of the Attorney General, was unaware of any Attorney General prosecutions related to drop boxes in 2020 or any unlawful voting conduct relating to assistance provided to persons with disabilities in 2020.  *Id*. at 38:2-6, 62:4-8.

208.   During the legislative debate on SB 90, there were many instances where the lack of voter fraud in the 2020 election was discussed.  *See generally* Appendix I.  Indeed, the sponsors of SB 90 were unable to identify evidence of fraud related to drop boxes, ECF No. 461-34 at 8:23-9:9, 16:24-17:16, VBM ballots, *id.* at 15:22-16:6; ECF No. 461-98 at 64:5-10, or solicitation of voters waiting in line, *id.* at 87:23-88:6.

## C.   Absence of Issues with Voter Registration Organizations

209.   The Supervisors of Elections testified to the absence of any issues with 3PVROs during the 2020 election.  *See* Appendix (SOE Responses to League Plaintiffs' RFA 10) (vast majority admitting that they are unaware of any voter who was unable to vote in 2020 as a result of 3PVRO returning voter registration late). For example, Supervisor Scott testified he was not aware of issues or problems with 3PVROs in Broward County, the second largest county in Florida, or any pending complaints or pending problems with such organizations.  Tr. 1158:17-18, 1162:24-

1163:10 (Scott).  He was also not aware of anyone who was unable to vote because of 3PVROs turning in their registrations late.  Tr. 1163:11-14 (Scott).

210.   Similarly, Supervisor Earley testified that the vast majority of registration forms sent by 3PVROs are received on time.  Tr. 2666:12-16 (Earley).  Though acknowledging a few instances of issues related to 3PVROs in the past, Supervisor Earley nevertheless testified that "in general, they're a big aid in our outreach efforts."  Tr. 3501:16-17 (Earley).

211.   Defendant White could not identify any voter in Miami-Dade County who has been prevented from voting because a 3PVRO turned in the voter's registration form late.  Tr. 1343:7-12 (White).  She testified that no voter has ever complained to her office about a late-delivered voter registration form, or about a 3PVRO's alleged failure to submit completed voter registration forms.  *Id.* at 1343:13-16, 3184:2-15 (White).  There were also no complaints of the sort from voters in Lake County.   ECF No. 549-2 (Hays Dep.) at 129:4-14.

212.   Director Matthews noted the distinction between election fraud complaints and complaints about 3PVROs, testifying about referrals to law enforcement of only the former type for the 2020 election cycle.  Tr. 3478:16-25 (Matthews).  Director Matthews did not identify any specific voter who was unable to vote in an election in which they wished to vote because of a 3PVRO turning in their form late. *See generally* Tr. 2756:22–2837:18, 3391:13–3481 (Matthews).  She

also did not identify any specific voter who faced any obstacle or barrier in updating their address in order to vote because of a 3PVRO turning in their form late. *See generally* Tr. 2756:22–2837:18, 3391:13–3481 (Matthews).

213.   The Florida Office of the Attorney General has pursued no enforcement actions against 3PVROs since 2012.  ECF No. 402 at ¶ 17.  Director Guzzo also testified to being unaware of any instances in which the Attorney General has pursued injunctive relief against 3PVROs or any restraining orders.  ECF No. 549-1 (Guzzo Dep.) at 69:9-15.

214.   Furthermore, Senator Gary Farmer (D) testified that the proponents of SB 90 did not cite issues with 3PVROs as a rationale for the bill.

215.   Instead, Senator Farmer testified about "Senator Baxley claiming that he was doing this to comply with a federal court order."  Tr. 1567:4-10 Senator Farmer.  Senator Farmer further stated that Senator Baxley's explanation for the 3PVRO provision suggested that he "just didn't know why he was doing these things or what his amendment or his bill was going to fix."  *Id.* at 1567:12-18 Senator Farmer.

### D.   Widespread Praise of 2020 Election and Florida Election Code

216.   Notwithstanding the unpredictability caused by the COVID-19 pandemic and the surge in voters casting VBM ballots, the administration of the 2020 election in Florida was a resounding success, and was praised as safe and

secure by federal, state, and local officials.  *See*  ECF No. 402 ¶ 44; Tr. 1262:6-25 (Supervisor Corley); Tr. 1204:6-12 (Scott); Tr. 1333:18-19 (White); Tr. 1450:23 (Thompson); Tr. 965:3-966:8, 969:3-12 (Burch); ECF No. 608-5 at 21-22 (Burch Rpt.); *see also* Tr. 1747:2-10, 1750:9-25, 1751:24-1752:8, 1752:15-20, 1752:22-1753:9, 1760:2-14, 1760:18-24 (Kousser).

217.   SOEs also praised the success of the 2020 election in Florida.  For example, Supervisor Corley was "beyond highly confident" that the results of the 2020 election were correctly determined and agreed that Pasco County "ran a good election."  Tr. 1263:1-3, 1264:8-9 (Supervisor Corley).

218.   Supervisor White testified that the 2020 elections in Miami-Dade County were successful for several reasons: "the integrity of the election was upheld throughout the entire process," "voting was made accessible and convenient to our voters," "all of our policies and procedures were carried out accurately," "the results were tabulated accurately, reported to the state on time, [and] certified on time," the county's "post-election audit was accurate," and "voters had a pleasant experience." Tr. 1333:18-1334:3 (White); *see also* ECF No. 608-78 ("the election was conducted successfully and without error");  Tr. 1381:11-14 (White) ("Our state, my county, was revered as having a near flawless election cycle; record voter turnout; no irregularities, as we've talked about; results substantiated, submitted on time.  It was all around a very well-run election.").

219.   Supervisor Earley agreed that the 2020 general election in Leon County and all of Florida was "definitely" a success even when it was "the hardest election [he had] ever encountered in all [his] years helping with elections."  Tr. 2605:16-18, 2606:5-11 (Earley).

220.   In noting that the 2020 elections in Florida were secure and successful, SOEs described using extensive security measures, such as physical security, cybersecurity, and the "logic and accuracy test."  ECF No. 549-3 (Latimer Dep.) at 95:8-23, 97:16-98:9; ECF No. 549-2 (Hays Dep.) at 39:12-41:3.  In fact, no elected official testified to problems in the 2020 General Election in Florida.  ECF No. 549-3 (Latimer Dep.) at 99:11-29; *see also* ECF No. 549-2 (Hays Dep.) at 38:19-20, 41:10-18

221.   In an April 30, 2021 statement, the Florida SOEs praised the 2020 election and noted widespread praise from other elected officials:

> As Supervisors of Elections, we are unwavering in our commitment to keeping our elections both secure and accessible. We did that in 2020, to universal acclaim. Elections ran smoothly, voters participated in record numbers, and election results were verified with audits in every count in Florida, as provided for in our current election law . . .Indeed, after the 2020 General Election, Governor DeSantis said that we had 'finally vanquished the ghosts of Bush vs. Gore,' praising our ability to count 11 million votes quickly and holding Florida up as an example for other states to follow. Throughout this legislative process, legislators who supported and opposed the bill commended our performance in 2020, over and over.

ECF No. 608-48 (April 30 Statement from Craig Latimer).

222.   The Secretary of State has admitted that Secretary Lee testified to the legislature shortly after SB 90 was introduced that the 2020 General Election in Florida "ran as smoothly as possible and inspired confidence on the part of Florida's voters."  ECF No. 465-88 (SOS RFA No. 33).

223.   The Secretary of State has also admitted that Governor DeSantis stated the 2020 General Election in Florida was "the smoothest, most successful election of any state in the country."  *Id*. (SOS RFA No. 34).

224.   Following the election, Secretary of State Lee stated, "[A]ll Florida voters, no matter how they chose to cast a ballot, or who they voted for, could be confident in the integrity of Florida's elections system and security of their vote." ECF No. 402 ¶ 45.  She further praised the election as "safe, secure and orderly" and asserted that in 2020 the state was "prepared to meet any challenges we faced during the elections."  ECF No. 608-101 at 1-2.

225.   Governor DeSantis described Florida's 2020 election as "perhaps the most transparent and efficient election in the nation in 2020."  ECF No. 608-108.At trial, Director Matthews reiterated that all voters should be confident in the integrity of the election system and the security of their vote in the 2020 election, no matter how they cast their ballots.  Tr. 2759:2-8 (Matthews).

226.   Director Guzzo testified that if the Secretary of State's office concluded that the 2020 elections were successful, safe, and secure, the Attorney General's office would not disagree.  ECF No. 549-1 (Guzzo Dep.) at 30:9-14.

227.   In 2020, Florida counties generally saw shorter lines than in previous elections. Tr. 1372:6-7 (White).  Supervisor White agreed that the shorter lines resulted in part from the fact that more voters voted by mail than in previous years. *Id.* at 1372:8-13.

228.   The legislative record is also full of praise for the success of the 2020 election. *See generally* Appendix H.  Even several Florida legislators—including the very legislators who would go on to sponsor SB90—praised the 2020 election as an "exception," a "model for the nation," "one of the smoothest elections," and as "the standard on how elections should be run across the United States."  *See also* ECF No. 461-54 at 2:5, 2:15-18, 19:8-11, 46:21-22; ECF No. 461-45 at 2:40:42-2:48:11; ECF No. 461-36 at 2:9-11; ECF No. 461-78 at 9:7-10; ECF No. 461-92 at 2:10-12; ECF No. 462-9 at 2:23-3:3; *see also* ECF No. 608-5 at 24-25 (Burch Rpt.); Tr. 965:3-966:8, 969:3-12 (Burch).

229.   Legislators who testified at trial similarly praised the election. Tr. 1517:8-13 (Farmer); Tr. 1907:2-8 (Eskamani) ("Florida's 2020 election cycle was very well managed across the state.").

230. Florida voters also expressed confidence in the 2020 election. Data from the COVID States Project, a joint project from scholars at Northeastern University, Harvard University, Rutgers University, and Northwestern University, shows that 78.4 percent of Florida voters were "mostly or "very" confident that their "ballot will be counted accurately in the 2020 presidential election." Tr. 980:9-984:22 (Burch); ECF No. 608-5 at 22 (Burch Rpt.). More than two-thirds of Floridians were "mostly" or "very" confident that the presidential election would be fair. Tr. 980:9-981:3 (Burch); ECF No. 608-5 at 22 (Burch Rpt.).

## VI. CHALLENGED PROVISIONS OF SB 90

### A. VBM Application Requests

231. Section 24 of SB 90 amended Fla. Stat. § 101.62(1)(a)-(b). In pertinent part, Section 101.62(1)(a) now provides:

> [t]he supervisor shall accept a request for a vote-by-mail ballot from an elector in person or in writing. One request is deemed sufficient to receive a vote-by-mail ballot for all elections through the end of the calendar year of the next regularly scheduled general election, unless the elector or the elector's designee indicates at the time the request is made the elections within such period for which the elector desires to receive a vote-by-mail ballot.

Fla. Stat. § 101.62(1)(a).

232. Section 24 of SB 90 cuts the lifespan of VBM requests by, eliminating standing requests to vote by mail and requiring voters to submit new VBM applications every general election cycle. *See* ECF No. 402 at 23 (Joint Stip.).

## B.     Vote-by-Mail Application Restriction

233.   Section 24 of SB 90 also amended the provision of Florida law that governs requests for VBM ballots.  The law now provides:

> If an in-person or a telephonic request [for a VBM ballot] is made, the elector must provide the elector's driver license number, the elector's Florida identification card number, or the last four digits of the elector's social security number, whichever may be verified in the supervisor's records.

Fla. Stat. § 101.62(1)(b).

234.   Similarly, a "written request" must "include the elector's Florida driver license number, the elector's Florida identification card number, or the last four digits of the elector's social security number." *Id.*

235.   Under SB 90 Section 24, Supervisors must match the required identification number provided on the VBM request to a number in their records or they are prohibited from sending an application. In its guidance and training materials presented at the June 2021 Supervisors' summer conference, Secretary Lee stated that there are "no exceptions" to the identification match requirement.  ECF No. 608-64 at 17.

236.   SOEs confirmed that there are "no exceptions" per the Secretary's guidance and that the identification number provided in a VBM request must match the number on file. Tr. 1184:22-1185:21 (Scott); *see also* Tr. 2649:9-16 (Earley). Supervisor Earley testified that under SB 90, his offices may not send a voter a VBM

ballot even if they provide the office with the correct identification number if that number is not on file with the office. Tr. 2651:2-11 (Earley).

237.   Due to SB 90's identification requirement, SOEs are no longer offering check boxes for voters to re-request VBM ballots. *See, e.g.*, ECF 549-3 at 84:5-10 (Latimer Dep.); Tr. 1286:5-18 (Corley); Tr. 2625:19-2626:14 (Earley); ECF No. 549-2 (Hays Dep.) at 126:6-17.

238.   Almost no other state has adopted a similar identification requirement to request a mail ballot.  Defendants' expert, Dr. Quentin Kidd, claimed to have looked at the laws of all 50 states, and only identified four others that were purportedly comparable to Florida in requiring a voter to provide their driver's license number or Social Security number to request an absentee ballot. ECF No. 634-5  ¶ 58 (Minnesota, Georgia, Montana) & Tab. 6 (Indiana) (Kidd Rpt).  At trial, however, Dr. Kidd conceded that he cited the mail ballot receipt (as opposed to mail ballot application) statutes for Montana, Minnesota, and Georgia, and that providing such information in Indiana was optional. Tr. 2991:16-3000:16 (Kidd).

## C.   3PVRO Compelled Disclaimer

239.   Section 7 of SB 90 requires 3PVROs to:

> notify the [voter registration] applicant at the time the application is collected that the organization might not deliver the application to the division or the supervisor of elections in the

> county in which the applicant resides in less than 14 days or
> before registration closes for the next ensuing election[.]

Fla. Stat. § 97.0575(3)(a).  In addition, the provision requires 3PVROs to "advise

the applicant that he or she may deliver the application in person or by mail[,]" and

to "inform the applicant how to register online with the division and how to

determine whether the application has been delivered." *Id.*

240.    The Secretary of State has authority to refer violations of the disclaimer

provision to the Attorney General for further action. Tr. 2777:8-20 (Matthews); *see*

Fla. Stat. § 97.0575(4).

241.    No other state has adopted a compelled disclaimer requirement

comparable to Florida's. Defendant's expert, Dr. Quentin Kidd, claimed to have

looked at the laws of all 50 states and could not identify any other state with a

comparable oral disclaimer requirement for 3PVROs. Tr. 3048:3-3052:4 (Kidd).

Plaintiffs' expert, Dr. Michael McDonald, has confirmed that no other state has a

comparable disclaimer requirement for 3PVROs. Tr. 3607:9-16 (McDonald).

### D.    Voter Registration Delivery Restriction

242.    Section 7 of SB 90 requires 3PVROs to:

> ensur[e] that any voter registration application entrusted to the
> organization . . . must be promptly delivered to the division or
> the supervisor of elections in the county in which the applicant
> resides within 14 days after the application was completed by the
> applicant, but not after registration closes for the next ensuing
> election.

Fla. Stat. § 97.0575(3)(a).

243.    Section 7 fines 3PVROs if they fail to deliver registration applications to the "supervisor of elections in the county in which the applicant resides" within 14 days. *Id.* This section does not fine, or have repercussions for anyone else that delivers out-of-county registration applications to a supervisor's office. *See* Tr. 3244:2-15 (Doyle) (Supervisor Doyle will still forward out-of-county registrations dropped off by individual voters to their respective supervisors).

244.    Under Section 7 of SB 90, Supervisors will no longer be processing the out-of-county registration applications. *See e.g.*, ECF No. 549-2 at 175:7-17 (Hays Dep.) (Supervisor Hays will "send [the out-of-county registrations] back to the third-party organization.").

245.    The Defendants did not offer any evidence that any other state requires a voter registration organization to deliver registration applications to the county of residence. This is not a point that Defendants' expert, Dr. Quentin Kidd, analyzed. ECF No. 634-5 at 26 (Table 5) (Kidd Rpt.).

**E.    Drop Box Restrictions**

246.    Section 28 of SB 90 amended Florida Statute Sections 101.69(2) and (3) which now provide:

> (2)(a) The supervisor shall allow an elector who has received a vote-by-mail ballot to physically return a voted vote-by-mail ballot to the supervisor by placing the return mail envelope containing his or her marked ballot in a secure drop box. Secure

drop boxes shall be placed at the main office of the supervisor, at each permanent branch office of the supervisor, and at each early voting site. Secure drop boxes may also be placed at any other site that would otherwise qualify as an early voting site under s. 101.657(1). <u>Drop boxes must be geographically located so as to provide all voters in the county with an equal opportunity to cast a ballot, insofar as is practicable.</u> Except for secure drop boxes at an office of the supervisor, a secure drop box may only be used during the county's early voting hours of operation <u>and must be monitored in person by an employee of the supervisor's office.</u> <u>A secure drop box at an office of the supervisor must be continuously monitored in person by an employee of the supervisor's office when the drop box is accessible for deposit of ballots.</u>

(3) If any drop box is left accessible for ballot receipt other than as authorized by this section, the supervisor is subject to a civil penalty of $25,000.

ECF No. 402 at 21-22 (Joint Stip.) (showing additions in underlined text).

247.   Accordingly, drop boxes at locations *other* than SOE offices can only be open during the hours and days of early in-person voting, which extends for between eight and fourteen days and is set by each county SOE, and must be monitored by an employee of the SOE office when accessible for ballot delivery. Tr. 2423:1-18 (Smith).  Drop boxes at SOE main or permanent branch offices, can be open for the full 40-day period from when VBM ballots are first mailed to voters through Election Day, but must be continuously monitored by an employee of the SOE office when they are accessible for ballot deposit. Tr. 2423:11-18. *See also* ECF No. ECF No. 467-1 at ¶¶ 117-20 (Herron Rpt.).

248.   Through the Division of Elections, the Secretary of State is responsible for enforcing compliance with the Drop Box Restrictions, including by subjecting Supervisors of Elections to the aforementioned $25,000 penalty for violations.  Fla. Stat. § 101.69(3).

249.   The Defendants did not offer any evidence that any other state requires in-person monitoring by employees of their election authorities (as opposed to video monitoring); imposes fines on election administrators who fail to do so; or restricts drop boxes to local election administrators' offices or early voting locations. Defense expert Dr. Kidd did not address this point. ECF No. 634-5 at 19 (Table 3) (Kidd Rpt.); Tr. 3026:7-3027:13 (Kidd).

## F.    Polling-Place Assistance Restriction

250.   Section 29 of SB 90 amended the definition of "solicit" or "solicitation" under Section 102.031(4)(b), for purposes of the prohibition under Section 102.031(4)(a).  As amended, Section 29 of SB 90 provides:

> For the purpose of this subsection, the terms "solicit" or "solicitation" shall include, but not be limited to, seeking or attempting to seek any vote, fact, opinion, or contribution; distributing or attempting to distribute any political or campaign material, leaflet, or handout; conducting a poll except as specified in this paragraph; seeking or attempting to seek a signature on any petition; and selling or attempting to sell any item; and engaging in any activity with the intent to influence or effect of influencing a voter. The terms "solicit," or "solicitation" may not be construed to prohibit an employee of, or a volunteer with, the supervisor from providing nonpartisan assistance to

> voters within the no-solicitation zone such as, but not limited to, giving items to voters, or to prohibit exit polling.

ECF No. 402 at 26 (Joint Stip.) (showing additions in underlined text).

251.   Section 29's broad language appears to criminalize the provision of nonpartisan relief to voters waiting in line. *See* Tr. 222:14-20 (Garces); Tr. 402:12-16 (Burney-Clark); Tr. 746:3-9 (Velez Burgos); Tr. 1961:7-14, 1962:17-22 (Slater); Tr. 2047:4-8 (Mercado). As a result of this threat of criminal sanction, Section 29 directly impairs and limits Plaintiffs' civic engagement work. This includes the work of the Florida NAACP, FRT, Poder Latinx, Equal Ground, and Hispanic Federation. Tr. 223:13-16 (Garces); Tr. 517:4-11 (Brown); Tr. 402:17-403:19 (Burney-Clark); Tr. 774:5-16 (Velez Burgos); Tr. 2047:7-20 (Mercado).

252.   Section 29 has caused Plaintiff NAACP, and other groups, to determine that they can no longer provide certain forms of voter support in Florida.  Plaintiff NAACP will no longer provide water, food, and other items of support to Florida voters waiting in line out of fear that their traditional line relief activities will be criminalized. Tr. 529:4-10 (Brown); Tr. 1963:11-16; 1976:22-1977:7 (Slater). As a consequence, voters in need of relief may leave long lines and forgo voting altogether. Tr. 1958:13-1959:2; 1963:17-1964:5 (Slater).

253.   Poll deputies at each individual polling place are responsible for enforcing the Line Relief Provision.  Tr. 1376:8-14 (White).

254.   No other state has adopted a prohibition on "engaging in any activity with the intent to influence or effect of influencing a voter."  Defendant's expert, Dr. Kidd, claimed to have looked at the laws of all 50 states and could not identify any other state with a comparable restriction as broad as Florida's.  ECF No. 634-5 ¶ 67 (Kidd Decl.); Tr. 3019-3022 (Kidd).

## VII.   THE PASSAGE OF SB 90

255.   This section summarizes key aspects of the legislative proceedings on SB 90.  *First*, it traces the evolution of the bills in the Senate and the House, noting the points at which key provisions were added to the bill.  *Second*, it describes the contemporaneous rationales that SB 90's sponsors offered for the bill.  As this discussion illustrates, the sponsors repeatedly disclaimed any interest in preventing fraud and instead offered justifications that made little if any sense and/or were disingenuous or pretextual.  *Third*, this section describes the evidence that legislators knew the law would place significant burdens on Florida voters' ability to vote— and that the burden would disproportionately fall on Black and Latino voters.  *Fourth*, the section describes irregularities in SB 90's legislative process, including the opposition of the Supervisors, the limits on public testimony, the limits on debate, and the unusual use of a late-night strike-all amendment.  *Fifth*, the section describes proposed amendments that would have ameliorated the discriminatory impact of SB 90 but were summarily rejected by the legislature.

90

### A.    SB 90's Introduction and Evolution in the Senate and House

256.    This section provides an overview of the introduction, consideration, and enactment of SB 90.  This discussion illustrates two key points.  First, SB 90 did not originate with the Supervisors of Elections, a substantial departure from the Florida legislature's typical approach to election law reform.  Second, because the Challenged Provisions were repeatedly rewritten during the legislative process, legislators and interested parties had minimal or no opportunity to provide input on critical  aspects of the Challenged Provisions that will made it substantially harder for Floridians to vote.

### 1.    The Origins of SB 90

257.    Representative Geraldine Thompson (D), a member of the House Public Integrity and Elections Committee, explained at trial that election legislation typically originates with the SOEs, *i.e.*, "the individuals who administer our elections" and are therefore "on the ground."  Tr. 1446:24-1447:17 (Thompson).  She explained that SOEs normally share their "concerns" and "needs" with elected leaders in the legislature, and the legislature responds to those needs.  *Id.*; *see also* Tr. 1029:20-1033:19 (Burch); ECF No. 608-5 at 47 (Burch Rpt.); Tr. 1515:14-24 (Farmer) (explaining why it is important to hear from SOEs).  Supervisor Earley provided similar testimony, explaining that the legislature would "[n]ormally . . . try to reach out . . . ahead of time" about election bills.  Tr. 3523:21-24 (Earley).

258.   In contrast, the approach to election legislation followed with SB 90 was abnormal:  "[The SOEs] did not ask for any of the provisions that are a part of the legislation."   Tr. 1446:24-1447:17 (Thompson).   Accordingly, unlike most election legislation that originates "from the bottom up," SB 90 was imposed "top down" by the legislature.  *Id.*

259.   Every SOE who testified at trial confirmed that they were not consulted by the legislature prior to the introduction of SB 90.   Tr. 1380:10-13 (White) (agreeing that "Senate Bill 90 appears to have been written without consulting Supervisors of Elections"); Tr. 3194:14-16 (White) ("Q. To your knowledge, was [the Florida Supervisors of Elections ("FSE")] involved in the legislative process leading up to SB 90?  A. Leading up to SB 90, no."); ECF No. 549-2 (Hays Dep.) at 43:8-11 (confirming he was not consulted in his capacity as a Supervisor about SB 90 or HB 7041 before it was released); Tr. 2611:16-19 (Earley); Tr. 1212:4-10 (Scott) (agreeing he was not consulted by the legislature before SB 90 was introduced); Tr. 1274:3-14 (Corley) (same); *see also* Appendix C, at RFA 24

260.   Indeed, the Supervisors were caught "off guard" by the introduction of a major election reform bill just after the "flawlessly" administered 2020 election cycle.  Tr. 1381:11-1382:5 (White).  As he wrote in an email at the time, Supervisor Corley was mystified by the bill:

> I'm literally befuddled as to why we would tweak a system that performed exceedingly well.  The current Vote By Mail (VBM) statutes (e.g. policies

and procedures), as well as the established security procedures with regards to VBM "Drop Boxes" worked extremely well in Pasco County and to my knowledge, all of Florida…. As such, I can think of no legitimate reason to make the sweeping and arbitration changes contained in SB 90!

ECF No. 608-28.

261. Supervisor Corley criticized the lack of consultation prior to filing the draft legislation, noting that the Supervisors "are the subject matter experts who actually administer elections." ECF No. 608-30.

262. The legislature also did not consult the Secretary of State or the Office of the Attorney General prior to introducing SB 90, despite those agencies' roles in enforcing 3PVRO regulations and other election laws. Tr. 3456:23-3457:13, 3462:14-3463:11 (Matthews); ECF No. 549-1 (Guzzo Dep.) at 39:20-23, 44:10-13, 53:22-24.

### 2.    *Consideration of SB 90 by Senate Committees*

263. Senator Dennis Baxley (R) filed SB 90 in the Senate on February 3, 2021.

264. Senator Gary Farmer (D), the former Minority Leader of the Florida Senate, explained the typical process for filing legislation. Ordinarily, a bill's sponsor "take[s] an idea concept" to the independent, nonpartisan "bill drafting" office of the Senate. The sponsor "work[s] on the bill with them," and officially files the bill once the sponsor feels the bill is "complete and accurate." Tr. 1513:5-15 (Farmer). After it is filed, the bill is referred to committees of reference for

consideration; the first committee of reference is typically the "subject matter substantive committee on the [bill] topic." *Id.* at 1513:16-20 (Farmer).

265.   Here, Senator Baxley introduced a version of SB 90 that was not "complete" and, in fact, bears no resemblance to the final bill.  As introduced, SB 90 had only four sections.  ECF No. 461-57 at 10-11.  The only substantive provision was a version of the VBM Application Provision, which provided that a VBM request would only be valid for elections within one year of the request.  *Id.*

266.   Because the bill did not include any of the Challenged Provisions other than a version of the VBM Application provision, the Senate Ethics and Elections Committee—the Senate Committee with the greatest subject matter expertise—had no opportunity to engage with the law that ultimately became SB 90.  They could not provide input on provisions that did not yet exist.

267.   The Ethics and Elections Committee held a hearing on February 16, 2021.  ECF No. 461-33 (portion of transcript on SB 90).  At that hearing, Secretary Lee testified generally about the 2020 election, *id.* at 2, but was not asked to (and did not) testify about SB 90 specifically.  *Compare* ECF No. 461-33 (portion of transcript on SB 90).  Secretary Lee did not testify to the Legislature about any of the Challenged Provisions.

268.   The only amendment accepted during the February 16 committee hearing was a technical amendment offered by Senator Baxley.  The amendment

94

made VBM requests valid until the end of the calendar year of the next ensuing general election—*i.e.*, for a maximum of two years.   ECF No. 461-33 at 12:24-20:11 (portion of transcript on SB 90).

269.   The bill then passed to the next committee of reference, the Senate Governmental Oversight and Accountability Committee.   That committee held a hearing on a proposed committee substitute on March 10, 2021.   ECF No. 461-34; ECF No. 461-65 at 17-22.   The proposed substitute made changes to SB 90 and doubled the number of provisions to a total of eight.   ECF No. 461-65 at 14-22; *see also*   ECF No. 461-61 at 9 (summarizing the differences following the March 10 committee substitution).   The relevant changes included:

- Prohibiting the use of drop boxes entirely.   ECF No. 461-34 at 4:18-21.

- Requiring VBM requests to include the voter's driver's license number, identification card number, or the last four digits of the voter's social security number.   ECF No. 461-61 at 9.   In introducing the amendment, Senator Baxley did not discuss the provision and there was no debate or discussion about it.   ECF No. 461-65.   Unlike the Challenged Provision of SB 90 Section 24, the March 10 version of the provision did not require the additional identification number to be matched against an identification number in the Supervisors' records.   *Id.*

270.   Even as amended, the bill did not  include any version of Challenged Provisions SB 90 Section 7 (changing the rules for 3PVROs) or Section 29 (changing the definition of "solicitation").   Accordingly, neither committee members nor members of the public could provide input on those changes.   Nor

could they provide input on the  final versions of the drop box restrictions or mail ballot identification requirements that were inserted into the bill at a later stage.

271.   During the hearing, Lake County Supervisor Alan Hays (R) and Leon County Supervisor Mark Earley (D) testified against the bill.  ECF No. 461-34 at 18-30. Supervisor Hays criticized the failure to consult with election experts, noting that "nothing in the bill is in [the Supervisor's] list of [10] suggestions"; the drop box provisions would wreak "havoc" for voters; and the reduction in the VBM request period would cost SOEs $14 to $16 million to notify voters. *Id.* at 19-23. Supervisor Earley testified that he had "heard of no Supervisors who are in support of this bill" and the provisions are "setting us up for another 2012 where we had long lines and chaos and confusion." *Id.* at 28. Representatives from Plaintiffs League of Women Voters, Florida Rising Together, the NAACP and four other witnesses testified against the bill, and no members of the public supported the bill. *Id.* at 30-40.

272.   At the conclusion of the March 10 hearing, the Senate Governmental Oversight and Accountability Committee approved the proposed substitute despite the concerns raised by legislators, SOEs, and the public.  ECF No. 461-34 at 49:3-6.

273.   SB 90 then passed to the next committee of reference, the Senate Rules Committee.  The day before the Rules Committee hearing, Senator Baxley filed a

delete-all amendment to SB 90 that differed from the previous version in several important respects.   ECF No. 461-90 (Senate Amendment for SB 90).   These changes included:

- Requiring 3PVROs to notify applicants that their voter registration applications might not be delivered on time and that they could either register online or choose to submit their own applications to the Supervisors.  ECF No. 461-90  at 9:223-232 (Senate Amendment for SB 90).

- Requiring 3PVROs to deliver each voter registration application to the county in which the applicant resides.  *Id*. at 9:215-223.

- Permitting drop boxes but imposing substantial restrictions on their availability.  In particular, drop boxes could only be used during early voting hours and had to be monitored in person by employees of the Supervisors.  *Id*. at 26:726-730.

- Revising the definition of "solicitation" to prohibit "giving or attempting to give any item to a voter." *Id.* 27:759-28:771.  Thilanguage is different than the Challenged Provision of SB 90 Section 29, which prohibits "any activity with the intent to influence or effect of influencing a voter."

- The April 14 version of the Senate bill still did not require that a voter requesting an absentee ballot provide an identification number to be matched against an identification number in the SOEs records.  *Id.* at 20:559-562 & 565-568.

274.   The Senate Rules Committee held a hearing on this version of SB 90 on April 14, 2021.   ECF No. 461-37.

275.   While the entire April 14 hearing ran for 3 hours and 15 minutes, opportunity for public comment during the April 14 hearing was very limited, as most of the hearing consisted of debate over proposed amendments to the bill. Approximately 20 members of the public signed up to comment by filling out

appearance cards, and an additional 70 individuals wanted to speak, but only one hour was allotted to hear public comments.   ECF No. 461-37 at 119:23-120:11. Rather than extend the hearing, the committee chair informed members of the public that the committee would "cut the testimony off at one minute."   ECF No. 461-37 at 120:12-17.

276.   In the end, only 18 members of the public were permitted to provide comments at the April 14 hearing, and eight of them were cut short.   ECF No. 608-5 at 52 (Burch Rpt.).

277.   Because of the time restrictions imposed by the committee, numerous individuals waived their opportunity to speak at the April 14 hearing.  Instead, their positions were merely summarized as "against."   ECF No. 461-37 at 130:4-17.

278.    The Senate Rules Committee reported the bill favorably at a 15-minute hearing on April 20, 2021.   ECF No. 461-94 at 11:10-11.  At this stage, the bill had grown to 27 provisions. Of the Challenged Provisions, only the VBM Application Provision had been considered by the Senate Ethics and Elections Committee, the Senate's subject matter experts on elections.  Most of the Challenged Provisions (the Line Relief Provision, the Registration Disclaimer Provision, and the Registration Delivery Provision) were only considered at the highly truncated Rules Committee hearing.   ECF No. 461-96 at 20.  Moreover, the versions of the VBM Request

98

Identification and the Line Relief Provisions considered in Senate Committees were materially different from those in the final bill.

279.    The bill then proceeded to the Senate floor for debate; those debates are summarized at greater length below.

### 3.    Introduction of HB 7041 in the House and Consideration by House Committees

280.    The House bill was also considered by three separate committees.  As in the Senate, however, the substantial revisions to the bill over time meant that the subject matter experts—the members of the House Public Integrity and Elections Committee—did not consider or provide input on critical provisions of the bill.  *See* Tr. 1446:15-21 (Thompson) (explaining that this committee "deals with the administration of elections in the state of Florida").

281.    The House first considered SB 90's counterpart on March 22, 2021. That day, Representative Blaise Ingoglia (R) presented proposed Committee Bill (PCB) 21-05 to the Public Integrity and Elections Committee.   ECF No. 461-68 at 27-70.   The proposed bill had 26 sections, including some, but not all, of the Challenged Provisions.  Among the provisions the bill included were:

- The requirement that 3PVROs provide a disclaimer to voter registration applicants ECF No. 461-68 at 34:214-223;

- The requirement that certain VBM requests made by telephone include an additional identification number. ECF No. 461-68 at 49:578-581.  In addition to being limited to phone requests, the bill did not require that a

voter requesting an absentee ballot provide an identification number to be matched against an identification number in the Supervisors' records;

- The provision that VBM requests would be valid only through the end of the calendar year of the next general election, with a grandfather provision that requests received after the 2020 Election would be valid through year end 2024, *i.e.,* no retroactive termination of requests. ECF No. 461-68 at 48:560-567;

- An expanded definition of "solicitation" that prohibited "giving or attempting to give any item" to a voter and "interacting or attempting to interact with any voter, " ECF No. 461-68 at 64:959-960; and

- Some restrictions on drop box availability, including (1) a provision stating that drop boxes at early voting sites and other discretionary drop boxes could only be open during early voting hours and (2) a requirement to monitor all drop boxes, including by video surveillance (at the supervisor's offices) or by persons other than supervisor office employees, such as law enforcement officers. ECF No. 461-68 at 62:905-920.During the March 22 hearing, witness testimony was limited to two minutes per speaker, and nine total witnesses testified.  ECF No. 461-67 at 65:7-8. Representatives from Plaintiffs League of Women Voters and Florida Rising Together testified against the bill, *id.* at at 65:10-66:6, 72:4-73:9. At the conclusion of the March 22 hearing, the Public Integrity and Elections Committee favorably reported the bill.  *See id.* at 106:17-20..  The following day, Representative Ingoglia filed HB 7041, which mirrored PCB 21-05 with the exception of certain technical amendments.

282.    On April 7, 2021, Representative Ingoglia filed a strike-all amendment to HB 7041 prior to the House Appropriations Committee hearing.   ECF No. 461-74.  The Appropriations Committee held a hearing on the bill the following day. ECF No. 461-36.

283.    This amendment made numerous changes to the bill.  Among other things, the strike-all:

- Required the additional identification number that voters provide in a VBM request to be "verified in the supervisor's records."  ECF No. 461-74 at 24:567-71.  Like the prior version of the bill, this requirement was limited to mail ballot requests made by telephone.  *See id.*  This provision was added despite legislative staff's contemporaneous acknowledgment that "a voter could not be expected to know which number they provided at registration." ECF No. 608-65 at 2.

- Required 3PVROs to submit each voter registration application to the applicant's county of residence.  ECF No. 461-74 at 8:187-88.  This provision was added despite the absence of any evidence that 3PVROs' submission of unsorted forms created any actual problem for Supervisors.  *See supra* ¶273.

- Proposed new language for the amended Line Relief Provision.  Rather than directly prohibiting giving items to voters, the new definition (which was eventually enacted) would prohibit "engaging in any activity with the intent to influence or effect of influencing a voter."  ECF No. 461-74 at 38:939-940.

284.   Despite the significant changes introduced by the strike-all amendment, opportunity for public comment was very limited at the April 8 Appropriations Committee hearing.  Speakers were asked to "be as brief as possible."   ECF No. 461-36 at 27:24-28:2. Several speakers were limited to thirty seconds.  *Id.* at 30:23, 43:14.  Members of the public expressed surprise and frustration at the limits on their testimony.  *Id.* at 43:13-17, 47:11-19.

285.   At the end of the hearing, the Appropriations Committee favorably reported a committee substitute based on Representative Ingoglia's strike-all.  ECF No. 461-36 at 58:25-59:5.

286.   The bill then passed to the final committee of reference, the House State Affairs Committee, which held a 97-minute hearing on April 19, 2021.  ECF No. 461-38; ECF No. 461-92. The bulk of the hearing was spent considering amendments, many from Representative Ingoglia.   ECF No. 461-92 at 25-77. Although many people asked to testify at the April 19 hearing, the committee refused to permit any public testimony.  Rather, the committee chair, Representative Ralph Massullo (R), read aloud a summary stating whether individuals who were present supported or opposed the legislation. ECF No. 461-92 at 77:5-78:4.  Representatives from Plaintiffs League of Women Voters, NAACP, and Florida Rising Together were all present and were not allowed to testify.   *Id.*

287.   The time for legislative debate was similarly truncated; each member was given only thirty seconds to speak.  ECF No. 461-92 at 78:7-8.  The entire debate lasted only a few minutes.  *Id.* at 78-82.

288.   Despite the limited opportunity for debate, the State Affairs Committee favorably reported Representative Ingoglia's strike-all at the conclusion of the April 19 hearing.  ECF No. 461-92 at 85:117-183.  The bill then passed to the House floor.

### 4.   *Floor Debates and Additional Revisions to the Bill*

289.   The debates in the Senate and House began on April 22 and April 27, respectively.  The 2021 legislative session was scheduled to adjourn on April 30. *See* Trial Tr. 1453:12-17 (Thompson). Given this timing, "there was little or no

opportunity for discussion or to try to find common ground or to improve the product before there was a vote." *Id.* .

290.   The Senate debated SB 90 on April 22 and April 26, 2021.  On April 26, the Senate passed a version of the bill that included some, but not all, of the Challenged Provisions.  ECF No. 462-8.

291.   In the House, Representative Ingoglia filed a strike-all amendment, Amendment 107453, at 1:33 a.m. on April 27, 2021—the day the House was scheduled to begin debating the bill.   ECF No. 462-28.  The timing of the strike-all — after the bill was out of the Committee and on the floor — was "very unusual." Trial Tr. 1453:18-24 (Thompson); *see infra* ¶ 433.

292.   The strike-all amendment contained more than 1,300 lines of changes and was substantially different from both the prior House version of the bill and the materially different version of SB 90 that had just passed the Senate.  ECF No. 462-28.

293.    Specifically, the strike-all amendment made last-minute changes to the drop box and VBM provisions.  For example, it required even those drop boxes at Supervisors' offices (as opposed to early voting sites) to be continuously monitored *in person* at all times while the drop boxes were accessible.  ECF No. 462-28 at 37:900-904.   In addition, the strike-all extended the requirement to provide an additional identification number on VBM requests to *all* such requests, regardless of

whether they were made in person, by phone, or online.   ECF No. 462-28 at 26:632-636.

294.   Although the strike-all did not change the definition of solicitation, *compare ECF* No. 461-74 at 38:939-940 with ECF No. 462-28 at 41:992-993, when questioned by Representative Davis (D), Representative Ingoglia stated incorrectly: "[W]e took that portion out, about giving items to voters in lines.  We changed it to making sure there is no campaigning going on in the line." ECF No. 462-9 at 20:21-21:6.

295.   The use of this strike-all amendment the night before the House floor debate was highly unusual.  As Representative Thompson explained, "[n]ormally a strike-all would be offered during committee so that you have the best product and the product is complete and almost final by the time it reaches the floor."   Tr. 1451:13-24 (Thompson).   Indeed, Dr. Burch analyzed all bills considered that session and found that only 7 of 227 were introduced such a short time before the floor session where they were considered.   ECF No. 608-5 at 7 (Burch Rpt.); *see also* Tr. 1453:8-11 (Thompson) (testifying that she could not recall a single other instance in the last session where a strike-all amendment was introduced on the floor).

296.   Because the strike-all amendment was introduced on the floor, there was no opportunity for public testimony on its provisions.

297.   Several legislators voiced concerns over the late-night strike-all amendment.  In particular, they expressed concern that the timing  impaired their ability to review and provide input on the legislation.  ECF No. 462-9 at 15:7-9, 29:5-7 (statements of Representative Davis (D) and Driskell (D)).

298.   Debate over the strike-all amendment was also limited during the April 27, 2021 hearing.   Again, legislators expressed concern about permitting only truncated debate on significant elections legislation.   ECF No. 462-9 at 59:22-60:6 (statement of Representative Hardy (D)).

299.   On April 28, 2021, the House passed the strike-all.   ECF No. 462-29 at 115:16-21.

300.   On April 29, 2021, Senator Hutson (R) filed a 33-provision delete-all amendment shortly before the Senate floor debate.   ECF No. 462-45;   ECF No. 462-40 at 5:5-16.

301.   The delete-all amendment differed from the prior Senate version of the bill in significant respects.   For example, it once again amended the definition of "solicitation."   Rather than prohibiting giving items to voters, the bill broadly prohibited "engaging in any activity with the intent to influence or effect of influencing a voter."   ECF No. 462-45 at 38:1073-74

302.   In addition, the delete-all amendment was the first time the Senate version required the additional identification number provided in a VBM request to

be "verified in the supervisors's records." ECF No. 462-45 at 27:756.  *See* also ECF No. 462-40 at 24:14-16.

303.    Because Senator Hutson's delete-all amendment was introduced on the floor, there was no opportunity for public comment following its introduction.

304.    In a 79-minute session, the Senate passed SB 90 at the conclusion of the April 29 floor debate.   ECF No. 462-40 at 51:4-5.

305.    The bill then returned to the House, where the bill's text was amended to reflect the changes in the Senate.  The House floor debate on the final bill took place late in the evening on April 29, and lasted barely more than an hour.  ECF No. 462-31.  Representative Geller (D) expressed concern that the representatives were debating the bill "after 8:00 at night with this massive change."  *Id.*  at 13:23-14:1.  He called the bill a "last minute attempt to try and get something through at all costs whether it's good or bad."  *Id.*  at 39:20-22.  He voiced concern that "people barely know what's coming back" from the Senate, and stated, "This process at 9:00 at night on day 59 is not how we should be revising our election laws."  ECF No. 462-31 at 38:10-15.

306.   At the same April 29 debate, Representative Davis (D) described feeling "rushed" and limited in her ability to prepare for the floor debate.  She noted that "there are a lot of things that have changed in this bill" and stated she had "less than an hour or two to prepare adequately."   *Id.* at 15:24; 30:21-24.  Similarly,

Representative DuBose (D) felt that he was being "censored" due to the lack of time to discuss the bill and remarked that it was a "really unfortunate" way "to handle . . . something that's so important."   ECF No. 462-31 at 40:1-4.   Representatives also expressed confusion as to what was included in the final bill.   ECF No. 462-31 at 39:15-20.

307.    Despite these concerns, the House passed SB 90 at the conclusion of the April 29 debate.   ECF No. 462-31 at 46:5-6.

**B.    Sponsors' Inability to Justify Major Election Law Changes or the Specific Challenged Provisions**

308.   SB 90 was introduced against the backdrop of the 2020 election—an election that the bill's own proponents described as the smoothest election Florida had ever experienced.

309.   Plaintiffs have identified dozens of instances where legislators praised the administration of the 2020 election in Florida.   *See* Appendix H.   Secretary Lee similarly testified to the legislature in February 2021 that the election "ran as smoothly as possible and inspired confidence on the part of Florida's voters."   ECF No. 461-54 at 2:16-18.   *See also* ECF No. 465-88 (SOS RFA No. 41).

310.   During the legislature's consideration of SB 90, none of the bill's proponents justified the bill by reference to any reported problems or concerns about the integrity of Florida's elections or by a lack of confidence in that election among Florida voters.

311.   Florida legislators were uniformly unable to identify any instances of widespread voter fraud or any other election integrity purpose justifying the Challenged Provisions.  *See* Appendix I.

312.   For example, Senator Baxley stated that he was not aware of "widespread complaints" concerning VBM.  *See ECF* No. 461-54 at 7:11-21, 11:23-12:12.  Secretary Lee similarly told the legislature that there are already "safeguards in place to ensure that vote-by-mail ballots are going to voters who are on the voter registration rolls," and that she was not aware of "any instance of fraud where people received the mailed ballot and voted even though it wasn't intended for them."  ECF No. 461-54 at 16:6-8, 17:2-7.

313.   Indeed, when asked about the purpose of several Challenged Provisions, SB 90's sponsors denied that they were meant to address fraud or voter harassment:

- **Drop boxes:**  When asked "is there fraud with drop boxes," Senator Baxley said "I don't know that I would have the evidence chain to present to you for that case."  ECF No. 461-34 at 8:23-9:3 & 16:24-17:16.

- **VBM ballots:**  When asked whether he believed "there was vote-by-mail fraud in the last election," Senator Baxley responded:  "That's not the purpose of our bill.  It's not in the bill."  ECF No. 461-98 at 64:5-10.

- **Solicitation:**  When asked whether there were reports of "solicitation near drop boxes," Senator Baxley said "I'm not aware of that."   ECF No. 461-98 at 87:23-88:6.

314.    Multiple legislators confirmed at trial that no evidence of voter fraud was presented to the legislature.  Tr. 1456:9–23 (Thompson) (explaining that the SOEs "had reported no problem with the security of the voting process" and that there was "no evidence of voter fraud" at the time the legislature considered SB 90); *see also* Tr. 1517:8–13 (Farmer) (explaining that there were not "any problems with how the 2020 election ran"); Tr. 1907:2–4 (Eskamani) ("Florida's 2020 election cycle was very well managed across the state.").

315.    The legislature also provided no justification for imposing new burdens on third-party voter registration organizations.  Director Matthews did not recall the Division of Elections providing any information to the legislature about 3PVROs during the consideration of SB 90.  Tr. 2795:13-2796:4 (Matthews).

316.    During debates and at trial, legislators repeatedly described the bill as a solution in search of a problem.  Tr. 1457:10–16 (Thompson) (explaining that SB 90 "address[ed] a problem that did not exist").

317.    The legislators testified that any attempt to justify SB 90 as an election integrity measure made no sense.  Tr. 1456:9–23 (Thompson); *see also* Tr. 1517:14–1518:2 (Farmer).

318.    Rather than point to any election integrity issues, SB 90's sponsors identified confusing and contradictory justifications for the Challenged Provisions.

### 1.   *Purported Justification for the 3PVRO Restrictions*

319.   Representative Ingoglia stated that the purpose of the restrictions on third-party voter registration organizations was to "clean[] up statutes that have been ruled unconstitutional."  ECF No. 461-67 at 4:22–5:4.  When challenged to explain the provision, Senator Baxley similarly represented that the changes "ha[ve] to do with codifying a federal court order into our statute."  ECF No. 461-78 at 89:5–89:23.

320.   Representative Ingoglia and Senator Baxley were presumably referring to this Court's 2012 decision in *League of Women Voters of Florida v. Browning*, 863 F. Supp. 2d 1155 (N.D. Fla. 2012), which enjoined the provision of HB 1355 requiring 3PVROs to submit voter registration forms within 48 hours, *id.* at 1160–63, 1168.  There is nothing in *Browning*, however, requiring 3PVROs to make the compelled disclosure or send applications to the applicant's county of residence.

### 2.   *Purported Justifications for the VBM Application Provision*

321.   During the legislative process, two justifications were offered for the VBM Application Provision.  Tr. 1008:19–1010:25 (Burch); ECF No. 608-5 at 38–40 (Burch Rpt.).  First, Senator Baxley claimed the provision was needed to keep voter files accurate when voters move.  ECF No. 461-37 at 17:17–18:3.  Second, Senator Baxley, in response to a question as to why there was a need for "any limitation" on VBM request renewal, stated that the change was to enable voters to

"be able to choose each year how they want to vote" between in-person and vote-by-mail.  *Id.* at 110:15–111:15.

322.   However, neither of these justifications was substantiated.  When SB 90 was passed,  the legislative record contained no evidence that SOEs had difficulty maintaining the accuracy of voter files; indeed, Secretary Lee herself indicated that SOEs already had safeguards in place to ensure that VBM ballots go only to voters who are on the voter registration rolls.  Tr. 1011:2–1013:2 (Burch).  In addition, the legislature shot down multiple proposed amendments which would have updated voters' addresses automatically once it was changed on their driver's license and thus would have helped to address this concern.  *Id.*; ECF No. 461-98 at 12:18-13:4, 14:15; ECF No. 608-5 at 38–39 (Burch Rpt.).

323.   The second justification regarding allowing voters the choice between in-person and vote-by-mail was also illusory.  This choice was *already the law* prior to SB 90.  Tr. 1013:5–1014:4 (Burch).  Indeed, the fact that voters already had the choice as to how they voted each year was brought up during the legislative process by Secretary Lee and legislators such as Senator Farmer.  *Id.*; ECF No. 461-37 at 110:15-111:15; ECF No. 608-5 at 39–40 (Burch Rpt.).

### 3.   *Purported Justifications for the Drop Box Provision*

324.   Regarding the Drop Box Provision, there were three justifications offered: (1) that the provision would address drop box security deficiencies and

prevent tampering, (2) that Supervisors of Elections were not administering drop boxes properly, and (3) that the provision was necessary to ensure the chain of custody of each ballot.  Tr. 1015:10– 1016:23 (Burch); ECF No. 461-98 at 66:21–67:1, 73:23–74:20;  ECF No. 462-9 at 43:2-14;  ECF No. 461-37 at 108:19–109:1; ECF No. 608-5 at  at 40–44 (Burch Rpt.).

325.   The   claims   about   drop   box   security   and   tampering   were unsubstantiated: no evidence of any incident of tampering or other security issues was cited anywhere in the legislative record.  Tr. 1016:25–1021:5, 1082:15–1083:18; ECF No. 608-5 at at 41–42 (Burch Rpt.).  When pressed, Senator Baxley was unable to give any specifics and simply said "I assure you, that this is a regular phenomenon that happens."  ECF No. 461-98 at 73:23–74:2.  At other points, Senator Baxley stated that he has "never made the case that there's [drop] box tampering."   ECF No. 461-37 at 108:22–23. Regardless of how these seemingly contradictory statements are interpreted, the fact remains that no evidence is cited anywhere in the legislative record that supports the notion that drop boxes lacked proper security.

326.   This justification is also contradicted by the fact that VBM ballots can be dropped off in USPS boxes, which Florida law does not subject to any sort of surveillance (either in-person or via video).  This raises the question as to why extremely restrictive security measures should apply to one particular method of

returning VBM ballots  while another method is not subject to any such safeguards. This contradiction was raised in the legislative record by Supervisor Hays and others.  ECF No. 461-34 at at 24:7-11.

327.   Likewise, no evidence or support was offered for the justification regarding SOEs improperly administering drop boxes. Tr. 1016:25–1021:9 (Burch); ECF No. 608-5 at 41–42 (Burch Rpt.).   This lack of evidence was noted by Supervisor Hays, who stated that nobody had brought forward any concrete evidence of SOEs violating drop box rules regarding monitoring.  ECF No. 461-34 at 23:22-24:5; ECF No. 608-5 at 41–42 (Burch Rpt.).

328.   The so-called chain-of-custody justification was similarly lacking in factual foundation.  Tr. 1023:12–1025:10 (Burch); ECF No. 608-5 at . at 42-44 (Burch Rpt.).  First, as Rep. Hinson (D) noted in the legislative record, the ballots already contain a tracking ID number and "if they make it into the box you will know." ECF No. 461-38 at 17:7–13; ECF No. 608-5 at 42 (Burch Rpt.).  Second, this justification is further called into question when considering that no such measures to ensure chain of custody are taken with USPS boxes.  Tr. 1024:1–1025:10 (Burch). Representative Bartelman (D) noted this contradiction in the legislative record, stating that it was a "loophole" in the argument that anybody could take another voter's ballot and drop it off in any USPS box without producing any ID.  *Id.*; ECF No. 461-34 at 24:7-11.

### 4.    *Purported Justifications for the Line Relief Provision*

329.   When explaining the purpose of Line Relief Provision, Representative Ingoglia stated that his concern was with candidates "giving and soliciting voters in the line," since voters are "more apt to think about voting for [those candidates]." ECF No. 461-67 at 101:23–102:7.   Representative Ingoglia later stated that the changes to the solicitation definition "boil[ed] down to" a prohibition on "campaigning on line." ECF No. 461-92 at 24:6–14; ECF No. 462-9 at 54:24–55:2 ("My only worry is people trying to influence voters while they are standing in line waiting to vote.").

330.   Senator Baxley also emphasized the purpose of the line warming provision was to prevent electioneering—*i.e.*, "[t]o protect voters from unwanted solicitation or intimidation as they approach the polls." ECF No. 461-98 at 4:12–23.   He further stated that the provision would "ensure, unlike other states, that a glass of water given in sincerity is not a violation of the law." ECF No. 461-94 at 9:12–14.

331.   The supposed issue addressed by this provision was already addressed under the previous law; "the existing Florida statute before the change already banned the solicitation of voters within 150 feet of the polling place and giving them campaign materials and the like." Tr. 1026:1–20 (Burch);  ECF No. 458-6 at 44 (Burch Rpt.).  Notably, this contradiction was raised in the legislative record with

legislators, including Senator Farmer, noting that this was already the law.  ECF No. 461-37 at 43:13–43:16.

### 5. *Purported Justifications for the VBM Request Identification Provision*

332.   Senator Baxley initially denied that the provision would preclude registered voters who do not have a driver's license, Florida identification card, or social security number.   When Senator Brandes (R) challenged that assertion noting that there were 28,000 voters in Pinellas County who would be affected, Senator Baxley responded (falsely) that these voters would be "exempt."  ECF No. 461-78 at 74:21–75:9.  Senator Baxley also claimed that individuals could use "whatever identifying numbers" they had and the intent of the provision was to "broaden the number of things you could use" to request a mail ballot.  *Id.* at 23:13-23.  None of those assertions are correct.

### 6. *Purported Justifications for the Registration Delivery Restriction*

333.   The sole Challenged Provision that was  actually requested by any SOE was the VBM Registration Delivery Restriction.  Mr. David Ramba, a lobbyist for the FSE, testified at trial that the FSE asked the legislature to require 3PVROs to submit voter registration forms to the county where the applicant resides.  Tr. 3119:8–19 (Ramba).

334.   However, Mr. Ramba did not claim to have presented evidence to the legislature about any problems created by the pre-SB 90 practice of delivering forms to the nearest SOE office.  He simply said the SOEs did not feel "it was [their] responsibility to be their assistant and separate out their files for them."  *Id.* at 3120:6–18 (Ramba).

335.   Accordingly, the legislative record is devoid of any evidence that justified any of the Challenged Provisions.

### 7.   *Failure to Address Actual Candidate Fraud in the 2020 Election*

336.   While the legislative record of SB 90 was rife with rhetoric about alleged voter fraud, SB 90 failed to address the only well-known example of election fraud in the 2020 election: third-party sham candidates.   As Representative Thompson explained, the 2020 election in Florida brought to light a problem of "stealth candidates who ran as individuals with no party affiliation and siphoned votes away from Democrats," enabling Republicans to win Senate seats.   Tr. 1456:19–23 (Thompson).

337.   Representative Carlos Guillermo Smith (D) proposed an amendment on April 19 seeking to prevent sham candidates from running in future elections.  ECF No. 461-92 at 68:23–69:16.  Representative Smith's amendment would have made it a third-degree felony to "knowingly and willfully solicit and influence a third-party sham candidate to run in a race that has no intention of winning that race."  *Id.*

116

at 69:4–16.  He explained that it was "really, really important to crack down on the actual election fraud that of course resulted in the indictment of former GOP State Senator Frank Artiles and has also implicated Congressman Matt Gaetz." *Id.* 69:13–16.

338.  Representative Robin Bartleman spoke in favor of the Smith amendment, emphasizing that it was "the one amendment that is addressing the only true documented case of voter fraud, where an arrest has been made, where there is a federal indictment, where there are other investigations." *Id.* at 72:17–20, 73:3–5. The amendment, however, was voted down.  *Id.* at 77:4–5.

339.  Representative Ingoglia urged members of the committee to vote down the bill because it was "drafted poorly." *Id.* at 71:3–14.  Yet Representative Smith's offer to narrow or revise the language of the amendment was not accepted, and there was no attempt to address the undelrying issue of sham candidates.  Tr. 1873:16–1874:22 (Smith).

340.  Senator Bobby Powell (D) similarly introduced an amendment that "would make it a crime to bribe, threaten, or influence someone into running a campaign."  ECF No. 462-40 at 15:8–10.  The aim was to "eliminate or put a halt to sham candidates who do not use their best efforts and skill to win an election." *Id.* at 15:10–12.  This amendment also failed.  *Id.* at 16:13–15.

341.    The legislature's failure to meaningfully address a prominent instance of fraud in the 2020 election strongly supports an inference that any interest in preventing fraud was pretextual.

## C.    Legislators' Awareness That SB 90 Would Burden Voters

342.    The legislative record is replete with evidence indicating legislators knew that SB 90 would burden voters and result in the suppression of voter turnout. *See* Appendix K (summarizing statements from legislators and stakeholders about the burdens imposed by SB 90).

### 1.    Statements of Other Legislators and Stakeholders

343.    Numerous Florida legislators were vocal regarding their concerns about SB 90's burdens on voters during debate.  For instance, Senator Perry Thurston (D) expressed his concern that SB 90 "will deprive individuals of their opportunity to vote."  ECF No. 462-8 at 10:12–13.  Other opponents of SB 90 shared specific concerns about how the bill's provisions would impede Floridians in casting their ballots. *See* ECF No. 461-34 at 43:4-12 (Drop Box Provision); ECF No. 461-35 at 52:22–53:11 (VBM Request Identification Provision); ECF No. 462-29 at 42:17–23 (Line Relief Provision); ECF No. 461-98 at 15:4-17:9 (Registration Disclaimer Provision).

344.    Several stakeholders also raised their concerns to the Senate Government and Accountability Committee during the March 10 hearing.  Trish

Neely from the League of Women Voters told the committee that "[t]aking away safe and secure drop boxes makes absolutely no sense unless you're looking for ways to suppress the vote."   ECF No. 461-34 at 31:5-21. She further stated that "changing the vote-by-mail process, especially following a major election, makes no sense unless you're looking for ways to confuse voters into not voting, or to make it harder, so they don't vote." *Id.* at 31:15–18.  Likewise, Jonathan Webber from Florida Conservation Voters warned that the drop box restrictions "will only lead to less people voting." *Id.* at 32:12–14, 33:14–16.  And Brad Ashwell from All Voting is Local similarly criticized the bill as likely to "confuse voters" and "create less options for them after record turnout in November." *Id.* at 34:10–11, 34:19-23.

## 2.   *Information from the Secretary of State's Office*

345.   The legislature also received information from the Division of Elections making it clear that SB 90 would impose significant burdens on voters.

346.   First, the legislature was made aware that the VBM Request Identification would prevent thousands of voters from casting VBM ballots.   In February 2021, the Division of Elections calculated that 681,481 Florida voters had no valid identification number on file, and over 2.85 million voters only had one form of identification on file and were at risk of a mismatch.  ECF No. 608-68; Tr. 2791:2–7 (Matthews).

347.   The Secretary of State's office provided this data to the legislature after the legislature identified the issue and requested the information.   Tr. 2794:14–2795:12 (Matthews).

348.   Correspondence between the legislature and the Secretary of State's office demonstrates that the legislature understood the burden the identification requirement would impose on these voters.   On April 6, a legislative staffer, Don Rubottom, wrote to a Division of Elections employee, Pierce Schuessler, about potential problems created by the VBM identification provision.   ECF No. 608-65 at 2.   He wrote:   "Our bill attempts to add two factor identity verification for VBM requests and registration changes.   Problem is that Supervisors cannot verify DL# or SSN if not previously provided."   *Id.*; *see also* ECF No. 465-88 (SOS RFA Nos. 160-61).

349.   Rubottom twice acknowledged that "a voter could not be expected to know which number they provided at registration."   ECF No. 608-65 at 3; *see id.* at 2 ("But if I send in writing with DL but they have ssn on file, they can't verify.").   And he asked whether the Department of State would be able to verify a voter's identity when SOEs could not.   *Id.* at 3.

350.   Despite Rubottom's concerns, the final bill required the additional identification number in a VBM request to be "verified in the supervisor's records."   Fla. Stat. § 101.62(b).

351.   In addition to the information about voters without identification in the supervisors' records, the Division of Elections made available to the legislature an "election recap report" that included data on all Florida voters in the 2020 election. Tr. 2826:4–10 (Matthews). The data provided in the report included information about the number of voters who voted by mail, early in person, and on election day. Tr. 2826:11–13 (Matthews).   Although the data was available to the legislature during its consideration of SB 90, Tr. 2827:9–14 (Matthews), there is no evidence that SB 90's proponents made any effort to assess how many voters would be affected by SB 90.

### 3.   *Information from Supervisors of Elections*

352.   Supervisor Earley testified during legislative hearings, relaying concerns from Leon County voters regarding the ability to request VBM ballots, including the VBM Request Identification provision.  Tr. 2615:3–5, 2615:21–2616: 11 (Earley).

353.   On April 13, Supervisor Julie Marcus emailed every member of the Senate Rules Committee to inform them that 28,000 voters in Pinellas County did not have an identification number on file because they were "not legally required to have this information to register to vote."  ECF No. 608-68 at 2.  Senator Jeff Brandes (R) referenced Supervisor Marcus's letter at the Rules Committee hearing. ECF No. 461-37 at 85:8-12.  Senator Brandes went on to share his concern that the

VBM Request Identification requirement did not create an exception for "those who don't have a Social Security number or driver's license." *Id.* at 85:12–18.

354.   SB 90's proponents offered conclusory responses when confronted with evidence that the provisions of the bill would disenfranchise voters.

### D.   Legislators' Awareness That SB 90 Would Have a Discriminatory Impact

355.   The legislature was repeatedly made aware that SB 90's provisions would have a discriminatory impact on Black and Latino voters.   The bill's proponents did not dispute these assertions or offer any evidence showing that the bills would *not* have a racially disparate impact.   Instead, SB 90's proponents offered statements dismissive of these concerns and passed SB 90 anyway.

### 1.   *Statements of Other Legislators*

356.   Senator Farmer, the Minority Leader during SB 90's consideration, testified that he had "many discussions" with the Republican Senate President and Chair of the Rules Committee regarding SB 90's discriminatory impact.   Tr. 1531:12-20 (Farmer).   Although none of the Republicans he spoke to "ever dispute[d] that the bill would have a negative impact on minority voters," *id.* at 1550:23-1551:2, they took no steps to address his concerns. *Id.* at 1534:7-12.

357.   Many legislators made statements during debate affirming the discriminatory impact that SB 90 would have.   Indeed, Representative Carlos Guillermo Smith testified that "concerns about the potential discriminatory impact

of" SB 90's restrictions was a "theme throughout the process."  Tr. 1877:15-1879:1 (Guillermo Smith).  A chart compiling the citations to the legislative record where the bill's discriminatory impact was discussed is attached as Appendix J.

358.   For example, during the April 26 Senate floor debate, Senator Farmer cited statistical evidence demonstrating the likely discriminatory impact of the bill:

> There are provisions in this bill that would place an inordinate burden on minority low income and young voters who are less likely to possess certain types of identification.  According to a 2012 National Election Studies, 13 percent of black respondents, 10 percent of Latino respondents but only 5 percent of white respondents lacked photo identification.

ECF No. 462-8 at 32:14-19.

359.   Other concerned legislators brought data about SB 90's disparate impact to their colleagues' attention during debates.  During the April 22 Senate floor debate, for example, Senator Lori Berman referenced a study by the Stanford-MIT Healthy Elections Project.  That study examined Florida's voting data from the 2020 general election and found the racial group that had the greatest increase in voting by mail from the last presidential election was Black voters.  ECF No. 461-98 at 100:6-13.  Senator Berman asked the sponsor, Senator Baxley, whether he was aware that SB 90's provisions would "have a disparate impact on Black voters."  *Id.* In response, Senator Baxley sidestepped the question about discriminatory *impact* and merely denied that anything in the bill would "disenfranchise[] anyone," while failing to address the statistics that Senator Berman had cited.  *Id.* at 100:15-22.

360.   Representative Thompson, an African-American woman, made the following statement about the drop box restrictions on the House floor: "[B]ecause it was people like me who used drop boxes in the last election more than they ever had and who made their voices heard, we are here today considering a bill that would restrict use of drop boxes."   ECF No. 462-29 at 83:1-4.   Representative Thompson conveyed to her colleagues that "African-Americans had used drop boxes in the 2020 elections in higher numbers" and that restrictions on drop boxes would "curtail that kind of involvement."   Tr. 1461:5-12 (Thompson).

361.   Similarly, Representative Anna Eskamani (D) testified that she made her "concerns about the bill's disparate impact on voters of color" known to the legislature.   Tr. 1910:4-9(Eskamani).   Representative Eskamani specifically spoke in the legislature about "Florida's dark history when it comes to Jim Crow."   *Id.* at 1910:13-15.   She further testified that she was "not alone" in "calling attention to the discriminatory impact of the bill on minority voters and disabled voters."   *Id.* at 1914:22-25.   Representative Eskamani never heard the proponents of SB 90 dispute the disparate impact that the bill would have on voters of color.   *Id.* at 1916:14-1917:3.

## 2.   *Information from Stakeholders*

362.   The legislature also received statistics and other evidence of SB 90's anticipated discriminatory impact from stakeholders.   For example, Senator Farmer

testified that, while the bill was being debated, he "was presented with evidence and statistics and studies that showed that people of color and minorities were going to be impacted by [SB 90] more than white voters."   Tr. 15228:9-14 (Farmer).

363.   Senator Farmer specifically recalled receiving a letter from the Florida NAACP and NAACP Legal Defense Fund (LDF) providing evidence about the disparate impact that certain provisions of SB 90 would have.  *Id.* at 1529:8-16; *see also* ECF No. 608-100.

364.   The letter outlined why these organizations were "deeply concerned that the enactment of S.B. 90 will impose unnecessary barriers and burdens that will disproportionately impact the rights of Black voters and other voters of color, voters with disabilities, the elderly, and low-income voters."   ECF No. 608-100 at 1.

365.   With respect to the VBM restrictions, the NAACP  letter explained:

366.   S.B. 90's assault on voting by mail is especially concerning because it comes immediately after an election in which Florida's Black voters cast VBM ballots at unprecedented levels. In the 2020 general election, 522,038 Black voters cast VBM ballots, more than double the number of VBM ballots cast by Black voters in previous years. Moreover, the proportion of VBM ballots that were cast by Black voters has increased by over 28% since the 2016 election. There has been no evidence of fraud in VBM balloting that provides any justification for these

provisions of S.B. 90. Passage of S.B. 90's novel restrictions at this moment appears, instead, to be a reaction to increased Black participation in voting by mail.

*Id.* at 2.

367.   The letter also described "S.B. 90's significant restrictions on drop boxes" as "deeply concerning":

> For many voters—especially voters with personal or professional commitments that limit their availability during normal voting hours, elderly voters, and voters with disabilities or other medical conditions—casting an in-person ballot during advance voting or on Election Day may be an untenable option, and broadly available drop boxes are an essential alternative . . . . Black voters are less likely to be able to take time off work and are therefore more likely to return their VBM ballot to a drop box in the evening, early morning, or weekend—options that would no longer be as widely available under S.B. 90.

*Id.* at 6.

368.   The letter also explained that the ban on line warming activities would "disproportionately burden Black voters and other voters of color" because "Black and Latino voters in Florida tend to encounter longer lines when voting in person and therefore are more likely to need water and food to make the longer waits tolerable." *Id.*

369.   The NAACP letter was sent to "all the members of the Florida Senate." Tr. at 1530:24-1531:8 (Farmer); ECF No. 608-100.

370.   In addition, the Division of Elections made available to the legislature an "election recap report" that included data on all Florida voters in the 2020

126

election.  The data provided in the report included demographic information such as race, ethnicity, and party, as well as information about the number of voters who voted by mail, early in person, and on election day.  Tr. 2826:4-16 (Matthews). Although the data was available to the legislature during its consideration of SB 90, Tr. 2827:9-14 (Matthews), there is no evidence that SB 90's proponents made any effort to assess whether the provisions would have a discriminatory impact on voters.

### 3.   *Bill Sponsors' Response to Discriminatory Impact*

371.   Senator Farmer testified that, in his discussions with the Senate President, he proposed "many" specific ideas "about ways that the discriminatory impact of the bill could be reduced."  Tr. 1542:10-17 (Farmer).  For example, he recalled asking "to take out the provisions that made it more burdensome, particularly on minority voters, with regard to the driver's license number and the last four of your social security number."  *Id.* at 1542:19-24.   Senator Farmer also "offered numerous alternatives" to the "onerous provisions of the bill requiring 24-hour in-person supervision [of] drop boxes" because he "didn't think any supervision was necessary" when "nobody's monitoring mailboxes when vote-by-mail ballots are dropped in."  *Id.* at 1543:18-24.  Senator Farmer confirmed that he had reduced those requests to the Senate President in writing and "gave a copy to the president's office and to the president so that he would have it for ease of reference."  *Id.* at 1544:1-12.

372.   However, as Senator Farmer testified, "none of the concepts [he] offered were adopted."   Tr. 1544:23-24 (Farmer).     In particular, none of the amendments Senator Farmer offered "that would have reduced or mitigated the discriminatory impact of the challenged provisions of SB 90" was enacted.   *Id.* at 1545:18-22.

373.   Moreover, Senator Farmer testified that none of the Republicans he spoke to "ever dispute[d] that the bill would have a negative impact on minority voters." Tr. 1550:23-1551:2 (Farmer).  For instance, in the Senate Rules Committee, Senator Bobby Powell asked Senator Dennis Baxley: "An analysis of the recent election indicated that Black voter turnout . . . doubled . . . during the last election ... Do you think that by putting these measures in place, it would be helpful to reduce that Black voter turnout?"  ECF No. 461-37 at 93:21-94:12.  Rather than addressing this concern about discriminatory impact, Senator Baxley merely responded, "I don't buy the whole Jim Crow story." *Id.*

374.   Rather than dispute the warnings given about disparate effects on minority voters, SB 90's proponents often responded to these warnings with statements – like Senator Baxley's quoted above – that were indicative of racial resentment.  For example, in response to concerns about the disparate impact of the bill, Senator Hutson (who was referred to as part of the "team" behind SB 90) replied by stating that "[t]he only excuse you have is that you're lazy if you do not vote."

ECF No. 462-8 at 29:6-20; Tr. 1045:11-1046:1 (Burch); ECF No. 608-5 at 58 (Burch Rpt.). Other proponents, including Senator Baxley himself, made similar statements consistent with racial resentment in the response to these warnings. ECF No. 608-5 at 55-59 (Burch Rpt.); Tr. 1041:24-1046:21 (Burch); ECF No. 461-98 at 100:15-22; ECF No. 462-8 at 26:23-27:8.

375. Representative Eskamani also emphasized that she never heard the proponents of SB 90 dispute—with evidence or argument—the potential disparate impact that the bill would have on voters of color. Tr. 1916:14-1917:3 (Eskamani).

### E. Procedural and Substantive Departures from the Ordinary Legislative Process

#### 1. *Limited Role of the Supervisors of Elections*

376. As explained, the SOEs were not consulted prior to SB 90's introduction. Legislators repeatedly expressed surprise that the SOEs had not been consulted before SB 90's introduction. *See generally* Appendix L ("Discussion of Supervisors of Elections Opposition").

377. The FSE is an association of all 67 SOEs. At the time SB 90 was under consideration, Supervisor Latimer served as President of the FSE, Supervisor Earley served as the Vice President, and Supervisor Hays served as the chair of the legislative committee. David Ramba was the lobbyist for the FSE.

378. The FSE did not believe there was a need for SB 90. Tr. 3504:11-13 (Earley). On the contrary, the FSE issued multiple statements during the legislative

process opposing the bill.  ECF No. 608-36 (April 23, 2021 statement: "Florida Supervisors of Elections (FSE) does not support SB90 or HB7041 in their current form"); ECF No. 634-19; ECF No. 608-48 (April 30, 2021 statement: "[T]his legislation still makes requesting Vote By Mail ballots and returning those ballots harder.").

379.   Supervisor Hays, a former Florida senator, confirmed that the FSE's official position on SB 90 near the end of the legislative process was that the FSE did not support SB 90 in its present form.  ECF No. 549-2 (Hays Dep.) at 43:12-19. This statement also "[a]bsolutely" represented Supervisor Hays' own views at the time. *Id*. at 47:13-18.

380.   The FSE never issued a statement in support of SB 90.  ECF No. 549-3 (Latimer Dep.) at 111:4-6; Tr. 2670:20-2671:1 (Earley) ("I think we said repeatedly it was not [a necessary bill]").

381.   Individual SOEs similarly opposed the bill at every stage of the process. Shortly after its introduction, Supervisor Earley sent an email stating: "Yes, it was very partisan and very little of the true reasoning behind the bill was actually stated. All SOEs are strongly against this bill.  Even ex-Sen Hayes [sic] is extremely against it."  ECF No. 608-35 at 1).

382.   Supervisor Scott was also "very vocal" about his opposition to SB 90 throughout the legislative process.   Tr. 1215:5-7 (Scott).   After the bill was

introduced, he spoke with several legislators, including members of the Broward County legislative delegation, to express his concerns.  Tr. 1212:11-24; *see also* ECF No. 608-99) (March 16, 2021 email summarizing meeting with Broward County legislative delegation and stating he was "asking the Florida Senate to vote no on SB-90").

383.   Supervisor Corley sent an email on April 14, 2021 to members of the Pasco County legislative delegation to express his disappointment in the bill:

> Ordinarily, I would reach out to you all to relay my in depth analysis/ thoughts on the above referenced legislation.  However, I will keep it brief.  There are no words to fully express my disappointment in the provisions contained in both the House and Senate bills.  ECF No. 608-30 at 1.  He continued to oppose the bill until its final passage. During the debate on the Senate floor, Senator Burgess (R) sent a text message to Supervisor Corley indicating he wanted to relay Supervisor Corley's support for SB 90 on the floor.  Supervisor Corley responded "hell no" to the request.  Tr. 1279:3-17; *see also* ECF No. 608-31 at 1-2.  On April 30, 2021, after SB 90 had passed, Supervisor Corley wrote in an email to other SOEs: "I have so much I want to say about the motives, intent and content of this election bill but to be honest, beyond disillusioned so I'll keep my pie hole shut!"

ECF No. 608-32 at 1.

384.   While SB 90 was being considered in the Senate, several legislators raised concerns over SOE opposition to the bill.

385.   For example, Senator Loranne Ausley (D) noted that the lack of consideration of SOE opposition was unusual, given the fact that "[i]n past elections we all typically listened to these experts and worked hard to fix what was broken—

131

except for this year.  This year something is different because, instead of listening to those voices, those experts we're doing exactly the opposite of what they're suggesting."  ECF No. 462-8 at 12:3-11.

386.   Senator Annette Taddeo (D) also expressed dismay at SOE opposition to the bill, particularly in light of the success of the 2020 election and the $25,000 fine SOEs would face if drop boxes were left unattended for any amount of time. ECF No. 462-40 at 46:1-22.

387.   And in an April 20, 2021 Senate hearing, Senator Brandes explained that the lack of SOE support was the reason he did not support the bill:

> I need to put on the record that, to my knowledge, not one Republican supervisor of elections in the State of Florida supports this bill in its current form.  I need to put on the record that even our good friend, Senator Hays, who had left here to become a supervisor of election, one of the most staunch conservatives that had run through this chamber, has strongly opposed this piece of legislation and believes that it will not work and will frankly hurt the voting process.

ECF No. 461-94 at 7:16-8:2.

388.   Likewise, when the bill was being considered in the House of Representatives, legislators expressed concerns that SOEs' views were not given adequate weight.

389.   During House floor debate on April 28, 2021, Representative Dan Daley (D) noted the overwhelming opposition from SOEs throughout the state: "I also defer to folks like the supervisors of elections across the state because they're

the experts. The overwhelming majority of them are opposed to the changes in this bill." ECF No. 462-29 at 32:12-15.

390.   Similarly, at the April 28, 2021 House session, Representative Dotie Joseph (D) noted: "We know that the supervisors of election throughout the state are opposed to this version of the bill." ECF No. 462-29 at 67:19-20.

391.   The legislative record also indicates that the bill's sponsors, Senator Baxley and Representative Ingoglia, were aware of the nearly uniform opposition of the SOEs.

392.   For instance, during a March 10, 2021 hearing, Senator Victor Torres (D) informed Senator Baxley that "the response that I received was 66 out of the 67 don't like your bill.  That's what I got.  The cost factor to the SOEs is going to be monumental to follow the guidelines of this bill." ECF No. 461-34 at 14:5-15:1.

393.   Representative Ingoglia erroneously stated during an April 19, 2021 hearing that "I also want to highlight that the SOEs have said that they supported the bill.  I don't think your SOEs would be on record saying that they would support a bill that dealt with voter suppression." ECF No. 461-92 at 83:8-11.

394.   However, later, at the April 27, 2021 House floor debate following the introduction of his late-night strike-all amendment, Representative Ingoglia acknowledged that SOE concerns were not accommodated.  ECF No. 462-9 at 31:14-32:2.

395.   Later, at an April 28, 2021 hearing, Representative Fentrice Driskell also clarified the lack of SOE support for the bill after receiving an unclear response from the bill's sponsors about SOEsupport:

> I didn't get a clear answer, but I got a general impression that maybe [the SOEs] don't oppose the bill.  Well, members, to eliminate any confusion, let me read you a statement from a local supervisor of elections that was made on behalf of all 67 of them: Florida Supervisors of Elections does not support SB90 or HB7041 in their current form, but continue to share information with the Legislature.

ECF No. 462-29 at 78:3-10.

396.   Legislators recalled the SOEs' opposition to the bill at trial. Representative Geraldine Thompson testified that she personally communicated with Supervisor Cowles (Orange County), Supervisor Earley (Leon County), and Supervisor Hays (Lake County) about SB 90.  Tr. 1447:18-25 (Thompson).  These SOEs told her that "they were opposed to the proposed legislation" and that "they were particularly concerned about restrictions on the use of drop boxes which had been used very, very effectively prior to [SB 90]."  *Id.* at 1449:6-13.  Representative Thompson recalls Supervisor Hays calling the proposed legislation "a travesty."  *Id.* at 1449:14-17.  This is consistent with Supervisor Hays' own testimony stating that he reached out to legislators to express "what a travesty certain parts" of SB 90 were. ECF No. 549-2 (Hays Dep.) at 43:24-44:7; *see also* Tr. 1897:1-16 (Eskamani)

(testifying that the SOEs "overwhelmingly said that the changes within this [new] law were unnecessary").

397.   Senator Farmer testified that he found the "unanimous" opposition among SOEs "extremely significant." Tr. 1520:25-1521:21 (Farmer).  He could not recall another time when all 67 SOEs from Florida's diverse counties unanimously agreed on a bill.  *Id.* at 1521:6-11.

398.   Senator Farmer also identified the SOEs as "particular stakeholders that would be important to hear from in . . . the legislature's consideration of a voting-related bill."  Tr. 1515:14-24 (Farmer).  Senator Farmer testified: "I think all of us want to hear from the Supervisors of Elections because they are the ones that actually conduct the elections and deal with this stuff on a day-to-day basis.  They are really the subject matter experts for us."  *Id*. at 1515:20-24.

399.   At trial, Supervisors confirmed that they remained opposed to multiple provisions of SB 90, including many of the Challenged Provisions.  Supervisor Earley testified that "significant parts of the bill . . . are troublesome, especially with regards to our voters and their confidence in being able to use vote-by-mail."  Tr. 2617:11-14 (Earley).  Supervisor Scott similarly testified that he did not support the final bill despite the improvements that had been made.  He explained:

> [E]ven though there were some improvements made, but there's still so many problems with it in the way that it makes it harder for us to use drop boxes, the fact that it makes it harder for third-party groups, for grassroots groups, to go out and do voter

135

registration drives, those problems made it so that that was not a bill that I could support, even after … the changes that were made.

Tr. 1213:21-1214:5 (Scott).

400.   The Supervisors were not given an adequate opportunity to voice their concerns about SB 90.   Senator Farmer testified that some senators "asked specifically for the Supervisors of Elections to be allowed to appear in person" to provide comment on SB 90, but that request was denied.   Tr. 1519:22-1520:15 (Farmer).   The denial of this request was striking because "during the . . . spring 2021 legislative term . . . public officials [were] allowed in other committee hearings on other legislation."   *Id.* at 1520:16-24.

401.   The SOEs did not believe their views on SB 90 were taken into consideration.   Supervisor Corley had little faith that any input would be properly considered.   He wrote: "It's apparent that the bill (with or without amendments) is certain to pass and no matter what input I were to provide, it would be moot."   ECF No. 608-30 at 1.   Supervisor Latimer stated that he "[doesn't] know that [the Supervisors' concerns] were listened to."   ECF No. 549-3 (Latimer Dep.) at 28:23-24.

402.   During the legislative proceedings, SOEs expressed dismay that their views had not received adequate consideration.   For instance, during a March 10, 2021 Senate Governmental Oversight and Accountability Committee hearing,

136

Supervisor Hays expressly "ask[ed] each member of the legislature to seek the opinions and take the advice of the elections professionals of the State of Florida before making significant changes in tinkering with our statutes." ECF No. 461-34 at 19:17-22.

403. Supervisor Hays went on to note before the Senate Governmental Oversight and Accountability Committee that

> Perhaps it might clarify if I just stated that nothing in this bill is on our list of suggestions, with the exception of that one section giving us the authorization to begin canvassing the vote-by-mail ballots after the logic and accuracy testing is completed. That's the only thing that we are in favor of in this bill.

*Id.* at 23:6-13.

404. Supervisors also expressed their opposition to specific provisions of the bill throughout the legislative process.

405. For example, Supervisor Hays noted that "Page 11, Line 309" and the following lines, proposing restrictions on drop boxes, were "a travesty":

> All of us are aware of the perils, perceived or actual, of trusting the United States Postal Service to deliver ballots on time. Last year in the general election, 4.9 million Floridians returned their vote-by-mail ballot for tabulation. Out of those 4.9 million, one and a half million were placed in drop boxes. If you allow Section 5 of this PCS to stand as it is currently worded, you will have outlawed the use of those drop boxes, and you have just played havoc in the lives of one and a half million Floridians, not to mention the burden that you've added to the Supervisors of Elections. Is that really your intention?

ECF No. 461-34 at 20:14-21:2; *see also id.* at 21:3-21 (describing Supervisor Hays'

opposition to the bill's proposal to require voters to request a new mail ballot each

year).

406.    Supervisor Earley also made clear his opposition to the bill's provisions

restricting the use of drop boxes during the March 10, 2021 Senate hearing: "The

key points that I'm very concerned about are the prohibition of the use of drop boxes.

Supervised drop boxes are the gold standard of the chain of custody for receiving

voter ballots.  I mean, that's plain and simple."  ECF No. 461-34 at 28:14-25; *see

also id.* at 29:14-30:8 (describing Supervisor Earley's opposition to the bill's

proposal to require voters to request a new mail ballot each year).

407.    Several Supervisors later testified about their opposition to SB 90 at

trial.

408.    Supervisor Scott "was very vocal about [his] opposition to Senate Bill

90 throughout the legislative process.  Tr. 1212:15-24; 1215:5-7 (Scott); *see also*

ECF No. 608-99.

409.    Supervisor Corley shared his opinion that he "wasn't a fan of some of

the contents" of SB 90 during a phone call with Representative Ingoglia after SB 90

was introduced.  Tr. 1275:2-1276:1 (Corley).  Even after Supervisor Corley shared

his concerns on the call, Representative Ingoglia continued to promote the merits of

the legislation; the conversation did not change Supervisor Corley's view of the bill.

*Id*. at 1278:21-1279:2. Supervisor Corley also communicated with Senator Burgess over text message while SB 90 was on the floor of the Senate.  *Id*. at 1279:10-12. Senator Burgess wished to relay Supervisor Corley's support for SB 90, but Supervisor Corley responded "hell no" to the request.  *Id*. at 1279:13-17.  Supervisor Corley also communicated with Senators Simpson (R), Brandes, and again with Representative Ingoglia; he did not express support for SB 90 in any of these communications.  *Id*. at 1280:2-8.

410.   Supervisor Earley testified that the reasoning provided for the bill during committee discussions "didn't really make much sense" and that "the true reasoning -- if that was the reasoning . . . was, frankly, nonsense."  Tr. 2614:4-10 (Earley).   He offered testimony during legislative hearings on problems with portions of the bill based on concerns from Leon County voters regarding the ability to request vote-by-mail ballots, including the identification provision, which influenced his testimony and position on SB 90.  *Id*. at 2615:22-2616:-11.

411.   Supervisor Corley sent an email on April 14, 2021 to members of the Pasco County legislative delegation to express his disappointment in the bill:

> Ordinarily, I would reach out to you all to relay my in depth analysis/thoughts on the above referenced legislation.  However, I will keep it brief.  There are no words to fully express my disappointment in the provisions contained in both the House and Senate bills.

ECF No. 608-30).

412.   Although Mr. Ramba estimated that 75 to 80 percent of SB 90's provisions were altered based on the SOEs' recommendations, Tr. 3100:21-3101:4 (Ramba), the legislature notably did not make changes to any of the Challenged Provisions other than the drop box restrictions and the delivery requirement in response to SOE concerns.

413.   Accordingly, SOEs did not support the bill even when it was enacted. Despite making their concerns and objections known, the SOEs did not believe their views were properly taken into consideration.  Supervisor Corley had little faith that any input would be properly considered: "It's apparent that the bill (with or without amendments) is certain to pass and no matter what input I were to provide, it would be moot."  ECF No. 608-30; *see also* ECF No. 608-29 ("My dream is that once just once, those in Tallahassee crafting legislation relating to elections would confer with those who actually administer elections in lieu of solely conferring with political parties").  Just a few days before SB 90 was enacted, Supervisor Corley believed it was "a horrible piece of legislation."  ECF No. 608-31.  Then again on April 30, 2021 after SB 90 had passed, Supervisor Corley wrote in an email to other SOEs: "I have so much I want to say about the motives, intent and content of this election bill but to be honest, beyond disillusioned so I'll keep my pie hole shut!"  ECF No. 608-32.

414.   Supervisor Latimer stated that despite expressing his and other Supervisors' input to the Legislature, he "[doesn't] know that [they] were listened to." ECF No. 549-3 (Latimer Dep.) at 28:23-24.  Similarly, Supervisor Earley stated that even though certain earlier portions of the bill were stricken, "there are still…certainly some significant parts of the bill that are troublesome, especially with regards to our voters and their confidence in being able to use vote-by-mail."  Tr. 2617:9-14 (Earley); *see also id*. at 2621:5-8 (testifying the final statute is "not as troubling, but there are still problems, without a doubt.").  Supervisor Scott testified that despite the improvements made to the bill, he did not support the final bill.  Tr. 1213:21-1214:5 (Scott).

415.   The legislative record makes clear that not one of the sixty-seven Supervisors of Elections supported the final version of SB 90 when it was passed. *See generally* Appendix L ("Discussion of Supervisors of Elections Opposition"). The legislators also testified to the Supervisors' opposition to the final bill.  *See generally id.*

416.   The limited role of the Supervisors was a substantial departure from the ordinary process for passing election legislation.  *See supra* ¶¶ 380-92.

## 2.   *Limitations on Witness Testimony*

417.   Public comment in the committees was extremely limited, and in some instances, was completely foreclosed.   ECF No. 608-5 at 7 (Burch Rpt.).   The

legislative record has several examples of how witness testimony was limited.  *See generally* Appendix M ("Truncated Debate & Limited Public Comments"); *see also* Tr. 1521:25-1522:19 (Farmer); ECF No. 608-5 at 52-54 (Burch Rpt.); ECF No. 461-36 at 47:12-19; ECF No. 461-37 at 120:7-17, 130:5-6; ECF No. 461-38 at 91:25-92:4, 93:10-13, 93:17-94:2; Tr. 1037:17-1039:8 (Burch); Tr. 1813:19-1814:19 (Kousser); Tr. 1889:20-1890:13 (Smith); 1904:20-1905:5 (Eskamani); Tr. 2615:3-23 (Earley).

418.   For instance, in an April 14, 2021 Senate Rules Committee hearing to consider Senator Baxley's delete-all amendment, which changed the bill in several respects, opportunity for public comment was very limited.

419.   At the April 14, 2021 hearing, members of the public were only allotted one minute each to speak.   ECF No. 461-37 at 120:12-14.  In fact, members of the public were told specifically that "we're going to cut the testimony off at one minute."  ECF No. 461-37 at 120:17.

420.   Approximately twenty members of the public signed up to comment by filling out appearance cards, and an additional seventy individuals wanted to speak, but only one hour was allotted to hear public comments.  ECF No. 461-37 at 119:23-120:11.

421.   Out of the nearly ninety members of the public who sought to provide comment, only eighteen members of the public were given the opportunity to do so

at the April 14, 2021 hearing, and eight of them were cut short.  ECF No. 608-5 at 52 (Burch Rpt.).

422.   A number of individuals, after witnessing the constraints placed on public comments, waived their opportunity to speak at the April 14, 20201 hearing. ECF No. 608-5 at 53 (Burch Rpt.).  Instead, their positions were merely summarized as "against."   ECF No. 461-37 at 130:4-17.

423.   And during the April 19, 2021 House State Affairs Committee hearing on HB 7041, the companion bill to SB 90, no public comment was permitted. ECF No. 608-5 at 52 (Burch Rpt.).

424.   House State Affairs Committee Chair Ralph Massullo apologized to the members of the public who had traveled to offer their comments, stating "Now, we're going to go to public testimony on the bill as amended, and for the sake of time, and I apologize to the individuals that have made the trip here, but we're just going to read into the record your position on the bill."  ECF No. 461-92 at 77:5-8.

425.   Representative Dotie Joseph voiced her opposition to the lack of witness testimony:

> I just wanted to state for the record my objection.  People come to these public meetings for an opportunity to be heard.  There was a prior bill that was not as important as this one but the bill sponsor took up a lot of time with that we didn't need to.  I think a lot of us have articulated our positions on this particular bill but I object to this process, I object to how some of these things have been limited so that we don't fully get a chance vet the bills.

*Id*. at 78:9-16.

426.   And at an April 8, 2021 House Appropriations Committee hearing to consider a strike-all amendment filed the day prior by Representative Blaise Ingoglia, the opportunity for public comment was very limited.

427.   For example, those participating in the public comment period were asked to "be as brief as possible."  ECF No. 461-36 at 27:24-28:2.

428.   Several speakers were limited to thirty seconds.  ECF No. 461-36 at 30:23, 43:14; *see also id.* at 47:12-19; Tr. 1038:13-20 (Burch); Tr. 1814:25 (Kousser).

429.   In response to being asked to keep his public testimony to thirty seconds, one speaker responded "Thirty seconds?  Holy cow.  Okay."   ECF No. 461-36 at 43:13-17.

430.   One member of the public was asked to keep his testimony to ten seconds, to which he responded "You know, I'll take this final ten seconds to urge the Committee to put time limits on public speakers in the beginning of the meeting. Because some of these people spoke for three or four minutes, and we've been sitting here and we've traveled over five hours, and we deserve the same amount of time." ECF No. 461-36 at 47:12-18.

431.   In total, the Chair of the House Appropriations Committee interrupted eight people who came to offer public comments in the interest of time.  ECF No. 608-5 at 53 (Burch Rpt.).

432.   There was no opportunity for public comment after significant changes were made to the bill.

433.   For example, Representative Ingoglia proposed a strike-all amendment, Amendment 107453, which was submitted on April 27, 2021 at 1:33am.   ECF No. 462-28.   The strike-all amendment contained more than 1,300 lines of changes, including last-minute changes to the drop box and VBM provisions.  ECF No. 608-5 at 50 (Burch Rpt.).   Because committee hearings were over, there was no opportunity for public comment following Representative Ingoglia's strike-all amendment.

434.   And on April 29, 2021, Senator Hutson filed a delete-all amendment shortly before the Senate floor debate.  The amendment lengthened the bill to thirty-three provisions.  ECF No. 462-45;  ECF No. 462-40 at 5:5-16.

435.   The amendment differed from the prior version of the bill in significant respects.  For example, it once again amended the definition of "solicitation."  Rather than prohibiting giving items to voters, the bill broadly prohibited "engaging in any activity with the intent to influence or effect of influencing a voter."  ECF No. 462-45.   In addition, the amendment for the first time required the additional

145

identification number provided in a VBM request to be "verified by the supervisors." ECF No. 462-40 at 24:14-16.   There was no opportunity for public comment following Senator Hutson's delete-all amendment.

436.   Legislators later testified about the lack of sufficient witness testimony.

437.   For instance, Representative Carlos Guillermo Smith commented on the unusual lack of public testimony in the State Affairs Committee hearing on April 19, 2021.  Tr. 1890:4-13 (Guillermo Smith).  He stated:

> I don't recall any members of the public testifying because we really took up all of the time in consideration of the bill on the 11 amendments that came from the sponsor, Representative Ingoglia, plus the amendments from members of the committee, and there was not sufficient time. Although there were a number of speaker cards that were presented from the public that were read into the record whether they were in favor or in opposition, my recollection is that there was no — there was no allowance for time for public testimony on the bill in this committee.  *Id*.

438.   Several legislators testified as to their surprise and dismay that opportunity for public comment was extremely limited.

439.   Senator Gary Farmer noted that "there was a high level of interest in [SB 90]" and that "a dozen different groups that had indicated their interest . . . wanted to testify . . . against the bill."  Tr. 1521:22-1522:7 (Farmer).  But "rather than extend time for the committee consideration of the bill" to accommodate the level of interest in testifying, "people were limited in their testimony to a minute." *Id*. 1522:8-16.  "In some instances," Senator Farmer testified, "people only had about

30 seconds to testify on this bill." *Id*. at 1522:18-19.  Senator Farmer further noted that Senators' ability to ask witness questions was "extremely limited" because "the chair was trying to move this thing along." *Id*. at 1523:4-12.

440.   Critically, Senator Farmer believed that the "limited . . .  time to testify impact[ed] the Senate's consideration of the bill . . . because it's impossible to stand up and talk about all the different aspects of SB 90 in a minute or two minutes." *Id*. at 1522:20-24.

441.   Representative Anna Eskamani was also struck by the lack of public testimony on SB 90.  Initially, she testified that, because voting is "a constitutional right . . . you really shouldn't pass policy without [public] feedback being integrated." Tr. 1897:4-8 (Eskamani).  But Representative Eskamani also noted:

> [I]n particular, when this bill was heard in the State Affairs Committee, there were, I think, upwards of 11 amendments considered on this bill, which also took away a lot of time for public testimony. And instead of temporarily postponing the bill to allow that public testimony to be heard, those who came to speak, who traveled to testify in front of this committee, were just read into the record as waiving for or against the bill. And, you know, that — that demonstrates an effort to really not only try to fast track this bill, but to not hear those concerns. You know, my understanding is some of the stakeholders who were there wanted to speak to Florida's history of Jim Crow laws and their concerns that this reflected that; this would impact the demographics that they identify with and so forth. And so it definitely seems like this process was just, you know, pushed forward in an aggressive fashion to silence that public feedback.

*Id*. at 1898:12-1899:3.

442.   Supervisor Earley found several aspects of the legislative debate of SB 90 to be unusual:

> [W]e've had a pretty good history of being consulted when — especially when a bill has this many changes coming through to an election statute that have many unexpected consequences potentially, so that was unusual that we weren't allowed to — we weren't brought into the conversation earlier. And also our ability to provide testimony during committee meetings was unusual — or a lack of ability, and really the reticence about even hearing what we had to say.

Tr. 2616:14-22 (Earley).  In particular, he believed that he and other Supervisors who testified in legislative hearings for SB 90 were given limited opportunity to be heard:

> But even given [measures taken in light of COVID concerns], we made every effort, myself and a few other Supervisors of Elections, Senator Hays in particular — Alan Hays, Lake County Supervisor of Elections — and our time was often extremely restricted.  I would get interrupted frequently and get cut off and -- maybe I'm wrong, but it certainly seemed sometimes I didn't even get my full three minutes to speak.

Tr. 2615:14-20 (Earley).

### 3.   *Truncated Legislative Debates*

443.   The legislative record reveals how time to debate SB 90 was unusually shortened.  *See generally* Appendix M ("Truncated Debate & Limited Public Comments").

148

444.   Overall, the Senate curtailed debate and passed SB 90 less than three months after it was introduced.  Tr. 1523:6-18 (Farmer) (referring to the accelerated consideration of SB 90 as a "rocket docket").

445.   And in the House, some hearings were expressly limited.  For instance, at the beginning of the April 19, 2021 House State Affairs Committee hearing, Chair Ralph Massullo indicated: "Members, we're going to be limiting questions and debate.  We have a lot of people who want to testify and we may be limiting those times as well."  ECF No. 461-92 at 2:3-5; *see also* Tr. 1033:20-1034:9 (Burch); Tr. 1898:11-1899:3 (Eskamani).

446.   Final debate on the bill in House State Affairs Committee hearing on April 19, 2021 was limited to thirty seconds per member.  ECF No. 461-38 at 93:14-15; Tr. 1034:2-4 (Burch); ECF No. 608-5 at 49 (Burch Rpt.).

447.   Chair Massullo later apologized for imposing these time constraints, stating "I'm sorry we're moving so fast.  The time crunch is 15 minutes left.  Less than 15 minutes left."  ECF No. 461-92 at 55:1-2.

448.   Several legislators were dismayed by this limitation.  For example, Representative Carlos Guillermo Smith noted that "Because we're so rushed for time for such an important bill - I mean we have ten minutes left at this committee - we can't properly vet these amendments.  I want to point out that I have a concern." ECF No. 461-92 at 51:22-52:1; see also ECF No. 462-31 at 15:24, 30:23-24, 38:10-

15; 39:15-20, 40:1-4; Tr. 1036:19-1037:15 (Burch); ECF No. 608-5 at 49-51 (Burch Rpt.).

449.   During the April 19, 2021 hearing, Representative Robin Bartleman opined "Why can't we just follow the normal process?  Why is there a rush to make it happen right away?  There is only one situation I could think of that would lead you to want to do that."   ECF No. 461-92 at 64:1-4.

450.   The House floor debate on April 27, 2021 was also unusually limited, despite the fact that Representative Ingoglia had filed a strike-all amendment at 1:33 AM that day.  Specifically, only ninety minutes were allotted to discuss eighteen different amendments to the strike-all.   In total, this restriction resulted in five minutes of discussion per amendment.   ECF No. 462-9 at 59:7-14.

451.   Representative Omari Hardy was surprised by the lack of opportunity for debate on amendments to the bill after the strike-all, and noted:

> It's very interesting that we should be given just five minutes to open, question, debate, and close amendments on this bill which is about the heart of our democracy in this state, one of the most important states in the United States of America.  I can't begin my discussion of this amendment without expressing how I feel about having this debate essentially canceled or truncated because we happened to have filed lots of amendments on this very objectionable piece of legislation.

ECF No. 462-9 at 59:22-60:6.

452.   Throughout the legislative debate, legislators made several statements conveying that their responses were rushed.

453.   For example, in an April 14, 2021 hearing, Senator Randolph Bracy (D) ended his remarks abruptly: "I'm going to end this, because I know we've got to move on, and we've got many speakers, but I would just say that I asked you that water question because it's gotten a lot of attention with Georgia and their law that they passed, and this, as I read this amendment, it sounds very similar to what Georgia has passed."  ECF No. 461-37 at 81:3-9.

454.   And during floor debate in the House on April 29, 2021, Representative Bobby DuBose stated "Man, I know we only have a few minutes left. It's really unfortunate with something that's so important how we are being handled. I feel like I'm being censored."  ECF No. 462-31 at 40:1-4.

455.   Legislators later testified that there had not been time to adequately debate SB 90.

456.    For example, Representative Geraldine Thompson emphasized that the process used to pass SB 90 was rushed and "highly unusual."  Tr. 1449:20-1450:6 (Thompson).  Specifically, Representative Thompson testified:

> [S]ince I serve on Public Integrity and Elections, it was presented to that committee and we discussed it; we debated it, and I did not see it again, which is unusual because there are generally a number of committees of reference where you have an opportunity to weigh in on legislation. And we did not see the bill again until a couple of days before the legislature was set to adjourn. And to do something this important in terms of setting out procedures for elections, that was highly unusual.

*Id*. at 1449:23-1450:6.

151

457.   The rushed process was particularly surprising to Representative Thompson because there was "no reason that the legislature had to pass SB 90 . . . before the end of the legislative session." Tr. 1450:22-1451:2 (Thompson).

458.   Representative Thompson further testified that the process used to pass SB 90 was even more rushed than the process used to pass HB 1—another controversial bill that was passed during the 2021 legislative session. Tr. 1454:1-14:55:1 (Thompson).

459.   In his testimony, Senator Gary Farmer characterized the passage of SB 90 as a "rocket docket situation." Tr. 1523:13-18 (Farmer). He further testified that "the expedited procedure . . . did adversely impact our ability to gain knowledge and make an informed decision" *Id*. at 1525:19-22. Senator Farmer also found that the expedited procedure amplified the challenges of the pandemic to the extent that Senators "were already limited in [their] ability to get information about the bill because of the fact that the capitol was closed." *Id*. at 1525:9-18. Senator Farmer stated that the expedited consideration of the bill made it "challenging" to prepare and submit amendments. *Id*. at 1525:23-25.

460.   Specifically, Representative Carlos Guillermo Smith spoke to how "the way that the proceedings went in the House State Affairs Committee" was "abnormal in a number of ways." Tr. 1884:3-9 (Guillermo Smith). He stated:

> We had started off the presentation of this bill in particular with the chair saying right out of the gate, before the bill presentation

was done, that this bill in particular he would be limiting questions from members on the committee; he would be limiting debate and would be limiting public comment as well. Then what was also abnormal in the committee was we had — 11 amendments were brought forward by the bill sponsor in one committee, which took an exceptional amount of time, and throughout this hearing on state affairs where the bill was heard, the chair of the committee either stopped questions from members and just said things like, [w]e're going to move on, and did not allow for additional questions on the bill, or there was even an instance — there was even an instance where a member of the committee was mid-question on the bill and her questions were interrupted by the chair. She was not able to finish asking her question, and the committee abruptly moved on and rushed through the proceedings without a proper vetting of the legislation.

*Id*. at 1884:10-1885:3.

461. Representative Anna Eskamani also testified about the lack of adequate time for debate. For instance, she recalled that "many" representatives who had questions about the strike-all amendment "were not given the time" to ask them. Tr. 1942:6-23 (Eskamani). Therefore, Representative Eskamani did not think "the overall time that was allotted to debate or discuss the strike-all [was] sufficient." *Id*.

### 4.   *Unusual Use of Strike-All Amendments*

462. The legislative record makes clear that the use of strike-all amendments on the House and Senate floors was unusual. *See generally* Appendix M ("Truncated Debate & Limited Public Comments"). Several legislators commented on unusual use of strike-all amendments during the legislative process.

463.   For instance, as described below, several legislators were vocal about their inability to prepare for floor debate following Representative Ingoglia's strike-all amendment introduced on April 27, 2021 at 1:33 AM, hours before the floor debate scheduled to take place later that morning and only one day after the Senate had passed SB 90.

464.   The April 27, 2021 strike-all amendment contained more than 1,300 lines of changes and was substantially different from the version of SB 90 that had recently passed in the Senate, specifically with respect to drop box and VBM provisions.  ECF No. 608-5 at 50 (Burch Rpt.).

465.   Additionally, there were changes made to the solicitation provisions. For example, at an April 19 House hearing, Representative Chambliss (D) asked if the bill would address nonprofits handing out items or providing language assistance within the 150-foot no solicitation zone, to which Representative Ingoglia responded "We are not planning on addressing that in this bill."  ECF No. 461-92 at 21:7-23:7.

466.   Only one hour was allotted for questions on the strike-all during the April 27, 2021 floor debate, which precluded any meaningful debate.  ECF No. 462-9 at 8:10-13.

467.   There was no opportunity for public comment following the introduction of April 27 strike-all, nor did legislators feel they had adequate opportunity to adequately vet the provisions of the strike-all.

468.   During the April 27, 2021 floor debate in the House, Representative Dotie Joseph remarked on the use of the late night strike all: "You know the Senate sent over a version.  This is the version that we have in the strike all that was dropped at almost 2:00 this morning."  ECF No. 462-9 at 111:22-24.

469.   During the April 27, 2021 hearing, Representative Tracie Davis asked a clarifying question about the bill's drop box provisions, as she was unclear on the bill's provisions given the limited time to prepare for debate: "In Section 11 of this bill, that we only had four hours to probably process because we received it at 1:33am, why are you referring to the drop box site as a site?  Why are we referring to the drop box as a site in Section 11, I think, of the strike all?  Are you doing sections or are you doing page numbers now?"   ECF No. 462-9 at 15:7-12.

470.   During the April 28, 2021 floor debate in the House, Representative Carlos Guillermo Smith expressed how the rushed process did not leave adequate time to prepare:

> And I do want to talk about the process. This bill is a case study in democracy in the dark. Strike all amendments at 1:33 a.m. The sponsor repeatedly said yesterday, well, if you read the strike all, if you read the strike all, if you read the strike all. Who had time to read the strike all? It was filed at 2:00 in the morning. No one. All rushed. Yesterday [during the April 27, 2021 House floor debate] I couldn't even debate on the strike-all because there was no more time.  No more questions.

ECF No. 462-29 at 17:23-18:6.

471.   During the final floor debate over the bill in the House on April 30, 2021, Representative Tracie Davis explained that she was "disappointed because there are a lot of things that have changed in this bill.  But the problem that I'm having is that we have less than an hour or two to prepare adequately."  ECF No. 462-31 at 30:20-24.

472.   Representative Davis also commented on the unusual use of last minute strike-all amendments in the context of election laws, underscoring that "You have allowed a caucus less than three hours to prepare for something that will change Florida's election law for over millions of voters."  ECF No. 462-31 at 34:3-5.

473.   She also commented on the unusual use of last-minute strike-all amendments for bills as lengthy as SB 90: "You gave us less than three hours to go through— how many pages is this?  A 48-page document to see the good stuff that you say is in here."  ECF No. 462-31 at 34:12-20.

474.   Moreover, although strike-all amendments themselves are not generally unusual, the timing of this strike-all amendment, which made significant substantial changes to the bill, was highly unusual when compared with other strike-all amendments.  Tr. 1034:12-1036:16 (Burch); ECF No. 608-5 at 49-51 (Burch Rpt.); Tr. 1899:4-9, 1902:8-1903:9 (Eskamani); Tr. 1451:15-24, 1453:8-24 (Thompson).

475.   Dr. Burch confirmed that the use of a strike-all amendment in this instance was "unusual given its length of more than 1300 lines and the substantial

changes it made to the Senate version that was just passed."  ECF No. 608-5 at 50 (Burch Rpt.).

476.   In fact, Dr. Burch "examined the histories of the 227 bills that appeared at least once on the Senate calendar for April 21st and 22nd (after day 50) or the House calendar for April 26th or 27th (after day 55).  Among those 227 bills, major strike-all amendments were submitted less than 24 hours before the bill was to be discussed in only 7 other instances."  ECF No. 608-5 at 50 (Burch Rpt.).

477.   In light of the unusual use of a strike-all amendment, legislators noted how difficult it was to keep track of the bill's changing provisions, including with respect to significant provisions such as drop box restrictions.   For instance, Representative Joseph Geller (D) commented:

> We could talk about individual provisions of this bill for a long time. But most of the people sitting here, members, if we had a quiz tonight on where we're at on drop boxes, on attestation, on where we're at tonight, on who can sign for when and how many drop boxes you can have and where, I got to tell you I suspect most of these people in this room - maybe me included - would flunk that quiz. Please vote down on this last minute attempt to try and get something through at all costs whether it's good or bad."

ECF No. 462-31 at 39:14-22.

478.   At trial, the legislators confirmed that the use of strike-all amendments to pass SB 90 was out of the ordinary.

479.   Representative Thompson testified that "rarely is there a strike-all offered once a bill is on the floor to be taken up for a vote."   Tr. 1451:18-21 (Thompson). "Normally," Representative Thompson explained, "a strike-all would be offered during committee so that you have the best product and the product is complete and almost final by the time it reaches the floor."   *Id*. at 1451:21-24. Indeed, Representative Thompson could not recall another time "ever" where "a strike-all amendment was introduced on the floor".   *Id*. 1453:8-11.

480.   Representative Thompson also found it "very unusual" that the April 27th strike-all amendment was introduced "around 1:30AM."   Tr. 1453:18-24 (Thompson).

481.   Not only was the strike-all amendment's timing unusual to Representative Thompson, but she also testified that she was "stunned" and "surprised" when Representative. Ingoglia waived close on the strike all amendment on April 27th.   Tr. 1458:2-13 (Thompson).   That is, she recalled what happened "very vividly because it was such an unusual behavior" to the extent that "[g]enerally the close gives you an opportunity to really hone in on your specific points and it is the last opportunity to be persuasive and to ask other members to vote favorably on the legislation."   *Id*. at 1458:2-9.

482.    Senator Farmer also testified that the use of the strike-all made it "challenging" to prepare and submit amendments.  Tr. At 1525:23-25 (Farmer).  He emphasized:

> [O]ur bill drafting office is just amazing in what they do, you know, on a turnaround basis under normal circumstances. But in this instance, I mean, I remember the House big strike-all amendment came out and it was like 1:30 in the morning when that came out. You know, bill drafting wasn't here.  We were all home.  And some people are night owls, may have seen it late. I'm a night owl, but I didn't see it that night.  You know, so then we come in in the morning and all of a sudden it's there and we have to try to prepare amendments.

*Id*. at 1526:1-9 (Farmer).

483.    In his testimony, Representative Carlos Guillermo Smith agreed that the use of the strike-all during the passage of SB 90 was "different from other strike-all amendments."   Tr. 1875:25-1876:17 (Guillermo Smith).   The representative identified a "few ways" that the strike all was different: first, "[I]t was different in the fact that it was on the House floor as opposed to presented in committee because it was a substantial change."  *Id*. at 1876:4-6.  This was unusual to the extent that "a strike-all is when you completely replace the original bill with a new legislative product."   *Id*. at 1876:6-8.   "It was also out of the ordinary," according to Representative Smith, "because of the fact that it was such a consequential piece of legislation . . . [and] was about 54 pages long."  *Id*. at 1876:9-12.  "[F]inally, it was out of the ordinary due to the fact that it was filed around 1:30 in the morning the

day that the bill was being presented on the House floor which really did not give members of the House an opportunity to review the strike-all." *Id*. at 1876:13-17. Strike-all amendments "are usually filed sometime in the evening . . . the day before the bill is presented[,] . . . which is an adequate amount of time, certainly, to review the language. *Id*. at 1876:20-23. Indeed, Representative Smith could not "recall another time when [the strike-all] was used on the House floor with the same length of the strike-all that this one was, which was longer, even, than the original bill . . . or the fact that it was introduced in the middle of the night in this way." *Id*. at 1877:1-5.

484. Similarly, Representative Anna Eskamani testified that the strike-all amendment on the House floor was unusual:

> [I]t is pretty rare to see a strike-all on the floor because that means the public really hasn't been given an opportunity to share feedback. In the case of lawmakers, we were not given ample time to even read and process this bill. And due to House rules, an amendment to a bill doesn't — well, it sets time restrictions on our ability to amend that amendment, so our ability to implement changes were limited. And during the strike-all presentation, only an hour was given to even ask questions, consider these potential amendments, and then vote on the new bill.

Tr. 1899:7-17 (Eskamani).

485. Representative Eskamani characterized the use of the strike-all amendment as "out of the norm." Tr. 1899:18-19 (Eskamani). She further stated that the strike-all amendment "deprive[d her] and [her] colleagues of adequate time

to consider and respond to the bill before it was passed." *Id*. at 1901:18-22. Indeed, Representative Eskamani described her response to the strike-all in the following way:

> I actually do remember printing out the strike-all and, you know, feverishly reading over and trying to contact my Orange County Supervisor of Election official, trying to contact different stakeholders that are impacted with changes to elections. It was a very rushed moment. And again, you know, asking questions to the bill sponsor can be very limited, especially when it's a strike-all, because then if there's a time certain, that's very explicit when it comes to your ability to ask questions, amend the amendment, and so forth.

*Id*. at 1901:18-1902:7.

486.   Further, Representative Eskamani testified that "[a] strike-all on the House floor is pretty rare because the point of something like a strike-all is you're dramatically changing something in the committee process."   Tr. 1902:17-21 (Eskamani).   Indeed, she had never seen a strike-all amendment on the floor with a bill as consequential as SB 90.   *Id*. at 1903:5-7.   This is because, according to Representative Eskamani, "[w]hen you have a strike-all on the floor, you're kind of nullifying all the feedback that was heard in those committee stops because you're not giving a space for any more public feedback to actually be heard on the record." *Id*. at 1902:22-25.   Therefore, Representative Eskamani understood the strike-all as "a tactic designed to kind of pass a bill because you can, not necessarily one that is putting into consideration those voices of concern."   *Id*. at 1903:1-3.

161

487.   Supervisors also did not have adequate time to review the changes being made to the bill.  Tr. 2616:23-2617:5 (Earley) ("especially the most dramatic changes often happened late at night with less than a day to review it before they were being heard in their first committee, so that made it very tough").  As a result, Supervisor Earley believed that there are problems in the final bill.  *Id*. at 2617:6-8 (Earley).

488.   Dr. Burch testified that, in particular, with respect to the April 27, 2021 strike-all filed by Representative Ingoglia at 1:33 AM, the "short, truncated time frame in which people had the chance to consider and digest the changes before the debate is unusual."  Tr. 1035:14-16 (Burch).

489.   And given the legislator reaction to the use of the late-night strike-all, Dr. Burch "took it as another indication that this was at least a violation of expectations and norms because people talked about this timing specifically in the record."  Tr. 1036:1-3 (Burch).

### 5.   *Rejection of Nondiscriminatory Alternatives*

490.   Throughout the legislative process, the Florida legislature rejected 57 amendments that would have ameliorated the discriminatory impact of the challenged provisions.  ECF No. 6608-26 ¶¶ 37-39 & Table (Kousser Rebuttal Rpt.).  This included ten amendments addressing the Section 7 voter registration provisions (Appendix G) ("Amendments that Would Have Made It Easier to Register to Vote"),

eight amendments addressing the Section 24 vote-by-mail provisions (Appendix G) ("Amendments that Would Have Made It Easier to Vote by Mail"), twelve amendments addressing the Section 28 drop box provisions (Appendix G) ("Amendments that Would Have Made It Easier to Use Drop Boxes"), and three amendments addressing the Section 29 line relief provisions (Appendix G) ("Amendments that Would Have Made it Easier to Offer In-Person Assistance to Voters in Line").

491.   These proposed amendments were all opposed by SB 90's sponsors and all failed.   In rejecting these provisions, the bill sponsors gave nonsensical or pretextual reasons for rejecting the amendments.   For example:

- In opposing Republican Senator Brandes' amendment to allow drop boxes to have video monitoring, Senator Baxley stated that he opposed it because the "chain of custody . . . may be impacted."   ECF No. 461-98 at 51:19-23.   In opposing Senator Powell's similar amendment, sponsors represented (falsely) that the Supervisors of Elections "think that they" could provide in-person staffing "before normal business hours and after normal business hours."   ECF No. 462-40 at 17:17-18:2.

- Senator Baxley similarly opposed Senator Farmer's amendment to allow nonpartisan organizations to provide assistance at the polls arguing that it was necessary to "protect this sacred act" of voting "as a private and individual thing."   ECF No. 461-78 at 37:16-38:2.   Representative Eskamani's similar amendment was voted down by the House without anyone saying anything against it.   ECF No. 462-31 at 9:4-18.

- Representative Ingoglia opposed Representative Hardy's amendment to allow a person to request a vote-by-mail ballot by providing their name, address, and date of birth saying in sum "I would ask you to vote it down. Also this takes away a lot of the voter integrity provisions that we have in the underlying bill."   ECF No. 462-9 at 72:20-22.

## VIII.  IMPACT OF SB 90 ON FLORIDA VOTERS

492.   The Challenged Provisions will have a substantial impact on voters as illustrated by the testimony at trial and when considered under the cost of voting framework.

### A.    Calculus of Voting Framework

493.   The calculus of voting framework is "an analytical framework used by political scientists, and it describes the voter decision [to vote as] a comparison of costs and benefits."  Tr. 2225:17-19 (Herron); *see also* ECF No. 608-1 ¶ 11 (Herron Rpt.).   This framework is the dominant framework for understanding voting behavior.  Tr. 2375:15-18 (Smith).  When the costs of voting exceed the benefits, a voter may not vote.  Tr. 2225:22-25 (Herron); ECF No. 608-1 ¶ 12 (Herron Rpt.); ECF No. 608-8 ¶ 21 (Smith Rpt.).

494.   Benefits of voting include the instrumental benefit of possibly changing the outcome of an election, and the expressive benefit of participating in the democratic process, and the value that one places on the right to vote.  Tr. 2227:5-25 (Herron); ECF No. 608-1 ¶¶ 13-14 (Herron Rpt.).

495.   A "cost" of voting is any "burden associated with the actions that voters have to take . . . and [anything] that they have to expend . . . in order to vote."  Tr. 2155:11-18 (Herron).  This includes transportation, time, information, financial, and

health costs.  Tr. at 2228:3-2229:8 (Herron); ECF No. 608-1 ¶¶ 15-19; Tr. 2378:2-2380:8 (Smith).

496.   When the cost of a particular voting method is decreased, turnout increases, and voters will take advantage of this method in future elections.  Tr. 2157:4-2158:3, 2227:1-4 (Herron); Tr. 2388:5-10 (Smith).

497.   Conversely, increased costs mean lower turnout.  Tr. 2226:17-22 (Herron); Tr. 2387:16-22 (Smith).  Increased costs can also decrease the likelihood that voters turn-out in future elections.  Tr. 2382:1-15 (Smith); ECF No. 608-6 ¶ 21 (Smith Rpt.); *see also* Tr. 2619:1-11 (Earley) ("Just vote-by-mail in general, if you impact that, then you increase demands on the other voters voting and potentially . . . dissuade people from voting if that's the method they want to use and it's difficult.").

498.   According to the Schraufangel, Pomante II & Li "Cost of Voting in the American States"—a national cost of voting index—Florida ranked 40th out of 50 states in 2020, prior to the passage of SB 90.  Tr. 2385:2-22 (Smith); ECF No. 608-6 ¶ 23 (Smith Rpt.).  Only ten states have higher costs of voting than Florida – even before SB 90.  Tr. 2385:14-22 (Smith); ECF No. 608-6 ¶ 23 (Smith Rpt.).  The restrictions put in place by SB 90 will move Florida further down the list of states with the greatest barrier to voting.  ECF No. 608-6 ¶ 23 (Smith Rpt.).

499.   Voting costs are not borne equally across the electorate.  *See* ECF No. 467-1 ¶21 (Herron Rpt.).  For example:

- Voters with fewer resources, who are required to take public transportation, and who have disabilities are more burdened by transportation costs.  Tr. 2231:3-16 (Herron).

- Voters who have rigid work schedules, who may not be able to easily take time off to vote are more burdened by time costs.  Tr. 2231:17-24 (Herron).

- Voters without internet access, vision impairments, and a lack of familiarity with interacting with government officials will be more burdened by time costs.  Tr. 2232:4-18 (Herron).

- People who are of lower socio-economic status, who don't have access to resources, who may not be as familiar with interacting with governmental officials, and who have lower levels of educational attainment may be disproportionately affected by administrative changes to requesting VBM ballots.  Tr. 2205:12-21 (Herron).

500.   Additionally, Black voters in Florida generally face higher costs of voting than white voters.  Tr. 2391:17-2392:4 (Smith).  As do Latino voters, and voters with disabilities.  Tr. 2392:5-25 (Smith).

## B.   The Challenged Provisions Burden All Florida Voters

501.   The Challenged Provisions burden all voters in Florida by raising the costs of voting.  Tr. 2151:12-22,2204:8-15, (Herron).

502.   In particular, the Drop Box Provision increases the cost of voting via drop box by limiting the availability, locations, and hours for voters to deposit their VBM ballots in drop boxes.  ECF No. 608-6 ¶ 26 (Smith Rpt.); Tr. 2486:1-10 (Smith).

503.   The Line Relief Provision increases the cost of voting by adding barriers to those who must wait in line to vote.  Tr. 2394:14-20 (Smith); ECF No. 608-6 ¶ 27 (Smith Rpt.).  Florida has "the broadest scope of what may be prohibited within the . . . exclusion zone around polling locations" when compared to other states.  Tr. 3610:5-10 (McDonald).

504.   The VBM Ballot Request Provision increases the cost of voting by adding informational and time taxes to the process of requesting a VBM ballot.  Tr. 2230:15-25 (Herron); Tr. 2493:8-11 (Smith); ECF No. 608-6 ¶ 25 (Smith Rpt.).

505.   The VBM Request Identification Provision increases the cost of voting by adding time, transportation, and information taxes to the process of requesting a VBM ballot.  Tr. 2503:4–2505:3 (Smith); ECF No. 608-6 ¶ 25 (Smith Rpt.).

506.   The Registration Disclaimer Provision and the Registration Delivery Provision increase the cost of voting by adding time, transportation, and information taxes to the process of registering to vote.  Tr. 2294:25 - 2296:15; 2299:21 – 2300:1 (Herron);  ECF No. 608-6 ¶ 24 (Smith Rpt.); ECF No. 467-5 ¶¶ 250 & 291 (Herron 2d. Am. Rpt.) .

507.   The costs of voting as they relate to the Challenged Provisions' specific burdens on the Plaintiffs and individual members of the Plaintiffs are discussed in Section X below, *see infra*. ¶¶620-740.

508.   The Challenged Provisions will disproportionately burden voters of color because these voters are more likely to (1) register to vote through 3PVROs, (2) vote via drop box in high numbers; (3) rely on line relief support due to longer lines in their communities; (4) maintain standing VBM requests, and (5) be unable to provide an identification number in requesting a VBM ballot that exactly matches their information on file.   Tr. 2159:20-25; 2163:6-24 (Herron); Tr. 2478:6-10, 2479:9-2482:24, 2494:7-2495:4, 2498:4-13; 2533:10-18; 2565: 3-12; 2574:23-3575:16 (Smith); ECF No. 608-6 ¶¶ 15-18, 20, 22, 24-25, 27-30 & 32 (Smith Rpt.).

509.   The Challenged Provisions will disproportionately burden voters with disabilities.   As reported in the American Community Survey, approximately 2.7 million voting age individuals in Florida have one or more disabilities, including voters with vision difficulty[3] (799,988 individuals), cognitive difficulty[4] (922,905 individuals), ambulatory difficulty[5] (1,522,812 individuals), self-care difficulty[6]

---

[3] A vision difficulty is defined by the Census Bureau as "blind or having serious difficulty seeing, even when wearing glasses."  ECF No. 467-10 ¶ 28 (Cooper Rpt.).

[4] A cognitive difficulty is defined by the Census Bureau as "having difficulty remembering, concentrating, or making decisions."  ECF No. 467-10 ¶ 28 (Cooper Rpt.).

[5] Ambulatory difficulty is defined by the Census Bureau as "having serious difficulty walking or climbing stairs."  ECF No. 467-10 ¶ 28 (Cooper Rpt.)

[6] Self-care difficulty is defined by the Census Bureau as "having difficulty bathing or dressing." ECF No. 467-10 ¶ 28 (Cooper Rpt.).

(536,621 individuals), and independent living difficulty[7] (1,037,535 individuals). ECF No. 456-10 ¶¶ 26, 28, Figure 5 (Cooper Rpt.).  Approximately 20.5% of voting age Floridians with a disability live alone.  *Id.* ¶ 29.

510.    Voters with disabilities will be disproportionately burdened by SB 90 because (1) drop boxes provide accessible means of voting for voters with disabilities; (2) they rely on line relief support to accommodate medical needs while waiting in line; and (3) may have difficulty requesting VBM ballots. Tr. 465:17-466:2, 466:19-25; Tr. 454:104-455:19 (DePalma); Tr. 2743:16-2744:13 (Babis); *see also* Tr. 1100:13-1101:8 (Rogers) (legally blind voter); Tr. 1608:13-20 (Brigham) (incontinent voter); Tr. 2099:11-18 (Zukeran) (voter with anxiety, depression, and PTSD); Tr. 2083:19-2084:12 (Slaughter) (voter with anxiety and agoraphobia); Tr. 1591:22-1593:4 (Teti) (voter with mobility issues); ECF No. 608-6 ¶ 32 (Smith Rpt.).

### 1.    *Vote-by-Mail Identification Provision*

511.    SB 90's VBM Request Identification Provision will increase the costs of voting for several categories of voters: (1) those who are registered to vote, but do not have a driver's license, state ID or the last four of a Social Security number

---

[7] An independent living difficulty is defined by the Census Bureau as "having difficulty doing errands alone such as visiting a doctor's office or shopping."  ECF No. 467-10 ¶ 28 (Cooper Rpt.).

on file; (2) those who have a form of ID on file other than the one that they currently possess; (3) those who have an incomplete or incorrect ID on file; (4) those who cannot remember which ID they provided when they registered to vote; and (5) those who are simply reluctant to provide their personal information every time they request a VBM ballot.   Tr. 2503:4-2505:3 (Smith); ECF No. 608-6 ¶¶ 9, 16 & 57-61 (Smith Rpt.).

512.   SB 90 makes it more difficult to request a VBM ballot than it is to register to vote or vote in person, since federal law does not require a driver's license, Social Security number or a state ID to be registered to vote, and the types of identifications accepted to vote in person are much broader. Tr. 2505:7-15; 2508:14-2509:5 (Smith).

513.   In practice, SB 90's VBM Request Identification Provision may be even more onerous than is apparent from the bill itself.  For example, the Palm Beach Supervisor VBM request form asks voters to provide their driver's license and the last four digits of their Social Security number, warning that although voters are only required to provide one, if they "only provide one of the above and it results in [the SOE's] inability to verify [the voter's] record, [the voter's] request will be deemed invalid and will not be filled." Tr. 2510:11-2513:8 (Smith); ECF No. 608-8 Fig. 2. According to Dr. Smith:

> [T]he point . . . is that not only are not both forms of ID required
> and millions of people in Florida do not provide both forms of

> ID when they properly register to vote — neither of those forms
> of ID are required to register to vote in Florida, and yet the
> Supervisor, because she wants to help voters to be able to have a
> vote-by-mail ballot sent to them, is asking people to provide both
> forms. So, it is highly problematic, in my mind, that you're
> asking an individual to provide both forms of ID when no forms
> of ID are required to register to vote.

Tr. 2512:24-2513:8 (Smith).

514.    At the time SB 90 passed, a total of 681,481 Florida voters did not have

a valid ID number on file with the Division of Elections. Tr. 2514:7-10 (Smith); s*ee*

*also* ECF No. 608-68 at 1; ECF No. 608-67 at 1; ECF No. 465-88 (SOS RFA No.

23) (The Secretary of State admits that as of May 2021, 622,998 registered voters in

the Florida Voter Registration System did not have a driver's license, state

identification number or social security number on file with the FVRS). 587,207

Florida voters had no identification on file with the state; 92,032 had an incomplete

driver's license on file; 2,258 had a driver's license on file that started with a number

instead of a letter; and 1,125 had a social security number on file that ended in four

zeros, totaling 681,481 voters with no ID or an invalid ID on file.  Tr. 2514:18-

2515:9 (Smith).  This number still stands at more than 480,000.  Tr. 2785:12-16

(Matthews); Tr. 3408:2-6 (Matthews).  Under SB 90, these voters with neither ID

on file cannot request a VBM ballot at all, "no exceptions."  ECF No. 608-64 at 17.

515.   More than three million voters had a valid driver's license number or

the last four digits of their social security number on file, but not both.  Tr. 2516:10-

20 (Smith); s*ee also* ECF No. 608-67; ECF No. 608-68 (emails from the Division of Elections identifying more than 3.5 million voters who lack one or both forms of ID or who lack a valid form of ID, as of February 2021). TAs noted above, the Secretary of State has admitted that when applying for a VBM ballot, "a voter could not be expected to know whether they provided a driver's license number or social security number at the time of registration."   ECF No. 465-88 (SOS RFA No. 163). Legislative staff identified the same concern that "a voter could not be expected to know which number they provided at registration."  ECF No. 608-65 at 2.  The more than 3.5 million who only have one form of identification on file are "basically taking a random shot of being able to get the correct information" when they request a VBM ballot. Tr. 2515:23-2516:1; 2517:1-9 (Smith).

516.   When analyzing the racial and ethnic demographics of these sets of voters, Dr. Smith distinguished between voters who registered pre- and post-2006, the year that the Help America Vote Act ("HAVA") allocated money to improving election systems across the country, making it easier for the Division of Elections and individuals Supervisors to verify voter information. Tr. 2522:15-2523:6 (Smith). Although the majority of registered voters registered pre-HAVA, post-HAVA trends in voters' ability to successfully register to vote without a driver's license or social security number are a better "guidepost of thinking about how future individuals who are successfully going to be able to register to vote under federal law may be

affected by SB 90" with respect to requesting a VBM ballot, as the post-HAVA regime is the one currently in place. Tr. 2529:25-2530:21 (Smith).

517.   For post-2006 registrants in Florida, 30.21 percent of voters who lacked both a driver's license and or social security number on file were Black, 21.53 percent were Latino, 34.26 percent were of another racial/ethnic group or unknown, and only 13.65 percent were white. Tr. 2525:3-19 (Smith). Dr. Smith applied a similar analysis to voters who had an incomplete or invalid ID on file, and also found that Black and Latino voters were disproportionately affected.  Tr. 2531:9-2532:14 (Smith).

518.   The percentage of Black voters registered without a driver's license or social security number on file with the division of elections who registered to vote after 2006 was about 2.5 times greater than the overall rate of Black individuals registered in Florida; in contrast, the percentage of white voter registrations overall (55 percent) was several times greater than the percentage of white voters registered after 2006 without a driver's license or social security number on file with the division of elections.  Tr.  2526:1-21 (Smith).

519.   Dr. Smith also testified to voting registration trends across 2016, 2018 and 2020, finding that Black and, to a lesser extent, Latino voters were more likely than white voters to not have a driver's license or social security number on file with

the division of elections, and yet successfully register to vote post-2006.  Tr. 2527:7-2529:24 (Smith).

520.   SB 90's VBM Request Identification provision will prevent "hundreds of thousands of individuals" from being able to request a VBM ballot, despite being "correctly and properly registered."   Tr. 2532:19-2533:9 (Smith).  Additionally, among voters who registered since 2006, Black and Latino voters will be disparately affected by SB 90, since they are "more likely to be individuals who successfully registered to vote but do not have a driver's license or a social security number on file." Tr. 2533:10-18 (Smith).

521.   SB 90's VBM Application Provision will interact with its VBM Requestion Identification Provision by making it impossible for Supervisors—as some counties' supervisors were in the practice of doing previously—to allow voters to renew their VBM requests with a simple checkbox on the back of their ballot return envelope.  Tr. 2533:19-2534:23 (Smith).

> So these do interact, these two provisions of Senate Bill 90 in Section 24, and I probably underappreciated that interaction when analyzing them separately in my report, but, you know, the more I think about it, the more pernicious it is with respect to vote-by-mail ballot access.

Tr. 2534:24-2535:3 (Smith).

522.   Many of these voters without one of the required identification numbers on file were able to cast a VBM ballot in the 2020 general election.  ECF No. 608-6

¶¶ 70, 72, 74, 82 (Smith Rpt.).  In Pinellas County, for example, 14,448 voters cast a VBM ballot in the election—even without any of those three forms of identification on file with the FVRS.  Tr. 2521:7-2522:8 (Smith); ECF No. 608-6 ¶ 94 (Smith Rpt.); ECF No. 465-88 (SOS RFA No. 24).  But under SB 90, according to Dr. Smith, "none of those individuals would be able to request, much less cast, a vote-by-mail ballot in subsequent elections because they do not have the requisite data on file for the Pinellas County Supervisor to verify."  Tr. 2521:7-2522:8 (Smith); ECF No. 608-6 ¶ 94 (Smith Rpt.).

523.   SOEs for Broward and Pasco County have testified that where voters do not have both a driver's license and a social security number on file, the voter will have to separately submit a new registration form with the proper identification information before requesting a VBM ballot.  Tr. 1173:14-1174:8 (Scott); Tr. 1287:3-13 (Corley); Tr. 1364:21-1365:6 (White).  Supervisor Latimer likewise testified that this legislation will make requesting VBM ballots more difficult, and the mismatch between Supervisor records and what the identification number the voter provides is "going to lead to confusion."  ECF No. 549-3 (Latimer Dep.) at 25:14-26:6, 111:7-23.

524.   Hundreds of thousands of voters in Florida will thus have to submit a new voter registration form separately if they wish to request a VBM ballot.  In Broward County, approximately 70,000 people do not have either a driver's license

number or social security number on file.  Therefore, they will have to separately update their voter registration information before requesting a VBM ballot.  Tr. 1175:22-1176:10 (Scott).  In Pasco County, "approximately 10 to 11,000 voters" do not have an identification number on file with the office.  Tr. 1287:3-9 (Corley).  In Leon County, over 13,000 voters, more than half of whom are frequent VBM voters, do not have the requisite identification numbers on file.  Tr. 2649:17-20, 2650:1-10 (Earley).  Additionally, about 31,000 voters in Leon County have only one of the required forms of identification on file.  Tr. 2650:13-17 (Earley).  Finally, about 22,000 voters in Miami-Dade County do not have an identification number on file.  Tr. 1364:21-25 (White).

525.    Numerous plaintiffs also testified about the burden posed by Section 24's identification requirement.  For example, Mr. Garces testified that it will be a hurdle for the Latinx community to provide the voter identification information that SB 90 requires.  Tr. 215:20-216:17 (Garces).  Other plaintiffs identified other impediments, including individuals who lack the required form of identification, Tr. 450:1-8 (DePalma), 2050:14-19 (Mercado), or those who are reluctant to provide the identification, Tr. 450:1-8 (DePalma), Tr. 1607:22-1608:2 (Brigham), or do not remember which identification number they provided when they registered to vote, Tr. 1486:8-16 (Nordlund), Tr. 1590:2-5 (Teti).

526.   As previously mentioned, the Division of Elections specifically identified the issue of voters without identification to the legislature while SB 90 was under consideration.  On April 13, 2021, Pinellas County Supervisor Marcus raised this issue to legislators, including the members of the Senate Rules Committee.  ECF No. 608-68.  At the legislature's request for more information regarding the lack of identification, the Secretary provided data on the number of voters without identification.  *Id.*; Tr. 2794:14-2795:11 (Matthews).  The Secretary of State has admitted that Don Rubottom, the Staff Director of the House Public Integrity and Elections Committee, consulted the Secretary's employees about the pending legislation.  ECF No. 465-88 (SOS RFA No. 159).

527.   The Secretary of State has admitted that Don Rubottom wrote to the Secretary's legislative director Pierce Schussler on April 6, 2021 regarding this issue, writing that one "problem is that Supervisors cannot verify DL# or SSN if not previously provided."  ECF No. 608-65 at 2; ECF No. 465-88 (SOS RFA Nos. 160-61).

528.   Rubottom added in his email: "a voter could not be expected to know which number they provided at registration."  ECF No. 608-65 at 2.

529.   SOE Earley testified that voters do not know what identification number they provided when they originally registered to vote and that he himself would not normally remember what number he provided when he registered to vote

177

had he not checked his own record.  Tr. 2650:18-24 (Earley).  The Secretary of State has admitted that "a voter could not be expected to know whether they provided a driver's license number or social security number at the time of registration."  ECF No. 465-88 (SOS RFA No. 163).

530.   Nevertheless, where voters do not recall which form of identification they have on file, Supervisor Scott testified that the voter must  recall which one they used.  Tr. 1174:21-1175:3 (Scott).  Otherwise, the Supervisors will not be able to process the VBM request.  Tr. 1175:4-9 (Scott).  Further, even if they knew, for example, that their driver's license number is on file, many voters do not know their driver's license number, which would lead to confusion.  ECF No. 549-3 (Latimer Dep.) at 26:1-6.

531.   There are no feasible alternatives to verifying the information. Supervisor Earley testified that though the relevant identification information may be validated through, for example, the DAVID system, that system is "not a good workaround" because it was not intended for such use and would be a "convoluted" "extra step."  Tr. 2651:20-2652:6 (Earley).  Additionally, not every staff member has access to DAVID.  *Id.* 3522:18-21.  Furthermore, the Supervisors do not have access to the Social Security Administration database to look up social security numbers.  *Id.* 2653:2-5.  And though driver's license numbers may be calculated based on data available in the public domain, the law does not permit Supervisors to

look up the relevant information online to calculate the identification information. *Id.* 3504:20-3505:25.

532.   The Division of Elections does not intend to send notices to voters who have incomplete information in the Florida Voter Registration System.  Tr. 2816:23-2817:25 (Matthews).

533.   According to Director Matthews, whether to conduct such outreach is in the "discretion" of the individual Supervisors.  Tr. 2816:23-2817:25 (Matthews). But Supervisor outreach to voters for the required identification information has been uneven, and the Secretary of State has not required such outreach.  Although SOEs Hays and Doyle have reached out to voters, SOEs Earley and Latimer have not.  ECF No. 549-2 (Hays Dep.) at 162:17-163:1; Tr. 3208:4-16 (Doyle); Tr. 2649:17-2650:10 (Earley); ECF No. 549-3 (Latimer Dep.) at 180:2-9, 19-23.  And the evidence in the record suggests that the limited outreach conducted (*e.g.,* by SOEs Hays and Doyle) to cure the issue, to date, has targeted overwhelmingly white voters.  The majority of registered voters (at least 75 percent) for the 2020 general election in Lake and Lee County were White.  ECF No. 608-16 ¶ 20, Ex. B (Cooper Rpt.).

534.   Moreover, Supervisors have expressed concern that efforts to reach out to voters for the additional information could cause more confusion because voters may become concerned that requests for such information could be used for identity

theft.  Tr. 2652:7-19 (Earley).  Supervisor Earley testified that this requirement will "disenfranchise[e]" voters and "undermin[e] trusted elections by making it harder to vote-by-mail when people are used to doing that."  Tr, 2654:17-22 (Earley).

535.   Supervisor Earley testified that this provision does not add any "real security" to the VBM request process because driver's license numbers are easily calculated based on information in the public domain and are therefore not information that only the voter possesses.  Tr. 3504:15-24, 3521:19-25, 2654:11-14 (Earley).

536.   Moreover, because requests made during the 2020 election for VBM ballots are still valid, much of the provision's impact will be seen in 2023 when those requests expire, and voters will have to re-request a VBM ballot.  Tr. 1252:7-17 (Scott).

537.   Election officials also testified that the reduction in the period of time for which a VBM request is valid will decrease turnout.  Tr. 1350:1-8 (White) (explaining that voters have told her office that they did not know an election was coming up until they received their VBM ballots)

> i.   *Testimony About the Impact on Third-Party Voter Registration Efforts*

538.   Plaintiffs and election officials alike confirmed at trial that the disclaimer and delivery restrictions will severely impede third-party voter registration efforts.

539.   These 3PVRO restrictions will increase the costs of voting, most heavily on Black and Latino voters.  ECF No. 608-6 at ¶¶ 8, 15, 50 (Smith Rpt.).

540.   For example, SOE Scott testified that the requirement could hinder 3PVRO efforts by discouraging volunteers from helping the 3PVRO:

> So because of the nature of the groups and the way this is done, this is done by people who are volunteering, who are looking to do something positive in their community, so whenever you make . . . it so that they could be confused and that they are scared that they might do something wrong and get fined or otherwise have some sort of legal action taken against them people just are far less likely to volunteer . . . doing something that could potentially get them into trouble.

Tr. 1164:20-1165:3 (Scott).  SOE Scott also testified to the disclaimer "absolutely" eroding trust between a 3PVRO and a potential voter:

> You know, if you're . . . telling people that you are conducting a voter registration drive and your whole intent is to help people in your community to get registered to vote, but now you are required to say to them that you might not turn in the form, that . . . obviously that would . . . erode trust.

Tr. 1168:2-10 (Scott).

541.   In fact, SOE Scott testified that he was aware that it had been a "very common occurrence" for voters to decline to register to vote with 3PVROs after hearing the compelled disclaimer, and thus 3PVROs have been "less effective" at registering voters as a result of SB 90.  Tr. 1236:13-1237:11, 1238:6-10 (Scott).

542.   Supervisor Earley similarly testified to the detrimental impact the disclaimer requirement will have on the voter registration process: "Asking you to

fill out a form that has a lot of sensitive information and then say, You shouldn't trust that I'm going to do the right things with it, that would not help my cause of registering voters." Tr. 2668:12-15 (Earley). Such restrictions will thus impact the number of voters registered overall, as 3PVROs are able to reach voters that Supervisor offices may not. *See id.* at 2666:8-11 (testifying that 3PVROs provide about 100 registrations per week to Leon County for outreach efforts that Leon County are missing). As a result, this provision will "make[] it more difficult [for 3PVROs] to do their job." *Id.* at 3501:13-15.

543.   Plaintiffs also testified extensively about the impact the Section 7 will have on their registration efforts. Numerous witnesses testified that it undermines the trust they have with their communities. Tr. 49:7-49:19, 52:15-53:14, 103:1-7 (Scoon); Tr. 266:18-268:12 (McCoy); Tr. 206:7-207:23 (Garces); Tr. 388:18-389:5 (Burney-Clarke); Tr. 794:2-4, 771:10-772:16 (Velez Burgos); Tr. 1423:20-25 (Nordlund); Tr. 2038:7-20 (Mercado).

544.   Plaintiffs also testified that providing the disclaimer makes interactions with voters take longer, has caused volunteers and canvassers to quit, and has caused some potential voters to turn away. Tr. 159:20-160:23, 162:1-163:2 (Scoon); Tr. 206:14-22 (Garces); Tr. 268:13-269:10 (McCoy); Tr. 819:7-20 (Velez Burgos); Tr. 1130:23-1132:17 (Nash); Tr. 1423:11-19, 1436:12-1437:11 (Nordlund); Tr. 2039:9-17, 2044:9-14 (Mercado).

545.   Plaintiffs also repeatedly testified about the important role that 3PVROs play in registering Black and Latino voters.  For example, more than 85% of the voters that the New Florida Majority Education Fund registered were people of color.  Tr. 2035:20-21 (Mercado); *see also id.* at 2034:12-19 ("[I]t is part of [FRT's] mission as an organization to expand democracy to have a voting population that represents the diversity of our communities in our state.").

### ii.   Testimony About the Impact on Voters

546.   It has been stipulated in this case that "between 2009 and November 5, 2021, 2,149,709 voter registration applications were received by Florida's Supervisors of Elections from 3PVROs."  ECF No. 402 at 34, ¶ 30 (Joint Stip.).

547.   Several experts testified as to the chilling effect the disclaimer will have on individuals registering with 3PVROs.   Tr. 2299:21-2300:1, 2332:21-2333:7 (Herron); Tr. 3608:9-21 (McDonald).

548.   Dr. Smith's report and testimony related to the Registration Disclaimer and Delivery Provisions focused specifically on which groups of voters are likely to register with third-party voter registration organizations.   Tr. 2565:23-2566:11 (Smith).  To perform his analysis, Dr. Smith relied on an August 2021 snapshot of the Florida statewide voter file provided by the Division of Elections showing that 763,240 individuals had their most recent registration method recorded as through a 3PVRO.  Tr. 2566:16-2567:23 (Smith).  Based on the likely possibility that many

individuals who register initially with a 3PVRO and subsequently update their registration through a different method (thus updating the method of registration recorded in the Division of Elections system), Dr. Smith testified that 763,240 is likely just a "baseline number" of how many people register through 3PVROs.  Tr. 2568:9-2569:8 (Smith).

549.   The snapshot also included the racial/ethnic data for these 763,240 individuals, from which Dr. Smith calculated that, as of August 2021, 10.86 percent of Black registrants, 9.57 percent of Latino registrants, and 9.63 percent of "Other" registrants had most recently registered with a 3PVRO.   Tr. 2569:13-2570:25 (Smith).  In contrast, only 1.87 percent of white registered voters (*i.e.*, 173,616 out of close to 9 million) had most recently registered through a 3PVRO.  Tr. 2570:25-2571:3 (Smith) (referencing ECF No. 608-6 at Table 2 (Smith Rpt.)). As Dr. Smith summarized:

> [W]hile one out of ten Black, Hispanic, and Other individuals who are registered in the state of Florida as of August 2021, registered through 3PVROs, it's one out of fifty white individuals who have registered through a 3PVRO, so five times less likely than Black, Hispanic, and Other.

Tr. 2571:4-9 (Smith).

550.   Dr. Smith also analyzed how voters in individual counties registered through 3PVROs.  ECF No. 608-6 at Table 4 (Smith Rpt.); Tr.2571:17-22 (Smith). In Alachua County, Black and white voters constituted similar percentages of

3PVRO registrants; however, Black registrants made up 33 percent of 3PVRO registrants despite making up only 17 percent of all registrants in the county.  Tr. 2572:5-2573:6 (Smith). Similarly, Latino and "Other" voters registered with 3PVROs at a higher rate than the county's overall rate of Latino and "Other" voter registration.  Tr. 2573:7-10 (Smith).  In contrast, White registrants made up 65 percent of overall registrants in the county, while only making up about 35 percent of 3PVRO registrants.  Tr. 2573:7-13 (Smith).  Similarly, in Hillsborough, 34.62% of the more than 59,000 voters who registered through 3PVROs are Black voters, and 27.37% are Latino voters.  ECF No. 465-72 (Latimer RFA No. 2).

551.   Overall, Dr. Smith testified that of the 16 largest counties he analyzed, Black voters in 15 counties and Latino voters in 12 counties were disproportionately more likely to register through 3PVROs than their share of the electorate.  Tr. 2574:4-13 (Smith); ECF No. 608-6 at Table 4 (Smith Rpt.).  In contrast, white voters in all 16 counties registered through 3PVRO's disproportionately *less* than their share of the electorate.  Tr. 2574:14-16 (Smith).  As to the impacts of what this data reveals about the impact of the Registration Disclaimer and Delivery Provisions, Dr. Smith testified:

> There is no question that Black and Hispanic and voters of other racial and ethnic identities rely more heavily on being registered by 3PVROs than White individuals in this state, that we see that pattern across counties and that the effects of putting regulations and restrictions on 3PVROs are likely to affect the ability of individuals who rely heavily on these to do so in the future. I

185

> would also note that this is likely the tip of the iceberg with respect to this impact. We would need to have other snapshots from the Division of Elections produced in different time periods. And I suspect these rates would actually be much higher if we looked at people who initially registered to vote in election years, as I discussed in another part of SB 90's impact. If we looked at the snapshot from the Division of Elections, say, in January of 2013 or 2017, we would have a higher rate of Black and Hispanic and individuals of Other races registering with a 3PVRO as opposed to what we are seeing here which is undercounting, likely, those who at one point used the 3PVRO to register.

Tr. 2574:23-2575:16 (Smith).

552.   Supervisors confirmed that 3PVROs would typically submit registration applications to their offices in person.  ECF No. 549-3 (Latimer Dep.) at 54:1-5.   Supervisor Latimer testified to handling "thousands" of out-of-county registrations during the 2020 general election.  *Id*. at 183:11-14.

553.   Now, because of SB 90's delivery restriction, at least one Supervisor will now "send [the out-of-county registrations] back to the 3PVRO" instead of processing the registration.  ECF No. 549-2 (Hays Dep.) at 175:7-17.

### 2.   *Drop Box Restrictions*

554.   The Drop Box Provision will burden voters by reducing the availability of drop box access across Florida.  This provision increases the cost of voting for voters in terms of time, transportation, and information.  Tr. 2420:9-15, 2486:1-10 (Smith).

555.   The drop box restrictions will reduce the availability of at least one in four of the 485 drop boxes provided during the 2020 General Election.  Tr. 2453:17-2454:25, 2455:7-11 (Smith); ECF No. 608-6 ¶ 125 (Smith Rpt.); ECF No. 608-1 Table 24 (Herron Rpt.).  Hundreds of thousands of voters may be impacted by this change, given that approximately one in ten ballots (or 12% of all ballots) cast in the 2020 General Election were cast via drop box in the majority of counties in Florida.  Tr. 2254:16-23 (Herron); ECF No. 608-1 ¶¶ 123-24 (Herron Rpt.); *see also* ECF No. 608-6 ¶¶123, 220-21 (Smith Rpt.); Tr. 2471:5-7 (Smith) (citing that during the 2020 General Election, approximately one-third of the VBM ballots cast in Florida were deposited into drop boxes).[8]  Tr. 2458:20-2459:13 (Smith); *see also id.* at 2469:25-2470:19; ECF No. 608-1 at Table 10 (Herron Rpt.).

556.   The Drop Box Restrictions will deprive voters of "a minimal estimate [of] tens of thousands of hours" of drop box availability, as compared to the 2020 General Election.   ECF No. 608-6 ¶¶127-30 (Smith Rpt.); Tr. 2462:11-2463:7 (Smith).

557.   At least 65 round-the-clock ("24/7") drop boxes that were available to voters during the 2020 General Election and were not continuously monitored are

---

[8] The State of Florida does not track the locations, days, and hours of drop boxes or maintain data on which voters have used drop boxes in recent elections.  ECF No. 608-1 ¶ 122 (Herron Rpt.);  Tr. 2453:14-16 (Smith).  Accordingly, both experts relied upon data produced in discovery by the Supervisors of Elections.

now in jeopardy, given the Drop Box Provision's in-person monitoring requirement. *See* ECF No. 608-6 ¶¶ 127-29 (Smith Rpt.); Tr. 2455:12-16, 2472:4-24, 2476:14-2478:3 (Smith); Tr. 2291:1-6 (Herron); ECF No. 608-1 ¶ 210 (Herron Rpt.). This will impact dozens of counties, particularly counties where a substantial number of VBM ballots were deposited after-hours, such as Okeechobee County, Indian River County, and Manatee County. Tr. 2475:14-2476:2 (Smith); ECF No. 608-6 ¶¶ 155, 161, 195 (Smith Rpt.).

558. The Drop Box Provision's elimination of drop boxes at non-SOE locations before and after early in person voting will further reduce drop box availability. In certain counties, ballots cast in drop boxes outside of early voting days accounted for between 38.5% and 72% of ballots cast in drop boxes. *See* ECF No. 608-6 ¶¶ 146, 160, 164, 167, 178, 186, 189, 192, 195, 198 (Smith Rpt.); *see also* Tr. 2466:6-2469:1 (Smith); ECF No. 608-1 at Table 22 (Herron Rpt.).

559. Now, at least 57 drop boxes that were available during the 2020 election, and that accounted for over 11,000 hours of drop box availability, will likely be eliminated under SB 90 because they were accessible at non-SOE locations outside of early in person voting. Tr. 2455:17-19 (Smith); ECF No. 608-6 at ¶¶130-31 (Smith Rpt.); Tr. 2285:18-25; 2286:2-2287:25 (Herron); ECF No. 608-1 ¶¶ 187-90 (Herron Rpt.); *see also* ECF No. 608-6 ¶ 182 (Smith Rpt.).

560.   SOEs admitted that they plan to reduce drop box availability—at least a third of counties will reduce the availability of outdoor drop boxes, 60% of counties that previously offered 24/7 drop boxes will eliminate them, and some will restrict the days on which voters may access drop boxes.  *See* Tr. 2460:1-2461:21 (Smith); ECF No. 608-6 at ¶¶ 201-18 (Smith Rpt.); Tr. 2292:21-2293:7 (Herron); ECF No. 608-1 ¶¶ 214-15 (Herron Rpt.); *see also* Tr. 1367:9-12 (White); ECF No. 464-56 (White RFA No. 14); ECF No. 608-6 ¶ 222 (Smith Rpt.); ECF No. 463-80 (Marcus ROG No. 3); ECF No. 608-6 No. ¶¶ 182, 222 (Smith Rpt.); Tr. 1251:23-1252:1 (Scott); *see generally* Appendix D.

561.   Some of the outdoor drop boxes will be moved indoors to SOE offices or inside other locations, *see* ECF No. 463-31 (Baird ROG No. 3); ECF No. 463-23 (Anderson ROG No. 4), or will be removed altogether, s*ee* ECF No. 463-32 (Chambless ROG No. 3); ECF No. 463-58 (Hays ROG No. 3); ECF No. 463-86 (Oakes ROG No. 3).

562.   Restrictions on drop boxes will increase the cost of voting in numerous ways.  First, transportation costs will increase because voters will have to drive farther to deposit their VBM ballots if the number of drop boxes decreases by virtue of the new requirements and the resulting decrease in drop boxes offered by SOEs. In addition, individuals who have less flexibility due to their employment or other constraints will be disproportionately affected by decreases in drop box hours.  Tr.

189

2293:22-2294:17 (Herron); ECF. No. 608-83 ¶¶ 11, 21 (Cowles Decl.).   These restrictions also limit a safe, secure option for returning VBM ballots.  Tr. 2655:23-2656:5, 2656:6-2657:5 (Earley); s*ee also* ECF No. 549-2  (Hays Dep.) at 52:1-15, 56:4-10, 79:14-15, 97:6-7, 97:15-18, 102:10-12, 103:18-104:1; ECF No. 549-3 (Latimer Dep.) at 125:3-5; Tr. 1340:22-1342:7 (White); ECF. No. 608-83 ¶¶ 11, 21 (Cowles Decl.). ECF No. 608-80 at 1; *see also* ECF No. 608-77 at 1.

563.   SB 90's restrictions on drop boxes will affect all voters but will disproportionately burden voters of color, given their high rates of drop box usage. Tr. 2483:4-9 (Smith); Tr. 2283:5-9 (Herron).

564.   During the 2020 election, Black voters deposited their ballots in drop boxes at much higher rates than white voters.  Tr. 2159:20-25, 268:19-2269:2, 2270:5-14, 2276:20-2277:11, 2280:17-2281:4, 2282:17-21 (Herron); *see also* ECF No. 608-1 ¶¶ 137, 158, 165, 169, 177 (Herron Rpt.).  Counties that had more Black VBM voters also had greater drop box usage rates, suggesting that Black voters used drop boxes more frequently than voters of other races.  Tr. 2256:4-21 (Herron); *see also* ECF No. 608-1 ¶ 127 (Herron Rpt.).

565.   Black voters tended to use drop boxes during the days and times that are restricted by SB 90 at greater rates than white voters.  Tr. 2479:11-2480:4, 2482:1-13 (Smith); *see also* ECF No. 608-6 ¶¶ 147-48, 155 (Smith Rpt.).  Souls to the Polls, a voter mobilization event previously held at drop box sites in Black

communities, can no longer be held at certain sites because of SB 90 reducing drop box availability.  Tr. 397:12-23 (Burney-Clark).  NAACP members in the Indian River Branch, for example, who work as farm laborers with inflexible hours may be unable to cast their ballot during the limited drop box hours available due to SB 90.  Tr. 527:6-16 (Brown).  Other voters with similarly inflexible schedules are also likely to be impacted by limited drop box availability. *See* Tr. 696:24-697:9, 697:12-25 (Madison); Tr. 215:18-217:11 (Garces) ("There's some major employers in this area – Disney, Universal and the airport – and a lot of times our folks work a third shift, and they get off at 3 in the morning, 4 in the morning and they have odd hours.").

566.   Limiting the availability of outdoor drop boxes will affect voters with disabilities who have depended on dropping a vote-by-mail ballot in an outdoor drop box or using a drive-through drop box.  Tr. 2462:2-10, 2485:7-20 (Smith); Tr. 465:17-466:2, 21-25 (DePalma); Tr. 2738:15-2739:25 (Babis).  It will also impact voters with anxiety disorders or other disorders that make interacting with SOE employees intimidating and challenging.   Tr. 2097:13-2099-13 (Zukeran); Tr. 1626:23-1627:4 (Sauers); Tr. 2048:22-2049:9 (Mercado).  Indoor drop boxes are less accessible to many voters with disabilities, especially those with limited mobility.   Tr. 2743:8-9  (Babis);  Tr.  457:13-458:6,  459:2-19,  461:24-463:10 (DePalma); Tr. 2737:9-2738:11 (Babis); Tr. 2740:3-2742:4 (Babis).  Ms. Babis,

DRF's senior public policy analyst and a part-time powerchair user, herself has had difficulty navigating different voting locations.  Tr. 2741:8-16, 2740:22-24, 2742:5-8 (Babis).

567.   Moving some drop boxes indoors at SOE offices "would prohibit" some persons with disabilities "from being able to access the facility to put their ballot in the drop box," such as persons who find it difficult or impossible to open doors, or to navigate pathways that are not clear and stable.  Tr. 2742:25-2743:8-9 (Babis).  Voters with other disabilities, such as anxiety, PTSD, and incontinence, may also be burdened by needing to access indoor drop boxes.  Tr. 2099:11-18 (Zukeran); Tr. 1607:6-13 (Brigham).

568.   Voters with disabilities who use after-hours drop boxes will also be impacted, as this option may no longer be available to them.  *See* Tr. 2484:6-14 (Smith); ECF No. 608-6 ¶ 156 (Smith Rpt.).

569.   Similarly, these restrictions will also burden voters with disabilities for whom casting an in-person ballot during early voting or on Election Day remains difficult (*e.g.*, because of difficulty seeing, walking, or dressing), and further compound the many ongoing accessibility burdens voters with disabilities continue to face in utilizing VBM ballots despite longstanding accessibility requirements under Fla. Sta. § 101.662.  ECF No. 608-16 ¶ 28 (Cooper Rpt.); Tr. 622:19-22 (Cooper); Tr. 2095:3-2097 (Zukeran); Tr. 2742:25-2743:7 (Babis).

192

### 3.     *Line Relief Provision*

570.   Long lines serve as a "tax" on voters' time, potentially leading to balking (when a voter sees how long a line is and decide not to join it in the first place) or reneging (when a voter leaves the line because it is too slow). Tr. 2536:10-2537:13 (Smith). Furthermore, a voter's experience with long lines in one election can lead to "downstream effects" in the next election, meaning that voters who experience long lines are less likely to vote in subsequent elections. *Id.* at 2537:14-20.

571.   Black and Latino voters, in general, are disproportionately affected by long lines at polling locations.  For example, recent studies show that majority-minority polling locations were more likely to have longer check-in times compared to mostly white precincts; that voters in majority Black precincts both faced longer wait times than voters in majority white precincts and were more likely to leave the line; and that predominantly Black neighborhoods were about 74 percent more likely to wait in lines longer than 30 minutes than voters in predominantly white neighborhoods.  Tr. 2542:7-2543:10 (Smith).

572.   According to a study Dr. Smith co-authored regarding wait times during early voting in the 2012 general election, Black and Latino voters were much more likely to face longer wait times, and voters who faced long lines in 2012 were less likely to vote in future elections and less likely to vote in person again.  Tr. 2543:17-

1544:44 (Smith).  Another study Smith co-authored regarding wait times in Florida

showed that:

> [T]he 2012 general election in Florida did not treat all voters equally. Minority voters in 2012 faced disproportionately long lines, thus disproportionately high cost of voting, and then in some cases a small downstream effect in 2014 and 2016 of decreased propensity to vote. Our results illustrate how administrative aspects of elections, in particular resource allocation decisions that affect whether the elections will have lines at the polls or not, should not only be understood as administrative in nature, but also as indicative of the underlying fairness of the electoral process and the extent to which all voters are treated equally under the law.

*Id.* at 2547:12-23 (Smith) (quoting David Cottrell et al., *Voting Lines, Equal*

*Treatment, and Early Voting Check-In Times in Florida*, 21 State Politics & Policy

Quarterly 109, 131 (2021)).

573.   Data provided by the SOEs from the 2020 election further demonstrates

that Black and Latino voters are more likely to vote in a polling location with longer

wait times.  In Miami-Dade, 24.8 percent of Black voters who cast ballots during a

5-day period across 33 polling locations had wait times of 30 minutes or greater,

compared to 21.2 percent of Latino, 16.9 percent of "Other" voters and 15.2 percent

of white voters.  Tr. 2557:2-2559:4 (Smith); ECF No. 608-10 (Smith Revised Table

19); ECF No. 608-11 (Smith Revised Figure 8).  Furthermore, nearly 75 percent of

white voters faced wait times of less than 15 minutes, as compared to 70.8 percent

of Black voters and 66.1 percent of Latino voters.  Tr. 2559:19-2560:4 (Smith); *see*

*also* ECF No. 608-6 at ¶¶ 248-250 (Smith Rpt.); ECF No. No. 608-13 (Smith Corrected Figure 10) (finding that a greater percentage of minority voters identified as needing assistance to vote, and that minority voters seeking assistance to vote waited longer in line than white voters seeking assistance).

574.    Data from Orange and Lee Counties similarly show that longer wait times disproportionately affecting Black and, to a lesser degree, Latino voters.  Tr. 2560:15-2561 (Smith).  Notably, the Winter Park Library location in Orange County had estimated wait times of up to three hours at one point.  *Id.* at 2561:3-9

575.    These results likely *underestimated* the disproportionate impacts of long wait-times for Black voters, based on media reports about Lee County that "showed very clearly, long lines, particularly in Black—heavily Black precincts" on the first day of early in-person voting, which fell outside of the five-day window for which Dr. Smith conducted his analysis.  Tr. 2562:2-18 (Smith).

576.    Such long wait times were not unique to the 2020 general election. Voters experienced similarly long wait times in the 2008 and subsequent elections. Tr. 2564:18-23 (Smith).

577.    Historically, nonpartisan organizations provided assistance to voters waiting in line and at polling locations that the government does not provide.  *See e.g.,* ECF No. 549-3 at 48:3-6 (Latimer Dep.) (describing that the Hillsborough County SOE office does not provide food, water, or umbrellas to voters waiting to

vote, and provides chairs to voters with disabilities only "up by the door," relying on other voters waiting in line to "let us know when they get up there."); ECF No. 549-2 (Hays Dep.) at 196:24-197:5; Tr. 1379:9-11 (White) (poll workers in Miami-Dade County do not provide food or water to voters waiting in line); Tr. 2046:1-2047:8 (Mercado) (describing predecessor organization's practice of providing water, food and umbrellas to voters with 150 feet of polls before SB 90); Tr. 218:5-17 (Garces) (describing organization's practice of providing language assistance within 150 feet of polls); Tr. 402:5-403:4 (Burney-Clark).

578.   Such non-partisan, non-disruptive provision of food, water, chairs, umbrellas, or other items to voters waiting in line has not disrupted orderly election administration in the past. *See e.g.*, ECF No. 549-1 (Guzzo Dep.) at 62:4-11 (testifying that the Florida Attorney General's Office was unaware of "any unlawful voting conduct relating to assistance provided to persons with disabilities" in 2018 or 2020).

579.   Florida has over 6,000 polling places staffed by many different people, including many temporary employees.  Tr. 2815:12-23 (Matthews).

580.   Supervisors confirmed that under the Solicitation Provision of SB 90, they will not permit line relief activities in the form of providing food, water, chairs, or other items to voters waiting in line.  ECF No. 549-3 (Latimer Dep.) at 170:9-18 (all activity, including a "nonpartisan volunteer provid[ing] a bottle of water to a

voter on his or her way into the polling place" is unlawful solicitation because he does not "have any idea what that person is talking to the voter about"); ECF No. 549-2 (Hays Dep.) at 197:15-20 ("But inside the 150-foot zone, there's no solicitation, there's no appearance of solicitation. The only people allowed to interact there are the voters themselves and . . . exit polling.");

581.   Supervisor Scott testified that SB 90's non-solicitation provision could intimidate volunteers and prevent them from assisting in their line warming volunteer activities due to fear of repercussions.  Tr. 1234:23-1235:5 (Scott); *see also* Tr. 773:19-12 (Velez Burgos) (describing SB 90's "chilling effect" on volunteers who are now afraid to do line warming work).

582.   At least one Supervisor has testified that SB 90's non-solicitation provision will not be preventing any alleged fraud or voter intimidation.  Supervisor Latimer admitted in discovery that he was not aware of any unlawful voting conduct, attempts to unduly influence voters, to intimidate voters, or attempts to harass voters after January 1, 2014 that would have been prevented by SB 90's Line Warming Ban.  ECF No. 462-74 (Latimer RFA Nos. 14-17).

583.   Voters with disabilities, especially those with underlying medical conditions or mobility impairments who may have difficulty standing in line for long periods of time, benefit from line relief activities in the form of chairs or water.  Tr. 2744:4-13, 2745:5-20 (Babis); ECF No. 608-6 ¶ 233 (Smith Rpt.); Tr. 1629:3-8,

197

1629:12-17 (Sauers).  Without this assistance, it will be more difficult for voters with disabilities to vote in-person and some may elect not to vote this way.  See Tr. 1629:3-8, 1629:12-17 (Sauers); Tr. 2745:5-20 (Babis).

584.   Voters with disabilities rely on voting-line relief activities because they are not guaranteed access to chairs while waiting in line or being moved to the front of a line at polling places.  Tr. 488:18-25 (DePalma).  SOEs are not legally obligated to provide disabled voters waiting in line chairs or allow them to move to the front of a line.  *Id*.  And at times, SOEs have failed to provide assistance to voters with disabilities.  For example, Ms. Babis testified that she has observed a voter with disability request and be denied assistance from a SOEs' office staff.  Tr. 2745:2-12 (Babis).  This particular voter left without voting.  *Id.* at 2745:13-20.

### 4.   *VBM Application Provision*

585.  The changes to the VBM Application Provision "increase[] the procedural complexity associated with . . . voting" and introduce an informational cost as voters must now learn about the change in law in order to request a VBM ballot.  Tr. 2230:15-25 (Herron); *see also* Tr. 2493:8-15 (Smith).  The VBM Application Provision severely burdens the right to vote by dramatically reducing the timeframe during which a standing VBM ballot request is valid from one to two election cycles.  Tr. 2490:11-2491:25 (Smith).

586.   Experts have also questioned the justifications for requiring voters to request VBM ballots more frequently.  There is no basis in political science literature to support the proposition that it is more secure to require people to more frequently decide how they vote, as now required by this provision.  Tr. 2202:22-2203:2 (Herron); ECF No. 467-1 ¶ 59 (Herron Rpt.).

587.   In fact, counties in Florida that had "check-the-box" provisions on the back of a VBM envelope which allowed voters to request a VBM ballot continually, had higher voter participation.  Tr. 2492:5-21 (Smith).  Higher voter participation has been seen not only in general elections but also in municipal and special elections that do not have as high a turnout typically because they are off cycle.  Tr. 2493:3-7 (Smith).

588.   Moreover, the VBM Application provision was not needed to allow for voter choice.  Prior to SB90, a voter could already request a VBM ballot and later decide to vote in person.  Tr. 2206:6-13 (Herron); ECF No. 467-1 ¶ 59 (Herron Rpt.).

589.   Numerous existing safeguards ensure VBM integrity, including signature match requirements, ballot receipt deadlines, voter registration validation requirements, prohibitions on forwarding VBM ballots, and post-election VBM audits.  *See* Tr. 2200:8-2201:24 (Herron); ECF No. 467-1 ¶ 58 (Herron Rpt.); Tr. 2761:21-2762:2 (Matthews).

590.   The new requirement will burden the millions of voters in Florida who have relied on standing requests to have ballots mailed to them.  Tr. 2500:15-22 (Smith); Tr. 2624:17-2625:5 (Earley); Tr. 1285:18-25 (Corley); ECF No. 549-3 (Latimer Dep.) at 135:7-14. This provision eliminates a safe, reliable method for obtaining a VBM ballot and makes it more likely that some voters may forget to request a VBM ballot in time to vote.  Tr. 1286:5-1286:18 (Corley); Tr. 2625:19-2626:14 (Earley); ECF No. 461-13 (Earley ROG No. 9); ECF No. 549-2 (Hays Dep.) at 125:6-126:17; ECF No. 608-61 ¶ 26 (Link Decl.); Tr. 1360:22-1361:11 (White); ECF No. 549-3 (Latimer Dep.) at 134:25-135:6, 137:23-138:1; Tr. 759:20-760:19 (Velez Burgos) (testifying that because of SB 90, even "SuperVoters" will need to be contacted more often to remind them to request a VBM ballot).

591.   The costs of this restriction will "fall most heavily on racial and ethnic minorities," senior citizen voters and voters with disabilities, because these groups have become increasingly more reliant on VBM ballots; Black and Latino voters in particular are more likely to have standing requests as compared to white voters. ECF No. 608-6  ¶¶ 10, 105, Table 13 (Smith Rpt.); Tr. 2494:7-18 (Smith).  These voters will face added burdens due to this provision.  ECF No. 608-6 ¶ 10 (Smith Rpt.).

592.   Voters of color will face added barriers to requesting VBM ballots twice as often, given the 8 percentage point gap in broadband Internet access of

Black households in Florida relative to white households, and the more than 4 percentage point gap in broadband Internet access of Latino households relative to white households.  Tr. 628:18-23 (Cooper).

593.   Voters with disabilities will also face new burdens in "procuring, filling out, or returning a VBM ballot request application" twice as often.  ECF No. 608-6 ¶ 105 (Smith Rpt.); s*ee also* Tr. 2633:20-2634:6 (Earley); Tr. 1361:15-1362:4 (White).

594.   Amongst the subset of voters with disabilities, older voters with memory issues and blind voters who "have difficulty interacting with forms and contacting government officials . . . are also disproportionately affected[.]"  Tr. 2204:8-25 (Herron).  In addition, voters with disabilities who require specialized equipment to read or fill out forms may have difficulty filling out a vote-by-mail application.  ECF No. 608-6 ¶ 106 (Smith Rpt.); *see also* Tr. 2494:21-2495:4, 2500:1-14 (Smith).

595.   SOE's websites may present a range of accessibility barriers and may not be equipped to integrate assistive technology.  Tr. 454:14-455:19 (DePalma); *see also* Tr. 450:15-17 (DePalma).  For example, Ms. Rogers, a legally blind woman, testified that the Pinellas County's SOE website is difficult for her to navigate.  Tr. 1100:18-1101:8 (Rogers).

596.   In addition, requesting a VBM ballot on the phone may not be a viable option for voters with disabilities either.  Tr. 493:21-494:8 (DePalma); Tr. 1096:14-1100:12 (Rogers); Tr. 2083:22-2084:3 (Slaughter).

597.   Multiple senior citizens and disabled people testified that they are concerned that they will forget to request a VBM ballot more frequently as required by SB 90.  *See* Tr. 1608:13-20 (Brigham); Tr. 1591:14-21 (Teti); Tr. 1102:9-1103:5 (Rogers); Tr. 1623:14-17 (Sauers); Tr. 2086:1-11 (Slaughter); Tr. 528:3-15 (Brown).

598.   Approximately 20.5 percent of voting age Floridians with a disability live alone.  ECF No. 608-16 ¶ 29 (Cooper Rpt.).  Thus, while in-person assistance may be possible at a polling location, such assistance may not be available at home to complete the new VBM application requirements.  ECF No. 608-6 ¶ 106 (Smith Rpt.).

599.   Many voters with disabilities testified that they may have difficulty or be unable to vote in person if they cannot obtain a VBM ballot.  *See, e.g.*, Tr. 1591:22-1593:4 (Teti) (testifying that she would "wear out very shortly" waiting in-line); Tr. 2079:6-8, 2080:10-13 (Slaughter) (testifying that voting in person is "literally an impossibility for me" because of agoraphobia); Tr. 2095:3-12 (Zukeran) (testifying that voting in-person is "anxiety provoking").

600.   Meanwhile, SOEs testified that existing Florida law was sufficient to ensure that the voter rolls are up to date.  Tr. 1190:12-22 (Scott) (testifying that the

list maintenance system works "very well"); Tr. 1362:16-19 (White) (testifying that the "voter rolls have never been more accurate and up to date"); Tr. 2643:7-19 (Earley) (testifying that the current procedures for maintaining voter rolls has been "proven very effective").

601.   Some elections officials stated that they are not aware of any VBM ballot fraud in Florida.  ECF No. 549-2 (Hays Dep.) at 62:18-21, 151:17-22; *see also* Appendix C, at RFA 12 (numerous SOEs admitting they are not aware of voter fraud that would have been prevented by the VBM Application Provision).  Similarly, the Florida Attorney General's Office testified that it was unaware of "any unlawful voting conduct . . . relating to the four-year duration of requests for vote-by-mail ballots" in 2018 or 2020.  ECF No. 549-1 (Guzzo Dep.) at 61:22-62:3.

### 5.   *Cumulative Impact*

602.   While each Challenged Provision raises the cost of voting individually, taken together, the provisions work together to compound the increase in costs of voting caused by SB 90 and produce even more severe burdens on Florida voters.

603.   When it is harder to vote by mail or when drop boxes are made more difficult to access, voters can be expected to vote by other methods.  If voters who would vote by mail use drop boxes shift back to in-person voting because of the increased cost of voting via mail ballots or drop boxes, then this change will burden individuals who vote in person.  Tr. 2159:9-15 (Herron).

604.    The converse is also true.  "Allowing voters to [vote using mail ballots or drop boxes] actually takes pressure off the Supervisors and for fellow voters who want to vote during early in-person voting or on election day.  Because you have shifted people to that other modality and made it convenient, it actually makes it convenient for all voters."   Tr. 2419:23-2420:3 (Smith); *see also* Tr. 2618:22-2619:11 (Earley).  And in fact, there is evidence that voters experienced shorter wait times in 2020 as a result of the expanded use of VBM.  Tr. 1372:6-13 (White).

605.    Altogether, the challenged provisions of SB 90 will "without question . . . increase the cost on all Florida voters but particularly racial and ethnic minorities, Black and Hispanic voters, as well as those who have disabilities." Tr. 2395:19-25 (Smith).  SB 90 not only disproportionately impacts Black and Latino voters in their ability to vote by mail, but also increases the likelihood of long lines for those voters, thus creating a "multiplying effect" on minority voters.  Tr. 2545:5-2546:2 (Smith).

606.    These effects are compounded by disparities in access to transportation and technology that are faced by Black and Latino voters in Florida.  Tr. 598:4-8 (Cooper).  Based on the most recent data from the American Community Survey:

> [t]here is no question that non Hispanic Whites outpace African-Americans and Latinos in the state of Florida across almost all key variables of socioeconomic status. That would include things like education levels, poverty rates, household income, access to broadband Internet, access to vehicles. There's a wide range of data points.

Tr. 598:4-9 (Cooper); *see also* Tr. 595:6-24 (Cooper).

204

607.   Dr. Kousser testified to the importance of considering the impact of changes in election law as a whole rather than determining impact only by analyzing each provision in isolation.  Tr. 1694:22-1695:9 (Kousser).  Just as combining the Eight Box Law law with a poll tax in the late 19th century magnified the discriminatory impact of each, the discriminatory effect of implementing all of SB 90's restrictions at once is likely to be greater than the effect of any one of them taken singly.  Tr. 1824:12-1825:11 (Kousser); ECF No. 608-25 ¶145 (Kousser Rpt.).

608.   Some SOEs have recognized this cumulative effect of the Challenged Provisions.  Supervisor Earley testified that if it becomes more difficult to vote using mail ballots or the drop box, there is a "ripple effect": "[I]f you impact [vote-by-mail], then you increase demands on the other voters voting and potentially have [to] dissuade people from voting if that's the method they want to use and it's difficult." Tr. 2618:22-2619:11 (Earley); *see also* Tr. 3507:6-25 (Earley) (stating that the reduction in early voting in 2011 resulted in "chaos" in 2012 on election day).

609.   Supervisor Latimer concurred that changing one method of voting will have repercussions for other methods.  ECF No. 608-51 (Latimer Talking Points) ("Encouraging Vote By Mail is one of the ways we avoid lines at in-person voting, so if fewer voters vote by mail, that could affect wait times during in-person voting.").  Supervisor Scott testified that when more voters vote by mail, lines at polling sites are shorter.  Tr. 1210:12-17 (Scott).

205

610.   SOEs testified that these provisions collectively will make it harder for voters to vote.  *See* Tr. 1216:14-18 (Scott); ECF No. 549-3 (Latimer Dep.) at 25:17-25; *see also* ECF No. 608-47.   In fact, SOEs concur that some voters will be prevented from voting entirely because they will not be able to register under SB 90. Tr. 1216:5-18 (Scott).

## IX.   INJURIES TO PLAINTIFFS

### A.   Florida NAACP

611.   The Challenged Provisions of SB 90 will severely burden or deny the right to vote of the Florida NAACP's members by severely limiting where, when, and how drop boxes can be used; imposing restrictions for standing VBM applications; and potentially imposing criminal penalties on individuals who provide free food and water or other assistance to in-person voters.  Tr. 526:14-529:11, 530:21-25 (Brown).

612.   SB 90's limitations on when, where, and how drop boxes may be utilized will result in reduced drop box availability, thus making it extremely difficult for many members to vote.  *Id.* at 526:14-527:5.

613.   Many Florida NAACP members work in service-oriented jobs that have inflexible hours and they have relied on drop boxes as a reliable and available method of returning their VBM ballots.  *Id.* at 527:1-5.  For example, one member of the Florida NAACP who is a farm labor worker may be unable to use drop boxes

that are only available during early voting hours due to his 12-hour work schedule. *Id*. at 527:6-16.

614.   In addition, Cecile Scoon, a lifelong member of the Bay County Branch of the Florida NAACP and President of the League of Women Voters of Florida, has voted using a drop box outside of the Bay County Supervisor of Elections office for the last five to ten years.  Tr. 32:7-16; 33:16-17; 77:4-7 (Scoon).  Ms. Scoon also used this drop box to transmit voter registration forms.  *Id.* at 78:2-6.  Ms. Scoon is not comfortable using USPS to transmit her VBM ballot due to mail delays.  *Id*. at 77:15-16.

615.   Ms. Scoon has not seen anyone monitoring the drop box outside of her local SOE office, which she described as being about 15 to 20 feet from the front door of the office.  *Id.* at 78:2-6; 78:13-15.

616.   As a result of SB 90, the Bay County SOE removed the outdoor drop box Ms. Scoon previously used.  *Id.* at 82:14-25; 83:6-14; ECF No. 608-84 at 2; Appendix D, at ROG No. 3).  Ms. Scoon will now have to modify how she casts her ballot.  Tr. 86:21-23 (Scoon).

617.   In addition, many members are confused about whether they will need to request a VBM ballot in the upcoming elections because of SB 90's VBM Application Request modification.  Tr. 528:10-15 (Brown).

618.   SB 90's Line Relief Provision also injures the Florida NAACP.  As part of its civic engagement efforts, the Florida NAACP regularly engages in line relief work for voters, particularly in minority communities across the state, where lines tend to be longer.  *Id*. at 515:14-21; 516:11-15; Tr. at 1957:18-1958:24; 1959:6-19 (Slater).   The Florida NAACP provides water, snacks, fans during hot weather, umbrellas and ponchos during rainy weather, and chairs to voters with disabilities and elderly voters.  Tr. 1954:17-1955:8 (Slater).  The Florida NAACP has done this work for decades, in service of its civic engagement mission.  *Id*. at 1956:2-5.

619.   This activity is designed to "ensure that [voters] stay in line" and to communicate that their vote matters.  *Id*. at 1954:15-16;  Tr. 517: 4-11 (Brown).  The Florida NAACP provides this non-partisan relief to any voter waiting in line, often at their request, and within the 150-feet no-solicitation zone.   Tr. 1956:13-24; 1959:3-1960:2 (Slater).  Voters are relieved to see the Florida NAACP providing this support at polling places.  *Id.* at 1960:22-1961:2.

620.   Under SB 90's Line Relief Provision, this expressive conduct may now be a crime.  Tr. 528:19-529:10 (Brown); Tr. 1961:7-8 (Slater).  As a result, the Florida NAACP will no longer engage in line relief work.  Tr. 1962:23-1963:16 (Slater).

621.   Therefore, voters will be forced to remain in long lines without much-needed support, and some may even forego voting altogether rather than remain in long lines without such support.  Tr. 1963:17-1964:5 (Slater).

622.   Additionally, all the Challenged Provisions make it substantially more difficult for the Florida NAACP to engage in its civic engagement mission, as the Florida NAACP has been forced to divert resources to respond to this new law.  Tr. 531:8-533:10 (Brown).

623.   Because the Florida NAACP is responding to the Challenged Provisions of SB 90 by assisting and educating its members and other Florida voters to ensure they can vote, SB 90 will require the Florida NAACP to divert time, money, and resources away from other activities, such as programming, and initiatives concerning the school-to-prison pipeline and eliminating academic, and educational inequities and mass incarceration.  *Id.*

624.   Indeed, the Florida NAACP has already started creating educational materials to inform its members about the new requirements under SB 90, including preparing to print and distribute flyers to its members to educate them about SB 90's changes. *Id.* at 532:10-15.

625.   In addition, the Florida NAACP has dedicated significant portions of its executive leadership meetings to discussing and planning efforts it will need to undertake to educate its members about SB 90.  *Id.* at 531:6-15.

**B.      Common Cause**

626.    The Drop Box and VBM Application Provisions of SB 90 have injured Common Cause by causing the organization to divert resources from its other programs.

627.    Common Cause has already spent $10,000, and plans to spend more to create educational resources for Florida voters to ensure that they understand the changes that SB 90 makes, and to ensure that each voter understands how to obtain and cast their ballot.  Tr. 544:10-24 (Albert).

628.    In addition, Common Cause anticipates having to hire at least five community organizers—at least two more than the organization employed during the 2020 General Election—to interact with voters and educate them on their options for voting after SB 90.  *Id.* at 544:25-545:21, 556:25-557:25 (Albert).  The additional community organizers will cost Common Cause at least $100,000.

629.    In the absence of SB 90, Common Cause would have used these resources to fund its ethics and redistricting campaigns.  *Id.* at 558:4-8, 559:4-13 (Albert).

### C.   Disability Rights Florida

630.   As a Protection and Advocacy ("P&A") organization for individuals with disabilities, DRF is charged with advocating for and protecting the rights of all individuals with disabilities in Florida.  Tr. 434:18-436:21, 437:12-15 (DePalma).

631.   Approximately 2.7 million voting age individuals in Florida have one or more disabilities, including voters with vision difficulty (799,988 individuals), cognitive difficulty (922,905 individuals), ambulatory difficulty (1,522,812 individuals), self-care difficulty (536,621 individuals), and independent living difficulty (1,037,535 individuals).  ECF No. 456-10 ¶¶ 26, 28, Figure 5 (Cooper Rpt.).  Approximately 20.5% of voting age Floridians with a disability live alone. *Id*. ¶ 29.

632.   DRF works to increase the political participation of individuals with disabilities, including by addressing barriers to voting that voters with disabilities face and by increasing opportunities for people residing in a range of congregate facilities to vote.  Tr. 441:22-442:2 (DePalma).  DRF engages in legislative and public advocacy on these issues, directly engages with and trains election officials and voters on expanding voting accessibility, promotes robust voter registration, and engages in voter hotline and voter education efforts.  *Id.* at 442:6-10, 442:19-443:6.

633.   DRF is concerned about the ways the Challenged Provisions will make it more difficult for voters with disabilities to vote.  For example, limiting where,

when, and how drop boxes can be used reduces the availability of a mode of voting that is accessible for people with disabilities.  Tr. 465:17-466:2 (DePalma).

634.   DRF has concerns that many SOEs' websites are not accessible for people with visual and cognitive impairments, and believes that requesting VBM ballots on such websites twice as frequently due to SB 90's changes to standing requests will impose a burden on voters with disabilities.   Tr. 454:14-455:5 (DePalma).

635.   As a result, DRF has commissioned an accessibility audit, which will cost approximately $82,000, to review all 67 SOE websites to assess whether they are compatible with screen readers and accessible for people with disabilities now that voters will have to attempt to utilize these websites twice as often to request VBM ballots.  Tr. 468:23-469:15, 472:21-473:10, 474:7-24 (DePalma); Tr. 2731:5-7, 2731:11-13 (Babis).

636.  Requesting vote-by-mail ballots by calling SOE offices is also burdensome for some voters with disabilities, and they will be burdened by having to make these requests twice as often as well.  Tr. 493:21-494:8 (DePalma).

637.   Imposing potential criminal penalties for individuals who provide relief, such as free food and water or other assistance to people standing in line to vote will also burden voters with disabilities who rely on this assistance.  *See* Tr. 2743:16-2744:13 (Babis).

638.   DRF has also developed new educational resources explaining SB 90's changes, which will cost between $5,000 and $9,000 dollars.   Tr. 475:14-476:1, 476:8-477:5 (DePalma).   DRF will distribute these materials to ADA coordinators at the city and county level, SOEs' offices, and not-for-profit organizations.   *Id.* at 476:190-22.

639.   To educate its constituents about SB 90, and to seek to minimize the impact of the Challenged Provisions, DRF has been forced to divert time, money, and resources away from other activities.   Tr. 474:20-24 (DePalma); Tr. 2731:24-2733:4,   2733:11-24,   2734:3-6,   2734:18-2736:3,   2736:15-2737:3   (Babis). Specifically, DRF would have focused its voting-related efforts on lobbying legislators and working with election officials to increase supervised facility voting, Tr. 2732:17-2733:4 (Babis); engaging with election officials to implement and increase awareness of accessible VBM balloting that allows a blind individual to cast a ballot in a confidential and private manner, *id.* at 2735:18-2736:3 (Babis); and producing videos demonstrating how to use accessible in-person voting machines, which would have cost approximately $30,000, *id.* at 2735:14-24 (Babis). Instead, the time and resources that would have been used for those programs and efforts have been reallocated to work addressing the effects of SB 90 on voters with disabilities.   *Id.* at 2734:3-6.

640. In addition, DRF approved a new Voting Outreach Specialist in its 2021-2022 budget. The position was intended to help implement fully accessible VBM balloting in the state, but the individual who fills the role will now focus on addressing the ramifications of SB 90, including distributing information and conducting outreach to SOEs. Tr. 483:11-484:5 (DePalma).

641. Individuals with disabilities, who are constituents of DRF, testified to the burdens imposed by the Challenged provisions of SB 90. *See* Tr. 1100:18-1101:8 (Rogers); Tr. 1608:13-20 (Brigham); Tr. 2099:11-18 (Zukeran); Tr. 2083:22-2084:8 (Slaughter); Tr. 1591:22-1593:4 (Teti).

### D. Florida Rising Together

642. Andrea Mercado is the Executive Director of FRT. Tr. 2032:7-10 (Mercado). She previously was Executive Director of New Florida Majority Education Fund, which merged with Organize Florida Education Fund to form FRT. *Id*. at 2032:11-17, 2032:23-2033:1.

643. FRT's efforts to expand democracy include voter registration, voter education, and election protection. *Id*. at 2034:5-8 (Mercado).

644. FRT began registering voters in October 2021, recognizing that there are many people in FRT's communities, specifically many Blacks and Latinos, who are eligible to vote but are not voting and are registered to vote at lower rates than their white counterparts. FRT aims to expand democracy by having a voting

population that represents the diversity of the communities in Florida. *Id*. at 2034:12-23. FRT has registered more than 2,000 individuals. *Id*. at 2034:24-2035:1. FRT has been registering voters in Miami-Dade, Broward, Orange, Osceola, Gadsden, and Duval Counties. *Id*. at 2036:11-13.

645. FRT's predecessors, New Florida Majority Education Fund and Organize Florida Education Fund Majority Education, each registered over 100,000 Florida voters. Tr. 2035:2-15 (Mercado). Over 85% of the people that New Florida Majority Education Fund registered were people of color. *Id.* at 2035:20-21 (Mercado).

646. FRT hires and trains professional voter registration canvassers or democracy organizers, who may register potential voters at their homes or at high-density sites such as laundromats, bus stops, carnivals, and Departments of Motor Vehicles, specifically targeting African-Americans and Latinos. *Id*. at 2035:23-2036:8.

647. Due to SB 90, the training that FRT provides its canvassers, which was previously conducted by New Florida Majority Education Fund, has increased in length from two to three hours because FRT had to add a new component concerning delivery of the required disclaimer. *Id.* at 2036:14-2037:10. FRT's canvassers must also be trained on a new procedure: After completing a voter registration form the

voter is asked to sign a note confirming receipt of the disclaimer as proof that FRT's canvassers are complying with the new law. *Id.* at 2037:16-24.

648.   The Registration Disclaimer Provision has lengthened the time that a canvasser has to spend with a registering voter. Tr. 2037:25-2038:6 (Mercado). The disclaimer requirement also interferes with canvassers' interactions with the individuals they are registering and undermines trust in and the credibility of FRT. *Id.* at 2038:7-24. FRT has had some canvassers quit out of frustration over the disclaimer, *id.* at 2038:25-2039:8, and while canvassers previously collected approximately 300 registration forms during a 29-hour work week, in the wake of SB 90 that number has dropped to just 100 per week. *Id.* at 2039:9-17.

649.   In addition, in view of SB 90, canvassers receive an hour of retraining if they turn in a registration form without a signed acknowledgement of the disclaimer. Also because of the Registration Delivery Provision, registration forms completed by residents of other counties have to be identified and mailed to the SOEs of their counties of residence. *Id.* at 2040:16-2041:7. Otherwise, FRT submits the forms to the SOEs' offices in person. *Id.* at 2041:19-2042:5.

650.   FRT conducts a quality control review of collected registration forms and tracks the applications to ensure they are submitted to the SOEs in advance of applicable deadlines. Tr. at 2042:6-2043:3 (Mercado). FRT has not submitted any forms late since it began registering voters in October 2021. *Id.* at 2043:4-6.

651.   Owing to SB 90, FRT will have to hire more canvassers just to collect the same number of registration forms, and FRT has hired three part-time quality control managers to conduct quality control checks and retraining.  *Id.* at 2043:12-2044:2.

652.   FRT aims to register 100,000 voters by October 2022.   The requirements imposed by SB 90 have increased the resources that FRT must expend to get the same number of voters registered.  *Id.* at 2044:3-14.

653.   Moreover, because the registration process has been extended by SB 90, FRT has stopped its practice of using the registration interaction to provide vote-by-mail education.   And because voter registration is taking more time and resources, FRT has focused less on other subjects such as housing justice.  *Id.* at 2044:15-2045:9.

654.   During the 2020 election, FRT provided assistance, such as food and water, to voters waiting in line at polling places.  According to FRT's Ms. Mercado, given that long lines have at times been used to dissuade people from voting and given that election day in Florida may be hot or rainy, FRT endeavors to make waiting voters feel more comfortable.  That in turn will cause some voters to decide to stay and vote.  *Id*. at 2045:16-2046:10.

655.   In 2020, the New Florida Majority Education Fund provided assistance to voters in Miami-Dade, Broward, Palm Beach, and Duval Counties.  FRT also

partnered with Organize Florida Education Fund and others in Orange, Osceola, Hillsborough, Pinellas Counties and others.  Tr. 2046:11-21 (Mercado).

656.   In 2020, FRT provided aid to voters waiting in line within 150 feet of the polls.  *Id.* at 2046:22-2047:3.

657.   Ms. Mercado testified that she understands that the Line Relief Provision bars providing assistance to voters within 150 feet of polling places.  *Id.* at 2047:4-8.  FRT is concerned that the 150 foot zone imposed by SB 90 will not be enforced precisely and consistently.  *Id.* at 2047:18-2048:2.  FRT is responding by investing in more visible signage and tents or canopies to inform voters where assistance is available.  *Id.* at 2047:9-17.  These new investments will diminish FRT's ability to pursue its other initiatives such as housing justice.  *Id.* at 2044:15-2045:9, 2051:19-2052:15.

658.   FRT has spent an estimated 80 staff hours educating voters about SB 90 which could have been spent on other FRT activities.  Tr. 2048:18-21 (Mercado).

659.   Ms. Mercado also expressed concern, based in part on comments by FRT members, about the fact that the by limiting the availability of drop boxes and by requiring supervision of drop boxes that some voters may find intimidating, the Drop Box Provision will impact FRT members who have used drop boxes after their working day concludes.  *Id.* at 2048:18-2049:9.

660.   Ms. Mercado also pointed to the fact that, per the VBM Request Identification, vote-by-mail requests require identification in the form of a Florida driver's license or a Social Security Number.  Blacks and Latinos are less likely to have either.  *Id*. at 2050:7-24.

661.   Before SB 90, FRT's predecessor produced extensive materials in three languages about vote-by-mail being a good option for people who want to vote from the comfort of their home.  *Id*. at 2050:25-2051:6.  The predecessor sent out 14,000 vote-by-mail applications, but FRT has abandoned that effort as a consequence of SB 90 and the change to the renewal requirement.  *Id*. at 2050:25-2051:15.

662.   The resources and energy that FRT is devoting to responding to SB 90 could otherwise have been used to further FRT's other interests such as vaccine education, educating members on how to participate in democracy, and supporting families facing eviction.  FRT also would have preferred to devote its resources to hiring more frontline organizers to interact with community members.  *Id*. at 2051:19-2052:15.  Ms. Mercado expects that SB 90 will make "even more difficult" and "more challenging" FRT's mission of expanding democracy.  *Id*. at 2052:18-20.

### E.    Poder Latinx

663.   Esteban Garces is a founder and Co-Executive Director of Poder Latinx ("PL").  Tr. 186:23-25 (Garces).

664.   PL's civic engagement programs include voter registration, voter education, voter turnout, and voter protection.  *Id.* at 191:19-22.  It carries out these programs in Orange, Osceola, Seminole, Lake, Polk, Lee, Palm Beach, and Volusia Counties.  *Id.* at 193:12-16.

665.   PL began registering voters in September 2019.  *Id.* at 191:23-192:3. Its voter registration program is at the core of its mission to expand the Latinx electorate and increase its political participation.  *Id.* at 193:25-194:16.  In 2020, PL registered 33,000 voters in central Florida, exceeding its goal to register 30,000 voters.  *Id.* at 191:9-13.

666.   PL trains its canvassers on how to engage with voters in the field, including their legal obligations, and supervises their activities.  *Id.* at 196:6-198:8. Its canvassers aim to educate and register voters in high-density areas where there is high foot traffic for the Latinx community, including supermarkets, libraries, and concerts.  *Id.* at 194:19-195:16.  PL engages in these in-person voter registration activities because doing so is more effective than registering voters online.  *Id.* at 195:17-196:5.

667.   Before SB 90, PL conducted a quality control review of collected registration forms to ensure the voter information it collected was accurate and the forms are submitted to the SOEs on time.  *Id.* at 198:9-199:14.  It would then drive the forms to deliver them to the SOE offices in Osceola and Orange Counties—the

latter of which would collect voter registration forms regardless of the county in which the voter lived.  *Id.* at 201:2-14.

668.  Since PL began registering voters in 2019, there have been two instances when it did not submit voter registration forms to Supervisors within the required time period—one involving 5 registrations and the other involving 50 registrations.  *Id.* at 201:18-202:3.  These 55 voter registrations were not submitted after book closing and constitute about "one-tenth of 1 percent" of the 40,516 total voter registrations that PL has submitted on behalf of Florida voters since it was founded.  *Id.* at 202:17-19; 233:25-235:16.  In response, PL improved its quality control process and has not submitted any late registration forms since it made those improvements.  *Id.* at 202:4-22.

669.  Since SB 90 took effect, PL has registered between 1,800 and 1,900 voters.  *Id.* at 203:1-6.

670.  The Registration Delivery Provision has increased the resource demands on PL's quality control process.  First, because of SB 90, registration forms must be checked to make sure that it matches with the county that the voter has placed on the form.  *Id.* at 207:24-208:11.  It implemented this change in response to one occasion where PL was threatened with a fine by an SOE because a voter had listed the wrong county on their registration form.  *Id.* at 209:1-15. Second, PL must now sort all voter registrations it submits by county to make sure they will be

delivered to the appropriate Supervisor.  *Id.* at 208:12-15.  Third, it must now either

pay to mail or drive voter registrations to the appropriate Supervisors' offices.  *Id.* at

208:16-22.

671.    Over an eight-week voter registration program in 2021, it cost PL over

$4,500 to comply with SB 90's delivery restriction—$476 in mail costs and $4,100

in staff time.  *Id.* at 210:6-21.  In 2022, PL expects that cost to be between $40,000

and $50,000.  *Id.* at 210:22-211:3.

672.    The Registration Disclaimer Provision has lengthened the voter

registration training that PL's canvassers receive.  *Id.* at 203:12-24.  Owing to SB

90, PL also now requires its canvassers to obtain signed acknowledgement forms

from voters as a method of confirming the disclaimer has been delivered.  *Id.* at

204:6-15.

673.    The Registration Disclaimer Provision undermines the reputation of PL

because it implies that the organization is not trustworthy.  *Id.* at 206:23-207:23.

Indeed, PL suffers "reputational harm . . . every time [it has] a conversation with a

voter."  *Id.* at 205:11-206:13.  Though PL has only registered 1,800 to 1,900 voters

since SB 90 took effect, it expects that reputational harm to be "ten times or more"

that amount when it expands its program in the future.  *Id.* at 206:7-13.

674.    The Registration Disclaimer Provision also interferes with PL's ability

to register voters.  *Id.* at 207:8-16.  First, it has lengthened the time that a canvasser

spends on each voter registration, taking away time to register another potential voter.  *Id.* at 206:14-22.  Second, PL has already seen two voters refuse to register with their organization because of the disclaimer.  *Id.* at 205:11-206:1.  Moreover, about one-to-three applicants a week express serious concerns and questions about the disclaimer.  *Id.* at 205:21-206:6.

675.   PL engages in voter education and turnout programs to engage and encourage the Latinx community to vote, particularly low-propensity Latinx voters. *Id.* at 211:24-214:7.  In 2020, PL's voter education program reached out by phone and by text to voters across the state.  *Id.* at 193:17-24.  Its voter turnout program also knocked on 105,000 doors ahead of the 2020 election.  *Id.* at 191:9-18. Depending on how much time remained before the 2020 election day, it encouraged voters to vote by mail, by drop box, or in person, and provided information to voters on how to do so.  *Id.* at 214:11-215:4.

676.   PL expects that the VBM Request Identification will constitute a barrier to voting for the Latinx community it serves, because the voter identification requirement makes it a more onerous process than it was pre-SB 90.  *Id.* at 215:20-216:17.  PL has decided to forego helping its voters vote-by-mail as a result.  *Id.*

677.   PL expects that the Drop Box Provision, and the corresponding loss of 24/7 availability of drop boxes, will result in longer lines at polling places for the Latinx community the organization serves.  *Id.* at 216:18-217:11.  Owing to SB 90's

restrictions on drop boxes, PL plans to start a transportation program to get voters to the polls—for which it has allocated $15,000. *Id.* at 217:3-11; 217:24-218:4. PL staff will also need to perform additional research on drop box availability for its voters. *Id.* at 217:12-23.

678. In 2020, PL's voter protection program provided language assistance to voters at polling places in Orange and Osceola Counties. *Id.* at 218:5-17; 219:20-220:18; 222:8-10. In 2020, PL provided these services to voters waiting in line within 50 feet of the polls. *Id.* at 218:7-17.

679. Mr. Garces testified that the Line Relief Provision bars providing language assistance to voters within 150 feet of polling places, because it would encourage voters to stay in line. *Id.* at 222:14-20. Due to the 150-foot distance, PL is responding by investing in other channels—such as social media or a $20,000 one-hour segment on television—to let voters know they are present to provide language assistance. *Id.* at 222:21-223:16.

680. The resources and energy that PL is devoting to responding to SB 90 could otherwise have been used to invest in the future growth of its organization and to hire additional, dedicated staff members for its current programs. *Id.* at 223:20-224:10. In addition to increased costs and staff time, Mr. Garces testified that SB 90 is "really harmful" for PL's civic engagement mission in that it will impose reputation harms and decrease voter turnout. *Id.* at 224:11-25.

### F.   Equal Ground

681.   As a result of SB 90, Equal Ground ("EG") has halted its voter registration program and did not conduct one of its main voter mobilization efforts, "Souls to the Polls," during the 2021 Florida municipal elections. Tr. 392:8-13; 398:3-24; 399:22-24 (Burney-Clark).

682.   EG founder and consulting director, Jasmine Burney-Clark, testified that Registration Disclaimer Requirement "directly harms" EG's voter registration program, as sharing the disclaimer would "tarnish the reputation" of EG and erode trust in the communities where EG is known as a "reliable resource." *Id.* at 388:15-389:5.  SB 90 was "ultimately the factor" behind EG's decision to stop registering voters, as the organization decided it could not provide a service that would "harm [its] community or [its] reputation as an organization." *Id.* at 392:8-13. Furthermore, the Registration Delivery Provision's requirement that voter registration applications be delivered to the voter's county of residence made it "almost cost prohibitive" for EG to deliver registrations, since EG, being headquartered in a tourist hotspot, frequently registered voters from counties across Florida. *Id.* at 392:24-393:13.  SB 90 also caused EG to discontinue the "Souls to the Polls" events that EG had previously held in 20 Florida Counties.  *Id*. at 393:14 -398:24.

683.   According to EG's Ms. Burney-Clark:

Souls to the Polls actually was started in the '90s and became much more mainstream in the 2000s. It is a tool that was used by the Black church. Because of the Black church's reach, they used it to harness their power by sort of breaking down barriers to the elections process and creating more accessible ways for people to be able to make it to their polling sites. So Black pastors use it to shepherd their members into church on Sunday. Members would hear messages of hope and inspiration, but — and then they'd be able to then from there pray over their members, pray over their ballots, and then pray over the process or process of a caravan, a march or a walk to the polling places.

*Id.* at 393:22-394:9.

684. Ms. Burney-Clark explained:

We launched our Souls to the Polls program because we know how deeply connected and rooted Black churches are in the South, Black churches are in Florida, and our relationship to the Black church is paramount. Black leaders are the backbone of the community. Again, churches have been used as a safe haven for organizing within the civil rights community, and so we found that, again, they had a reach that was quite monumental. . . . So we work with a faith network of pastors across the state of Florida. This network consists of pastors who are leaders of Christian clergy networks. So those clergy networks can range from either 50 to 100 churches in each of those 20 counties, and we estimate that there are about 60,000 parishioners who belong to the 50 to 10 -- or 100 churches per county that we work in. So we believe about 60,000 individuals.

*Id*. at 394:21-395:2; 395:13-19.

According to Burney-Clark, the choice of event locations and the proximity of

drop boxes was key to EG's Souls to the Polls program:

[W]e wanted to work in predominantly Black communities; we wanted to work in the best proximity to where a church was in coordination to where a drop box or early vote site was, and we

226

also wanted to make sure that it was in one of the most highly visible and accessible areas for the Black community. And so we used those as factors to determine where these drop boxes would either be placed or where we would go to host our events. . . . So we worked with the pastors by hosting the Souls to the Polls events. We did the coordination with the Supervisors of Elections on their behalf to make sure that the drop boxes were at the location.

*Id*. at 396:8-15; 396:17-20.

685.   The Drop Box Provision has thus made EG's Souls to the Polls effort impractical:

So I explained Souls to the Polls earlier as, you know, an event or a celebration that provided joy to folks, but it also does not happen without the presence of a drop box. We are not hosting parties and events for the sake of hosting them. We are creating tools of mobilization to help voters vote. And so these drop boxes and the elimination of them from the sites where we previously were able to hold Souls to the Polls means that we are removing the very tool that we had been using to help people be able to vote. So without that or the absence of a drop box, we are now removing the ability for a person to be able to vote in community with the folks that they've been doing that with since the '90s.

*Id.* at 397:12-23.

686.   Additionally, EG held 80 percent of its 2020 "Souls to the Polls" events within 150 feet of a polling place or drop box, and, as an extension of "Souls to the Polls," provided line relief assistance, such as providing voters with waters, fans and seating. *Id.* at 422:4-15; 400:10-401:8. Due to the Line Relief Provision, EG is no longer able to provide this assistance. *Id.* at 402:12-22. SB 90 has also caused EG

to terminate its efforts, conducted in Orange, Volusia, Seminole, and Pinellas Counties to assist voters, waiting in lines outside of polling places. *Id.* at 402:5-403:4; 411:15-17. As Ms. Burney-Clark explained:

> [W]e have been able to go to the polls, provide folks with food, water, fans, and seating and sometimes even entertainment. And we've done this as a way to ensure voters stay in line and commit to voting as opposed to choosing between some of their bodily needs that could be affected by the weather while they are standing in those long lines. And so if we could give them some assistance while they're there, our hope is that they will not have to decide between casting their ballot or taking care of some of their personal needs.

*Id.* at 400:24-401:8.

687. Such aid is of particular importance in Black neighborhoods where the lines tend to be long:

> [I]n Black communities there are oftentimes polling place changes during either early voting or on election day, whether that has to do with capacity or shifts in sizes of the community. And what we've really seen during early voting is that there are some historical sites in Black communities where folks are known to be able to go and vote at. And because they are known, they've been there for a little while, those lines tend to be much longer than some of the other polling places in the community. What we also know is that some of those polling places are smaller in size, just based off of where the Supervisor has chosen to place that polling place and/or resource that polling place. So if they are smaller in size, staff size could also be a result of why that polling place may have long lines. So those are some of the things that we've seen in our community that have been a factor that has contributed to the time frame a person could be standing in a line within the Black community.

*Id.* at 401:12-402:4.

688.   However, Ms. Burney-Clark understands SB 90 to prohibit such activities: "I'm aware that we, as a third-party organization, are no longer able to provide people with food, water, fans, umbrellas, while they are standing in long lines at the polling place." *Id*. at 402:14-16.

689.   While EG has canceled certain programs owing to SB 90, EG has also expended significant resources to adapt to the changes imposed by the bill. In light of the bill, EG has hired two new staffers, a program manager and a political director who spend about 75% and 60% of their time, respectively on SB 90-related work. *Id*. at 418:22-419:3.  As Ms. Burney-Clark testified:

> [W]e have had to divert resources. More specifically, we have had to hire a program manager whose job was to determine what the impacts of SB 90 would be on the community, develop a tool of resources that we could get to the community, and also attend events that were hosted throughout the community so we could educate people on SB 90. In addition to the program manager position, we also decided to hire a political director for the organization as well. This is more of a higher level role that could think more strategically and long term about its impacts, as well as have conversations with the Supervisor of Elections to ensure that we are properly interpreting and communicating to the community what and how this impacts us.

*Id*. at 391:16-392:3.  The positions are funded from monies that would, absent SB 90, have been spent on voter registration and "Souls to the Polls," and from EG's reserves.  *Id*. at 409:15-18.

690.   EG is also doubling its spending on voter education, largely because of SB 90.  *Id.*  at 403:16-19; 405:18-406:10; 406:23-407:6.  As Ms. Burney-Clark

testified: "[W]e have had to mass produce, again, voter education content that would explain to people what SB 90 means, how it impacts them, how it impacts our programming, and we've had to, again, pay for the fees and costs associated with going into the community at events, festivals, back-to-school drives, things of that nature." *Id*. at 403:20-25. This education includes materials notifying community members that Equal Ground can no longer provide line relief activities as a result of SB 90, as well as palm-sized handouts to break down how SB 90 affects voters in an easily digestible format. *Id.* at 403:5-15; 405:1-14.

691.   SB 90 has thus ended EG's plans to expand its voter registration efforts and its "Souls to the Polls" program, and has diverted resources from other organizational goals, including increasing outreach to churches and potential voters, managing misinformation in the community, and expanding EG's staff. *Id.* at 411:21-412:21.  In fact, Ms. Burney-Clark stated that SB 90 has created financial burdens for EG that raise serious questions about the future of the organization and the prospect of layoffs or other cutbacks. *Id.* at 407:21-408:4.

### G.    Hispanic Federation

692.   Frederick Velez, III, Burgos is the National Director of Civic Engagement of Hispanic Federation ("HF").  Tr. 716:12-13 (Velez).

693.   HF's civic engagement program includes voter registration, "Get Out The Vote" ("GOTV"), and voter education.  *Id.* at 719:11-720:4.

694.   HF's voter registration program engages in canvassing targeted towards Latino voters at places like churches, supermarkets, salons, and special events, in addition to digital campaigns. *Id.* at 724:1-725:10.  In 2020, HF budgeted nearly $1 million for its program in Florida.  *Id.* at 728:24-729:2.  HF's in-person program registers voters in Hillsborough, Polk, Osceola, Orange, Seminole, Lake, Volusia, Miami-Dade, and Broward Counties.  *Id.* at 722:8-17.  At special events, however, it is common for HF to register people from 20 to 30 counties who have traveled to Orlando for a festival, for example.  *Id.* at 725:16-23.

695.   HF also supports the civic engagement activities of its member agencies—all of which are nonprofit organizations.  *Id.* at 780:14-17.  HF assists its member agencies through technical capacity building and by providing subgrant funding.  *Id.* at 780:20-23.

696.   In 2020, HF's budget for its civic engagement program in Florida was about $2 million—of which the principal components were pay for staff and canvassers, voter outreach, transportation, and printing costs.  *Id.* at 718:16-17.  The principal components of its budget were pay for its staff and canvassers, voter outreach, transportation, and printing costs.  *Id.* at 718:18-25.  In 2020, HF had seven full-time staff members and about 70 canvassers in Florida.  *Id.* at 722:2-7.

697.   HF registered over 60,000 voters during the 2016 election cycle.  *Id.* at 726:3.  Comparatively, it registered about 18,000 voters during the 2020 election

cycle. *Id.* at 726:17-21. In addition to the pandemic, Mr. Velez Burgos attributed a portion of this decrease to HF's temporary shift to remote-only voter registration techniques, which are less effective in getting voters to register than in-person canvassing. *Id.* at 726:22-728:23.

698. Before SB 90, HF trained its voter registration canvassers with an initial two- to three-hour training session and shorter weekly refresher trainings. *Id.* at 729:9-20. HF then conducted a quality control review to verify each voter registration form it collected and to ensure the accuracy of the information. *Id.* at 729:21-730:10; 730:21-23. In 2020, HF had three full-time staff members working on quality control. *Id.* at 729:21-24. An HF staff member would then drive to either the Orange County or Osceola County Supervisor of Elections' office to deliver the forms in-person and within the required ten-day period. *Id.* at 730:11-18; 731:2-12. HF did not mail forms because of the confidential information they contain and the assurance that hand-delivery provides. *Id.* at 731:16-732:1.

699. Mr. Velez Burgos was aware of one occasion in 2017 when HF discovered it had misfiled a voter registration form and did not submit it to the SOE's office within the ten-day time period. *Id.* at 732:2-11. HF investigated the issue, self-reported the late submission to the Supervisor's office, and worked with the voter to register them in time for the election. *Id.* at 732:11-19; 792:25-793:5. In

response, HF improved its quality control process and has not since had any issues since 2017. *Id.* at 732:22-733:5.

700.   HF will restart its in-person voter registration activities in late February or early March 2022. *Id.* at 729:3-8.

701.   The Registration Disclaimer Provision will increase the time and resource demands of HF's quality control process. *Id.* at 769:18-770:1. For example, HF will need to hire an additional quality control staff member to comply with SB 90—an additional $30,000 to $40,000 per year that it would otherwise have allocated to hiring more canvassers. *Id.* at 770:2-9. HF also now plans to use its quality control staff to hand-deliver voter registration forms to Supervisor's offices in the voters' counties of residence. *Id.* at 769:24-770:1. When its staff members cannot drive to Supervisors' offices due to prohibitive distance, HF will now mail voter registration forms to the correct Supervisors' offices—an estimated "couple of thousand dollars more" in expenses. *Id.* at 776:3-14.at 776:3-14.

702.   The Registration Disclaimer Provision interferes with HF's ability to register voters, because it forces HF's canvassers to imply that the organization is not trustworthy. *Id.* at 768:10-769:2; 794:2-4. HF has also consulted with outside counsel and has determined that it will print the disclaimer to comply with SB 90— incurring new legal and printing costs. *Id.* at 765:2-766:7; 789:17-19; 794:5-795:2. The disclaimer requirement will also harm HF's reputation in the communities it

serves, which will diminish the organization's ability to pursue other core parts of its mission (e.g., public health initiatives).  *Id.* at 771:10-772:16.  Furthermore, each voter that decides after receiving the disclaimer to instead rely on an online registration tool that HF provides will cost the organization $1.70 per registration—or an estimated additional cost of $4,000 to $5,000.  *Id.* at 770:10-771:9; 776:8.

703.   Some HF member agencies may "refrain from registering voters" altogether "because they also fear that using that disclaimer will harm the trust that people have in them."  *Id.* at 772:3-7.

704.   Owing to both the Registration Delivery and Disclaimer Provisions, the cost of HF's voter registration program in 2022 will increase by about $150,000 to $200,000 in order to reach a similar 20,000-voter goal as the 2020 election.  *Id.* at 775:7-23.  As part of that adjusted cost, HF will need to hire three more canvassers to reach its voter registration goal—totaling about $60,000 in additional expenditures.  *Id.* at 775:24-776:2.  It will also spend additional staff time to retrain its canvassers to comply with SB 90's requirements.  *Id.* at 800:6-16.

705.   HF's voter education programs seek to advance and empower Hispanic communities by providing voters with information via text, phone, social media, television, and radio campaigns in both English and Spanish.  *Id.* at 733:22-735:1.  HF's voter education program reaches voters in every county in Florida.  *Id.* at 723:4-8.  HF's GOTV program also informs Latino voters on how to obtain VBM

ballots and the hours and locations of drop boxes. *Id.* at 735:15-736:20; 784:25-785:1.

706.   During the 2020 election cycle, HF's voter education and GOTV programs engaged with about 520,000 voters, of which 226,000 voted by mail. *Id.* at 737:23-738:1.   HF spent about $300,000 on its voter education and GOTV programs. *Id.* at 735:8-14.

707.   In response to the VBM Request Identification and VBM Application Provision, HF will create new voter educational materials, including more spending on TV and radio media, to inform and follow-up with voters on how these changes will affect them. *Id.* at 757:2-21; 762:23-763:15; 801:2-8.  For example, the VBM Application Provision will cause HF to conduct more outreach to "SuperVoters"—or someone who has voted in each of the past four election cycles—to alert them to the need to renew their VBM requests or changes to a drop box location and availability. *Id.* at 758:21-760:19.  Each new interaction with these voters costs HF six cents per text message and/or staff time to make phone calls. *Id.* at 760:20-761:25.

708.   HF also incorporates assisting voters with requesting VBM ballots in its voter registration program. *Id.* at 726:4-14; 757:22-25.  The VBM Application Provision will lengthen the amount of time its canvassers spend on each voter interaction because they will need to explain why they are asking for sensitive

information, which will result in a decreased production rate for HF's voter registration program. *Id.* at 758:1-20. HF also expects a further decrease in the number of Latino voters it is able to register because SB 90 requires them to provide a canvasser with confidential information. *Id.* at 767:20-768:9.

709. Owing to the cumulative consequences of the Registration Disclaimer and Delivery Provisions, VBM Request Identification, and Drop Box Provision, HF plans to decrease its communications budget to accommodate hiring additional canvassers and quality control staff for its voter registration program—thus decreasing the amount of voters HF reaches despite these voters' increased need for information about SB 90's changes. *Id.* at 761:1-762:8. As a result, HF expects to reach about 150,000 fewer voters than it planned to in 2022. *Id.* at 778:21-24. Moreover, SB 90's increased demand on HF's resources also means it will have to consolidate satellite offices or forego the opportunity to reach voters in additional counties. *Id.* at 762:9-22; 778:25-779:14; 817:7-18.

710. HF provides polling place assistance to Florida voters, including language assistance to Latino voters and providing food, water, and phone chargers to voters waiting in long lines. *Id.* at 741:12-742:1. It also assists disabled voters in reaching the polling booth and provides disabled and elderly voters with rides to the polls—dropping them off inside the non-solicitation zone. *Id.* at 742:1-8; 744:18-745:8. HF provides these services in Orange, Osceola, Miami-Dade, and Broward

County.  *Id.* at 722:23-723:3.  Before SB 90, HF provided both language assistance and comfort items like refreshments and phone charges to voters waiting in line within 150 feet of the polls.  *Id.* at 742:16-743:24; 810:9-25.  During the 2020 election, HF provided subgrant funding for its member organizations to conduct "line warming" activities.  *Id.* at 784:8-13; 810:13-17.

711.   When HF provides voters waiting in line with food, water, and phone charges, it encourages voters to "[p]lease stay in line until you exercise your right to vote."  *Id.* at 744:5-15.  When lines are long, HF staff members go to replenish their food and water supplies to "make sure that people stay in line" to vote.  *Id.* at 743:25-744:4.

712.   HF only provides polling place assistance to voters that requested that assistance from their organization.  *Id.* at 747:1-13; 811:16-22.

713.   Mr. Velez Burgos testified that the Line Relief Provision bars HF from handing out food within the non-solicitation zone, as it had done in the past.  *Id.* at 746:3-9.  It is unclear to HF whether handing out a bottle of water or dropping off a voter within 150 feet of the polling place constitutes "an attempt to influence a voter" prohibited by SB 90.  *Id.* at 746:10-21.  Some of HF's veteran canvassers are already fearful that providing these services may violate the law.  *Id.* at 746:22-25; 773:3-13.  Indeed, HF has already observed a "chilling effect" on its staff members' desire

to engage in this work, including language access and assisting disabled voters.  *Id.* at 773:19-774:4.

714.   Mr. Velez Burgos also testified about the "domino effect" increase of the length of lines at polling places that HF observes when vote by mail or drop box availability is restricted, which ultimately discourages eligible voters from voting. *Id.* at 738:6-15; 773:14-18.  He also expects SB 90's restrictions on polling place assistance will also discourage voters from voting in-person.  *Id.* at 774:5-16.

715.   If HF cannot raise an additional $200,000 to comply with SB 90's requirements, it will need to divert its general operating funds which are used to fund the organization's infrastructure, staff needs, and expansion into new states.  *Id.* at 776:15-777:11; 807:19-808:13.  Doing so would result in HF forgoing expansion of its civic engagement program into Pennsylvania.  Id. at 777:12-19; 816:18-24.  It would also diminish HF's capacity to provide support to its member agencies when an emergent need arises.  *Id.* at 777:9-11.

### H.   UnidosUS

716.   Jared Nordlund is the Florida state advocacy director of UnidosUS.  Tr. 1403:15-16 (Nordlund).

717.   UnidosUS's civic engagement program includes voter registration, voter education, and Get Out The Vote ("GOTV").  *Id.* at 1406:16-19.

718.   UnidosUS engages in community-based canvassing in high-traffic commercial areas in densely populated Latino precincts, as well as online programs. *Id.* at 1406:20-1407:6, 1409:4-10.  Since 2012, it has registered over 300,000 voters in Florida, including 72,000 voters in 2020.  *Id.* at 1409:11-15, 1413:8-13.  It carries out its voter registration program principally in Miami-Dade, Broward, Palm Beach, Osceola, Orange, Lake, Seminole, and Volusia Counties.  *Id.* at 1409:22-25.

719.   UnidosUS's budget for its 2020 Florida voter registration program was between $3 and $3.5 million.  *Id.* at 1413:14-16.  Its voter registration team in 2020 included three quality control managers and 50 canvassers.  *Id.* at 1414:3-7.  UnidosUS prepares and delivers training on voter registration to its staff members, including its quality control managers and canvassers.  *Id.* at 1414:7-1415:1.

720.   Since 2016, UnidosUS has also supported the in-person voter registration programs of its affiliate organizations.  *Id.* at 1407:7-12, 1411:14-24.  UnidosUS provides its Florida affiliates with both funding and training for their voter registration efforts.  *Id.* at 1411:25-1413:3.  These affiliates are based in Miami-Dade, Broward, Orange, Osceola, Brevard, and Hillsborough Counties.  *Id.* at 1413:4-7.

721.   UnidosUS conducts a quality control review of the voter registration forms it collects for completion and accuracy.  *Id.* at 1415:2-12, 1416:5-21.  Its process involves multiple layers of review and contacting at least 20% of voters,

which altogether takes about eight days. *Id.* at 1416:5-1417:2.  It would then deliver the voter registrations it collected—including out-of-county registrations—to the Miami-Dade or Orange County Supervisors of Elections' office.  *Id.* at 1417:6-1418:2.  For example, Mr. Nordlund estimated that half of the forms UnidosUS delivered to the Orange County Supervisor's office in 2020 were from Osceola County residents. *Id.* at 1504:4-15.  Before SB 90, UnidosUS did not deliver voter registrations to Supervisors via mail because:  (i) it wanted to ensure that they would arrive within the ten-day time period; and (ii) the Supervisors' offices would forward out-of-county registrations to the appropriate county offices.  *Id.* at 1418:3-1419:1.

722.   Mr. Nordlund was aware of one instance in 2018 in which UnidosUS did not submit five voter registration forms within the required time period.  *Id.* at 1419:6-13.  Only two of the five voter registration forms were turned in after the book closing deadline.  *Id.* at 1420:25-1421:18.  In response, UnidosUS paid a fine, conducted an internal investigation to identify the cause, and improved its quality control process to make sure it did not happen again.  *Id.* at 1419:14-1420:6, 1420:20-1421:24.  Since 2012, UnidosUS has turned in five registration forms late out of an approximate total of 300,000 voter registrations it has submitted.  *Id.* at 1420:8-16.

723.   UnidosUS intends to resume in-person voter registration campaigns in Spring 2022.  *Id.* at 1422:12-15.  It is currently preparing its voter registration program for compliance with SB 90's provisions.  *Id.* at 1496:6-13.

724.   Due to the Registration Delivery Restriction, UnidosUS will implement new quality control processes to sort the registration forms by the voter's county of residence.  *Id.* at 1424:13-1425:12.  It will also now require canvassers to collect that information during each voter interaction, which will increase the time each new registration takes.  *Id.* at 1427:5-1428:1.  After its quality control process, UnidosUS will incur new expenses either:  (i) to mail out-of-county registration forms to the correct Supervisors' offices or the Division of Elections; or (ii) to have staff drive registration forms to the correct Supervisors' offices to deliver them by hand.  *Id.* at 1429:4-12, 1429:16-1430-1, 1430:12-1431:24, 1433:8-16.

725.  Complying with the Registration Disclaimer Provision will also lengthen the amount of time UnidosUS's canvassers expend on each voter registration, thereby lowering its production to rates below pre-SB 90 levels.  *Id.* at 1423:11-19.  It will also expend resources and staff time to produce new training materials for its canvassers and field staff on how to comply with the law.  *Id.* at 1424:4-12, 1425:13-18.  UnidosUS also expects the disclaimer to undermine its reputation and trust in the community by giving voters the inaccurate impression that it habitually delivers voter registrations late.  *Id.* at 1423:20-1424:3.

726.   Though it typically tries to register the same number of voters every election cycle (i.e., 70,000 voters in 2020), UnidosUS expects to register about 20,000 less voters in the 2022 election cycle due to the additional time and expense it will incur to comply with SB 90's delivery and disclaimer provisions.  *Id.* at 1434:17-1435:14, 1436:8-18.   Mr. Nordlund projects that the cost per voter registration to UnidosUS will increase from $30-35 to $40-45 due to the cost of compliance with SB 90.  *Id.* at 1438:19-1439:2, 1508:9-1509:17.

727.   The Registration Delivery and Disclaimer Provisions will also cost UnidosUS at least $100,000 between hiring an additional 2-4 quality control staff and accounting for additional staff time to retrain canvassers.  *Id.* at 1437:12-1438:5.   If UnidosUS cannot fund this additional $100,000 expense through additional fundraising, it will either need to pare down its voter registration program or reallocate resources currently dedicated to its voter education, GOTV, and issue advocacy campaigns to make up the difference.  *Id.* at 1439:7-1441:3.

728.   UnidosUS affiliate organizations' voter registration programs will also incur additional resources to comply with SB 90, such as for retraining staff and mailing voter registration forms to out-of-county Supervisors' offices.  *Id.* at 1428:9-24.   UnidosUS's affiliates with similarly affected in-person voter registration programs include: the Mexican American Council in Miami-Dade County; Hispanic Unity of Florida in Broward County; Hispanic Services Council in Hillsborough

County; and Latino Leadership in Orange, Broward, and Osceola Counties. *Id.* at 1434:6-12.

729. UnidosUS's voter education and GOTV programs provide Latino voters in Florida with information and assistance on how to request vote-by-mail ballots through its in-person voter registration efforts and via its paid digital mediums (e.g., website, ads). *Id.* at 1407:13-1408:12, 1484:22-1485:15. These programs reach voters statewide. *Id.* 1484:4-7. During the 2020 election cycle, UnidosUS helped about 25,000 Florida voters vote by mail. *Id.* at 1485:16-21.

730. UnidosUS expects that VBM Request Identification will result in voters submitting a higher rate of incomplete VBM applications than before. *Id.* at 1486:2-16. In response, UnidosUS plans to spend more staff time and money on additional efforts to educate voters on the requirements of the VBM application process. *Id.* at 1486:17-24, 1488:20-1489:21. It also expects to provide additional training to its canvassers on SB 90's requirements. *Id.* at 1488:5-11. UnidosUS's capacity to accommodate the additional cost of compliance with the VBM Request Identification will likewise be contingent upon securing additional funding or reducing funding for its other programs. *Id.* at 1489:22-1490:7.

731. UnidosUS is devoting additional resources to complying with SB 90—including staff and fundraising time—which will ultimately interfere with both the organization's ability to fulfill its mission of registering all eligible Latino voters and

its ability to pursue its complementary programs like its issue advocacy campaigns. *Id.* at 1490:8-21.

## X.   THE DEFENDANT'S CASE

### A.   Witnesses

732.   In their case, Defendants called two expert witnesses, Dr. Quentin Kidd and Dr. Dario Moreno.[9]   Defendants also recalled Director of Elections Maria Matthews and Miami-Dade Supervisor Christina White, as well as Lee County Supervisor Tommy Doyle and the FSE contract lobbyist David Ramba.

### 1.   *Defendants' Experts*

#### i.   *Dr. Quentin Kidd*

733.   Dr. Quentin Kidd is a Professor of Political Science at Christopher Newport University.  He received a Ph.D. in Political Science from Texas Tech University.  ECF No. 634-5 at 1 (Kidd Rpt.).  He has no training as a lawyer and has never been qualified as an expert in election laws, election administration, election mechanics, or comparative election laws.   Tr. 2906:14-2907:21 (Kidd).   His testimony has been excluded in multiple election law cases in which he was offered as an expert.  Tr. 2909:8-2911:11 (Kidd).

---

[9] Defendants initially disclosed Brad Lockerbie as an expert witness but did not call him to testify at trial.  Because he did not testify, his expert report is not in evidence.

734.   Dr. Kidd's testimony was offered to "place Florida into some context nationally" by comparing Florida's election laws to those in other states.  Tr. 2906:5-11 (Kidd).  Dr. Kidd also purported to provide a "comparison of certain aspects of SB 90 with . . . 49 other states and the District of Columbia."  Tr. 2915: 8-12 (Kidd).

735.   Dr. Kidd did not offer any opinion about how SB 90 (or any specific provision of SB 90) impacts Florida voters.  Tr. 2904:21-2905:2 (Kidd).  Dr. Kidd also testified that he did not analyze whether unique features of Florida law render Florida more or less restrictive "in terms of different modalities of voting."  *Id.* at 2967:3-11.

736.   Dr. Kidd's report was developed using a fundamentally flawed analysis, including conflating basic legal concepts such as "rules" with "recommendations" and "prohibited" with "unregulated."  His original report lacked citations, and his supplemental report included widespread incorrect citations that did not support his classification of particular statutes.  These incorrect citations are so numerous as to render his report unreproducible, and unreliable.  Tr. 3535:24 -3536:7, 3536:25-3537:13, 3542:20- 3544:17 (Mayer).  *See also* ECF No. 634-3 at 4 (McDonald Rpt.) ("Since [Dr. Kidd] provides no description of his methodology, I am unable to reanalyze his work to ascertain if I can reproduce his results.")

737.   Based on the considerable flaws in Dr. Kidd's analysis, including widespread citation to incorrect statutes, misclassification of states, and focusing on

issues that were not changed by SB 90, the Court should find Dr. Kidd's work is

unreliable and his analysis is not credible.  The Court should not rely on Dr. Kidd's

analysis in any way.  Among other flaws in Dr. Kidd's work:

- In opining that Florida's mail ballot application verification requirements were "largely average," Dr. Kidd mischaracterized the requirements of numerous states for requesting mail ballots, including representing that certain states require application when they automatically mail ballots to all registered voters (Tr. 2978-79 (Kidd)), insisting that states required signature matching to request mail ballots when he was reviewing statutes that concerned returned ballots (*id.* at 2980-2990), and insisting that Minnesota, Georgia, Montana, and Indiana (like Florida) require provision of a driver's license or social security number to request a mail ballot when the evidence he considered shows that he was looking at ballot return verification statutes and/or the identification provision in these states was optional.  *Id.* at 2991-3000.

- In opining that Florida "stands among a small group of states that require [drop boxes] to be widely available," Dr. Kidd mischaracterized numerous states where drop boxes are widely available as prohibiting them.  ECF No. 634-5 at Table 3 (Kidd Rpt.).  In so doing, Dr. Kidd failed to consider that drop boxes are authorized in numerous states by regulation or directive or are simply unregulated, Tr. 3028-30, 3034-38 (Kidd), and he opined incorrectly that several states with statutes expressly permitting drop boxes had "no enabling statute," *Id.* at 3031-34.  And in grouping Florida with other states such as Virginia, Maryland, and New Jersey, Dr. Kidd failed to consider that these states provide considerably more availability of drop boxes on or before Election Day and more flexibility in security measures (such as allowing video surveillance).  *Id.* at 3038-3044.

- In opining that Florida's 3PVRO disclaimer requirements "are not unique among states that require them," Dr. Kidd treated states that provide guidance recommending such disclaimers as equivalent to Florida's statutory requirement that such disclaimers be provided.  Of the five states whose disclaimer "rules" Dr. Kidd purported to analyze in his report,  ECF No. 634-5¶¶ 49-53 & Table 5 (Kidd Rpt.), four only have recommendations published in the form of non-mandatory guidance.  Tr.

3048-3051 (Kidd). And the fifth state Dr. Kidd analyzed in his report – Iowa – did not concern voter registration at all; the provision cited concerned a pre-printed disclaimer provided on an absentee ballot request form. *Id.* at 3051-3054; ECF No. 634-14. Dr. Kidd continued to insist that this form could be used to register voters even after confronted with it at trial.

738. In addition to these fundamental methodological flaws, Dr. Kidd did not analyze key provisions of Florida law that were changed by SB 90, and accordingly his observations about SB 90 are irrelevant.

739. In particular, Dr. Kidd testified that he did not review the laws of other states with respect to any of the challenged provisions of SB 90 related to drop boxes: security requirements, staffing, locational constraints or penalties. Tr. 3026: 7-19; 3027: 2-13 (Kidd).

740. Dr. Kidd testified that he did not look at whether any state has a provision of law like SB 90 that invalidates VBM requests after a voter has already made a request. *Id.* at 3023:14- 3024:4.

741. Dr. Kidd testified that his analysis of 3PVROs examined five elements completely unrelated to the changes in law made by SB 90. *Id.* at 3046: 8-25.

742. With respect to SB 90's change to the definition of "solicitation," Dr. Kidd testified that he did not compare Florida to other states with respect to the definition of prohibited conduct. *Id.* at 3018:21-3019:13. Dr. Kidd also testified that he did not review any state's law to see if it banned activity which has the effect of influencing a voter. *Id.* at 3022:1-23.

743. Dr. Kidd's testimony was also characterized by methodological inconsistency. For example, he testified that despite confining his analysis only to statutes when analyzing SB 90's restrictions on drop boxes (and expressly testifying that Secretary of State guidance should not be considered), he reviewed guidelines and policy when reviewing state practices with respect to 3PVROs. *Id.* at 3054:14-3055:9.

744. Dr. McDonald did review the no-solicitation language of the states identified by Dr. Kidd, and concluded that the language added by SB 90 rendered Florida the most restrictive of the states reviewed by Dr. Kidd. Tr. 3609:10-3610:10 (McDonald).

745. Contrary to Dr. Kidd's analysis, both Dr. Smith and Dr. Mayer cited to a study by Schraufnabel, Pomante and Li showing that Florida is among the most restrictive states—40th out of 50—with respect to the administrative burden of voting. Tr. 3541:9-3542:11 (Mayer); *See also*, Tr. 2383:8- 2386:1 (Smith); ECF No. 608-6 at 15, Figure 1 (Smith Rpt.).

### ii.   *Dr. Dario Moreno*

746. Dr. Dario Moreno is an associate professor of politics at Florida International University. Tr. 3276:8-12 (Moreno). He earned his Ph.D at the University of South California in 1987. *Id*. at 3277:12-15. He has written two books on Central America. *Id*. at 3277:23. He helped edit two other books, one on

Florida's different media markets and the other, edited with two former congressmen, on political polarization. *Id*. at 3277:23-24.  He has also written book chapters on Latino politics in Florida. *Id*. at 3279:25–3280:1-25.

747.   Dr. Moreno was proffered as an expert with respect to Latino political behavior in Florida but not with respect to African American political behavior.  *Id*. at 3292:1-25 – 3293:1-7, 3293:24-25–3294:1-10.

748.   Dr. Moreno does not consider himself a statistician.  *Id*. at 3294:24-25–3295:1-3.

749.   Dr. Moreno offered no testimony with regard to most of the provisions of SB 90 challenged in this case.  He opined solely on SB 90's VBM provisions, and his testimony on mail ballots focused on ballot collection (as opposed to procedures for applying for absentee ballots).  He offered no opinions on the intent or effect of SB 90's restrictions on 3PVROs; its restrictions on drop boxes; or its changes to the definition of "solicitation" at polling places.  *Id*. at 3295:4-22.

750.   Dr. Moreno was not asked to respond to any of the plaintiffs' expert reports in this case, other than Dr. Kousser's.  *Id*. at 3295:23-24.  At the time he prepared his expert report, Dr. Moreno was unfamiliar with the Arlington Heights factors relevant to assessing intentional discrimination in election legislation.   Tr. 3296:5-8 (Moreno).

751.   Large portions of Dr. Moreno's testimony and expert opinion focused on the activities of *boloteros* who had engaged in so-called "ballot harvesting" (collection of absentee ballots) in Miami-Dade, and why Dr. Moreno viewed the *bolotero* system as harmful.   Tr. 3306–3309, 3313:4-25–3314:1-8, 3316:17-25–3317:1-14, 3332:13-23.   Dr. Moreno identified the provisions of SB 90 that compare to Miami-Dade's 2011 restrictions on ballot collection as "the most significant part" of SB 90.   *Id*. at 3325:12-19.   The claims challenging SB 90's provisions on ballot collection, however, have been dismissed and are no longer at issue in this case. ECF No. 274.

752.   Dr. Moreno also testified as to past incidents in which, he alleged, candidates or their representatives went door-to-door in Hialeah and Palm Beach urging elderly people to turn in their absentee ballots, in a manner perceived as threatening.   Tr. 3309:17--3311:14 (Moreno).   However, SB 90 does nothing to prevent campaigns from continuing to visit voters to urge them to turn in their absentee ballots.

753.   Dr. Moreno opined that Latino voters in Florida leaned Republican between 1980 and 2004, but leaned Democratic from 2008 to 2018, and then leaned more Republican in 2020.   He sees them as a swing vote in Florida.   Tr. 3331:5-13 (Moreno).   However, Dr. Kousser's testimony showed that, according to exit polls

in 2020, the majority of Latinos in Florida supported the Democratic presidential candidate.   ECF No. 608-25  ¶ 93 (Kousser Rpt.).

754.   Dr. Moreno predicted that SB 90's restrictions on voting by mail would not negatively affect Black or Latino voters in Florida. His only evidence for this conclusion was his analysis of absentee ballot usage in Miami-Dade as a whole after a 1998 Miami-Dade ordinance placed restrictions on absentee voting in the county. Dr. Moreno noted that absentee ballot usage in Miami-Dade as a whole between 2010 and 2020 had not declined markedly compared to absentee ballot usage in certain other urban counties in Florida.  ECF No. 634-4.  He concluded from this that SB 90 would not negatively affect absentee voting by Blacks or Latinos throughout Florida.

755. Dr. Moreno's prediction, however, was undermined by several methodological problems.  First, unlike SB 90, the Miami-Dade ordinance enacted in 1998 (and strengthened with criminal penalties in 2011) only restricted ballot collection by third parties.  The Miami-Dade ordinance did not impose any new restrictions on the process of applying for an absentee ballot—such as providing a driver's license number, state identification number, or last four digits of the social security number—as SB 90 does.  Tr. 3346:9-25–3347:1-3 (Moreno).  The Miami-Dade ordinance did not require voters to renew their absentee ballot request every two years, as SB 90 does.  ECF No. 634-4 ¶¶ 4-6.   Therefore, Miami-Dade's

251

experience with restricting absentee ballot collection by third parties has no bearing on how voters will be affected by SB 90's ID matching requirement and requirement that absentee ballot requests be renewed every two years.

756.   Second, even in Miami-Dade itself, Dr. Moreno was unable to reach any valid conclusions as to the impact of Miami-Dade's restrictions on ballot collection on African Americans.  Because African Americans are only 18% of Miami-Dade's population, the behavior of Miami-Dade as a whole cannot be used to understand the behavior of African Americans even in Miami-Dade – much less in Florida as a whole. Tr. 3356:15-25-3357:1-22 (Moreno).   Dr. Moreno also acknowledged that South Florida is unique not only compared to the rest of Florida but unique in the nation as a whole.  *Id*. at 3350:1-13

757.   Dr. Moreno acknowledged that the two Florida U.S. Congressional seats and two state legislative seats that had swung Republican in 2020 were all centered in South Florida.  *Id*. at 3361:22-25–3362:1-11.

758.   Dr. Moreno further acknowledged that African Americans in Florida are overwhelmingly Democratic, that African-American turnout is an important variable in Florida elections given the closeness of statewide elections; and that it would provide political advantage to the Republican Party in Florida if voting were to decrease among African Americans.  *Id.* at 3362:12-25.

**B.    Defendants' Defense of SB 90**

759.    In defense of SB 90, Defendants advanced a number of theories at trial: (i) that SB 90 imposes little burden and it is still easy to vote in Florida, and (ii) that the Challenged Provisions are justified either simply as partisan measures or as anti-fraud or other election security measures.

### 1.    *Defendants' Expert Evidence as to Lack of Burden*

760.    Of Defendants' two experts, Dr. Kidd did not offer any opinion about how SB 90 (or any specific provision of SB 90) impacts Florida voters.  Tr. 2904:21-2905:2 (Kidd).

761.    Dr. Moreno's evidence concerning the impact of SB 90 was limited to the ballot collection provision in SB 90 Section 32.  As noted above, however, Dr. Moreno's analysis had severe limitations that undermined any usefulness in drawing conclusions about the likely impact of SB 90 on Florida voters. *See supra* ¶¶ 759–768. In sum, Dr. Moreno's analysis was limited to examining total vote-by-mail numbers in Miami-Dade County following that County's adoption of an ordinance restricting ballot collection in 1998.  Dr. Moreno did not provide any basis for extrapolating his findings concerning Miami-Dade to Black Floridians or the rest of the state, and he acknowledged under cross-examination that Miami-Dade is in many ways a unique jurisdiction.  Tr. 3350:1-13 (Moreno).  Dr. Moreno did not testify about any other provision of SB 90 or how they impact Florida voters.

## 2.   *Defendants' Non-Expert Evidence as to the Lack of Burden From SB 90*

762.   Defendants' non-expert testimony about the impact of SB 90 was limited to Director of Elections Maria Matthews.   Of the various Challenged Provisions, Matthews testified about the VBM Request Identification requirement, Tr. 3427-3431 (Matthews), the VBM Applicaiton Provision, *id*. at 3431-3432,  and the Line Relief Provision. *Id*. at 3439-3442.

763.   With regard to the VBM Request Identification, Director Matthews testified that this provision can be waived if the voter appears in person to request a VBM ballot.   Tr. 3428 (Matthews).   But SB 90 Section 24 expressly provides that the identification requirement cannot be waived and specifically provides that the requirement that one of the three forms of identification that can be "verified in the Supervisor's records" applies to applications for a VBM ballot in writing, in person or by telephone. Fla. Stat. § 101.62(1)(b).   Moreover, Director Matthews conveyed this position directly to Supervisors in a training on SB 90 and directed that the identification requirement was to be enforced with "no exceptions."   ECF No. 608-64 at 17 ("All in-person or telephonic requests must include voter's Florida DL #, FL ID Card #, or last 4 of SSN (no exceptions) whichever may be verified in the supervisors' records."); *see also* ECF No. 608-91) (2021 Conference Q & A's) at 2 ("As such, the statute does not provide a generally applicable mechanism for an

individual to request a VBM ballot without providing his or her Fl DL #, FL ID card #, or the last four digits of his or her social security number.").

764.   Director Matthews also testified that since SB 90 passed, the number of voters without any valid identification in the system was down 200,000 to just under 480,000.  Tr. 2784-85, 2824 (Matthews).   Director Matthews did not testify that there had been any reduction in the 2.85 million Florida voters who only have one form of identification number in the system and will not be provided a mail ballot if they provide the wrong number.  ECF No. 608-68.  Director Matthews also testified that the Division of Elections had not required Supervisors to send notices to voters who have incomplete information in the Florida Voter Registration System and will leave such outreach to the "discretion" of individual Supervisors. Tr. 2816:23-2817:25 (Matthews).   Additionally,  she did not acknowledge that the limited outreach conducted has been in predominantly white counties, such as Lake and Lee. ECF No. 549-2 (Hays Dep.) at 162:17-163:1; Tr. 3208:9-16 (Doyle).

765. Director Matthews also testified that this provision halved the timeframe for which VBM ballot requests are valid. Tr. 3431:13-20 (Matthews).

766.   With regard to the Line Relief Provision, Director Matthews testified that she had "not heard that long lines are an issue" and the Secretary of State has "not had complaints about long lines."  Tr. 3442:1-7 (Matthews). Contrary to Director Matthews' testimony, there is extensive evidence in the record that long

lines continue to be an issue in Florida elections, particularly in predominantly Black and Latino neighborhoods.  *See, e.g., ee, e.g.*, Tr. 1210:7-9 (Scott); ECF No. 608-6 ¶ 230 (Smith Rpt.), Feb. 8, 2022 (Herron) Tr. 2163:10-14; ECF No. 467-1 ¶ 296 (Herron Rpt.); ECF No. 549-2 (Hays Dep.) at 130:12-15; ECF No. 608-15  ¶¶ 21-29 (Smith 2d Supp. Rpt.); Tr. 1917:14-19 (Eskamani); Tr. 1982:6-1983:9 (Albright); Tr. 516:11-23 (Brown).

### 3. *Defendants' "The Supervisors Made Us Do It," Partisanship, Election Integrity, and Other Post Hoc Rationales for SB 90 Contradict the Legislative Record*

767.    At trial and in their summary judgment motion, Defendants offered a number of rationales for SB 90, including (i) that the Supervisors had requested the Challenged Provisions, (ii) that the Challenged Provisions are justified as partisan measures, and (iii) that the Challenged Provisions are necessary as anti-fraud provisions.  These proffered rationales are contrary to the weight of the evidence, largely contradicted by the legislative record, and simply pretextual.

768.    With regard to Supervisor alleged support for SB 90, there is ample evidence and testimony that the Supervisors did not support the bill.  *See, e.g., supra* Findings of Fact, Section VII.E.1; Appendix L; ECF No. 608-36; ECF No. 634-19; ECF No. 608-48.  Although Mr. Ramba estimated that 75 to 80 percent of SB 90's provisions were altered based on the Supervisors' recommendations,  Tr. 3100:21-3101:4 (Ramba), his testimony notably did not discuss most of the Challenged

Provisions.  For example, Mr. Ramba did not testify that the final bill reflected the Supervisor's input on the Registration Disclaimer Provision or the definition of solicitation in the Line Relief Provision.  Tr. 3132.  He did not testify about the VBM Request Identification at all.  Additionally, Mr. Ramba acknowledged that although language prohibiting drop boxes, the Supervisors were still not happy with the final language in the Drop Box Provision.  Tr. 3130, 3105 ("we had always a dispute over drop boxes").

769.   Director Matthews also testified about several other interests in her testimony, including to address mail ballot fraud,  to prevent voter harassment online or to maintain up-to-date voter information.  Tr. 3423, 3428-29, 3432-3433 3439:22-3440:2.  But Director Matthews acknowledged that Secretary Lee told the legislature she was not personally aware of mail ballot fraud, Tr. 2763:4-9.  Director Matthews also admitted that the state already had robust procedures for tracking voter information, Tr. 3471:5-3474:1.

770.   The legislative record confirms that mail ballot fraud is a post-hac rationale.  When SB 90's sponsor, Senator Baxley was asked whether he believed "that there was vote-by-mail fraud in the last election," he responded "That's not the purpose of our bill.  It's not in the bill, and I don't really have to answer that question." ECF No. 461-98 at 64:5-10.

771.   Critically, SB 90's sponsors expressly and repeatedly disavowed that the bill's purpose was to address voter fraud.  *See generally* Appendix I.

772.   Defendants also argued that SB 90 can be justified as an "obvious" exercise in partisanship, ECF 245-1 (Defendants' Corrected Memorandum of Law in Support of Summary Judgment), at 34 (citing Rucho v. Common Cause, 139 S. Ct. 2484, 2503 (2019) for the proposition that "securing partisan advantage" is a "permissible intent").  SB 90's sponsors and supporters, however, never attempted to defend SB 90 as having partisan motivations during the legislative proceedings.

773.   If anything, defendants' effort to defend SB 90 as a deterrent to voting by Democrats only underscores the racial discrimination at the heart of SB 90.  As Dr. Kousser pointed out, Florida's elections are deeply racially polarized, with large majorities of Black voters supporting Democratic candidates and strong majorities of white voters supporting Republican candidates, both in presidential elections and state-level elections from 2004 - present.  Latino voters in Florida, although more of a "swing" vote, have also given a majority of their votes to Democratic candidates in the last four presidential elections from 2008 through 2020; they supported George Bush, the brother of then-Florida Governor Jeb Bush, over John Kerry in 2004.  ECF No. 608-25 ¶ 93-94 (Kousser Rpt.).  If SB 90 was a deliberate effort to disenfranchise Democrats in Florida, it was also a deliberate effort to disenfranchise persons of color in Florida.  Tr. 1757:8-25 – 1759:10 (Kousser).

## CONCLUSIONS OF LAW

## I.   PLAINTIFFS HAVE ESTABLISHED STANDING TO SUE.

774.   Each of the NAACP and Florida Rising Plaintiffs—the Florida NAACP, Common Cause, Disability Rights Florida, Florida Rising Together, Poder Latinx, Equal Ground, Hispanic Federation, and UnidosUS—has established standing to sue.

775.   To establish standing, Plaintiffs must show (1) that they have suffered an injury that is (2) traceable to Defendants and that (3) can likely be redressed by a favorable ruling.  *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). Plaintiffs must establish standing as to each challenged statutory provision.  *CAMP Legal Def. Fund, Inc. v. City of Atlanta*, 451 F.3d 1257, 1273 (11th Cir. 2006). However, "the presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement." *Rumsfeld v. Forum for Acad. And Inst. Rights*, 547 U.S. 47, 53 (2006). For plaintiff organizations, either organizational or associational standing with respect to a challenged provision will satisfy Article III.

776.   Scope of injury. The Supreme Court has held that even a small injury, "an identifiable trifle," is sufficient to confer standing.  *United States v. Students Challenging Regulatory Agency Procedures*, 412 U.S. 669, 689 n.14 (1973). Despite Defendants' suggestions otherwise, in a voting rights case, a "plaintiff need not have the franchise wholly denied to suffer injury. Any concrete, particularized,

non-hypothetical injury to a legally protected interest is sufficient." *Common Cause / Georgia v. Billups*, 554 F.3d 1340, 1351 (11th Cir. 2009) (quoting *Charles H. Wesley Educ. Found., Inc. v Cox*, 408 F.3d 1349, 1352 (11th Cir. 2005)).  "[A] denial of equal treatment is an actual injury even when the complainant is able to overcome the challenged barrier." *Id.*

777.  Injury – Organizational standing.  An organization can establish standing based on concrete injury to itself as an entity.  One form of such concrete injury occurs "when a defendant's illegal acts impair the organization's ability to engage in its own projects by forcing the organization to divert resources in response."  *Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1341 (11th Cir. 2014), s*ee also Fla. Democratic Party v. Hood*, 342 F. Supp. 2d 1073, 1079 (N.D. Fla. 2004).  To demonstrate resource diversion, a party must explain what activities it "would divert resources away from in order to spend additional resources on combatting" the effects of the challenged law.  *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1250 (11th Cir. 2020).

778.  The types of diverted resources that establish standing range from money, to staff time, to volunteer efforts. *See Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*, 11 F.4th 1266, 1287 (11th Cir. 2021) (diversion-of-resources standing established where challenged ordinance caused the organization "to expend resources in the form of volunteer time" and where "volunteers . . . had

to divert their energies to advocacy activities such as attending City meetings and organizing protests against the Ordinance."); *see also Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1341 (11th Cir. 2014); *Fla. State Conference of the NAACP v. Browning*, 522 F.3d 1153, 1158, 1165-67 (11th Cir. 2008) (diversion-of-resources standing established where organizations "*reasonably anticipate* that they will have to divert personnel and time to educating volunteers and voters on compliance with [challenged law] and … resolving the problem of voters left off the registration rolls on election day," where such resources "would otherwise be spent on registration drives and election-day education and monitoring") (emphasis added); *see also Georgia State Conf. of the NAACP v. Kemp*, 841 F. Supp. 2d 1320, 1336 (N.D. Ga. 2012) (expenditure of "additional resources—such as staff and volunteer time" as a result of the challenged conduct "plainly satisfy the injury prong of the Article III test for standing.").

779.   Injury – Associational standing.  "Even in the absence of injury to itself, an association may have standing solely as the representative of its members." *Warth v. Seldin*, 422 U.S. 490, 511 (1975). An organization may sue "on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation

of individual members in the lawsuit." *Greater Birmingham Ministries v. Sec'y of State for State of Ala*., 992 F.3d 1299, 1316 (11th Cir. 2021) ("*GBM"*).

780.   Generally, "[t]o establish standing under [a] theory [of associational standing], an organization must 'make specific allegations establishing that at least one identified member has suffered, or will suffer harm.'" *Georgia Republican Party v. Securities & Exch. Comm'n*, 888 F.3d 1198, 1204 (11th Cir. 2018) (citing *Summers v. Earth Island Inst*., 555 U.S. 488, 498 (2009)).   But "where all the members of the organization are affected by the challenged activity," the organization need not name a specific member.   *Summers*, 555 U.S. at 497-99. Moreover, "[w]hen the alleged harm is prospective," and at least one member is certain to be injured, the Eleventh Circuit has held that it is "not required that the organizational plaintiffs name names because every member faces a probability of harm in the near and definite future." *Fla. State Conference of the NAACP v. Browning*, 522 F.3d 1153, 1160 (11th Cir. 2008); *see also Fla. Democratic Party v. Scott*, 215 F. Supp. 3d 1250, 1254 (N.D. Fla. 2016) ("[P]olitical parties have standing to assert, at least, the rights of [their] members who will vote in an upcoming election. . . . That was so even though the political party could not identify specific voters that would be affected; it is sufficient that some inevitably would.").

781.   In addition, "individual participation is not normally necessary when an association seeks prospective or injunctive relief for its members." *United Food and*

*Commercial Workers Union Local 751 v. Brown Grp., Inc.*, 517 U.S. 544, 546 (1996) (internal quotations omitted) (quoting *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333 (1977). This Court has already held that there is no need for individual member participation here.  "[N]either the claims asserted, nor the relief requested requires the participation of the individual members in this lawsuit." *Fla. State. Conf. of the NAACP v. Lee*, No. 4:21-cv-187, 2021 WL 6071169 at *1 (N.D. Fla., Dec. 17, 2021).

782.   In analyzing associational standing, courts need not elevate "form over substance." *Hunt,* 432 U.S. at 345.  Organizations have associational standing when they possess indicia of membership, including representing a constituency and providing means by which constituents can express "their collective views and protect their collective interests." *Id*.

783.   <u>Traceability</u>. To have standing, Plaintiffs must establish causation by showing that "their injuries are connected with [Defendants'] conduct." *Wilding v. DNC Servs. Corp.*, 941 F.3d 1116, 1125 (11th Cir. 2019) (cleaned up) (quoting *Trump v. Hawaii*, 138 S. Ct. 2392, 2416 (2018)).  As this Court has acknowledged, traceability "is not an exacting standard," Plaintiffs need only show "that there is a substantial likelihood' that the of causation. *Fla. State Conf. of the NAACP v. Laurel M. Lee*, No. 4:21-cv-187, 2021 WL 4818913 at *10 (N.D. Fla., Oct. 8, 2021)

(quoting *Duke Power Co. v. Carolina Env't Study Grp.*, 438 U.S. 59, 75 n.20 (1978)).

784. *Defendant Lee.* As this Court previously held, Plaintiffs "asserted injuries, including the diversion of resources to respond to the new restrictions on drop boxes and the burdens such restrictions will place on voters who will have fewer drop box options, are traceable to Defendant Lee's enforcement authority under" SB 90. *Fla. State Conf. of the NAACP v. Laurel M. Lee*, 2021 WL 4818913 at *10; 4:21-cv-201, ECF No. 201 at 24 (Order Mot. to Dismiss). Nothing that occurred at trial changes this conclusion. Defendant Lee, in her official capacity as Secretary of State, is responsible for enforcing compliance with the Drop Box Provision. Fla. Stat. § 101.69(3). Section 28 of SB 90 specifically empowers Defendant Lee to levy a $25,000 civil penalty against any SOE who leaves a drop box "accessible for ballot receipt other than as authorized by this section." Fla. Stat. § 101.69(3). This Court's previous conclusion that Plaintiffs' injuries are traceable to Defendant Lee through her enforcement authority specifically provided for by Section 28 is the law of this case and should not be revisited. *See Fla. State Conf. of the NAACP, et al. v. Laurel M. Lee*, 2021 WL 4818913 at *10; *FRT v. Lee*, 4:21-cv-20,1 ECF No. 201 at 24.

785. Similarly, "Plaintiffs' injuries under the disclaimer and delivery requirements are traceable to Defendant Lee's statutory authority to refer violations

264

to the Attorney General for investigation and subsequent enforcement proceedings." *FRT v. Lee*, 4:21-cv-201, ECF No. 201 at 25.   Nothing at trial changes this conclusion.   Defendant Lee, in her official capacity as Secretary of State, is responsible for referring suspected violations of the Registration Delivery and Disclaimer Provisions to the Attorney General for enforcement.   Fla. Stat. § 97.0575(4).  This Court's previous conclusion that Plaintiffs' injuries are traceable to Defendant Lee through her statutory authority is the law of this case and should not be revisited.  *FRT v. Lee*, 4:21-cv-201, ECF No. 201 at 25.

786.   In addition to these provisions, the Secretary sought to intervene as of right to defend "all provisions of Florida state law," including the VBM Application Provision, the VBM Identification Requirement, and the Line Relief Provision citing her interest in defending the State's election statutes, to obtain and maintain uniformity in the interpretation and implementation of the election laws. *FRT v. Lee*, 4:21-cv-201, ECF No. 337-1.  The Court granted the Secretary's motion. *FRT v. Lee*, 4:21-cv-201, ECF No. 359.  In making these arguments, the Secretary of State has conceded that she has a "direct, substantial, legally protectable interest in the proceeding," and her role in promoting uniformity in the interpretation and implementation of the election laws is sufficient to establish traceability and redressability for all of the Challenged Provisions.  *See generally Chiles v. Thornburgh*, 865 F.2d 1197, 1212-13 (11th Cir. 1989) ("standing cases are relevant"

to the intervention question because "an intervenor's interest must be a particularized interest").

787.   *Supervisor Defendants*. Similarly, nothing at trial calls into question this Court's previous finding that Plaintiffs' injuries from the Drop Box Provision, VBM Application Provision, VBM Request Identification, and the Line Relief Provision are traceable to Defendant Supervisors.   *See Fla. State Conf. of the NAACP, et al. v. Laurel M. Lee*, 2021 WL 4818913 at *10.   Defendant Supervisors are "directly responsible for offering drop boxes and complying with the statute limiting the locations, operating hours, and monitoring of such drop boxes"; "directly enforce the challenged provision requiring repeat requests"; "directly enforce the challenged provision requiring the submission of identification when requesting a vote-by-mail ballot"; and "are responsible for designating the 'no-solicitation zone' and marking its boundaries."  *Id.* at *11 (internal citation omitted); *FRT v. Lee* ECF No. 201 at 27; *see also Fla. State Conf. of the NAACP v. Laurel M. Lee*, No. 4:21-cv-187, 2021 WL 6071169 at *3 (N.D. Fla., Dec. 17, 2021) (noting that "Defendant Supervisors are statutorily tasked with enforcing the challenged provisions."); *FRT v. Lee*, 4:21-cv-201, ECF No. 293 at 6 (Order on Mot. for Summ. J.).

788.   <u>Redressability</u>. Redressability "focuses . . . on whether the injury that a plaintiff alleges is likely to be redressed through the litigation." *Sprint Commc'ns*

*Co. v. APCC Servs., Inc.*, 554 U.S. 269, 287 (2008) (emphasis omitted).  Plaintiffs are not required to seek complete relief.  *Id.*  As this Court previously held, it does not matter that some Supervisors may choose to comply with some restrictions of the Challenged Provisions of SB 90 absent an order from a court because "Article III . . . does not demand that the redress sought by a plaintiff be complete."  *See Fla. State Conf. of the NAACP v. Laurel M. Lee*, 2021 WL 4818913 at *12 (quoting *Moody v. Holman*, 887 F.3d 1281, 1287 (11th Cir. 2018)); *FRT v. Lee*, 4:21-cv-201, ECF No. 201 at 29.  The Court's earlier determination that Plaintiffs' injuries are redressable is still valid because nothing in the trial record suggests that any facts have changed.

789.  *Secretary Lee*: "[E]njoining Defendant Lee from using her powers to impose a $25,000 penalty" for violations of the Drop Box Provision would "go a long way towards redressing Plaintiffs and their members' injuries."  *See Fla. State Conf. of the NAACP v. Laurel M. Lee*, 2021 WL 4818913 at *12; *FRT v. Lee*, 4:21-cv-201 ECF No. 201 at 28.  Moreover, "enjoining Defendant Lee from referring suspected violations" for violations of the Registration Disclaimer and Delivery Provisions "removes the threat of enforcement against Plaintiffs and provides partial redress for their injuries," even if the Attorney General is ultimately authorized to prosecute violations of this section.  *FRT v. Lee*, 4:21-cv-201, ECF No. 201 at 30. And as discussed above, the representations Secretary Lee made in her request to

intervene to defend "all provisions of Florida state law" is sufficient to establish redressability as to the other Challenged Provisions.

790. *Supervisor Defendants*: *First*, enjoining the Supervisors from complying with the Drop Box Provision would allow them to "no longer be limited to providing voters with drop boxes that must be always monitored in person and open only during early voting hours." *Fla. State Conf. of the NAACP v. Laurel M. Lee*, 2021 WL 4818913 at *12; *FRT v. Lee*, 4:21-cv-201 ECF No. 201 at 29. *Second*, "[a]n injunction against enforcing the 'repeat request' requirement would redress Plaintiffs' injuries involving having to request a vote-by-mail ballot twice as often as before." *Fla. State Conf. of the NAACP. v. Laurel M. Lee*, 2021 WL 4818913 at *12. *Third*, enjoining the Supervisors from enforcing the VBM Identification Requirement would "redress Plaintiffs' injuries of having to divert resources to educate voters about this new requirement and alleviate the alleged burden [it] has on voters who seek to request a vote-by-mail ballot." *FRT v. Lee*, 4:21-cv-201, ECF No. 201 at 30. Finally, a "court order prohibiting enforcement of the new solicitation restriction would prohibit the Defendant Supervisors from reporting Plaintiffs' members and volunteers who wish to engage with voters at drop boxes and polling places as they have done in the past." *Fla. State Conf. of the NAACP v. Laurel M. Lee*, 2021 WL 4818913 at *12 (N.D. Fla., Oct. 8, 2021); *FRT v. Lee*, 4:21-cv-201 ECF No. 201 at 30.

268

791.   In their Rule 52(c) motion, Defendants argued that the injuries stemming from the Line Relief Provision are not redressable because a separate statute, Fla. Stat. § 101.051(2), already prohibits Plaintiffs' activities.   That is incorrect.

792.   Section 101.051 affords voters who require assistance in voting "by reason of blindness, disability, or inability to read or write" the right to receive assistance in casting their votes from a person of their choice, other than an employer or union representative.   The provision further explains that the person providing assistance may "read over" the ballot to the voter and "retire to the voting booth for the purpose of casting the elector's vote according to the elector's choice." Fla. Stat. § 101.051(1).

793.   Section 101.051(2) makes it unlawful to "*solicit* any elector *in an effort to provide assistance to vote pursuant to subsection (1).*"   (Emphases added.)   In other words, that section prohibits persons from directly offering to provide assistance in casting a ballot inside the polling place.   There is no evidence in the record that *any* Plaintiffs "solicit[ed]" any voter "in an effort to provide" the kind of direct assistance in casting a ballot inside a polling place as described in § 101.051. *See infra* ¶ 1110.

794.   Moreover, to prevail on their redressability argument, Defendants would have to show that *all* of Plaintiffs' pre-SB 90 activities at polling places were

proscribed by that section.  Defendants plainly cannot meet that burden, because Plaintiffs engaged in activities outside the scope of 101.051 and because voters requested that Plaintiffs provide language and disability assistance.  *See, e.g.*, Tr. 400:12-401:8 (Burney-Clark) (describing Equal Ground's efforts to provide food, water, fans, seating, and entertainment at the polls); Tr. 515:14-516:10 (Brown) (describing NAACP's efforts to provide food, water, chairs, umbrellas, and tents to people in line that require assistance); Tr. 1956:13-21 (Slater) (explaining that voters approach volunteers from her branch seeking relief items rather than being approached by the volunteers); Tr. 742:16-25 (Velez Burgos) (explaining that "people ask" Hispanic Federation staff to translate sample ballots); Trial Tr. 219:20-220:18 (Garces) (describing situations where Spanish-speaking voters approached Poder Latinx staff with questions about voting process); Tr. 2045:13-2047:3 (Mercado) (describing predecessor organization's provision of food, water, and umbrellas to voters in line).

795.   Miami-Dade County's redressability argument similarly fails.  The trial testimony demonstrated that Hispanic Federation directly conducted line warming activities in Miami-Dade County in 2018 and provided funding to other organizations to conduct such activities in 2020.  Tr. 810:9-17 (Velez Burgos).  For example, Mr. Velez Burgos testified that he was "sure" that Hispanic Federation handed out pizza within the 150-foot non-solicitation zone in 2018.  *Id.* at 810:18-

811:4.  He further testified that "at no point has any poll worker issued an order telling us that [Hispanic Federation] cannot, for example, give food or . . . provide line-warming activities like language assistance or . . . helping a person with disabilities." Tr. 811:10-15 (Velez Burgos).  Ms. Mercado also testified that Florida Rising Together's predecessor handed out food, water, and umbrellas in several counties in 2020, including Miami-Dade County, and that they provided items to voters within 150 feet of the polls.  *Id.* at 2046:11-24.  SB 90, however, prevents Hispanic Federation, Florida Rising Together, and other organizations from providing exactly this kind of assistance.

### A.   NAACP Plaintiffs Have Established Standing.

#### 1.   *Plaintiff Florida NAACP Has Both Organizational and Associational Standing to Sue.*

796.   With respect to Plaintiff Florida NAACP, the testimony of Anthony J. Brown, Cynthia Slater, and Cecelia Scoon established that the Florida NAACP has been harmed by SB 90 in both an organizational and an associational capacity, and therefore has standing to sue both as an organization and on behalf of its members.

#### i.   *Organizational Standing*

797.   As a result of SB 90, the Florida NAACP has had to divert, and will continue to divert, both time and money to combat the adverse effects of SB 90's Challenged Provisions on its members and on its mission, programs, and activities as an organization.

798.   Since the passage of SB 90, approximately one-third of Florida NAACP's executive leadership time has been devoted to strategizing how to minimize the harm that SB 90 will impose on its members.  Tr. 531:6-15 (Brown). Had SB 90 not passed, the leadership would instead be focusing that time on the organization's traditional priority focus areas, or "game changers," i.e., creating programming to address issues such as health care, criminal justice, education, environmental justice, and the economy.  Tr. 531:18-24 (Brown).

799.   The Florida NAACP also anticipates spending more than $18,000 to develop educational flyers to communicate SB 90's changes to its members across the State, to help the members successfully vote.  Tr. 531:25-532:23 (Brown).  If SB 90 had not passed, the Florida NAACP would have instead focused those resources on pandemic-related health care and other "game changer" programming.  *Id.* at 532:24-533:10 (Brown).

800.   In sum, the undisputed trial evidence that the Florida NAACP has had to divert both time and money in responding to SB 90, and reasonably anticipates that it will continue to do so if the Challenged Provisions are not enjoined, has established its standing to sue as an organization on its own behalf.

ii.   *Associational Standing*

801.   The testimony of Anthony Brown, Cecile Scoon, and Cynthia Slater also established the Florida NAACP's associational standing, by demonstrating that

voting is central to the Florida NAACP's purpose; that its members would have standing to sue in their individual capacities; and that its members need not participate individually in this lawsuit because Plaintiffs seek injunctive relief. *United Food*, 517 U.S. at 546.

802.   As this Court has previously acknowledged, political action and voting is central to the Florida NAACP's mission, as evidenced by the many voting-related activities the organization facilitates and hosts, including voter registration drives, voter training, voter education, political forums, and workshops. *Fla. State. Conf. of the NAACP v. Lee*, 2021 WL 6071169 at *1; Tr. 509:19-510:23 (Brown); Tr. 1951:8-1952:3 (Slater).

803.   The record also shows that individual members of the Florida NAACP would have standing to sue in their individual capacities because the Challenged Provision of SB 90 will make it more difficult for some members to vote than other groups. *See Common Cause/Georgia v. Billups*, 554 F.3d 1340, 1351 (11th Cir. 2009) (*citing Ne. Fla. Chapter of Assoc. Gen. Contractors of Am. v. City of Jacksonville, Fla.,* 508 U.S. 656, 666 (1993)).

804.   The overwhelming majority of the Florida NAACP's members are African-American. Tr. 509:1-7 (Brown); Tr. 1952:8-14 (Slater).  In addition, many members of the Florida NAACP are registered and plan to vote in the upcoming election. Tr. 510:4-8 (Brown); Tr. 1951:5-7 (Slater).  As Professor Smith explained,

the Challenged Provisions of SB 90 will erect and exacerbate barriers that disproportionately affect minority voters, thereby disproportionately burdening their right to vote.  ECF No. 608-6 at ¶¶ 10, 12-13 (Smith Rpt.).

805.   Section 28 of SB 90 mandates that drop boxes only be available during early voting hours and requires that an employee of the Supervisor continuously monitor each drop box in person. Fla. Stat. § 101.69. As described above, these provisions severely limit the availability of drop boxes. *See* Section IV.A. In addition, the Florida NAACP has many members whose jobs require them to work inflexible hours, often in 12-hour shifts that begin before drop boxes will be available and end after they close.  Tr. 527:1-16 (Brown).  Mr. Brown specifically identified one member of his Indian River County NAACP Branch who is a farm labor worker who will be burdened by the limited accessibility of drop boxes resulting from Section 28 of SB 90.  *Id.* at 527:8-16.

806.   In addition, Cecile Scoon, a member of the Florida NAACP, testified that the drop box located outside the Bay County SOE office that she used "all the time" has already been removed as a result of SB 90's new drop box requirements. Tr. 77:1-78:17 (Scoon); *see also* ECF No. 608-84 (Bay County, Fl. press release announcing that the "Drop Box outside the Supervisor of Elections office has been removed.").

807.   As a result of the changes prompted by the Challenged Provisions of SB 90, many Florida NAACP members will be unable to cast their ballots using drop boxes.  Tr. 527:6-16 (Brown).

808.   Mr. Brown also explained that Section 24 of SB 90, which reduces the amount of time that a standing request is valid for VBM ballots, burdens the Florida NAACP's elderly members who have typically relied on the standing VBM request application to receive their ballots.  Fla. Stat. § 101.62(1)(a).  Mr. Brown explained that the elderly members worry that they will forget to request a VBM ballot on time, thereby depriving them of their "precious and priceless right to vote."  Tr. 527:23-528:15 (Brown).

809.   Finally, due to the potential that line warming activities may be criminalized under the Line Relief Provision of Section 29 of SB 90, Mr. Brown and Ms. Slater testified that the Florida NAACP will no longer engage in line warming. Fla. Stat. § 102.031(4)(a)-(b); Tr. 1962:23-1963:16 (Slater). In past elections, over 45 branches of the Florida NAACP provided relief and encouragement, in the form of water, fans, and snacks, for voters waiting in long lines.  Tr. 1954:12-1955:8, 1960:8-18 (Slater).  As Ms. Slater explained based on communications she has received from her SOE, because of Section 29 of SB 90 "there could be fines and penalties" for providing line relief in the future.  *Id.* at   1961:17-1962:22. Consequently, voters, especially voters of color who tend to face longer lines to vote,

may be discouraged from turning out to vote.   Tr. 529:4-530:25 (Brown); Tr. 1963:17-1964:5 (Slater). Mr. Brown explained that the changes "would seriously adversely affect voting" by many voters who are NAACP members.  *Id.*

810.   In sum, the evidence at trial has established that members of the Florida NAACP will suffer the kind of injury from the Challenged Provisions of SB 90 that would support their standing to challenge SB 90 in their individual capacity. Plaintiff Florida NAACP therefore has also established its standing to sue in an associational capacity on behalf of its members.

## 2.   *Common Cause Has Established Organizational Standing.*

811.   The testimony of Sylvia Albert, Common Cause's director of voting and elections, establishes that Common Cause has organizational standing to challenge the Drop Box and VBM Application Provisions of SB 90 (Fla. Stat. §§ 101.69, 101.62(1)(a)) because the organization has suffered concrete injury by having to divert resources from its other programs in responding to those provisions of SB 90.

812.   In response to these Challenged Provisions, Common Cause has already spent $10,000 to carry out its mission of educating voters about how they can vote in Florida after SB 90, to ensure that all voters have access to the franchise. Tr. 544:10-24 (Albert).

813.   As a result of SB 90, Common Cause anticipates having to spend at least an additional $100,000 in Florida to create additional educational materials and hire additional community organizers to interact with voters and educate them regarding their options for accessing the franchise despite the new restrictions SB 90 imposes.  Tr. 544:25-545:21, 556:25-558:2 (Albert).

814.   If Common Cause did not have to spend these resources to respond to the changes resulting from the Challenged Provisions of SB 90, it would have used these resources to fund its ethics and redistricting campaigns.  *Id.* at 558:4-8, 559:6-11 (Albert).  SB 90 has concretely impaired Common Cause's ability to carry out its mission in Florida.  *Id.* at 558:9-14.

815.   As a result, Common Cause has standing to sue in its organizational capacity.

### 3.   *Plaintiff Disability Rights Florida Has Established Both Organizational and Associational Standing.*

816.   DRF is Florida's designated protection and advocacy ("P&A") system, established pursuant to a congressional mandate requiring each state to designate a P&A system that "shall have the authority to pursue legal, administrative, and other appropriate remedies or approaches to ensure the protection of, and advocacy for, the rights of" disabled individuals, "with particular attention to members of ethnic and racial minority groups." 42 U.S.C. § 15043(a)(2)(A)(i).

277

817.   A P&A system has standing to bring suit to redress injuries to itself as an organization. *See Ala. Disabilities Advoc. Program v. J.S. Tarwater Dev. Ctr,* 894 F. Supp. 424, 427 (M.D. Ala. 1995), *aff'd on other grounds*, *Ala. Disabilities Advoc. Program v. J.S. Tarwater Dev. Ctr.*, 97 F.3d 492 (11th Cir. 1996) (holding that P&A organization had standing to sue facility to redress the injury to organization itself caused by the facility's refusal to provide those records to which P&A was entitled).

### i.   *Organizational Standing.*

818.   As explained by Tony DePalma, DRF's Public Policy Director, and Olivia Babis, DRF's Senior Public Policy Analyst, both of whom testified at trial, DRF has diverted and will continue to divert significant organizational time and resources from other programs and activities as a result of SB 90.

819.   Mr. DePalma and Ms. Babis both testified that, as a result of SB 90, DRF has altered its programming priorities by commissioning an accessibility audit to review all 67 SOE websites to assess their accessibility for voters with disabilities. Tr. 468:23-469:15, 472:19-473:10, 474:7-24 (DePalma). SB 90 greatly increased the urgency of conducting this audit and thereby displaced other programming priorities because, *inter alia*, many voters with disabilities rely on online access and will have to request VBM ballots more frequently under SB 90.  The audit will cost DRF approximately $82,000.  *Id.* at 472:19-23 (DePalma); *see also* Tr. 2731:11-13 (Babis).

820.   DRF is also developing new educational resources explaining the changes to Florida's voting laws created by SB 90, which will cost between $5,000 and $9,000.   Tr. 475:14-476:1, 476:8-477:8 (DePalma); Tr. 2731:3-5, 2731:8-10 (Babis).

821.   If DRF did not have to spend these resources to respond to the changes from the Challenged Provisions of SB 90, DRF would have used these resources to work on expanding supervised facility voting, implementing new accessible vote-by-mail programs, and producing equipment demonstration videos.   Tr. 2731:24-2732:3, 2732:17-2733:4, 2734:18-2735:2, 2735:14-24 (Babis).   DRF has significantly decreased, if not altogether halted, those efforts, instead focusing its activities on mitigating the impact of the Challenged Provisions on its membership. *Id.* at 2733:23-24, 2735:3-6, 2735:25-2736:3.   DRF has had to take funds from the budget for these activities and reallocate them to the website accessibility audit and educational materials regarding changes under SB 90.   *Id.* at 2734:3-6.

822.   In addition, DRF has also shifted the focus of its annual Election Summit from accessible vote-by-mail to website accessibility, *Id.* at 2736:20-25, and modified the duties and responsibilities of its new Voting Outreach Specialist position.   The position was originally intended to help implement fully accessible VBM balloting in the state but must now address ramifications of SB 90 including

by distributing information and conducting outreach to supervisors of elections.  Tr. 483:11-484:5 (DePalma).

*ii.    Associational Standing.*

823.   As a P&A system, DRF also can have associational standing to serve as a representative body for the constituents that it serves. *Doe v. Stincer*, 175 F.3d 879, 884-89 (11th Cir. 1999) (holding that a P&A entity "may sue on behalf of its constituents like a more traditional association may sue on behalf of its members"); *accord Oregon Advocacy Center v. Mink*, 322 F.3d 1101, 1110-11 (9th Cir. 2003). Although DRF refers to the individuals for whom it advocates as "constituents" instead of "members," it is undisputed that DRF advocates on behalf disabled individuals and provides a means for protecting its constituents' collective interests. Therefore, "this is a distinction without a difference," *Fla. State Conf. of the NAACP v. Lee*, 2021 WL 4818913 at *7 n.2, and DRF should be treated the same as a membership organization for associational standing purposes.  *Hunt*, 432 U.S. at 345; Tr. 434:17-435:2, 437:12-15 (DePalma).

824.   Further, as this Court previously acknowledged, DRF's "core purpose[] involve[s] . . . encouraging electoral participation and advocating for accessibility for Florida voters." *Fla. State. Conf. Of the NAACP v. Lee*, 2021 WL 6071169 at *1.

280

825.   In addition, DRF constituents would have standing to sue in their individual capacities, because disabled individuals will be disproportionately burdened by the Challenged Provisions. *See Billups*, 554 F.3d at 1351 (*citing Ne. Fla. Chapter of Assoc. Gen. Contractors of Am. v. City of Jacksonville, Fla.,* 508 U.S. 656, 666 (1993).

826.   As a result of SB 90, several SOE's have indicated that they are going to reduce the availability of outdoor drop boxes and move some of them indoors. *See, e.g.,* ECF No. 608-84 (Bay County, FL Press Release announcing drop box removal); *see also* Appendix D (showing that several counties including Bradford, Citrus, Clay, Gadsden, Jefferson, Liberty, and Marion intend to reduce the availability of outdoor drop boxes). Indoor drop boxes present accessibility barriers for individuals with disabilities if, as DRF has documented through its poll surveying, the buildings in which they are held are not accessible for individuals with mobility issues and other disabilities. Tr. 2737:19-2738:11, 2739: 3-19, 2740:18-2742:12 (Babis). As a result, disabled individuals will encounter myriad new accessibility issues, including challenges opening the door to get inside to the drop box, not having a stable path of travel into the building, or finding no curb cut outs to access sidewalks or paths of travel. *Id.* at 2740:16-2742:4; 2742:25-2743:12. It would also create an additional challenge for voters like Robert Brigham, who struggles with incontinence and whose situation worsens when he has to engage in

physical activities like walking into a building, as opposed to sitting in a car.  Tr. 1597:21-1598:2, 1601:18-1602:5 (Brigham).

827.   To request VBM ballots more frequently, as the VBM Application Provision requires, voters with disabilities face unique hurdles because they may be unable to "use their chosen assistive technology" to navigate SOEs' websites or because the forms and websites are not presented in plain language.  Tr. 454:10-455:16 (DePalma). In addition, as Catherine Teti, a 76-year-old voter with mobility issues testified, she was used to simply checking the box on her VBM ballot envelope to request future VBM ballots. Tr. 1590:6-13 (Teti). *See*, *e.g.*, Tr. 1285:18-1286:9 (Corley) (Supervisor Corley explaining after SB 90, voters cannot renew their VBM requests using a check box); *see also* ECF No. 462-9 at 69:20-70:1, 71:14-15 (Amendment to include option to renew VBM request by checking a box fails in House Debate). She now does not know how she will request VBM ballots and is worried that she will forget to request them.  Tr. 1591: 5-21 (Teti).

828.   The Line Relief Provision will cause some organizations, including the NAACP, to cease providing line relief because of the threat of potential criminal penalties. Tr. 1962:23-1963:16 (Slater). Voters with disabilities who choose to vote in-person are particularly reliant on these line relief services traditionally provided by civic organizations.  For voters with mobility impairments, in particular, these line relief activities—getting a chair, water, or food—makes voting in person

possible. Tr. 2744:4-13 (Babis).  Further, as Olivia Babis explained, SOE employees cannot always accommodate requests from voters with disabilities, which can lead to these voters leaving the line altogether and not voting.  *Id*. at 2744:18-2745:20.

829.   The trial evidence clearly establishes that all disabled voters are DRF constituents, and many, if not all of them, would have standing to challenge SB 90 in their individual capacities.  Tr. 440:23-24 (DePalma). DRF therefore also has associational standing to challenge SB 90 in this case on behalf of its constituents.

### B.   FRT Plaintiffs Have Established Standing.

#### 1.   *Plaintiff Florida Rising Together Has Both Organizational and Associational Standing to Sue.*

##### i.   *Organizational Standing*

830.   The testimony of Andrea Mercado, the Executive Director of Florida Rising Together ("FRT"), establishes that FRT has organizational standing to challenge SB 90's Registration Delivery Provision, Registration Disclaimer Provision, VBM Request Identification, Drop Box Provision, and Line Relief Provision.

831.   Due to the Registration Delivery Provision, FRT has hired three additional quality control managers to review the voter registrations its canvassers collect to ensure voters have provided accurate information. Tr. 2043:12-2044:2 (Mercado).  FRT will also now incur new costs to mail those voter registrations it collects to Supervisors.  *Id.* at 2040:16-2041:7; 2041:19-2042:5.

832.   Due to the Registration Disclaimer Provision, FRT's canvasser training has increased from 2 to 3 hours.  *Id.* at 2036:14-2037:10.   The Registration Disclaimer Provision has also lengthened the time its canvassers spend registering a voter, which has resulted in collecting fewer registrations overall.  *Id.* at 2037:16-2037:24; 2037:25-2038:6.  As a result, FRT has also decided to stop its practice of using the registration interaction to provide vote-by-mail education because a lengthier conversation was causing the decrease in successful voter registrations—undermining its mission of expanding political participation.  *Id.* at 2044:15-2045:9.

833.  The Registration Delivery Provision and Registration Disclaimer Provision together have caused FRT to hire more canvassers so that it can collect a similar number of registration forms as it has in the past.  *Id.* at 2043:12-2044:2; *Fla. State Conf. of NAACP v. Browning*, 522 F.3d at 1165 ("[A]n organization suffers an injury in fact when a state 'compel[s]' it to divert more resources to accomplishing its goals.").  To do so, it will divert staff time and money away from hiring frontline organizers for its other initiatives, including its housing justice program.  Tr. 2044:15-2045:9; 2051:19-2052:15 (Mercado).   FRT's diversion of time and resources is an injury sufficient to confer organizational standing to challenge these two provisions.  *See Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1341 (11th Cir. 2014) ("Under a diversion-of-resources theory, an organization has standing to sue

when a defendant's illegal acts impair the organization's ability to engage in its own projects by forcing the organization to divert resources in response.").

834.   Moreover, FRT has organizational standing to challenge the Registration Disclaimer Provision because its First Amendment injuries are cognizable injuries-in-fact, as this Court has recognized.   Case No. 4:21-cv-201-MW-MAF, ECF No. 201 at 16 (Order Mot. to Dismiss).   Voter registration involves core First Amendment-protected activity.   *See League of Women Voters of Fla. v. Browning*, 863 F. Supp. 2d at 1158 (voter registration includes "speak[ing] and act[ing] collectively with others, implicating the First Amendment right of association"); *see also Meyer v. Grant*, 486 U.S. 414, 421-23 (1988).   The Registration Disclaimer Provision forces FRT to alter the content of their protected speech by undermining the trust and credibility of the organization, which interferes with its canvasser's interactions with the voters they are trying to register.   Tr. 2038:7-24 (Mercado); *see League of Women Voters v. Hargett*, 400 F. Supp. 3d 706, 730 (M.D. Tenn. 2019).   FRT has already lost several canvassers due to frustration over the disclaimer.   *Id.* at 2038:25-2039:8.

835.   The VBM Request Identification and Drop Box Provision together have, in part, caused FRT to spend an unplanned 80 staff hours educating voters about the cumulative effects of SB 90 since it was passed.   Tr. at 2048:18-21 (Mercado).   For example, as previously noted, FRT has decided to stop its practice

of providing vote-by-mail education in its voter registration program because a lengthier conversation caused a decrease in successful registrations—a burden that collecting confidential information from voters would increase.  *Id.* at 2044:15-2045:9.  Instead, FRT has diverted its staff time to educating voters on how SB 90 affects their options to vote—including how to request a vote-by-mail ballot and drop box availability.  *Id.* at 2067:5-23.  An unexpected 80 hours to educate voters on changes to SB 90 is sufficient to confer FRT to challenge these provisions.  *See Arcia*, 772 F.3d at 1341.

836.   As a result of SB 90, FRT has also decided to stop its practice of using the registration interaction to provide vote-by-mail education because a lengthier conversation was causing the decrease in successful voter registrations—undermining its mission of expanding political participation.  *Id.* at 2044:15-2045:9.

837.   Before SB 90, FRT's predecessor organizations provided food, water, and other comfort items to voters waiting in long lines within 150 feet of polling places in Miami-Dade, Broward, Palm Beach, Duval, Orange, Osceola, Hillsborough, and Pinellas Counties.  *Id.* at 2046:11-2047:3.

838.   Due to the Line Relief Provision, FRT has determined that its past activities are now prohibited and will no longer provide assistance to voters within 150 feet of polling places.  *Id.* at 2047:4-8.  FRT has made this decision, in part, because it is concerned that Supervisors will not enforce the language of the Line

Relief Provision precisely and consistently. *Id.* at 2047:18-2048:2. Instead, FRT anticipates investing in larger and more visible tents and signage to let voters know they are there to help. *Id.* at 2047:9-17. This diversion of resources will also undermine FRT's ability to hire more frontline organizers for its other initiatives, like vaccine education and housing justice, and is sufficient to confer organizational standing to challenge the Line Relief Provision. *Id.* at 2051:19-2052:15; *Arcia*, 772 F.3d at 1341.

839. FRT also has organizational standing to challenge the Line Relief Provision because it unconstitutionally restricts FRT's First Amendment protected expression. FRT's provision of food, water, and other comfort items are expressive conduct meant to encourage voters to decide to stay in line and vote. Tr. 2045:16-2046:10 (Mercado); *Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*, 901 F.3d 1235, 1241 (11th Cir. 2018) ("*FLFNB*"). As discussed further herein, the Line Relief Provision unconstitutionally restricts FRT's right to convey that political message.

840. As a result, FRT has established organizational standing as to these Challenged Provisions.

*ii.    Associational Standing*

841. FRT has associational standing to challenge the VBM Request Identification and Drop Box Provision on behalf of its members. First, after

conducting "an analysis of [its] members," FRT identified several members who are unable to successfully request vote-by-mail ballots due to the identification requirement. Tr. 2050:7-24 (Mercado). Many of FRT's are members of Florida's Black and Latino communities. *Id.* at 2050:12-19. Their inability to request a VBM ballot is a sufficient injury for standing purposes. *See Common Cause/Georgia v. Billups*, 554 F.3d 1340, 1351 (11th Cir. 2009) (*citing Ne. Fla. Chapter of Assoc. Gen. Contractors of Am. v. City of Jacksonville, Fla.,* 508 U.S. 656, 666 (1993).

842.   Second, several FRT members have expressed frustration and dismay at both the limited availability of drop boxes and intimidating presence of monitors. *Id.* at 2048:18-2049:13. Because the Drop Box Provision makes it more difficult for some members to vote than other groups, these FRT members have standing to sue in their individual capacities. *See Common Cause/Georgia*, 554 F.3d at 1351.

843.   Third, FRT's challenges to both the VBM Request Identification and Drop Box Provision are germane to one of FRT's principal purposes—namely, empowering and encouraging diverse individuals to participate in the democratic process. Tr. 2034:12-19; see *Greater Birmingham Ministries v. Sec'y of State for the State of Alabama*, 992 F.3d 1299, 1316 (11th Cir. 2021) ("*GBM*") (voting rights challenge was "germane" to organization's purposes where those purposes included "voter rights and equal opportunity for minority voters").

844. Finally, FRT's challenge to these provisions does not require the participation of individual members. Nor does FRT's request for declaratory and injunctive relief. See *GBM*, 992 F.3d at 1316 n.29 ("[P]rospective relief weigh[s] in favor of finding that associational standing exists.").

845. Accordingly, FRT has associational standing to challenge SB 90's VBM identification requirement.

### 2. *Plaintiff Poder Latinx Has Organizational Standing to Sue.*

846. The testimony of Esteban Garces, a founder and then co-Executive Director of Poder Latinx, establishes that Poder Latinx has organizational standing to challenge SB 90's Registration Delivery Provision, Registration Disclaimer Provision, VBM Request Identification, Drop Box Provision, and Line Relief Provision.

847. Due to the Registration Delivery Provision, Poder Latinx's quality control staff must now verify that voters have provided their correct county-of-residence on their registration forms. Tr. 207:24-208:11; 208:12-15 (Garces). Since SB 90 was enacted, Poder Latinx has already spent an additional $4,500 between staff time to deliver registration forms and mail costs. *Id.* at 210:6-21. Poder Latinx anticipates those costs will increase to $40,000-$50,000 in 2022. *Id.* at 210:22-211:3.

848.    Due to the Registration Disclaimer Provision, Poder Latinx has implemented longer trainings for its canvassers so it can ensure compliance. *Id.* at 203:12-24.   Between the delivery of the disclaimer, and the collection of an acknowledgement form from the voter to show Poder Latinx has complied, the Registration Disclaimer Provision has increased the length of each voter interaction. *Id.* at 206:14-22.

849.    The Registration Delivery and Disclaimer Provisions together have caused Poder Latinx to divert staff time and money from its efforts to hire more dedicated staff for its programs and make planned investments in the growth of the organization. *Id.* at 223:20-224:10.   These two provisions "impair the organization's ability to engage in its own projects" and are injuries in fact sufficient to confer Poder Latinx standing to challenge them. *Arcia*, 772 F.3d at 1341; *Browning*, 522 F.3d at 1165 & n.14.

850.    Moreover, Poder Latinx has organizational standing to challenge the Registration Disclaimer Provision because its First Amendment injuries are cognizable injuries-in-fact, as this Court has recognized.   Case No. 4:21-cv-201-MW-MAF, ECF No. 201 at 16 (Order Mot. to Dismiss).   Voter registration involves core First Amendment-protected activity. *See Browning*, 863 F. Supp. 2d at 1158 (voter registration includes "speak[ing] and act[ing] collectively with others, implicating the First Amendment right of association"); *see also Meyer*, 486 U.S. at

421-23.  The Registration Disclaimer Provision alters the content of Poder Latinx's constitutionally protected speech by undermining its efforts to register voters because it implies that the organization is not trustworthy.  Tr. 206:23-207:23; 205:11-206:13 (Garces); *see Hargett*, 400 F. Supp. 3d at 730.  This results in reputational harm to Poder Latinx and has already diminished its ability to register voters.  *Id.* at 207:8-16; 205:11-206:1 (two voters refused to register); 205:21-206:6 (one-to-three voters per week express serious concerns).

851.  Due to the VBM Request Identification, Poder Latinx has ceased helping voters apply to vote by mail because SB 90 has made it an onerous process to do so.  *Id.* at 215:20-216:17.  The cancellation of previous programming is a paradigmatic injury in fact sufficient to confer Poder Latinx standing to challenge this provision.  *See Arcia*, 772 F.3d at 1341 ("Under the diversion-of-resources theory, an organization has standing to sue when a defendant's illegal acts impair the organization's ability to engage in its own projects by forcing the organization to divert resources in response").

852.  Due to the Drop Box Provision, Poder Latinx anticipates spending additional staff time and resources to research variable drop box availabilities for its voter education and turnout programs—which assisted voters across the state and knocked on 105,000 doors in 2020.  *Id.* at 217:12-23; 193:17-24; 191:9-18.  Because SB 90 will decrease drop box availability, Poder Latinx has also diverted another

$15,000 to fund a new transportation program to get Latinx voters to the polls. *Id.* at 217:3-11; 217:24-218:4. Poder Latinx has, and will continue to, divert staff time and money to counteract the adverse effects of the Drop Box Provision on its programs, which it would otherwise have used to hire additional staff members for its programs and invest in the future growth of the organization. *Id.* at 223:20-224:10. The Drop Box Provision frustrates Poder Latinx's voter turnout activities and requires it to add resources to meet its goals, which is sufficient to confer standing. *See Browning*, 522 F.3d at 1165.

853.   Before SB 90, Poder Latinx provided language assistance to voters at polling places in Orange and Osceola Counties.   Tr. 218:5-17; 219:20-220:18; 222:8-10 (Garces).

854.   Due to the Line Relief Provision, Poder Latinx has decided that its former language assistance within the non-solicitation zone is barred. *Id.* at 222:14-20. To compensate for their decreased accessibility to voters, Poder Latinx will now invest in other communication channels—social media or one-hour television segments at a cost of $20,000 each—to notify voters that they are present to provide language assistance at the pools. *Id.* at 221:21-233:16. Resources diverted to these communications efforts would otherwise have been used to hire additional staff members for its programs and invest in the future growth of the organization. *Id.* at 223:20-224:10.

855.   Poder Latinx also has organizational standing to challenge the Line Relief Provision because it unconstitutionally restricts Poder Latinx's First Amendment expressive conduct.  Poder Latinx provides assistance to voters in line because it encourages them to stay in line to vote.  *Id.* at 222:14-20.  As discussed further herein, the Line Relief Provision unconstitutionally restricts Poder Latinx's right to convey that political message.  *See FLFNB*, 901 F.3d at 1241.

856.   As a result, Poder Latinx has established organizational standing as to these Challenged Provisions.

### 3.   *Plaintiff Equal Ground Education Fund Has Organizational Standing to Sue.*

857.   The testimony of Jasmine Burney-Clark, founder and consuling director of Equal Ground Education Fund ("Equal Ground"), establishes that Equal Ground has organizational standing to challenge SB 90's Registration Delivery Provision, Registration Disclaimer Provision, VBM Request Identification. Drop Box Provision, and Line Relief Provision.

858.   Due to the Registration Delivery Provision, Equal Ground anticipates that complying with the requirement that registration forms are delivered a voter's county of residence will be "almost cost prohibitive" due to its frequent interactions with voters from counties across Florida.  Tr. 392:24-393:13 (Burney-Clark).  Due to the cumulative impacts of SB 90, including the Registration Delivery Provision, Equal Ground has decided to stop registering voters altogether.  *Id.* at 392:8-13.  The

cancellation of previous programming is a paradigmatic injury in fact sufficient to confer Equal Ground standing to challenge this provision. *See Arcia*, 772 F.3d at 1341 ("Under the diversion-of-resources theory, an organization has standing to sue when a defendant's illegal acts impair the organization's ability to engage in its own projects by forcing the organization to divert resources in response").

859.    Equal Ground has organizational standing to challenge the Registration Disclaimer Provision because its First Amendment injuries are cognizable injuries-in-fact, as this Court has recognized. Case No. 4:21-cv-201-MW-MAF, ECF No. 201 at 16 (Order Mot. to Dismiss).    Voter registration involves core First Amendment-protected activity. *See Browning*, 863 F. Supp. 2d at 1158 (voter registration includes "speak[ing] and act[ing] collectively with others, implicating the First Amendment right of association"); *see also Meyer* 486 U.S. at 421-23. The Registration Disclaimer Provision would alter the content of Equal Ground's constitutionally protected speech and undermines its efforts to register voters because it tarnishes Equal Ground's reputation and erodes the community's trust in its organization. Tr. 388:15-389:5 (Burney-Clark); *see Hargett*, 400 F. Supp. 3d at 730.    In fact, the compelled disclaimer has completely chilled Equal Ground's political speech, as it has now decided that it could not provide a service that would "harm [its] community or [its] reputation as an organization." Tr. 392:8-13 (Burney-Clark).

860.   Due to the VBM Request Identification, the Drop Box Provision, and the Line Relief Provision, Equal Ground is now also doubling its spending on voter education for approximately 500,000 voters from $1 to $2 million, in part, to inform voters about how SB 90 "directly impact[s] them as a voter." *Id.* at 403:5-407:6. These new materials educate voters on how these Challenged Provisions affect their plan to vote (e.g., how to obtain mail ballots and cast them in a timely manner, early voting information, election day location information). *Id.* at 404:6-15, 405:11-406:10.   This diversion of resources is a paradigmatic injury in fact sufficient to confer Equal Ground standing to challenge this provision. *See Arcia*, 772 F.3d at 1341; *Browning*, 522 F.3d at 1165.

861.   Due to the Drop Box Provision, Equal Ground has suspended its signature "Souls to the Polls" program because SB 90 has eliminated the ability to have drop boxes at its events. *Id.* at 397:12-23.   Equal Ground is now also doubling its spending on voter education, in part to inform voters about how SB 90 will affect them—including the suspension of its Souls to the Polls program. *Id.* at 403:16-19, 405:18-406:10, 406:23-407:6.   This diversion of resources and cancellation of previous programming are paradigmatic injuries in fact sufficient to confer Equal Ground standing to challenge this provision. *See Arcia*, 772 F.3d at 1341; *Browning*, 522 F.3d at 1165.

862.   Before SB 90, Equal Ground's Souls to the Polls events were held in 20 counties, and an estimated 80 percent were held within 150 feet of a polling place or drop box.   *Id.* at 393:14-398:24, 422:4-15, 400:10-401:8.   Moreover, as an extension of its Souls to the Polls events, Equal Ground provided water, fans, and seating to voters waiting in line at polling places in Orange, Volusia, Seminole, and Pinellas Counties.  *Id*. at 402:5-403:4, 411:15-17.

863.   Due to the Line Relief Provision, Equal Ground has determined that it is no longer able to continue its Souls to the Polls program to assist voters waiting in long lines at the polls.  *Id.* at 402:12-22.  It did not conduct the program during the 2021 Florida municipal elections due to SB 90.   *Id.* at 392:8-13, 398:3-24, 399:22-24.  As a result, Equal Ground has doubled its spending on voter education, in part to inform voters that it will no longer conduct its line relief activities as a result of SB 90.   *Id.* at 403:5-15, 405:1-14. This diversion of resources and cancellation of previous programming are paradigmatic injuries in fact sufficient to confer Equal Ground standing to challenge this provision. *See Arcia*, 772 F.3d at 1341; *Browning*, 522 F.3d at 1165.

864.   Equal Ground also has organizational standing to challenge the Line Relief Provision because it unconstitutionally restricts Equal Ground's First Amendment expressive conduct.  When Equal Ground provides voters waiting in line with waters, fans, and seating, it is intended to "ensure voters stay in line and

commit to voting." *Id.* at 400:24-401:8.   As Ms. Burney-Clark testified, the proximity of its events to polling places and drop boxes was key to conveying that message. *Id.* at 396:8-15, 396:17-20.   As discussed further herein, the Line Relief Provision unconstitutionally restricts Equal Ground's right to convey that political message. *See FLFNB*, 901 F.3d at 1241.

865.   In response to each of these Challenged Provisions, Equal Ground has had to divert both staff time and money and has halted several of its programs.   If Equal Ground did not have to divert these resources, it would have used them towards its other organizational goals, including increasing outreach to churches and potential voters, managing misinformation in the community, and hiring new staff. Tr. 411:21-412:21 (Burney-Clark).

866.   As a result, Equal Ground has established organizational standing as to these Challenged Provisions.

### 4.   *Plaintiff Hispanic Federation Has Both Organizational and Associational Standing to Sue.*

#### i.   *Organizational Standing*

867.   The testimony of Frederick Velez III Burgos, the National Director of Civic Engagement of Hispanic Federation, establishes that Hispanic Federation has organizational standing to challenge SB 90's Registration Delivery Provision, Registration Disclaimer Provision, VBM Request Identification, Drop Box Provision, and Line Relief Provision.

868.   Due to the Registration Delivery Provision, Hispanic Federation anticipates hiring an additional quality control staff member so it can ensure that the people it registers have provided their accurate counties of residence—an additional $30,000 to $40,000 per year the organization would otherwise have used to hire more canvassers.  Tr. 769:18-770:1 (Velez Burgos).  Hispanic Federation staff will also now need to spend time and resources driving to out-of-county Supervisors' offices to deliver registration forms or incur an estimated $2,000 in new mail expenses to deliver them.  *Id.* at 769:24-770:1, 776:3-14.

869.   Due to the Registration Disclaimer Provision, Hispanic Federation has incurred legal fees for outside counsel to determine that it will need to print the disclaimer to show compliance with SB 90—both new costs.  *Id.* at 765:2-766:7, 789:17-19, 794:5-795:2.  Furthermore, Hispanic Federation anticipates that after receiving the disclaimer, some voters will decide to instead rely on an online registration tool that Hispanic Federation provides—resulting in an additional $4,000 to $5,000 in costs to the organization.  *Id.* at 770:10-771:9, 776:8.

870.   Owing to both of these provisions, Hispanic Federation estimates the cost of its voter registration program in 2022 will increase by about $150,000 to $200,000 in order to reach a similar 20,000 voter registration goal as the 2020 election.  *Id.* at 775:7-23.  That includes the need to divert another $60,000 in order to hire three more canvassers to match its 2020 production.  *Id.* at 775:24-776:2.

Hispanic Federation will also divert additional staff time to retrain its current canvassers on compliance with these provisions. *Id.* at 800:6-16.

871. The Registration Delivery Provision and Registration Disclaimer Provision together have caused Hispanic Federation to divert staff time and money from its effort to expand its voter registration program to reach voters in additional counties. *Id.* at 762:9-22, 778:25-779:14, 817:7-18. Moreover, if Hispanic Federation does not fundraise an additional $200,000, it anticipates forgoing planned investments in infrastructure, staff, and an expansion of its civic engagement program to Pennsylvania. *Id.* at 776:15-777:19, 807:19-808:13, 816:18-24. Hispanic Federation's diversion of time and resource is an injury sufficient to confer organizational standing to challenge these two provisions. *Arcia*, 772 F.3d at 1341; *Browning*, 552 F.3d 1165 & n.14 (standing established when an organization's "ability to conduct specific projects during a specific period of time will be frustrated").

872. Moreover, Hispanic Federation has organizational standing to challenge the Registration Disclaimer Provision because its First Amendment injuries are cognizable injuries-in-fact, as this Court has recognized. 4:21-cv-201-MW-MAF, ECF No. 201 at 16 (Order Mot. to Dismiss). Voter registration involves core First Amendment-protected activity. *See Browning*, 863 F. Supp. 2d at 1158 (voter registration includes "speak[ing] and act[ing] collectively with others,

implicating the First Amendment right of association"); *see also Meyer*, 486 U.S. at 421-23.   The Registration Disclaimer Provision alters the content of Hispanic Federation's constitutionally protected speech and undermines its efforts to register voters because it implies Hispanic Federation is not a trustworthy organization.  Tr. 768:10-769:2;, 794:2-4 (Velez Burgos); *see Hargett*, 400 F. Supp. 3d at 730.  This harm to Hispanic Federation's reputation also diminishes its ability to pursue its other programs in the communities it serves.  Tr. 771:10-772:16 (Velez Burgos).

873.  Due to the VBM Request Identification, Hispanic Federation anticipates that lengthier voter interactions will cause a decrease in its voter registration production rate.  *Id.* at 758:1-20.  It also believes it will see a decrease in Latino voters because it will require Hispanic Federation's canvassers to ask for confidential information—directly impacting the organization's mission.  *Id.* at 767:20-768:9.  In response, Hispanic Federation will create new voter education materials to inform and follow up with voters on how SB 90's changes will affect them.  *Id.* at 757:2-21, 762:23-763:15, 801:2-8.  Hispanic Federation's diversion of staff time and resources to "educating potential voters on compliance with the laws" is a sufficient injury in fact to confer standing.  *Arcia*, 772 F.3d at 1341.

874.  Due to the Drop Box Provision (and the VBM Request Identification), Hispanic Federation anticipates having to conduct unplanned outreach to "SuperVoters" to inform them, in part, of changes to their drop box locations—at a

cost of six cents per text message and/or staff time to make phone calls.  Tr. 760:20-761:25 (Velez Burgos).

875.   The VBM Request Identification and Drop Box Provision together have caused Hispanic Federation to anticipate diverting staff time and money to unplanned expansions of its voter education programs.  *Id.* at 757:2-21, 762:23-763:15, 801:2-8.  However, if it cannot fundraise, Hispanic Federation plans to divert funds from its voter education budget to accommodate the necessary changes to its voter registration program first.  *Id.* at 761:1-762:8.  As a result, the organization expects to reach about 150,000 fewer voters than planned in 2022.  *Id.* at 778:21-24.  This consequence would be in addition to Hispanic Federation's need to consolidate its satellite offices or forgo the opportunity to reach voters in additional counties.  *Id.* at 762:9-22, 778:25-779:14, 817:7-18.  Either diversion of resources is far greater than an "identifiable trifle" sufficient to confer Hispanic Federation standing to challenge these provisions.  *Common Cause/Ga.*, 554 F.3d at 1351.

876.   Before SB 90, Hispanic Federation provided the following within the non-solicitation zone at polling places: (i) language assistance to Latino voters; (ii) food, water, and phone chargers to voters waiting in long lines; and (iii) rides or assistance in reaching the polls to disabled and elderly voters.  Tr. 741:12-742:1; 742:1-8, 744:18-745:8, 742:16-743:24, 810:9-25 (Velez Burgos).   Hispanic

Federation provided these services in Orange, Osceola, Miami-Dade, and Broward Counties. *Id.* at 722:8-13, 810:13-17.

877.   Due to the Line Relief Provision, Hispanic Federation has determined that its past activities—including its assistance to disabled and elderly voters—are now prohibited.   Tr. 746:3-9, 746:10-21 (Velez Burgos).   Some of Hispanic Federation's veteran canvassers are already expressing fears that providing these services may violate the law.   *Id.* at 746:22-25, 773:3-13.   Furthermore, Hispanic Federation has already observed a "chilling effect" on its staff members' desire to engage in this work, including language access and assisting disabled voters.   *Id.* at 773:19-774:4.

878.   Hispanic Federation also has organizational standing to challenge the Line Relief Provision because it unconstitutionally restricts the organization's First Amendment expressive conduct.   When Hispanic Federation provides voters waiting in line with food, water, and phone chargers, it encourages voters to "[p]lease stay in line until you exercise your right to vote."   *Id.* at 744:5-15.   As discussed further herein, the Line Relief Provision unconstitutionally restricts Hispanic Federation's right to convey that core political message.   *See FLFNB*, 901 F.3d at 1241.

879.   In response to SB 90, Hispanic Federation has had to divert both staff time and money, and has halted its line relief program.   If Hispanic Federation cannot raise an additional $200,000 to comply with SB 90's requirements, it will need to

divert its general operating funds, which would otherwise be used to fund the organization's infrastructure, staff needs, and expansion of its civic engagement program into Pennsylvania.  Tr. at 776:15-777:19, 807:19-808:13, 816:18-24 (Velz Burgos).

880.   As a result, Hispanic Federation has established organizational standing as to these Challenged Provisions.

## ii.   *Associational Standing*

881.   Hispanic Federation also has associational standing to challenge SB 90's Registration Disclaimer Provision and Line Relief Provision on behalf of its member affiliates.

882.   First, due to the Registration Disclaimer Provision, several Hispanic Federation member affiliates may discontinue their voter registration programs altogether because they "fear that using the disclaimer will harm the trust that people have in them."  Tr. 772:3-7 (Velez Burgos).  The inability to engage in protected expression by registering voters is a paradigmatic First Amendment injury in fact. *See Browning*, 863 F. Supp. 2d at 1158; *Meyer*, 486 U.S. at 421-23.  Cancellation of previous programming is also a sufficient injury for standing purposes.  *See Arcia*, 772 F.3d at 1341.

883.   Second, the organization's member affiliates engage in the distribution of comfort items at polling places like Hispanic Federation does.  Tr. 784:8-13,

810:13-17 (Velez Burgos) (subgranting funding to member affiliates to engage in its "line-warming" activities).  As with Hispanic Federation, the Line Relief Provision is likely to burden these member affiliates' ability to engage in protected expressive conduct.  *See FLFNB*, 901 F.3d at 1241.

884.   Third, Hispanic Federation's challenges to both the Registration Disclaimer and Line Relief Provisions are germane to one of the organization's principal purposes—increasing Latino political participation in elections.  Tr. 719:3-10, 720:8-11 (Velez Burgos); *see GBM*, 992 F.3d at 1316 (voting rights challenge was "germane" to organization's purposes where those purposes included "voter rights and equal opportunity for minority voters").

885.   Finally, Hispanic Federation's challenge to these provisions does not require the participation of individual members.  Nor does its request for declaratory and injunctive relief.   *See GBM*, 992 F.3d at 1316 n.29 ("[P]rospective relief weigh[s] in favor of finding that associational standing exists.").

886.   Accordingly, Hispanic Federation has associational standing to challenge the Registration Disclaimer Provision and Line Relief Provision.

### 5.   *Plaintiff UnidosUS Has Both Organizational and Associational Standing to Sue.*

#### i.   *Organizational Standing*

887.   The testimony of Jared Nordlund, the Florida state advocacy director for UnidosUS, establishes that UnidosUS has organizational standing to challenge

SB 90's Registration Delivery Provision, Registration Disclaimer Provision, and VBM Request Identification.

888.   Due to the Registration Delivery Provision, both UnidosUS's voter interactions and a corresponding new step in its quality control process have become lengthier due to the need to collect and verify a voter's county of residence.  Tr. 1427:5-1428:1, 1424:13-1425:12 (Nordlund).  After it reviews the forms, UnidosUS will incur new expenses either: (i) to mail out-of-county registration forms to the correct Supervisors' office or the Division of Elections; or (ii) to have staff drive registration forms to the correct Supervisors' offices to deliver them by hand.  Tr. 1429:4-12, 1429:16-1430-1, 1430:12-1431:24, 1433:8-16 (Nordlund).  It anticipates hiring an additional 2-4 quality control staff members, in addition to retraining its canvassers, to accommodate these new processes—resulting in at least $100,000 in diverted resources.  *Id.* at 1437:12-1438:5.

889.   Due to the Registration Disclaimer Provision, UnidosUS will spend additional staff hours training its canvassers on the disclaimer.  *Id.* at 1424:4-12, 1425:13-18.  In addition, due to a lengthier per-voter interaction, UnidosUS expects to register 20,000 fewer voters in 2022 than it did in 2020.  *Id.* at 1423:11-19, 1438:19-1439:2, 1508:9-1509:17.

890.   The Registration Delivery Provision and Registration Disclaimer Provision together will cause UnidosUS to spend an additional $5-15 per voter

registration it collects.  *Id.* at 1438:19-1439:2, 1508:9-1509:17.  This diversion of staff time and money will diminish UnidosUS's ability to pursue its other programs, like its issue advocacy campaigns.  Tr. 1490:8-21 (Nordlund).  These injuries are sufficient to confer UnidosUS organizational standing to challenge these two provisions.  *See Browning*, 522 F.3d at 1165.

891.   Moreover, UnidosUS has organizational standing to challenge the Registration Disclaimer Provision because its First Amendment injuries are cognizable injuries-in-fact, as this Court has recognized.  *FRT* ECF 201 at 16 (Order Mot. to Dismiss).   Voter registration involves core First Amendment-protected activity.  *See Browning*, 863 F. Supp. 2d at 1158; *Meyer*, 486 U.S. at 421-23.  The Registration Disclaimer Provision forces UnidosUS to alter the content of its protected speech by undermining the reputation and trust in the organization by giving the inaccurate impression that it habitually delivers voter registrations late. Tr. 1423:20-1424:3 (Nordlund); *see Hargett*, 400 F. Supp. 3d at 730.

892.   To counteract a higher rate of incomplete applications due to the VBM Request Identification , UnidosUS will spend more staff time and money educating voters on this new statutory provision.  Tr. 1486:2-16, 1486:17-24, 1488:20-1489:21 (Nordlund).  It will also spend additional staff time to train its canvassers on this requirement.  *Id.* at 1488:5-11.  This diversion of staff time and money will diminish UnidosUS's ability to pursue its other programs, like its issue advocacy campaigns.

*Id.* at 1490:8-21.  These injuries are sufficient to confer UnidosUS organizational standing to challenge the VBM Request Identification.  *See Arcia*, 772 F.3d at 1341.

893.  As a result, UnidosUS has organizational standing as to these Challenged Provisions.

## ii.   Associational Standing

894.  UnidosUS also has associational standing to challenge SB 90's Registration Delivery Provision on behalf of its affiliate organizations:  the Mexican American Council (Miami-Dade); Hispanic Unity of Florida (Broward); Hispanic Services Council (Hillsborough); and Latino Leadership (Broward, Orange and Osceola).  Tr. 1434:6-12 (Nordlund).

895.  First, UnidosUS's affiliate organizations' voter registration programs will also incur additional staff time and money to comply with the Registration Delivery Provision, including by retraining staff and mailing registration forms to out-of-county Supervisors' offices.  *Id.* at 1428:9-24.  This diversion of resources impairs these organizations' "ability to engage in [their] own projects" and is an injury sufficient to confer standing.  *Arcia*, 772 F.3d at 1341; *Browning*, 522 F.3d at 1165 & n.14.

896.  Second, UnidosUS's challenge to the Registration Delivery Provision is germane to one of UnidosUS's principal purposes—namely, to "make sure that

307

all Latinos who are eligible can register to vote and go vote in elections."  Tr. 1490:16-18; 1406:13-15 (Nordlund); *see GBM*, 992 F.3d at 1316.

897.   Finally, UnidosUS's challenge to the Registration Delivery Provision does not require the participation of individual members.  Nor does UnidosUS's request for declaratory and injunctive relief.  *See GBM*, 992 F.3d at 1316 n.29 ("[P]rospective relief weigh[s] in favor of finding that associational standing exists.").

898.   Accordingly, UnidosUS has associational standing to challenge the Registration Delivery Provision.

### 6.   *Poder Latinx's Capacity to Sue*

899.   Poder Latinx is a fiscally sponsored project of Tides Advocacy.  At trial, the Court invited Plaintiffs to address whether Poder Latinx is a proper plaintiff in this lawsuit.  Tr. 246:20-247:5.

900.   To start, Defendants have waived the argument that Poder Latinx is not a proper plaintiff.  Federal Rule of Civil Procedure 9(a)(2) provides that if one party seeks to challenge another party's capacity to sue or be sued, the party must "do so by a specific denial, which must state any supporting facts that are peculiarly within the party's knowledge."  Fed. R. Civ. P. 9(a)(2).  The amended complaint in this case accurately described Poder Latinx the amended complaint described Poder Latinx as a fiscally sponsored project of Tides Advocacy, a California nonprofit

public benefit corporation.  Case No. 4:21-cv-201-MW-MAF, ECF No. 59 ¶ 41.  None of Defendants' answers included a "specific denial" of Poder Latinx's capacity to sue.  Case No. 4:21-cv-201-MW-MAF, ECF No. 225 ¶ 41 ("The Secretary is without sufficient information to admit or deny the factual allegations contained within paragraph 41; therefore denied."); Case No. 4:21-cv-201-MW-MAF, ECF No. 103 ¶ 41 (Defendant-Intervenors); Case No. 4:21-cv-201-MW-MAF, ECF No. 131 ¶ 41 (Defendant White).  Accordingly, Defendants have waived this issue.  *See, e.g.*, *RK Co. v. See*, 622 F.3d 846, 849 n.2 (7th Cir. 2010).

901.   In any event, Poder Latinx does have the capacity to sue.  Under Federal Rule of Civil Procedure 17(b)(3)(A), an "unincorporated association . . . may sue or be sued in its common name to enforce a substantive right existing under the United States Constitution or laws," regardless of whether it generally has capacity to sue under state law.  Here, Poder Latinx is suing to enforce substantive rights guaranteed by the First Amendment, Fourteenth Amendment, Fifteenth Amendment, and Voting Rights Act.  It therefore has capacity to sue under Rule 17.

II.   **THE CHALLENGED PROVISIONS OF SB 90 WERE PASSED WITH RACIALLY DISCRIMINATORY INTENT IN VIOLATION OF THE FOURTEENTH AMENDMENT, FIFTEENTH AMENDMENT AND SECTION 2 OF THE VOTING RIGHTS ACT**

A.   **Voting Laws Passed with Racially Discriminatory Intent Violate the Fourteenth Amendment, Fifteenth Amendment, and Section 2 of the Voting Rights Act**

902.   A facially neutral election law violates the U.S. Constitution and the Voting Rights Act when available "circumstantial and direct evidence" shows that the law was passed with racially discriminatory intent. *See Rogers v. Lodge*, 458 U.S. 613, 618 (1982); *N.C. State Conf. of the NAACP v. McCrory*, 831 F.3d 204, 220 (4th Cir. 2016) (quoting *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977)).   Ostensibly neutral laws motivated by racial prejudice "are just as abhorrent, and just as unconstitutional, as laws that expressly discriminate on the basis of race." *McCrory*, 831 F.3d at 220.

903.   A state statute violates the Fourteenth and Fifteenth Amendments if it (1) was passed with "an intent to discriminate," and (2) has "actual discriminatory effect." *GBM*, 992 F.3d at 1321.   Courts apply a two-prong analysis to evaluate intentional discrimination claims.   *Id*.   On the first prong, the plaintiff must show that the law has both "a discriminatory purpose and effect." *Id.* (quoting *Burton v. City of Belle Glade*, 187 F.3d 1175, 1188-89 (11th Cir. 1999)).   Once the plaintiff satisfies the first prong, the burden shifts to the defendant to show that the state legislature would have passed the law even absent any discriminatory intent.   *Id*.

904.   Section 2 of the Voting Rights Act, 52 U.S.C. § 10301, prohibits states from engaging in "invidious discrimination" on the basis of race in enacting voting laws. *Osburn v. Cox*, 369 F.3d 1283, 1289 (11th Cir. 2004) (quoting *Nipper v. Smith*, 39 F.3d 1494, 1524 (11th Cir. 1994)).

905.   Courts use the multi-factor *Arlington Heights* framework to examine whether a facially neutral voting law was passed with discriminatory intent. *Arlington Heights*, 429 U.S. at 266-68; *see GBM*, 992 F.3d at 1321 ("The *Arlington Heights* analysis . . . applies to both Fourteenth Amendment and Fifteenth Amendment claims[.]"); *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2349 (2021) (applying *Arlington Heights* to section 2 intent claim).

906.   Under *Arlington Heights*, a claim of intentional racial discrimination "does not require direct evidence." *United States v. Marengo Cnty. Comm'n*., 731 F.2d 1546, 1552 (11th Cir. 1984); *see also Lodge*, 458 U.S. at 618 ("discriminatory intent need not be proved by direct evidence").  Rather, the *Arlington Heights* analysis "demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Young Apartments, Inc. v. Town of Jupiter*, 529 F.3d 1027, 1045 (11th Cir. 2008).  But discriminatory intent need not be the sole motivating factor: "Under *Arlington Heights* plaintiffs need only show that racially discriminatory intent was *a* motivating factor behind the challenged legislation."

311

*Underwood v. Hunter*, 730 F.2d 614, 620 n.12 (11th Cir. 1984) (emphasis in original), *aff'd sub nom. Hunter v. Underwood*, 471 U.S. 222 (1985).

907.   The *Arlington Heights* factors are (1) the challenged law's impact, (2) the law's historical background; (3) "the specific sequence of events leading up" to the law's passage, which includes "(4) procedural and substantive departures; and (5) the contemporary statements and actions of key legislators." *GBM*, 992 F.3d at 1322.   This "list has been supplemented" with three additional factors: "(6) the foreseeability of the disparate impact; (7) knowledge of that impact, and (8) the availability of less discriminatory alternatives." *Id.*   These factors are non-exhaustive, *id.*, and no one factor is controlling, *see id..* at 1327 (only assessing discriminatory impact "[a]fter examining all of the *Arlington Heights* factors").

908.   While the *Arlington Heights* factors inform the discriminatory purpose inquiry, courts should not "miss[] the forest in carefully surveying the many trees" by focusing on each factor in isolation.   *McCrory*, 831 F.3d at 214.   Rather, discriminatory purpose under *Arlington Heights* is determined "from the totality of the relevant facts," and courts must weigh the plaintiff's evidence as a whole.   *Davis*, 426 U.S. at 242.   Accordingly, "[t]he *Arlington Heights* factors require a fact intensive examination of the record."   *GBM*, 992 F.3d at 1322 n.33.

### B. SB 90 was Enacted with Discriminatory Intent and Effect under *Arlington Heights*

909. **Racially Disparate Impact**: "[A]n important starting point" under *Arlington Heights* is "[t]he impact of the official action [and] whether it bears more heavily on one race than another." *Arlington Heights*, 429 U.S. 252 at 266 (quoting *Washington v. Davis*, 426 U.S. 229, 242 (1976)). Testimony from experts, election officials, and Plaintiffs has established the substantial impact that each of the Challenged Provisions will have on Florida voters. *Supra* ¶ 492.

910. *Drop Box Provision*: Ample evidence demonstrates how the burden of the Drop Box Provision will "fall disproportionately on voters of color." ECF No. 608 ¶26. *See* ECF No. 608-6 ¶¶ 7, 28 (Smith Rpt.) ("[A] large fraction of the more than half-a-million Black voters and more than 700,000 Latino voters who cast VBM ballots in the 2020 General Election will likely be disproportionately burdened by the [Challenged Provisions].") This provision increases the cost of voting for Floridians in terms of time, transportation, and information. Tr. 2420:9-15, 2486:1-10 (Smith).

911. Voters of color will face added barriers because, among other factors, voters of color in Florida are more likely than non-Hispanic white voters in Florida to have, longer commutes to work, less access to transportation and jobs in sectors with less flexible hours. Tr. 622:4-22, 629:12-630:4, 630:9-18, 630:19-631:12 (Cooper); ECF No. 608-16 ¶¶ 23-24 (Cooper Rpt.). This will make it harder, for

instance for these voters to access drop boxes during the reduced timeframes required by Section 28. *Supra* ¶¶ 554-560.

912. Additionally, as Dr. Smith and Dr. Herron testified, Black voters relied on drop boxes to cast their ballots at higher rates than voters of other races. *Supra* ¶¶ 563-565. Therefore, any restriction on drop boxes will disproportionately affect Black voters. *See McCrory*, 831 F.3d at 230 (finding disparate impact under *Arlington Heights* where "African Americans disproportionately used the removed voting mechanisms").

913. *VBM Application Provision and VBM Request Identification*: The VBM provisions also disproportionately affects minorities. *See supra* ¶¶ 516-520, 591-592. In *Veasey*, for example, the court found onerous ID requirements to have a disparate impact on minority voters because they were less likely to have their identification numbers on file with the state. 830 F.3d at 250. So too with SB 90: the VBM provisions "decrease the opportunities for thousands of registered voters to request their VBM ballots, . . . [and] the costs associated with requesting a VBM ballot, which already fall most heavily on racial and ethnic minority voters . . . will be exacerbated under this law." ECF No. 608-6 ¶¶ 10, 96, 105-106 (Smith Rpt.). To the extent that voters use the Internet to facilitate VBM renewals, the VBM Application Provision is especially burdensome on households that lack broadband

Internet access—a group that is disproportionately comprised of minorities. Tr. 628:18-23 (Cooper).

914.   *3PVRO Restrictions:*  The restrictions on 3PVROs will likewise have a disparate impact on Black and Latino Floridians' ability to register to vote.  *Supra* ¶¶ 549-551.  Plaintiffs and election officials testified that the Registration Disclaimer and Registration Delivery Provisions will severely impede third-party voter registration efforts by eroding trust between organizations and potential voters. *Supra* ¶¶ 540-542.

915.   Further, Plaintiffs and experts repeatedly confirmed that 3PVROs play a crucial role in registering Black and Latino voters.  *Supra* ¶¶ 545, 549-551.  For instance, Dr. Smith relied on an August 2021 snapshot of the Florida statewide voter file to determine that 10.86 percent of Black registered voters as of August 2021, 9.57 percent of Latino registrants and 9.63 percent of "Other" registrants had most recently registered with a 3PVRO.  Tr. 2569:13-2570:24 (Smith). In contrast, only 1.87 percent of white registered voters (i.e., 173,616 out of close to 9 million) had most recently registered through a 3PVRO.  *Id.* at 2570:25-2571:3 (referencing Table 2 of Dr. Smith's report, at p. 32 of ECF No. 608-6).  Therefore, restrictions on 3PVROs will be felt most acutely by voters of color.  *See McCrory,* 831 F.3d at 231.

916.   *Line Relief Provision*: The line relief restrictions will disproportionately impact voters of color by preventing them from accessing needed relief while

waiting in line to vote.  ECF No. 608-6 ¶ 27 (Smith Rpt.); *see also* ECF No. 608-5 at 23-24 (Burch Rpt.); Tr. 961:9-962:16 (Burch).

917.   Before SB 90, voters waiting in long lines could rely on nonpartisan organizations to provide line assistance that the government does not provide.  *Supra* ¶¶ 577.   Some supervisors have confirmed that they will no longer permit this assistance to voters waiting in line under SB 90's Solicitation Provision.  *Supra* ¶ 590.   Taking opportunities to vote away from minority voters "bears the mark of intentional discrimination."  *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 440 (2006).

918.   As an initial matter, the VBM restrictions discussed above will exacerbate lengthy voting lines for voters of color, where already "Black and Hispanic voters face longer wait times when casting a ballot in person."  ECF No. 608-6 ¶ 230 (Smith Rpt.); *see also*  ECF No. 608-5 at 23-24 (Burch Rpt.); Tr. 961:9-962:16 (Burch).   For example, in Miami-Dade County, "[o]ver 23 percent of all Black voters, nearly 24 percent of Hispanic voters, but only 17 percent of white voters faced wait times of 30 minutes or more across the five days of early voting." ECF No.  608-6 ¶¶ 243–244 (Smith Rpt.).

919.   But even before SB 90, long lines in densely populated areas disproportionately affected minority voters: about 80% of Black and Latino registered voters in Florida are concentrated in the 12 most populated counties in the

state, whereas only about half of non-Hispanic white registered voters reside in those same sets of counties.   ECF No. 608-16 ¶19 (Cooper Rpt.); Tr. 609:17-610:7 (Cooper). Because voters of color are more likely to wait in long lines, they are likely to disproportionately suffer the consequences of the Line Relief Provision.  *See McCrory*, 831 F.3d at 231.

920.   *Cumulative impact:* While each Challenged Provision raises the cost of voting individually, taken together, the provisions compound one another to add additional costs of voting.  *Supra* ¶¶ 602-610.  For example, when drop boxes are made more difficult to access or it is harder to request a mail ballot, voters can be expected to vote using other methods.  If mail ballot or drop box voters shift back to in-person voting, the change will burden individuals who vote in person.  Tr. 2159:9-15 (Herron).  Dr. Smith testified that altogether, the Challenged Provisions would "without question . . . increase the cost on all Florida voters but particularly racial and ethnic minorities, Black and Hispanic voters, as well as those who have disabilities."  Tr. 2395:19-25 (Smith).  Together, these provisions result in the kind of "cumulative" disparate impact found to indicate discriminatory intent.  *See McCrory,* 831 F.3d at 231.

921.   **Historical Background**: *Arlington Heights* instructs that "[t]he historical background of the decision is one evidentiary source, particularly if it reveals a series of official actions taken for invidious purposes."  429 U.S. at 267.

Evidence of historical discrimination is particularly relevant when, as here, it shows "that discriminatory practices were commonly utilized, that they were abandoned when enjoined by courts or made illegal by civil rights legislation, and that they were replaced by laws and practices which, though neutral on their face, serve to maintain the status quo." *Lodge,* 458 U.S. at 625; *see also Marengo Cnty. Comm'n*, 731 F.2d at 1567 ("A history of discrimination is important evidence of both discriminatory intent and discriminatory results.").

922.   It is well-established that "[a] longstanding general history of official discrimination against minorities has influenced Florida's electoral process." *DeGrandy v. Wetherell*, 794 F. Supp. 1076, 1079 (N.D. Fla. 1992).   Further, Plaintiffs have provided ample evidence of Florida's shameful history of "passing legislation that is designed to roll back practices that remove barriers to voting when they are used disproportionately by Black Floridians."   ECF No. 608-5 at 6 (Burch Rpt.); Tr. 934:16-957:6, 957:7-958:15 (Burch).

923.   In other words, SB 90 is best understood as the latest chapter of Florida's long history of racially discriminatory voting restrictions.   Indeed, an examination of how Florida achieved disenfranchisement reveals principles that are important in assessing subsequent developments in Florida's voting rights history. *Supra* ¶ 135.   One such principle is to understand the significance of seemingly small, incremental changes in voting laws that ultimately result in substantial

disenfranchisement. *Supra* ¶¶ 70-76. Another principle is the pattern of progress in enfranchisement being met with backlash. *Supra* ¶ 151. These patterns help to reveal how this history of racial discrimination in voting is not something that stopped during Reconstruction, or even following the passage of the VRA, but continues up to the present. *Supra* ¶ 135. This historical background, therefore, supports an inference of discriminatory intent.

924. **Sequence of Events**: "The specific sequence of events leading up to the challenged decision also may shed some light on the decisionmaker's purposes." *Arlington Heights*, 429 U.S. at 267.

925. SB 90 was introduced soon after the 2020 general election, which had the highest voter turnout ever reported in Florida. *Supra* ¶¶184-185. More than 11 million ballots were cast, including more than 1.3 million and 1.7 million ballots by Black and Latino voters, respectively. *Id.* Not only were 4.8 million VBM ballots cast in the 2020 election, but the number of VBM ballots cast by Latino and Black voters increased far more dramatically than the increase for white voters from 2016 to 2020. *Supra* ¶¶ 187-189. Black voters were also more likely than other racial groups to rely on drop boxes to return their VBM ballots. *Id.*

926. This sequence of events is all the more striking because Florida's 2020 election had been universally lauded as a "success story." *Supra* ¶¶ 184-215. Indeed, there was no evidence of systematic voter fraud following the 2020 election.

*Supra* FOF ¶¶ 196-208.  Nor were there issues with third-party voter registration organizations.  *Supra* ¶¶ 209-215.

927.   This hasty legislative response to the widely-praised 2020 election is a textbook sequence of events exemplifying discriminatory intent.  For instance, the *McCrory* court found that, where, against the backdrop of a major Supreme Court decision lifting preclearance requirements, a state legislature "rushed through the legislative process" a voter ID bill "that restricted voting mechanisms it knew were used disproportionately by African Americans," the "obvious inference [is] that this sequence of events signals discriminatory intent."  *McCrory*, 831 F.3d at 227-29. More Recently, the Southern District of Florida determined that a sequence of events "strongly suggest[ed]" that anti-sanctuary city legislation ratified "racially discriminatory views," in part because bill sponsors consistently invoked an "alleged public safety purpose" that "was actually pretextual," since "statistical data [reflected] falling crime rates in Florida, despite the simultaneous rise in undocumented immigration."  *City of S. Miami v. DeSantis*, 2021 WL 4272017, at *27, 43, 48 (S.D. Fla. 2021), *appeal filed* (11th Cir. Oct. 20, 2021).  So too here: the Florida legislature's voter fraud rationale must be pretextual because there is no evidence of widespread fraud or other election integrity problems in recent elections.

928.   **Substantive and Procedural Departures**: Substantive and procedural departures from the ordinary lawmaking process exist when "factors usually

considered important by the decisionmaker strongly favor a decision contrary to the one reached." *Arlington Heights*, 429 U.S. at 267.

929.   Thus, when a legislature passes a bill that violates federal law, addresses an imaginary concern, or has no connection to its stated purpose, those substantive departures support an inference of discrimination. *See McCrory*, 831 F.3d at 235-37; *Veasey*, 830 F.3d at 238-39.   SB 90's purported motivation—voter fraud—was "almost nonexistent," *Veasey*, 830 F.3d at 239, and their purported solutions are "seemingly irrational restrictions unrelated to the goal of combating fraud," *McCrory*, 831 F.3d at 236.   As detailed above, in December 2020 Florida officials touted the 2020 Florida elections as a model of security and accessibility. *Supra* ¶¶ 228-230.   But a mere three months later, legislators aggressively propelled a law purporting to address voter fraud—without evidence that any widespread voter fraud actually existed.   *Supra* ¶¶ 196-208

930.   Further, a "legislature need not break its own rules to engage in unusual procedures," *McCrory*, 831 F.3d at 228; departure "from usual procedures in its consideration or enactment of the bill" may support a finding of discriminatory purpose claim, *Allstate Ins. Co. v. Abbott*, 495 F.3d 151, 161 (5th Cir. 2007).

931.   Several procedural irregularities are apparent from the legislative record.   ECF No. 608-5 at 46-54 (Burch Rpt.) ("SB 90 was adopted under an unusual process that was designed to stifle debate." *First*, the Supervisors of Elections were

not consulted prior to SB 90's introduction; nor did they support the bill at any stage of the process.  *Supra* ¶¶ 259-261, 271.  Indeed, the Supervisors were not given adequate opportunity to voice their concerns about SB 90 before the legislature and did not believe their views were considered.  *Supra* ¶¶ 259-261, 442 . *Second*, public comment in the legislative committees was extremely limited, and in some instances, completely foreclosed.  *Supra* ¶¶ 275-277, 417-441.  *Third*, the time allotted to debate SB 90 was "highly unusual" because it was so truncated.  *Supra* ¶¶ 443-461. *Fourth*, the use of strike-all amendments—especially the one at 1:30AM on the House floor—was unusual and prevented legislators and stakeholders from adequately reviewing the changes being made to the bill.  *Supra* ¶¶ 462-489.

932.    Taken together, these substantive and procedural irregularities suggest that "improper purposes [were] playing a role" in the legislative process.  *See Arlington Heights*, 429 U.S. at 267.

933. **Statements made during deliberations** by "members of the decisionmaking body . . . may be highly relevant" to determining whether there is intentional discrimination.  *Arlington Heights*, 429 U.S. at 268.  In considering such statements in the context of discrimination claims, the Supreme Court has emphasized the importance of considering what the legislature says the "actual purpose" of the provision is.  *Shaw v. Hunt*, 517 U.S. 899, 908 n.4 (1996).  As discussed above, the legislative sponsors repeatedly provided pretextual and/or false

explanations as to the purpose or operation of their bills, going so far as to falsely assert that a Challenged Provision had been dropped from the final strike-all. *Supra* ¶ 465. It can be "reasonably infer[ed] from [such] falsity of the representation that the [defendant] is dissembling to cover up a discriminatory purpose . . . consistent with the general principle of evidence that the factfinder is entitled to consider a party's dishonesty about a material fact as affirmative evidence of guilt." *Reeves v. Sanderson Plumbing Prod. Inc.*, 530 U.S. 133, 147 (2000) (internal punctuation and citations omitted). *Cf. Dep't of Commerce v. New York¸* 139 S. Ct. 2551, 2576 (2019) (courts "cannot ignore the disconnect between the decision made and the explanation given . . . [and] are not required to exhibit a naivete from which ordinary citizens are free").

934. **Foreseeability of the Disparate Impact**: To determine whether legislators were aware of a law's disparate impact, courts routinely consider the comments of the bill's opponents. *See, e.g.*, *Veasey*, 830 F.3d at 236 ("[T]he Legislature was advised of the likely discriminatory impact by the Deputy General Counsel to the Lieutenant Governor and by many legislators[.]"). Here, the legislature was repeatedly made aware that SB 90's provisions would have a discriminatory impact on Black and Latino voters. *See Veasey*, 830 F.3d at 236.

935. For example, multiple advocacy groups submitted letters highlighting the bill's racially discriminatory impacts. ECF No. 608-5 at 54 (Burch Rpt.); Tr.

1039:11-1046:21 (Burch); *see* ECF No. 608-100. Legislators also highlighted data showing Black voters had the greatest increase in VBM usage in 2020. ECF No. 608-5 at 54 (Burch Rpt.); ECF No. 461-37 at 93:21-24; ECF No. 461-98 at 100:6-13.

936. Even SB 90's sponsors made statements that show that they were aware of the racially disparate impact that SB 90 would have. For example, Senator Baxley, when asked about racially disparate impact, stated that voters would not be disenfranchised but that "look[ing] at the patterns of use" there would be "a learning curve" for particular voters. ECF No. 608-5 at 55 (Burch Rpt.); ECF No. 461-98 at 100:15-22.

937. Despite these warnings, SB 90's supporters did not take any action to mitigate the Challenged Provisions' discriminatory impactor even dispute that the bill would burden minority voters. *Supra* ¶¶ 371-375; ECF No. 608-5 at 54-59 (Burch Rpt.); ECF No. 461-37 at 90:3-91:23, 93:21-24; ECF No. 461-98 at 100:6-13, 100:15-22; ECF No. 462-8 at 26:23-27:8, 29:6-20; Tr. 1039:11-1046:21 (Burch). Instead, when proponents of SB 90 were confronted with their colleagues' concerns, they often responded with statements indicative of racial resentment and insinuated that a failure of Black or minority Floridians to vote in the wake of SB 90 would be a result of lack of initiative or laziness. *Supra* ¶ 373. Notably, as Dr. Burch explained in her testimony, the relevant academic studies and scholarly literature

establish that attitudes of racial resentment have been shown to affect policy preferences. *Supra* ¶ 374.

938.   What's more, the legislature had access to the Secretary of State's "recap report" from the 2020 election cycle, which is a data set shared by the Secretary of State's office after each election cycle.  Tr. 2827:3-14 (Matthews).  The "recap report" would have included demographic data about every Florida voter, including race, address, party affiliation, and method of voting.  *Id.* at 2827:15-2828:14.

939.   Thus, as in *Veasey*, SB 90's proponents "were aware of the likely disproportionate effect of the law on minorities, and . . . nonetheless passed the bill without adopting a number of proposed ameliorative measures that might have lessened this impact."  *Veasey*, 830 F.3d at 236.

940.   SB 90's proponents were also explicitly told that, due to existing socioeconomic conditions, the bill would disproportionately burden Black voters. Moreover, even without these explicit warnings, SB 90's sponsors could have reasonably anticipated this disparate impact, given Black people's widely-reported high rate of VBM voting.  *See, e.g.*,  ECF No. 608-5 at 54-55 (Burch Rpt.) Appendix J;  *see also* Ex. 58 (news clip demonstrating that Secretary Lee and senior officials were aware of racial disparities in VBM voting); *cf. McCrory*, 831 F.3d at 227–28 ("a reasonable legislator would be aware of the socioeconomic disparities endured

by African Americans" that undermine their likelihood of possessing identification documents).

941.   Insofar as SB 90's proponents sought to apply foreseeable burdens on racial minorities in service of perceived political gain, their actions remain subject to disapprobation.  *Cf. Cooper v. Harris*, 137 S. Ct. 1455, 1473 n.7 (2017) ("[I]f legislators use race as their predominant districting criterion with the end goal of advancing their partisan interests . . . their action still triggers strict scrutiny.").

942.   **Availability of less discriminatory alternatives**: The legislature passed SB 90 notwithstanding repeated warnings that its impact would disproportionately harm Black and Latino voters.  *Supra* ¶¶ 355-375.  Worse still, the legislature "passed the bill without adopting a number of proposed ameliorative measures that might have lessened this impact."  *Veasey*, 830 F.3d at 236.

943.   Over the course of the legislative process, the Florida legislature rejected 57 amendments that would have ameliorated the discriminatory impact of the challenged provisions.  *Supra* FOF ¶ 403.  This included ten amendments addressing the Section 7 voter registration provisions, eight amendments addressing the Section 24 vote-by-mail provisions, twelve amendments addressing the Section 28 drop box provisions, and three amendments addressing the Section 29 at-poll assistance provisions.  *Id.*  And, the bill sponsors gave nonsensical or pretextual reasons for rejecting these amendments.  *Supra* ¶ 491.

944.   Under *Arlington Heights*, these repeated failures to adopt a less discriminatory law "shed some light on the decisionmaker's purposes" to discriminate against minority voters. *Arlington Heights*, 429 U.S. at 267; *City of S. Miami*, 2021 WL 4272017, at *50-51 (finding that rejection of amendments designed to "lessen the discriminatory effect of the bill on minority communities" "suggests an unwillingness to reduce or address the harmful effects that [the bill] posed").

945.   Every prong of the *Arlington Heights* analysis indicates that SB 90 intentionally discriminates against Black and Latino Floridians; that partisan motivations may have also played a role does not alter that conclusion. Indeed, it is well-established that an intent to disadvantage minority citizens to gain a perceived political or partisan benefit still qualifies as discriminatory intent. *See League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 440 (2006) (finding that taking away a political opportunity just as minorities were about to exercise it "bears the mark of intentional discrimination"); *see also Hunter v. Underwood*, 471 U.S. 222, 233 (1985) (finding intentional discrimination where a state enacted a law to harm Black and poor white voters for partisan purposes). As other courts have observed, "acting to preserve legislative power in a partisan manner can also be impermissibly discriminatory." *Veasey,* 830 F.3d at 241 n.30; *see also McCrory*, 831 F.3d at 222 ("[I]ntentionally targeting a particular race's access to the franchise because its

members vote for a particular party, in a predictable manner, constitutes discriminatory purpose.").

946.   Indeed, courts have long understood that the *Arlington Heights* inquiry requires a careful review when political advantage is proffered as a race-neutral reason for actions that undermine the voting power of a racial or ethnic group. *See, e.g.*, *Garza v. Cnty. of Los Angeles*, 918 F. 2d 763, 771 (9th Cir. 1990) (although county supervisors may have acted primarily out of interest in political "self-preservation," actions were discriminatory when fragmentation of Hispanic community was the means chosen to achieve goal); *Ketchum v. Byrne*, 740 F.2d 1398, 1408 (7th Cir. 1984) (although goal of preserving incumbencies may not be inherently discriminatory, city council's actions were discriminatory when "racial discrimination was the necessary accompaniment of the action taken to protect incumbencies").

947.   Finally, as noted above, the shifting explanations and excuses the legislature proffered for the Challenged Provisions are themselves probative of intentional discrimination.   The excuse that the Challenged Provisions had an "obvious" partisan purpose and therefore were non-discriminatory (Def. Corrected Memorandum of Law ISO Summ. J. at 34) simply cannot be squared with the myriad other excuses offered by the legislature.  *Reeves*, 530 U.S. at 147 (false explanations of motive may be probative of discriminatory intent).

## III.   SB 90 HAS DISCRIMINATORY EFFECTS IN VIOLATION OF SECTION 2 OF THE VOTING RIGHTS ACT

### A.   Legal Principles

948.   In addition to forbidding voting laws or practices adopted with a discriminatory purpose, Section 2 of the Voting Rights Act prohibits any law or practice that "results in a denial or abridgment of the right of any citizen of the United States to vote on account of race or color," regardless of the legislature's intent.  52 U.S.C. § 10301(a) (emphasis added); *see Chisom*, 501 U.S. at 404 ("a violation of § 2 [can] be established by proof of discriminatory results alone"); *GBM*, 992 F.3d at 1329 ("[T]he language of Section 2(a) of the VRA requires only proof of discriminatory 'results,' not of discriminatory intent."); *Johnson v. Governor of State of Fla.*, 405 F.3d 1214, 1227 (11th Cir. 2005) (en banc) ("Recognizing the subtle ways that states often denied racial minorities the right to vote, in 1982, Congress amended Section 2 of the Voting Rights Act so that a plaintiff could establish a violation without proving discriminatory intent.").

949.   "[A]n application of the results test requires an inquiry into the totality of the circumstances."  *GBM*, 992 F.3d at 1329 (quoting Chisom, 501 U.S. at 394). "[I]n looking into the totality of the circumstances, if 'members of a protected class have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice,' a violation is shown." *Id.* (quoting *Chisom*, 501 U.S. at 388).  Stated otherwise, section 2 is violated when

minority voters are denied "meaningful access to the political process." *Osburn*, 369 F.3d at 1289 (quoting *Nipper*, 39 F.3d at 1524).  The central question is whether a "certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black [or other minority voters] and white voters to elect their preferred representatives." *Thornburg v. Gingles*, 478 U.S. 30, 47 (1986).

950.  Because Section 2 requires considering the totality of the circumstances, "any circumstance that has a logical bearing on whether voting is 'equally open' and affords equal 'opportunity' may be considered." *Brnovich*, 141 S. Ct. at 2338.  Relevant circumstances include a non-exhaustive list of "guideposts" that informed the Supreme Court's decision in *Brnovich*, including (1) "the size of the burden imposed by a challenged voting rule," (2) "the degree to which a voting rule departs" from standard practice in 1982, (3) "[t]he size of any disparities in a rule's impact on members of different racial or ethnic groups," (4) "the opportunities provided by a State's entire system of voting," and (5) "the strength of the state interests served by a challenged voting rule."  *Id.* at 2338-40.

951.  Also relevant and not to be "disregarded" are the *Gingles* or "Senate" factors, which are set out in a Senate report accompanying the 1982 amendments to section 2.  *Id.* at 2340; *see also Gingles*, 478 U.S. at 36-37; *Johnson*, 405 F.3d at 1227 nn.25-26.  In particular, courts should consider evidence that "minority group

members suffered discrimination in the past . . . and that effects of that discrimination persist." *Brnovich*, 141 S. Ct. at 2340 (citing *Gingles*, 478 U.S. at 36-37).

952.   Given that section 2 requires courts to consider "the totality of circumstances," insufficient proof on some of the relevant factors is not dispositive. *See Gingles*, 478 U.S. at 45.   Rather, no one factor controls, and "there is no requirement that any particular number of factors be proved, or that a majority of them point one way or the other." *Id.* (quoting S. Rep. No. 97-417 at 29).   Instead, "the question whether the political processes are equally open depends upon a searching practical evaluation of the past and present reality, and on a functional view of the political process." *Id.* (internal citation and quotation marks omitted); *see Wright v. Sumter Cnty. Bd. of Elections & Registration*, 979 F.3d 1282, 1288-89 (11th Cir. 2020).

**B.    Applying the *Brnovich* and *Gingles* Factors, the Challenged Provisions Have Discriminatory Effects**

953.   **Size of Burden Imposed**:   The burdens imposed by SB 90 exceed the "usual burdens of voting," even considering the other "opportunities" for people to vote.   In *Brnovich*, the Supreme Court found that Arizona's requirement that voters must vote in their assigned precinct did not "exceed the usual burdens of voting." 141 S. Ct. at 2344 (internal quotation marks omitted).   In making that determination, the Court emphasized that the State had "made extensive efforts to reduce [the] impact on the number of valid votes ultimately cast."   *Id*.

331

954.   In contrast, the burdens imposed by SB 90 are significantly heightened by the fact that Florida has made little effort to reduce the law's impact on voters.

955.   For example, the Line Relief Provision allows only SOE staff to render aid to voters standing in long lines, yet the legislature did not mandate such assistance and provided no funding to enable SOE staff to offer help. *See* ECF No. 462-9 at 41:8-42:17 (discussion during House floor debate); *supra* ¶¶ 577-581 (explaining that nonprofit organizations historically have provided assistance that the government does not provide).

956.   Similarly, regarding the VBM Identification Provision, both the legislature and the Secretary's staff recognized that many voters likely do not know which identification number they provided when they registered to vote.  *Supra* ¶¶ 348-351.  Despite this known potential for voter confusion, the legislature required the identification number provided on a VBM request form to be verified in the Supervisor's records. *Id.*  Instead of accommodating voters who did not recall the identification number they had previously used, the Secretary decreed that there will be "no exceptions to the exact-match requirement." *Supra* ¶¶ 235, 236, 514. Moreover, neither the legislature nor the Secretary mandated that Supervisors conduct outreach to voters with either no identification number or only one identification number on file.

957.   The record also contains ample evidence that the Challenged Provisions will impose a substantial burden on all Florida voters, and especially voters of color and disabled voters, by raising the cost of voting.  *See supra* ¶¶ 503-537 (describing the substantial burden imposed by the bill's VBM Request Identification); ¶¶ 538-545 (describing the substantial burden imposed by the law's 3PVRO restrictions); ¶¶ 554-569 (describing the substantial burden imposed by the Drop Box Provision); ¶¶ 570-584 (describing the substantial burden imposed by the Line Relief Provision); ¶¶ 585-601 (describing the substantial burden imposed by the VBM Application Provision).

958.   The record also demonstrates that taken together, the Challenged Provisions compound one another and create additional costs of voting.  *See supra* ¶¶ 602-650.

959.   The record further contains ample evidence describing the disparate impact the Challenged Provisions will have on minority voters.  For example, Dr. Smith explained that the 3PVRO restrictions impact a registration method used to register at least 10.86% of Black and 9.57% of Latino voters—five times the percentage of white voters.  *See supra* ¶¶ 549-550.  In addition, the Line Relief Provision prevents organizations from providing assistance to voters in line, significant considering lines in predominantly Black neighborhoods are twice the length of lines in predominantly white neighborhoods.  *See supra* ¶ 178.  Moreover,

SB 90 impacts one of every four drop boxes deployed in 2020, with Black and Latino voters facing greater impacts than white voters. *See supra* ¶ 555; *see also supra* ¶¶ 493-610; *infra* ¶¶ 995-1028.

960. **Benchmarking to 1982**:   Though *Brnovich* guideposts examine "the degree to which a voting rule departs" from standard practice in 1982, civil rights organizations challenged Florida's redrawing of districts to prevent the election of Blacks, ECF No. 608-25 ¶ 40 (Kousser Rpt.), and it would be another eleven years before Florida sent a Black person to Congress, *id.* ¶ 35.   Thus, Florida's laws in 1982 hardly set a reasonable benchmark for assessing modern voting restrictions.

961.   However, even measured against Florida's 1982 election laws, SB 90 is in some respects far more restrictive.   For example, in 1982, the law only prohibited the distribution of campaign material or selling of any item within 100 feet of a polling place, whereas SB 90 prohibits engaging in *any* activity with the intent to influence or effect of influencing a voter within 150 feet of the polls.   ECF No. 608-5 at 62-64 (Burch Rpt.).   The limitation on the number of ballots an individual can submit for another voter is also a new restriction that was not in place in 1982. *Id.* at 64.

962.   At trial, when asked whether it was easier for African Americans and Latinos to register and vote today as compared with 1982, Dr. Austin replied, "I would say no." Tr. 914:14-915:2 (Austin).

963. **Disparate Impact**: Under the framework established by *Brnovich*, one relevant circumstance to consider is "[t]he size of any disparities in a rule's impact on members of different racial or ethnic groups."

964. As discussed, the record contains ample evidence describing the disparate impact the Challenged Provisions will have on minority voters. For example, Dr. Smith explained that the 3PVRO restrictions impact a registration method used to register at least 10.86% of Black and 9.57% of Latino voters, five times the percentage of white voters, *supra* ¶ 549; the Line Relief Provision prevents providing assistance to voters on line, when lines in predominantly Black neighborhoods are twice the length in predominantly white neighborhoods, *supra* ¶ 178; and SB 90 impacts one of every four drop boxes deployed in 2020, with Black and Latino voters facing a greater burden than white voters *supra* ¶ 555.

965. **Opportunities to Vote**: The *Brnovich* framework also considers relevant "the opportunities provided by a State's entire system of voting." In *Brnovich*, the Court highlighted the various ways Arizona voters could vote early even if they could not vote on election day in their assigned precinct. 141 S. Ct. 2344. The "easy ways to vote" highlighted by the Court included the option of being placed on a permanent VBM list, an option which SB 90 prohibited. *Id.* Further, the provisions challenged here are distinguishable from those the Court found to be non-discriminatory in *Brnovich* because here they burden practically every mode of

voting in Florida (VBM, VBM via drop box, and voting in person) as well as the process of registering to vote.

966.   Experts have established that while each Challenged Provision raises the cost of voting individually, taken together, the provisions work to compound the increase in costs of voting caused by SB 90. *Supra* ¶¶ 602-610.  Specifically, experts emphasized that the impact of changes in election law as a whole should be key impact analysis, not simply the impact of each individual Challenged Provision.  Tr. 1694:22-25 – 1695:1-12 (Kousser)

967.   For example, when it is harder to vote by mail or when drop boxes are made more difficult to access, voters can be expected to vote using different methods, such as in-person voting.  As a result, in addition to the burdens faced by voters who previously voted by mail or by using a drop box, there are increased costs for individuals who vote in person. Tr. 2159:9-15 (Herron).

968.   And importantly, the Challenged Provisions of SB 90 would "without question . . . increase the cost on all Florida voters but particularly racial and ethnic minorities, Black and Hispanic voters as well as those who have disabilities." Tr. 2395:19-25 (Smith).

969.   Supervisor Earley also explained that a restriction on one modality of voting creates a "ripple effect" of adverse impact on others, contributing to the cumulative impact of the Challenged Provisions as a whole on restricting

336

opportunities to vote.  Tr. 2619:1-11 (Earley); *see also* Tr. 3507:6-25 (Earley) (reduction in early voting in 2011 resulted in "chaos" in 2012 on election day).

970.   Similarly, Supervisor Latimer believed that when one method of voting is affected, it can have repercussions on other methods.  ECF No. 608-51 ("Encouraging Vote By Mail is one of the ways we avoid lines at in-person voting, so if fewer voters vote by mail, that could affect wait times during in-person voting.").  Supervisor Scott also testified to that effect, agreeing that more voters voting by mail helps keep in-person voting times shorter.  Tr. 1210:12-17 (Scott).

971.   **Strength of State Interest**: SB 90's burdens far outweigh the state interests behind it.  In *Brnovich*, the Court stated that Arizona's interest in preventing fraud should not be discounted simply because "there was no evidence that fraud in connection with early ballots had occurred in Arizona."  141 S. Ct. at 2348.  But as this Court recognized, "nothing in *Brnovich* suggests that the words 'voter fraud' are a mysterious and powerful incantation that instantly incinerates even the most fearsome section 2 claims."  *FRT* Order on Mot. to Dismiss at 48.  Here, unlike in *Brnovich*, the legislative sponsors expressly disclaimed that the purpose of the bill was to address fraud.

972.   The record is replete with evidence that voter fraud did not motivate the passage of SB 90.  *Supra* ¶¶ 196-208 (describing absence of systematic voter fraud following 2020 election); ¶¶ 209-215 (noting absence of issues with 3PVROs during

the 2020 election); ¶¶ 308-318 (recounting sponsors' inability to justify major election law changes or the specific Challenged Provisions); ¶¶ 319-335 (detailing sponsors' purported justifications for the Challenged Provisions); *see* Appendix I; Appendix H.

973.   Indeed, if the genuine purpose of SB90 was to combat fraud, the SB90 sponsors would not have rejected amendments targeting the sham candidate fraud that actually impacted Florida's 2020 election.  *Supra* ¶¶ 336-341; *cf. McCrory*, 831 F.3d 204 ("The photo ID requirement here is both too restrictive and not restrictive enough to effectively prevent voter fraud; '[i]t is at once too narrow and too broad.'").

974.   The state's interests should be further discounted because, unlike in *Brnovich*, there are no "obvious disadvantages" to the 57 less discriminatory alternatives proposed by legislators during the SB90 debate.  141 S. Ct. at 2346. *Supra* ¶¶ 490-491.

975.   **History of Discrimination**: *Gingles* considers especially relevant evidence "that minority group members suffered discrimination in the past." Florida's long history of racial discrimination and efforts to dilute the turnout of voters of color is well-documented, from the Reconstruction period to present day. *Supra* ¶¶ 66-138.

976.   Even seemingly small, incremental changes have contributed to substantial disenfranchisement.  Over time, efforts to dilute the voters of Black and Latino voters have had their intended effect.  Tr. 1701: 8-9 (Kousser);  ECF No. 608-25 ¶ 33 (Kousser Rpt.).

977.   And as explained by Dr. Burch, Florida's long history of racial disenfranchisement in voting is relevant and continues to impact ideologies, and ultimately laws, in the present day.  Tr. 936:7-938:17 (Burch).

978.   **Effects of Past Discrimination**: And under *Gingles*, there is ample evidence that "minority group members bear the effects of past discrimination" in various areas of life.  *Gingles*, 478 U.S. at 45 (citing S. Rep. No. 97-417, at 28-29).

979.   Based on the Census Bureau's 2019 American Community Survey, expert witness William Cooper walked through the various socioeconomic indicators demonstrating that non-Hispanic Whites outpace African-Americans and Latinos in the state of Florida across "almost all key variables of socioeconomic status" and across a "wide range of data points."  ECF No. 608-16 ¶ 10 (Cooper Rpt.); Tr. 591:9-12, 597:5-22 (Cooper).

980.   This analysis took into account several metrics, showing socioeconomic disadvantages in education, employment, and health are reflected in lower income, less access to driver's licenses and vehicles, and less access to jobs with flexible hours for Black and Latino Floridians, all of which impedes access to

voting, especially under the Challenged Provisions.   *Supra* ¶¶ 139-148.   Voter registration rates among Black and Latino individuals who are eligible to vote are lower than their white counterparts.   *Id.*

## IV.   THE CHALLENGED PROVISIONS ARE UNCONSITUTTIONAL UNDER THE FIRST AND FOURTEENTH AMENDMENTS

### A.   Legal Standard

981.   Under the *Anderson-Burdick* test, a court evaluating a claim that a state law burdens the right to vote must undertake a two-step process.   At the first step, a court considers whether and to what extent a challenged law burdens the right to vote.   *See Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983).   A law may impose minimal burdens, serious or significant burdens, or severe burdens.   Under controlling Supreme Court authority, *Anderson-Burdick* requires consideration of whether a statute "imposes 'excessively burdensome requirements' on *any class of voters*."   *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 202 (2008) (controlling op.) (quoting *Storer v. Brown*, 415 U.S. 724, 738 (1974)) (emphasis added). In *Crawford* itself, for example, the "relevant" burdens were "those imposed on persons who are eligible to vote but do not possess a current photo identification" and that "[t]he fact that most voters already possess a valid driver's license . . . would not save the statute." *Id.* at 202 (controlling op.); *see also id.* at 199; *id.* at 212-14 (Souter, J., dissenting) (similar); *id.* at 239 (Breyer, J., dissenting) (similar).

982.   Once a court determines the character and magnitude of the burden, the court should move onto step two: considering the strength of the state interests and whether they justify the burden at issue.  The standard that the state must meet varies depending on the court's determination at the first step of the magnitude of the burden that the law imposes on the relevant class or classes of voters.  If the burden imposed is severe, the law is subject to strict scrutiny.  *Norman v. Reed*, 502 U.S. 279, 280 (1992); *see also Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1318 (11th Cir. 2019) ("Regulations imposing severe burdens must be narrowly tailored and advance a compelling state interest.").  Burdens that are less than severe are subject to a sliding scale.  In those circumstances, the court must "identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule," and in so doing, consider both the "*legitimacy* and *strength* of each of those interests."  *Anderson*, 460 U.S. at 789 (1983) (emphasis added).  "In passing judgment," the court "also must consider the extent to which those interests *make it necessary* to burden the plaintiff's rights.  *Id.* (emphasis added).

983.   The upshot is that even laws that have less than severe burdens must be justified by state "interest[s] *sufficiently weighty* to justify the limitation."  *Norman*, 502 U.S. at 288–89 (emphasis added); *see also Crawford*. 553 U.S. at 191 (controlling op.) ("However slight" the burden on voting may appear, it still "must be justified by relevant and legitimate state interests 'sufficiently weighty to justify

the limitation.'"").  Some courts have conceived of this requirement as one of "fit," noting that the law must actually advance the state interests in question.  *See, e.g.*, *Soltysik v. Padilla*, 910 F.3d 438, 448 (9th Cir. 2018).  Under no circumstances are burdens on the right to vote evaluated under a traditional rational basis standard, which simply asks if the law is conceivably rationally related to the state's purported interest.

984.  *Anderson* and *Burdick* are themselves instructive in how to evaluate and weigh burdens and the corresponding state interests.  In *Anderson*, the Court considered an Ohio statute that required all candidates for President, including major party candidates and independent candidates, to file a statement of candidacy and nominating petition by late March to appear on the ballot in November.  460 U.S. at 799.  The plaintiff argued this deadline made it more difficult in practice for independent candidates to successfully access the ballot.  *Id.* at 790.

985.  The Court then embarked on a detailed examination of each of the proffered state interests for the law at step two.  The state claimed three interests: (1) increasing voter education, (2) treating partisan and independent candidates equally, and (3) ensuring political stability.  The Court took the first interest—voter education—and asked:

- **Is voter education a legitimate interest?  Yes.**  "There can be no question about the legitimacy of the State's interest in fostering informed and educated expressions of the popular will in a general election."  *Id.* at 796.

342

986.   But the Court did not stop there.  It then asked:

- **Does anything undermine this state interest?  Yes.**  "The validity of this asserted interest is undermined by the State's willingness to place major-party nominees on the November ballot even if they never campaigned in Ohio."  *Id.* at 798.

- **Does the law actually promote voter education?  No.**  "It is also by no means self-evident that the interest in voter education is served at all by a requirement that independent candidates must declare their candidacy before the end of March in order to be eligible for a place on the ballot in November."  *Id.*

- **Is this law necessary to have informed voters?  No.**  "In the modern world it is somewhat unrealistic to suggest that it takes more than seven months to inform the electorate about the qualifications of a particular candidate."  *Id.* at 797.

987.   The Court then turned to the second proffered state interest: treating independent and major party candidates equally.  The Court leapfrogged the inquiry into whether the state interest was a legitimate one, and asked:

- **Does law serve the interest of treating candidates equally? Does this law put candidates on equal footing?  No.**  We "find no merit in the State's claim that the early filing deadline serves the interest of treating all candidates alike . . . the reasons for requiring early filing for a primary candidate are inapplicable to independent candidates in the general election."  *Id.* at 799.

988.   The Court then moved onto the third interest: ensuring political stability.  It asked:

- **Is this interest a legitimate one?  No.**  The Court explained the state has an interest in preventing unrestrained factionalism, but it does not have an interest in suppressing political competition against the major parties.  *Id.* at 802-04.

343

- **Does the deadline actually serve the interest of ensuring political stability?  No.**  "If the deadline is designed to keep intraparty competition within the party structure, its coverage is both too broad and too narrow. . . Moreover, the early deadline for filing as an independent may actually impair the State's interest in preserving party harmony." *Id.* at 805.

989.   *Anderson* demonstrates that, when faced with even a non-severe burden on the right to vote, the court must ask whether (1) the state interest proffered for the law is a legitimate state goal, and if so, (2) whether the law actually serves that interest, and (3) whether the law is necessary to accomplish that interest.

990.   Similarly, the *Burdick* Court, which found only a "slight" burden on the right to vote from a ban on write-in voting in Hawai'i, did not apply rational basis review; again, it applied the balancing test: "Because we have already concluded that the burden is slight, the State need not establish a compelling interest to tip the constitutional scales in its direction."  504 U.S. at 439.  But the Court still took a close look at the law and evidence before it, before concluding that, in that case, the state's specific interest in "averting divisive sore-loser candidacies," was a legitimate state goal and that "[t]he prohibition on write-in voting is a *legitimate means* of" accomplishing that goal"; and that, in that particular case, "the State's interests *outweigh* petitioner's *limited interest* in waiting until the eleventh hour to choose his preferred candidate."  *Id*.  The Court further found that the prohibition was a necessary component of that state's larger election system, emphasizing that: "Hawaii further promotes the two-stage, primary-general election process of

344

winnowing out candidates[] by permitting the unopposed victors in certain primaries to be designated office-holders.  This focuses the attention of voters upon contested races in the general election.  *This would not be possible, absent the write-in voting ban.*"  504 U.S. at 439 (emphasis added).  Thus, although the burden was slight, the Court still considered whether the ban was necessary to further the state's interests.

991.  *Crawford* did not change this analysis.   While *Crawford* unquestionably says that deterring voter fraud is a legitimate state interest, it does *not* say that voter fraud is a sufficiently weighty state interest to justify all voting restrictions, or that courts never need to require evidence of voter fraud, evidence of how the law will prevent voter fraud, or whether the law is necessary to prevent voter fraud.  *See, e.g.*, *Fish v. Schwab*, 957 F.3d 1105, 1126 (10th Cir. 2020), *cert. denied*, 141 S. Ct. 965 (2020) (holding that while interests in "protecting the integrity of the electoral process" or "safeguarding voter confidence" are "legitimate [interests] in the abstract," there is "no concrete evidence that those interests make it necessary to burden the plaintiff's rights in this case").[10]

992.  Moreover, in *Anderson-Burdick* cases, "[t]he existence of a state interest . . . is a matter of proof."  *Duke v. Cleland*, 5 F.3d 1399, 1405 n.6 (11th Cir.

---

[10] In *Crawford*, the Court was not presented with concrete evidence of the relevant burdens, and "on the basis of the evidence in the record it [was] not possible to quantify either the magnitude of the burden" "or the portion of the burden imposed on them that is fully justified." 553 U.S. at 201

1993).  It is not enough for state officials to assert in briefing that a law is justified—they must offer "record . . . evidence as to the state's interests in promulgating" the challenged law.  *Id.* at 1405.  As other circuits have explained, courts need not accept a state's justifications at face value, particularly where those justifications are "speculative," otherwise it "would convert *Anderson-Burdick* . . . into ordinary rational-basis review wherever the burden a challenged regulation imposes is less than severe." *Soltysik*, 910 F.3d at 448–49 (citing *Pub. Integrity All., Inc. v. City of Tucson*, 836 F.3d 1019, 1024-25 ((9th Cir. 2016) (en banc)).

993.  *Anderson-Burdick* requires an individualized assessment of the specific state's law in question and the burdens it imposes.  That other states may employ similar laws in their election schemes cannot sufficiently justify any law at issue here.  Consistent with the Supreme Court's directive that challenges to laws under this framework "cannot be resolved by any 'litmus-paper test' that will separate valid from invalid restrictions," *Anderson*, 460 U.S. at 789, courts recognize that states' election laws are not fungible.  State voter identification laws, for example, are not universally constitutional or unconstitutional—rather, an individual assessment of each state's law and the burdens it imposes is required.  *See, e.g., Ohio State Conf. of N.A.A.C.P. v. Husted (Husted III)*, 768 F.3d 524, 547 n.7 (6th Cir. 2014) (explaining, "we do not find that other states' electoral laws and practices are

346

relevant to our assessment of the constitutionality or legality" of Ohio law), *vacated on other grounds*, No. 14-3877, 2014 WL 10384647 (6th Cir. Oct. 1, 2014).

994.   Finally, when assessing the severity of the burden on plaintiffs' right to vote, courts look at the effect on plaintiffs and the groups they represent because the right to vote is "individual and personal in nature."  *Reynolds*, 377 U.S. at 561; *see also Veasey v. Abbott*, 830 F.3d 216, 249, n. 40 (5th Cir. 2016) (en banc) ("The right to vote is personal and is not defeated by the fact that 99% of other people can secure the necessary credentials easily.") (citations omitted).

### B.   The Challenged Provisions Unduly Burden Florida Voters Right to Vote and Are Not Justified by Any Purported State Interest

995.   The NAACP and FRT Plaintiffs incorporate by reference the *Anderson-Burdick* arguments as set forth in the post-trial brief filed by the League of Women Voters Plaintiffs.  The NAACP and FRT Plaintiffs also assert that the Challenged Provisions violate the First and Fourteenth Amendments for the further reasons below.

996.   Through evidence adduced at trial, Plaintiffs have demonstrated that the Challenged Provisions impose severe burdens on their members, and all Florida voters. Each of the Challenged Provisions increases the cost of voting. Together, their effects are even more severe. These burdens magnify the challenges to voting in Florida, which had a high cost of voting before SB 90.  *Supra* ¶ 498.

### 1.   *Drop Box Provision*

#### i.   *The Drop Box Provisions Impose Severe Burdens on Voters*

997.      Voting via drop box is a popular, secure, and important method of voting in Florida. *See* Tr. 2417: 13-25 (Smith); ECF No. 608-6 ¶ 25 (Smith Rpt.); ECF No. 467-1 ¶ 93 (Herron Rpt.). More than a million voters relied on drop boxes to cast their votes during the 2020 election. Tr. 2410: 22-2411:3 (Smith). In the future, voters are likely to continue to rely on drop boxes as voters commonly will use accessible means of voting once that method has been made available to them. Tr. 2388:5-10 (Smith); *supra* ¶ 496.

998.   Unfortunately for the hundreds of thousands of voters who relied on drop boxes in the past, *supra* ¶ 555, extensive evidence supports that the Drop Box Provisions will significantly reduce the availability and accessibility of drop boxes in future elections.  At least one in four drop boxes will have reduced availability, totaling 40,000 fewer hours of availability statewide, compared to the 2020 general election. Tr. 2454:20-2455:11; Tr. 2458:19-2459:13 (Smith); ECF No. 608-6 ¶¶ 125, 127-30 (Smith Rpt.).   SOE discovery responses have already confirmed this concern—60% of counties that previously offered 24/7 drop boxes will no longer offer them.  ECF No. 608-6 ¶ 132.

999.   In particular, there will be greatly reduced drop box availability outside of regular business hours. *See* ECF No. 608-6 ¶¶ 127-29 (Smith Rpt.); Tr. 2472:4-

24 (Smith); *supra* ¶¶ 555-561.  This loss in Drop Box availability will burden all voters, but especially those who typically vote on the Monday before Election Day as drop boxes will only be accessible at SOE offices on this day and it will be too late for them to mail their ballot. *See* ECF No. 608-6 ¶ 182 (Smith Rpt.).  This improperly burdens voters who wish to "take the time available to consider the issues and candidates in an election." *Vote Forward v. DeJoy*, 490 F. Supp.3d 110, 126 (D.D.C. 2020).  Reduced drop box availability will also particularly burden voters with limited access to transportation, *see* Tr. 2293:22-2294:17 (Herron); Tr. 2231: 7-16 (Herron); Tr. 2378:2-2380:8 (Smith), and voters with inflexible work hours. Tr. 527:6-16 (Brown); Tr. 2231:17-24 (Herron); Tr. (Garces) 215:18-217:11.

## ii.   *The Drop Box Provisions Will Disproportionately Burden Voters of Color*

1000. The impact of the Drop Box Provisions will be even more severe on Black voters who were more likely to use drop boxes overall.  Tr. 2159:20-25; 2256:11-13, 17-21 (Herron); ECF No. 4671 ¶¶ 177, 215 (Herron Rpt.); Feb. 2, 2022 Tr. 960:17-961:8 (Burch); Tr. 395:20-397:1 (Burney-Clark) (describing drop boxes as a key aspect of mobilizing Black voters).  Black voters are also more likely to use drop boxes during days and times that are restricted by SB 90. Tr. 2479:9-2480:4; 2481:24:2481:10, 2483:4-9 (Smith); ECF No. 608-6 ¶ 223 (Smith Rpt.).  This is confirmed by anecdotal evidence. *See supra* ¶¶ 563-565.  Direct return of VBM ballots via drop box rather than through the U.S. Mail is also important for Voters

of Color whose ballots are rejected at disproportionately higher rates in Florida as compared to white voters. ECF No. 608-6 ¶¶ 135, 137 (Smith Rpt.).

> ### iii.   The Drop Box Provisions Will Disproportionately Burden Voters with Disabilities

1001. The reductions in drop box hours and outdoor locations will severely impact voters with disabilities. Amy Zukeran, a disabled voter with anxiety; Post-Traumatic Stress Disorder and Major Depression, relies on outdoor drop boxes to cast her ballot.   Tr. 2097:12-2099:10 (Zukeran).   Sixty percent of SOEs who previously offered 24/7 drop boxes admitted they will reduce their availability. *See supra* ¶¶ 566-568.  Indoor drop boxes are less accessible to voters with disabilities, particularly those with mobility issues, ECF No. 608-16 at 14, Figure 5, and may even restrict persons with disabilities from accessing the drop box entirely. *See supra* ¶ 569. Voting via drop box is also a critical option for those voters with disabilities who are unable to vote in person or will face accessibility barriers when casting an in-person ballot.  Tr. 2739:1-25 (Babis)*; Tr. 2095:3-12 (Zukeran). This is particularly true for voters who are unwilling to rely on the U.S. Postal Service.  Tr. 2099: 19-2100:4 (Zukeran).

1002. Defendants adduced no evidence to dispute that the Drop Box Provisions will result in less drop box availability statewide. Further, the expert and individual witness testimony that the reduction in said availability will impose challenges and burdens was uncontroverted.

### 2.    *VBM Application Provision*

> i.    *The VBM Application Provision Imposes Severe Burdens on Voters*

The VBM Application Provision burdens the millions of voters in Florida who rely on VBM ballots and standing requests to have ballots mailed to them.  Tr. 2500:17-22 (Herron).  The VBM Application Restriction increases the cost of voting by adding informational and time taxes to the process of requesting a VBM ballot.  Tr. 8-11 (Smith); Tr. 2230:18-25 (Herron).  This requirement will pose particular challenges for people of lower socio-economic status who are likely to burdened by the administrative challenges involved in requesting VBM ballots more often.  Tr. 2205:12-21 (Herron).

The VBM Application Provision threatens to reduce the turnout of voters who rely on their standing applications and who are more likely to vote as a result.  Tr. 2492:12-2493:7 (Smith).  SOEs testified that this provision will burden voters who rely on standing requests and may cause confusion among those voters.  *See* Tr. 2625:1-5, 2626:6-8 (Earley); ECF No. 549-3 (Latimer Dep.) at 137:23-138:1.  Defendants seeming contention that voters can just request VBM ballots via the Internet is of little comfort to those without internet access, *see* Tr. 628:18-23 (Cooper), or those for whom the Internet is not otherwise accessible.  Tr. 1100:18-1101:8 (Rogers).

> ii.   *The VBM Application Provision Will Disproportionately*
> *Burden Voters with Disabilities.*

1003. Voters with disabilities will also be disproportionately burdened by having to request VBM ballots twice as often due to a variety of challenges they face in completing those applications.   *See* ECF No. 608-6 ¶105 (Smith Rpt.). Completing administrative forms can be difficult for older voters, voters with memory issues, and blind voters.   Tr. 2204:8-25 (Herron); Tr. 1100:18-1101:8 (Rogers).   Requesting vote-by-mail ballots by calling and having to interact with Supervisors of Elections' offices is burdensome for some voters with disabilities. Tr. 493:21-494:8 (DePalma); Tr. 2082:17-2084-3 (Slaughter).   Voters with disabilities who require specialized equipment to read or fill out forms may have difficulty filling out a vote-by-mail application and satisfying the new ID requirements.   ECF No. 608-6 ¶ 106 (Smith Rpt.); *see also* Tr. 2494:21-2495:4, 2500:7-14 (Smith).  For voters with disabilities who live alone, there may be no one available to assist them in completing the VBM ballot application.  ECF No. 608-6 ¶ 106 (Smith Rpt.).

1004. The fact that applying for a VBM twice as often will impose greater burdens on voters was, again, undisputed at trial.  Defendants suggested instead that voters could simply vote in person, seemingly ignoring the significant barriers voters with disabilities face when voting in person.  *See* Tr. 2089:17-2090:10 (Slaughter); Tr. 1591:22-1593:4 (Teti); Tr. 2095:3-12 (Zukeran).   For these individuals,

forgetting to request a VBM ballot may mean not voting at all.  Tr. 2079:6-8;
2080:10-13 (Slaughter).

### 3.     VBM Request Identification Provision

#### i.     The VBM Request Identification Provision Imposes Severe Burdens on Voters

1005. The VBM Request Identification burdens several groups of voters: (1)
those who are registered to vote, but do not have driver's license, state ID, or the last
four of a social security number on file; (2) those who have a form of ID file other
than the one that they currently possess; (3) those who have an incomplete or
incorrect ID on file; (4) those who cannot remember which ID they provided when
they registered to vote; (5) those who no longer possess the form of ID that was used
to register to vote; and (6) and those who are simply reluctant to provide their
personal information every time they request a VBM ballot.  Tr. 2503:4-2505:3
(Smith).

1006. The most severe burden falls on the more than 680,000 voters who, as
of 2021, were registered to vote in Florida without having a social security number
or drivers' license on file.  ECF No. 608-68 at 1.  Even after outreach by supervisors,
the number of voters whose voter file lacks both forms of ID remain in the hundreds
of thousands.   ECF No. 608-68 at 1; Tr. 2785:8-16 (Matthews); Tr. 3408:2-6
(Matthews).  Under SB 90, these voters cannot request a VBM ballot despite being
registered to vote, and the law makes "no exceptions" for those who lack a form of

identification. *Supra* ¶ 514; Tr. 2532:19-2533:9 (Smith); ECF No. 608-64 at 17-18. SB 90 increases the costs of voting for these voters by forcing them to separately submit a new registration form before requesting a VBM ballot. Tr. 1173:22-1174:8 (Scott); Tr. at 1287:3-13 (Corley); Tr. 1364:21-1365:6 (White).

1007. Additionally, the VBM Request Identification makes voting more burdensome for any voter who misremembers the identification used when registering to vote or reasonably mistakes supervisors' efforts to verify his identification as attempts at identity theft, thus being subject to confusion or distress simply for attempting to vote by mail. Tr. 1174:21-1175:3 (Scott); ECF No. 465-88 (SOS RFA No. 163); ECF No. 549-3 (Latimer Dep.) at 26:1-6; Tr. 2652:7-19 (Earley).

1008. Further burdened are the remainder of the more than 3.5 million voters who have neither form of identification or only one form of identification on file, *see* ECF No. 608-68, and cannot be expected to remember which one they provided when they registered to vote. Tr. 2515:23-2516:1; 2517:3-9 (Smith); Tr. 2650:18-24 (Earley).

1009. Furthermore, multiple supervisors testified that because of the VBM Request Identification, they will no longer allow voters to re-request VBM ballots using a simple checkmark on the back of their ballot return envelope. *See, e.g.*, ECF No. 549-3 (Latimer Dep.) at 83:5-10. This change increases the costs of voting for

any voter who previously relied on the checkmark, especially voters who, because of socioeconomic, mental or physical limitations, find it difficult to request a VBM ballot by a telephone or online request. *See* Tr. 454:14-455:19, 493:25-494:8 (DePalma); Tr. 2232:4-18 (Herron).

        *ii.*    *The VBM Request Identification Provision Will Disproportionately Burden Black Voters*

1010. The impact of the VBM Request ID provision falls particularly heavily on Black voters. For the voters who registered after 2006, the number of Black voters without a driver's license or social security number on file with the Division of Elections is 2.5 times greater than their overall registration rate. Tr. 2526:1-21 (Smith); ECF No. 608-6 ¶ 81; Table 10 (Smith Rpt.). By contrast, the percentage of white voters registered after 2006 without a driver's license or social security number on file with the division of elections is less than the overall percentage of registered white voters. *Id.* Moreover, these post-2006 trends are likely to continue into the future. Tr. 2529:25-2530:21 (Smith).

        *4.*    ***Line Relief Provision***

        *i.*    The Line Relief Provision Imposes Severe Burdens on *Voters*

1011. The Line Relief Provision prevents nonpartisan groups from providing assistance to voters waiting in line, assistance which the government often does not provide. *See e.g.*, ECF No. 549-3 (Latimer Dep.) at 48:3-6. This provision therefore

increases the cost of voting by adding barriers for those waiting who must wait in line to vote.  *See* Tr. 2394:14-20 (Smith); ECF No. 608-6 ¶ 27 (Smith Rpt.).  The "tax" imposed by lines may lead to balking (when a voter sees how long a line is and decide not to join it in the first place) or reneging (when a voter leaves the line because it is too slow).  Tr. 2536:10-2537:13 (Smith).

1012. As a result of the Line Relief Provision, Florida's restriction on activities in the non-solicitation zone is now one of the most severe in the United States. *See supra* ¶ 225.

> ii.   *The Line Relief Provision Will Disproportionally Burden Voters of Color*

1013. Black and Latino voters are disproportionately affected by long lines at polling locations.  *Supra* ¶ 571.  As discussed above, data from the 2020 election further demonstrates that Black and Latino voters are more likely to vote in a polling location with longer wait times. *Supra* ¶ 573.  These voters were more likely to rely on line relief activities of organizations like those of Plaintiff organizations NAACP, Florida Rising Together, and Black Voters Matter.  As a result of the Line Relief Provision, this assistance will no longer be available, which could result in voters forgoing voting altogether.  Tr. 1963:17-1964:5 (Slater); Tr. 402:9-403:4 (Burney Clark) (testifying that because of SB 90, organization will no longer provide people with food, water, fans and umbrellas at polling places); Tr. 773:19-12, 742:16-743:24 (Velez Burgos) (describing SB 90's "chilling effect" on line warming

volunteers and explaining that to provide line warming assistance at some polling locations, staying 150 away would require setting up in the street); Tr. 223:13-16 (Garces) (describing inability to continue providing language assistance to voters in line because of SB 90).

> ### iii.  The Line Relief Provision Will Disproportionally Burden Voters with Disabilities

1014. Voters with disabilities will also be particularly burdened by the inability to receive assistance while waiting in line to vote. *See supra* ¶¶ 583-584. Disability advocates Mr. DePalma and Ms. Babis explained the importance of voters with disabilities being able to access chairs or water when needed. *Id.*; Tr. 2744:4-13, 2745:5-20 (Babis). At times, SOEs have failed to provide assistance to voters with disabilities. Tr. 2745:2-12 (Babis). Line warming relief by third-party organizations has often included assistance to voters with disabilities. *See, e.g.*, Tr. 745:1-8 (Velez Burgos) ("I've personally helped wheel some voters into the polling location.").

> ## 5.  *Voter Registration Delivery Restriction & Voter Registration Disclaimer*

> ### i.  The Voter Registration Delivery Restriction Imposes Severe Burdens on Voters

1015. The Delivery Restriction Provision increases the cost of voting by heavily impacting 3PVROs' various missions to encourage civic engagement and their abilities to assist individuals with registering to vote. 3PVRO plaintiffs

testified to the need to expend significant additional resources to comply with the Delivery Restriction Provision in order to be able to reach the same number of voters they previously did.  *See e.g.*, Tr. 2040:16-2041:7 2043:12-2044:2, (Mercado); Tr. 210:6-211:3 (Garces); Tr. 769:18-770:1, 775:7-776:14, 800:6-16 (Velez Burgos); Tr. 1424:13-1425:12, 1427:5-1428:1, 1429:4-12, 1430:12-1431:24, 1433:8-16 (Nordlund).  Even then, Plaintiffs are not sure they will reach the same number of registrations as in prior elections.  *See* Tr. 1434:17-1435:14, 1436:8-18 (Nordlund) (UnidosUs expecting to register 20,000 less voters in the 2022 election due, in part, to the delivery restriction); Tr. 224:11-25 (Garces) (Poder Latinx believes SB 90 will impose reputational harms and decrease voter turnout).

1016. SOEs testified that the impact to 3PVROs will make it harder for voters to vote, with some voters prevented from voting entirely because they will not be able to register.  Tr. 1216:5-8, 17-18 (Scott).  For example, the delivery restriction is "almost cost prohibitive" for Equal Ground, who has stopped registering voters because of SB 90.  Tr. 392:24-393:13 (Burney-Clarke).  3PVROs are integral to reaching voters who would not otherwise be reached.  *See* Tr. 2666:6-11 (Earley).  Accordingly, the provision ultimately burdens the over 700,000 of voters in Florida who rely on 3PVROs to register to vote.  *See* Tr. 2566:18-2567:23 (Smith).

1017. Additionally, 3PVROs operate their voter registration efforts in locations that attract voters from various counties.  Tr. 392:24-393:13 (Burney-

Clarke) (Equal Ground frequently registered voters from various Florida counties due to its location in a tourist hotspot); Tr. 725:16-23 (Velez Burgos) (Hispanic Federation commonly registering voters from 20 to 30 counties during special events). The State has not presented evidence that these visiting voters will otherwise register to vote once they return to their county of residence. Delivering these registrations by mail is not an acceptable alternative not only because of costs, but also because of concerns regarding delays and confidentiality. Tr. 731:16-732:1 (Velez Burgos); Tr. 1418:3-1419:1 (Nordlund).

1018. There has been no evidence from the Defendants to dispute that the provision will result in fewer voter registrations.

> ii. *The Voter Registration Disclaimer Provision Imposes Severe Burdens on Voters*

1019. The Registration Disclaimer Provision has and will continue to have the effect of deterring potential voters from registering with 3PVROs. Since SB 90 was enacted and 3PVROs began delivering the Registration Disclaimer, some voters have declined to register to vote upon hearing the disclaimer. Tr. 50:15-51:2 (Scoon); *see also* Tr. 1237:3-11 (Scott) (describing feedback from 3PVROs that, upon delivering the Registration Disclaimer, potential voters declined to register with the organization by saying "they will register online").

1020. 3PVROs are often local, grassroots organizations comprised of "volunteers from the community who [are] more trust[ed] than government

agencies[.]"   Tr. 1162:12-19 (Scott).   As Supervisor Earley testified, 3PVROs "absolutely" provide valuable assistance to voters and reach voters that his office does not. Tr. 2665:23-2666:11 (Earley); *see also* Tr. 1343:3-6 (White) (acknowledging 3PVROs can "help to reach potential voters who otherwise might not register to vote").

1021. Because of SB 90, fewer people are willing to engage in voter registration. *See e.g.*, Tr. 1131:1-1131:14 (Nash); Tr. 1164:20-1165:13 (Scott); Tr. 52:3-14 (Scoon).  The Registration Disclaimer Provision will require volunteers and canvassers to spend more time with each applicant to explain the disclaimer and answer any questions applicants may have.  As a result, they will not be able to register as many voters.  Tr. 1423:14-19 (Nordlund).  *See also* Tr. 2039: 11-17 (Mercado) (Florida Rising Together noticed reductions from 300 to 100 voter registrations per week since enactment of SB 90).

> iii.   *The Voter Registration Delivery Provision and the Voter Registration Disclaimer Provision Disproportionately Burden Black and Latino Voters*

1022.     Many 3PVROs focus their efforts on registering low-income, Black and Latino Floridians.  Registering to vote online can be a barrier for voters who lack access to the internet or a computer.  Tr.  262:1-17 (McCoy); *see also* Tr. 272:19-273:2 (McCoy).   This is the case for tens of thousands of Black and Latino Floridians.  *See*  Tr.  623:14-20 (Cooper); *see also* ECF No. 608-16 at 62 (Cooper

Rpt.).  Floridians with disabilities may also find it difficult to register online due to challenges navigating the voter registration form.  *See* Tr. 449:10-14 (DePalma).  Likewise, registering to vote in person can be a barrier for the 114,000 Black households and 126,000 Latino households without access to a vehicle.  Tr. 629:3-8 (Cooper).

1023.  Black and Latino voters disproportionately rely on 3PVROs to register to vote than their share of the electorate and rely more heavily on 3PVROs than White voters.  ECF No. 608-6 at Table 2; Tr. 2569:20-2571:9 (Smith); ECF No. 608-6 at Table 4; Tr. 2572:5-2573:5, 7-13, 2574:4-16, 23-2575:16 (Smith); *see also* Tr. 2035:20-21 (Mercado) (more than 85% of voters that New Florida Majority Education Fund registered were people of color).

1024.  For minority voters and low-income voters, 3PVROs may be their only viable option to register to vote. So, if they are deterred from registering through a 3PVRO because of the Registration Disclaimer Provision they may be foreclosed from registering all together.

### 6.     *The Cumulative Effect of the Challenged Provisions Impose Severe Burdens on Voters*

1025. The burdens imposed by the Challenged provisions are significant, unnecessary, and could result in outright disenfranchisement.  These burdens are unreasonable even under the standard that Plaintiffs need only show that "'burdened voters have few alternate means of access to the ballot.'"  *Obama for Am.v. Husted*,

697 F.3d 423, 431 (6th Cir. 2012); *see also New Alliance Party of Ala. V. Hand*, 933 F.2d 1568, 1575-76 (11th Cir. 1991) (explaining challenged provisions need not be "insurmountable" barriers).   Here, the court should consider the effect of the Challenged Provisions on voters generally, and on voters of color and voters with disabilities in particular. *See Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312 (11th Cir. 2019).

1026. The Drop Box Restrictions, the VBM Request Requirement and the VBM Request ID requirement are likely to result in more individuals voting in person.  Tr. 2419:23-2420:3 (Smith); Tr. 2159:9-15 (Herron); Tr. 2618:23-2619:11 (Earley); Tr. (Mercado) 215:17-24.  In addition to burdening those who previously voted via drop box, this shift will burden those who wish to vote in person as they are likely to experience longer wait times at the polls.  *See* Tr. 2419:23-2420:3 (Smith).  SOEs testified that alternatives to voting in person on Election Day are critical to avoid lines.  ECF No. 549-3 (Latimer Dep.) at 115:16-116:2.  Moreover, the VBM Application Provision and the VBM Request Identification will operate together to further reduce the number of voters who will vote by mail.  Tr. 2533:22–2535 (Smith).  The cumulative impact of the provisions of SB 90 will have a greater impact on the cost of voting, especially for Black and Latino voters, and voters with disabilities. Tr. 2395:5-25 (Smith).

1027. As lines lengthen, more voters may require line relief assistance. With the Line Relief Restriction in place, however, such assistance will be unavailable from nonpartisan organizations who traditionally engaged in these activities. This only exacerbates the burden of voting in person. *Supra* ¶¶ 251-252.

1028. Dr. Cooper provided extensive testimony regarding the socio-economic disparities between white voters and voters of color.  *Supra* ¶¶ 142-149.  These include less access to vehicles, longer commutes, and less flexible hours, variables which contribute to increased costs of voting.  *Supra* ¶ 496.  And, Black voters already face higher costs of voting than white voters.  Tr. 2391:17-2392:4 (Smith).  As do Latino voters, and voters with disabilities.  Tr. 2392:5-25 (Smith).  The added burdens imposed by the Challenged Provisions compound the challenges and costs of voting voters of color already face, and at a time when VBM usage for Black and Latino voters was on the rise.  Tr. at 2409:1-13, 2407:16-2408:5 (Smith); Tr. 960:22-961:15, 1083:19-1084:24 (Burch); ECF No. 608-5 at 21-22 (Burch Rpt.).

### C.   The State's Interest in the Challenged Provisions is Pretextual, or Is At Least Insufficient to Justify the Burdens on Voters

1029. The State's proffered interests in the Challenged Provisions are tenuous at best, and pretextual at worst. *See supra* Conclusions of Law, Section II.B. Especially without a serious, valid justification, the burdens the Challenged Provisions impose on voters are unconstitutional under the First and Fourteenth Amendment.

1030. Despite the State's repeated invocation of voter fraud as a justification for the Challenged Provisions, there simply was no evidence of widespread voter fraud adduced at trial or in the legislative record.  Tr. 2207:2-5 (Herron); *id.* at 2210:18-21; *id.* at 2217:7-12; ECF No. 608-5 at 36-38 (Burch Rpt.); *supra* ¶¶ 196-215. Of the few, isolated examples of voting irregularities that Defendants raised, they adduced no evidence that the Challenged provisions would have prevented issues moving forward.  *See supra* ¶¶ 308-354.  Sponsors of SB 90 were unable to point to evidence of voter fraud, drop box vandalism, or election security issues to justify the Challenged Provisions. ECF No. 461-34 at 15:16-18:13; ECF No. 608-5 at 26 (Burch Rpt.); Tr. 972:15-973:13 (Burch).

1031. For example, Defendants have suggested the Drop Box Restrictions were necessary to address drop box security and prevent tampering; because SOEs were not administering drop boxes properly; and to ensure the chain of custody of each ballot.  Tr. 1015:8-1016:23 (Burch); *supra* ¶¶ 324-328.  The Legislature considered no evidence in support of these alleged justifications, ECF No. 461-37 at 108:19-109:1, and Defendants adduced no evidence to support these post hoc rationales at trial.  In particular, as USPS boxes are outdoors and unattended, there is no basis to treat drop boxes differently.  ECF No. 461-34 at 24:7-11; *supra* ¶ 328.

1032. With regard to the VBM Application Restriction, there is no basis in political science literature to support the proposition that it is more secure to require

people to more frequently decide how they vote, as now required by this provision. Tr. 2202:22-2203 (Herron); ECF No. 467-1 ¶ 59 (Herron Rpt.).  In fact, counties in Florida that had "check-the-box" provisions on the back of a vote-by-mail envelope which allowed voters to request a VBM ballot continually had higher voter participation.  Tr. 2492: 5-21 (Smith).  Higher voter participation has been seen not only in general elections but in municipal and special elections that do not have as high a turnout typically because they are off cycle.  Tr. 2493: 3-7 (Smith).  To justify the VBM Request ID provision, legislators provided only vague and unsupported claims about election safety.  ECF No. 461-67: 4-7 (Rep. Ingoglia claiming that the bill "increases election security by requiring a two-factor identification . . . for vote by mail request.").  Furthermore, Secretary Lee indicated that SOEs already had safeguards in place to ensure that vote-by-mail ballots are going to voters who are on the voter registration rolls.  Tr. 1011:1-1013:2 (Burch). And expert testimony confirmed that numerous safeguards exist to ensure VBM integrity.  Tr. 2200:3-2201:24 (Herron); ECF No. 467-1 ¶ 58 (Herron Rpt.).

1033. To support the Registration Disclaimer Provision, the State asserts an interest in addressing the risk that 3PVROs might not deliver registrations on time. But this purported interest has no basis.  Of the 67 SOEs, 64 are unaware of *any* voter in their county who was unable to vote in 2020 because a 3PVRO returned a registration form past book closing or not at all.  *See* Appendix C, at RFA 10.  The

alternative ways to register to vote impose substantial burdens for many of the very populations that 3PVROs are so successful at registering to vote. *See, e.g.*, Tr. 1494:16-22 (Nordlund). Moreover, the FVRS is subject to frequent crashes and failures. *See, e.g.,* ECF No. 608-6 at ¶ 44. Yet SB90 does not direct that *that* information be shared with voters.

1034. To support the Voter Registration Delivery Provision, the State asserted an interest in decreasing the administrative burden on the SOEs. Tr. 3119:8-3120:18 (Ramba). This justification is weak, at best. SOEs have testified to being able to handle out-of-county registrations in the past and have done so for many years. Tr. 3185:2-7 (White) (the Miami-Dade supervisor's office "for years" was able to handle the out-of-county registrations); ECF No. 549-3 (Latimer Dep.) at 183:14 (handled "thousands" of out-of-county registrations during the 2020 general election). The legitimacy of this asserted interest is also undermined by Supervisor testimony confirming that SOEs will nevertheless continue to process out-of-county registrations delivered by other methods (e.g., individual voters), which are not subject to the same delivery restrictions. Tr. 3244:2-15 (Doyle).

1035. Further, this alleged interest was never considered by the legislature. Indeed, during legislative testimony, no one cited any issues regarding 3PVROs. Tr. 1567:4-10,12-18 (Farmer); *see also* Tr. 2795:13-2796:4 (Matthews). The only purported justification for 3PVRO restrictions during the legislative process was to

"clean[] up statutes that have been ruled unconstitutional." ECF No. 461-67 at 4:22-5:4; *see also* ECF No. 461-78 at 89:5-89:23. In no way does the delivery restriction serve this purported justification—the bill's sponsors were presumably referring to this Court's 2012 decision in *League of Women Voters of Florida v. Browning*, 863 F. Supp. 2d 1155 (N.D. Fla. 2012), a case that had no mention of requiring 3PVROs to deliver applications to the applicant's county of residence.

1036. For the Line Relief Provision, the State's sole articulated interest is to prevent harassment or intimidation at the polls. Tr. 3474:8-17 (Matthews). There is no evidence of such harassment every having occurred, nor was any evidence considered by the legislature. This concern is also already addressed by Fla. Stat. § 102.031(1).

1037. As discussed above, and in the League of Women Voters post-trial brief each of the purported justifications for the Challenged Provisions are unsupported by the record, and the record before the legislature.

## V.    FIRST AMENDMENT CHALLENGES TO LINE RELIEF PROVISION

### A.    Legal Standard – Expressive Conduct

1038. The *First* Amendment guarantees "all people [ ] the right to engage not only in 'pure speech,' but 'expressive conduct,' as well." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1270 (11th Cir. 2004) (citing *United States v. O'Brien*, 391 U.S. 367, 376–77 (1968)).

1039. In *Spence v. Washington*, 418 U.S. 405, 410–11 (1974), the Supreme Court formulated a two-part inquiry to determine whether conduct is sufficiently expressive under the First Amendment: (1) whether "[a]n intent to convey a particularized message was present[;]" and (2) whether "in the surrounding circumstances the likelihood was great that the message would be understood by those who viewed it."

1040. "[I]n determining whether conduct is expressive, we ask whether the reasonable person would interpret it as *some* sort of message, not whether an observer would necessarily infer a *specific* message." *Holloman*, 370 F.3d at 1270 (emphasis in original) (citing *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 569 (1995). Context matters: the circumstances surrounding an event often help set the dividing line between activity that is sufficiently expressive and similar activity that is not. *See Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*, 901 F.3d 1235, 1237 (11th Cir. 2018). Context separates the physical activity of walking from the expressive conduct associated with a picket line or a parade. *See United States v. Grace*, 461 U.S. 171, 176 (1983) ("There is no doubt that as a general matter peaceful picketing and leafletting are expressive activities involving 'speech' protected by the First Amendment."); *Hurley*, 515 U.S. at 568 ("[W]e use the word 'parade' to indicate marchers who are making some sort of collective point, not just to each other but to bystanders along the way.").

1041. Context also differentiates the act of sitting down—ordinarily not expressive—from the sit-in by African Americans at a Louisiana library which was understood as a protest against racial segregation. *See Brown v. Louisiana*, 383 U.S. 131, 141–42 (1966).

1042. To aid in this analysis, the Eleventh Circuit applies a five-factor test to determine whether conduct would be understood as conveying a message: (1) whether the plaintiff intends to distribute literature or hang banners in connection with the expressive activity, (2) whether the activity will be open to all, (3) whether the activity takes place in a traditional public forum, (4) whether the activity addresses an issue of public concern, and (5) whether the activity "has been understood to convey a message over the millennia." *Fort Lauderdale Food Not Bombs*, 901 F.3d at 1242-43; *see also Burns v. Town of Palm Beach,* 999 F.3d 1317, 1343 (11th Cir. 2021).

1043. When, as with SB 90, expressive conduct is regulated based on its content, the regulation must be narrowly tailored to serve a compelling government interest. *Solantic, LLC v. City of Neptune Beach*, 410 F.3d 1250, 1258 (11th Cir. 2005); *Burns v. Town of Palm Beach*, 999 F.3d at 1377. "Narrow tailoring" in this context requires "the least restrictive means," *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 813 (2000). "As a practical matter, only the most extraordinary

circumstances will justify regulation of protected expression based upon its content." *Dimmitt v. City of Clearwater*, 985 F.2d 1565, 1570 (11th Cir. 1993).

1044. Relatedly, the First Amendment doctrine of overbreadth prohibits the government from maintaining regulations that prohibit or chill a substantial amount of protected speech activities. *See Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 244–51, 253–55 (2002); *United States v. Williams*, 553 U.S. 285, 293, 297 (2008); *Dream Defs. v. DeSantis*, No. 4:21-cv-191, 2021 WL 4099437, at *28 (N.D. Fla. Sept. 9, 2021).

### B.    Application – Expressive Conduct

1045. SB 90's Line Relief Provision violates the First Amendment as applied to Plaintiffs because it is not the least restrictive means of regulating their expressive conduct.   Plaintiffs' line relief activities are expressive conduct because: (1) Plaintiffs intend to convey a particularized message through these activities; and (2) these activities are understood as conveying a message.

1046. Plaintiffs provided uncontroverted testimony that their line relief efforts are intended to communicate that it is important to stay in line to vote.  Tr. 1954:12-16 (Slater) (explaining that Florida NAACP volunteers provide "support," "encouragement," "relief," and "a variety of items that we have available to voters to ensure that they stay in line."); Tr. 517:4-11 (Brown) (explaining that Florida NAACP provides assistance to voters waiting in line "to show them the importance

of staying in line to cast their most precious and priceless right, and that's their vote . . . we want to show them it is very important."); Tr. 1981:23-1982:3 (Albright) ("[Line relief is] also a part of just sending a message about celebrating the voting experience, having it be an enjoyable way for people to express themselves and fully participate in the governance of our communities."); Tr. 744:5-15 (Velez Burgos) (Hispanic Federation encourages voters to "[p]lease stay in line until you exercise your right to vote" when it provides food, water, and phone chargers to voters in line); Tr. 2046:1-10 (Mercado) ("[W]hen a volunteer is there to offer a bottle of water in the heat or an umbrella in the rain, . . . sometimes that can be the encouragement that someone needs to stick it out and stay in line until they cast their vote.").

1047. This expressive conduct is not a one-way communication.   For example, Florida NAACP provides line relief in direct response to requests from voters.  Tr. 1956:13-18 (Slater) (Q: "And do voters ever approach you or volunteers requesting specific items of support?" A: "Yes. That is . . . the only way that we hand out those kinds of items, if they [] approach us with the need for any water or fan or anything else. We don't approach them and just say, Here. You know, we don't do that."); *id.* at 1959:25-1960:2 ("We provide [these] relief efforts [and] relief items to anyone who comes to us and requests or asks.").

1048. Defendants did not offer any evidence that voters requesting this relief do not understand that Plaintiffs' line relief efforts convey support for the act of remaining in line to vote.

1049. The context of these line relief efforts, as evaluated using the five-factor test described in *Fort Lauderdale Food Not Bombs*, further supports a finding that voters understand these efforts to convey a message.

1050. Regarding factor 1 Plaintiffs do not provide any literature when engaging in line relief efforts. Regarding factors 2 and 3, Florida NAACP provides nonpartisan line relief to all voters waiting in lines in and around polling places, which include traditional public forums such as public streets. *See* Tr. 1957:10-17; 1959:10-1960:2 (Slater); *Burson v. Freeman,* 504 U.S. 191, 196–97 (1992) (finding that a Tennessee law barring electioneering within 100 feet of a polling place "bars speech in quintessential public forums").

1051. Regarding factor 4, it is axiomatic that voting for public officials or on initiatives that affect one's community is a matter of public concern. "[S]peech [is of public concern] when it can 'be fairly considered as relating to any matter of political, social, or other concern to the community,'" or when it "is[] a subject of general interest and of value and concern to the public." *Snyder v. Phelps*, 562 U.S. 443, 453 (2011) (quoting *Connick v. Myers*, 461 U.S. 138, 146 (1983)) (alteration in original) (citation omitted). And Florida NAACP provided uncontroverted

testimony that its members are interested in and value the right to vote.  *See* Tr. 1951: 5-6, 1951:19-21 (Slater) (describing that "99.9[%]" of members of the Daytona Beach Branch are registered voters and that "the main thing is when individuals want to become members of the organization, their goal or their mission is to want to support civic engagement efforts within the NAACP."); *see also* Tr. 510:4-11, 512-19-21 (Brown) (stating that voter education, registration, and mobilization are all part of the Florida NAACP's mission and that many Florida NAACP members are voters).

1052. Regarding factor 5, while Florida NAACP has not been around for millennia, it has engaged in this work for decades.  Tr. 510:16-517:11 (Brown); Tr. 1953:22-1954:8 (Slater).  And through the years, courts have repeatedly recognized that the provision of similar forms of voter assistance constitutes expressive conduct. *Buckley v. Am. Const. Law Found. Inc.*, 525 U.S. 182, 195 (1999); *Meyer v. Grant*, 486 U.S. 414, 421–22 (1988); *Coley-Pearson v. Martin*, No. 520-151, 2021 U.S. Dist. LEXIS 4782272, at *8 (S.D. Ga. Oct. 13, 2021).

1053. Given that four of the five factors weigh in Plaintiffs' favor, the overall context supports a finding that Plaintiffs' line relief efforts are expressive conduct. As such, these efforts are subject to First Amendment scrutiny.

1054. By its plain terms, the Line Relief Provision prohibits "engaging in any activity with the intent to influence or effect of influencing a voter."  ECF No. 402

at 26 (Joint Stip.).  Plainly, one cannot determine what expressive conduct has the effect of influencing a voter without knowing what was said and done.  The Line Relief Provision therefore regulates speech based on its content because it cannot be understood "without reference to the content of the regulated speech."  *Burson v. Freeman*, 504 U.S. 191, 212 (1992) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)).

1055. Because it is a content-based restriction, the Line Relief Provision can only survive First Amendment scrutiny if it is the least restrictive means of achieving a compelling government interest.  *See Solantic*, 410 F.3d at 1258.

1056. The Line Relief Provision fails both prongs of this test.  *First*, it is fatally over-inclusive, because the "any activity" language has no readily discernible limit.  *See Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 66 (1983); *Playboy Entm't Grp.*, 529 U.S. at 814; *Reno v. Am. C.L. Union*, 521 U.S. 844, 875 (1997).

1057. Plaintiffs provided uncontroverted testimony that the broad scope of this provision may sweep up their constitutionally protected line relief activities.  Tr. 528:19-25, 529:1-10 (Brown); Tr. 1961:7-8 (Slater).  "Because the statute so broadly restricts expressive activity, the State must use far more restrictive means in achieving its goal."  *CBS Broad., Inc. v. Cobb*, 470 F. Supp. 2d 1365, 1371–72 (S.D. Fla. 2006).

1058. *Second*, the Line Relief Provision does not serve a compelling government interest. Director Matthews testified that this provision is designed to address voter harassment. Tr. 3439:22–3440:2 (Matthews). Yet Director Matthews failed to offer any explanation of how this provision actually serves that end. *See id.* at 3439:13-3474:8. She further admitted that complaints about voter harassment have not been made against nonpartisan groups who provide line relief as Plaintiffs do. *Id.* at 3474:12-17; *see also* Tr. 1387:18-1383:14 (White) (describing chaotic activities within the 150-feet no-solicitation zone by "political parties" and "campaigns."). Nor did SB 90's sponsors explain how criminalizing the provision of nonpartisan voter relief promotes voter privacy in any way. *See e.g.,* ECF No. 461-37 at 42-43.

1059. Defendants' evidence thus fails to "show[] that the articulated concern has more than merely speculative factual grounds." *Flanigan's Enters., Inc. v. Fulton Cnty.,* 242 F.3d 976, 986 (11th Cir. 2001).

1060. Nor can Defendants rely on their purported interest in stamping out traditional voter solicitation where, as here, Defendants chose to "regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals." *Ward*, 491 U.S. at 799; *see also Cobb*, 470 F. Supp. 2d at 1371–72 (enjoining restriction on exit-polling activities, where offending

statute broadly sought to prohibit exit polling activities "without any regard as to whether they are disruptive").

### C.    Application – Overbreadth

1061. The Line Relief Provision is unconstitutionally overbroad, both on its face, and as-applied to Plaintiffs, for many of the same reasons that it is not narrowly tailored.

1062. Giving effect to every word in this provision, as this Court must do, means that the Line Relief Provision prohibits *any* expressive conduct that has the effect of influencing a voter. *See* ECF No. 402 at 26 (Joint Stip.); *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992) ("[C]ourts must presume that a legislature says in a statute what it means and means in a statue what it says there.".

1063. Because there are no limitations on what conduct may have an influencing effect, this provision is arguably broad enough to prohibit Plaintiffs' constitutionally protected line relief activities. Tr. 528:19-25, 529:1-10 (Brown) (describing the Line Relief Provision as criminalizing the Florida NAACP's line relief work); Tr. 1961:7-8 (Slater) (describing the Line Relief Provision as criminalizing the Florida NAACP's line relief work); *id.* 1970:1-2 ("SB 90 is not really clear on what we can and can't do overall."). The ambiguity of the Line Relief Provision therefore "consumes vast swaths of core First Amendment speech."

*DeSantis*, 2021 WL 4099437, at \*29.  This is the very essence of overbreadth. *Ashcroft*, 535 U.S. at 237; *Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973).

1064. The Line Relief Provision's overbreadth is further confirmed by its vagueness, as explained more fully below.  *See DeSantis,* 2021 WL 4099437, at \*17 ("[O]ften a law is both overbroad and vague—a concept the Eleventh Circuit has called 'overbreadth from indeterminacy.' This is so because an indefinite law may give the government leeway to punish protected conduct." (internal citation omitted)).

### D.    Legal Standard – Vagueness

1065. The Due Process Clause incorporates the "fundamental principle in our legal system" that "laws which regulate persons or entities must give fair notice of conduct that is forbidden or required."  *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012).  The reasoning is simple: (1) "regulated parties should know what is required of them so they may act accordingly[,]" and (2) "precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way."  *Id.*

1066. Therefore, any statute that "forbids or requires the doing of an act in terms so [broad] that men of common intelligence must necessarily guess at its meaning and differ as to its application," *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1926), or is "so standardless that it authorizes or encourages seriously

discriminatory enforcement" violates the essence of due process of law. *Id.*; *see also Fox Television Stations*, 567 U.S. at 253 (holding that the Due Process Clause "requires the invalidation of laws that are impermissibly vague").

1067. This requirement must be applied rigorously when speech is at issue to "ensure that ambiguity does not chill protected speech." *Fox Television Stations*, 567 U.S. at 253–54; *see also NAACP v. Button,* 371 U.S. 415, 432–33 (1963) (finding that "standards of permissible statutory vagueness" impacting First Amendment freedoms "are strict").

1068. When evaluating a law for unconstitutional vagueness, the Court "must presume that a legislature says in a statute what it means and means in a statute what it says there." *Wollschlaeger v. Governor, Fla.*, 848 F.3d 1293, 1322 (11th Cir. 2017) (quoting *Conn. Nat'l Bank v. Germain*, 503 U.S. at 253–54).

## E.    Application – Vagueness

1069. The Line Relief Provision is unconstitutionally vague, both on its face and as-applied to Plaintiffs, because it fails to give ordinary people fair notice of what it prohibits.  Plaintiffs do not know whether their line relief activities are unlawful and are engaging in self-censorship to avoid running afoul of this provision.

1070. Lawmakers repeatedly put the sponsors of SB 90 and HB 7041 on notice of the Line Relief Provision's ambiguity during legislative debates. *See e.g.,* ECF No. 461-38 at 27:21-28:10; ECF No. 462-29 at 40:20-41:2.

1071. In response, Rep. Ingoglia failed to provide meaningful clarity regarding this provision's reach. *See* ECF No. 462-9 at 5:4-14, 39:10-41:6 (responding to a question regarding whether third parties can provide water to voters on a hot day within the 150-foot no-solicitation zone, saying "Number one, they can go outside the 150-foot line, get food, water, bring it back in . . .  If it's a hot day outside, there's nothing under this bill preventing a supervisor of elections, an elections worker for handing out water and taking care of the people in that line."); ECF No. 461-38 at 28:13-19 (responding to a critique regarding the Line Relief Provision's ambiguity, saying, "We tried to be more precise in earlier versions and found that putting it this way was probably the most optimal way and here's why. What we're saying is that the intent – it's basically campaigning.  What it boils down to is if you're campaigning on line.").

1072. Plaintiffs testified to the ongoing uncertainty regarding this provision. Tr. 528:19-25, 529:1-10 (Brown) ("We consider it too confusing.");  Tr. 1961:7-8 10; 1970:1-2 (Slater) ("SB 90 is not really clear on what we can and can't do overall."); Tr. 746:10-25 (Velez Burgos) (meaning of SB 90 is "not very clear" and Hispanic Federation canvassers are "fearful of being sent to do line-warming

379

activities").  Plaintiffs have a credible fear that their line relief activities violate the Line Relief Provision because they cannot predict what activities will have the *effect* of influencing a voter in advance.

1073. The Line Relief Provision's ambiguity forces Plaintiffs "to make a choice between declining to jointly express their views [] or risk being arrested and spending time behind bars. . ." *DeSantis*, , 2021 WL 4099437, at *27.

1074. And in fact, Plaintiffs testified they will forgo engaging in expressive conduct supporting the right to vote due to the ambiguity of the Line Relief Provision. Tr. 1963:11-16; 1976:22-1977:7 (Brown); Tr. 2047:4-8 (Mercado); Tr. 222:14-20 (Garces); Tr. 402:12-22 (Burney-Clark); Tr. 746:3-9; 746:10-21 (Velez Burgos).

1075. This provision is vague precisely because it forces Plaintiffs to refrain from engaging in protected speech activities due to its ill-defined boundaries.  *See Baggett v. Bullitt*, 377 U.S. at 372; *Button*, 371 U.S. at 433 (holding *inter alia* that the "objectionable quality of vagueness" depends upon "the danger of tolerating, in the area of First Amendment freedoms, the existence of a penal statute susceptible of sweeping and improper application"); *Reno*, 521 U.S. at 871–72, ("The vagueness of such a regulation raises special First Amendment concerns because of its obvious chilling effect on free speech.").

1076. The Line Relief Provision is also unconstitutionally vague because it invites arbitrary enforcement.  Key concepts in the provision, including what it means to "influence" a voter; what it means to have an "effect" of a voter; and how to determine intent are left undefined.  As Supervisor White testified, this provision is "hard to administer" and "apply [] consistently" because SOE staff cannot easily discern whether someone intends to influence a voter.  *See*  Tr. 1378:4-13 (White); *see also* Tr. 3512:24-3513:6 (Earley); ECF No. 634-20 at 2.  Defendants did not offer any evidence that this provision is readily understood by a majority of SOEs. *DeSantis*, 2021 WL 4099437, at *27 ("Without at least minimal guidelines, a criminal statute may permit a standardless sweep [that] allows policemen, prosecutors, and juries to pursue their personal predilections.") (quoting *Kolender v. Lawson*, 461 U.S. 352, 358 (1983)) (internal citation and quotation marks omitted).

## VI.   THE CHALLENGED PROVISIONS VIOLATE THE AMERICANS WITH DIABILITIES ACT

### A.   Legal Standard

1077. Under Title II of the ADA, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity . . . ."  42 U.S.C. § 12132.  To prevail under Title II of the ADA, a plaintiff must demonstrate "(1) that he is a qualified individual with a disability; (2) that he was excluded from participation in or denied the benefits of a public entity's services, programs, or

381

activities, or was otherwise discriminated against by the public entity; and (3) that the exclusion, denial of benefit, or discrimination was by reason of the plaintiff's disability." *Am. Ass'n of People with Disabilities v. Harris*, 647 F.3d 1093, 1101 (11th Cir. 2011).

1078. Under the ADA, "services, programs, and activities [must] be readily accessible" to people with disabilities. *Shotz*, *v. Cates*, 256 F.3d 1077, 1080 (11th Cir. 2001) (citing 28 C.F.R. § 35.150). An individual with a disability does not need to be "completely prevented from enjoying a service, program, or activity" for a violation of Title II to occur. *Id.*

1079. In the voting context, whether a person with a disability is discriminated against depends on whether they have access to a particular mode of voting that a state offers, not whether they are precluded from voting altogether. *See Nat'l Fed'n of the Blind v. Lamone*, 813 F.3d 494, 503–04 (4th Cir. 2016); *Disabled in Action v. Bd. of Elections,* 752 F.3d 189, 198-99 (2d Cir. 2014); *People First of Ala. v. Merrill*, 491 F. Supp. 3d 1076, 1158–59 (N.D. Ala. 2020). If a state provides voters different modes of voting, each option must be accessible to voters with disabilities under the ADA. *See People First of Ala.*, 491 F. Supp. 3d at 1158.

1080. Once Plaintiffs demonstrate that a Challenged Provision prevents them from accessing one or more available modes of voting in violation of the ADA, Plaintiffs must offer a "reasonable modification[] to rules, policies, or practices." 42

U.S.C. § 12131(2); *see also* 28 C.F.R. § 35.130(b)(7)(i).  Whether a modification is reasonable is "fact-specific."  *Nat'l Fed. of the Blind*, 813 F.3d at 508; *Bircoll v. Miami Dade Cnty.*, 480 F.3d 1072, 1085 (11th Cir. 2007).   A modification is reasonable if it will not cause "undue hardship."  *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 401–03 (2012).

1081.  The burden of showing that a modification is reasonable is "not a heavy one"; it "is enough for the plaintiff to suggest the existence of a plausible accommodation."  *Nat'l Fed. Of the Blind*, 813 F.3d at 507–08.  In contrast, a public entity must "demonstrate that making the modification[] would fundamentally alter the nature of the service, program, or activity" in order to not be bound by it.  *Bircoll*, 480 F.3d at 1081-82 (citing 28 C.F.R. § 35.130(b)(7)).

## B.   DRF May Sue Defendants for Violations of the ADA

1082. DRF's constituents are qualified individuals with a disability because they include many citizens eligible to vote and registered voters who meet the "essential eligibility requirements" to vote "with or without reasonable modifications." *See United States v. Georgia*, 546 U.S. 151, 153–54 (2006) (quoting 42 U.S.C. § 12131(2)); *see also* Tr. 440:24-441:11 (DePalma); Tr. 2744:4-2745:1 (Babis).  As of 2019, approximately 2.7 million persons of voting age in Florida have one or more disabilities, representing 15.9% of the population in the state, and

383

nearly one-third of the population of Florida's senior citizens.  ECF No. 608-16 ¶ 26

(Cooper Rpt.);  Tr. 632:15-633-10, 638:14-19 (Cooper).

1083. Defendants, who oversee and provide voting services for voters in

Florida, qualify as public entities under the ADA, which is defined as "any State or

local government [or] any department, agency . . . or other instrumentality of a State

or States or local government."  42 U.S.C. § 12131(1).

### C.     The Drop Box Provision Will Deny Voters with Disabilities' Access to Drop Boxes

1084. The Drop Box Provision will decrease the availability of drop boxes by

limiting the locations, days, and hours of operations that SOEs can offer drop boxes.

*See supra* ¶¶ 554-564.  All voters will be burdened by this change in law, *see supra*

Conclusions of Law, Section IV.B.1.i; ¶ 562, but voters with disabilities will have

particular difficulty accessing drop boxes by virtue of their disabilities.

1085. Drop boxes as was available prior to SB 90 offered a convenient way

for voters with disabilities to deposit their VBM ballots outdoors or in their cars by

using a drive-through drop box.  Tr. 2462:2-10 (Smith).  Now, approximately one-

third of SOEs have reported that they will reduce the number of outdoor drop boxes,

including by moving drop boxes into indoor locations and removing some outdoor

drop boxes altogether.  Tr. 2461:19-21, 2484:16-2485:20 (Smith); *see supra* ¶¶ 560-

561.  More SOEs may reduce drop box availability in the future as they continue to

assess how they will implement SB 90.  *See, e.g.*, Appendix D, at ROG No. 3; ECF

No. 463-45 (Hamilton SOE ROG No. 3).  The resulting reduction in outdoor drop boxes will make it more difficult for voters with disabilities, particularly those whose physical or mental disabilities make it difficult for them to access indoor buildings, to utilize drop boxes.  *See supra* ¶¶ 566-567.

1086.  Indoor drop boxes at SOE offices, early voting sites, and other locations are less accessible to many voters with disabilities for a number of reasons.  Tr. 2743:8-9 (Babis).  According to DRF's poll site accessibility audit in 2018 and 2020, early voting and Election Day voting sites already had barriers such as inaccessible parking, path of travel barriers, and obstruction inside the buildings.  Tr. 457:13-458:6, 459:2-19; 461:24-463:10 (DePalma); Tr. 2737:9-2738:11 (Babis).  To the extent that SOEs move drop boxes indoors to comply with SB 90 as they have stated, some persons with mobility disabilities will have increased difficulty "being able to access the facility to put their ballot in the drop box," including persons who find it difficult or impossible to open doors or navigate pathways that are not clear and stable.  Tr. 2742:25-2743:9 (Babis).  The approximately 1.5 million individuals in Florida with serious difficulty walking or climbing stairs may have trouble accessing these indoor drop boxes.  *See* ECF No. 608-16 ¶ 28 (Cooper Rpt.).

1087. Barriers accessing indoor drop boxes extend to voters with other disabilities.  For example, Dr. Brigham, who is incontinent, testified that if he had to deposit his ballot in a drop box inside his SOE's office while experiencing an

onset of symptoms, he would have to go home immediately. Tr. 1607:6-13 (Brigham). Voters with mental disabilities may also be burdened by using indoor drop boxes, as entering an indoor facility may trigger severe anxiety. *See* Tr. 2099:11-18 (Zukeran).

1088. In addition, the requirement that all drop boxes must be monitored in person will make drop boxes less accessible for some elderly voters and voters with anxiety or other medical issues for whom the presence of an employee of the SOE's office may be intimidating. *See* Tr. 1626:23-1627:4 (Sauers); Tr. 2098:24-2099:5 (Zukeran).

### 1.   *Enjoining the Drop Box Provision is a Reasonable Modification.*

1089. Multiple justifications were offered for the Drop Box Provision, including increasing drop box security, preventing ballot tampering, ensuring the proper administration of drop boxes, and protecting the chain of custody of ballots. *See supra* ¶¶ 324-328. But as Dr. Burch testified, no evidence has been offered to support these justifications. *Id*. In fact, all 67 SOEs admitted that they "did not detect, or receive reports of, any tampering or voter fraud involving Drop Boxes . . ." Appendix E, at RFA 1; *see also* Tr. 2420:18–2421:21 (Smith); ECF No. 608-6 ¶ 139 (Smith Rpt.). In addition, the elimination of the Drop Box Provision would restore the pre-SB 90 status quo and would not require SOEs to fundamentally alter their administration of drop boxes in their respective counties. Moreover, the

Defendants have not put forth any evidence that this reasonable modification would be burdensome or fundamentally alter managing drop box availability.

1090. The reasonableness of the pre-SB 90 rules governing drop boxes was reflected in Ms. Zukeran's testimony. *See* Tr. 2102:20–23 (Zukeran) ("I thought maybe the drop boxes were [] a really good compromise . . . or accommodation for people like me who just want to feel like they're voting and drop the ballot off.").

### D. The VBM Application Provision Will Deny Individuals with Disabilities Access to Vote-By-Mail.

1091. The VBM Application Provision will make it more difficult for all voters to request a VBM ballot, *see supra* Conclusions of Law, Section IV.B.2.i; ¶¶ 583-590, but in particular it will make vote-by-mail less accessible for voters with disabilities by reason of their disabilities. *See* ECF No. 608-6 ¶ 105 (Smith Rpt.); Tr. 2500:2–14 (Smith); Tr. 2204:8–25 (Herron) (testifying that older voters with memory issues and blind voters who "have difficulty interacting with forms and contacting government officials . . . are also disproportionately affected").

1092. Approximately 800,000 voting-age individuals in Florida are blind or have serious difficulty seeing, even with glasses. ECF No. 608-16 ¶¶ 26, 28 (Cooper Rpt.). For voters with visual impairments, requesting VBM ballots twice as often will be difficult given the barriers they face in accessing SOEs' websites. *See* Tr. 1100:18–1101:8 (Rogers); Tr. 454:14–455:19 (DePalma). Voters with disabilities who require specialized equipment to read or fill out forms will likely also face

difficulty filling out a VBM application.  ECF No. 608-6 ¶ 106 (Smith Rpt.); *see also* Tr. 2494:21–2495:4, 2500:7–14 (Smith); Tr. 454:14–18 (DePalma).

1093. In addition, municipal websites do not always present information in plain language that voters with cognitive disabilities can assimilate.  Tr. 454:19–455:10 (DePalma).  These voters will also face difficulties requesting a VBM ballot twice as often on SOEs' websites.

1094. While voters may also request a VBM ballot by calling their SOEs' offices, voters with hearing or visual impairments or mental illnesses may have difficulty making use of this method.  *See, e.g.*, Tr. 1096:14–1100:12 (Rogers); Tr. 493:21–494:8 (DePalma); Tr. 2083:22–2084:8 (Slaughter).

1095. Furthermore, approximately 1 million voting age individuals in Florida have difficulty remembering, concentrating, or making decisions.  ECF No. 608-16 ¶¶ 26, 28 (Cooper Rpt.).  Voters with memory issues or mental impairments may forget to request VBM ballots now that they must request them twice as often and can no longer simply check a box indicating that they would like to receive a VBM ballot.  *See, e.g.*, Tr. 1608:13–20 (Brigham); Tr. 1591:14–21 (Teti); Tr. 1102:9–1103:5 (Rogers); Tr. 1623:17 (Sauers); Tr. 2086:1–11 (Slaughter); *see supra* ¶ 237 (citing SOEs that testified that they will no longer offer the "check the box" option to renew vote-by-mail requests after SB 90).

1096. Some SOEs have recognized that the VBM Application Provision will make it more difficult for voters with disabilities to request a VBM ballot.  For example, Miami-Dade Supervisor White testified that "the elderly, voters with disabilities, and overseas military may be most affected" by the change in law.  Tr. 1361:15–1362:4 (White); ECF No. 608-75.

1097. Overcoming these obstacles will likely be even more difficult for the approximately 20.5% of voting age Floridians with a disability who live alone and may not have assistance requesting a VBM ballot.  ECF No. 608-6 ¶ 106 (Smith Rpt.); ECF No. 608-16 ¶ 29 (Cooper Rpt.); *see also id.* ¶¶ 26, 28 (stating that approximately 1,000,000 voting age individuals in Florida have difficulty living independently, including doing errands alone). While in-person assistance may be possible at a polling location, such assistance may not be available at home to comply with the new VBM application requirements.  ECF No. 608-6 ¶ 106 (Smith Rpt.).

1098. Florida Statute § 101.62(7) specifies that "[e]xcept as expressly authorized for voters having a disability under s. 101.662, . . . a county, municipality, or state agency may not send a vote-by-mail ballot to a voter unless the voter has requested a vote-by-mail ballot in the manner authorized under this section."  But neither § 101.62 nor § 101.662 specifies how a voter with a disability may request a VBM ballot after SB 90.  Moreover, no regulations have been promulgated pursuant

to either statute stating how a voter with a disability may request a VBM ballot after SB 90.  No evidence was introduced at trial demonstrating alternative means by which voters with disabilities may request VBM ballots.

1099. While an individual with a disability does not need to show that they will be precluded from voting altogether to state a claim under the ADA, *see Nat'l Fed'n of the Blind*, 813 F.3d at 503–04, in the instant case, voters with disabilities' difficulty obtaining a VBM ballot may in fact exclude them from voting altogether. As witnesses testified at trial, many voters may have difficulty or be unable to vote in person by virtue of their disabilities if they cannot obtain a VBM ballot. *See, e.g.*, Tr. 1591:22–1593:4 (Teti); Tr. 2079:6–8, 2080:10–13 (Slaughter); Tr. 2095:3–12 (Zukeran).   Similarly, Leon County Supervisor Earley recognized that elderly, infirm, and people with disabilities are amongst the category of voters "who would have difficulty voting if they are not able to vote-by-mail."  Tr. 2633:20–2634:6 (Earley).  Thus, the VBM Application Provision will make it more difficult for voters with disabilities to vote-by-mail, which could prevent them from voting altogether if they are unable to secure a VBM ballot.

## 1.   *Enjoining the VBM Application Provision is a Reasonable Modification*

1100. Enjoining the VBM Application Provision is a reasonable modification, which will allow voters with disabilities to request VBM ballots with greater ease. The VBM Application Provision does not protect the integrity of the voting process,

and no evidence has been introduced of fraud associated with requesting VBM ballots. *See supra* ¶ 601  The VBM Application Provision was introduced for the purported purposes of ensuring that voter files are accurate and enabling voters to choose each year how they want to vote. *See supra* ¶¶ 321-323.  But expert testimony from Dr. Burch has demonstrated that no evidence has been adduced to support these justifications. *See supra id.*  Moreover, Dr. Herron has undermined the purported justifications by testifying that multiple safeguards ensure the integrity of VBM balloting and that the change in law is not necessary to enable voter choice. *See supra* ¶¶ 588-589.

1101. The elimination of the VBM Application Provision would not burden the Defendants because they would not be required to take any affirmative acts to implement the change as the law would revert to the pre-SB 90 position.  Moreover, allowing a VBM request to extend to two election cycles would not "fundamentally alter" voting-by-mail in Florida and therefore the Defendants should not be excused from implementing the reasonable modification. *See Bircoll*, 389 F.3d at 1082.  The Defendants meanwhile have not put forth any evidence that this reasonable modification would be burdensome.   In fact, it would reduce the SOEs' administrative burden by restoring pre-SB 90 rules that were easier and more efficient to administer. *See* Tr. 3498:10–24 (Earley).

1102. At a minimum, if the Court does not enjoin the VBM Application Provision, it should order Defendants to specify procedures governing how a voter with a disability may request a VBM ballot pursuant to § 101.62(7).

### E. Enforcement of the Line Relief Provision Will Deny Individuals with Disabilities Equal Access to In-Person Voting.

1103. The enforcement of the Line Relief Provision will make in-person voting less accessible for individuals with disabilities and will result in excluding many individuals with disabilities from voting in-person by reason of their disabilities.

1104. Long lines at polling places in Florida are commonplace. *See, e.g.*, Tr. 1210:7–9 (Scott); ECF No. 608-6 ¶ 230 (Smith Rpt.), Tr. 2163:10–14 (Herron); ECF No. 467-1 ¶296 (Herron Rpt.); ECF No. 549-2 (Hays Dep.) at 130:12–15.  There is ample evidence that many voters with disabilities, especially those with limited mobility or those who use a walker, have difficulty standing in line at polling places. Tr. 2744:4–13 (Babis); ECF No. 608-6 ¶ 233 (Smith Rpt.); *see also* Tr. 1589:10, 1589:18–25 (Teti); Tr. 1091:19–25 (Rogers); Tr. 1627:19–1628:6, 1628:10–15 (Sauers).

1105. Given that 1.5 million individuals with disabilities have serious difficulty walking or climbing stairs, ECF No. 608-16 ¶ 28 (Cooper Rpt.), these individuals, including voters with other disabilities, benefit from line relief activities,

such as receiving chairs or water, while waiting in line to vote.  Tr. 2744:4–13 (Babis); Tr. 1628:17–1629:11 (Sauers).

1106. Voters with disabilities especially rely on line relief support from nonpartisan groups because SOEs are not obligated to provide disabled voters waiting in line chairs or to allow them to move to the front of the line.  Tr. 488:18–25 (DePalma); ECF No. 549-3 (Latimer Dep.) at 48:3-6. At times, some SOEs have failed to provide such assistance to voters with disabilities even when it is requested. *See* Tr. 2745:2–12 (Babis).

1107. Without assistance from third party organizations providing chairs, water or food, it will be more difficult for voters with disabilities to vote in-person, *see* Tr. 1629:3–8; 1629:12-17 (Sauers); Tr. 2745:5–20 (Babis), which would render polling sites not "readily accessible" for voters with disabilities, *see Shotz*, 256 F.3d at 1080.

### 1. *Fla. Stat. § 101.051(2) is Inapposite and Does Not Prohibit Plaintiffs' Line Relief Activities*

1108. Defendants argued at trial that the line relief activities that Plaintiffs contend are rendered illegal by the Line Relief Provision are already prohibited under Fla. Stat. § 101.051(2).  ECF No. 532; *see also* Tr. 152:13–23 (Scoon). Section 101.051(2) makes it a first-degree misdemeanor for any "person at a polling place, a drop box location, or an early voting site, or within 150 feet of a drop box location or the entrance of a polling place or an early voting site" to "*solicit* any

elector *in an effort to provide assistance to vote pursuant to subsection (1).*" (emphases added). But Defendants' interpretation of § 101.051(2) misstates the plain meaning of § 101.051, which affords voters who require assistance in voting "by reason of blindness, disability, or inability to read or write" the right to receive assistance in casting a ballot.

1109. Defendants' argument further ignores the context in which the relevant provision of § 101.051(2) was added to the Election Code in 2005. Explaining the statutory language that was added to the bill, a bill analysis drafted by the House of Representative staff reiterated that the section was amended to "prohibit anyone from soliciting a voter at a polling place, early voting site, or within 100 feet of such locations, *in an effort to provide the voter with assistance in casting their vote.*" HOUSE OF REPRESENTATIVE STAFF ANALYSIS, ETHICS AND ELECTIONS COMMITTEE, HB 1567, 19th Legislature, 2005 Regular Session, at 10 (Apr. 20, 2005) (emphasis added). There is no evidence in the record that any parties "solicited" any voter "in an effort to provide" the kind of direct assistance in casting a ballot inside a polling place as described in § 101.051.

1110. Moreover, Defendants' argument is further undermined as courts interpreting § 101.051 have consistently interpreted it as pertaining to helping a disabled voter cast a ballot, not activities related to the management of polling places generally or providing food, water, umbrellas, or chairs to voters waiting in line.

*See, e.g.*, *Am. Ass'n of People with Disabilities v. Hood*, 278 F. Supp. 2d 1345, 1356 (M.D. Fla. 2003); *Am. Ass'n of People with Disabilities v. Smith*, 227 F. Supp. 2d 1276, 1285 (M.D. Fla. 2002); *Wakulla Cnty. Absentee Voter Intervenors v. Flack*, 419 So. 2d 1124, 1127 (Fla. Dist. Ct. App. 1982).  Thus, Defendants' argument at trial that Plaintiffs' line relief activities are already prohibited under § 101.051(2) should be rejected.

### 2.   *Eliminating the Line Relief Provision is a Reasonable Modification.*

1111. Eliminating the Line Relief Provision is a reasonable modification, which will allow Plaintiffs to continue to provide, and voters with disabilities to continue to receive, line-relief assistance as they did before SB 90 was enacted.

1112. SB 90's Line Relief Provision does not protect the integrity of the voting process.  While preventing harassment of voters was offered as an alleged justification for the Line Relief Provision, *see* ECF No. 461-37 at 42:20–43:16, there is no evidence in the legislative or trial record suggesting that the line relief activities provided by Plaintiffs disrupts polling sites or harasses voters.  *See supra* 329-331, 581-582.  Moreover, SOEs are already authorized to prevent any actual harassment of voters and to maintain order at polling sites under Fla. Stat. § 102.031(1), rendering the Line Relief Provision unnecessary.

1113. The elimination of the Line Relief Provision would not burden Defendants. They would not be required to take any affirmative actions to implement

the change as the reasonable modification would restore the pre-SB 90 status quo. In addition, the Defendants have not put forth any evidence that a reasonable modification would be burdensome or would fundamentally alter their ability to manage election administration at polling sites.

1114. Thus, Plaintiffs have demonstrated that enforcement of the Drop Box Provision, VBM Application Provision, and the Line Relief Provision violates the ADA, and enjoining these provisions presents a reasonable modification.

## VII.   THE LINE RELIEF PROVISION OF SB 90 IS PREEMPTED BY SECTION 208 OF THE VOTING RIGHTS ACT

1115. Conflict preemption occurs "where . . . state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'"  *Arizona v. United States*, 567 U.S. 387, 399 (2012); *see also Felder v. Casey*, 487 U.S. 131, 151 (1988) (state law preempted where it "interferes with and frustrates the substantive right Congress created").

1116. "The purpose of the Voting Rights Act is to prevent discrimination in the exercise of the electoral franchise," which necessitates the regulation, and sometimes the preemption, of state election procedures.  *Adamson v. Clayton Cnty. Elections & Registration Bd.*, 876 F. Supp. 2d 1347, 1356 (N.D. Ga. 2012).

1117. Section 208 of the VRA provides that "[a]ny voter who requires assistance to vote by reason of blindness, disability, or inability to read or write may

be given assistance by a person of the voter's choice, other than the voter's employer or agent of that employer or officer or agent of the voter's union." 52 U.S.C. §10508.

1118. Section 208 was enacted because voters with disabilities and voters who speak limited English "must be permitted to have the assistance of a person of their own choice." S. Rep. No. 97-417, at 62 (1982). Congress sought to continue "the effort to achieve full participation for all Americans in our democracy"—including those who need assistance at the polls. *Id.* at 4.

1119. As the Court has already determined, the plain language of the VRA also provides that private parties, including the Plaintiffs in this case, may enforce section 208. Case No. 4:21-cv-187-MW-MAF, ECF No. 328 at 23.

1120. The Line Relief Provision, which prohibits anyone from "engaging in any activity with the intent to . . . or effect of influencing a voter," Fla. Stat. § 102.031(4)(b), prevents nonpartisan civic organizations from providing voters with disabilities assistance in the form of water, food, chairs, or other items of support to encourage those voters to stay in line and vote. *See supra* ¶¶ 250-251.

1121. The Line Relief Provision also bars an organization from providing language assistance to a voter. If, for example, a volunteer seeking to ensure that a limited-English voter can cast her vote effectively helps the voter communicate with poll workers about voting technologies, the volunteer has engaged in conduct that has the intent and effect of influencing the voter to cast her vote. *See id.* In light of

the Line Relief Provision, many organizations have determined that their past activities—including language assistance and assistance to disabled and elderly voters—are now prohibited within the 150-foot zone. *See, e.g.*, Tr. 746:3-9; 746:10-21; 746:22-25; 773:3-13 (Velez Burgos); Tr. 222:21-223:16 (Garces).

1122. Because this restriction necessarily limits whom voters with disabilities and limited-English voters may choose to assist them, it cannot coexist with Section 208, which guarantees certain voters—i.e., "voters needing assistance due to blindness, disability, or inability to read or write"—"assistance by a person of the voter's choice, other than the voter's employer or agent of that employer or officer or agent of the voter's union."  52 U.S.C. § 10508; *see OCA-Greater Houston v. Texas*, 867 F.3d 604, 615 (5th Cir. 2017) (Section 208 guarantees to voters the right to receive assistance from persons of their choice when voting, including "steps in the voting process before entering the ballot box"); *Priorities USA v. Nessel*, 462 F. Supp. 3d 792, 816 (E.D. Mich. 2020) (finding a conflict with Section 208, which "provides that a voter may be given assistance by anyone of that voter's choice," where the regulation did "not permit a voter to request just anyone to assist them.").

1123. Plucking an excerpt from a U.S. Senate Report stating that "State provisions would be preempted only to the extent that they unduly burden" voters, Defendants have claimed that preemption turns on whether the Line Relief Provision *unduly* burdens the voting rights of voters with disabilities.  Case No. 4:21-cv-187-

MW-MAF, ECF No. 285-1 at 53 (quoting S. Rep. No. 97-417, at 62-63 (1982)).  Yet the Senate Report cannot override the plain language of Section 208 itself, which does not articulate such an "undue burden" analysis.  *See Arkansas United v. Thurston*, No. 5:20-CV-5193, 2020 WL 6472651, at *4 (W.D. Ark. Nov. 3, 2020).

1124. Even if Defendants were correct, the evidence at trial has shown that individuals with disabilities are more likely to experience, and be vulnerable to, long lines and wait times and that the Line Relief Provision will unduly burden their access to the aid they need from a person of their choice so that they can exercise their right to vote.  *See supra* Conclusions of Law, Section VI.  In that respect it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" in Section 208 of the VRA.  *See Arizona*, 567 U.S. at 399.

1125.  In sum, the Line Relief Provision of SB 90 is preempted by Section 208 of the VRA and invalid.

## VIII.  FIRST AMENDMENT CHALLENGE TO REGISTRATION DISCLAIMER PROVISION AS COMPELLED SPEECH

### A.    Legal Principles

1126. The *Florida Rising Together* and *NAACP* Plaintiffs join the section of the *HTFF* post-trial submission relating to compelled speech.

1127. Organizations possess First Amendment rights.   *Primera Iglesia Bautista Hispana of Boca Raton, Inc. v. Broward Cnty.*, 450 F.3d 1295, 1305 (11th Cir. 2006).

399

1128.  "[F]reedom of speech includes both the right to speak freely and the right to refrain from speaking at all."  *Janus v. Am. Fed. of State, Cnty., and Mun. Emps.*, 138 S. Ct. 2448, 2463 (2018) (citation and internal quotation marks omitted). The government therefore cannot "compel affirmation of a belief with which the speaker disagrees."  *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 573 (1995).  This rule "applies not only to expressions of value, opinion, or endorsement, but equally to statements of fact the speaker would rather avoid."  *Id.*

1129.  "By compelling individuals to speak a particular message," a mandatory disclaimer necessarily "alters the content" of speech and constitutes a content-based regulation.  *Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361, 2371 (2018) (*NIFLA*).   Accordingly, such laws are subject to strict scrutiny.  *Id.*; *see also League of Women Voters v. Hargett*, 400 F. Supp. 3d 706, 730 (M.D. Tenn. 2019) (applying strict scrutiny to a mandatory voter registration disclaimer); *Masonry Bldg. Owners of Or. v. Wheeler*, 394 F. Supp. 3d 1279, 1297 (D. Or. 2019) (applying strict scrutiny to a disclaimer relating to building safety).

1130.  A content-based law is "presumptively unconstitutional" and fails strict scrutiny unless it is "narrowly tailored to serve compelling state interests."  *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015); *McClendon v. Long*, 22 F.4th 1330, 1338 (11th Cir. 2022).

1131. "To be a compelling interest, the State must show that the alleged objective was the legislature's *actual* purpose . . . ."  *Shaw v. Hunt*, 517 U.S. 899, 908 n.4 (1996) (emphasis added) (quotation marks omitted).  it is irrelevant "what '*may* have motivated' the legislature" to adopt legislation.  *Id.*   Courts regularly apply *Shaw*'s "actual purpose" requirement to evaluate First Amendment claims.  *See Haight v. Thompson*, 763 F.3d 554, 562 (6th Cir. 2014); *McLaughlin v. City of Lowell*, 140 F. Supp. 3d 177, 190 (D. Mass. 2015).

## B.   The Registration Disclaimer Provision Violates the First Amendment

### 1.   *The Registration Disclaimer Provision Is a Content-Based Regulation of Speech*

1132. Plaintiffs' voter registration activities, including conversations with prospective voters, constitute protected speech and expressive conduct intended to convey Plaintiffs' belief in the importance of all eligible citizens participating in the democratic process.  Tr. 212:5-15 (Garces) (explaining that "[v]oter education starts at the voter registration phase" and that Poder Latinx trains canvassers to discuss "the importance of election[s]" and "the importance of [voter] participation" in the field, particularly with members of the community who may not trust the electoral system); Tr. 744:5-15 (Velez Burgos) (Hispanic Federation encourages voters to "[p]lease stay in line until you exercise your right to vote" when it provides food,

water, and phone chargers to voters in line); Tr. 263:20-23 (McCoy) (explaining that canvassers "help [prospective voters] . . . understand the importance of voting").

1133.   Advocating for that belief by registering Floridians to vote is core political speech and expression. *See Meyer v. Grant*, 486 U.S. 414, 421-23 (1988). Plaintiffs' voter registration activities also constitute protected associative conduct. *See League of Women Voters of Fla. v. Browning*, 863 F. Supp. 2d at 1158 (voter registration includes "speak[ing] and act[ing] collectively with others, implicating the First Amendment right of association").

1134.  The Disclaimer Provision requires a 3PVRO to tell potential voters that it may not submit their registration forms within 14 days or before close of registration; that the voter may submit their own registration forms online, by mail, or in person; and how they can determine if their registration form has been delivered to election officials.  *See* Fla. Stat. § 97.0575(3)(a).

1135. 3PVROs would not engage in this speech if SB 90 did not mandate it. *See supra* ¶¶ 673, 702, 725.

1136. Because the Disclaimer Provision compels speech by 3PVROs, it is a content-based regulation subject to strict scrutiny.

1137. The fact that the disclaimer may be communicated to prospective registrants in writing rather than verbally does not change the First Amendment analysis.  "Speech is speech, and it must be analyzed as such for purposes of the

First Amendment." *Otto v. City of Boca Raton*, 981 F.3d 854, 866 (11th Cir. 2020) (quoting *Wollschlaeger v. Gov., Fla.*, 868 F.3d 1293, 1307 (11th Cir. 2017)).  Thus, which level of scrutiny applies does not depend on whether the speech is communicated verbally or in writing, but whether the regulation constitutes a content-based regulation.  *See* ECF No. 583; *Otto*, 981 F.3d at 861.

1138.  The fact that 3PVROs can provide their own message to counter the government-mandated message also does not render the compelled disclaimer constitutional, because the government cannot "require speakers to affirm in one breath that which they deny in the next." *Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Calif.*, 475 U.S. 1, 16 (1986); *see McClendon*, 22 F.4th at 1337.

## 2. *The Disclaimer Does Not Serve Any Actual Governmental Interest Identified by the Legislature*

1139.  In light of *Shaw*'s "actual purpose" requirement, only state interests that were contemporaneously identified by the legislature are relevant to Plaintiffs' First Amendment claims.

1140.  The legislative record is utterly devoid of any rationale for the disclaimer provision, let alone a compelling interest to justify it.  There is no evidence that any specific information about 3PVROs was provided to the legislature to justify the disclaimer.  Nor were any relevant statements made on the record that would justify the provision.

1141. The most commonly offered rationale for 3PVRO changes offered in the record—that these changes were included to comply with a court order—is spurious as it pertains to the Challenged Provisions.  The referenced court order is presumably *League of Women Voters of Florida v. Browning*, 863 F. Supp. 2d 1155 (N.D. Fla. 2012), which invalidated the requirement that 3PVROs submit voter registration forms within 48 hours of collection.  SB 90 did amend the bill to formally strike the 48-hour provision and replace it with a 14-day deadline; those changes are not challenged in this litigation.  ECF No. 461-2 § 7 (revising 97.0575(1)(c), (d), and eliminating 48-hour turnaround requirement in (3)(a), (5)).  The provisions that *are* challenged—including, as relevant here, the Registration Disclaimer Provision —are in no way mandated by the *Browning* decision.

1142. The legislative record also contains a conclusory complaint that "a lot of chaos [] occurs as a result of private involvement with voter registration"; as an example, the speaker cited problems with an organization "using outdated information" and sending "flyers" to people who are deceased."  ECF No. 466-87 at 63:4-17.  But neither of those issues bears any specific relation to the registration disclaimer provision.  At most, it reveals that the true intent of the law was simply to limit third-party voter registration efforts—an improper purpose in light of Plaintiffs' First Amendment rights and the undisputed invaluable role that 3PVROs play in reaching voters who might not otherwise register.

1143. Defendants' post hoc rationales for the Registration Disclaimer Provision are not only legally irrelevant; they are unpersuasive on their own terms. For example, Defendants assert that the disclaimer serves the role of "informed consent"; gives voters who may not be "comfortable" the chance to turn in their own applications; and gives voters "options," which allegedly improves voter "confidence in the process." Tr. 3417:4-21 (Matthews). The evidence presented at trial demonstrates the opposite is true. The disclaimer *reduces* voter confidence, as evidenced by the reduction in voters registering through 3PVROs and the testimony that the disclaimer undermines 3PVROs. *See supra* ¶¶ 538-545.

1144. Nor does the record suggest that 3PVROs systematically return voter registration applications late. On the contrary, many Supervisors testified that they were not aware of any late submissions, let alone significant numbers of them. *See supra* ¶¶ 209-213. Plaintiffs' testimony similarly demonstrated that accidental late submissions have been rare and constitute a very small fraction of the total number of the forms they submit. Poder Latinx, for example, has submitted only 55 of 33,000 forms late since 2019 (*i.e.*, 0.16%), and none of those forms was submitted after book closing. Tr. 191:11-13, 201:18-202:22, 234:3-10 (Garces).

1145. The strong record of Plaintiffs and other 3PVROs with respect to timely submission of forms is compelling evidence that existing laws—which allow the Secretary of State to impose fines for untimely submissions and to refer 3PVROs to

the Attorney General for enforcement, Fla. Stat. § 97.0575(3)(a), (4)—are sufficient to incentivize timely return of voter registrations.

1146. To the extent Defendants claim an interest in preventing voter registration fraud, they cannot establish that the Registration Disclaimer Provision serves that interest at all.  It was already unlawful before SB 90 to submit fraudulent voter registration forms; SB 90 did not change that prohibition.  Tr. 3474:24-3475:3 (Matthews).  Moreover, the disclaimer provision does not require 3PVROs to warn registrants about the possibility of fraud. *Id.* at 3475:4-6.  And the isolated instances of voter registration fraud discussed at trial, including a situation where canvassers registered a deceased voter, would not have been prevented by SB 90's disclaimer. Tr. 3423:2-20 (Matthews).  If a canvasser registers a deceased or fictitious voter, the canvasser will not have any interaction with a voter at all and therefore has no opportunity to provide a disclaimer.

1147. Moreover, the record demonstrates that Plaintiffs have strong training and quality control processes that seek to prevent voter registration fraud to the maximum extent possible.  After collecting the forms in the field, 3PVROs engage in internal and external quality control processes to determine, among other things, whether forms have been filled out with the same handwriting—a potential indicator of fraud.  Tr. 2062:4-12 (Mercado); Tr. 198:9-199:14 (Garces).  The predecessor of New Florida Majority Education Fund, for example, identified two canvassers

engaged in potential fraud based on handwriting flags; the organization terminated the canvassers, brought the issue to the attention of Supervisor Earley, and cooperated with a subsequent law enforcement investigation.   Tr. 2062:4-12, 2065:21-25 (Mercado).  In other words, the record demonstrates that 3PVROs make a good-faith effort to detect and report fraud, at least those instances that can be detected without "hav[ing] access to the same kinds of records as the Supervisor of Elections does" (*e.g.*, voter signatures and registration files).   Tr. 2062:4-12 (Mercado).

1148. Law enforcement recognized that the predecessor of Florida Rising Together was not responsible for any isolated instances of canvasser fraud.  The agent responsible for the investigation wrote: "I wanted to reiterate that based off my investigation, I do not believe this is an organizational issue.  [New Florida Majority Education Fund] has provided several documents to include training material where canvassers appear to be properly trained prior to canvassing events.  Also, the organization appears to have strict and efficient quality control practices in my opinion."  ECF No. 634-15.  For this reason as well, any suggestion by Defendants that SB 90's restrictions on 3PVROs are justified to address fraudulent voter registration activity is entirely unsubstantiated.  Indeed, the example of a fraudulent change of address cited by Director Matthews—the example of Governor

DeSantis—was not made by a 3PVRO, but rather by someone who accessed the online registration system.  Tr. 3425:13-18, 3466:18-25 (Matthews).

1149. Accordingly, Defendants have not demonstrated that the state has any actual interest that could be served by enforcing the disclaimer, let alone a compelling one.  As the Supreme Court has emphasized, "[t]he simple interest in providing voters with additional relevant information does not justify a state requirement that a writer make statements or disclosures she would otherwise omit." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 348 (1995).  There must instead be a compelling interest beyond the provision of information that justifies the compelled disclosure.  And that is especially so where "the compelled disclosure will almost certainly hamper the legitimate efforts," *Nat'l Fed. of the Blind of N.C., Inc.*, 487 U.S. 781, 799 (1988), of the parties forced to speak—here, the 3PVROs working to register voters.

### 3. *The Registration Disclaimer Provision Is Not Narrowly Tailored*

1150. Defendants cannot demonstrate that the disclaimer is narrowly tailored to serve its purported interests of informing the public about a "possible registration delay" or voter registration options more generally. Critically, Florida already has extensive requirements meant to ensure 3PVROs timely submit voter registration applications, including placing the collection date and organization ID on the forms and fines for noncompliance.  Tr. 2768:4-20 (Matthews).

1151. The government's alleged "simple interest in providing voters with additional relevant information does not justify a state requirement that a [speaker] make statements or disclosures she would otherwise omit." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 348 (1995).

1152. Even assuming the disclaimer serves some state interest, Florida has "more benign and narrowly tailored options" available to serve that end. *Riley*, 487 U.S. at 800. The government is entirely free to speak for itself, and can "communicate the desired information to the public without burdening a speaker with unwanted speech during the course of a solicitation." *Id.*; *see also NIFLA*, 138 S. Ct. at 2376.

1153. For example, the state could—but currently does not—inform applicants that Florida law requires 3PVROs to serve as a fiduciary to the applicant and to return completed applications within 14 days or by the registration deadline. *See* ECF No. 464-13. The Florida Voter Registration Form already informs applicants that they can return their forms by mail or in person at certain government offices, and that the voter registration deadline is 29 days before Election Day, thereby allowing applicants to decide for themselves whether to entrust the form to a third party. *Id.* These aspects of the form demonstrate the ease with which the government can communicate its own messages to applicants.

1154. The state could also—but currently does not—provide information on its registration form concerning the option for those with DHSMV IDs to register online. *See id.* Instead it ignores online registration in its notice of "Where to Register" and says only that "the downloadable/printable online form is available at registertovoteflorida.gov" ignoring the existence of the online option at the very same website. *See id.*

1155. Finally, the state could simply rely on enforcement of existing laws that penalize 3PVROs that submit voter registration forms late. Indeed, these fines already work to promote the timely submission of forms, as demonstrated by how rare it is for 3PVROs to submit voter registration forms late. *See* Appendix C at RFA 10.

1156. Each of these "more narrowly tailored" options would be "in keeping with the First Amendment directive that government not dictate the content of speech absent compelling necessity, and then, only by means precisely tailored." *Riley*, 487 U.S. at 800.

### 4. *The Court Should Reject Defendants' Proffered Analogies to Professional Speech and Campaign Finance Disclosures*

1157. Although federal courts have previously applied lesser scrutiny to content-based regulations of "commercial speech, as well as incidental speech swept up in the regulation of professional conduct," this Court has already held that voter registration activity is not commercial speech. ECF No. 647 at 7-11 (responding to

Court's questions at ECF No. 636); Case No. 4:21-cv-201-MW-MAF, ECF No. 294 at 31-32 (Order on Cross Mots. Summ. J.); *compare Otto*, 981 F.3d at 865, *with NIFLA*, 138 S. Ct. at 2374 ("[T]he lawyer's statements in *Zauderer* would have been 'fully protected' if they were made in a context other than advertising." (citation omitted)).

1158. For the reasons discussed in Plaintiffs' separate filing in response to the Court's questions (ECF No. 636), 3PVRO voter registration activities are not "professional conduct" and are not compelled disclosures akin to campaign finance law jurisprudence.  ECF No. 647 at 7-11.

1159. *Zauderer* also does not apply because the disclaimer does not provide "purely factual and uncontroversial information about the terms under which . . . services will be available."  *See NIFLA*, 138 S. Ct. at 2366 (quoting *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio,* 471 U.S. 626, 651 (1985)). To the extent portions of the disclaimer do include any factual information, those portions require 3PVROs to disclose information about other modes of registration offered *by the state*—not their own voter registration activities.  Other portions of the mandatory disclaimer are not purely factual and uncontroversial.  For example, the statement that 3PVROs "might not" turn in applications on time is misleading at best and false at worst, given the strong record of 3PVROs at submitting forms on time.  The statement that voters can register online is misleading for certain

prospective registrants; only those with internet access as well as a Florida-issued driver license or ID card can register to vote online.   Fla. Stat. § 97.0525(4)(a). Finally, there is no comprehensive tracking system for 3PVROs to point to as to delivery status, because the statewide registration lookup contains no information regarding the application unless and until it is processed and the person is added to the voter roll.   ECF No. 402 at 32, ¶¶ 22–24 (Joint Stip.).

1160. Defendants now cite cases applying intermediate scrutiny to campaign finance disclosure requirements to argue that the same level of scrutiny applies to the disclaimer.   *See* ECF No. 582.   Unlike campaign finance disclosure rules subject to lesser scrutiny, the disclaimer goes beyond requiring Plaintiffs to identify basic information about themselves.   *Cf. Citizens United v. FEC*, 558 U.S. 310, 366 (2010) (challenging federal law requiring "televised electioneering communications funded by anyone other than a candidate" to display the name of the funder and its address or website and to clearly state that the "communication 'is not authorized by any candidate or candidate's committee'"); *Worley v. Fla. Sec. of State*, 717 F.3d 1238, 1240-41 (11th Cir. 2013) (challenging law requiring political action committees to disclose their donors and identify themselves in political advertisements); *Gaspee Project v. Mederos*, 13 F.4th 79, 83 (1st Cir. 2021).   The Registration Disclaimer Provision must therefore satisfy strict scrutiny.   *McClendon*, 22 F.4th at 1338.

412

1161. For these reasons and the reasons articulated in Plaintiffs' separate filing, compelled disclosure cases do not provide the appropriate parallel for SB 90's disclaimer provision.

### 5. The Registration Disclaimer Provision Violates the First Amendment Even If a Lower Level of Scrutiny Applies

1162. Even when lesser scrutiny applies because the regulated speech is commercial in nature, the government must cite actual interests or harms redressed by the regulation. *Ibanez v. Fla. Dep't of Bus. & Pro. Regul., Bd. of Acct.*, 512 U.S. 136, 142-3 (1994); *see also Tinsley Media, LLC v. Pickens Cnty.*, 203 F. App'x 268, 273 (11th Cir. 2006) ("[T]he vast majority of courts reject the use of *post hoc* testimony as a means of determining legislative intent."). "[A] governmental body seeking to sustain a restriction on commercial speech must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree." *Borgner v. Brooks*, 284 F.3d 1204, 1211 (11th Cir. 2002) (citing *Rubin v. Coors Brewing Co.,* 514 U.S. 476, 487 (1995)).

1163. "Unlike rational-basis review," the standard applied even to regulations of commercial speech "does not permit [courts] to supplant the precise interests put forward by the State with other suppositions. Neither will [they] turn away if it appears that the stated interests are not the actual interests served by the restriction." *Edenfield v. Fane*, 507 U.S. 761, 768 (1993) (internal citation omitted).

1164. Not only did the legislature fail to articulate any legitimate interest supporting the Registration Disclaimer Provision, but there can be no legitimate interest in requiring organizations to provide misleading information. *See* e.g*., League of Women Voters of Fla. v. Browning*, 863 F. Supp. 2d 1155, 1164-65 (N.D. Fla. 2012) (enjoining misleading sworn statement).

## IX.   FIRST AMENDMENT CHALLENGE TO REGISTRATION DISCLAIMER PROVISION BASED ON PLAINTIFFS' RIGHTS TO FREEDOM OF ASSOCIATION

1165. "[T]he freedom to associate for the purpose of engaging in activities protected by the First Amendment . . . is protected by the First Amendment as a necessary corollary of the rights that the amendment protects by its terms." *Gaines v. Wardynski*, 871 F.3d 1203, 1212 (11th Cir. 2017) (quoting *McCabe v. Sharrett*, 12 F.3d 1558, 1563 (11th Cir.1994)).

1166. "Where an individual has asserted a First Amendment right, the Supreme Court has held that such person is entitled to exercise such right in an effective manner." *League of Women Voters of Fla. v. Cobb*, 447 F. Supp. 2d 1314, 1334 (S.D. Fla. 2006) (citing *Meyer v. Grant,* 486 U.S. 414, 424 (1988)). The First Amendment protects 3PVROs' "right to select what they believe to be the most effective means of conducting their voter registration drives to ensure their voices are heard in the political process." *Id.* The Registration Disclaimer Provision makes communications between canvassers and potential voters less effective by

interfering with the trust that Plaintiffs and other 3PVROs try to build within the community in the course of their voter registration activities.

1167. "Election regulations that impose a severe burden on associational rights are subject to strict scrutiny." *Wash. Stat. Grange v. Wash. State Republican Party*, 552 U.S. 442, 451 (2008); *League of Women Voters of Fla. v. Browning*, 575 F. Supp. 2d 1298, 1331 (S.D. Fla. 2008) ("[R]egulations directly burdening the one-on-one, communicative aspect of [electoral activity] are subject to strict scrutiny." (quoting *Buckley v. Am. Constitutional Law Fndt., Inc.,* 525 U.S. 182, 215 (1999)) (internal quotation marks omitted) (alteration in original)). The disclaimer provision significantly interferes with and burdens the one-on-one interaction with potential voters that Plaintiffs seek to reach. *See supra* ¶¶ 538-544.

1168. A law also violates the right of association when it "reduce[s] the quantum of political speech and association." *Cobb*, 447 F. Supp. 2d at 1333 (citing *Meyer*, 486 U.S. at 422–23). The disclaimer reduces the quantum of Plaintiffs' and other 3PVROs' political speech and association by forcing them to dedicate a portion of their limited time with each potential voter to providing the disclaimer, answering questions about it, and reassuring potential voters that it can be trusted to submit their registration forms on time. *See supra* ¶¶ 543-544.

1169. The Registration Disclaimer Provision severely burdens Plaintiffs' speech and associational rights in the course of their "interactive communication

415

concerning political change" and for that reason as well, must be narrowly tailored to a compelling government interest. *See Buckley*, 525 U.S. at 186. For the reasons discussed above regarding compelled speech, Defendants have put forward no evidence of an interest sufficiently weighty or tailored to justify the disclaimer.

## X.   FIRST AMENDMENT CHALLENGES TO VOTER REGISTRATION DELIVERY RESTRICTION

### A.   Legal Principles

1170. This Court has already held that 3PVROs' collection and submission of voter registration forms involves First Amendment-protected expression and association. Case No. 4:21-cv-00201, ECF No. 294 at 37-38 ("[T]he act of returning a registration application is inextricable from the other, speech-imbued aspects of encouraging Floridians to register to vote. And, at any rate, the act of collecting and returning voter registration forms implicates third-party registration organizations' right to associate, both with their members and with unregistered Floridians."); *see also supra* ¶¶ 1132.

1171. Laws that burden political speech are subject to "exacting scrutiny" and will be upheld only if "narrowly tailored to serve an overriding state interest." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 347 (1995). "To withstand [exacting] scrutiny, the strength of the governmental interest must reflect the seriousness of the actual burden on First Amendment rights." *Ams. for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2383 (2021) (quoting *Doe v. Reed*, 561 U.S. 186,

416

196 (2010)).  And the state must demonstrate that the provision is narrowly tailored to meet that interest.  *Bonta*, 141 S. Ct. at 2383-84 (reaffirming that exacting scrutiny requires narrow tailoring); *see also Meyer v. Grant*, 486 U.S. 414, 426 (1988).

1172. The *Anderson-Burdick* standard does not substitute for exacting scrutiny here.  The Supreme Court has explained that *Anderson-Burdick* applies to laws that "control the mechanics of the electoral process" or "govern[] the voting process itself."  *McIntyre*, 514 U.S. at 344-45; see *id.* at 344 (noting that the Court had applied *Anderson-Burdick* in cases involving filing deadlines, ballot access, write-in voting, and eligibility to vote in primaries).  If a law "govern[s] election-related speech and association," the Supreme Court instead applies exacting scrutiny, as such cases implicate "the area where the First Amendment has its fullest and most urgent application."  *Priorities USA v. Nessel*, 462 F. Supp. 3d 792, 810-11 (E.D. Mich. 2020) (internal quotation marks omitted); see also *McIntyre*, 514 U.S. at 345, 347 (applying exacting scrutiny to a law banning the circulation of campaign literature); *Meyer*, 486 U.S. at 420 (applying exacting scrutiny to regulation of petition-drive activities); *League of Women Voters v. Hargett*, 400 F. Supp. 3d  706, 721 (M.D. Tenn. 2019) (applying exacting scrutiny to law regulating voter registration drives).

1173. Exacting scrutiny applies even though the Registration Delivery Restriction does not directly regulate speech (unlike the Registration Disclaimer

Provision, which directly compels speech and is therefore subject to strict scrutiny).

In *Meyer*, for example, the Supreme Court applied exacting scrutiny to a Colorado law that made it unlawful to pay individuals to circulate petitions for ballot initiatives. 486 U.S. at 420. The Court explained that the law "restrict[ed] political expression" by reducing the number of people who could circulate petitions and ultimately "limit[ing] the size of the audience [that initiative proponents] can reach." *Id.* at 422-23. Here, the Delivery Provision similarly makes it more burdensome for 3PVROs to engage in voter registration and therefore reduces the effectiveness of their programs. *See infra* ¶¶ 1175-1180.

## B. The Registration Delivery Restriction Violates the First Amendment Under Exacting Scrutiny

1174. The Registration Delivery Restriction imposes fines on 3PVROs that fail to deliver registration applications to the "supervisor of elections in the county in which the applicant resides" within 14 days. Fla. Stat. § 97.0575(3)(a)(1)-(3).

1175. The Registration Delivery Provision substantially burdens Plaintiffs' voter registration activities by significantly raising the costs associated with third-party voter registration and ultimately deterring those activities.

1176. Multiple Plaintiffs testified that they routinely collect registration forms from out-of-county voters. For example, it is common for Hispanic Federation to register people from 20 to 30 counties during a voter registration drive. Tr. 725:16-23 (Velez Burgos). Similarly, Poder Latinx operates in Central Florida and regularly

collects forms from tourists who live across the state.  Tr. 209:16-210:5 (Garces); see also Tr. 392:24-393:13 (Burney-Clark) (testifying that Equal Ground previously operated voter registration drives in tourist hotspots).

1177.  Prior to SB 90, 3PVROs could submit all of the forms they collected to the nearest SOE office in person. *See supra* ¶ 552.  Plaintiffs testified that they prefer to deliver forms in person, as it allows them to ensure that forms are delivered on time and also "build a relationship with the staff" at the SOE office. *See, e.g.*, Tr. 2041:19-2042:5 (Mercado).

1178.  In light of SB 90, 3PVROs now have to expend limited resources sorting the voter registration forms they collect and either hand-delivering or mailing them to the SOE in each applicant's home county.  Plaintiffs and other 3PVROs have had to allocate substantial additional staff time and funding to ensure that forms are delivered correctly.  FRT has hired three part-time quality control managers to ensure compliance with SB 90, including the Registration Delivery Provision.  Tr. 2043:12-2044:2 (Mercado).   Poder Latinx anticipates spending an additional $40,000-50,000 in mail and staff costs in 2022 due to the delivery requirement.  Tr. 210:6-25 (Garces); id. (explaining his calculations of Poder's compliance costs).

1179.  If Plaintiffs do not engage in these quality control measures, they will be subject to fines or other enforcement actions.  Indeed, Poder Latinx was already

threatened with a fine for turning in a form to the county that the voter had incorrectly identified as part of their address.  Tr. 209:1-15 (Garces).

1180. Plaintiff Equal Ground has terminated its registration program altogether because of the burden imposed by SB 90's 3PVRO restrictions, including the Registration Delivery Provision.  Tr. 392:24-393:13 (Burney-Clark).

1181. The Registration Delivery Provision thus infringes on Plaintiffs' First Amendment rights because it burdens Plaintiffs with increased costs and dissuades them from engaging with and registering potential voters.

1182. Defendants have not demonstrated that any sufficiently weighty state interest is served by the Delivery Provision.  The only explanation the FSE lobbyist offered for requesting the provision is that SOEs did not feel "it was [their] responsibility to be [the 3PVROs'] assistant and separate out their files for them." Tr. 3120:16-18 (Ramba).   That interest—a slight increase in administrative convenience—is far from "sufficiently important" to survive exacting scrutiny.  *See Bonta*, 141 S. Ct. at 2387 (holding that state's interest in "ease of administration . . . cannot justify [a] disclosure requirement" under exacting scrutiny); *id.* ("Mere administrative convenience does not remotely reflect the seriousness of the actual burden that [the challenged regulation] imposes on donors' association rights.") (internal quotation marks and citations omitted).

1183. The administrative convenience rationale is especially unpersuasive here, where Defendants presented no evidence that SOEs actually encountered any problems sorting voter registration forms and delivering them to the appropriate counties. Accordingly, Florida lacks any legitimate interest in forcing 3PVROs, at risk of fines and reputational harm, to expend their limited resources delivering each form to the registrant's home county.

1184. The fact that Florida permits 3PVROs to mail unsorted forms to the Division of Elections does not reduce the burden on Plaintiffs and other 3PVROs. First, in light of the potential fines for late submissions, Plaintiffs have chosen to send forms to out-of-county SOEs by priority mail. Tr. 208:16-22 (Garces) (explaining that Poder Latinx sends forms "by priority mail" and obtains "certified mail receipts"); Tr. 2041:16-18 (Mercado) (same). Mailing all forms is likely to be financially untenable for many nonprofit 3PVROs. Second, as noted, Plaintiffs prefer to deliver voter registration forms in person to confirm receipt, save costs, and develop relationships with their local SOEs. Plaintiffs cannot realize these benefits if they simply mail all unsorted forms to the Division. *Cf. Meyer*, 486 U.S. at 424 ("The First Amendment protects [Plaintiffs'] right not only to advocate their cause but also to select what they believe to be the most effective means for so doing.").

1185. The Registration Delivery Provision also violates the First Amendment because it constitutes unconstitutional viewpoint- and speaker-based discrimination,

in that it imposes different obligations on 3PVROs than it does on government agencies and family members that collect voter registration forms.  *See* Fla. Stat. § 97.021(40) (defining "[t]hird-party voter organizations").   Those persons may continue to return applications to any Supervisor.  At the very least, the fact that Florida allows others to deliver forms to any Supervisor is evidence that the state lacks a sufficiently important interest in the Delivery Provision.

## C.    Plaintiffs Are Entitled to Injunctive Relief

1186.  To obtain a permanent injunction, a plaintiff "must satisfy a four-factor test." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 159 (2010) (internal quotation marks omitted). A plaintiff must show (1) "irreparable injury"; (2) that "remedies at law are inadequate"; (3) that "the balance of hardships weigh[]" in their favor; and (4) "that a permanent injunction would not disserve the public interest." *Barrett v. Walker Cnty. Sch. Dist.*, 872 F.3d 1209, 1229 (11th Cir. 2017) (citing *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)). These requisite elements are satisfied here.

1187. First, Plaintiffs have suffered an irreparable injury. Constitutional violations establish per se irreparable harm. *See Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."); *see also Jones v. Governor of Fla.,*

422

950 F.3d 795, 828 (11th Cir. 2020) ("The denial of the opportunity to cast a vote that a person may otherwise be entitled to cast -- even once -- is an irreparable injury.")

1188. Second, given that they have suffered an irreparable harm, Plaintiffs also have no adequate remedy at law for Florida's deprivation of its rights. *See Ferrero v. Associated Materials, Inc.*, 923 F.2d 1441, 1449 (11th Cir. 1991); *see also Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. Unit B 1981) ("An injury is 'irreparable' only if it cannot be undone through monetary remedies."). [1]

1189. Third, the balance of hardships favors Plaintiffs. Defendants have demonstrated only weak or pretextual injuries from being prohibited from enforcing the Challenged Provisions.  Moreover, Defendants have not demonstrated that their interest in the Challenged Provisions outweighs the significant and numerous impacts to Plaintiffs.  Conversely, Plaintiffs have important constitutional and statutory rights at stake.

1190. Fourth, injunctive relief would promote—not disserve—the public interest.  Indeed, "[t]he vindication of constitutional rights … serve[s] the public interest almost by definition." *Browning*, 863 F. Supp. 2d at 1167.  It is well-established that "the public has a strong interest in exercising the fundamental political right to vote . . . [that] is best served by favoring enfranchisement and ensuring that qualified voters' exercise of their right to vote is successful." *Obama*

*for Am. V. Husted,* 697 F.3d 423, 436 (6th Cir. 2012) (citations omitted); *see also League of Women Voters of Fla. v. Detzner,* 314 F. Supp. 3d, 1205, 1224 (N.D. Fla. 2018) ("[A]llowing for easier and more accessible voting for all segments of society serves the public interest.")

1191.  Decisions from the former Fifth Circuit's Unit B constitute binding precedent in the Eleventh Circuit. *Barrett*, 872 F.3d at 1229 n.12; *Stein v. Reynolds Secs., Inc.*, 667 F.2d 33, 34 (11th Cir. 1982).

## XI.  THE NEED FOR BAIL-IN RELIEF UNDER SECTION 3 OF THE VOTING RIGHTS ACT

### A.  Legal Principles

1192. Section 3(c) of the Voting Rights Act, 52 U.S.C. § 10302(c), provides in relevant part:

> (c) If in any proceeding instituted by the Attorney General or an aggrieved person under any statute to enforce the voting guarantees of the fourteenth or fifteenth amendment in any State or political subdivision the court finds that violations of the fourteenth or fifteenth amendment justifying equitable relief have occurred within the territory of such State or political subdivision, the court, in addition to such relief as it may grant, shall retain jurisdiction for such period as it may deem appropriate and during such period no voting qualification or prerequisite to voting or standard, practice, or procedure with respect to voting different from that in force or effect at the time the proceeding was commenced shall be enforced unless and until the court finds that such qualification, prerequisite, standard, practice, or procedure does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color, or in contravention of the voting guarantees set forth in section 10303(f)(2) of this title[.]

52 U.S.C. § 10302(c).  In short, Section 3(c) "empowers a court, in a proper case, to impose a preclearance remedy on states," known as "bail-in" relief.  *Perez v. Abbott*, 390 F. Supp. 3d 803, 807 (W.D. Tex. 2019) (citing *Jeffers v. Clinton*, 740 F. Supp. 585, 587 (E.D. Ark. 1990), *aff'd*, 498 U.S. 1019 (1991) (mem.)).

1193. "Section 3's provisions have long applied equally to all states and localities, and have been imposed in numerous cases."  *Allen v. City of Evergreen*, No. 13-0107-CG-M, 2014 WL 12607819, at *1-*2 (S.D. Ala. Jan. 13, 2014) (collecting cases and ordering bail-in relief).  In considering whether to impose Section 3(c) relief, courts have applied a two-step analysis, asking (1) "whether violations of the Fourteenth or Fifteenth Amendments justifying equitable relief have occurred within the State or its political subdivisions"; and (2) "whether, if so, the remedy of preclearance should be imposed."  *Perez*, 390 F. Supp. 3d at 813 (citing *Jeffers*, 740 F. Supp. at 587).

1194. Per the terms of the statute, "triggering violations for bail-in relief must be violations of Fourteenth and Fifteenth Amendment protections against intentional racial discrimination in voting."  *Id.* at 813-14 (citing *Jeffers*, 740 F. Supp. at 589). A plaintiff must prove "conscious racial discrimination" by "preponderance of the evidence."  *Id.* at 813 (citing *Jeffers*, 740 F. Supp. at 589); *see id.* at 814-16 (finding that state congressional and legislative district plans were "motivated by racially discriminatory purpose" and thus "qualif[ied] as triggers for § 3(c) bail-in relief").

425

1195. At the second step of the inquiry, "traditional principles of equitable discretion" guide whether courts should impose bail-in relief, "as conditioned by the necessities of the public interest which Congress has sought to protect." *Jeffers*, 740 F. Supp. at 600-01 (quoting *The Hecht Co. v. Bowles*, 321 U.S. 321, 329-30 (1944)). Several non-exhaustive factors are relevant in making this determination: "[1] Have the violations been persistent and repeated? [2] Are they recent or distant in time? [3] Are they the kinds of violations that would likely be prevented, in the future, by preclearance? [4] Have they already been remedied by judicial decree or otherwise? [5] How likely are they to recur? [6] Do political developments, independent of this litigation, make recurrence more or less likely?" *Perez*, 390 F. Supp. 3d at 818 (quoting *Jeffers*, 740 F. Supp. at 601).  While courts must consider the defendants' countervailing interests alongside "the interest of the plaintiffs in vindication of their constitutional right to vote," "the rights of the plaintiffs must prevail" when "prospective relief in the form of preclearance is indicated by the other factors in the case." *Jeffers*, 740 F. Supp. at 601.

## B.    Application

1196. Here, each of these factors favors bail-in relief.  As is thoroughly documented in the record of this case, Florida has a longstanding pattern of imposing burdens on Black and Latino voters, both historically and continuing into the present. Most notably, the legislature sought to impose limits on mail voting only when mail

voting became a preferred mode of voting for Black and Latino voters. The State has a practice of trying to impair the activities of Third Party Voter registration organizations, with full knowledge that these organizations principally meet the needs of Black and Latino voters. The State has a well-documented history of extensive wait times at polling places, particularly in minority precincts, a trend that was mitigated to some degree in 2020 due to extensive use of mail voting. Now the legislature proposes to reduce mail voting, which will have the predictable effect of reviving the extended wait times on election day and early voting.

1197. Moreover, because the legislature and the Governor are controlled by the same party, and because that party tends to benefit from imposing burdens on Black and Latino voters, these patterns are likely to recur. This continued domination of the Florida legislature and the office of the Governor by the same political party tends to make recurrence more likely. Thus, preclearance may be the only mechanism to prevent the State of Florida from engaging in further efforts to impair the voting rights of Black and Latino voters.

1198. The scope of the remedy the court imposes "must be tailored to" the violations found. *Veasey v. Abbott*, 888 F.3d 792, 801 (5th Cir. 2018). Where the court finds that a challenged statute was adopted for the purpose of restricting participation of minority voters in the political process, and equitable factors point in favor of relief, the court may order that future statutes concerning related aspects

of voting and elections "must be subjected to the preclearance process" before the U.S. Department of Justice. *Jeffers*, 740 F. Supp. at 601; *see also Patino v. City of Pasadena*, 230 F. Supp. 3d 667, 729-30 (S.D. Tex. 2017). The court may also retain jurisdiction to enforce its order and hear any challenges by the prevailing plaintiffs to relevant future legislation. *Jeffers*, 740 F. Supp. at 602; *Patino*, 230 F. Supp. 3d at 729-30; *Allen*, 2014 WL 12607819, at *3.

Dated:  February 26, 2022

s/  *Jeremy C. Karpatkin*
JOHN A. FREEDMAN*
JEREMY C. KARPATKIN
ELISABETH S. THEODORE*
JANINE M. LOPEZ*
LESLIE C. BAILEY*
SAM I. FERENC*
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Ave., N.W.
Washington, D.C. 20001-3743
(202) 942-5000
John.Freedman@arnoldporter.com
Jeremy.Karpatkin@arnoldporter.com
Elisabeth.Theodore@arnoldporter.com
Janine.Lopez@arnoldporter.com
Leslie.Bailey@arnoldporter.com
Sam.Ferenc@arnoldporter.com

JEFFREY A. MILLER*
Arnold & Porter Kaye Scholer LLP
3000 El Camino Road
Five Palo Alto Square, Suite 500
Palo Alto, CA 94306-3807
(650) 319-4500
Jeffrey.Miller@arnoldporter.com

AARON STIEFEL*
DANIEL R. BERNSTEIN*
RYAN D. BUDHU*
ANDREW R. HIRSCHEL*
Arnold & Porter Kaye Scholer LLP
250 West 55th Street
New York, NY 10019-9710
(212) 836-8000
Aaron.Stiefel@arnoldporter.com
Daniel.Bernstein@arnoldporter.com
Ryan.Budhu@arnoldporter.com
Andrew.Hirschel@arnoldporter.com

Respectfully submitted,

s/  *P. Benjamin Duke*
Benjamin L. Cavataro (Fla. Bar No. 113534)
Morgan E. Saunders (*pro hac vice*)
Michael A. Fletcher II (*pro hac vice*)
Elizabeth T. Fouhey (*pro hac vice*)
Cyrus Nasseri (*pro hac vice*)
Miles Galbraith*
Covington & Burling LLP
850 Tenth Street, N.W.
Washington, DC 20001
202-662-5693
bcavataro@cov.com
msaunders@cov.com
mfletcher@cov.com
efouhey@cov.com
cnasseri@cov.com
mgalbraith@cov.com

P. Benjamin Duke (*pro hac vice*)
Shira M. Poliak (*pro hac vice*)
Covington & Burling LLP
620 Eighth Avenue
New York, NY 10018
212-841-1270
pbduke@cov.com
spoliak@cov.com

Robert D. Fram (*pro hac vice*)
Ellen Y. Choi (*pro hac vice*)
Nia Joyner (*pro hac vice*)
Covington & Burling LLP
415 Mission Street
San Francisco, CA 94105
415-591-7025
rfram@cov.com
echoi@cov.com
njoyner@cov.com

429

KIRA ROMERO-CRAFT
Florida Bar No. 49927
MIRANDA GALINDO*
LatinoJustice, PRLDEF
523 W. Colonial Drive
Orlando, FL 32804
(321) 418-6354
Kromero@latinojustice.org
Mgalindo@latinojustice.org

BRENDA WRIGHT*
DEMOS
80 Broad St, 4th Flr
New York, NY 10004
(212) 633-1405
bwright@demos.org

JUDITH BROWNE DIANIS**
GILDA R. DANIELS
JORGE VASQUEZ**
SABRINA KHAN**
ESPERANZA SEGARRA
Florida Bar No. 527211
SHARION SCOTT**
ADVANCEMENT PROJECT
1220 L Street, N.W., Suite 850
Washington, DC 20005
(202) 728-9557
Jbrowne@advancementproject.org
Gdaniels@advancementproject.org
Jvasquez@advancementproject.org
Skhan@advancementproject.org
Esegarra@advancementproject.org
Sscott@advancementproject.org

*Counsel for Florida Rising Plaintiffs*

*Admitted pro hac vice*
***Application for admission pro hac
vice forthcoming*

Michael Pernick (*pro hac vice*)
Morenike Fajana (*pro hac vice*)
Romane Paul (*pro hac vice*)
NAACP Legal Defense & Educational
Fund, Inc.
40 Rector Street, 5th Floor
New York, NY 10006
212-965-2200
mfajana@naacpldf.org

Amia Trigg (*pro hac vice*)
Mahogane D. Reed (*pro hac vice*)
NAACP Legal Defense & Educational
Fund, Inc.
700 14th Street NW, Ste. 600,
Washington, DC 20005
202-682-1300
atrigg@naacpldf.org

Nellie L. King (Fla. Bar No. 0099562)
The Law Offices of Nellie L. King, P.A.
319 Clematis Street, Suite 107
West Palm Beach, FL 33401
561-833-1084
Nellie@CriminalDefenseFla.com

*Counsel for NAACP Plaintiffs*

*Admitted pro hac vice*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of this document was served on

all counsel of record through the Court's CM/ECF system on the 26th of February,

2022.

s/ <u>*P. Benjamin Duke*   </u>
Attorney for Plaintiffs
