UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

LEAGUE OF WOMEN VOTERS OF
FLORIDA, INC., et al.,

> Plaintiffs,

v.

CORD BYRD, in his official capacity
as Florida Secretary of State, et al.,

> Defendants,

and

REPUBLICAN NATIONAL
COMMITTEE, and NATIONAL
REPUBLICAN SENATORIAL
COMMITTEE,

> Intervenor-Defendants.

Case Nos.: 4:21-cv-186-MW/MAF (lead)
4:21-cv-187-MW/MAF
4:21-cv-201-MW/MAF
4:21-cv-242-MW/MAF

## PLAINTIFFS' JOINT SUPPLEMENTAL BRIEF FOR ISSUES ON REMAND

TABLE OF CONTENTS

Page

INTRODUCTION ...................................................................1

BACKGROUND ...................................................................4

    A.    SB 90 Amendments.................................................4

        1.    The Drop Box Provisions.............................................4

        2.    The Registration Delivery Provision .........................5

    B.    Subsequent Amendments to Challenged Provisions............5

        1.    Drop Box Provisions....................................................6

        2.    Registration Delivery Provision Amendments ...........9

LEGAL STANDARD...........................................................10

ARGUMENT ........................................................................13

I.    THE DROP BOX PROVISIONS SEVERELY BURDEN FLORIDA
    VOTERS' RIGHT TO VOTE AND ARE NOT ADEQUATELY
    SUPPORTED BY A STATE INTEREST ...................................13

    A.    Prior Drop Box Usage in Florida .......................................14

    B.    The Drop Box Provisions Severely Burden the Right to Vote ..........19

        1.    The In-Person Monitoring Requirement Severely
            Burdens the Right to Vote..........................................19

            a.    The In-Person Monitoring Requirement Reduces
                Drop Box Availability ....................................19

            b.    The In-Person Monitoring Requirement Threatens
                to Intimidate Voters and Chill Voter Turnout ...............21

        2.    The Hours Restrictions Severely Burden the Right to
            Vote ...........................................................................23

          a.     The Hours Restrictions Severely Burden Voters Who Rely on Casting Their Ballots via Drop Box Prior to the Start of Early Voting ....................................24

          b.     The Hours Restrictions Severely Burden Voters Who Rely on Casting Their Ballots in the Days Immediately Prior to the Election or on Election Day..........................................................................................24

     3.    The Drop Box Provisions Collectively Impose a Severe Burden on Many Voters Who Have Difficulty Voting During Ordinary Business Hours............................................29

     4.    The Drop Box Provisions Will Severely Burden Voters with Disabilities ........................................................................31

   C.   The Drop Box Provisions Are Not Adequately Supported by a State Interest ............................................................................34

     1.    None of the Drop Box Provisions Further or Are Necessary to Achieve a State Interest in Drop Box Security ...........................................................................35

     2.    None of the Drop Box Provisions Further or Are Necessary to Achieve a State Interest in Uniformity................40

     3.    None of the Drop Box Provisions Further or Are Necessary to Achieve the State Interest of Assisting Voters ...............................................................................44

     4.    None of the Drop Box Provisions Further or Are Necessary to Achieve the State Interest in Voter Confidence .......................................................................45

II.   THE REGISTRATION DELIVERY PROVISION UNDULY BURDENS FLORIDA VOTERS' RIGHT TO VOTE AND IS NOT ADEQUATELY SUPPORTED BY A STATE INTEREST ......................48

   A.   The Trial Evidence Concerning the Severe Burden Imposed by the Registration Delivery Provision ....................................48

   B.   The State's Interest in the Registration Delivery Provision Is Insufficient to Justify Its Burden on Voters ........................55

1.      The Legislature's Sole Contemporaneous Interest in the
        Provision Does Not Justify the Burden.....................................56

2.      The State's Purported Interest for the Provision Should
        Not Be Credited and Does Not Justify the Burden in Any
        Event ........................................................................................58

CONCLUSION ..........................................................................................62

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Agudath Israel of Am. v. Cuomo,*
  983 F.3d 620 (2d Cir. 2020) .............................................................56

*Anderson v. Celebrezze,*
  460 U.S. 780 (1983)..............................................................*passim*

*Bethune-Hill v. Va. State Bd. of Elections,*
  580 U.S. 178 (2017)............................................................56

*Common Cause/Ga. v. Billups,*
  554 F.3d 1340 (11th Cir. 2009) .........................................12

*Crawford v. Marion Cnty. Election Bd.,*
  553 U.S. 181 (2008).....................................................10, 11, 12

*Democratic Exec. Comm. of Fla. v. Detzner,*
  347 F. Supp. 3d 1017 (N.D. Fla. 2018) .............................45

*Democratic Exec. Comm. of Fla. v. Lee,*
  915 F.3d 1312 (11th Cir. 2019) ..................................*passim*

*Duke v. Cleland,*
  5 F.3d 1399 (11th Cir. 1993) ............................................12

*Jones v. Governor of Fla.,*
  15 F.4th 1062 (11th Cir. 2021) ............................................2

*League of Women Voters of Fla. Inc. v. Fla. Sec'y of State,*
  66 F.4th 905 (11th Cir. 2023) ......................................*passim*

*League of Women Voters of Fla., Inc. v. Lee,*
  595 F. Supp. 3d 1042 (N.D. Fla. 2022) ................50, 53, 57

*League of Women Voters of Fla. v. Browning,*
  863 F. Supp. 2d 1155 (N.D. Fla. 2012) ................51, 57, 58

*Norman v. Reed,*
  502 U.S. 279 (1992)...................................................11, 12, 55

*Pub. Integrity All.*, *Inc. v. City of Tucson*,
836 F.3d 1019 (9th Cir. 2016) (en banc) .............................................................13

*Shaw v. Hunt*,
517 U.S. 899 (1996) .............................................................................................56, 59

*Soltysik v. Padilla*,
910 F.3d 438 (9th Cir. 2018) .............................................................12, 13, 61

*Storer v. Brown*,
415 U.S. 724 (1974) .............................................................................................10

## **Statutes**

Fla. Stat. § 97.0575(3)(a) .............................................................................5, 9, 51

Fla. Stat. § 97.0575(5)(a) .............................................................5, 9, 10, 54, 55

Fla. Stat. § 97.0575(5)(a)(1) .............................................................................10

Fla. Stat. § 97.0575(5)(a)(2) .............................................................................10

Fla. Stat. § 98.015(4) .............................................................................................7

Fla. Stat. § 101.62(3)(c) .............................................................................................26

Fla. Stat. § 101.69 .............................................................................................5, 6, 41

Fla. Stat. § 101.69(2) .............................................................................................8

Fla. Stat. § 101.69(2)(a) (2021) .............................................................4, 6, 43

Fla. Stat. § 101.69(3) .............................................................................................4

Fla. Stat. § 101.657(1)(a) .............................................................................6, 7

Fla. Stat. § 101.657(1)(d) .............................................................................4, 41

Fla. Stat. § 101.662 .............................................................................................31

Fla. Stat. § 101.6103(2) (2021) .............................................................................26

2022 Fla. Sess. Law Serv. Ch. 2022-73 .............................................................6, 9

2023 Fla. Sess. Law Serv. Ch. 2023-8 .............................................................6

2023 Fla. Sess. Law Serv. Ch. 2023-120 ................................................9

**Other Authorities**

AO 22-07, Office of the Secretary of State, *Re: DE 22-07 Secure Ballot Intake Stations Placed at Offices of the Supervisor of Elections - §§ 101.69(2)(a), 101.657(1), 98.015(4), Florida Statutes* (Oct. 4, 2022) ...............................................................7, 8

First Amendment ................................................................................62

Fourteenth Amendment ...............................................................2, 62

Fifteenth Amendment .........................................................................2

Florida Senate Bill 32 ........................................................................6

Florida Senate Bill 90 ..................................................1, 20, 25, 26

Florida Senate Bill 524 ......................................................................6

Florida Senate Bill 7050 ...................................................9, 10, 54

Pursuant to this Court's October 17 and November 16, 2023 Orders (ECF Nos. 755 and 760), Plaintiffs in the consolidated cases submit this brief to address open issues following remand from the Eleventh Circuit. Specifically, this brief addresses the challenges brought by Plaintiffs in Case Nos. 4:21-cv-186 ("League of Women Voters Plaintiffs"), 4:21-cv-187 ("NAACP Plaintiffs"), and 4:21-cv-201 ("Florida Rising Together Plaintiffs") to Section 28 of Florida Senate Bill 90 (SB 90) imposing certain restrictions on the use of drop boxes ("Drop Box Provisions") under the *Anderson-Burdick* standard. This brief also addresses the challenge brought by the Florida Rising Together Plaintiffs to Section 7 of SB 90 imposing certain requirements on the activities of third-party voter registration organizations ("3PVROs") concerning the delivery of voter registration applications ("Registration Delivery Provision") (collectively, "Challenged Provisions") under the *Anderson-Burdick* standard.[1] Plaintiffs address these topics because they are the outstanding matters on which the Court requested supplemental briefing. ECF No. 760 at 1.

## **INTRODUCTION**

On remand, the Court will assess the Plaintiffs' challenges to the Drop Box and Registration Delivery Provisions as imposing an undue burden on the right to

---

[1] The League of Women Voters Plaintiffs, the NAACP Plaintiffs, and the Florida Rising Together Plaintiffs all challenge the Drop Box Provisions. The Florida Rising Together Plaintiffs also challenge the Registration Delivery Provision.

vote under the *Anderson-Burdick* standard.[2] Under this inquiry, the relevant question is whether there is a sufficiently weighty state interest to justify the burden imposed on the right to vote, not whether legislators were or were not impermissibly motivated by race in passing those Provisions. *See* ECF No. 665 at 253; *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1319 n.9 (11th Cir. 2019) ("Under *Anderson-Burdick*, it is not necessary for a plaintiff to show discriminatory intent to make out a claim that the state has unconstitutionally burdened the right to vote."); *Jones v. Governor of Fla.*, 15 F.4th 1062, 1066 (11th Cir. 2021) (reiterating same).

The legal standard and relevant evidence when evaluating these provisions under the *Anderson-Burdick* framework is fundamentally different from the standards and evidence used to determine whether the Challenged Provisions were motivated by a racially discriminatory motivation or had a discriminatory impact. When these provisions are evaluated under *Anderson-Burdick*, the focus is on the evidence of burdens on voters generally, or on the subgroups of voters who will be most affected by the Challenged Provisions. The record demonstrates that both of the Challenged Provisions impose severe burdens on the right to vote.

---

[2] When the Eleventh Circuit considered whether it had been proven that the Drop Box and Registration Delivery Provisions violated the Fourteenth and Fifteenth Amendments, the question before the Court was what had been established regarding the legislators' motivation in passing those provisions. Ultimately, the Eleventh Circuit held there was not sufficient evidence to show either provision was passed with discriminatory intent. *League of Women Voters of Fla. Inc. v. Fla. Sec'y of State*, 66 F.4th 905 (11th Cir. 2023) ("*LWV*").

With respect to the Drop Box Provisions, they functionally restrict access to drop boxes during the dates and times when drop boxes are needed most and impose such prohibitive requirements that many Supervisors will not be able to offer them as needed. The reduction of drop box availability severely burdens Plaintiffs' members along with the more than one million Florida voters who have historically relied on drop boxes, including, in particular, low-income voters, voters with disabilities, and voters whose work or family obligations do not permit them to return their ballots during regular business hours. *See infra*, Section I.B. These burdens are not justified by the State's proffered interests for them, which, as Plaintiffs show below, are sometimes not even legitimate state interests and rarely advance the interests they purport to serve. *See infra*, Section I.C.

With respect to the Registration Delivery Provision, it imposes administrative requirements and financial penalties on 3PVROs, severely burdening and limiting the operations of those organizations, and consequently on Black and Latino voters who disproportionately and more heavily rely on 3PVROs to register to vote. *See infra*, Section II.A. These burdens are not justified by the State's proffered interests for them, which, as Plaintiffs show below, were illusory and not supported by the trial evidence. *See infra*, Section II.B.

