UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

LEAGUE OF WOMEN VOTERS OF
FLORIDA, INC., et al.,

Plaintiffs,

v.

CORD BYRD, in his official capacity
as Florida Secretary of State, et al.,

Defendants,

and

REPUBLICAN NATIONAL
COMMITTEE and NATIONAL
REPUBLICAN SENATORIAL
COMMITTEE,

Intervenor-Defendants.

Case Nos.: 4:21-cv-186-MW/MAF (lead)
4:21-cv-187-MW/MAF
4:21-cv-201-MW/MAF
4:21-cv-242-MW/MAF

**PLAINTIFFS' JOINT SUPPLEMENTAL REPLY BRIEF
FOR ISSUES ON REMAND**

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................1

I. THE SECRETARY BADLY DISTORTS THE *ANDERSON-BURDICK* LEGAL STANDARD ..................................................2

II. THE DROP BOX PROVISIONS DO NOT PASS CONSTITUTIONAL MUSTER UNDER *ANDERSON-BURDICK* ...........10

    A. The Drop Box Provisions Impose An Undue Burden On The Right To Vote ...................................................................10

        1. SB 90's In-Person Monitoring Provision Imposes Undue Burdens on the Right to Vote....................................................12

        2. SB 90's Drop Box Hours Restrictions Impose Undue Burdens on the Right to Vote....................................................14

        3. Other Voting Methods Do Not Ameliorate the Burdens Imposed by SB 90's Drop Box Provisions ...........................17

    B. The Drop Box Provisions Are Not Adequately Supported by a Sufficiently Weighty State Interest. ..................................18

III. SB 90'S REGISTRATION DELIVERY PROVISION DOES NOT PASS CONSTITUTIONAL MUSTER UNDER *ANDERSON-BURDICK* ......................................................................................23

    A. The Court Can and Should Enjoin the Registration Delivery Provision Regardless of the Superseding Legislation........................24

    B. The Trial Evidence Demonstrated that the Burden Imposed by the Registration Delivery Provision Is Severe ...................................28

    C. The State's Interest in the Registration Delivery Provision Is Insufficient to Justify Its Burden on Voters ........................33

CONCLUSION ....................................................................................................38

i

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Anderson v. Celebrezze,*
  460 U.S. 780 (1983)................................................................*passim*

*Bethune-Hill v. Va. State Bd. of Elections,*
  580 U.S. 178 (2017)................................................................33

*Brnovich v. DNC,*
  141 S. Ct. 2321 (2021)...........................................................7, 8

*Burdick v. Takushi,*
  504 U.S. 428 (1992)...............................................................3, 6

*California Democratic Party v. Jones,*
  530 U.S. 567 (2000)................................................................19

*Common Cause/Ga. v. Billups,*
  554 F.3d 1340 (11th Cir. 2009) ...........................................7

*Crawford v. Marion Cnty. Election Bd.,*
  553 U.S. 181 (2008)...............................................................*passim*

*Curling v. Raffensperger,*
  50 F.4th 1114 (11th Cir. 2022) ...........................................5

*Democratic Executive Committee of Florida v. Lee,*
  915 F.3d 1312 (11th Cir. 2019) ........................................4, 33

*Fish v. Schwab,*
  957 F.3d 1105 (10th Cir. 2020), *cert. denied*, 141 S. Ct. 965 (2020) ................9

*Fla. State Conf. of NAACP v. Lee,*
  566 F. Supp. 3d 1262 (N.D. Fla. 2021) .........................2, 3, 7

*Jacobson v. Florida Secretary of State,*
  974 F.3d 1236 (11th Cir. 2020) .........................................4, 5

*League of Women Voters of Fla., Inc. v. Detzner,*
  314. F.Supp. 3d 1205 (N.D. Fla. 2018) ............................28

*Libertarian Party of Tex. v. Fainter*,
    741 F.2d 728 (5th Cir. 1984) ...............................................................10

*Miller v. Brown*,
    503 F.3d 360 (4th Cir. 2007) ...............................................................10

*New All. Party of* Alabama *v. Hand*,
    933 F.2d 1568 (11th Cir. 1991) .........................................................6, 9

*New Georgia Project v. Raffensperger*,
    976 F.3d 1278 (11th Cir. 2020) ...................................................6, 7, 31

*Norman v. Reed*,
    502 U.S. 279 (1992)..............................................................................33

*Obama for Am. v. Husted*,
    697 F.3d 423 (6th Cir. 2012) ........................................................5, 7, 9

*Pilcher v. Rains*,
    853 F.2d 334 (5th Cir. 1988) ...............................................................10

*Pub. Integrity All. v. City of Tuscon*,
    836 F.3d 1019 (9th Cir. 2016) .............................................................28

*Soltysik v. Padilla*,
    910 F.3d 438 (9th Cir. 2018) .................................................................9

*Storer v. Brown*,
    415 U.S. 724 (1974)................................................................................8

*Timmons v. Twin Cities Area New Party*,
    520 U.S. 351 (1997)................................................................................9

## **Statutes**

Fla. Stat. § 97.0575 ...................................................................................25

Fla. Stat. § 97.0575(3)(a) ...........................................................................25

Fla. Stat. § 97.0575(5)(a) ...............................................................25, 26, 27

## **<u>Other Authorities</u>**

First Amendment...................................................................................2, 38

Fourteenth Amendment .........................................................................2, 38

**INTRODUCTION**

The Secretary's opposition (ECF No. 764) confirms that both the Drop Box and Registration Delivery Provisions do not pass constitutional muster under the *Anderson-Burdick* standard. In particular, Plaintiffs have demonstrated with ample evidence that the Drop Box and Registration Delivery Provisions unduly burden the right to vote, and the Secretary has failed to point to evidence from the trial record that meaningfully disputes Plaintiffs' evidence. Nor has the Secretary pointed to evidence from the trial record that substantiates that either provision is supported by a sufficiently weighty state interest.

Instead, the Secretary misstates the applicable legal standard to assess an *Anderson-Burdick* claim and mischaracterizes the record evidence presented at trial. On the proper legal standard, the Secretary repeats the same arguments in favor of his erroneous interpretation of the *Anderson-Burdick* standard that this Court previously considered and rejected at earlier phases of this litigation without either acknowledging that the Court has previously addressed these arguments or explaining why the Court should reconsider its prior rulings. On the record evidence, the Secretary fails to acknowledge or address the evidence Plaintiffs cited in the opening brief demonstrating the burdens flowing from these provisions, and the Secretary overstates and mischaracterizes the trial evidence concerning the state's purported interests in these provisions.

The Court should declare that the Drop Box and Registration Delivery Provisions violate the First and Fourteenth Amendments and should enjoin their enforcement.

## I. THE SECRETARY BADLY DISTORTS THE *ANDERSON-BURDICK* LEGAL STANDARD

In defending the Drop Box and Registration Delivery Provisions, the Secretary warps the *Anderson-Burdick* standard beyond recognition, including in ways this Court has already expressly rejected. The Secretary's characterization of *Anderson-Burdick* defies Supreme Court precedent on how to scrutinize burdens, invites this Court to apply "litmus tests" the Supreme Court has rejected in *Anderson-Burdick* cases, and improperly absolves the Secretary of any responsibility to show that the state interests he identifies for the challenged provisions will actually be advanced.