# BACKGROUND

**A.    SB 90 Amendments**

    1.    <u>The Drop Box Provisions</u>

The Drop Box Provisions of SB 90 include three operative elements. *First*, SB 90 requires that any secure drop box be "monitored *in person* by an employee of the supervisor's office" (the "In-Person Monitoring Requirement"). Fla. Stat. § 101.69(2)(a) (2021) (emphasis added). *Second*, SB 90 limits the operation of drop boxes to the hours and days of early in-person voting, except for drop boxes located at a supervisor's office (the "Hours Restrictions"). *Id.* § 101.69(2)(a). The early voting days and hours are limited: Early voting hours may be no less than eight hours and no more than 12 hours per day, beginning on the tenth day before a statewide or federal election and ending the third day before the election. *Id.* § 101.657(1)(d). Supervisors of Elections have the option to begin early voting on the 15th day before a statewide or federal election and end early voting the second day before an election. *Id.* In other words, the early voting period extends for between eight and 14 days, depending on the Supervisor. *Third*, SB 90 imposes a $25,000 civil penalty on the Supervisor if any drop box is left accessible for ballot receipt during days and times other than those authorized by the statute (the "Enforcement Penalty"). *Id.* § 101.69(3).

2.    The Registration Delivery Provision

The Registration Delivery Provision includes two operative elements. *First*, SB 90 requires that a 3PVRO must deliver completed registration forms to "the supervisor of elections in the county in which the applicant resides." Fla. Stat. § 97.0575(5)(a). Prior law allowed a 3PVRO to return completed voter registration forms to any Supervisor of Elections. *Second*, SB 90 required that a 3PVRO must deliver the completed form "within 14 days after the application was completed by the applicant, but not after registration closes for the next ensuing election." Fla. Stat. § 97.0575(3)(a) (2021).[3] Prior law required only that completed registration forms be delivered "promptly." Florida law previously provided that a 3PVRO would be subject to fines up to an aggregate of $1,000 in a calendar year for failing to promptly deliver registration applications. *See id.* § 97.0575(3)(a)(1)-(3) (2021).

**B.    Subsequent Amendments to Challenged Provisions**

Pursuant to the Court's November 16, 2023 Order (ECF No. 760), this Section outlines amendments to the Challenged Provisions since the Court's March 31, 2022 decision (ECF No. 665).

---

[3] As discussed below, subsequent legislation has shortened this to 10 days.  Fla. Stat. § 97.0575(5)(a).

1.   Drop Box Provisions

After the record closed in this case, the Florida Legislature passed Senate Bill 524 ("SB 524") in March 2022, which significantly changed Fla. Stat. § 101.69 by further restricting where Supervisors may offer drop boxes outside of early voting hours. *See* 2022 Fla. Sess. Law Serv. Ch. 2022-73 (SB 524).[4]

Under SB 90 as enacted, drop boxes were permitted outside of early voting hours only at the "office of the Supervisor." Fla. Stat. § 101.69(2)(a). Supervisors generally interpreted this to mean the "main office of the supervisor" or "permanent branch office of the supervisor." But the statute did not define what it meant for a branch office to be permanent. At trial, Broward County Supervisor Joe Scott testified that he intended to open six additional branch offices that he would lease year-round specifically so that he could offer more than two drop boxes outside of early voting hours for his county of two million people. *See* Tr. Day 4, 1159:11-23, 1202:4-12.

One month after the trial, the Legislature adopted SB 524, amending Fla. Stat. § 101.69 to define "permanent branch office" as an office that "meets the criteria set

---

[4] The Legislature also made two non-substantive changes to the drop box regulations since trial. First, SB 524 renamed drop boxes to "ballot intake stations." which Plaintiffs understand to have no substantive effect. Second, in 2023, Senate Bill 32 made a purely stylistic change that has no substantive effect. *See* 2023 Fla. Sess. Law Serv. Ch. 2023-8 (SB 32) (inserting the word "which" and substituting "minimum number" for "minimum amount").

forth in s. 101.657(1)(a) for branch offices used for early voting and is open for at least the minimum amount of hours prescribed by s. 98.015(4)." SB 524 § 22 (2022) (amending Fla. Stat. § 101.69(2)(a) (2021)). Under existing law, Section 101.657(1)(a) requires a branch office to be a permanent facility of the Supervisor for "at least 1 year prior to the election" to be used for voting purposes. And Section 98.015(4) requires that a Supervisor's office be "open Monday through Friday, excluding legal holidays, for a period of not less than 8 hours per day, beginning no later than 9 a.m."

In October 2022, the Secretary of State issued an advisory opinion to Supervisor Scott advising that the combined effect of SB 90 and SB 524 means that drop boxes may be provided outside of early voting hours "at the office of the supervisor" if, and only if, that office constitutes the main office of the Supervisor or a "permanent branch office" as defined by SB 524—that is, an office that is designated as a permanent facility a year in advance of the election and is open every business day for at least eight hours. *See* Letter from the Office of the Secretary of State, *Re: DE 22-07 Secure Ballot Intake Stations Placed at Offices of the Supervisor of Elections — §§ 101.69(2)(a), 101.657(1), 98.015(4), Florida Statutes* (Oct. 4, 2022) ("AO 22-07").[5] In other words, Supervisor Scott cannot offer drop boxes

---

[5] The Secretary's advisory opinion can be found at https://files.floridados.gov/media/705938/de-22-07-final-broward-ao-final-opinion-plus-attach-signed.pdf.

outside of early voting hours and days at any of the six locations where he had intended to open permanent branch offices because they would not be staffed and open every business day for eight hours each day. *See id.* at 8.

Ultimately, if the Drop Box Provisions remain in force, the additional restriction imposed by SB 524 will make it prohibitively expensive to offer drop boxes outside of early voting hours because it will require Supervisors to expend exorbitant resources to staff permanent branch offices year-round. Indeed, not even Supervisor Scott, with one of the state's largest budgets for a Supervisor's office, is likely to have the resources to meet such a requirement. *See* Tr. Day 4, 1159:7-1160:15; AO 22-07 at 8. SB 524 thus eliminates one method that Supervisors planned to utilize to offer additional drop boxes outside of early voting hours under SB 90, and increases burdens on all voters who rely on drop boxes.

If the Court grants Plaintiffs the relief they seek in their challenge to SB 90's Drop Box Provisions, the new restrictive language imposed by SB 524 would have only a limited impact because Supervisors could again be permitted to place drop boxes at eligible early voting locations, even outside of early voting days and hours. *See* Fla. Stat. § 101.69(2) (2020); *see also* ECF No. 649 at 136-37. Indeed, prior to the passage of SB 90, several Supervisors took advantage of that authority. *See* Tr. Day 10, 2811:20-2812:17 (Florida Director of Elections Maria Matthews testifying that "some Supervisors did offer drop boxes other than at their offices outside of

early voting days and hours during the 2020 election"). They could do so again if the Court invalidates the Drop Box Provisions, as SB 524 does not alter the rules for drop boxes at eligible early voting locations.

2.   <u>Registration Delivery Provision Amendments</u>

Since the March 31, 2022 decision, there have been two material amendments to the Registration Delivery Provision. *First*, Senate Bill 7050 (SB 7050) Section 4 (enacted in May 2023) reduces the time period for a 3PVRO to deliver completed registration forms to the Supervisor of Elections from 14 days to 10 days. *See* 2023 Fla. Sess. Law Serv. Ch. 2023-120 (SB 7050) (modifying Fla. Stat. § 97.0575(5)(a)).

*Second*, the fine structure for a violation has been significantly revised in two respects. While SB 90 included a statutory annual cap of $1,000 on the amount a 3PVRO can be fined for late or improper delivery, SB 7050 increased that cap to *$250,000* annually. *See* Fla. Stat. § 97.0575(5)(a).[6] Relatedly, while SB 90 provided maximum fines of $50 for an application delivered to a Supervisor of Elections more than 14 days, but before book closing, $100 for an application delivered to a Supervisor of Elections more than 14 days after completion, but after book closing, and $500 for any application not delivered, the fines for each late-delivered

---

[6] SB 524 (passed by the Legislature in March 2022) increased the annual cap on fines to $50,000. *See* 2022 Fla. Sess. Law Serv. Ch. 2022-73, § 7 (modifying Fla. Stat. § 97.0575(3)(a)).

application are now assessed for each day late ($50 or $100 *per day* late, up to $5,000 per late-delivered application). *Id.* § 97.0575(5)(a)(1) & (a)(2).

If the Court grants the relief sought concerning SB 90's Registration Delivery Provision, it should also grant relief as to the relevant provisions of SB 7050, both of which exacerbate the severe burdens imposed by the Registration Delivery Provision.

## LEGAL STANDARD

Under the *Anderson-Burdick* test, a court evaluating a claim that a state law burdens the right to vote must undertake a two-step process. At the first step, a court considers whether and to what extent a challenged law burdens the right to vote. *See Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983). A law may impose minimal burdens, serious or significant burdens, or severe burdens. Under controlling Supreme Court authority, *Anderson-Burdick* requires consideration of whether a statute "imposes 'excessively burdensome requirements' on *any class of voters*." *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 202 (2008) (controlling op.) (quoting *Storer v. Brown*, 415 U.S. 724, 738 (1974)) (emphasis added); *see also Democratic Exec. Comm. Of Fla.*, 915 F.3d at 1319 (evaluating the "burden . . . on vote-by-mail and provisional voters' fundamental right to vote"). In *Crawford*, for example, the "relevant" burdens were "those imposed on persons who are eligible to vote but do not possess a current photo identification," and the Court explained

that "[t]he fact that most voters already possess a valid driver's license . . . would not save the statute" if its burdens on voters who lack photo identification were not justified by the relevant state interests. 553 U.S. at 198 (controlling op.); *see also id.* at 199; *id.* at 212-14 (Souter, J., dissenting) (similar); *id.* at 239 (Breyer, J., dissenting) (similar). The Eleventh Circuit has applied *Anderson-Burdick* this way as well. *See Democratic Exec. Comm.*, 915 F.3d at 1319.

Once a court determines the character and magnitude of the burden, the court moves on to step two: considering the strength of the state interests and whether they justify the burden at issue. The standard that the state must meet varies depending on the magnitude of the burden that the law imposes on the relevant class or classes of voters. If the burden imposed is severe, the law is subject to strict scrutiny. *Norman v. Reed*, 502 U.S. 279, 288-89 (1992); *see also Democratic Exec. Comm.*, 915 F.3d at 1318 ("A law that severely burdens the right to vote must be narrowly drawn to serve a compelling state interest."). Burdens that are less than severe are subject to a sliding scale under which the court must "identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule," and, in so doing, consider both the "*legitimacy* and *strength* of each of those interests." *Anderson*, 460 U.S. at 789 (1983) (emphases added). "In passing judgment," the court "also must consider the extent to which those interests make it necessary to burden the plaintiff's rights." *Id.*

11

No matter how slight the burden, it must be justified by state "interest[s] *sufficiently weighty* to justify the limitation." *Crawford*, 553 U.S. at 191 (controlling op.) (quoting *Norman*, 502 U.S. at 288-89) (emphasis added). Some courts have conceived of this requirement as one of "fit," under which the law must actually advance the state interests in question. *See, e.g.*, *Soltysik v. Padilla*, 910 F.3d 438, 448 (9th Cir. 2018). Under no circumstances are burdens on the right to vote evaluated under the rational basis standard used in challenges to certain other kinds of laws, which simply asks if the law is rationally related to the state's purported interest. *See Democratic Exec. Comm.*, 915 F.3d at 1318-19; *Common Cause/Ga. v. Billups*, 554 F.3d 1340, 1352-55 (11th Cir. 2009) (distinguishing the *Anderson-Burdick* standard from rational basis review).

In *Anderson-Burdick* cases, "[t]he existence of a state interest . . . is a matter of proof." *Duke v. Cleland*, 5 F.3d 1399, 1405 n.6 (11th Cir. 1993). It is not enough for state officials to assert in briefing that a law is justified — they must offer "record . . . evidence as to the state's interests in promulgating" the challenged law. *Id.* at 1405. As other circuits have explained, courts need not accept a state's justifications at face value, particularly where those justifications are "speculative"; otherwise it "would convert *Anderson-Burdick*[] . . . into ordinary rational-basis review wherever the burden a challenged regulation imposes is less than severe." *Soltysik*, 910 F.3d

at 448-49 (citing *Pub. Integrity All.*, *Inc. v. City of Tucson*, 836 F.3d 1019, 1024-25 (9th Cir. 2016) (en banc)).