*First*, it is not true that Plaintiffs must prove the regulation at issue imposes excessively burdensome requirements on "most voters" to prevail. ECF No. 764 at 14 (citing *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 198 (2008)). As this Court recognized at an earlier stage of this case, *Crawford* itself said the opposite. *See Fla. State Conf. of NAACP v. Lee*, 566 F. Supp. 3d 1262, 1287–88 (N.D. Fla. 2021). Specifically, in *Crawford*, six justices agreed that in evaluating burdens, courts should consider a law's impact on subgroups for whom the burden may be more severe. 553 U.S. at 199–203 (controlling op.); *id.* at 212–23, 237 (Souter, J.,

2

dissenting); *id.* at 237 (Breyer, J., dissenting). The Court did not require that every challenged statute burden all voters, or even most voters. *See id.* at 187–88 & n.6, 198 (controlling op.). Instead, the "relevant" burdens were "those imposed on persons who are eligible to vote but do not possess a current photo identification," and "[t]he fact that most voters already possess a valid driver's license . . . would not save the statute." *Id.* at 198 (controlling op.). Although the Secretary cites Justice Scalia's concurrence for the proposition that burdens on only some voters are "irrelevant," to the analysis, ECF No. 764 at 14 (citing *Crawford*, 553 U.S. at 204 (Scalia, J., concurring)), "Justice Scalia's concurrence [in *Crawford*] is not the law" because it garnered only three votes. *Lee*, 566 F. Supp. at 1287–88 (surveying cases and concluding that Justice Stevens's plurality opinion controls).

Even putting *Crawford* aside, the Secretary's proposed approach is contrary to how the Supreme Court has scrutinized burdens under *Anderson-Burdick* since its inception. In *Anderson*, for example, the Supreme Court considered only the burdens imposed on a "segment of Ohio's independent-minded voters," *Anderson v. Celebrezze,* 460 U.S. 780, 792-93 (1983), not all or most Ohio voters, and in *Burdick*, it considered only the burdens on a subset of voters who sought to write-in their candidate of choice, not on voters generally. *Burdick v. Takushi*, 504 U.S. 428, 437-38 (1992). The Supreme Court has never concluded — as the Secretary suggests —

that if only *some* voters are burdened by the law, the Court should stop its analysis. Indeed, it has concluded the opposite.

*Second*, the *Anderson-Burdick* balancing test does not require a plaintiff to show disenfranchisement to establish a burden on the right to vote. In support of this incorrect proposition, the Secretary cites *Democratic Executive Committee of Florida v. Lee*, 915 F.3d 1312, 1320 (11th Cir. 2019), which found an undue burden on the right to vote for a Florida law that placed an unjustifiable "risk of disenfranchisement" on Florida's vote-by-mail voters. ECF No. 764 at 8. But that case did not suggest that a Plaintiff must prove disenfranchisement to establish a burden on the right to vote. The case involved a challenge to Florida's signature-match statute, under which election officials were required to notify voters of a non-match and provide them with an opportunity to cure. *Lee*, 915 F.3d at 1324. In that context, the Eleventh Circuit concluded that Florida's signature-match statute, which "subject[ed] vote-by-mail and provisional electors to the risk of disenfranchisement," imposed a "serious" burden on the right to vote, an unremarkable proposition. *Id.* at 1319, 1321.

In fact, no Eleventh Circuit case has held that a plaintiff must establish "a risk of disenfranchisement" to establish a burden. Instead, the proper inquiry is simply whether the regulation unjustifiably impedes voting access and makes it more difficult to access the franchise. *Jacobson v. Florida Secretary of State*, 974 F.3d

1236 (11th Cir. 2020), for example, described how *Anderson-Burdick* applies to regulations that "make it more difficult for individuals to vote." *Id.* at 1261. And even *Curling v. Raffensperger*, 50 F.4th 1114 (11th Cir. 2022), upon which the Secretary relies, envisioned that a plaintiff could establish a "severe burden" on the right to vote if a state's election scheme impeded voting access sufficiently such that voters found it difficult, even if not impossible, to participate. *Id.* at 1123 (explaining that, "if excessive wait times result in many voters leaving their polling places before voting, and doing so with a likelihood that they will not return to vote, that may well rise to the level of a severe burden"); *see also Obama for Am. v. Husted*, 697 F.3d 423, 433 (6th Cir. 2012) (finding undue burden on the right to vote where Ohio cut three days of early voting, even though that change did "not absolutely prohibit early voters from voting"). In any event, even if plaintiffs were required to prove a risk of disenfranchisement, plaintiffs have done so here, for the reasons described *Infra* Section II.

The Secretary's argument that disenfranchisement is necessary to show a constitutionally significant burden is foreclosed by *Anderson* itself. In that case, the Supreme Court did not ask whether candidates or parties were absolutely excluded from the ballot. Instead, it found a burden because the regulation at issue made it unnecessarily *difficult* to reach the ballot. *See Anderson*, 460 U.S. at 792 (finding Ohio's early deadline for ballot access imposed a burden because such a deadline

made it "more difficult to recruit and retain" volunteers and "more difficult to secure" contributions and publicity). Similarly, in *New All. Party of Ala. v. Hand*, 933 F.2d 1568, 1576 (11th Cir. 1991), the Eleventh Circuit found Alabama's ballot scheme imposed an unjustified burden even though it did not pose an "insurmountable" barrier to the ballot.

*Third*, the Secretary is wrong that the Drop Box Provisions do not "implicate the right to vote." ECF No. 764 at 8, 11-12, 14. To start, that language comes from *New Georgia Project v. Raffensperger*, 976 F.3d 1278 (11th Cir. 2020), a non-binding stay panel decision written "only for the parties' benefit" which does not "hav[e] an effect outside that case." *Id.* at 1280 n.1. And the court in *New Georgia Project* did exactly what the Secretary argues is not required: it conducted an *Anderson-Burdick* balancing analysis of an absentee voting restriction. *Id.* at 1282. After expressly holding that "*Anderson* and *Burdick*" provide "the appropriate framework" for evaluating a challenge to an absentee voting deadline, the court explained that "the alleged burdens" from the deadline "[we]re not severe" and that they were outweighed by "several interests that justif[ied] the deadline." *Id.* at 1280, 1282. The Secretary takes the quoted sentence asserting that the absentee voting deadline "does not implicate the right to vote at all" out of context: that consideration was a part of the court's balancing analysis — it did not establish an exception to it. *Id.* at 1281. And in conducting the balancing inquiry, the Eleventh Circuit emphasized the

availability of "dozens of drop boxes [that] are available through Election Day in numerous locations," *id.*, which, of course, are banned under SB 90.

In fact, courts have long applied *Anderson-Burdick* to regulations that affect "only" one method of voting, be it vote-by-mail, early voting, or in-person voting without suggesting that alternatives "insulate" the provision at issue from review or that a burden "does not implicate" the right to vote simply because alternative voting methods exist. *See, e.g.*, *Crawford*, 553 U.S. at 185-86 (controlling op.) (evaluating ID requirement, which did "not apply to absentee ballots submitted by mail," under *Anderson-Burdick)*; *Common Cause/Ga. v. Billups*, 554 F.3d 1340, 1346 (11th Cir. 2009) (like *Crawford*, evaluating ID requirement, which did not apply to those voting "by absentee ballot," under *Anderson-Burdick*); *Obama for Am.*, 697 F.3d at 431 (finding undue burden on the right to vote where Ohio reduced in-person early voting opportunities, and specifically rejecting argument that this burden could be ignored in light of options to vote absentee or vote in-person on other days). As this Court concluded when the Secretary pressed a similar argument earlier in this case, a plaintiff in an *Anderson-Burdick* case does not need to provide "proof that that there was no possibility that the plaintiffs would find a way to adjust and vote through the remaining options." 566 F. Supp. 3d at 1287 (citation omitted).