## ARGUMENT

## I.   THE DROP BOX PROVISIONS SEVERELY BURDEN FLORIDA VOTERS' RIGHT TO VOTE AND ARE NOT ADEQUATELY SUPPORTED BY A STATE INTEREST

SB 90's Drop Box Provisions have and will continue to significantly reduce drop box availability for voters in Florida and therefore have and will continue to severely burden the right to vote. Tr. Day 8, 2158:25-2159:15 (Dr. Herron explaining "[a]ny restrictions on drop box voting [will] affect" the 1.3 million voters who cast their vote-by-mail ballot via drop box in 2020). Although this reduction in drop box availability will burden the right to vote for all Florida voters who rely on drop boxes, it will especially burden voters like Plaintiffs' members whose work and family responsibilities may not permit them to vote or return their ballot during early voting hours, as well as voters with disabilities. At trial, Defendants asserted four interests as justifications for the Drop Box Provisions: (1) to ensure that drop boxes are secure; (2) to ensure that the law is uniformly applied; (3) to assist voters; and (4) to increase voter confidence.

For the reasons explained below, the burdens imposed by the Drop Box Provisions are so significant that the Court should consider them severe and apply strict scrutiny to these provisions. However, in the alternative, even if the burdens

were not so severe as to justify strict scrutiny, under the sliding scale a weighty interest is required, and not one of the aforementioned four state interests is sufficiently weighty to justify the burdens that the Drop Box Provisions impose on the right to vote.

## A.    Prior Drop Box Usage in Florida

The record showed that drop boxes have been widely used by Florida voters for over a decade. Drop boxes offer a secure, convenient alternative to voting in person or mail-in voting and remain an essential alternative for voters who cannot access in-person voting on Election Day or early voting during regular business hours.

Since drop boxes' first adoption in 2008, counties throughout Florida provided drop boxes for voters to return their VBM ballots. *See* Tr. Day 6, 1745:18-24 (Kousser); ECF No. 549-3 at 35:14-17 (Latimer); Tr. Day 1, 77:4-7 (Scoon). In 2020, there were over 480 drop boxes throughout the state, with approximately 65 drop boxes across 48 counties available 24 hours per day. Tr. Day 8, 2290:23-2291:13 (Herron); Tr. Day 9, 2453:17-2454:25 (Smith); *see also* ECF No. 467-1 at Table 24 (Herron Rpt.). Many counties made drop boxes available that were monitored only via video surveillance. Tr. Day 8, 2251:2-4, 2291:7-13 (Herron); Ex. 7, ECF No. 608-6 ¶¶ 138-39 (Smith Rpt.).

In many cases, Supervisors made drop boxes available from the first day VBM ballots were mailed to voters through election night. *See, e.g.*, ECF No. 549-2 at 65:4-18 (Hays); Ex. 234, ECF No. 608-61 at 4 (Palm Beach Cnty. Supervisor Wendy Link offered four 24-hour drop boxes from September 19, 2020 through November 3, 2020). Further, several counties made drop boxes available outside of early voting hours. Tr. Day 10, 2812:11-17 (Matthews). For example, Miami-Dade County offered drop boxes on the Monday before Election Day and on Election Day itself, including at locations other than the Supervisor's offices. Tr. Day 5, 1366:18-1367:1 (White). According to Supervisor Christina White, "thousands of people deliver their [vote-by-mail] ballots in those final days" before an election. *Id.* at 1370:1-7.

Drop boxes were exceedingly popular with Florida voters: In 2020, at least 1.3 million ballots were cast via drop box. Tr. Day 8, 2158:25-2159:8 (Dr. Herron explaining "[t]hat's approximately 31 percent of all vote-by-mail ballots in the 46 counties for which I have data"); *id.*, 2410:22-2411:3 (Smith); *see also* Tr. Day 9, 2616:3-7 (Leon Cnty. Supervisor Mark Earley testifying that voters "love the ability to use [drop boxes] as a method for returning a vote by mail ballot"); ECF No. 549-3 at 104:21-105:4 (Hillsborough Cnty. Supervisor Craig Latimer testifying that nearly half of voters who used VBM in Hillsborough County used drop boxes); Ex. 234, ECF No. 608-61 at 3 (Supervisor Link explaining her "office received an overwhelming amount of positive feedback from voters who used our secure drop

boxes"). This was also true for 24-hour drop boxes. Lee County Supervisor Thomas Doyle, for example, testified that for "[o]ne weekend during the 2020 election [Lee County] had an overnight drop box" that was "very full" just two days after it was made available. Tr. Day 12, 3203:3-5, 3203:21-22.

Drop boxes have the additional benefit of being a safe and secure method for returning vote-by-mail ballots. Voters are "guaranteed on-time delivery" when they deposit their ballot into a drop box. Tr. Day 8, 2247:3-9, 2248:13-18 (Herron); *see also* ECF No. 549-2 at 79:14-21 (Hays) ("If a vote-by-mail ballot is placed in a drop box on the day before election day, that ballot will be counted."). That is not the case for ballots placed in the mail. *See* Tr. Day 8, 2247:16-22 (Dr. Herron testifying, "[A] vote-by-mail ballot in the mail is subject to Postal Service delivery schedules, and I would say there are two points here: One is . . . that the voter can no longer control delivery because the Postal Service has the ballot; and, in addition, [the] Postal Service can be late, and so there is a risk of a late ballot anytime you put a ballot in the postal system"); *see also* ECF No. 549-2 at 79:14-21 (Lake County Supervisor Alan Hays testifying that he cannot be sure that "a vote-by-mail ballot that is placed in a mailbox on the day before election day will be counted."); Tr. Day 4, 1202:22-1203:10 (Supervisor Scott testifying he would not recommend that a voter place their ballot in the mail on the day before Election Day or on Election Day: "[t]he only

way to know that the ballot is going to reach us those last two days would be to deposit it in a drop box.").

Specifically, as Plaintiff Scoon explained, drop boxes are often utilized by voters who "have obligations during the day that make it really difficult [to vote] during regular business hours," such as work or family responsibilities. Tr. Day 1, 71:6-12. For these voters, voting in-person on Election Day is not always a feasible option, especially given the persistence of excessively long lines. *See, e.g.*, Tr. Day 5, 1371:20-1372:4 (Supervisor White testifying that Miami-Dade has historically faced "very long lines to vote in person," with voters "waiting for many hours to vote in some instances"); Tr. Day 7, 1917:14-1918:6 (Rep. Anna Eskamani testifying that "long lines have continued to be very common, especially in major election cycles.").

Many voters in Florida work in the hospitality and service industries where they have little flexibility in their schedules and often work second and third shifts. As Frederick Vélez Burgos of the Hispanic Federation explained, many Florida voters "have odd hours in terms of work. They have late hours. They work, for example, in the airport industry or they work in the service industry at Disney at night in hotels. We also have a lot of people that have two jobs." Tr. Day 3, 735:17-736:3. Because of their nontraditional hours, "a lot of people [ ] would actually vote at night on their way . . . to work, or sometimes they are coming back from work in

17

the morning and they are able to drop off the ballot." *Id.* Similarly, Representative Carlos Guillermo Smith explained that many within his working-class constituency "work in the hospitality industry [and] due to low wages and low benefits, they have multiple jobs, and they work weeknights; they work weekends." Tr. Day 7, 1877:23-1878:11. This is also the case for many voters in Indian River County's rural migrant-farm community, who often work 12-hour shifts, five to seven days per week. Tr. Day 2, 527:2-16 (Brown); *see also* Tr. Day 9, 2476:14-25 (Dr. Smith) (explaining that "[t]here are a lot of migrant farm workers [in Indian River County]. And I suspect there are a lot of people who have difficulty dropping off a ballot during normal business hours.").

Many voters who have rigid work schedules also rely on 24-hour drop boxes to return their ballot. As Cliff Albright, Executive Director of Black Voters Matter, explained, after-hour drop box access is crucial for voters who work shift jobs and may not have the ability to access a drop box during business hours. Tr. Day 7, 1994:18-1995:13; *see also* Tr. Day 1, 216:20-217:5 (Esteban Garces of Poder Latinx testifying that for many voters who work for Disney, Universal, and the airport and work late hours, having a drop box available 24/7 allows them to deliver their ballot when they get off from work — sometimes at 3 a.m.).

**B.     The Drop Box Provisions Severely Burden the Right to Vote**

SB 90's restrictions on drop boxes have led to significant reductions in drop box hours and locations, severely burdening the right to vote for the over 1.3 million voters who voted via drop box in 2020. Tr. Day 8, 2158:25-2159:15 (Herron). And the restrictions will disproportionately and even more severely burden low-income voters and voters with disabilities.

**1.     The In-Person Monitoring Requirement Severely Burdens the Right to Vote**

The In-Person Monitoring Requirement severely burdens the right to vote by imposing such prohibitively expensive requirements on drop boxes that Supervisors can no longer offer them, functionally restricting their availability, and by chilling voter turnout at drop boxes.

**a.     The In-Person Monitoring Requirement Reduces Drop Box Availability**

SB 90's In-Person Monitoring Requirement has had and will continue to have a chilling effect on many Supervisors who would otherwise exercise their discretion to make drop boxes widely available. Many Supervisors testified during trial that because of the additional resources needed to ensure continuous drop box supervision, they are forced to limit the hours of drop box availability or eliminate drop box locations altogether to avoid the risk of being fined $25,000 for leaving a drop box unattended. These changes severely burden voting rights for over one million Floridians.

For example, in Broward County, Supervisor Scott testified that his drop boxes "would have to be [staffed by] at least two people at all times because we have to be prepared for somebody to go and, you know, relieve themselves if they need to." Tr. Day 4, 1204:18-1205:22. Similarly, Supervisor Earley of Leon County testified that "in many instances" he has to staff two employees at each drop box "because Senate Bill 90 requires—well, penalizes Supervisors potentially [with] a $25,000 fine, which is just unbelievable, if we don't maintain that continuous monitoring or staffing of the drop box." Tr. Day 9, 2660:1-11. To staff these drop boxes, Supervisors must expend significant resources or risk penalties, which enhances the risk that they choose to reduce the number of drop boxes or choose not to offer them altogether. *See, e.g.*, Tr. Day 13, 3500:24-3501:2 (Supervisor Earley explaining "there's some talk from Supervisors about potentially getting rid of those drop boxes because it's just not worth the threat [of penalties] to them. It's kind of unprecedented from our perspective.").

Because of the requirement that drop boxes be continuously physically monitored, many Supervisors across Florida — in large and small, rural and urban counties — will no longer offer 24-hour drop boxes. *See* Tr. Day 8, 2291:14-20, 2292:14-17 (Herron). For example, Supervisor Link testified that Palm Beach County will no longer make drop boxes available 24 hours a day at her main offices because of the expense required to do so by SB 90's Drop Box Provisions. Ex. 234,

ECF No. 608-61 at 6; *see also* Ex. 221, ECF No. 549-3 at 119:4-20 (Supervisor Latimer explaining that he does not plan to offer a 24-7 drop box because of the cost to "have somebody physically monitor it" as now required by SB 90). For many smaller counties, too, 24-hour monitoring of drop boxes is simply not financially feasible. For example, Bradford County Supervisor Amanda Seyfang explained that "I could not give up one of my staff members to just sit at our drop box all day long, nor could I afford with my budget to hire another staff member just to do that." Ex. 214, ECF No. 608-49 at 5. "There's no way a county my size could afford it." *Id.* As discussed further *infra*, Section I.B.3., the loss of 24-hour drop boxes as a result of SB 90's In-Person Monitoring Requirement, in combination with its Hours Restrictions, would impose a severe burden on Florida voters.

### b. The In-Person Monitoring Requirement Threatens to Intimidate Voters and Chill Voter Turnout

Drop box monitoring also threatens to have a chilling effect for many voters who view this form of monitoring as an uncomfortable and, in some cases, intimidating experience. This is particularly true of Black or Hispanic voters, many of whom have experienced mistreatment and harassment from government officials, including while attempting to exercise their right to vote. As Mr. Vélez Burgos of the Hispanic Federation testified, "[Y]ou're asking voters to go up to a ballot box with someone that's there standing and looking at them, and to some voters that might look like voter intimidation, especially when we're talking about Latino

communities. You're talking about people that will probably be wearing some type of security outfit just in front of the mailbox, and I think that can be a dissuasion." Tr. Day 3, 821:24-822:6; *see also* Tr. Day 7, 1997:20-21 (Mr. Albright of Black Voters Matter testifying that in-person monitoring will have a "chilling effect" on Black voters); Tr. Day 1, 79:2-7 (Ms. Scoon testifying that the drop box monitoring will make voters feel "unwelcomed and intimidated and uncomfortable"); Tr. Day 7, 2049:13 (Ms. Andrea Cristina Mercado, Executive Director of Florida Rising Together, testifying that "some member[s] have expressed some frustration and dismay [with the Drop Box Provisions]").