*Brnovich v. DNC*, 141 S. Ct. 2321 (2021), does not counsel a different result. *Brnovich*, of course, was a Section 2 Voting Rights Act case adjudicated under an

entirely different legal standard. Under that standard, the plaintiff had to show the state's political process "as a whole" was not equally open to them. *Id.* at 2344. After conducting a Section 2 analysis, the Court in *Brnovich* concluded that there was no violation, noting as one relevant circumstance that the policy at issue applied to very few voters total: less than half of one percent of all ballots. *Id.* By contrast, in Florida's last Presidential election, at least 1.3 million ballots were cast via drop box, including half of all VBM ballots in some large counties. Tr. Day 8, 2158:25-2159:15 (Herron); ECF No. 549-3 at 104:21-105:4 (Supervisor Latimer). In other words, the burden here is much worse than in *Brnovich*.[1]

*Fourth*, and finally, the Secretary's articulation of the state-interest part of the *Anderson-Burdick* balancing test improperly characterizes the test as one that is wholly deferential to the state's policy choices. ECF No. 764 at 16. To the contrary, *Anderson-Burdick* imposes a "fit" requirement even when the burdens imposed on the right to vote are moderate or small. *See* ECF No. 763 at 11, 34-36. That is, even if a plaintiff shows something less than a severe burden, the Court must consider: (1) the state's purported interest in imposing those burdens; and (2) whether the law at issue actually furthers those same interests. *See Anderson*, 460 U.S. at 789, 796;

---

[1] *Brnovich* also did not suggest that alternative means of voting wholly insulate reductions in another voting method from review. At most, *Brnovich* counsels that burdens should be evaluated while taking into account the rest of the state's election system, which the Supreme Court has long recognized. *See, e.g.*, *Storer v. Brown*, 415 U.S. 724, 737 (1974) (instructing courts to consider how a state's election laws "may operate in tandem to produce impermissible barriers to constitutional rights.").

*see also id.* at 789 (holding courts "must consider the extent to which those interests make it necessary to burden the plaintiff's rights").

Although this balancing analysis does not require the state to put forward an "elaborate, empirical verification of the weightiness of the State's asserted justifications," *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 364 (1997), it does require the state to put forward a "sufficiently weighty" interest that is actually furthered by the law at issue, which does contemplate some evidence (or at a bare minimum, some logic) supporting the necessity of the regulation at issue. And when the state has not done so, the balancing test weighs in favor of voting access. *See, e.g.*, *Anderson*, 460 U.S. at 789, 796; *Hand*, 933 F.2d at 1576 (finding that a "significant burden" on ballot access was not justified where "there appears to be a less drastic means for the State to achieve its ends"); *Fish v. Schwab*, 957 F.3d 1105, 1126 (10th Cir. 2020), *cert. denied*, 141 S. Ct. 965 (2020) (cleaned up) (holding that while interests in "protecting the integrity of the electoral process" or "safeguarding voter confidence" are "legitimate [interests] in the abstract," there is "no concrete evidence that those interests make it necessary to burden the plaintiff's rights in this case"); *Soltysik v. Padilla*, 910 F.3d 438, 447 (9th Cir. 2018) (reversing dismissal of *Anderson-Burdick* claim and holding that even an "important government interest" could not justify a non-severe burden because the court "struggle[d] to understand how [the challenged] regime . . . advance[d] that goal"); *Obama for Am.*, 697 F.3d

9

at, 433–34 (holding that a voting restriction that imposed a moderate burden was not justified by an interest in "smooth election administration" when there was insufficient evidence to show that interest was sufficiently weighty to justify the restriction); *Pilcher v. Rains*, 853 F.2d 334, 337 (5th Cir. 1988) (requiring state to put forward some evidence of the necessity of the law imposing a burden). As courts have made clear, there is a difference between "second-guessing" the state's policy choices, ECF No. 764 at 16, which is not permitted under *Anderson-Burdick*, and requiring the state to put forward sufficiently weighty state interests that justify the burden on voting rights.

The upshot is that the State may not simply raise "vague assertions of 'doubts'" or "serious questions" or engage in "speculation" to justify burdens. *Miller v. Brown*, 503 F.3d 360, 370–71 (4th Cir. 2007); *Libertarian Party of Tex. v. Fainter*, 741 F.2d 728, 730 (5th Cir. 1984) (rejecting state's assertion that electoral regulation was necessary where they had "done nothing to prove it"). More is required.

## II.   THE DROP BOX PROVISIONS DO NOT PASS CONSTITUTIONAL MUSTER UNDER *ANDERSON-BURDICK*

### A.   The Drop Box Provisions Impose An Undue Burden On The Right To Vote

The Secretary's repeated claims that SB 90's Drop Box Provisions constitute mere inconveniences that do not implicate the right to vote, *see*, *e.g.*, ECF No. 764 at 8, 11-14, are contradicted by the factual record. Plaintiffs' evidence shows these

provisions, collectively, would result in an estimated 40,000 fewer hours of drop box availability statewide by reducing access to at least one in four drop boxes. Tr. Day 9, 2454:20-2455:11; *id.*, 2458:19-2459:13 (Smith); Ex. 7, ECF No. 608-6 ¶¶ 125, 127-30 (Smith Rpt.). The Secretary's claim that a reduction of this magnitude does not "burden voting or implicate the right to vote," *see*, *e.g.,* ECF No. 764 at 11, strains credulity. As the Secretary points out repeatedly, *see*, *e.g.*, ECF No. 764 at 3, voting methods do not exist in a vacuum. By reducing the availability of drop boxes, these provisions would increase the demand for other methods for voting, thereby burdening all Florida voters regardless of how they choose to cast their ballot.

In addition to burdens imposed on the electorate at large, these provisions impose even weightier burdens on several particularly at-risk classes of voters that this Court must consider. *See Crawford*, 553 U.S. at 202 ("*Anderson-Burdick* requires consideration of whether a statute 'imposes "excessively burdensome requirements" on *any* class of voters.'" (emphasis added)). These include the particular burdens on (1) Black and Hispanic voters, (2) voters with disabilities, (3) voters who cast their ballots via drop box before the early voting period, (4) voters who cast their ballots after the postal service can no longer guarantee delivery of their ballot, and (5) voters whose work and family obligations do not permit them to vote during early voting hours. Relief is required to alleviate these burdens and ensure continued access to drop boxes by voters in these communities in particular.

1.   SB 90's In-Person Monitoring Provision Imposes Undue
Burdens on the Right to Vote

The In-Person Monitoring Provision is unduly burdensome for two reasons:
(1) the resulting reduction in access to drop boxes and (2) the risk of voter
intimidation.

*First*, Plaintiffs have shown the In-Person Monitoring Provision would result
in a significant reduction in drop box availability, and the Secretary cites no evidence
disputing Plaintiffs' showing. *Compare* ECF No. 763 at 20-21, *with* ECF No. 764 at
11. Supervisors of Elections from across the state testified that the resources required
to staff drop box monitors and the risk of being personally liable for a $25,000
unattended drop box fine would force them to reduce both the number of available
drop boxes and the hours of operation for remaining drop boxes. *See*, *e.g.*, Tr. Day
4, 1204:18-1205:22 (Broward County); Tr. Day 9, 2660:1-11 (Leon County).
Supervisors testified that 24-hour drop boxes are especially impracticable when
constant in-person monitoring is required and, as a result, many counties that had
offered 24-hour drop boxes in previous elections would no longer do so. *See* Tr. Day
8, 2291:14-20, 2292:14-17 (Herron); *see also* Ex. 234, ECF No. 608-61 at 6 (Palm
Beach County); Ex. 221, ECF No. 549-3 at 119:4-20 (Hillsborough County); Tr. Day
13, 3500:24-3501:2 (Leon County); Ex. 214, ECF No. 608-49 at 5 (Bradford
County). This reduction of drop box availability alone is significant enough to
constitute a burden on the right to vote under *Anderson-Burdick*.

*Second*, the In-Person Monitoring Provision creates a significant risk of voter intimidation, particularly among Black voters, Hispanic voters, and voters with mental disabilities.[2] For many Black and Hispanic voters, the mere presence of a government official closely monitoring them while they attempt to cast their votes would have a chilling effect on turnout due to the history of, and personal experience with, mistreatment by government officials, including election officials. *See* Tr. Day 3, 821:24-822:6 (Vélez Burgos); *see also* Tr. Day 7, 1997:20-21 (Albright); Tr. Day 1, 79:2-7 (Scoon); Tr. Day 7, 2049:13 (Mercado). For voters with disabilities, especially those suffering from debilitating mental health issues, in-person monitoring may similarly intimidate voters in such a way as to discourage and put at risk their continued participation in the voting process. *See*, *e.g.*, Tr. Day 7, 2097:12-2098:12, 2099:6-8 (Zukeran).