The In-Person Monitoring Requirement also threatens to intimidate voters with mental health issues, such as severe anxiety. Ms. Zukeran, a disabled Floridian voter with anxiety, Post-Traumatic Stress Disorder, and Major Depression, testified that using a drop box monitored by a person was "anxiety-provoking," and that she does not believe that she would have the same issue with a drop box monitored by video. *See* Tr. Day 7, 2097:12-2098:12, 2099:6-8. Other voters are also likely to find the experience troubling. *See, e.g.*, Tr. Day 3, 698:1-7 (Plaintiff Madison describing the experience of handing his VBM ballot to a staffer as "[d]isconcerting. I felt uncomfortable handing my ballot to someone else . . . . [E]ven during [in-person voting] when you go in, nobody takes your ballot once you fill it out; you put it

yourself in a machine."); Tr. Day 5, 1626:23-1627:4 (Sauers); Tr. Day 7, 2048:22-2049:9 (Mercado).

### 2.   The Hours Restrictions Severely Burden the Right to Vote

The Hours Restrictions sharply restrict where drop boxes may be offered outside of early voting days and hours, including on the day before and on Election Day itself. At trial, Plaintiffs demonstrated that these restrictions, in combination with the In-Person Monitoring Requirement, will significantly reduce the availability of drop boxes. Indeed, Dr. Smith calculated that the Drop Box Provisions would reduce availability of at least one in four drop boxes, totaling 40,000 fewer hours of availability statewide, compared to the 2020 general election. Tr. Day 9, 2454:20-2455:11; *id.*, 2458:19-2459:13 (Smith); Ex. 7, ECF No. 608-6 ¶¶ 125, 127-30 (Smith Rpt.). This decrease in drop box availability will severely burden the right to vote for Plaintiffs' members and thousands of Floridians, especially (1) voters who rely on drop boxes to cast their ballots *before* early voting, (2) voters who rely on drop boxes to cast their ballots in the last week before the election when it is too late to mail a ballot, and (3) voters who lack flexibility in their schedules and therefore rely on returning their ballot outside of traditional business hours, including at 24-hour drop boxes.

a.  **The Hours Restrictions Severely Burden Voters Who Rely on Casting Their Ballots via Drop Box Prior to the Start of Early Voting**

In the 2020 general election, Dr. Herron found, an estimated 21 percent of ballots (over 109,000 ballots) returned to drop boxes were cast before early voting began. Ex. 5, ECF No. 608-1 at 70, Table 22 (Herron Rpt.); *see also* Tr. Day 8, 2287:2-24 (Dr. Herron noting that "[t]he true number is of course larger than that, and that's because I only have data on [27] counties"). In certain counties, ballots cast in drop boxes outside of early voting days accounted for between 38.5% and 72% of ballots cast in drop boxes. *See* Ex. 7, ECF No. 608-6 ¶¶ 146, 160, 164, 167, 178, 186, 189, 192, 195, 198 (Smith Rpt.); *see also* Tr. Day 9, 2466:6-2469:1 (Smith); Ex. 5, ECF No. 608-1 at 70, Table 22 (Herron Rpt.).

According to Dr. Smith's analysis, at least 57 drop boxes that were available during the 2020 election, and that accounted for over 11,000 hours of drop box availability, are no longer permitted under SB 90 because they were accessible at non-SOE locations outside of early in-person voting. Tr. Day 9, 2455:17-19 (Smith); Ex. 7, ECF No. 608-6 ¶¶ 130-31 (Smith Rpt.); *see also id.* ¶ 182.

b.  **The Hours Restrictions Severely Burden Voters Who Rely on Casting Their Ballots in the Days Immediately Prior to the Election or on Election Day**

The Hour Restrictions severely burden nearly any voter who votes by drop box. *See* Tr. Day 8, 2158:25-2159:10 (Herron). But voters who rely on drop boxes

24

to cast their ballots the last week before the election when it is too late to mail a ballot will be disproportionately burdened. *Id.* at 2285:13-25 (Herron). For example, in the 2020 general election, Miami Dade County offered four drop boxes on the Monday before and on Election Day — two at the Supervisor's offices and two in other parts of the county. Tr. Day 5, 1366:5-1367:8 (White). As a result of SB 90, however, Supervisor White testified she would no longer be able to offer drop boxes on those days at any location that is not a permanent Supervisor office. Therefore, Supervisor White testified that Miami-Dade County will have two fewer drop boxes on the Monday before and on Election Day. *Id.* 1367:9-12. Miami-Dade is the most populous county in Florida with 1.5 million registered voters. Ex. 5, ECF No. 608-1 at ¶ 195 (Herron Rpt.). Given its size, the "ratio of voters to potential drop box location[s] is high" and VBM voters in Miami-Dade are "particularly burdened" by SB 90's drop box restrictions, Tr. Day 8, 2289:18-20, 2290:5-11 (Herron), as they will mean more voters will need to travel greater distances to access an available drop box.

Miami-Dade County is not alone in this regard; as the record demonstrated, other counties will struggle to offer drop boxes on the day before Election Day or on Election Day itself at more than one or two locations (if at all). *See supra* Background B.1. (Broward County will not be able to offer more than two locations, which is insufficient for a county of more than two million people); *see also* Tr. Day

25

4, 1251:23-1252:1 (Supervisor Scott explaining, "I would have gone for 40 drop boxes if it weren't for Senate Bill 90.").

With fewer drop boxes available during the days immediately prior to Election Day, many voters will be forced to rely on the U.S. Postal Service and risk their ballots not being delivered in time to be counted. Voting on Election Day is not always a viable alternative, given the persistence of excessively long lines and the inability of some workers to obtain time off from work. *See supra* Section I.A.; Tr. Day 5, 1371:20-1372:5 (White); Tr. Day 5, 1371:20-1372:5 (White); Tr. Day 7, 1917:14-1918:6 (Rep. Eskamani); Tr. Day 6, 1786:13-1787:2 (Herron).

The last day to request a VBM ballot is the twelfth day before an election, and the deadline for the Supervisor to mail VBM ballots is ten days before an election. Fla. Stat. § 101.62(3)(c). Florida law requires that all VBM ballots be received by 7 p.m. on Election Day to be counted. *Id.* § 101.6103(2) (2021). U.S. Postal Service guidelines state that ballots should be placed in the mail at least one week before Election Day. In practice, "[a]ny voter who received a ballot within a week of an election, even if the voter were to turn around and fill it out immediately, could not return the ballot via mail and still be compliant with Postal Service guidelines." Tr. Day 8, 2248:3-9 (Herron). Similarly, "[i]f a voter has a vote-by-mail ballot and chooses to wait to vote until close to election day in order to gain information about

the candidates and other issues on the election," that voter could not place the ballot in the mail and still comply with U.S. Postal Service guidelines. *Id.* 2248:13-18.

Illustrative of this, in 2020, approximately 29% of all drop box submissions (over 150,000 ballots) were cast within a week of Election Day. *Id.* 2287:2-24 (Herron). If voters were to mail their ballot during that last week before Election Day, there is a substantial risk it would not be received in time to be counted. *See* Ex. 5, ECF No. 608-1 at 66 (Herron Rpt.). The U.S. Postal Service's delivery of vote-by-mail ballots after Election Day is an ongoing problem that Supervisors recognize. Supervisor Earley, for example, testified that there are "a lot of failure points" with the U.S. Postal Service. Tr. Day 9, 2655:23-2656:5, 2659:17-20. Even in 2020, Supervisor Earley's office would receive ballots from the U.S. Postal Service that were from the *2018* general election. *Id*. In Leon County, the most common reason a ballot is rejected is because it arrives too late to be counted. *Id*., 2659:13-16. In fact, in "[e]very election [in Florida] there are thousands of ballots" that are rejected for arriving after 7 p.m. on Election Day. Tr. Day 8, 2249:2-6 (Herron); *see also* Ex. 7, ECF No. 608-6 at ¶ 135 (Smith Rpt.) ("Scholars have shown that thousands of late [vote-by-mail] ballots are rejected by [Supervisors] because they arrive in the mail after the state's deadline, including in Florida."). This is especially true for minority voters — studies show "[r]ejected VBM ballots are disproportionately higher among minority voters than white voters in Florida." *Id*.

Because of the valid concern about late delivery, Supervisor Earley "would much rather have a vote-by-mail ballot put in one of our drop boxes than in the U.S. Mail system." Tr. Day 9, 2655:23-2656:5; *see also* Ex. 2, ECF No. 549-2 at 97:2-18 (Supervisor Hays explaining that "the U.S. Postal Service is notorious for tardy deliveries."); *id*. at 103:18-104:1 ("It would be my opinion that the USPS box is subjecting those ballots to an unnecessary chance of being misplaced or disfigured or destroyed or lost or anything else that would preclude those votes from being counted."). Similarly, Supervisor White testified: "[A]s of Thursday, Friday [before election day], we are telling [voters] it's not worth the risk [of mailing their ballot] and to bring it in." Tr. Day 5, 1369:14-22.

Even voters who follow U.S. Postal Service Guidelines risk their ballot arriving late due to issues with the Postal Service. Tr. Day 8, 2250:2-19 (Herron). Additionally, many voters are simply not willing to risk placing their ballot in the mail given their negative experiences with the U.S. Postal Service. *See, e.g.*, Tr. Day 5, 1603:10-20 (Dr. Brigham testifying he uses drop boxes because of issues he has had with his mail, including having "mailed in my property tax and it [] never got there"); Tr. Day 3, 700:15-19 (Mr. Madison testifying to his poor experiences with the mail, including having "things that I've mailed to others including a thousand dollar bond go missing. I've had packages and letters delivered to me that belong to other people. So I don't trust the Postal Service like I used to."); Tr. Day 1, 84:8-

85:11 (Ms. Scoon testifying she has "a lot of concern to use the Postal Service. I'm not comfortable putting my ballot in the mail . . . ."). This mistrust of the mail is especially true for Black voters. As Dr. Smith testified, "[W]e know that African-Americans are more distrustful of the U.S. Postal Service, and there's good reason here in Florida to understand why with respect to mail delivery rates and the timing that the U.S. Postal Service suggests — takes to both request and deliver mail" especially when "you, yourself, may not regularly be getting your mail through the U.S. Postal Service." Tr. Day 8, 2412:14-2413:8.

### 3. The Drop Box Provisions Collectively Impose a Severe Burden on Many Voters Who Have Difficulty Voting During Ordinary Business Hours

The Hours Restrictions, together with the In-Person Monitoring Requirement, have and will continue to reduce the use of 24-hour drop boxes. This reduction will disproportionately and severely burden voters who lack flexibility in their schedules and have difficulty accessing voting during regular business hours.

Many Supervisors across Florida — in large and small, rural and urban counties — stated that they will no longer offer 24-hour drop boxes due to SB 90's Drop Box Provisions. *See* Tr. Day 8, 2291:14-20, 2292:14-17 (Herron); Tr. Day 13, 3500:24-3501:2 (Supervisor Earley explaining "there's some talk from Supervisors about potentially getting rid of those drop boxes because it's just not worth the threat to them. It's kind of unprecedented from our perspective."); ECF No. 549-3 at 119:4-

20 (Supervisor Latimer explaining that he does not plan to offer a 24/7 drop box in 2022 because of the cost to "have somebody physically monitor it" as now required by SB 90). The Florida Supervisors of Elections' discovery responses confirmed this concern. According to Dr. Smith's analysis, 60% of counties that previously offered 24/7 drop boxes prior to SB 90's passage stated they will no longer offer them, whereas only four counties committed to maintaining their 24/7 drop boxes. Ex. 7, ECF No. 608-6 ¶ 132 (Smith Rpt.). Dr. Smith also estimated that at least 65 around-the-clock ("24/7") drop boxes that were available to voters during the 2020 General Election and were not continuously monitored were jeopardized by the Drop Box Provisions. *See id.* ¶¶ 127-29; Tr. Day 9, 2455:12-16, 2472:4-24, 2476:14-2478:3 (Smith); Tr. Day 8, 2291:1-6 (Herron); Ex. 5, ECF No. 608-1 ¶ 210 (Herron Rpt.). Similarly, Dr. Herron determined the 41 counties that previously had offered 24-hour drop boxes indicated that they would no longer do so after SB 90's passage. *Id.* ¶ 211.