The Secretary downplays this risk to a "fear[] of interacting with others while voting[,]" ECF No. 764 at 11, diminishing the reality and nuances of voter intimidation and ignoring the substantial record showing how systemic racism and

---

[2] The Secretary classifies the concerns of these groups as "idiosyncratic," ECF No. 764 at 12, ignoring the evidence presented at trial and cited in Plaintiffs' Opening Brief of the chilling effect that in-person monitoring is likely to have. This evidence included testimony regarding voters in the electorate who may fear interacting with government officials generally, as well as voters without such fear but who, nonetheless, find placing their vote-by-mail ballot in the hands of election staff rather than a ballot box "disconcerting." ECF No. 763 at 21-23; Tr. Day 3, 698:1-7 (Madison); *see also* Tr. Day 5, 1626:23-1627:4 (Sauers); Tr. Day 7, 2048:22-2049:9 (Mercado).

the debilitating mental health issues that many voters struggle to overcome can severely burden certain voters. *See generally* ECF No. 763 at 21-22; Tr. Day 3, 821:24-822:6 (Velez Burgos); Tr. Day 7, 1997:20-21 (Albright); Tr. Day 1, 79:2-7 (Scoon); Tr. Day 7, 2049:13 (Mercado); Tr. Day 7, 2097:12-2098:12, 2099:6-8 (Zukeran). Other voters are also likely to find the experience troubling. *See, e.g.*, Tr. Day 3, 698:1-7 (Madison). The Secretary erroneously analogizes interacting with election officials acting in a supervisory and enforcement capacity to interacting with postal workers, commercial mail carriers, and, bafflingly, the voters' own designees. ECF No. 764 at 11. This logic is flawed. Plaintiffs did not allege or present evidence that they have ever been intimidated by postal workers or their own designees.[3] In any case, those alternatives would not work for many voters, including those without potential designees or for whom mail service would not ensure on-time delivery. *Infra* Section II.A.2.

> 2.   SB 90's Drop Box Hours Restrictions Impose Undue Burdens on the Right to Vote

Like the In-Person Monitoring Provision, the Drop Box Hours Restrictions limit the availability of drop boxes and therefore burden the right to vote. The burden

---

[3] When sending ballots via postal and carrier service, it is unlikely that postal employees will evaluate voters for legal compliance or ask anxiety-provoking questions about the providence of their ballots. In fact, it's possible to send ballots via postal and carrier service without interacting with postal employees at all. Similarly, selecting a designee requires a level of familiarity and trust that would inherently mitigate, if not eliminate entirely, the risk of voter intimidation.

is especially significant for: (1) voters who submit their ballots before the early voting period, (2) voters who prefer to wait until the last week of the campaign to make their selections among various candidates, and (3) voters whose work and family obligations preclude them from voting during early voting hours.

*First*, restricting drop box hours unduly burdens voters who rely on them to vote before the start of Florida's early voting period. At trial, Dr. Herron testified that over 109,000 of 2020 voters cast their ballot this way. Tr. Day 8, 2287:2-24; *see also* Ex. 5, ECF No. 608-1 at 70, Table 22 (Herron Rpt.). Dr. Smith testified that there were at least 57 drop boxes at non-SOE locations outside of the early voting period in 2020, accounting for 11,000 hours of drop box availability. Tr. Day 9, 2455:17-19 (Smith); Ex. 7, ECF No. 608-6 ¶¶ 130-31 (Smith Rpt.); *see also id.* ¶ 182. The Secretary failed to rebut or dispute this evidence, and instead merely referenced in the abstract the availability of other voting methods including vote-by-mail and outside-of-early-voting drop boxes in SOE locations. ECF No. 764 at 13. The existence of other voting methods does not overcome a burden finding, *infra* Section II.A.3, particularly where, as here, such methods do not suffice as reasonable alternatives for all voters. The Secretary's analysis ignores, for example, that the In-Person Monitoring Provision would substantially reduce the number of outside-of-early-voting drop boxes that Supervisors would offer absent relief from this Court.

15

*Second*, restricting drop box hours unduly burdens voters who make their voting decisions later in the voting period, after it becomes unfeasible to mail in their ballots on time. Voters are "guaranteed on-time delivery" when they deposit their ballot into a drop box, Tr. Day 8, 2247:3-9, 2248:13-18 (Herron), but there is no such guarantee when voting via postal or commercial mail carriers, especially within one week of Election Day. *See* Tr. Day 8, 2247:16-22 (Herron). The Drop Box Hours Restrictions therefore burden voters who receive their mail-in ballots within that final week or choose to wait until that final week to decide which candidates to vote for.

*Third*, restricting drop box hours would unduly burden voters who have work, family, or other commitments that prevent them from voting during typical business hours, both during the early voting period and on Election Day. *See*, *e.g.*, Tr. Day 1, 71:6-12 (Plaintiff Scoon); Tr. Day 5, 1371:20-1372:4 (Supervisor White); Tr. Day 7, 1917:14-1918:6 (Rep. Eskamani). Removing or restricting drop box access in this way imposes a heavy burden on Florida's working-class voters, including those in Florida's bustling tourism and agriculture industries. *See* Tr. Day 3, 735:17-736:3 (Vélez Burgos); Tr. Day 7, 1877:23-1878:11 (Rep. Guillermo Smith); *see also* Tr. Day 9, 2476:14-25 (Dr. Smith). The Secretary argues that this disproportional burden is mitigated by the availability of drop boxes during the early voting period, but the Secretary fails to account for voters whose work and family obligations can

contribute to their need to vote via drop box earlier or later than SB 90's restrictions allow, and for whom voting during the early voting period does not offer a meaningful alternative. ECF No. 763 at 30-31; Tr. Day 7, 2049:4-7 (Mercado); Tr. Day 3, 695:13-24, 695:25-696:5, 696:9-18, 699:6-15 (Madison).

### 3. Other Voting Methods Do Not Ameliorate the Burdens Imposed by SB 90's Drop Box Provisions

The Secretary has not identified any evidence that disputes that the Drop Box Provisions are burdensome. Instead, he obfuscates the issue. His implication that there is some bright line rule that restricting one of several avenues to vote is *per se* not burdensome is incorrect. ECF No. 764 at 11. Such a rule purports to establish the kind of "litmus test" for identifying valid from invalid restrictions that the Court has repeatedly rejected in *Anderson-Burdick* cases. *See Anderson*, 460 U.S. at 789; *Crawford*, 553 U.S. at 190.

Indeed, Plaintiffs' burden evidence goes beyond the requirements of the *Anderson Burdick* analysis by showing how the limitation on certain methods have cascading effects on other methods. First, limits on drop box availability would necessarily either increase demand, and therefore wait times, for other methods of voting or suppress turnout for those voters who tend to vote via drop box. Both outcomes plainly implicate the right to vote broadly. Second, there are many voters for whom voting via drop box is the only feasible option, including the at-risk groups discussed above. For those voters and those who are similarly situated, other options

17

in the broader election code simply may not work. This Court can, and should, account for this when evaluating the Drop Box Provisions' implications for the electorate generally.

Furthermore, the Secretary's argument is wholly incompatible with the *Anderson-Burdick* framework because, as described above, that framework evaluates the extent of the burden on the right to vote without requiring a showing of absolute disenfranchisement. *Supra* Section I. Indeed, under The Secretary's skewed interpretation of the *Anderson-Burdick* test, as long as a state offers more than one method of voting, there can *never* be an unconstitutional burden on any single method, no matter how severe of a burden that restriction places on voters.

## B.   The Drop Box Provisions Are Not Adequately Supported by a Sufficiently Weighty State Interest

None of the state interests that purportedly support the Drop Box Provisions — security, uniformity, voter assistance, and voter confidence, ECF No. 764 at 15 — are sufficiently weighty to justify the Provisions' corresponding burden on the right to vote, whether or not the Court determines the burden is severe (requiring strict scrutiny) or something more moderate (requiring *Anderson-Burdick*'s "fit" requirement). *See* ECF No. 763 at 34-47.