These reductions threaten to burden nearly any voter who voted by drop box in 2020 — or who would use a drop box to vote in the future. *See* Tr. Day 8, 2158:25-2159:15 (Herron). For voters who lack flexibility in their schedules due to work or family obligations, the reduction of 24-hour drop boxes "means that individuals who might want to use a drop box at a point that is no longer permitted by SB 90 will be burdened, and they will be disproportionately burdened compared to the regular drop

box users." Tr. Day 8, 2294:9-17 (Herron); Tr. Day 7, 2049:4-7 (Ms. Mercado of Florida Rising Together explaining restrictions on drop box hours impacts their members because they can no longer "drop off [their ballot] after their third shift at work."); *see also* ECF No. 549-3 at 111:16-112:3 (Supervisor Latimer recognizing that the Drop Box Provisions "make [returning VBM ballots] harder because it starts to limit the hours that you can have drop boxes available to just the early voting hours instead of outside those hours"); *supra* Section I.A.1. For example, Mr. Madison, who lives in Indian River County, testified that he votes by mail using a drop box because his father-in-law has extensive health issues and Mr. Madison travels to care for him regularly, often with no advance notice. Tr. Day 3, 695:13-24, 695:25-696:5, 696:9-18. During the 2020 general election, Mr. Madison deposited his ballot in the 24-hour drop box at the Supervisor's office before the office opened. In his county's 2021 local election, which took place after SB 90, the 24-hour drop box was no longer available and he had to wait for the office to open before he could deliver his ballot. *Id.* 699:6-15; Ex. 911, ECF No. 464-43. Because of the change in drop box hours, if Mr. Madison had a family emergency, his ability to cast his ballot would be impacted. Tr. Day 3, 699:6-15.

### 4. The Drop Box Provisions Will Severely Burden Voters with Disabilities

Voters with disabilities, for whom casting an in-person ballot during early voting or in-person on Election Day remains difficult (e.g., because of difficulty

seeing, walking, or dressing), have and will continue to be particularly affected by the Drop Box Provisions, which further compound the many ongoing accessibility burdens voters with disabilities continue to face in utilizing VBM ballots despite longstanding accessibility requirements under Fla. Stat. § 101.662. Ex. 10, ECF No. 608-16 ¶ 28 (Cooper Rpt.); Tr. Day 2, 622:19-22 (Cooper); Tr. Day 7, 2095:3-2097:3 (Zukeran); Tr. Day 10, 2742:25-2743:7 (Babis). In particular, the Drop Box Provisions have led some Supervisors to eliminate outdoor drop boxes outside their offices. ECF No. 549-2 at 90:9-21, 91:7-12 (Hays); *see also* Ex. 633, ECF No. 463-31 at 2 (Baird, Citrus Cnty.); Ex. 625, ECF No. 463-23 at 3 (Andersen, Bay Cnty.); Ex. 634, ECF No. 463-32 at 4 (Chambliss, Clay Cnty.); Ex. 660, ECF No. 463-58 at 3 (Hays, Lake Cnty.); Ex. 688, ECF No. 463-86 at 2 (Oakes, St. Johns Cnty.). In fact, one-third of all counties indicated that they would reduce the availability of outdoor drop boxes, including by moving them inside. Tr. Day 9, 2461:19-21 (Smith). The loss of outdoor drop boxes impacts all drop box voters, but voters with disabilities are severely burdened.

Approximately 2.7 million Floridians have disabilities, amounting to 16% of all voting age Floridians. Tr. Day 2, 598:25-599:2, 632:19-22 (Cooper). Limiting the availability of outdoor drop boxes will affect voters with disabilities and physical ailments who have depended on dropping a vote-by-mail ballot in an outdoor drop

box or using a drive-through drop box. Tr. Day 9, 2462:2-10, 2485:7-20 (Smith); Tr. Day 2, 465:17-466:2, 21-25 (DePalma); Tr. Day 10, 2738:15-2739:25 (Babis).

Take, for example, Dr. Brigham, who is 87 years old and votes with an absentee ballot because incontinence caused by chronic complications from surgery prevents him from voting in person. Tr. Day 5, 1596:10-22, 1597:21-1598:2. In the 2020 general election, Dr. Brigham cast his ballot via an outdoor drive-through drop box in Orange County. *Id.* 1599:19-1600:5. For the 2020 municipal election, the outdoor drop box was no longer available, and Dr. Brigham had to vote inside of the Supervisor's office. *Id.* 1598:13-1599:8. The act of walking inside of the Supervisor's office increased the risk that Dr. Brigham would have an onset of his condition. *Id.* 1602:3-4 ("[M]y situation gets worse when I do physical actions as opposed to sitting [in] the car[.]").

When a county provides only an indoor drop box, voters with disabilities, particularly those with mobility issues who face barriers delivering their ballot in person, are severely burdened. *See also* Ex. 234, ECF No. 608-61 at 6 (Supervisor Link explaining, "[i]f some or all of the outdoor drop boxes are moved indoors, voters with mobility limitations will have more difficulty accessing the indoor drop boxes"). Indoor drop boxes are less accessible to many voters with disabilities, who face "inaccessible parking sites and drop-off locations at in-person polling places," find it difficult or impossible to open doors, or cannot navigate pathways that are not

clear and stable. Tr. Day 2, 457:15-458:6 (DePalma); Tr. Day 10, 2742:25-2743:12 (Babis); Ex. 10, ECF No. 608-16 at 14, Figure 5 (Cooper Rpt.). Olivia Babis, Disability Rights Florida's senior public policy analyst and a part-time powerchair user, has had difficulty navigating different voting locations. Tr. Day 10, 2741:8-16, 2740:22-24, 2742:5-8 (Babis). Voting via an outdoor drop box is also a critical option for voters with anxiety disorders or other disorders that make interacting with election employees intimidating and challenging. *See* Tr. Day 7, 2095:3-12, 2098:5-6 (Ms. Zukeran, a disabled Florida voter, explaining that she has relied on outdoor drop boxes to cast her ballot, and using an indoor drop box or a drop box with in-person monitoring would be "anxiety provoking"). This is particularly true for voters who are unwilling to rely on the U.S. Postal Service. *Id.* 2099:19-2100:4.

Notably, Defendants adduced no evidence at trial to dispute that the Drop Box Provisions will result in reduced availability of outdoor drop boxes. The expert and individual witness testimony that the reduction in said availability will impose severe burdens on voters with disabilities was uncontroverted.

## C.   The Drop Box Provisions Are Not Adequately Supported by a State Interest

In their post-trial briefs, the Defendants collectively asserted four interests for the Drop Box Provisions: (1) to ensure that drop boxes are secure; (2) to ensure that the law is uniformly applied; (3) to assist voters; and (4) to increase voter confidence. ECF No. 648 at 32 (State Defendants explaining, "[t]he need for uniformity and

security animates the State's interest in the drop boxes, as does the voter benefit that comes from having someone physically available to voters as they use the drop box"); ECF No. 651 at 10 (Miami-Dade Supervisor articulating additional interest in voter confidence).[7] None of these provisions justify the severe burdens imposed on the right to vote by the Drop Box Provisions. The record evidence illustrates that the state interests proffered for the Provisions are weak, and that the Provisions do not even promote those interests. Regardless of whether the Drop Box Provisions are evaluated under strict scrutiny or under *Anderson-Burdick*'s "fit" requirement for burdens that are not severe, these interests therefore do not suffice to justify the burdens that the Provisions place on the fundamental right to vote. Plaintiffs address each interest below in turn.

### 1. None of the Drop Box Provisions Further or Are Necessary to Achieve a State Interest in Drop Box Security

Although the Eleventh Circuit concluded that SB 90's sponsors may have been motivated by a desire to prevent drop-box tampering and promote security, *LWV*, 66 F.4th at 925, 928, the Eleventh Circuit did not reach whether the Drop Box

---

[7] Although this Court's opinion also identified "ensuring the chain of custody of the ballot" as a justification that the State advanced for the Drop Box Provisions in considering Plaintiffs' racial intent claim, no Defendant advanced that interest in briefing before the Court, and, as the Court has recognized, for an *Anderson-Burdick* claim, "this Court's analysis is limited to the justifications furthered by Defendants' post-trial briefing." ECF No. 665 at 253.

Provisions *actually* further that interest — nor did the Court reach whether the State's pursuit of that interest justifies its resulting burden on the right to vote.

Moreover, even to the extent the sponsors' security concerns are valid, the Legislature had alternative ways to address those concerns — including, as explained below, video monitoring of drop boxes. The Eleventh Circuit did not reach the question of whether the burdens imposed by the Drop Box Provisions were actually justified in the face of other, less-burdensome alternatives.

*Anderson-Burdick* imposes a "fit" requirement, even when the burdens imposed on the right to vote are small: in all cases, the Court must consider (1) the state's purported interest in imposing those burdens, and (2) whether the law at issue *actually furthers those same interests*. *See Anderson*, 460 U.S. at 789, 796. This is illustrated by the Supreme Court's opinion in *Anderson* itself, which considered the burdens and state interests for a law setting an early filing deadline for independent Presidential candidates. Although the Court found there that the state's proffered interest in increasing voter education was *legitimate and important*, it found the law could not survive review because the law (1) did not actually promote voter education, and (2) was not necessary to have informed voters in the modern world where information about national candidates is instantaneously communicated to the electorate nationwide. *See id.* at 796-98. In other words, the legitimacy and strength of the state interest is the Court's starting point, but far from the end of the analysis.

As a result, regardless of whether the state may have, as a general matter, a legitimate interest in drop box security, this Court must determine whether there is in fact a sufficient nexus between that interest and the specific provisions at issue — that is, does the challenged law actually further that interest? Because the answer is no, the Court should find the Drop Box Provisions fail the *Anderson-Burdick* test.

As a threshold matter, the only Drop Box Provision that purportedly is intended to promote security is the In-Person Monitoring Requirement—the State has never contended that the Hours Restriction or the Enforcement Penalty promotes security. But there is no evidence that even the In-Person Monitoring Requirement meaningfully promotes security or is necessary to achieve security.

Before SB 90, some Supervisors secured drop boxes using video surveillance, some used in-person monitoring, and some used a combination of both. Ex. 5, ECF No. 608-1 at 78:205 (Herron Rpt.). The record proves that those forms of monitoring worked. When Supervisors were asked in discovery to produce evidence of security issues related to drop boxes, they had none. *Id.* at 78:206. That is because there were no security issues related to drop boxes in Florida despite the different forms of drop box monitoring. At trial, Supervisor after Supervisor testified to this:

| Citation | Witness | Testimony |
|---|---|---|
| Tr. Day 4, 1204:6-17 | Supervisor Scott | Broward County "didn't have any problems" at its video-monitored drop boxes. "[T]here wasn't any kind of vandalism or any kind of, you know, issues that were reported to us. And so it seemed to work very, very well." |

37

| Citation | Witness | Testimony |
|---|---|---|
| ECF No. 549-3, 30:11-14; 42:25-43:6 | Supervisor Latimer | Drop boxes were secure before SB 90: Hillsborough "utilize[d] a large, probably two, two and a half foot by two and a half foot box with a lock on it and a seal, has a slit in the top to be able to put return vote-by-mail ballots in."<br><br>Hillsborough County officials are not aware of any violations of election law or instances of vandalism at drop boxes in 2020. |
| Tr. Day 9, 2664:8-13, 2655:15-22 | Supervisor Earley | Supervisor Earley is not aware of any vandalism or tampering with drop boxes occurring in his county or anywhere else in Florida. |
| ECF No. 549-2, at 70:16-22; ECF No. 549-2, at 86:6-15 | Supervisor Hays | "Q. . . . To your knowledge, from 2017 until you hired an independent security firm, during the time when the drop box was only monitored via video surveillance, was there any suspicion of activity such as destruction of the box or stealing of the ballots inside the box?<br>A. None whatsoever."<br><br>"Q. Is it fair to say that you think that your drop boxes were secure when they were solely — or your drop box outside your office was secure when it was monitored solely via video?<br>A. I can best answer that by saying that it has been there in place for every election since we moved into this building, and I have had not one instance of any kind of suspected malbehavior. So security, yes, it is very secure." |
| Tr. Day 12, 3259:13-3260:10 | Supervisor Doyle | Supervisor Doyle is unaware of vandalism, theft, or fraud related to any drop box in Lee County in 2020. He also did not receive any complaints from voters who had submitted their ballot in the drop box saying that their ballot had not been counted. |

When asked, Director Matthews was also unable to identify a single incident regarding drop box tampering or vandalism in the 2020 election in Florida. Tr. Day 10, 2806:5-2808:19, 2810:9-13; Ex. 775, ECF No. 608-93. In other words, the In-Person Monitoring Requirement cannot be necessary to achieve security with drop boxes when the Supervisors did not have security issues before the In-Person Monitoring Requirement was in place.