At this stage, the Secretary must do more than show that neutral (i.e., non-discriminatory) reasons motivated the Drop Box Provisions. *See* ECF No. 763 at 2, 35-36. Simply asserting that the state's interests are "compelling" or "important" in

18

the abstract does not cut it. The Secretary must show that the Drop Box Provisions, on this record, actually advance and are actually necessary to achieve its goals. *See supra* Section I. The Secretary has not shown this.

In *California Democratic Party v. Jones*, for example, the Supreme Court rejected the State's contention that several of the interests it claimed were "compelling" were in fact compelling (or even legitimate) state interests. 530 U.S. 567, 582-84 (2000). And the remaining "four asserted state interests—promoting fairness, affording voters greater choice, increasing voter participation, and protecting privacy" were not, "*in the circumstances of this case,* compelling." *Id.* at 584. As the Court explained, the strength of the state interest cannot be made "in the abstract, by asking whether fairness, privacy, etc., are highly significant values; but rather by asking whether the *aspect* of fairness, privacy, etc., addressed by the law at issue is highly significant." *Id.*; *see also Anderson,* 460 U.S. at 789, 796-805 (applying a similar kind of scrutiny to the state's asserted interests in increasing voter education, treating candidates equally, and ensuring political stability even in light of a non-severe burden).[4]

Here, too, the state's asserted interests — security, uniformity, voter assistance, and voter confidence — are perfectly legitimate values in the abstract.

---

[4] For a closer examination of how *Anderson* scrutinized state interests in light of a non-severe burden, see the *League* Plaintiffs' post-trial brief at ECF No. 649 at 88-90.

But the Secretary fails at that next step; that is, to show that these values are highly significant in this context, and to show that the Drop Box Provisions actually advance and are necessary to accomplish those interests (or are narrowly tailored to those interests, if this Court finds a severe burden).

Take, for example, the state interest of uniformity. The Secretary argues that the Drop Box Provisions, including the Hours Restrictions, promote uniformity because they provide for "standardize[d] dates and times where drop boxes can be provided," ECF No. 764 at 18, as if that itself were a compelling state interest that could not be accomplished if drop boxes were permitted to be offered before and after early voting hours, which of course it could. At the same time, the Secretary concedes that the Hours Restrictions "allow[] some discretion and variability," ECF No. 764 at 18, and makes no effort to show that the purported interest in uniformity, even if compelling or important, is even accomplished here. In fact, the opposite is true: for the reasons Plaintiffs laid out in their opening brief, the record shows that SB 90's Hours Provisions — especially in combination with the other Drop Box Provisions — will exacerbate differences in drop box availability across Florida's 67 counties. *See* ECF No. 763 at 42-43. Accomplishing uniformity on paper but not in practice is not the kind of sufficiently weighty state interest that can justify burdens on voters. *See*, *e.g.*, *Anderson*, 460 U.S. at 797-98 (rejecting state's assertion

20

that state interest in voter education was actually served by state's primary deadline in practice).

The same dynamic is true of the state's purported interests in voter assistance and voter confidence. As Plaintiffs have argued, the Drop Box Provisions do not actually serve the interest of assisting voters or inspiring voter confidence if they make it substantially harder to access drop boxes in the first place. *See* ECF No. 763 at 44-47. The Secretary ignores this obvious conclusion, instead focusing on the individual interaction between an election worker and a voter, *see* ECF No. 764 at 18-19, which is helpful to that voter only if the voter manages to reach the drop box in the first place in light of SB 90's onerous requirements. Of course, even before SB 90, nothing precluded Supervisors from providing this kind of assistance, and they are free to provide it, as Supervisor White testified Miami-Dade did prior to SB 90, *see* Day 12 Tr. 3152:9-11, even if SB 90's Drop Box Provisions are enjoined.

A final note on security. Plaintiffs do not contest that security is an important interest in the abstract, and they do not contest that physical, in-person monitoring could, in theory, advance the security of drop boxes.[5] But the record in this case does not establish that physical, continuous, in-person monitoring of drop boxes by a

---

[5] Although the Secretary now contends that the Hours Restrictions promote security, there is nothing about offering drop boxes before or after early voting days (or hours) that could make drop boxes less secure if the drop box is independently required to be secure. *See* ECF No. 763 at 40-41 & n.8.

Supervisor's employee (not even by a volunteer or a law enforcement officer) in fact advances security or is necessary to accomplish that interest. The Supervisors themselves — the actual subject matter experts — testified to this. As Plaintiffs showed, the Florida Supervisor of Elections Association (FSE), which is a "bipartisan group" of all 67 Supervisors, ECF 549-3, 91:19-24 (Supervisor Latimer), consistently opposed SB 90. As FSE's President-elect, Supervisor Earley, explained at trial, "I don't think [FSE] ever made a statement as an association, certainly, that it was a necessary change in statute or necessary bill, just the opposite. I think we said repeatedly it was not." Tr. Day 9, 2670:20-2671:1; *see also* Tr. Day 5, 1381:6-1382:5 (Supervisor White testifying that nothing in SB 90 was necessary for secure elections). Supervisor Hays, in particular, who before SB 90 used camera-based monitoring of drop boxes, testified that SB 90's physical, continuous, in-person monitoring requirement was "absurd." ECF No. 549-2 at 85:10-14. As he explained, camera-based monitoring "is very secure," and he had no reason to believe an in-person monitoring requirement would increase election security. *Id.* at 86:6-15, 144:25-145:3.

Although the Secretary contends that the Eleventh Circuit found the "record" includes "undisputed evidence of fraud," ECF No. 764 at 16 (citing *LWVFL*, 66 F.4th at 925-28), that discussion concerned evidence of fraud in absentee ballot collection or absentee ballot request. The Secretary does not suggest the Drop Box Provisions

actually guard against this kind of fraud — just that the In-Person Monitoring Requirement guards against "individuals who wish to tamper with a drop box and potentially destroy ballots." ECF No. 764 at 16. The Secretary asserts the "record identifies instances where drop boxes have been tampered with," *id.*, but the testimony cited for this proposition concerns vandalization of a post office box, not a drop box, and drop box vandalization in California and Massachusetts, not Florida, the circumstances of which were not before this Court. *See* Tr. 3439:6-12 (Matthews). No Supervisor testified differently. *See, e.g.*, Tr. 3154:2-20 (Supervisor White confirming, "we did not have any circumstances like that arise").

In the end, none of the purported state interests for the Drop Box Provisions — especially when scrutinized in light of its individual requirements (the In-Person Monitoring Requirement, the Hours Restrictions, and the Enforcement Penalty) — adequately justify the burdens that the Drop Box Provisions impose on Florida voters. Reaching that conclusion would not mean that rules around drop boxes are always unjustifiably burdensome. It simply means that these specific restrictions, in these circumstances, and on this record, cannot be justified.

## III.   SB 90'S REGISTRATION DELIVERY PROVISION DOES NOT PASS CONSTITUTIONAL MUSTER UNDER *ANDERSON-BURDICK*

Based on extensive evidence adduced at trial, Plaintiffs' opening brief demonstrated that the Registration Delivery Provision unduly burdens Florida

voters' right to vote and is inadequately supported by a state interest. *See* ECF No. 763 at 55-62.

The Secretary offers no persuasive response. Instead, the Secretary insists the Court should ignore the extensive trial evidence establishing that the law's burdens are severe. Beyond that, the Secretary asserts *post-hoc* state interests in 3PVROs "delivering forms late" and "timely processing registration forms" to justify the law. ECF No. 764 at 25-26. But careful examination of the record cites in the Secretary's brief confirms that there is ***no*** evidence of this interest — ***none*** — in the legislative record. Nor is there any evidence in the record that these interests are advanced by the Registration Delivery Provision: to the contrary, as discussed below, there was extensive evidence adduced at trial that 3PVRO compliance with the Registration Delivery Provision delays 3PVROs in submitting registration forms to election officials.