Separately, there is also no evidence that in-person monitoring of drop boxes would in fact reduce tampering or vandalism, as compared to video monitoring. As multiple Supervisors testified, they did not expect in-person monitoring to achieve a higher level of security than video monitoring, because they would not ask employees to intervene if anyone actually attempted to tamper with a drop box in the first place. As Supervisor Scott explained, the people who staff Broward County's drop boxes "are generally not people who would violently confront somebody if somebody wanted to do harm to the drop box. The people that we hire are not the type of people that would be prepared to take on a violent confrontation." Tr. Day 4, 1206:2-1207:9. Supervisor Scott went on to say, if someone attacked the drop box, "we would want to protect the life of the employee first and we would ask the — you know, we would advise our employees to stay safe and to, you know, not to put themselves in any — in any physical jeopardy." *Id.* The person would be "told to call the police" in the event of an attack, just as someone monitoring by video

would. *Id.* Similarly, Supervisor Latimer explained that having drop boxes physically monitored does not prevent tampering; monitors do not necessarily "have [] time to respond" to keep someone from causing harm to the box. ECF No. 549-3 at 191:21-192:18. Yet during the consideration of SB 90, the Florida Legislature was repeatedly presented with amendments that would permit video monitoring as an alternative to in-person monitoring, but summarily rejected or ignored each of those amendments. *See* ECF No. 652-7, at 3; Tr, Day 5, 1462:21-1464:8 (Thompson), 1548:17-1550:21 (Farmer).

To put it simply, none of the Supervisors — the officials responsible for overseeing voting using drop boxes in Florida — believe the Drop Box Provisions are likely to increase election security. ECF No. 549-2 at 144:25-145:17. And because there is no evidence that the In-Person Monitoring Requirement meaningfully promotes security or is necessary to achieve security, this interest is not sufficiently weighty to justify the In-Person Monitoring Requirement's consequent reduction in access to drop boxes and burden on the right to vote.

### 2.     None of the Drop Box Provisions Further or Are Necessary to Achieve a State Interest in Uniformity

The Eleventh Circuit also suggested that SB 90's supporters may have been motivated by a desire to address a "lack of uniformity in drop-box policies." *LWV*, 66 F.4th at 928. But the Eleventh Circuit once again did not reach whether the Drop Box Provisions *actually* further uniformity — nor did it reach whether the state's

40

pursuit of that interest justifies its resulting burden on the right to vote. Notably, uniformity is the *only* purported state interest that the State advanced for the Hours Restrictions.[8]

While the Eleventh Circuit found that achieving uniformity was a *neutral* motivation (i.e., one that suggested that race was not a motivating factor), there are reasons to question whether this interest is a legitimate one, let alone an important one.[9] The Legislature — even in adopting the provisions in SB 90 — has acknowledged that drop boxes do not need to be offered with the same precise hours, days, and procedures across the state. Florida consists of 67 counties that differ in geography, size, population density, and resources, and Supervisors repeatedly testified that what works in one part of the state does not work in another. Tr. Day

---

[8] The Hours Restriction cannot promote security by itself as long as the In-Person Monitoring Requirement remains in place. Only if the Court enjoined enforcement of the In-Person Monitoring Requirement could the State plausibly argue that the Hours Restriction provides any guise of security. In any event, the State has never argued the Hours Restriction promotes security, only that it "clarifies existing law to provide statewide uniformity regarding drop box locations and availability." ECF No. 648 at 14.

[9] Plaintiffs concede there may be a legitimate state interest in promoting uniformity in *minimum* access to drop boxes. *See* Fla. Stat. § 101.657(1)(d). But the law before SB 90 already required minimum access to drop boxes: at the main office of the supervisor, branch office offices of the supervisor, and early voting sites. *See* Fla. Stat. § 101.69 (2020). However, there is no legitimate state interest in creating laws that "promote uniformity" by *reducing access*, which is the outcome of the challenged provisions, *see supra* Section I.B., particularly where the purpose of having drop boxes in the first place is to allow voters a way to return their ballots when they are not able to do so during regular business hours.

4, 1159:18-1160:15 (Supervisor Scott); Tr. Day 5, 1332:22-1333:3 (Supervisor White).[10]

In any event, the Drop Box Provisions do not actually promote uniformity in any meaningful way. Take the In-Person Monitoring Requirement, to start. True, it requires "uniformity" in requiring each Supervisor to monitor the drop boxes continuously with an employee of the Supervisor. But otherwise, the In-Person Monitoring Requirement is likely to create further disparities in access to drop boxes. While larger counties, such as Miami-Dade County, may have the resources to provide continuous in-person monitoring, smaller counties simply do not. *See, e.g.*, Ex. 214, ECF No. 608-49 at 5 (Bradford County Supervisor Seyfang explaining "I could not give up one of my staff members to just sit at our drop box all day long, nor could I afford with my budget to hire another staff member just to do that."); Tr. Day 12 at 3262:1-4 (Supervisor Doyle acknowledging that in-person drop box monitoring costs may affect different counties differently). As a result, some counties (likely only a handful and the most resourced counties) will offer a 24/7 drop box, while others will not.

The Hours Restriction also does not promote uniformity. Under SB 90, the Supervisors are functionally limited to offering drop boxes at most (but not all)

---

[10] As just one example of these disparities and needs, Miami-Dade County has over 1.5 million registered voters, while Bradford County has just over 18,000 registered voters. Ex. 5, ECF No. 608-1 at 72, Table 23.

locations within early voting hours. *See* Fla. Stat. § 101.69(2)(a). But even early voting hours are highly discretionary and variable; as the State itself has explained, "the State's early voting sites are available to Florida voters for at least eight days and as many as fourteen days; the sites are available for at least sixty-four hours and as many as 168 hours." ECF No. 648 at 6. In other words, it will still be true, after SB 90, that "the times of day at which drop boxes [are] available to voters" will vary after SB 90. *LWV*, 66 F.4th at 928. This is true even just considering drop boxes at early voting sites, let alone the further disparities across counties in access to 24/7 drop boxes at main offices or permanent branch offices as a result of the In-Person Monitoring Requirement.

The upshot is that the Drop Box Provisions do not promote uniformity. If anything, they undermine it because the provisions will be implemented in disparate ways by the Supervisors. And when laws that burden voters do not actually promote or achieve the state interests they purport to serve, they are not sufficiently weighty to justify consequent burdens on the right to vote. *See Anderson*, 460 U.S. at 796-805 (finding that none of the three state interests proffered for a law were meaningfully promoted by the law at issue and consequently did not justify the corresponding burden on the right to vote).

### 3.   None of the Drop Box Provisions Further or Are Necessary to Achieve the State Interest of Assisting Voters

The third articulated state interest for the Drop Box Provisions is to provide Supervisors with an opportunity to assist voters (for example, to have an employee available to answer questions about their ballot and to ensure that ballots are signed and sealed). The Eleventh Circuit did not address this interest in evaluating the Drop Box Provisions.

The State's purported interest in assisting voters could only conceivably support the In-Person Monitoring Requirement; the State has not claimed it supports the Hours Restrictions. And, once again, the In-Person Monitoring Requirement does not actually serve the State's purported interest in assisting voters. The reason is simple: Voters cannot be assisted at a drop box to answer their questions or make sure their ballot is signed and sealed unless a drop box is available to them in the first place. As Plaintiffs have already shown, drop box access is likely to decrease access significantly under these provisions. *See supra* Section I.B.

While Supervisor White has previously claimed that in-person monitoring at drop boxes is responsible for the decreased rate of VBM ballot rejection in 2020, the county offered no evidence to that effect. The decreased rate of ballot rejection from 2018 to 2020 is instead just as likely attributable to the then-new requirement for the 2020 election (as a result of litigation) that Supervisors offer the voter a chance to cure their signature or prove their identity if the ballot is missing a signature,

resulting in lower ballot rejection rates statewide. *See Democratic Exec. Comm. of Fla. v. Detzner*, 347 F. Supp. 3d 1017 (N.D. Fla. 2018); *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312 (11th Cir. 2019).

Nor does the evidence show that the In-Person Monitoring Requirement is necessary to assist voters. The State provided no evidence of this. And as Supervisor Scott testified, having a staff member at the drop box to remind voters to sign and seal their ballot is "not the most efficient way to do that." "[O]ur drop boxes do have a sign on them and it does have it painted on the box for a reminder. We also have signs and flags that we place around the drop box to remind people to sign and make sure that their envelope is signed and sealed before they drop it in the drop box. . . . I wouldn't choose to use the resources to have two people standing there to tell a voter to sign and seal their envelope." Tr. Day 4, 1206:19-1207:9. Thus, the State could achieve its purpose of ensuring ballots are signed and sealed without imposing restraints on drop box access and burdening the right to vote for thousands of Floridians.

### 4.   None of the Drop Box Provisions Further or Are Necessary to Achieve the State Interest in Voter Confidence

Defendant Supervisor White of Miami-Dade County asserted one final purported state interest for the In-Person Monitoring Requirement: voter confidence. *See* ECF No. 651 at 10 (Supervisor White testifying that voters were happy to hand their ballot to an election worker and were happy to receive "I Voted" stickers at the

drop box from an employee); *see also* ECF No. 648 at 27, 32 (State Defendants asserting same). Plaintiffs have no objection if Miami-Dade (which has the largest budget of all SOE offices) believes this staffing is a good use of its resources. But it is not a sufficiently weighty interest to support the corresponding reduction in access to drop boxes and burden on the right to vote for the many counties that will have to pull back on drop box access because they cannot meet the In-Person Monitoring Requirement. If anything, a reduction in drop box access is likely to decrease voter confidence, not inspire it.

At the outset, it is far from clear that "increasing voter confidence" with drop boxes was an issue to begin with. There is no evidence in the record that voters had misgivings about using drop boxes because they were not staffed. The fact that 1.3 million voters cast ballots via drop box in 2020 makes that apparent, as does the repeated positive feedback that Supervisors received from voters about drop boxes. *See* Ex. 234, ECF No. 608-61 at 3 (Supervisor Link Decl.); *see also* Tr. Day 9, 2616:6-7. Even Senator Dennis Baxley, who sponsored SB 90, said that in 2020 "we had [an] excellent, excellent conducted election and very high credibility." Ex. 453, ECF 461-62, at 6:10-16. And while voters do not lack confidence in drop box voting, the record indicated that massive changes caused by SB 90 may in fact spur a wave of distrust in the system. As Supervisor Latimer noted, "making a lot of changes all at once has the potential to create voter confusion . . . and worst of all, an erosion of

the confidence we've worked so hard to earn." Ex. 216, ECF No. 608-51. Ultimately, as Supervisor Earley explained, the concern about distrust in drop boxes is nothing more than a "misinformation campaign that's always been inflamed by partisan interest." Tr. Day 9, 2655:15-22. This, of course, cannot be a legitimate basis to burden voting rights. Otherwise, legislatures and partisan actors hoping to restrict voting rights could simply manufacture a basis to do so.

But even if this Court finds that increasing voter confidence is a legitimate state interest in this context, the record shows that the In-Person Monitoring Requirement does not promote voter confidence. Instead, the Court heard from voter after voter who testified that they would be uncomfortable with a government official hovering over the drop box. *See supra* Section I.B.1.b. And even if they are not intimidated or dissuaded by the presence of government officials, they may still be uncomfortable handing over their ballot to a government worker. *See, e.g.*, Tr. Day 3, 698:1-7 (Plaintiff Alan Madison describing the experience of handing his VBM ballot to a staffer as "[d]isconcerting. I felt uncomfortable handing my ballot to someone else . . . . [E]ven during [in-person voting] when you go in, nobody takes your ballot once you fill it out; you put it yourself in a machine.").

Voter confidence is not a sufficiently weighty state interest to support the In-Person Monitoring Requirement, just as promoting security, ensuring uniformity,

and assisting voters are also not significant enough interests — let alone served at all — by the Drop Box Provisions.

## II.   THE REGISTRATION DELIVERY PROVISION UNDULY BURDENS FLORIDA VOTERS' RIGHT TO VOTE AND IS NOT ADEQUATELY SUPPORTED BY A STATE INTEREST

### A.   The Trial Evidence Concerning the Severe Burden Imposed by the Registration Delivery Provision

Through evidence adduced at trial, the Florida Rising Together Plaintiffs demonstrated that the Registration Delivery Provision imposes a severe burden on Florida voters.