Accordingly, the Court should find that the severe burden exacted by the Registration Delivery Provision is not justified by any compelling or sufficient state interest.

## A. The Court Can and Should Enjoin the Registration Delivery Provision Regardless of the Superseding Legislation

The Secretary's first contention is that the Court should refuse to consider Plaintiffs' challenge to the Registration Delivery Provision because it was subsequently amended by SB 7050 and "this case is a challenge to SB90, not

SB7050" and even if "this Court affords relief against SB90, SB7050 is still on the books." ECF No. 764 at 20-21.

This argument is a red herring. The fact that the statutory provision at issue has been subsequently amended is irrelevant. Here, Plaintiffs ask this Court to enjoin enforcement of a *statutory provision* — namely, Fla. Stat. § 97.0575(5)(a) — as an undue burden on the right to vote. *See generally* No. 4:21-cv-00201, ECF No. 59 ¶ 129 (noting that the registration delivery provision is codified at Fla. Stat. § 97.0575); ECF No. 309 (enjoining enforcement of "the registration delivery provision described in section 97.0575(3)(a)").

The subsequent modifications to the statutory language have not changed that the statute still requires that the form must be delivered to the "supervisor of elections in the county in which the applicant resides." Fla. Stat. § 97.0575(5)(a). And Plaintiffs adduced extensive evidence at trial that the burden on voters is being driven by compliance and logistical requirements of complying with getting forms to the correct county. There was extensive testimony from 3PVROs at trial that they needed to adapt their compliance and logistics procedures and expend significant additional resources to comply with the requirement that forms be delivered to the "supervisor of elections in the county in which the applicant resides." Tr. Day 3, 731:16-732:1, 769:18-770:9, 775:7-776:14, 800:6-16 (Vélez Burgos); Tr. Day 5, 1418:3-1419:1, 1424:13-1425:12, 1427:5-1428:1, 1429:4-12, 1429:16-1430:1,

1430:12-1431:24, 1433:8-16 (Nordlund); Tr. Day 7, 2040:16-2041:7, 2042:6-2043:3, 2043:12-2044:14 (Mercado); Tr. Day 1, 207:24-208:15, 210:6-211:3 (Garces). As testimony from Supervisors confirmed, those impacts on 3PVROs will ultimately make it harder for voters to vote by burdening people like the over 760,000 Florida voters who rely on 3PVROs to register to vote and threatening to disenfranchise some Floridians altogether. *See* Tr. Day 4, 1216:5-8, 17-18 (Scott); Tr. Day 9, 2666:6-11 (Earley), 2566:18-2567:23 (Smith). Nothing in SB 7050 or any other law has altered the requirement that forms be delivered to the applicant's county of residence. For the Secretary to suggest now that the record evidence supporting Plaintiffs' claim is "stale" and "based on a now-written-over election regulation" is disingenuous and, ultimately, beside the point.

To be sure, SB 7050's amendments to Fla. Stat. § 97.0575(5)(a) made the Registration Delivery Provision *more* burdensome than as enacted in SB 90, because it (i) *reduced* the 14-day compliance period to 10 days and (ii) *increased* the fines imposed for violations. *See* ECF No. 763 at 16-17, 61-62. The Secretary suggests that the obvious supplemental burden associated with these changes is "speculation" because Plaintiffs "submitted no evidence of how SB7050 affects voters, 3PVROs, and election administrators."[6] ECF No. 764 at 21. But it is not speculative to

---

[6] The Secretary's argument is disingenuous, because (as the Secretary is well aware) this Court directed upon remand that it would not re-open the record for further (continued…)

conclude that, because 3PVRO witnesses testified that the delivery requirement deadline posed significant hardships and was difficult to meet, *see* Tr. Day 5, 1429:4-18, 1430:12-1432:7 (discussing the burdens imposed by having to mail or hand-deliver voter registration applications in order to "turn them in within the deadline") (Nordlund); Tr. Day 7, 2042:6-15, 2043:14-2044:1 (hiring new quality control managers to ensure delivery "before the State's deadline") (Mercado); Tr. Day 1, 208:4-25 (using priority mail because of deadline) (Garces), that shortening that period and imposing draconian fines for noncompliance would increase the burden. The Secretary's suggestion, ECF No. 764 at 21, that SB 7050 could in any way lessen the burden on 3PVROs is absurd.

At bottom, the Secretary's opening argument is an irrelevant distraction. Plaintiffs ask this Court to again enjoin enforcement of "the registration delivery provision described in section 97.0575[]," No. 4:21-cv-00201, ECF No. 309, as an undue burden on the right to vote. Indeed, if the enactment of a superseding and *more onerous* law meant that a suit challenging the prior law was moot, the Legislature could simply evade judicial review by amending challenged provisions year-after-year. The Secretary offers no authority for this novel theory for evading judicial review, and this Court can and should enjoin Fla. Stat. § 97.0575(5)(a).

---

evidence. ECF No. 755. So, too, is the Secretary's complaint that "the Secretary has had no opportunity to admit evidence to the contrary." ECF No. 764 at 21.

**B.**     **The Trial Evidence Demonstrated that the Burden Imposed by the Registration Delivery Provision Is Severe**

Plaintiffs' opening brief established that the Registration Delivery Provision imposes a severe burden on Florida voters. *See* ECF No. 763 at 55-62. The Secretary's response is wrong on the law and wrong on the record.

On the law, the Secretary wrongly contends that, as a matter of law, the Registration Delivery Provision's racially discriminatory disparate impact on Black voters cannot alone establish that the law's burden is severe for purposes of an *Anderson-Burdick* analysis. ECF No. 764 at 22-23. They insist Plaintiffs must show burden as to the whole electorate, rather than one subgroup. *Id.* But that is incorrect. Indeed, this Court has previously rejected this same argument from the Secretary. *See* No. 4:21-cv-00201, ECF No. 201 at 39-40 ("If Defendants' . . . argument looks familiar, it is because this Court has already rejected it. *See League of Women Voters of Fla., Inc. v. Detzner*, 314. F.Supp. 3d 1205, 1216 (N.D. Fla. 2018)). As this Court previously recognized, No. 4:21-cv-00201, ECF No. 201 at 40-41, in *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181 (2008), a majority of the Supreme Court agreed that courts may consider a law's impacts on a subgroup for whom the burden may be more severe when applying the *Anderson-Burdick* test. *See Crawford*, 553 U.S. at 199-203 (plurality opinion), 212-17 (dissenting opinion); *see also, e.g., Pub. Integrity All. v. City of Tuscon*, 836 F.3d 1019, 1024 n.2 (9th Cir. 2016). Indeed, in *Anderson* itself, the Supreme Court assessed the burden imposed by the challenged

28

law by looking to its impact on "an identifiable segment of Ohio's independent-minded voters," rather than assessing whether the law burdened all voters. *Anderson*, 460 U.S. at 792. Accordingly, the Registration Delivery Provision's disparate impact on Black Floridians, in particular, is enough to conclude its burdens are severe and trigger strict scrutiny.

On the record, even if *Anderson-Burdick* required a showing of burden "on the whole electorate," the Secretary wrongly asserts that the evidence at trial did not demonstrate burdens to Florida's electorate as a whole. To the contrary, Plaintiffs adduced substantial evidence demonstrating the burdens exacted by the law would affect a substantial proportion of *all* Florida voters. Expert testimony from Dr. Herron and Dr. Smith established that, as of August 2021, the *lower limit* of Florida voters that had relied on 3PVROs to register was over 760,000, or five percent of voters (and both noted the actual number of voters who registered through 3PVROs was significantly higher). Tr. Day 9, 2567:20-2569:12 (Smith); ECF No. 608-6 ¶¶ 40-42 (Smith Rpt.); ECF No. 608-1 ¶¶ 257-61 & Table 30 (Herron Rpt.). Moreover, the trial evidence established that prior restrictions on 3PVROs have exacted burdens on Florida's electorate as a whole, with prior legislation causing "a drop in *total* voter registrations of roughly five percentage points." ECF No. 608-1 ¶ 248 (comparing effect of HB 1355 in 2007 and 2011).