In particular, Plaintiffs established that the Registration Delivery Provision imposes a severe burden on 3PVROs, and consequently on the Black and Latino voters, who rely on 3PVROs to register to vote disproportionately and more heavily than White voters. ECF No. 608-6 at 32, Table 2 (Smith Rpt.); Tr. Day 9, 2569:20-2571:9 (Smith); ECF No. 608-6 at 35, Table 4; Tr. Day 9, 2572:5-2573:6-13, 2574:4-16, 2574:23-2575:16 (Smith); *see also* Tr. Day 7, 2035:20-21 (Mercado) (more than 85% of voters that New Florida Majority Education Fund registered were people of color).

Dr. Smith presented analysis that the Registration Delivery Provision will most heavily burden Black and Latino voters by adding time, transportation, and information costs to the process of registering to vote. ECF No. 608-6 ¶¶ 8, 15, 24, 50 (Smith Rpt.). As he testified:

> There is no question that Black and Hispanic and voters of other racial
> and ethnic identities rely more heavily on being registered by 3PVROs
> than White individuals in this state, that we see that pattern across
> counties and that the effects of putting regulations and restrictions on
> 3PVROs are likely to affect the ability of individuals who rely heavily
> on these to do so in the future. I would also note that this is likely the
> tip of the iceberg with respect to this impact.

Tr. Day 9, 2574:23-2575:16 (Smith). This opinion was supported by Dr. Smith's

quantitative analysis that, as of August 2021, 763,240 individuals had their most

recent registration method recorded through a 3PVRO, and that this number included

10.86 percent of Black registrants, 9.57 percent of Latino registrants, and 9.63

percent of "Other" registrants who had most recently registered with a 3PVRO. *Id.*

2566:16-2567:23, 2569:13-2570:25 (Smith). This contrasts with only 1.87 percent

of white registered voters (i.e., 173,616 out of close to 9 million) who had most

recently registered through a 3PVRO. Tr. Day 9, 2570:25- 2571:3 (Smith)

(referencing ECF No. 608-6 at Table 2 (Smith Rpt.)). As Dr. Smith testified, "one

out of ten Black, Hispanic, and Other individuals who are registered in the state of

Florida as of August 2021, registered through 3PVROs, it's one out of fifty white

individuals who have registered through a 3PVRO, so five times less likely than

Black, Hispanic, and Other." Tr. Day 9, 2571:4-9 (Smith). Dr. Smith also testified

that Black and Hispanic voters relied on 3PVROs far beyond their share of the

electorate consistently across counties, with Dr. Smith finding that of the 16 largest

counties he analyzed, Black voters in 15 counties and Latino voters in 12 counties

were disproportionately more likely to register through 3PVROs than their share of

the electorate. *Id*. 2574:4-16 (Smith); ECF No. 608-6 at 35, Table 4 (Smith Rpt.).

As this Court concluded after trial, the Legislature that enacted SB 90 sought

out information from the Division of Elections about — and was subsequently well

aware of — the racially discriminatory impact the Registration Delivery Restriction

would have on Black voters. *League of Women Voters of Fla., Inc. v. Lee*, 595 F.

Supp. 3d 1042, 1109-11 (N.D. Fla. 2022). This was well supported by the trial

record. As Senator Gary Farmer testified:

> Q: Turning to the last of the contested provision areas, the third-party
> registration areas, was there any information or evidence presented to
> the Florida Legislature that the regulation provisions in SB 90 would
> have a disproportionate impact on Black and Hispanic voters?
> A: Yes, absolutely. We were in possession of statistical evidence that
> showed that voter registration groups registered about 10 percent of
> Black voters; a very close number, I think it was 8 or 9 percent, of
> Hispanic voters; but only 1 percent of White voters.

Tr. Day 5, 1566:8-17 (Farmer). Senator Farmer's testimony was corroborated, in

part, by Florida Director of Elections Matthews, who testified that the Legislature

"wanted to know about third-party voter organizations." Tr. Day 13, 3409:24-25.

*See generally* Tr. Day 10, 2795:13-2796:4; 2826:4-2828:6; Tr. Day 13, 3406:22-

3410:5 (Matthews). *See generally* ECF No. 652 at 122-29; ECF No. 652-10

(compiling discussions of SB 90's discriminatory impact in the legislative record).

On this point, the Eleventh Circuit affirmed that the evidence "establishes that some

legislators knew that black voters are more likely than white voters to register to vote

using third-party voter-registration organizations." *League of Women Voters*, 66 F.4th at 942.

Furthermore, the evidence adduced at trial also demonstrated that the burdens from the Registration Delivery Provision are severe. SB 90 Section 7 requires that a voter registration application be "promptly delivered to the division or the supervisor of elections in the county in which the applicant resides within 14 days after the application was completed by the applicant, but not after registration closes for the next ensuing election" and imposes fines for non-compliance. Fla. Stat. § 97.0575(3)(a). Several 3PVROs testified that they operate their voter registration efforts in locations (like Disney World, other theme parks, concert venues, and sporting events) that attract voters from various counties. Tr. Day 2, 392:24-393:13 (Burney-Clarke) (Equal Ground frequently registered voters from various Florida counties due to its location in a tourist hotspot); Tr. Day 3, 725:16-23 (Vélez Burgos) (Hispanic Federation commonly registered voters from 20 to 30 counties during special events); Tr. Day 1, 194:19-195:16 (Garces); Tr. Day 5, 1413:4-7, 1417:6-1418:2, 1504:4-15 (Nordlund). Delivering these registration applications by mail is not an acceptable alternative given the costs, the concerns regarding delays and confidentiality, and the risks that an application is delivered late or lost. Tr. Day 3, 731:16-732:1 (Vélez Burgos); Tr. Day 5, 1418:3-1419:1 (Nordlund). *Cf. League of Women Voters of Fla. v. Browning*, 863 F. Supp. 2d 1155, 1162 (N.D. Fla. 2012)

("A prudent organization would be ill advised to risk significant fines — and the attendant damage to the organization's reputation — by mailing an application . . . .").

One 3PVRO Plaintiff (Equal Ground) testified that SB 90 had caused it to stop registering voters, noting that the Registration Delivery Provision made the program "almost cost prohibitive." Tr. Day 2, 392:24-393:13 (Burney-Clarke). Other 3PVRO Plaintiffs similarly testified that the provision increased their costs and impaired their ability to assist individuals with registering to vote. Plaintiff 3PVROs testified to the need to change procedures and expend significant additional resources to reach the same number of voters in compliance with the Registration Delivery Provision. *See, e.g.*, Tr. Day 7, 2040:16-2041:7, 2042:6-2043:3, 2043:12-2044:14 (Mercado); Tr. Day 1, 207:24-208:15, 210:6-211:3 (Garces); Tr. Day 3, 769:18-770:9, 775:7-776:14, 800:6-16 (Vélez Burgos); Tr. Day 5, 1424:13-1425:12, 1427:5-1428:1, 1429:4-12, 1429:16-1430:1, 1430:12-1431:24, 1433:8-16 (Nordlund). Even then, Plaintiffs are not sure they will be able to achieve the same number of registrations as in prior elections. *See* Tr. Day 5, 1434:17-1435:14, 1436:8-18 (Nordlund) (UnidosUS expecting to register 20,000 less voters in the 2022 election due, in part, to the delivery restriction).

Testimony from SOEs confirmed that the Registration Delivery Provision will impact 3PVROs and make it harder for voters to vote, with some voters prevented

from voting entirely because they will not be able to register. Tr. Day 4, 1216:5-8, 17-18 (Scott). 3PVROs are integral to reaching voters who would not otherwise be reached. *See* Tr. Day 9, 2666:6-11 (Earley). Thus, the provision ultimately burdens people like the over 760,000 Florida voters who rely on 3PVROs to register to vote. *See id.*, 2566:18-2567:23 (Smith). Indeed, it threatens to disenfranchise some of those Floridians altogether.

Other record evidence confirms that the Registration Delivery Provision imposes a severe burden on Black and Latino voters. For example, registering to vote online can be a barrier for voters who lack access to the internet or a computer. Tr. Day 1, 262:1-17 (McCoy); *see also id.*, 272:19-273:2 (McCoy). This is the case for tens of thousands of Black and Latino Floridians. *See* Tr. Day 2, 623:14-20 (Cooper); *see also* ECF No. 608-16 at 62 (Cooper Rpt.). Likewise, registering to vote in person can be a barrier for the 114,000 Black households and 126,000 Latino households without access to a vehicle. Tr. Day 2, 629:3-8 (Cooper). For many of these Black and Latino Floridians, 3PVROs may be their *only* viable option to register to vote. Therefore, the Registration Delivery Provision diminishes these Floridians' right to vote by inhibiting 3PVROs' ability to register voters without regard to their county of residence.

Accordingly, the Court should find that the impact of the Registration Delivery Provision constitutes a severe burden under the *Anderson-Burdick* test.

Doing so would be consistent with this Court's prior conclusion that the law, by "hindering 3PVROs . . . will have a disparate impact on Black and Latino voters" and will "especially burden Black voters." *League of Women Voters v. Lee*, 595 F. Supp. 3d at 1107-09. Indeed, on appeal, the Eleventh Circuit sustained that conclusion, determining that "[s]ufficient evidence exists in the record to uphold the finding, on clear-error review, that the provision will have a disparate impact on black voters." *LWV*, 66 F.4th at 942.

The State did not dispute the evidence presented at trial regarding the population of voters reliant on 3PVROs. Further, the State did not present evidence that affected voters will otherwise register to vote — either via an alternative channel or once they return to their county of residence. Nor did the State produce any evidence to dispute the fact that the provision will result in fewer voter registrations, as demonstrated by the 3VPROs' testimony. As a result, on the basis of the racially discriminatory character of the burden and its magnitude, the Court should conclude that the Registration Delivery Provision imposes a severe burden on the right to vote under the *Anderson-Burdick* test.

Pursuant to the Court's November 16, 2023 Order (ECF 760), the two amendments to the Registration Delivery Provision (discussed *supra*) will exacerbate the burdens of the Registration Delivery Provision. Notably, SB 7050 (enacted in May 2023) both (i) reduced the time period for a 3PVRO to deliver

registrations to the Supervisor of Elections from 14 days to 10 days, Fla. Stat. § 97.0575(5)(a), and (ii) significantly increased the fines for non-compliance, including increasing the aggregate annual fine to $250,000 (the comparable cap was $1,000 at the time SB 90 passed), and imposing daily fines of $50 or $100 for each day each application is submitted late, up to $5,000 per late-delivered application. *Id.*

Because these provisions became effective over a year after the record in this case closed, there is no record evidence concerning their incremental burden on 3PVROs. That said, it is reasonable to assume that these provisions make the Registration Delivery Provision even more onerous for 3PVROs than as enacted in SB 90, and that they do not reduce the burdens of the Registration Delivery Provision.

### B.   The State's Interest in the Registration Delivery Provision Is Insufficient to Justify Its Burden on Voters

Because the Registration Delivery Provision imposes a severe burden on the right to vote, the State's asserted interest must satisfy strict scrutiny. *Norman*, 502 U.S. at 288-89; *see also Democratic Exec. Comm. of Fla.*, 915 F.3d at 1318 ("A law that severely burdens the right to vote must be narrowly drawn to serve a compelling state interest."). The State's purported interests fall far short of justifying the Registration Delivery Provision's racially discriminatory burden on Black and Hispanic voters.