As for the Registration Delivery Provision, Dr. Smith presented analysis concluding that the law "burdens *eligible Florida citizens*, but particularly persons of color, from registering to vote due to restrictions placed on 3PVROs." ECF No. 608-6 ¶ 31 (emphasis added). To be clear, Dr. Smith concluded the law burdened *all* eligible Floridians, not just persons of color (who bore an outsize burden). Further, Dr. Herron also testified to the law's burdens on *all* voters — regardless of race — that rely on 3PVROs to register to vote, due to the law's overall impact on the cost of voting. *See* Tr. Day 8, 2294:25-2295:6 (Herron); *see also* 2295:7-2296:18 (discussing decrease in voter registration rates resulting from restrictions on 3PVROs), 2301:3-11 (quantifying Florida voters who rely on 3PVROs to register), 2332:2-2333:10 (discussing overall impact of 3PVRO restrictions). Accordingly, there is ample evidence in the trial record to conclude that the Registration Delivery Provision burdens *all* Florida voters, in addition to its racially discriminatory impact on Black and Hispanic voters.

The errors in the Secretary's analysis don't stop there. The Secretary further wrongly contends that because "3PVROs are but one of several means to register" in Florida, Plaintiffs' purported failure to consider "how many voters won't be registered to vote *and won't register to vote using an alternative registration method*" stops this Court from concluding the law's burden is severe. *See* ECF No. 764 at 23 (emphasis in original). In particular, they insist the law's burdens must be

evaluated "in light of all of the ways that a voter may register to vote," citing *New Georgia Project* in support.[7] *Id.* But again, the Secretary is wrong on the law, and is wrong on the record.

On the law, as explained in Section I *supra*, courts have long applied *Anderson-Burdick* to regulations that affect "only" one method of voting, and this Court already concluded that a plaintiff in an *Anderson-Burdick* case does not need to provide "proof that there was no possibility that the plaintiffs would find a way to adjust and vote through remaining options." *See* No. 4:21-cv-00201, ECF No. 201 at 37. Likewise, Plaintiffs need not prove here that the law burdens *all* methods of registering to vote to establish its burdens are severe.

On the record, the Secretary's speculative contention that voters who rely on 3PVROs would simply turn to an alternative registration method, ECF No. 764 at 23, has no support in the record and is directly refuted by the evidence presented at trial that 3PVROs meet a persistent need to reach eligible voters who are not otherwise registering. That is the case for eligible Floridians who are unable to register online because they lack access to the internet or a computer, Tr. Day 1, 262:1-17, 272:19-273:2 (McCoy), or unable to register in person because they lack access to a vehicle, Tr. Day 2, 629:3-8 (Cooper). As Dr. Smith found, many eligible

---

[7] As noted earlier, *New Georgia Project* is a non-binding stay panel decision written "only for the parties' benefit" which does not "hav[e] an effect outside that case." *New Ga. Project*, 976 F.3d at 1280 n.1.

Floridians "do not have alternatives" to 3PVROs to register to vote for those reasons (and others), and even when they do, alternative methods like online registration "are not always reliable in Florida." ECF No. 608-6 ¶¶ 43-44 (Smith Rpt.). Furthermore, 3PVRO witnesses testified that they registered eligible voters unable to use alternative registration methods. *See, e.g.,* Tr. Day 5, 1494:9-1495:11 ("When the State launched their online website, we got a lot of complaints from voters that couldn't navigate that website and were turned away from . . . registering to vote.") (Nordlund); Tr. Day 1, 261:23-262:17, 274:14-276:24 (describing focus on registering voters who face barriers to online and in-person registration, such as lack of internet access, driver's license, and transportation); *see also* Tr. Day 9, 2666:6-11 (Supervisor agreeing that 3PVROs reach voters who would not otherwise be reached) (Earley).

The Secretary offered no evidence to support his speculative supposition that some substitution effect mitigates the law's burden on Florida's eligible, but unregistered, voters. ECF No. 764 at 23. And the evidence in the record was to the contrary. As Dr. Herron testified, decreases in *total* voter registration caused by restrictions placed on 3PVROs in Florida — like the Registration Delivery Provision — are not abated by the availability of alternative registration methods. Instead, "individuals who are affected by . . . restrictions on 3PVROs did not simply switch to another form of voter registration," because "when [registering with

3PVROs] was difficult, *they basically didn't register to vote*." Tr. Day 8, 2296:3-15 (Herron) (emphasis added); *see also* ECF No. 608-1 at ¶ 248 (Herron Rpt.).

The evidence adduced at trial shows that the Registration Delivery Provision imposes a severe burden on registering to vote in Florida, both for Black residents, but also for all eligible persons. Accordingly, the Court should conclude that the Registration Delivery Provision imposes a severe burden on the right to vote.

### C.   The State's Interest in the Registration Delivery Provision Is Insufficient to Justify Its Burden on Voters

Because the Registration Delivery Provision imposes a severe burden on the right to vote, the State's asserted interest must satisfy strict scrutiny. *Norman v. Reed*, 502 U.S. 279, 288-89 (1992); *Democratic Exec. Comm.*, 915 F.3d at 1318. In evaluating the State's purported interest, the Court must look to the Legislature's contemporaneous articulation of purpose, rather than post-hoc justifications. *Bethune-Hill v. Va. State Bd. of Elections*, 580 U.S. 178, 189-90 (2017). Here, Plaintiffs' opening brief set forth several reasons why the State's purported interests fall far short of justifying the Registration Delivery Provision's racially discriminatory burden on Black and Hispanic voters or its burden on Florida voters generally. ECF No. 763 at 63-69.

In response, the Secretary again asserts *post-hoc* justifications for the Registration Delivery Provision — preventing "turning in voter registration forms after the registration deadline" and "burdening the supervisors" — and argue that

this interest "surpasses strict scrutiny." ECF No. 764 at 24. In support, they cite six passages of trial testimony from Maria Matthews and David Ramba, and contend that "[b]oth Director Matthews and Mr. Ramba spoke with the Florida Legislature about 3PVRO issues . . . concerning late-submission and form dumping" and such testimony sufficiently establishes the *Legislature's* contemporary purpose in enacting the Registration Delivery Provision. *Id.* at 25 (arguing that "[c]onversations and other shared concerns [that] are not hypothesized or post hoc.").

In evaluating the Secretary's evidence of the justification for the Registration Delivery Provision, the Court should bear in mind three things.

First, the Secretary effectively concedes that the State's purported interest in the law was never articulated in the Legislative record. The record, in fact, includes, extensive legislative transcripts and a voluminous production from the Legislature, and *the Secretary doesn't cite **anything*** from it — not one exchange from the legislative debates, not one document. Instead, the Secretary is left with his argument that "contemporaneous justifications aren't limited to things said or done on the legislative record." *See id.* at 24-25. The Secretary's failure to point to anything from the legislative record is telling.

Second, careful examination of each of the Secretary's citations to Ms. Matthews and Mr. Ramba's testimony confirms that ***none*** of the cited passages corroborates the Secretary's assertion that Matthews or Ramba contemporaneously

conveyed the post-hoc interest "concerning late-submission and form dumping" to the Legislature, through "conversations" or otherwise. *See* ECF No. 764 at 24-27 (citing Tr. 3119:8–3120:18, 3397:13-24, 3402:18-22, 3409:25, 3413:15-22, 3426:14-20); *see also id.* at 5 (citing Tr. 3421:25-3422:3).