### 1. The Legislature's Sole Contemporaneous Interest in the Provision Does Not Justify the Burden

Because the Florida Legislature was aware that the Registration Delivery Provision had a racially discriminatory impact (as explained above), the Court should look to the Legislature's contemporaneous articulation of purpose, rather than post-hoc justifications, to evaluate the State's purported interest in the law. *See Shaw v. Hunt*, 517 U.S. 899, 908 n.4 (1996); *see also Agudath Israel of Am. v. Cuomo*, 983 F.3d 620, 633 (2d Cir. 2020) ("The government's justification 'must be genuine, not hypothesized or invented *post hoc* in response to litigation.'"). *Cf. Bethune-Hill v. Va. State Bd. of Elections*, 580 U.S. 178, 189-90 (2017) (the "inquiry concerns the actual considerations . . . not post hoc justifications the legislature in theory could have used but in reality did not."). That is, "[t]o be a compelling interest, the State must show the alleged objective was the legislature's *actual* purpose." *Shaw*, 517 U.S. at 908 n.4 (emphasis added) (internal quotation marks omitted). "[W]hat '*may* have motivated' the legislature" to adopt the law is therefore irrelevant. *Id.*

Here, the only purported contemporaneous justification for the Registration Delivery Provision (and SB 90's other provisions restricting 3PVROs) articulated during the legislative process was to "clean[] up statutes that have been ruled unconstitutional" by a court order. ECF No. 461-67 at 4:22-5:4 (quoting Representative Blaise Ingoglia, the chief House sponsor); *see also* ECF No. 461-78

at 89:5-89:23. When challenged to explain the provision, Senator Baxley, the chief Senate sponsor of SB 90, similarly represented that the changes "ha[ve] to do with codifying a federal court order into our statute." *Id.* In addition, Representative Tommy Gregory claimed that SB 90's new restrictions were "absolutely required by court ruling" and that "it isn't even as if we have a choice to do it." ECF No. 462-29 at 45:20-46:3.

The record is clear that no other contemporaneous justifications were offered for these provisions of SB 90. Indeed, during legislative hearings and floor debates, no one cited any issues regarding the delivery of applications by 3PVROs at all. Tr. Day 5, 1567:4-10, 1567:12-18 (Farmer); *see also* Tr. Day 10, 2795:13-2796:4 (Matthews). Notably, the discussion of the "contemporaneous legislative record" in Defendants' post-trial brief does not cite any contemporaneous justification for the Registration Delivery Provision raised during Committee or floor debate. ECF No. 648 at 25-26 & n.6.

As this Court concluded, the bill's sponsors were referring to this Court's 2012 decision in *League of Women Voters of Florida v. Browning*, 863 F. Supp. 2d 1155 (N.D. Fla. 2012), which had nothing to do with SB 90's requirement that 3PVROs send applications to the Supervisor in the applicant's county of residence. *League of Women Voters*, 595 F. Supp. 3d at 1091-92. Thus, any stated interest that the new restrictions were compelled by a judicial order was demonstrably false. *See*

57

*id.* On appeal, the Eleventh Circuit acknowledged that "some supporters misunderstood the court order" in *Browning*, even though it ultimately disagreed with this Court that those statements constituted a pretext for discriminatory intent. *See LWV*, 66 F.4th at 930. For present purposes, however, the key point is that the only contemporaneously articulated justification for the law — that the Registration Delivery Provision was included to comply with a court order — *cannot* justify the severe burden it imposes on voters.

Accordingly, the Court should find the State's interest does not justify the severe burden imposed by the Registration Delivery Provision.

### 2. The State's Purported Interest for the Provision Should Not Be Credited and Does Not Justify the Burden in Any Event

In their post-trial briefing, the State Defendants asserted a post-hoc rationale that the Registration Delivery Provision was intended to decrease the administrative burden on Supervisors and "shift[] the burden of processing voter registration forms" to 3PVROs. ECF No. 648 at 28. The trial record substantiating this interest is thin: the State Defendants' post-trial briefing spends a paragraph on the Registration Delivery Provision and cites testimony from Elections Director Matthews and David Ramba, a lobbyist for the Florida Supervisors of Elections (FSE). *Id.* Ms. Matthews testified that the provision helped "to ensure that . . . the application is more timely processed." Tr. Day 13, 3426:3-6. Mr. Ramba testified that the FSE asked the

Legislature to require 3PVROs to submit voter registration forms to the county where the applicant resides. Tr. Day 11, 3119:8-19 (Ramba).

This court must assess both the "legitimacy and strength" of these asserted interests. *Anderson*, 460 U.S. at 789. There is significant reason to doubt both. With regard to "legitimacy," these justifications for the provision are notably not reflected in the public legislative record. Neither Mr. Ramba nor Ms. Matthews claimed to have presented evidence to the Legislature about any problems created by the pre-SB 90 practice of delivering forms to the nearest SOE office. Mr. Ramba simply said the SOEs did not feel "it was [their] responsibility to be [3PVROs'] assistant and separate out their files for them." Tr. Day 11, 3120:6-18 (Ramba). Consistent with this, there was no evidence presented at trial that the alleged justification was actually contemporaneously considered or viewed as important by Supervisors or the Legislature. Indeed, the purported interest was offered only at trial through Mr. Ramba's oral testimony, without any corroborating documents or testimony indicating that Mr. Ramba — or anyone else — actually conveyed this interest to the Legislature during consideration of SB 90. All of this undermines the "legitimacy" of the asserted interest; indeed, this kind of post-hoc justification is precisely the type of justification that should be discounted when examining a severe burden on voters that was proven to have a racially discriminatory effect. *See Shaw*, 517 U.S. at 908 n.4.

The Court should also discount the strength of the purported rationale for two independent reasons. *First,* the interest identified by Ms. Matthews — to "ensure . . . the application is more timely processed," Tr. Day 13, 3426:3-6 — is not advanced by requiring 3PVROs to deliver registration forms to the county where the applicant resides. As numerous 3PVROs testified, the delivery requirement will require additional compliance processes and additional time to deliver the application to the correct county, which will only delay submission of registration application forms. Tr. Day 1, 207:24-209:15, 210:13-211:23 (Garces); Tr. Day 3, 729:21-732:1, 761:1-20, 769:18-770:4 (Vélez Burgos); Tr. Day 5, 1416:5-1419:5, 1428:9-1434:2, 1437:12-1439:6 (Nordlund); Tr. Day 7, 2039:18-2043:3 (Mercado). In this regard, there is no "fit" between the purported interest and the restriction, as required by *Anderson-Burdick. See Anderson*, 460 U.S. at 789, 796.

Second, Mr. Ramba's testimony did not substantiate that any Supervisors wanted this change, considered it important, or thought it would alleviate a substantial administrative burden, and it was hearsay to the extent it could suggest an alternative, contemporaneous interest of the Legislature in adopting the law. Importantly, no Supervisor actually testified that they wanted this change; rather, the trial evidence of Supervisor opposition to SB 90, as a whole, was overwhelming. *See* ECF 652 ¶¶ 376-415 (collecting evidence, including ECF Nos. 608-36, 634-19, 608-48, 461-34 at 23:6-13 ("nothing in this bill is on our list of suggestions"), & ECF

652-12. Thus, evidentiary support for the State's interest in enacting the Registration Delivery Provision is paltry and should be discounted.

In any event, even if the Court were to consider the interest that the State has identified post hoc, this interest is weak, at best, and falls far short of justifying the discriminatory impact the Delivery Restriction Provision has on Black and Latino voters. As an initial matter, the Court should not accept at face value the State's assertion that the Delivery Restriction Provision was necessary to cure some vague administrative burden on Supervisors. *See Soltysik v. Padilla*, 910 F.3d 438, 448-49 (9th Cir. 2018) (a state's "merely speculative concern" about voter confusion is insufficient to meet the State's burden under *Anderson-Burdick*). Indeed, the record evidence suggests that any interest in easing the administrative burden on Supervisors was far from compelling — if it was a problem worth addressing at all. At trial, SOEs testified to being able to handle out-of-county registrations in the past and to having done so for many years. Tr. Day 12, 3185:2-7 (White) (the Miami-Dade Supervisor's office "for years" was able to handle out-of-county registrations); ECF No. 549-3 (Latimer Dep.) at 183:11-14 (handled "thousands" of out-of-county registrations during the 2020 general election). The validity of this asserted interest is also undermined by Supervisor testimony confirming that SOEs will nevertheless continue to process out-of-county registrations delivered to their offices by other methods (e.g., registrations completed at public assistance agencies, submitted by

individual voters, etc.), which are not subject to the same delivery restrictions. Tr. Day 12, 3244:2-15 (Doyle).

And even assuming *arguendo* that there was record evidence establishing there was some administrative burden on the Supervisors, the State's interest in relieving that burden is far from sufficient to justify the law's severe, racially discriminatory burden on the right to vote. Here, the State altogether failed to establish how providing some additional administrative convenience for Supervisors justifies disproportionately burdening Black and Latino Floridians in exercising their right to vote. *Cf. Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1325-26 (11th Cir. 2019) (concluding that a state interest in "facilitating timely and orderly election processing" would not justify even a "serious" burden on voters' opportunity to have their votes counted).

Accordingly, the Court should find that the severe, racially discriminatory burden exacted by the Registration Delivery Provision is not justified by any compelling or sufficient state interest.

## **CONCLUSION**

For the foregoing reasons, the Court should declare that both the Drop Box Provisions and the Registration Delivery Provision violate the First and Fourteenth Amendments and should enjoin enforcement of these provisions.

DATE: December 8, 2023

Respectfully submitted,

*/s/ David R. Fox*
Frederick S. Wermuth
Florida Bar No. 184111
Thomas A. Zehnder
Florida Bar No. 63274
KING, BLACKWELL, ZEHNDER &
WERMUTH, P.A.
P.O. Box 1631
Orlando, FL 32802
(407) 422-2472
fwermuth@kbzwlaw.com
tzehnder@kbzwlaw.com

Elisabeth C. Frost*
David R. Fox*
Christina A. Ford
Florida Bar No. 101634
ELIAS LAW GROUP LLP
250 Massachusetts Avenue NW
Suite 400
Washington, DC 20001
(202) 968-4490
efrost@elias.law
dfox@elias.law
cford@elias.law

Counsel for *League* Plaintiffs

* Admitted *Pro Hac Vice*

/s/ *Benjamin Duke*
P. Benjamin Duke*
Covington & Burling LLP
620 Eighth Avenue
New York, NY 10018
(212) 841-1000
pbduke@cov.com

Cyrus Nasseri*
Covington & Burling LLP
850 Tenth Street, NW
Washington, DC 20001
(202) 662-6000
cnasseri@cov.com

Ellen Y. Choi*
Covington & Burling LLP
415 Mission Street
San Francisco, CA 94105
(415) 591-6000
echoi@cov.com

Morenike Fajana*
NAACP Legal Defense & Educational
Fund, Inc.
40 Rector Street, 5th Floor
New York, NY 10006
(212) 965-2200
mfajana@naacpldf.org

Amia Trigg*
NAACP Legal Defense & Educational
Fund, Inc.
700 14th Street, NW, Suite 600
Washington, DC 20005
(202) 682-1300
atrigg@naacpldf.org

63

Nellie L. King
Fla. Bar No. 0099562
The Law Offices of Nellie L. King,
P.A.
319 Clematis Street, Suite 107
West Palm Beach, FL 33401
(561) 833-1084
Nellie@CriminalDefenseFla.com

Counsel for *NAACP* Plaintiffs

*/s/ John A. Freedman*
John A. Freedman*
Jeremy C. Karpatkin
Elisabeth S. Theodore*
Daniel R. Bernstein*
Sam I. Ferenc*
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Avenue, NW
Washington, D.C. 20001-3743
(202) 942-5000
John.Freedman@arnoldporter.com
Jeremy.Karpatkin@arnoldporter.com
Elisabeth.Theodore@arnoldporter.com
Daniel.Bernstein@arnoldporter.com
Sam.Ferenc@arnoldporter.com

Jeffrey A. Miller*
Arnold & Porter Kaye Scholer LLP
3000 El Camino Road
Five Palo Alto Square, Suite 500
Palo Alto, CA 94306-3807
(650) 319-4500
Jeffrey.Miller@arnoldporter.com

Aaron Stiefel *
Andrew R. Hirschel*
Arnold & Porter Kaye Scholer LLP
250 West 55th Street
New York, NY 10019-9710
(212) 836-8000
Aaron.Stiefel@arnoldporter.com
Andrew.Hirschel@arnoldporter.com

Miranda Galindo *
LatinoJustice, PRLDEF
523 W. Colonial Drive
Orlando, FL 32804
(321) 418-6354
Mgalindo@latinojustice.org

Estee Konor *
DEMOS
80 Broad Street, 4th Floor
New York, NY 10004
(212) 633-1405
ekonor@demos.org

Judith Browne Dianis*
ADVANCEMENT PROJECT
1220 L Street, NW
Suite 850
Washington, DC 20005
(202) 728-9557
Jbrowne@advancementproject.org

Counsel for *Florida Rising Together*
Plaintiffs

* Admitted *Pro Hac Vice*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on December 8, 2023 I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record registered to receive notifications.

*/s/ Frederick S. Wermuth*
Frederick S. Wermuth
Florida Bar No. 0184111

*Counsel for League Plaintiffs*