Specifically, the testimony the Secretary cites from Ms. Matthews established only that she had answered unspecified questions from the Legislature about 3PVROs and nothing further. *See* Tr. Day 13, 3397:13-24 (stating the Florida Department of State "did get asked [by the Legislature] about . . . [3PVROs]" and nothing further), 3402:18-22 (stating that she had "interactions with [legislators] through emails"[8] and nothing about 3PVROs), 3409:25 (stating the Legislature "wanted to know about [3PVROs]" and nothing further), 3413:15-22 (stating she had relayed information received from the Florida Department of State's complaint process to the Legislature "related to voter registration," not 3PVROs), 3421:25-3422-3 & 3426:14-20 (no discussion of interactions with Legislature) (Matthews). Similarly, the single passage of Mr. Ramba's testimony the Secretary cites does not establish that Mr. Ramba (or anyone else) ever conveyed to the Legislature purported Supervisor concerns with form dumping. *See* Tr. Day 11, 3119:13-3120:18 (stating only that *Supervisors* did not feel "it was [their] responsibility to be

---

[8] Defendants have notably failed to identify any such emails from the productions from the Secretary or the Legislature that corroborate their assertion that these communications concerned "form dumping" or "late submission."

[3PVROs'] assistant and separate out their files for them," not that this was conveyed to the Legislature) (Ramba).

In sum, the Secretary points to no trial evidence showing that the State's purported interest in the law was contemporaneously considered or viewed as important by the Legislature. Indeed, examination of the evidence the Secretary cites confirms that there is no State interest beyond the kind of disallowed post-hoc justification created solely to justify the challenged law in this litigation.

Third, even if the Court were to consider the State's *post-hoc* interest, the Secretary has failed to show that the Delivery Restriction Provision is tailored or in any way actually advances that interest. Take the State's purported interest in reducing late submissions, or as Ms. Matthews testified, that the Delivery Restriction Provision advances "ensur[ing] . . . the application is more timely processed," Tr. Day 13, 3426:3-6 (Matthews). The evidence at trial, however, showed that there is a complete disconnect between this purported interest and the Delivery Restriction Provision, which required 3PVROs to adopt significant new compliance and logistics measures to ensure registration forms were delivered to the correct county. Tr. Day 3, 731:16-732:1, 769:18-770:9, 775:7-776:14, 800:6-16 (Vélez Burgos); Tr. Day 5, 1418:3-1419:1, 1424:13-1425:12, 1427:5-1428:1, 1429:4-12, 1429:16-1430:1, 1430:12-1431:24, 1433:8-16 (Nordlund); Tr. Day 7, 2040:16-2041:7, 2042:6-2043:3, 2043:12-2044:14 (Mercado); Tr. Day 1, 207:24-208:15, 210:6-

211:3 (Garces). The 3PVRO witnesses testified about how these additional procedures slowed their processing of application forms, and delayed the processing and submission of forms. Tr. Day 1, 207:24-209:15, 210:13-211:23 (Garces); Tr. Day 3, 729:21-732:1, 761:1-20, 769:18-770:4 (Vélez Burgos); Tr. Day 5, 1416:5-1419:5, 1428:9-1434:2, 1437:12-1439:6 (Nordlund); Tr. Day 7, 2039:18-2043:3 (Mercado). The Secretary cites nothing from the trial record — and there is nothing in the trial record — that established that implementation of the Registration Delivery Provision actually advances more rapid processing of voter registration forms. As noted in the opening brief, there is no "fit" between the purported interest and the restriction, as required by *Anderson-Burdick*. *See Anderson*, 460 U.S. at 789, 796.

Furthermore, as explained in Plaintiffs' opening brief, the record evidence supporting the State's purported interest in alleviating some vague administrative burden on Supervisors is weak, at best, and far from compelling. *Id.* at 68. Even assuming some administrative burden could be established, the State's interest in relieving that burden is far from sufficient to justify the law's severe, racially discriminatory burden on the right to vote. *Id.* at 69.

Accordingly, the Court should find that the State's interest does not justify the severe burden exacted by the Registration Delivery Provision.

## CONCLUSION

For the foregoing reasons, the Court should declare that both the Drop Box Provisions and the Registration Delivery Provision violate the First and Fourteenth Amendments and should enjoin enforcement of these provisions.

DATE: February 5, 2024    Respectfully submitted,

<table>
<tr><td>

*/s/ David R. Fox*
Frederick S. Wermuth
Florida Bar No. 184111
Thomas A. Zehnder
Florida Bar No. 63274
KING, BLACKWELL, ZEHNDER &
WERMUTH, P.A.
P.O. Box 1631
Orlando, FL 32802
(407) 422-2472
fwermuth@kbzwlaw.com
tzehnder@kbzwlaw.com

Elisabeth C. Frost*
David R. Fox*
Christina A. Ford
Florida Bar No. 101634
ELIAS LAW GROUP LLP
250 Massachusetts Avenue NW
Suite 400
Washington, DC 20001
(202) 968-4490
efrost@elias.law
dfox@elias.law
cford@elias.law

Counsel for *League* Plaintiffs

</td><td>

/s/ *Benjamin Duke*
P. Benjamin Duke*
Covington & Burling LLP
620 Eighth Avenue
New York, NY 10018
(212) 841-1000
pbduke@cov.com

Cyrus Nasseri*
Covington & Burling LLP
850 Tenth Street, NW
Washington, DC 20001
(202) 662-6000
cnasseri@cov.com

Ellen Y. Choi*
Covington & Burling LLP
415 Mission Street
San Francisco, CA 94105
(415) 591-6000
echoi@cov.com

Morenike Fajana*
NAACP Legal Defense & Educational
Fund, Inc.
40 Rector Street, 5th Floor
New York, NY 10006
(212) 965-2200
mfajana@naacpldf.org

</td></tr>
</table>

Amia Trigg*
NAACP Legal Defense & Educational
Fund, Inc.
700 14th Street, NW, Suite 600
Washington, DC 20005
(202) 682-1300
atrigg@naacpldf.org

Nellie L. King
Fla. Bar No. 0099562
The Law Offices of Nellie L. King,
P.A.
319 Clematis Street, Suite 107
West Palm Beach, FL 33401
(561) 833-1084
Nellie@CriminalDefenseFla.com

Counsel for *NAACP* Plaintiffs

/*s/ John A. Freedman*
John A. Freedman*
Jeremy C. Karpatkin
Elisabeth S. Theodore*
Daniel R. Bernstein*
Sam I. Ferenc*
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Avenue, NW
Washington, D.C. 20001-3743
(202) 942-5000
John.Freedman@arnoldporter.com
Jeremy.Karpatkin@arnoldporter.com
Elisabeth.Theodore@arnoldporter.com
Daniel.Bernstein@arnoldporter.com
Sam.Ferenc@arnoldporter.com

39

Jeffrey A. Miller*
Arnold & Porter Kaye Scholer LLP
3000 El Camino Road
Five Palo Alto Square, Suite 500
Palo Alto, CA 94306-3807
(650) 319-4500
Jeffrey.Miller@arnoldporter.com

Aaron Stiefel *
Andrew R. Hirschel*
Arnold & Porter Kaye Scholer LLP
250 West 55th Street
New York, NY 10019-9710
(212) 836-8000
Aaron.Stiefel@arnoldporter.com
Andrew.Hirschel@arnoldporter.com

Miranda Galindo
LatinoJustice, PRLDEF
523 W. Colonial Drive
Orlando, FL 32804
(321) 418-6354
Mgalindo@latinojustice.org

Estee Konor *
DEMOS
80 Broad Street, 4th Floor
New York, NY 10004
(212) 633-1405
ekonor@demos.org

Judith Browne Dianis*
ADVANCEMENT PROJECT
1220 L Street, NW
Suite 850
Washington, DC 20005
(202) 728-9557
Jbrowne@advancementproject.org

40

Counsel for *Florida Rising Together* Plaintiffs

\* Admitted *Pro Hac Vice*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on February 5, 2024 I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record registered to receive notifications.

*/s/ Frederick S. Wermuth*
Frederick S. Wermuth
Florida Bar No. 0184111

*Counsel for League Plaintiffs*

41